ORAL ARGUMENT NOT YET SCHEDULED

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**No. 24-3021**

---

**UNITED STATES OF AMERICA,**
*Plaintiff-Appellee,*

**v.**

**MURALI YAMAZULA VENKATA,**
*Defendant-Appellant.*

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

---

**APPENDIX FOR APPELLANT
VOLUME II OF VIII**

---

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

MATTHEW L. FARLEY
Assistant Federal Public Defender
625 Indiana Ave. NW, Suite 550
Washington, D.C. 20004
(202) 208-7500
Matthew_Farley@fd.org

District Court
Cr. No. 20-066-RDM-2

# Appendix – Volume II
## Table of Contents

### ECF Filings

Motion for a New Trial.............................................................. A0252
05/20/22 [ECF No. 166]

Gov. Response to Motion for New Trial................................... A0303
06/10/22 [ECF No. 169]

Def. Reply in Support of Motion for New Trial ........................ A0335
06/25/22 [ECF No. 170]

Gov. Supplement to Response to Motion for New Trial........... A0369
09/06/23 [ECF No. 209]

Def. Reply to Gov. Supplement................................................ A0380
10/03/23 [ECF No. 211]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 20-cr-00066-2 |
| v. | Honorable Randolph D. Moss |
| MURALI YAMAZULA VENKATA, | |
| Defendant. | |

### DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL

Pursuant to Federal Rules of Criminal Procedure 29 and 33, Mr. Venkata respectfully moves this Honorable Court to enter a judgment of acquittal on all counts or, in the alternative, to grant him a new trial on all counts.

Respectfully submitted,

/s/ Kamil R. Shields

Kamil R. Shields
Pardis Gheibi (*pro hac vice*)
Tara N. Ohrtman (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W. Suite 700
Washington, D.C. 20006-5215
Telephone: (202) 956-7040
Facsimile: (202) 956-7676
Email: shieldska@sullcrom.com
Email: gheibip@sullcrom.com
Email: ohrtmant@sullcrom.com

Katherine M. Savarese (*pro hac vice*)
Jared H. Rosenfeld (*pro hac vice*)
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000

Facsimile: (212) 558-3588
Email: savaresek@sullcrom.com
Email: rosenfeldj@sullcrom.com

Michelle Peterson
Chief Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C. 20004
Telephone: (202) 208-7500
Email: Shelli_Peterson@fd.org

May 20, 2022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

MURALI YAMAZULA VENKATA,

Defendant.

Case No. 20-cr-00066-2

Honorable Randolph D. Moss

**HEARING REQUESTED
PURSUANT TO LCRR 47(F)**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTIONS FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL

Kamil R. Shields
Pardis Gheibi (*pro hac vice*)
Tara N. Ohrtman (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W. Suite 700
Washington, D.C. 20006-5215
Telephone: (202) 956-7040
Facsimile: (202) 956-7676
Email: shieldska@sullcrom.com
Email: gheibip@sullcrom.com
Email: ohrtmant@sullcrom.com

Katherine M. Savarese (*pro hac vice*)
Jared H. Rosenfeld (*pro hac vice*)
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: savaresek@sullcrom.com
Email: rosenfeldj@sullcrom.com

Michelle Peterson
Chief Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C. 20004
Telephone: (202) 208-7500
Email: Shelli_Peterson@fd.org
*Attorneys for Defendant*

May 20, 2022

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ...................................................................1

STANDARD OF REVIEW ..........................................................................1

ARGUMENT ..............................................................................................2

I.   THE GOVERNMENT'S CONSPIRACY TO DEFRAUD AND WIRE FRAUD
     THEORY IS WHOLLY UNSUPPORTED BY THE EVIDENCE ...........................2

     A.   The Government Did Not Prove Any Scheme To Defraud ....................3

     B.   The Government Did Not Prove An Interstate Wire ...........................6

II.  THE GOVERNMENT'S THEFT THEORY FAILS AS A MATTER OF LAW AND
     IS AGAINST THE WEIGHT OF THE EVIDENCE ......................................7

     A.   The Government Has Not Advanced A Cognizable Stealing Theory ....7

     B.   The Government Did Not Prove Serious Interference..........................8

     C.   The Government Did Not Prove Involvement Or Assistance By Mr. Venkata In
          Any Conversion ...............................................................................12

     D.   The Government Did Not Prove That The Converted Property Had A Value Of
          More Than $1,000..............................................................................13

III. THE GOVERNMENT'S EXPANSIVE AND ILL-DEFINED THEORY OF
     AGGRAVATED IDENTITY THEFT FAILS AS A MATTER OF LAW ...............14

     A.   The Government Did Not Prove That Mr. Venkata Used Any PII Deceptively to
          Facilitate Wire Fraud Or Theft Of Government Property ....................16

          1.   Section 1028A Requires Proof Of Deceptive Use ....................16

               a.   The Statutory Structure Supports A Deceptive Use Requirement.17

               b.   The Legislative History Supports A Deceptive Use Requirement 18

               c.   Other Circuits Have Uniformly Required Deceptive Use ............19

          2.   The Government Did Not Prove Any Deceptive Use By Mr. Venkata.....21

     B.   The Government Did Not Prove That Any Use of Mr. Balfour's PII Was Integral
          To The Alleged Wire Fraud Or Theft Of Government Property ..........23

IV.  THE GOVERNMENT'S DESTRUCTION OF RECORDS THEORY IS
     UNSUPPORTED BY THE EVIDENCE ...................................................25

V.   THE JURY WAS WRONGLY INSTRUCTED ON THE CONSPIRACY CHARGE
     AND WRONGLY DENIED A DEFENSE THEORY OF THE CASE ...................29

     A.   The Jury Should Have Been Properly Instructed On The Nature Of The Alleged
          Conspiratorial Agreement For The Conspiracy Charges......................30

**B.**     The Theory of Defense Instruction Erroneously Excluded An Instruction
Concerning Apparent Authority ...........................................................................35

**CONCLUSION** ...........................................................................................................40

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Abbott* v. *United States*,
239 F.2d 310 (5th Cir. 1956) ................................................................13

*Apprendi* v. *New Jersey*,
530 U.S. 466 (2000) ......................................................................12, 13

*Attias* v. *Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) ...........................................................23

*Braverman* v. *United States*,
317 U.S. 49 (1942) ......................................................................31, 34

*Brooke* v. *United States*,
385 F.2d 279 (D.C. Cir. 1967) ...........................................................36

*Churder* v. *United States*,
387 F.2d 825 (8th Cir. 1968) ...........................................................14

*Council on Am.-Islamic Rels. Action Network, Inc.* v. *Gaubatz*,
793 F. Supp. 2d 311 (D.D.C. 2011) .....................................................9

*Flores-Figueroa* v. *United States*,
556 U.S. 646 (2009), 2009 WL 191837 ...............................................19

*Fulks* v. *United States*,
283 F.2d 259 (9th Cir. 1960) ...........................................................13

*Furash & Co., Inc.* v. *McClave*,
130 F. Supp. 2d 48 (D.D.C. 2001) .......................................................9

*Harper & Row Publishers, Inc.* v. *Nation Enters.*,
723 F.2d 195 (2d Cir. 1983) .............................................................9

*Joy* v. *Bell Helicopter Textron, Inc.*,
999 F.2d 549 (D.C. Cir. 1993) .......................................................36, 37

*Laughlin* v. *United States*,
385 F.2d 287 (D.C. Cir. 1967) .......................................................37, 39

*Laughlin* v. *United States*,
474 F.2d 444 (D.C. Cir. 1972) ....................................................37, 38, 39

(Page 8 of Total)

*Levine* v. *United States*,
    261 F.2d 747 (D.C. Cir. 1958) ...................................................................36, 38

*Muscarello* v. *United States*,
    524 U.S. 125 (1998) ...................................................................................16, 23

*Neder* v. *United States*,
    527 U.S. 1 (1999) .............................................................................................36

*Pearson* v. *Dodd*,
    410 F.2d 701 (D.C. Cir. 1969) .........................................................................8

*Reynolds* v. *East Dyer Dev. Co.*,
    882 F.2d 1249 (7th Cir. 1989) .........................................................................3

*Salley* v. *United States*,
    353 F.2d 897 (D.C. Cir. 1965) .......................................................................39

*Smith* v. *United States*,
    508 U.S. 223 (1993) ...................................................................................15, 16

*Tatum* v. *United States*,
    190 F.2d 612 (D.C. Cir. 1951) .........................................................................2

*United States* v. *Akhigbe*,
    642 F.3d 1078 (D.C. Cir. 2011) .....................................................................36

*United States* v. *Barlow*,
    470 F.2d 1245 (D.C. Cir. 1972) .......................................................................7

*United States* v. *Beard*,
    713 F. Supp. 285 (S.D. Ind. 1989) ...............................................................12

*United States* v. *Berroa*,
    856 F.3d 141 (1st Cir. 2017) ...............................................................20, 21, 26

*United States* v. *Bigelow*,
    728 F.2d 412 (9th Cir. 1984) .........................................................................13

*United States* v. *Binday*,
    804 F.3d 558 (2d Cir. 2015) ...........................................................................3, 6

*United States* v. *Collins*,
    56 F.3d 1416 (D.C. Cir. 1995) ...............................................................8, 9, 11

*United States* v. *Dale*,
    991 F.2d 819 (D.C. Cir. 1993) .........................................................................2

*United States* v. *DiGilio*,
   538 F.2d 972 (3d Cir. 1976) ........................................................13, 14

*United States* v. *Dubin*,
   27 F.4th 1021 (5th Cir. 2022) ..............................................22, 24, 25

*United States* v. *E.I. du Pont de Nemours & Co.*,
   2022 WL 161332 (S.D. Tex. Jan. 18, 2022) ....................................12

*United States* v. *Gagarin*,
   950 F.3d 596 (9th Cir. 2020) ......................................................20, 25

*United States* v. *Garrett*,
   898 F.3d 811 (8th Cir. 2018) ..............................................................36

*United States* v. *Gatwas*,
   910 F.3d 362 (8th Cir. 2018) ......................................................21, 24

*United States* v. *Harris*,
   983 F.3d 1125 (9th Cir. 2020) ..........................................................24

*United States* v. *Hong*,
   938 F.3d 1040 (9th Cir. 2019) ............................................20, 21, 26

*United States* v. *Hurt*,
   527 F.3d 1347 (D.C. Cir. 2008) ........................................36, 37, 39

*United States* v. *Izydore*,
   167 F.3d 213 (5th Cir. 1999) ..............................................................6

*United States* v. *Lee*,
   833 F.3d 56 (2d Cir. 2016) ................................................................12

*United States* v. *Lemire*,
   720 F.2d 1327 (D.C. Cir. 1983) ..........................................................3

*United States* v. *Ligon*,
   440 F.3d 1182 (9th Cir. 2006) ..........................................................14

*United States* v. *Mangieri*,
   694 F.2d 1270 (D.C. Cir. 1982) ..........................................................2

*United States* v. *Mathis*,
   535 F.2d 1303 (D.C. Cir. 1976) ........................................................36

*United States* v. *McKnight*,
   665 F.3d 786 (7th Cir. 2011) ............................................................31

(Page 10 of Total)

*United States* v. *Medlock*,
    792 F.3d 700 (6th Cir. 2015) .......................................................21, 26

*United States* v. *Miller*,
    734 F.3d 530 (6th Cir. 2013) .......................................................21, 26

*United States* v. *Munksgard*,
    913 F.3d 1327 (11th Cir. 2019) ........................................................21

*United States* v. *Nall*,
    437 F.2d 1177 (5th Cir. 1971) ..........................................................13

*United States* v. *North*,
    910 F.2d 843 (D.C. Cir. 1990) ....................................................37, 39

*United States* v. *Oberhardt*,
    887 F.2d 790 (7th Cir. 1989) ............................................................14

*United States* v. *Peltier*,
    585 F.2d 314 (8th Cir. 1978) ............................................................39

*United States* v. *Perez*,
    43 F.3d 1131 (7th Cir. 1994) ............................................................31

*United States* v. *Regent Office Supply Co.*,
    421 F.2d 1174 (2d Cir. 1970) .............................................................4

*United States* v. *Rogers*,
    918 F.2d 207 (D.C. Cir. 1990) ...........................................................2

*United States* v. *Shellef*,
    507 F.3d 82 (2d Cir. 2007) .................................................................6

*United States* v. *Singleton*,
    702 F.2d 1159 (D.C. Cir. 1983) ........................................................6

*United States* v. *Smart*,
    98 F.3d 1379 (D.C. Cir. 1996) ...........................................................2

*United States* v. *Starr*,
    816 F.2d 94 (2d Cir. 1987) .................................................................3

*United States* v. *Takhalov*,
    827 F.3d 1307 (11th Cir. 2016) .........................................................4

*United States* v. *Taylor*
    (U.S. argued Dec. 7, 2021) ...............................................................23

*United States* v. *Treadwell*,
    760 F.2d 327 (D.C. Cir. 1985) ...................................................31, 35, 36

*United States* v. *Villanueva-Sotelo*,
    515 F.3d 1234 (D.C. Cir. 2008) ...........................................................17, 19

*United States* v. *Wedd*,
    993 F.3d 104 (2d Cir. 2021) .....................................................................21

*United States* v. *Weimert*,
    819 F.3d 351 (7th Cir. 2016) ......................................................................3

*Van Buren* v. *United States*,
    141 S. Ct. 1648 (2021) ...............................................................................21

**Statutes**

18 U.S.C. § 371 ............................................................................................31, 34

18 U.S.C. § 641 .......................................................................................... *passim*

18 U.S.C. § 924(c) ......................................................................................15, 16

18 U.S.C. § 1028A ..................................................................................... *passim*

18 U.S.C. § 1343 ...............................................................................................2

**PRELIMINARY STATEMENT**

This prosecution—of a devoted civil servant, for crimes devised and committed by his superiors—has been flawed from its inception. The Government has introduced errors and failed to meet its burdens throughout the proceedings, including by overcharging Murali Venkata, a minor participant; by failing to offer sufficient evidence at trial to prove those charges; and by submitting inappropriate jury instructions that were ultimately provided to the jury. These errors warrant outright acquittal, or at the least a new trial.

Mr. Venkata's former supervisors, Charles Edwards and Sonal Patel, have admitted that, for years, they made and maintained unauthorized copies of case management systems belonging to multiple government agencies. They did so, they explained, in order to aid their efforts to develop a new and improved case management system that they intended to sell back to the government to replace its existing systems. The government charged Mr. Edwards and Ms. Patel with serious felonies for this misconduct. But the government also prosecuted Mr. Venkata, one of Ms. Patel's subordinates, for the same serious crimes—despite the limited evidence that Mr. Venkata was involved in any misconduct, and the complete lack of evidence that he knew about the objectives of the conspiracy, let alone intended to accomplish them. Because the evidence was wholly insufficient to convict Mr. Venkata of the crimes charged, he is entitled to a judgment of acquittal, or at least a new trial, under Federal Rules of Criminal Procedure 29 and 33.

**STANDARD OF REVIEW**

When a defendant timely renews his motion after a guilty verdict, a court must "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c)(1). "In considering a motion for a judgment of acquittal, a [court] must appraise the record evidence in the light most favorable to the prosecution and

determine whether [it] could reasonably support a finding of guilt beyond a reasonable doubt." *United States* v. *Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990).[1]

A court may likewise, on the defendant's motion, "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "In considering a new trial motion based on the weight of the evidence [a court] weighs the evidence and evaluates the witnesses' credibility and decides whether a serious miscarriage of justice may have occurred." *United States* v. *Dale*, 991 F.2d 819, 838 (D.C. Cir. 1993).

Courts have also interpreted Rule 33 to require a new trial where "there has been such a variance as to affect the substantial rights of the accused," including where the jury was erroneously instructed as to the law. *United States* v. *Mangieri*, 694 F.2d 1270, 1278 (D.C. Cir. 1982); *see also Tatum* v. *United States*, 190 F.2d 612, 617 (D.C. Cir. 1951) ("The complete absence of instructions by the court on the essential issue of appellant's sanity requires that the case be reversed and remanded for a new trial."). A new trial is appropriate based on trial error if the error "had a substantial or injurious effect or influence in determining the jury's verdict." *United States* v. *Smart*, 98 F.3d 1379, 1390 (D.C. Cir. 1996).

## ARGUMENT

### I. THE GOVERNMENT'S CONSPIRACY TO DEFRAUD AND WIRE FRAUD THEORY IS WHOLLY UNSUPPORTED BY THE EVIDENCE

In order to convict Mr. Venkata of either conspiracy to defraud the United States under 18 U.S.C. § 641 or of wire fraud under 18 U.S.C. § 1343, the Government was required to prove a scheme to defraud the United States, specifically, the USDA-OIG. *See* ECF No. 146 at 33, 43. For wire fraud, the Government must also prove that Mr. Venkata used interstate wire

---

[1]    Unless otherwise stated, all internal citations, brackets, and quotation marks are omitted from quotations.

communications for the purpose of executing the scheme. *See id.* at 43. Simply put, the Government did not make the requisite showing. The evidence at trial was insufficient for a rational jury to find beyond a reasonable doubt that any of the defendants (much less Mr. Venkata) sought to cheat the government, that Mr. Venkata had any knowledge of the scheme, or that the relevant wire communication by Mr. Venkata crossed state lines. Mr. Venkata is therefore entitled to a judgment of acquittal on the conspiracy to defraud and wire fraud charges.

### A.    The Government Did Not Prove Any Scheme To Defraud

The jury was instructed that a scheme to defraud means "cheat[ing] the United States government or any of its agencies out of money or property," ECF No. 146 at 33, or a "course of action intended to deprive [the United States] of money or property," *id* at 43. Either way, the requirements are the same: the scheme must be intended to cheat, to deprive, to harm the victim. This is so because "[n]ot all conduct that strikes a court as sharp dealing or unethical conduct is a scheme or artifice to defraud." *Reynolds* v. *East Dyer Dev. Co.*, 882 F.2d 1249, 1252 (7th Cir. 1989); *cf. United States* v. *Weimert*, 819 F.3d 351, 356 (7th Cir. 2016) ("We must take care not to stretch the long arms of the fraud statutes too far."). Rather, a "scheme to defraud must threaten some cognizable harm to its target," using a misrepresentation or omission "that is intended or is contemplated to deprive the [victim] of some legally significant benefit." *United States* v. *Lemire*, 720 F.2d 1327, 1335-36 (D.C. Cir. 1983).

In addition to proving that Mr. Venkata intended to cheat or harm the United States, the Government must also show a material deception, since "not every deceit is actionable." *United States* v. *Binday*, 804 F.3d 558, 568 (2d Cir. 2015) (citing *United States* v. *Starr*, 816 F.2d 94, 98 (2d Cir. 1987)); *see also Lemire*, 720 F.2d at 1336 (not every failure to disclose information "constitute[s] a sufficient indicium that the [defendant] intended any criminally cognizable harm"). Courts have long held that a defendant cannot engage in the

requisite "scheme to defraud," whatever his intent, "when the customer gets exactly what he expected and at the price he expected to pay." *United States* v. *Regent Office Supply Co.*, 421 F.2d 1174, 1180-81 (2d Cir. 1970). "Thus, even if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims received exactly what they paid for." *United States* v. *Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016).

Judgment of acquittal is the only appropriate outcome here. As articulated before trial and at closing, the Government's scheme to defraud theory is that Mr. Edwards and Ms. Patel intended to "induce USDA-OIG to purchase EDS 2.0 from them rather than acquire the original EDS from DHS-OIG free of charge." ECF No. 66 at 12. According to the Government, EDS "would have been free to any agency in the federal government. It would have been made available to them for free . . . . That's the way it should have been done. That's the way Pete Paradis wanted it done. He told you that. But who got in the way of USDA-OIG securing the excellent EDS system in this conspiracy? Mr. Edwards's profit motivation and Mr. Venkata's acquiescence, his inclination to engage in criminal activity. That's the scheme to defraud." Trial Tr. Afternoon Session, 57:13–24, April 6, 2022. As explained in Part II.B, however, the Government's own witnesses testified that USDA-OIG did in fact receive EDS free of charge in the spring of 2016, and that it was provided by Ms. Patel. The Government's fraud theory is flatly contradicted by the evidence.

Beyond this unproven theory, the Government has failed to offer any evidence that any of the defendants (much less Mr. Venkata) had any intent to cheat or harm USDA-OIG, or that USDA-OIG would not have gotten exactly what it wanted to purchase: a new and improved case management system. As Mr. Edwards explained, far from intending to cheat or

-4-

harm the government, he wanted to provide a better system. He was concerned about "the problems with EDS and issues connected with that, and [he] had [his] own ideas of what the next generation needed to be." Trial Tr. Afternoon Session, 30:11–13, March 29, 2022. The idea was to build a new, "modular" system, with none of the "drawbacks of what EDS at OIG had." Trial Tr. Afternoon Session, 36:1–3, March 29, 2022. To that end, Mr. Edwards hired software developers in India to write new code for the system, to avoid the problems with the old one. Importantly, Mr. Edwards never once suggested that the new system would actually contain stolen government source code. Rather, as explained in Part III.B below, he displayed the EDS and PARIS systems to the developers in order to show them, visually, what the new system should look like, in order for it to "mirror the functionality" of EDS as Mr. Paradis had requested. Trial Tr. Afternoon Session, 15:11–12, March 31, 2022. To be sure, Mr. Edwards's unauthorized copying of government source code and PII was wrong and unethical, but without more, his testimony is insufficient for a rational jury to find beyond a reasonable doubt that either he or Mr. Venkata intended to cheat or harm the *customer*, USDA-OIG.[2]

---

[2]    There is also no evidence that Mr. Venkata was even aware of the plan to sell the new system back to the government. Mr. Edwards conceded that he did not tell Mr. Venkata about the plan himself. *See* Trial Tr. Afternoon Session, 20:1–6, March 30, 2022 ("Q You, sir, never told him ultimately about why you were engaging these Indian developers, correct, which was to sell a commercial case-management system back to the government? A If you're asking me if I said those exact words, no, I did not."). Rather, he claimed Mr. Venkata was told during a "meeting that happened between Ms. Patel and Mr. Venkata" in early May. Trial Tr. Morning Session, 76:11–12, March 30, 2022. But Ms. Patel testified multiple times that she never told Mr. Venkata about the plan to sell the system to the government. Trial Tr. Afternoon Session, 68:24 – 69:5, April 5, 2022 ("Q Did you ever explicitly tell Mr. Venkata that you were utilizing government information to create a case management system that you would sell back to the government for a profit? Did you ever explicitly have that conversation with Mr. Venkata? A No."); Trial Tr. Afternoon Session, 94:14–19, April 5, 2022 ("Q And you testified previously that you never explicitly told Mr. Venkata that Mr. Edwards' new case management system was based on those stolen workflows; is that right, and that you were selling it back for-profit, you never had that explicit discussion? A That's correct.").

Moreover, if Mr. Edwards and Ms. Patel had successfully finished building their new case management system, USDA-OIG would have received precisely what it had bargained for—an improved system that mirrored the functionality of EDS. Although there is no doubt that the methods by which Mr. Edwards developed the new system were improper, it is "not sufficient to show that the government, had it known the truth, would have refused to deal with him on general principles." *United States* v. *Binday*, 804 F.3d 558, 570 n.10 (2d Cir. 2015) (quoting *United States* v. *Mittelstaedt*, 31 F.3d 1208, 1218 (2d Cir. 1994)). In this case, at most, the supposed scheme did "no more than cause [the] victim[] to enter into transactions [it] would otherwise avoid—which do[es] not violate the mail or wire fraud statutes." *United States* v. *Shellef*, 507 F.3d 82, 108 (2d Cir. 2007). Because the Government failed to prove that any of the defendants intended to cheat or harm USDA-OIG, or that there was any discrepancy between the product reasonably anticipated and the product that Mr. Edwards and Ms. Patel intended to create, Mr. Venkata is entitled to a judgment of acquittal on the conspiracy to defraud and wire fraud charges.

### B.    The Government Did Not Prove An Interstate Wire

Finally, the wire fraud charge also fails because the Government failed to prove any interstate wire. Although it established that Mr. Edwards was in Maryland during the March 22, 2017 call with Mr. Venkata that it charged as the relevant "wire," the Government did not elicit testimony or adduce any other evidence about Mr. Venkata's whereabouts during the call. The Government argued at closing that "there is zero evidence that Mr. Venkata was in Maryland" when the call took place, Trial Tr. Afternoon Session, 102-3–4, April 6, 2022, but that misstates the Government's burden. Mr. Venkata was not obliged to prove that he was in Maryland. Rather, the Government was required to prove, beyond a reasonable doubt, that he was not. And the Government's argument about general commuter bus schedules was

unavailing, as it proved nothing about where Mr. Venkata was on that *particular* morning. A reasonable jury thus "*must necessarily* entertain a reasonable doubt on the evidence presented" concerning Mr. Venkata's location. *United States* v. *Singleton,* 702 F.2d 1159, 1163 (D.C. Cir. 1983); *see also*, *e.g.*, *United States* v. *Izydore*, 167 F.3d 213, 219–20 (5th Cir. 1999) (vacating wire fraud conviction where government did not offer evidence regarding defendant's location during phone calls in furtherance of scheme).

## II.    THE GOVERNMENT'S THEFT THEORY FAILS AS A MATTER OF LAW AND IS AGAINST THE WEIGHT OF THE EVIDENCE

In order to convict Mr. Venkata of theft of government property, the Government was required prove that:  "(1) Mr. Venkata stole or knowingly converted property for his use or for the use of another; (2) The property belonged to the United States at the time it was stolen or converted; (3) When Mr. Venkata stole or converted the property, he intended to deprive, without right, the owner of the use or benefit of the property; and (4) The property stolen or converted had, in the aggregate, a value of more than $1,000."  ECF No. 146 at 37.  As discussed below, the Government did not make the required showings as to the first, third, and fourth elements.  Mr. Venkata is therefore entitled to a judgment of acquittal on the theft charges.

### A.    The Government Has Not Advanced A Cognizable Stealing Theory

As an initial matter, although the jury was instructed as to both "stealing" and "conversion" formulations of section 641, the Government did not offer any evidence to support the "stealing" formulation.  In this Circuit, "stealing" under section 641 requires "a wrongful *taking and carrying away (asportation) of personal property* of another with fraudulent intent to deprive the owner of his property without his consent."  *United States* v. *Barlow*, 470 F.2d 1245, 1251 (D.C. Cir. 1972) (emphasis added).  Similarly, the jury instructions here defined "steal" as "to *take away* from one in lawful possession without right with the intention to keep

wrongfully." ECF No. 146 at 37 (emphasis added). Under either formulation, it is clear that a tangible item must be physically removed (taken away) from the owner, such that the owner is no longer in possession.

Here, the Government has not alleged or offered evidence that any tangible property of the government was physically taken or carried away, or that the government ever lost possession of any of its property. To the contrary, there is no dispute that all of the items of government property at issue (that is, the source code and PII) remained precisely where they started—in the possession of the government on government databases. Because the evidence was plainly insufficient for a reasonable jury to find beyond a reasonable doubt that Mr. Venkata stole or aided in the stealing of government property, Mr. Venkata is entitled to a judgement of acquittal to the extent that the jury convicted under a stealing theory.

## B.    The Government Did Not Prove Serious Interference

In the absence of a stealing theory, the Government must rely on conversion. In this Circuit, "[t]he cornerstone of conversion is the unauthorized exercise of control over property in such a manner that *serious interference* with ownership rights occurs." *United States* v. *Collins*, 56 F.3d 1416, 1420 (D.C. Cir. 1995); *accord* ECF No. 146 at 37 ("[C]onversion requires the unauthorized exercise of control over property in such a manner that serious interference with ownership rights occurs."); *cf. Pearson* v. *Dodd*, 410 F.2d 701, 706 (D.C. Cir. 1969) ("[I]t has long been recognized that not every wrongful interference with the personal property of another is a conversion. Where the intermeddling falls short of the complete or very substantial deprivation of possessory rights in the property, the tort committed is not conversion, but the lesser wrong of trespass to chattels."). More specifically, the D.C. Circuit has agreed that, to rise to the level of "serious interference," the defendant's conduct must have "deprived [the owner] of the use or possession of its property." *Collins*, 56 F.3d at 1421; *see also id.* at

1420 (noting that, in the analogous tort context, serious interference occurs where "[t]he interference is of such a magnitude that the converter must pay the rightful owner the full value of the property converted").

By way of example, the court in *Collins* concluded that, although the defendant used a highly classified government computer system for personal purposes without authorization, this did not seriously interfere with the government's ownership rights in its computer system because "no evidence exists that such conduct prevented him or others from performing their official duties on the computer" and "[t]he government did not even attempt to show that [defendant's] use of the computer prevented agency personnel from accessing the computer or storing information."  *Id.* at 1421.  Applying the standard from *Collins*, the court in *United States* v. *Aytes* similarly vacated a section 641 conviction where, although the defendant "embezzled and made copies of" sensitive government documents, "there was no evidence that she deprived (much less 'seriously') the government of anything other than the thumb drives on which they were stored."  2019 WL 5579485, at *2 (E.D.N.Y. Oct. 29, 2019); *accord Council on Am.-Islamic Rels. Action Network, Inc.* v. *Gaubatz*, 793 F. Supp. 2d 311, 340 (D.D.C. 2011) (merely "copy[ing] electronic data" does not amount to "serious[] interfere[nce]"); *see also Furash & Co., Inc.* v. *McClave*, 130 F. Supp. 2d 48, 58 (D.D.C. 2001) (there is no "conversion when [the owner] retains originals or other copies of documents another improperly uses because the owner is not deprived of the beneficial use of the information"); *Harper & Row Publishers, Inc.* v. *Nation Enters*., 723 F.2d 195, 201 (2d Cir. 1983) ("Merely removing one of a number of copies of a manuscript . . . and returning it undamaged, constitutes far too insubstantial an interference with property rights to demonstrate conversion.").

The Government's "conversion" theory is baseless.  As articulated during closing, the Government's theory of "serious interference" appears to be that USDA-OIG was deprived of the benefit and use of the free version of EDS.  *See* Trial Tr. Afternoon Session, 99:3–13, April 6, 2022 ("USDA-OIG wanted EDS. They wanted a system that worked as well as the EDS -- EDS did.  But these individuals jumped in in the middle of that relationship, in the middle of those negotiations and said: Stop.  I'll get you something better. And then they stole EDS and tried to sell that same property back to the U.S. government.  In this case, USDA-OIG. Is that serious interference of the full benefit and use of the property? Yeah, because the United States government would have been entitled to that property for free.").  Notably, this theory does not describe any supposed interference with the ownership rights of either USPS-OIG or DHS-OIG, and with respect to USDA-OIG, it is contradicted by the evidence.

Turning first to USPS-OIG, the Government failed to prove that USPS-OIG was deprived of the use or possession of its source code or PII.  To the contrary, the Government's lead investigator, Agent Chad Steel, admitted that he never learned that USPS-OIG's access to STARS or PARIS was ever compromised in the course of his investigation.  Trial Tr. Morning Session, 62:13–22, April 4, 2022.  This is consistent with Indictment and with the testimony of Ms. Patel, who confirmed that Mr. Edwards and Ms. Patel copied USDA-OIG's source code and PII in 2009, more than *seven years* before their misconduct was detected and investigated.  Trial Tr. Afternoon Session, 43:7–10, 44:10–13, April 5, 2022.  In other words, the only act that supposedly constituted a theft of USPS-OIG property—the copying of the source code and PII— went completely undetected for years, undermining the notion that there was *any* interference with USPS-OIG's use of its property, much less a serious one.

-10-

A0271

As for DHS-OIG, the evidence at trial was similarly clear that DHS-OIG's access to its source code and PII was at no point interrupted, let alone seriously interfered with, as a result of Mr. Edwards and Ms. Patel's conduct. Agent Steel, an employee of DHS-OIG and an EDS user, testified that DHS-OIG investigators' access to the system was never impeded as a result of Mr. Edwards and Ms. Patel's copying of the source code and PII, and that the system remained functioning properly after the copying. Trial Tr. Morning Session, 61:25–62:5, 62:11–12, April 4, 2022; *see also id.* at 100:9–12 ("Q. Well, the core -- the functioning of EDS, was that in any way undermined by the activities at issue here in this investigation? A. No, sir."). As in *Collins*, the defendants' conduct here did not prevent DHS-OIG personnel from "performing their official duties on" the EDS system or from "accessing" the system, 56 F.3d at 1421, and therefore it did not rise to the level of "serious interference."

With respect to USDA-OIG, the Government's theory is again contradicted by the evidence. Peter Paradis, the Government's USDA-OIG witness, testified that, although he "personally did not receive the [EDS] code or see the code," he was informed by the Chief Information Officer of USDA-OIG that the EDS "source code had been provided to . . . the information technology division within USDA-OIG" in the spring of 2016. Trial Tr. Afternoon Session, 13:19-22, March 31, 2022. Similarly, Agent Steel testified that, in or about the spring of 2016, USDA-OIG "did receive a copy of the sanitized source code," and that USDA-OIG's access to its copy of EDS was never compromised. Trial Tr. Morning Session, 62:23-63:7, April 4, 2022. Not only did USDA-OIG in fact receive a free version of EDS, it was Ms. Patel who provided it and helped set it up. *See* Trial Tr. Afternoon Session, 61:22-25, April 5, 2022. There is simply no evidence that USDA-OIG was deprived of the full benefit and use of the free version of EDS, which it indisputably received. Because the evidence at trial was insufficient for

-11-

A0272

a rational jury to find beyond a reasonable doubt that either USPS-OIG, DHS-OIG, or USDA-OIG were deprived of the use or possession of their source code or PII, Mr. Venkata is entitled to a judgment of acquittal on the theft charges.

### C.    The Government Did Not Prove Involvement Or Assistance By Mr. Venkata In Any Conversion

Even if the Government had proved serious interference, the theft charges would still fail as to Mr. Venkata because the Government also failed to prove that he was involved in the "initial interference" with USPS-OIG or DHS-OIG's ownership rights, and "[t]he act of conversion is completed upon the initial interference with the owner's interest." *United States* v. *Beard*, 713 F. Supp. 285, 291 (S.D. Ind. 1989); *see also United States* v. *E.I. du Pont de Nemours & Co.*, 2022 WL 161332, at *6 (S.D. Tex. Jan. 18, 2022) ("[A] theft or knowing conversion under 18 U.S.C. § 641 [is] not a continuing offense."). Rather, "[a] violation under § 641(a) is complete as soon as the offender unlawfully takes or misappropriates [property] . . . of the United States." *E.I. du Pont*, 2022 WL 161332, at *6.

Here, the evidence is clear that Mr. Edwards and Ms. Patel had already made numerous copies of USPS-OIG and DHS-OIG source code and PII long before Mr. Venkata was even alleged to have joined their conspiracy. *See, e.g.*, Trial Tr. Afternoon Session, 43:7-13, April 5, 2022; *id.* Morning Transcript, 69:12-19, March 30, 2022. To the extent that any conversion ever occurred (which it did not), it was completed years before Mr. Venkata ever became involved with Mr. Edwards and Ms. Patel. For this reason, Mr. Venkata lacked both involvement in depriving, and any intent to deprive, USPS-OIG, DHS-OIG, or USDA-OIG of their property. Because there is no evidence from which a rational jury could find beyond a reasonable doubt that Mr. Venkata was involved in depriving, or intended to deprive, the government of property, he is entitled to a judgment of acquittal on the theft charges.

### D.    The Government Did Not Prove That The Converted Property Had A Value Of More Than $1,000

Finally, Mr. Venkata's theft conviction must also be vacated because the

Government failed to established that the aggregate "value" of the copied source code and PII

exceeded $1,000.  *See Apprendi* v. *New Jersey*, 530 U.S. 466, 476 (2000) ("[A]ny fact (other

than prior conviction) that increases the maximum penalty for a crime must be charged in an

indictment, submitted to a jury, and proven beyond a reasonable doubt."); *see also United States*

v. *Lee*, 833 F.3d 56, 64 (2d Cir. 2016) (holding that the $1,000 threshold in section 641 is subject

to *Apprendi*).  Section 641 expressly defines "value" as the "face, par, or market value" or "cost

price, either wholesale or retail," 18 U.S.C. § 641, but the Government did not offer evidence of

any of the listed values.  As an initial matter, the government did not attach a "face" or "par"

value to either the source code or the PII.  *See United States* v. *DiGilio*, 538 F.2d 972, 979 (3d

Cir. 1976) ("Obviously, the stolen records had no 'face' or 'par' value.").  Similarly, because

none of the items were purchased on the market, there was no evidence of "cost price, either

wholesale or retail."  *Fulks* v. *United States*, 283 F.2d 259, 261 (9th Cir. 1960) (reasoning that

the "cost price" is the retail price to the "to the United States at the time of acquisition").

That leaves "market value," which is "determined by market forces the price at

which the minds of a willing buyer and a willing seller would meet."  *DiGilio*, 538 F.2d at 979.

But "market value" is not a catch-all phrase for all moderately relevant dollar amounts the

government introduces at trial.  *See*, *e.g.*, *Abbott* v. *United States*, 239 F.2d 310, 313 (5th Cir.

1956) ("Mere cost of production, cost of replacement, value to the owner, value to one who

might have use of it under certain special circumstances, whatever else it might be, is not market

value, . . . [which] depends on a market, whether formal or informal, in which willing buyers

bargain with willing sellers."); *United States* v. *Nall,* 437 F.2d 1177, 1186 (5th Cir. 1971)

-13-

(same).  When there is no commercial market for the items, the market value "may be established by reference to a thieves' market."  *DiGiglio*, 538 F.2d at 979*; see also United States* v. *Bigelow*, 728 F.2d 412, 414 (9th Cir. 1984) ("As there is no commercial market for the sale of IRS credentials, . . . the property's value in an illegal market may be considered.").

The Government offered no such evidence, however.  Instead, the Government attempted to meet the $1,000 threshold by pointing to the cost of producing the source code, and of credit monitoring as a result of the data breach.  But neither production costs, *see United States* v. *Ligon*, 440 F.3d 1182, 1185 (9th Cir. 2006), nor costs of mitigation falls with section 641's definition of "value," which aims to measure the benefit to the thief—not the mitigation cost to the victim, *see Churder* v. *United States*, 387 F.2d 825, 833 (8th Cir. 1968) (reasoning that the "obvious" and "practical" way to understand "value" under section 641 is the "amount the goods may bring to the thief"); *United States* v. *Oberhardt*, 887 F.2d 790, 792 (7th Cir. 1989) (agreeing with *Churder*).  Based on the evidence at trial, any conclusion about the respective market values of the source code and PII would be speculative.  *See DiGilio*, 538 F.2d at 980 ("A fact which distinguishes a violation punishable by imprisonment for not more than one year from a violation punishable by imprisonment for ten years cannot be permitted to rest upon conjecture or surmise.").  Because the Government failed to prove that the converted property had any value—much less a value over $1,000—and waived the right to pursue a misdemeanor violation, *see* Trial Tr. Morning Session, 10:6–17, April 7, 2022, Mr. Venkata is entitled to a judgment of acquittal on the theft charges.

## III.  THE GOVERNMENT'S EXPANSIVE AND ILL-DEFINED THEORY OF AGGRAVATED IDENTITY THEFT FAILS AS A MATTER OF LAW

Section 1028A penalizes "[w]hoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful

-14-

authority, a means of identification of another person . . . ."  18 U.S.C. § 1028A(a)(1).  At most, the government showed that the defendants conducted a remote demonstration of a front-end software module linked to a back-end database (which happened to contain real PII, including Scott Balfour's) in order to show developers what one component of the new program they were building should look like.  These facts fall short of proving a section 1028A violation.

This Court has already agreed that, under *Smith* v. *United States*, 508 U.S. 223 (1993), the transfer, possession, or use of PII must facilitate the offense to be "in relation to" it.  But that was the bare minimum in *Smith*, and the Supreme Court left open what more was required even under the firearms statute, 18 U.S.C. § 924(c)(1).  *See Smith*, 508 U.S. at 238.  Here, the statutory structure and history of section 1028A confirm that the transfer, possession, or use of PII must facilitate the predicate offense in *a particular way*: a deceptive use of another's means of identification to further a crime.  They also confirm that the PII must facilitate the crime to *a certain degree*: it must be integral to the underlying scheme.

This interpretation is consistent with the holdings of all federal courts of appeal that have confronted this question.  As set forth below, the First, Sixth, and Ninth Circuits have held that a defendant must facilitate the underlying predicate offense by impersonating or acting on behalf of the victim.  The Second and Fifth Circuits have held that using the identifying information deceptively to facilitate the underlying offense is sufficient.  But no circuit has adopted a construction of section 1028A that would extend as far as the facts here, where Mr. Venkata neither impersonated Mr. Balfour nor used his information deceptively to facilitate the underlying offenses.  Nor has any circuit interpreted section 1028A to prohibit the tangential use of identifying information that was incidental, not integral to, the underlying scheme to deceive.  Here, the government's evidence at trial failed both minimum requirements:  it failed to show

that Mr. Venkata used Mr. Balfour's PII deceptively to facilitate the underlying scheme, and it failed to show that the transfer, possession, or use of the PII was integral to the scheme.

### A. The Government Did Not Prove That Mr. Venkata Used Any PII Deceptively to Facilitate Wire Fraud Or Theft Of Government Property

#### 1. Section 1028A Requires Proof Of Deceptive Use

Section 1028A requires that a defendant "use[]" the means of identification "during and in relation to" a predicate offense. That requirement is an important limitation on the scope of the statute. In *Smith*, the Supreme Court held that, "at a *minimum*," the phrase "during and in relation to" in 18 U.S.C. § 924(c) means that a firearm must "facilitate, or have the potential of facilitating," the underlying felony and that "its presence or involvement cannot be the result of accident or coincidence." 508 U.S. at 238 (emphasis added). Importantly, by the Court's own characterization, this articulation did not purport to "determin[e] the precise contours of the 'in relation to' requirement." *Id.* The *Smith* Court was satisfied that the standard was met because "the gun was an integral part of the [drug] transaction," and "[w]ithout it, the [drug] deal would not have been possible." *Id.*; *see also id.* at 241 (Blackmun, J., concurring) (noting that the opinion did not "foreclose the possibility that the 'in relation to' language of 18 U.S.C. § 924(c)(1) requires more than mere furtherance or facilitation of a crime of violence or drug-trafficking crime"). Just five years later, the Supreme Court went further, emphasizing that "[t]he limiting phrase 'during and in relation to' should prevent misuse of the statute to penalize those *whose conduct does not create the risks of harm at which the statute aims*." *Muscarello* v. *United States*, 524 U.S. 125, 139 (1998) at 139 (emphasis added); *see also id.* at 138 ("[T]he words 'during' and 'in relation to' will limit the statute's application to the harms that Congress foresaw.").

Consistent with the principle of *Muscarello*, the limiting phrase "in relation to" in section 1028A should confine the application of the statute to "the harms that Congress foresaw"—namely, identity theft and identity fraud. *Id.* at 138. Such limitation requires that the defendant facilitate the predicate offense through deception—be it by impersonating the victim, acting on behalf of the victim, or representing something on behalf of (or about) the victim— none of which occurred here. The statutory structure and legislative history of section 1028A, as well as decisions by all courts of appeal that have reached the issue, support this reading.

### a.     The Statutory Structure Supports A Deceptive Use Requirement

As an initial matter, the title of section 1028A is "[a]ggravated *identity theft*" (emphasis added). As the D.C. Circuit has acknowledged in *United States* v. *Villanueva-Sotelo*—which tackled a different aspect of the statute—in enacting section 1028A, "Congress intended to target identity theft and the thieves who perpetrate it." 515 F.3d 1234, 1243 (D.C. Cir. 2008); *see also id.* at 1246 (framing the relevant inquiry as "whether conduct like [the defendant's] amounts to 'identity theft' in the first place.").[3] There are various forms of identity theft and identity fraud, but they all have one thing in common: even if the initial access to the identifying information is legitimate, the eventual "use" of the identifying information is deceptive. *See* H.R. Rep. No. 528, 108th Cong., 2d Sess. 4 (2004) ("House Report") ("The terms 'identity theft' and 'identity fraud' refer to all types of crimes in which someone wrongfully obtains and uses another person's personal data *in some way that involves fraud or deception*." (emphasis added)).

---

[3]     Indeed, the *Villanueva-Sotelo* court was not even persuaded that section 1028A extended beyond traditional "identity theft" to capture "identity fraud." *See* 515 F.3d at 1247.

-17-

A0278

This reading finds further support when the operative words in the statute are read together rather than in isolation. Under section 1028A, the "use[]" of identifying information must be "in relation to" one of eleven specific predicate offenses listed in section 1028A(c). These offenses include false personation of citizenship; false statements in connection with the acquisition of a firearm; and mail, bank, and wire fraud; among others. *Id.* at 1028A(c). Tellingly, the nature of these predicate offenses presumes that the identifying information will be used as a means of deception. Put simply, when section 1028A is read as a whole, the natural "relation" between the "use" of identifying information and the enumerated predicate offenses is that the "use" of identifying information furthers the predicate offense by perpetuating some falsity.

### b.    The Legislative History Supports A Deceptive Use Requirement

The legislative record confirms this ordinary reading. In describing those who use means of identification during and in relation to other predicate offenses, Congress referred *exclusively* to those who use a victim's identifying information as a tool of deception by committing identity theft or fraud in furtherance of another crime. *See*, *e.g.*, House Report at 5 ("[He] used the information to open bank accounts in New York, where he deposited counterfeit checks."); *id.* at 6 ("[He] used the social security number of [the victim] to obtain loans and lines of credit."); *id.* ("She used the stolen identity to apply for and receive Social Security benefits. She also used the stolen identity to establish credit."). Indeed, nothing in the legislative record even suggests that the use of identifying information can facilitate a predicate offense by any means other than deception. *Cf. Villanueva-Sotelo*, 515 F.3d at 1245 (considering the fact that "[a]t no point in the legislative record did anyone so much as allude to a situation" similar to the

defendant's conduct, before concluding that "Congress never intended its 'aggravated identity theft' statute to reach conduct like [defendant's]").

This reading is further supported by the statutory purpose. As the Government has previously acknowledged, "[s]ection 1028A(a)(1) is a victim-focused statute." Br. for United States at 5, *Flores-Figueroa* v. *United States*, 556 U.S. 646 (2009) (No. 08-108), 2009 WL 191837, at *5. Congress was concerned that offenders who use victims' identifying information to commit any of the enumerated predicate offenses could cause severe reputational, credit-related, and financial harms to victims, who are then faced with the "difficult[,] time consuming and expensive task of repairing a damaged credit history." House Report at 25 (statement of Rep. Coble); *see also id.* at 51 (statement of Rep. Schiff) (highlighting that the aim of section 1028A is "to protect the good credit and reputation of hard-working Americans").

Concerned that sentencing outcomes under the original identity theft statute, 18 U.S.C. § 1028A(a)(7), did not "reflect the impact on the victims," Congress enacted section 1028A, which carried a mandatory two-year minimum. House Report at 51 (statement of Rep. Schiff). But instead of increasing the mandatory minimum for all crimes under the original statute (which is triggered as long as the conduct was "in connection with" *any* state or federal felony), Congress limited section 1028A to a "focused and narrow set of predicate offenses," to single out the "most serious and harmful forms of identity thefts" for enhanced penalties. House Hearing, 108th Cong. 11 (2004) (statement of Timothy Coleman, Counsel to the Assistant Attorney General, Criminal Division, U.S. Department of Justice) ("House Hearing").

### c.    Other Circuits Have Uniformly Required Deceptive Use

Consistent with the above, all appellate courts considering this issue have uniformly upheld a defendant's conviction only where the defendant used a victim's identifying information in order to perpetuate a falsity. The First, Sixth, and Ninth Circuits have steered

closer to the prototypical identity crimes by holding that the defendant must facilitate the underlying predicate offense by impersonating or acting on behalf of the victim. *See United States* v. *Hong*, 938 F.3d 1040, 1051 (9th Cir. 2019) (vacating conviction of defendant who "provided massage services to patients to treat their pain, and then participated in a scheme where that treatment was misrepresented as a Medicare-eligible physical therapy service" because the facts did not prove that the defendant "attempt[ed] to pass [himself] off as the patients"); *United States* v. *Berroa*, 856 F.3d 141, 156 (1st Cir. 2017) (vacating convictions of defendants who, while practicing medicine under fraudulent licenses, used patient names and addresses to write prescriptions, because neither defendant "used" the means of identification to "pass him or herself off as another person or purport to take some other action on another person's behalf"); *United States* v. *Medlock*, 792 F.3d 700, 705, 712 (6th Cir. 2015) (vacating conviction of defendant who used patients' information to submit falsified reimbursement claims because he did not lie about whether he provided services to the patients, but rather about the type of services he provided); *United States* v. *Miller*, 734 F.3d 530, 541 (6th Cir. 2013) (vacating conviction of defendant who submitted a resolution for a loan application, which falsely claimed that two individuals voted to pledge a property because the defendant "did not steal or possess [the two individuals'] identities, impersonate them or pass himself off as one of them, act on their behalf, or obtain anything of value in one of their names"); *cf. United States* v. *Gatwas*, 910 F.3d 362, 364 (8th Cir. 2018) (upholding conviction where defendant fraudulently used the identities of children to obtain tax refunds on behalf of his clients); *United States* v.

*Munksgard*, 913 F.3d 1327, 1335 (11th Cir. 2019) (upholding conviction of defendant who

"forg[ed] the [victim]'s name to bolster a loan application").[4]

The Second and Fifth Circuits have concluded that it is sufficient for a defendant

to use the identifying information deceptively to facilitate the underlying offense. *United States*

v. *Wedd*, 993 F.3d 104, 124 (2d Cir. 2021) (upholding the conviction where the defendant used

victims' telephone numbers to enroll them, "without their consent or knowledge, for paid text

message services by means of auto-subscribing"); *United States* v. *Dubin*, 27 F.4th 1021 (5th

Cir. 2022) (upholding conviction for medical overbilling).[5]  In short, the Government's theory in

this case conflicts with the reasoning of the First, Sixth, and Ninth Circuits and even extends

beyond the bounds recognized by the Second and Fifth Circuits.

### 2.    The Government Did Not Prove Any Deceptive Use By Mr. Venkata

Even viewed in the light most favorable to the Government, the evidence at trial

failed to prove that Mr. Venkata used Mr. Balfour's PII as a tool of deception.  At most, the

evidence at trial established that, at some point during the development of his new case

---

[4]    Notably, the defendants in *Hong, Berroa, Medlock, and Miller* all used means of
information to further a deception.  Yet, the courts still expressed concern about the "limitless
nature of the government's [interpretation]."  *Hong*, 938 F.3d at 1051 (quoting *Berroa*, 856 F.3d
at 156); *accord Miller*, 734 F.3d at 541 (expressing similar concern).  In other words, the
majority of circuits that have explored this issue have found that a standard that would still be
too narrow to capture Mr. Venkata's conduct here is too broad.  This only "underscores the
implausibility of the Government's interpretation.  It is extra icing on a cake already frosted."
*Van Buren* v. *United States*, 141 S. Ct. 1648, 1661 (2021).

[5]    In analyzing this type of challenge, some circuits have invoked the word "use" as the sole
textual hook, while others have relied on the limiting phrase "during and in relation to" or the
entire word cluster.  *Compare Berroa*, 856 F.3d at 156 (holding that "the purported 'use' of
patient information alleged here strays far afield from the conduct targeted by Congress"), *with
United States* v. *Gatwas*, 910 F.3d at 365 ("Our sister circuits have construed the word 'use'
broadly, relying on the statute's causation element—that the use be during and in relation to an
enumerated felony—to limit its scope.").  Regardless of where this Court lands on the academic
debate, the result is the same.

management system, Mr. Edwards sought to show the developers in India the "Audit Module" of the PARIS system as a reference point. *See* Trial Tr. Afternoon Session, 98:1-99:22, March 29, 2022. Mr. Edwards asked Mr. Venkata to pull up the Audit Module on Mr. Edwards's home server remotely so that the developers in India could view it to see what it looked like. During this remote demonstration, real PII of USPS employees was present in a back-end database connected to PARIS, which was the front-end interface that the developers in India were viewing. There is no evidence, however, that this use was deceptive, or that any of the defendants transferred or possessed any PII for the purpose of using it deceptively to further either the theft of government property or wire fraud. Moreover, the conduct here does not begin to approach the "most serious and harmful forms of identity thefts" singled out for enhanced penalties because the underlying scheme was not harder to detect because of this conduct, and the existence of Mr. Balfour's PII in the back-end database did not create the reputational, credit, or financial harms experienced by victims of identity theft or identity fraud.[6]

Section 1028A should not be interpreted to capture defendants like Mr. Venkata whom Congress did not seek to penalize. It must be interpreted reasonably in light of the statutory structure and purpose to "limit the statute's application to the harms that Congress foresaw." *Muscarello*, 524 U.S. at 138. At the very least, under Rule of Lenity, this Court should vacate the conviction by holding that the statute is ambiguous in its application to Mr. Venkata's conduct, particularly given that the statute at issue carries a mandatory minimum.

---

[6]      Even assuming that the type of harm associated with the initial breach of Mr. Balfour's PII (which happened years prior to Mr. Venkata's involvement) is relevant here, it falls far short of the unique harms associated with "identity theft" or "identity fraud." In fact, even in the civil context, the D.C. Circuit has acknowledged that a data breach is not synonymous with "identity theft" or "identity fraud." *Attias* v. *Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017) (evaluating whether the subjects of a data breach have sufficiently alleged a substantial risk of *future* harm of "identity theft" or "identity fraud").

-22-

*See* Br. for The National Association of Criminal Defense Lawyers et al. as Amicus Curiae

Supporting Respondent, *United States* v. *Taylor* (U.S. argued Dec. 7, 2021) (No. 20-1459)

(collecting cases for the proposition that "[t]he Court has consistently cautioned against adopting

expansive interpretations of criminal statutes carrying significant mandatory minimum

sentences").

### B. The Government Did Not Prove That Any Use of Mr. Balfour's PII Was Integral To The Alleged Wire Fraud Or Theft Of Government Property

Even if this Court determines that deceptive use is not required, Mr. Venkata's

conviction must still be vacated because the Government also failed to prove that any use of Mr.

Balfour's PII was integral to the alleged wire fraud or theft. As the legislative record makes

clear, section 1028A seeks to penalize those whose misuse of identifying information is

inextricably tied to the underlying scheme. *See, e.g.*, House Report at 2-3 reprinted in 2004

U.S.C.C.A.N. 779 (*e.g.*, "submitted bogus Federal income tax returns," "received Title XVI

benefits under the name and Social Security number of his former brother-in-law," and "received

SSI benefits under her actual Social Security number while working as a seasonal temporary

worker employed by the IRS using the Social Security number of another individual").

Although the D.C. Circuit has not yet considered the issue, other circuits have

consistently looked to whether the use of the identifying information was integral to the

underlying crime. In *Gatwas*, for instance, the court concluded that "Gatwas violated Section

1028A(a)(1) because his use of children's names and social security numbers was *essential* to the

fraudulent claim of dependent-based tax benefits." 910 F.3d at 368 (emphasis added). Indeed,

as the Government clarified during oral argument in *Gatwas*, testimonial evidence at trial proved

that the use of real Social Security numbers was, in fact, essential to Gatwas's scheme because

the IRS's online tax system would have "bounced back" fake Social Security numbers that did

not belong to real persons. Oral Arg. at 19:52–20:41, *Gatwas*, 910 F.3d  (No. 17-3683), http://media-oa.ca8.uscourts.gov/OAaudio/201 8/9/173683.MP3.  Other courts have employed a similar analysis.  *See, e.g.*, *Dubin*, 27 F.4th at 1025 ("He could not have effectuated the health care fraud or the conspiracy to commit health care fraud without using Patient L's identifying information."); *United States* v. *Harris*, 983 F.3d 1125, 1128 (9th Cir. 2020) ("This portion of Harris's scheme could not have succeeded otherwise.").

Here, by contrast, the Government failed to prove that Mr. Balfour's PII was "integral" or "essential" to the commission of the alleged wire fraud or theft of government property.  To the contrary, as Agent Lowder and others testified at trial, the front-end user interfaces of the case management systems could run even while connected to back-end databases that contained dummy PII, which is what the DHS-OIG developers used to test those systems.  Trial Tr. Afternoon Session, 70:6-71:13, March 30, 2022.  In other words, the case management systems could run and be shown to developers in India using either dummy or real PII—it made no difference to the defendants.  Indeed, Russ Barbee testified that he only ever witnessed demonstrations of the system using dummy PII.  Trial Tr. Morning Session, 87:17-19, April 5, 2022.

Not only was the PII not necessary to demonstrate the case management system to the developers in India, it was hardly "central" to either the alleged wire fraud or theft.  *Gagarin*, 950 F.3d 596, 604 (9th Cir. 2020).  As described by the Government, the crux of the scheme to defraud was to "represent back," or sell the government a system that contained source code that it already possessed.  Of course, and importantly, there is no allegation or evidence that the defendants planned to sell the government personal identifying information.  If anything, the stolen government source code was the "key to duping the government," not the PII.  *Dubin*, 27

F.4th at 1029.  Because the USPS-OIG PII functioned as sheer "filler" (*i.e.*, random numbers and letters) in the back-end database connected to the front-end Audit Module interface during a remote demonstration, its role in the underlying scheme was even more incidental than that of the identifying information in *Berroa*, *Hong*, *Miller*, and *Medlock*.[7]  Because the Government failed to prove that the PII was used deceptively or was integral to the underlying offenses, a judgment of acquittal is required on the aggravated identity theft charge.

## IV.    THE GOVERNMENT'S DESTRUCTION OF RECORDS THEORY IS UNSUPPORTED BY THE EVIDENCE

In order to convict on destruction of records, the Government was required to prove that:  (1) Mr. Venkata knowingly altered or destroyed a record, document, or tangible object; and (2) Mr. Venkata acted with the intent to impede or obstruct the investigation of a matter.  ECF No. 146 at 49.  The Government did not make those showings.  Because the evidence at trial was insufficient for a rational jury to find beyond a reasonable doubt that Mr. Venkata knowingly deleted any text messages or emails, or that he had any intent to impede or obstruct the investigation, Mr. Venkata is entitled to a judgment of acquittal on the destruction of records charges.

Turning first to emails, the Government failed to establish that Mr. Venkata destroyed *any* emails, much less that he did so with the intent to impede or obstruct an investigation.  Because the Government failed to preserve the contents of Mr. Venkata's cellphone, which would have reliably showed what was or was not present on the device, why,

---

[7]    Although before trial the Government represented that the PII played a more meaningful role in the scheme because it was actively and regularly used by the programmers in India to test the program and its revisions, *see* Pre-Trial Conference Tr. 30:1 – 31:11, March 21, 2022, the evidence at trial did not support, let alone prove, that theory.  Mr. Venkata does not concede the evidence would have been sufficient had the Government proven that the PII was actively and regularly used in order to test the system.

and when any deletions might have occurred, the Government's only evidence of destruction of records was the uncorroborated recollection of Agent Steel. With respect to email, the Government introduced evidence of only a single email between Mr. Venkata and Mr. Edwards. *See* Gov't Ex. 25. Therefore, the Government needed to prove that Mr. Venkata (1) destroyed this specific email (2) with the intent to obstruct the Government's investigation.

When asked about the email, Agent Steel testified that he could not find it on Mr. Venkata's phone, but he "did find it in his home." Trial Tr. Morning Session, 48:4, April 4, 2022. More specifically, Agent Steel testified that Mr. Venkata "showed me his e-mail account, which was Murali Mohan, and showed me that *there were no e-mails in there*." Trial Tr. Morning Session, 44:18-20, April 4, 2022 (emphasis added). Without more, this proves only that the email might not have been on Mr. Venkata's phone at the time that Agent Steel reviewed it, but it proves nothing about *why no*t. There are any number of reasons why an email might not appear on someone's phone at a particular time, including a failure of the phone to sync to the email server. Indeed, the fact that there were no emails whatsoever on Mr. Venkata's phone tends to indicate that there was a broader syncing issue with email appearing on the phone. This is further supported by Agent Steel's testimony that he *was* able to find the email in Mr. Venkata's home, *see* Trial Tr. Morning Session, 48:4, April 4, 2022, suggesting that Mr. Venkata did not in fact delete it from the email server (or else it would not still have appeared on Mr. Venkata's home devices). If anything, Agent Steel's testimony indicates that Mr. Venkata's phone may not have properly synced to the email server at the time Agent Steel reviewed it, not that Mr. Venkata had deleted any email.

With respect to Mr. Venkata's intent, Agent Steel conceded that, far from attempting to conceal the email, Mr. Venkata *told him* about it during his interview. *See* Trial

Tr. Morning Session, 53:7-11, April 4, 2022; *id.* at 84:1-4 ("A. Yes, he did tell us about that e-mail in the interview, ma'am."). Had Mr. Venkata intended to obstruct the Government's investigation, he would not have offered up the email to the Government. Based on Agent Steel's testimony alone, a rational juror could not conclude, beyond a reasonable doubt, that Agent Steel's inability to find the email during a review of Mr. Venkata's phone meant that he had deleted it, much less that he had done so with the intent to obstruct the Government's investigation.

Turning next to text messages, the Government failed to establish that Mr. Venkata deleted any specific text messages, or that he did so with an intent to impede the Government's investigation. As an initial matter, although the Government introduced dozens of messages between Mr. Venkata and Mr. Edwards and Ms. Patel, *see* Gov't Exs. 17 and 19, it did not identify which, if any, specific messages had allegedly been deleted. Rather, Agent Steel testified that Mr. Venkata "showed his messaging, and that there were no relevant messages in there," Trial Tr. Morning Session, 44:20-21, April 4, 2022, leading Agent Steel to assume that Mr. Venkata had deleted them, *see id.* at 45:14-16. This assumption is contradicted by Agent Steel's own testimony, however. When asked, "What did Mr. Venkata tell you about when he deleted these text messages," Agent Steel conceded: "*He told me nothing about deleting these text messages.*" Trial Tr. Morning Session, 45:24-25, 46:1-2, April 4, 2022 (emphasis added).[8] As with the emails, there are any number of reasons why a text message might not appear on

---

[8]    Immediately after making this statement about the text messages, Agent Steel added that Mr. Venkata "told me that he deleted the communications with Mr. Edwards following becoming aware of the investigation; and that he had done so because he wanted to distance himself from Mr. Edwards and Ms. Patel." Trial Tr. Morning Session, 46:2-5, April 4, 2022. In the context of the rest of his testimony, it is clear that by "communications" Agent Steel was referring to the April 20, 2017 phone calls between Mr. Venkata and Mr. Edwards, as discussed further below.

someone's phone at a particular time, including because the phone is not set to retain text messages longer than a specified period of time (for example, on an iPhone, the default setting is 30 days). Indeed, the last text message between Mr. Venkata and Mr. Edwards occurred on March 29, 2017, more than 30 days before Agent Steel interviewed Mr. Venkata in May 2017. *See* Gov't Ex. 19 at 21.

Lacking any evidence as to whether Mr. Venkata had in fact deleted any text messages (such as a forensic report of his phone or an admission), Agent Steel was also unable to testify as to when any deletion might have occurred, despite being asked several times by the Government. *See* Trial Tr. Afternoon Session, 14-19, April 4, 2022. Of course, the Government was desperate to prove that Mr. Venkata deleted the messages after learning of the investigation, as this could have provided some evidence of intent. *Cf.* Trial Tr. Afternoon Session, 16:4-6, April 4, 2022 ("Q. Was Mr. Venkata aware of the investigation before April 19th when the search warrants were done? A. To the best of my knowledge, no."). Given Agent Steel's limited knowledge, however, the Government was not able to offer any evidence whatsoever about the timing of the deletion. Without more, a rational juror could not conclude, beyond a reasonable doubt, that Agent Steel's inability to find particular text messages during a review of Mr. Venkata's phone meant that he had deleted them, much less that he had done so with the intent to obstruct the Government's investigation.

Finally, as to the call logs, although there is some evidence that Mr. Venkata may have deleted them, there is no evidence that he did so with the intent of obstructing the investigation. Mr. Venkata was first interviewed by the Government in this case on April 20, 2017. Later that same day, Mr. Edwards placed five phone calls to Mr. Venkata. *See* Gov't Ex. 36 at 550 and 552. Prior to that, Mr. Edwards and Mr. Venkata last spoke on March 25, 2017,

*see* Gov't Ex. 36 at 534, approximately one month prior, consistent with what Mr. Venkata told

Agent Valles during his first interview, *see* Trial Tr. Afternoon Session, 47:3-10, April 1, 2022.

Agent Valles could not recall whether she instructed Mr. Venkata to report any contact from Mr.

Edwards, and she did not recall telling Mr. Venkata that he had any obligation to preserve

records at that point.  Trial Tr. Afternoon Session, 49-50, April 1, 2022.  Despite having no

obligation to do so, Mr. Venkata nevertheless took it upon himself to report the calls from Mr.

Edwards to his supervisor, Mike Horton, to pass along to the Government agents.  Trial Tr.

Afternoon Session, 15-17, April 5, 2022.  Indeed, Mr. Venkata did so on the very same day of

the calls, April 20, 2019.  *See* Def. Ex. 6.

Having already reported the calls to the Government to assist in the investigation,

Mr. Venkata could not have believed that deleting the call records from his phone could

somehow obstruct the same investigation—he had already provided the Government with the

relevant information.  Given Mr. Venkata's affirmative disclosure of the calls to the Government

prior to any deletion, a rational juror could not conclude, beyond a reasonable doubt, that by later

deleting the calls Mr. Venkata intended to obstruct the Government's investigation.

## V.   THE JURY WAS WRONGLY INSTRUCTED ON THE CONSPIRACY CHARGE AND WRONGLY DENIED A DEFENSE THEORY OF THE CASE

In rejecting the proposed defense instructions, the Government sought to

foreclose instructions revealing the legal infirmities of its theory of the case.  Mr. Venkata was

legally entitled to any jury instruction that was a "correct statement[] of the law that [was]

supported by the evidence," *United States* v. *Perez*, 43 F.3d 1131, 1137 (7th Cir. 1994), and that

was necessary "to ensure that the case [wa]s submitted to the jury in a full and fair manner,"

*United States* v. *McKnight*, 665 F.3d 786, 792 (7th Cir. 2011).  Mr. Venkata's proposed

conspiracy and defense theory of the case instructions satisfied this standard and should have been given.  Their omission warrants a new trial.

### A.    The Jury Should Have Been Properly Instructed On The Nature Of The Alleged Conspiratorial Agreement For The Conspiracy Charges

"The existence of an 'agreement' is the essential element of the statutory crime of conspiracy." *United States* v. *Treadwell*, 760 F.2d 327, 336 (D.C. Cir. 1985); *see also Braverman* v. *United States*, 317 U.S. 49, 53 (1942).  "Although the government in order to prove an agreement need not show that the conspirators agreed on the details of their criminal scheme, it is required to show the essential nature of the plan." *Treadwell*, 760 F.2d at 336. Accordingly, jury instructions on a charge of conspiracy under 18 U.S.C. § 371 must be "sufficient to inform the jury of the essential nature of the conspiratorial agreement—the meeting of minds—that the government [is] required to prove beyond a reasonable doubt." *Id.* at 337.

Consistent with the Criminal Jury Instructions for the District of Columbia ("the Red Book"),[9] the Indictment, and the evidence adduced at trial, Mr. Venkata proposed that, as to the conspiracy count of the Indictment, the Court should instruct the jury that "Mr. Venkata is charged with conspiring to defraud the United States by converting government information to sell for private gain," and that the jury must find beyond a reasonable doubt that "[b]etween October 2014 and April 2017, an agreement existed between two or more people to commit the crime of defrauding the United States by converting government information to sell for private

---

[9]    The standard pattern instruction for conspiracy in violation of 18 U.S.C. § 371 contained the Red Book provides that the Court should instruct the jury that the defendant "is charged with conspiring to [describe object of the conspiracy]" and—as to the first element of conspiracy, a conspiratorial agreement—that "[Between [beginning date] and [concluding date]], an agreement existed between two or more people to commit the crime of [describe object of the conspiracy]." Red Book 7.102.

gain." (ECF No. 125 at 4.)  This was a correct statement of the law and supported by ample trial

evidence.

Rejecting Mr. Venkata's characterization, the Court's instructions as to

conspiracy provided in relevant part:

> Mr. Venkata is charged with conspiring, one, to commit an offense against the United States; that is, theft of government property, in violation of 18 U.S.C. section 641; and two, to defraud the United States.  These are called the objects of the conspiracy. . . .
>
> The elements of conspiracy, each of which the government must prove beyond a reasonable doubt, are that, first, between October 2014 and April 2017, an agreement existed between two or more people to commit at least one of the following objects of the conspiracy: A, to steal or knowingly convert property belonging to the United States with an aggregate value exceeding $1,000, to wit, copies of the Department of Homeland Security - Office of Inspector General's enforcement database, EDS, system; copies of DHS-OIG's EDS source code and database files; copies of the U.S. Postal Service - Office of Inspector General case management system; copies of the USPS-OIG's STARS database and PARIS code; or the PII, or personal identifiable information, of approximately 246,167 DHS employees, and approximately 6,723 USPS employees in violation of 18 U.S.C. section 641; or B, to defraud the United States by devising, or intending to devise, a scheme to defraud, or for obtaining money or property from the United States Department of Agriculture - Office of Inspector General by means of materially false or fraudulent pretenses, representations or promises, or by concealing material facts.

Trial Tr. Morning Session, 65:23–66:3, 66:18–67:13, April 7, 2022.

The evidence adduced at trial, the Government's opening statement, and the

Indictment reflect that the conspiratorial agreement alleged and put to the jury was not *either* to

steal or knowingly convert the property of the U.S. government *or* to defraud the U.S.

government by selling the government's own property back to federal agencies.  But the Court's

instruction suggested to the jury that the co-conspirators could be found guilty of participating in

the conspiracy if the jury found that they had either agreed to defraud the government, or agreed

to steal or convert U.S. property.  This is wrong.  The illegal agreement alleged and put to the

jury was that the co-conspirators agreed to defraud the U.S. government *by* stealing or knowingly converting U.S. government property *and* selling it back to federal agencies.

At the very start of its opening statement, the Government argued that Mr. Venkata "stole valuable technology that belonged to a federal agency; software programs worth millions of dollars of taxpayer money. He and his co-conspirators had a plan to redevelop that software and then sell it back to other government agencies. They wanted to sell the government property that it already owned, property that they themselves had stolen from the government, and they wanted to do so at a profit." Trial Tr. Morning Session, 4:7–13, March 29, 2022. In other words, the Government contended from the outset that the co-conspirators agreed to defraud the government by stealing software *and* selling it back to federal agencies.

Charles Edwards repeatedly testified to this understanding of the essential nature of the conspiratorial agreement. When asked why he wanted to "mirror" a copy of the government's case management system on his home server, Mr. Edwards testified that it was because he "wanted to see how it executed or how it -- how it displayed so I can look at to see how it function and see the drawbacks of it; *because I wanted to build a better system and sell it back to the government*." Trial Tr. Afternoon Session, 24:19–22, March 29, 2022 (emphasis added); *see also* Trial Tr. Morning Session, 70:22–24, March 30, 2022 (testifying that he "wanted to build a case management system and then sell it back to the government for profit"). Mr. Edwards later agreed in his testimony that he spoke with Peter Paradis "[t]o discuss what [Mr. Edwards] want[ed] to do, which is steal government information and then sell it back to the government for profit. . . ." Trial Tr. Morning Session, 121:21–24, March 30, 2022.

The allegations in the conspiracy count of the Indictment also reflect this understanding of the conspiratorial agreement. After alleging that Mr. Venkata and his co-

conspirators conspired to knowingly steal or convert specified government property in violation of 18 U.S.C. § 641 and to defraud the government in violation of 18 U.S.C. § 371, the Indictment lists three specific "Purposes of the Conspiracy" to which the co-conspirators agreed. These paragraphs reflect that the conspiratorial agreement alleged was not an agreement to convert government property *or* to defraud the government, but rather to defraud the government *by* illegally stealing government property *and* selling it back to the government for profit. *See* Indictment ¶ 12 (purpose of the conspiracy was to steal specified property "*so that* Defendant EDWARDS and his business DBS could create and develop a . . . case management system to be offered for sale to government agencies" (emphasis added)); *id.* ¶ 13 (purpose of the agreement was "to access and copy" software access keys "to assist with the creation and development of . . . a case management system to be offered for sale to government agencies for the benefit, enrichment, and profit of Defendant EDWARDS and his business DBS"); *id.* ¶ 14 (purpose of the agreement was "to conceal from DHS-OIG, USDA-OIG, and others the theft and provision of [the EDS system, source code, and the DHS-OIG's database] to Defendant EDWARDS").[10] These paragraphs reflect the essential nature of the agreement, specifying what illicit ends the co-conspirators sought to achieve. *See Braverman*, 317 U.S. at 53 ("[T]he precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and

---

[10]    Although Paragraph 14 of the Indictment does not explicitly mention the fraudulent sale of software to government agencies, this paragraph refers to the "provision" of the EDS system, source code, and the DHS-OIG's database to Mr. Edwards. Read in the context of the other allegations in the Indictment, this clearly refers to the conspiratorial plan to provide Mr. Edwards with stolen property so that he could develop it into a product for sale to federal agencies. Moreover, this paragraph's reference to "conceal[ment]" of theft should be read in conjunction with the "Manner and Means" allegations of the conspiracy count, which alleges that the co-conspirators "concealed their theft of EDS-related software, source code, databases, documents, information, and PII from USDA-OIG through false and fraudulent pretenses, representations, and promises . . . to encourage and induce USDA-OIG into purchasing EDS 2.0 for the benefit, enrichment, and profit of Defendant EDWARDS and his business DBS." Indictment ¶ 15(g).

defines its objects.").  And they reflect that the conspiratorial agreement alleged was not an agreement to convert government property *or* to defraud the government, but rather to defraud the government *by* illegally stealing government property *and* selling it back to the government for profit.  *See* Indictment ¶¶ 12-13.

     *United States* v. *Treadwell* further supports the conclusion that the conspiracy instruction given to the jury was erroneous.  In that case, the defendant-appellant argued that final jury instructions as to the conspiracy charge at issue "inadequately informed the jury that it was required to find the particular fraudulent scheme described in" the paragraph of the indictment entitled "Object of the Conspiracy," which provided detail as to the specific facts of the conspiratorial agreement alleged.  *Treadwell*, 760 F.2d at 335–36.  The D.C. Circuit disagreed, concluding that the instruction had adequately informed the jury of the "essential nature" of the conspiratorial agreement because it included the entire "Object of the Conspiracy" paragraph, among others.  *Id.* at 337.  The jury instructions here, by contrast, failed to include the "Purposes of the Conspiracy" section of the Indictment, which is equivalent to the "Object of the Conspiracy" paragraph in *Treadwell*.

     The Government's representations at trial as to what it sought to prove, the testimony of Charles Edwards, and the Indictment reflect that the essential nature of the conspiratorial agreement was to defraud the government by means of converting government software and selling it back to the government for profit.  By departing from this understanding of the agreement, the Court's instruction to the jury failed to "inform the jury of the essential nature of the conspiratorial agreement . . . that the government was required to prove beyond a reasonable doubt," and was therefore legally erroneous and violated Mr. Venkata's substantial

rights.  *Id.*; *see also Neder* v. *United States*, 527 U.S. 1, 13 (1999) (finding that an "improper

instruction on an element of the offense violates the Sixth Amendment's jury trial guarantee").

**B.    The Theory of Defense Instruction Erroneously Excluded An Instruction Concerning Apparent Authority**

Under the well-established theory of the case rule, "a defendant is entitled to an

instruction on a defense theory if it has a basis in the law and in the record."  *Joy* v. *Bell*

*Helicopter Textron, Inc.*, 999 F.2d 549, 556 (D.C. Cir. 1993); *see also United States* v. *Mathis*,

535 F.2d 1303, 1305 (D.C. Cir. 1976) ("The settled law in this circuit is that a defendant is

entitled to an instruction on his theory of the case when properly requested by counsel and when

the theory is supported by any evidence.").  Evidence of the defendant's theory need not be

compelling:  A "theory-of-defense instruction is in order if there is sufficient evidence from

which a reasonable jury could find for the defendant on his theory."  *United States* v. *Hurt*, 527

F.3d 1347, 1351 (D.C. Cir. 2008).  "Where there is evidentiary support for special facts

sustaining a rational defensive theory, to which the court's attention is specifically directed, the

defendant is entitled to have the jury charged on that theory.  However weak the evidence,

however implausible the theory may appear to be, the matter is for the jury's determination."

*Brooke* v. *United States*, 385 F.2d 279, 284 (D.C. Cir. 1967).  "Such evidence may be direct or

circumstantial."  *United States* v. *Akhigbe*, 642 F.3d 1078, 1083 (D.C. Cir. 2011).

The theory of the case rule "is not confined to cases involving" affirmative

defenses such as self-defense or entrapment, but "applies as well to situations where special facts

present an evidentiary theory which if believed defeats the factual theory of the prosecution."

*Levine* v. *United States*, 261 F.2d 747, 748–49 (D.C. Cir. 1958); *see also United States* v.

*Garrett*, 898 F.3d 811, 814 (8th Cir. 2018) ("The word 'defense' in this context includes

evidence that negates an affirmative element of the government's case, such as the *mens rea*

element of the charged offense."). "What is required before the theory of the case rule comes

into play is a more involved [defense] theory involving law or fact, or both, that is not so obvious

to any jury." *Laughlin* v. *United States*, 474 F.2d 444, 455 (D.C. Cir. 1972). Although "[t]he

trial court is not required to rehearse the evidence, especially where the effect would be . . . to

give special emphasis to the defendant's testimony," a theory-of-defense instruction is

appropriate where the jury "might find the defendant guilty . . . because of failure to appreciate

the significance of defendant's evidentiary theory." *Laughlin* v. *United States*, 385 F.2d 287,

294 (D.C. Cir. 1967).

      Here, Mr. Venkata's proposed theory of defense instruction stated that "Mr.

Venkata . . . contends that he did not possess the requisite state of mind because he engaged in

the conduct related to Counts One, Two, Eleven and Twelve based on his reasonable belief that

he was acting pursuant to the apparent authority of Sonal Patel, regardless of whether or not she

had the actual authority to sanction that conduct." (ECF No. 141 at 1-2.) This proposed theory

of defense instruction had both a "basis in the law and in the record," and was therefore required

under D.C. Circuit caselaw. *Joy*, 999 F.2d at 556. The D.C. Circuit has recognized that although

"authorization from one's superiors cannot convert illegal activity into legal, yet it surely can

affect a defendant's *belief* that his conduct was lawful." *United States* v. *North*, 910 F.2d 843,

885 (D.C. Cir. 1990). Ms. Patel's apparent authority to authorize Mr. Venkata's actions was

therefore legally relevant evidence to one of the key questions presented to the jury: whether

Mr. Venkata had a culpable mental state.

      Further, ample trial evidence supported the instruction. *See Hurt*, 527 F.3d at

1351. Multiple witnesses testified that Ms. Patel was Mr. Venkata's direct and sole supervisor

during the relevant period. *See* Trial Tr. Afternoon Session, 7:6–8, 31:3–4, April 1, 2022 (Judy

Kuo); Trial Tr. Afternoon Session, 8:22–11:25, April 5, 2022 (Michael Horton); *id.* at 29:12–14,

41:6–9, 47:12–25, 48:1–6 (Sonal Patel).  Mr. Horton, the Chief Information Officer at DHS-

OIG, testified that Mr. Venkata would have turned to Ms. Patel, and no one else, for instructions.

*Id.* at 9:9–11:3.  He further testified that DHS-OIG had a distinctly hierarchical structure, and

that Ms. Patel had the discretion to give Mr. Venkata all work-related instructions.  *Id.*; *id.* at

12:2–17.  Ms. Patel's testimony, as well as e-mails and text messages, also reflected that she

frequently corresponded with Mr. Venkata about his performance of work-related tasks.  *Id.* at

49:5–54:15; Def. Exs. 14–18; Gov't Ex. 17.  Another of Ms. Patel's supervisees, Ms. Kuo,

testified that she did not second-guess Ms. Patel's instructions:  "[b]ecause it's in the workplace

and she's my supervisor, I think this is normal."  Trial Tr. Afternoon Session, 22:16–17, April 1,

2022.  Based on this evidence, a jury could find that Mr. Venkata reasonably believed that Ms.

Patel had the authority to authorize his performance of tasks such as configuring a laptop or

server for, or delivering CDs to, Mr. Edwards, especially when such instructions were delivered

in the workplace and appeared work-related.

        Finally, an instruction on Ms. Patel's apparent authority was required under the

theory of the case rule here.  The above evidence constitutes "special facts" supporting

Mr. Venkata's evidentiary theory—that he reasonably believed that Ms. Patel had authority to

authorize his actions, such that he did not have a culpable *mens rea*—that "if believed [would]

defeat[] the factual theory of the prosecution" as to Counts One, Two, and Eleven.  *Levine*, 261

F.2d at 748.  The theory of the case rule is not limited only to affirmative defenses, but extends

also to situations where, as here, the proposed instruction pertains to an evidentiary theory that is

"not so obvious," *Laughlin*, 474 F.2d at 455, and where a jury might "fail[] to appreciate [its]

-37-

significance," *Laughlin* v. *United States*, 385 F.2d 287, 294 (D.C. Cir. 1967).[11]  Mr. Venkata's proposed apparent authority instruction fits comfortably within this category.  The significance of Ms. Patel's apparent authority to Mr. Venkata's mental state would be far from obvious to the typical juror.  *Cf. United States* v. *Peltier*, 585 F.2d 314, 328 (8th Cir. 1978) (court need not have instructed jury that defendant's theory was "that the government framed him by manufacturing evidence and inducing witnesses to testify falsely" as "[i]t is a matter of common sense that a government prosecution based on false testimony is a weak one.").  By omitting any instruction on apparent authority, the jury instructions as given prevented the jury from considering Mr. Venkata's defense, or risked the jury mistakenly rejecting it on the grounds that the authorization of a superior could not render his conduct legal, *see North*, 910 F.2d at 885, causing irreparable prejudice to Mr. Venkata.

The Government's objections to Mr. Venkata's theory of defense instruction were also without merit.  *First*, an instruction on apparent authority would not have been duplicative because the instructions given on the substantive elements of the charges and how the jury was to evaluate the evidence plainly did not elucidate for the jury Mr. Venkata's important, non-obvious evidentiary theory.  Trial Tr. Morning Session, 43, April 7, 2022; *cf. United States* v. *Hurt*, 527 F.3d 1347, 1352 (D.C. Cir. 2008) (reasoning that theory-of-defense instruction is unnecessary where standard jury instructions "substantially covered the same ground"); *see also Salley* v. *United States*, 353 F.2d 897, 898 (D.C. Cir. 1965) ("[D]espite the trial judge's correct charge that

---

[11]     At trial, the Government argued that the theory of defense instruction is limited only to affirmative defenses and theories of law, citing the Red Book sections that follow the Red Book section 9.100 on theory of defense instructions and which concern affirmative defenses such as insanity and self-defense.  (*See* Trial Tr. Afternoon Session, 23:4–24, April 7, 2022.)  But the D.C. Circuit clearly held the opposite: a requested theory of defense instruction can, and must, be given for the defense's non-obvious evidentiary theories.  *See Laughlin*, 474 F.2d at 455.

-38-

each element must be proved beyond a reasonable doubt, it is reversible error for the court to refuse on request to instruct also as to defendant's theory of the case.").

   *Second*, Mr. Venkata plainly presented his theory of the case to the jury during closing, which focused in significant part on the lack of evidence of *mens rea* in light of Ms. Patel's supervisory relationship with Mr. Venkata.  *See* Trial Tr. Afternoon Session, 65:16–17, April 6, 2022 (Mr. Venkata "was asked to do some technical support work, was told nothing about the larger purpose, and he had no idea what was going on").  Specifically, counsel noted that "[a]ll the texts between Ms. Patel and Mr. Venkata were during ordinary business hours," *id.* at 67:16–17, and that Judy Kuo testified about similar requests she received from Ms. Patel that "[b]ecause it's in the workplace and she's my supervisor, I think that's normal," *id.* at 68:5–6; *see also id.* at 77:15–20 (Ms. Patel's requests were "for Mr. Venkata to do the same work that he did in the ordinary course of his job: to provide information, to configure devices.  Like Judy Kuo told you, requests in the workplace from Ms. Patel, a supervisor, seemed normal").  Counsel concluded:

> The government told you that Ms. Patel didn't have the authority to tell Mr. Venkata to break the rules, but that misses the point.  If Ms. Patel was the only person who was giving Mr. Venkata those assignments and he had no one else to ask about those assignments, how could Mr. Venkata even know it was wrong? He trusted her.  That should give you reason to doubt.

*Id.* at 68:11–17.

   *Finally*, Mr. Venkata's proposed instruction would not have confused the jury.  The proposed instruction clearly stated to which counts it applied ("Counts One, Two, Eleven and Twelve"), the element to which it applied ("state of mind"), and what conduct Mr. Venkata reasonably believed Ms. Patel had apparent authority to authorize: "the conduct related to Counts One, Two, Eleven and Twelve."  ECF No. 141 at 1.

Because the instructions as given prevented the jury from adequately considering Mr. Venkata's defense, causing him irreparable prejudice, he is entitled to a new trial.

## CONCLUSION

For the foregoing reasons, a judgment of acquittal should be entered on all charges. In the alternative, a new trial should be granted on any charges for which a judgment of acquittal is not entered.

Respectfully submitted,

/s/ Kamil R. Shields

Kamil R. Shields
Pardis Gheibi (*pro hac vice*)
Tara N. Ohrtman (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W. Suite 700
Washington, D.C. 20006-5215
Telephone: (202) 956-7040
Facsimile: (202) 956-7676
Email: shieldska@sullcrom.com
Email: gheibip@sullcrom.com
Email: ohrtmant@sullcrom.com

Katherine M. Savarese (*pro hac vice*)
Jared H. Rosenfeld (*pro hac vice*)
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: savaresek@sullcrom.com
Email: rosenfeldj@sullcrom.com

Michelle Peterson
Chief Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C. 20004
Telephone: (202) 208-7500
Email: Shelli_Peterson@fd.org

May 20, 2022

-40-

**A0301**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                                     Plaintiff,

v.

MURALI YAMAZULA VENKATA,

                                  Defendant.

Case No. 20-cr-00066-2

Honorable Randolph D. Moss

## [PROPOSED] ORDER

**AND NOW**, upon consideration of Defendant Murali Yamazula Venkata's Motion for Judgment of Acquittal and New Trial and the Memorandum of Law in support thereof, filed May 20, 2022, it is **HEREBY ORDERED** that Defendant's motion is **GRANTED** and Defendant is **ACQUITTED** on all counts.

DATED: May __, 2022

_____
Randolph D. Moss
United States District Court Judge

**A0302**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 20-cr-00066-RDM** |
| | ) | |
| **MURALI YAMAZULA VENKATA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTIONS FOR
## <u>JUDGMENT OF ACQUITTAL AND NEW TRIAL</u>

**A0303**

After hearing six days of testimony and receiving dozens of exhibits, the jury found defendant Murali Yamazula Venkata guilty on Counts One, Two, Eleven, Thirteen, and Sixteen of the Indictment.  Venkata now asks this Court to overturn the jury's verdict, arguing that the evidence was insufficient and the jury was not properly instructed.  Those contentions are incorrect.  Defendant's motions should be denied, and this case should proceed to sentencing as scheduled.

## **BACKGROUND**

Venkata engaged in an unlawful scheme to convert government property for private gain. Venkata and his co-conspirators stole valuable code and databases belonging to the government. Their plan was to use the stolen property to develop a commercial software product, which they intended to sell back to the government at a profit.  They hired a software development company in India to build the purported commercial product.  To facilitate the Indian developers' work, they gave the developers access to vast amounts of sensitive information contained within the stolen databases, including law-enforcement records, information regarding witnesses and confidential informants, and the Personally Identifying Information ("PII") of hundreds of thousands of government employees.  Upon learning that he was under investigation, Venkata deleted incriminating text messages, call records, and emails in an effort to obstruct the investigation.

On March 5, 2020, a grand jury returned an Indictment charging defendants Venkata and Charles Kumar Edwards with Conspiracy to Commit Offenses Against the United States, in violation of 18 U.S.C. § 371 (Count One); Theft of Government Property, in violation of 18 U.S.C. §§ 641 & 2 (Count Two); Wire Fraud, in violation of 18 U.S.C. §§ 1343 & 2 (only Count Eleven pertained to Venkata); and Aggravated Identity Theft, in violation of 18 U.S.C. §§ 1028A & 2 (Counts Twelve through Fifteen).  The Indictment also charged Venkata with Destruction of

1

**A0304**

*Herron*, 567 F.2d 510, 514 (D.C. Cir. 1977); *see also United States v. Davis*, 763 F. Supp. 645, 648 (D.D.C. 1991) ("Sentencing courts should therefore be wary of rejecting a jury's assessment of witness credibility."); *United States v. Khanu*, 675 F. Supp. 2d 55, 60 (D.D.C. 2009) ("This stringent standard contemplates that the ultimate decision of guilt or innocence should be left to the jury, and that it is the province of the jury to credit certain testimony and reject other testimony.").

## <u>ARGUMENT</u>

## I.    THE EVIDENCE IS SUFFICIENT TO SUSTAIN THE JURY'S VERDICTS ON THE CONSPIRACY TO DEFRAUD AND WIRE FRAUD CHARGES

Venkata seeks to overturn the jury's verdicts on the conspiracy to defraud the United States and wire fraud charges, asserting that the "evidence at trial was insufficient for a rational jury to find beyond a reasonable doubt that any of the defendants (much less Mr. Venkata) sought to cheat the government, that Mr. Venkata had any knowledge of the scheme, or that the relevant wire communication by Mr. Venkata crossed state lines." Mot. at 3. This claim falls short on all three fronts.

First, the government proved beyond a reasonable doubt at trial that Venkata aided and abetted a scheme to defraud USDA-OIG through misleading half-truths and omissions that struck at the core of the anticipated bargain between the conspirators and Peter Paradis, the representative of USDA-OIG. Specifically, the conspirators devised a scheme whereby they would steal a government system worth over $5 million from DHS-OIG, use that system to develop an enhanced version, and then sell that enhanced version to USDA-OIG on the basis of misleading half-truths and without disclosing material facts concerning the development of the repackaged product—namely, that it was developed using stolen proprietary code and sensitive law enforcement data with the direct involvement of software developers in India. The jury heard evidence that these

3

OIG.  Trial Tr. 3/31/22 AM, 39:16–40:6 (Paradis).

In late 2015, Paradis contacted Patel with a view toward securing EDS for USDA-OIG, *see id.* at 37:7–38:25, but Edwards and Patel seized on Paradis's outreach as an opportunity to pitch the "next generation EDS," which Edwards was planning to develop.  *See* Trial Tr. 3/29/22 PM, 29:2–30:6 (Edwards).  Over the next few months, Edwards and Patel recruited Venkata to assist in these efforts, and Venkata readily agreed to join the conspiracy.  *Id.* at 30:7–31:6 & 34:19–22.  Moreover, the evidence at trial proved that Venkata knew that Edwards's case management system was a for-profit endeavor that could potentially yield millions of dollars, *see id.* at 34:7–35:11, and that it was being developed for the express purpose of selling it to USDA-OIG through Paradis.  *Id.* at 43:21–44:11.  Critically, Venkata knew that Edwards would hire software developers in India for the purpose of developing the case management system.  *Id.* at 44:25–45:4.

From May 2016 through March 2017, Venkata assisted Edwards in setting up the original version of EDS on a personal laptop and on two servers housed in Edwards's residence.  *See generally id.* at 57:13–96:25 & GEX 19, at 1–8.  Also in March 2017, Venkata assisted Edwards in setting up USPS-OIG's case management system on a server housed in Edwards's residence for the purpose of assisting the software developers in India.  *See generally* Trial Tr. 3/29/22 PM, 97:1–120:15 (Edwards) & GEX 19, at 8–21.  Critically, Edwards uploaded the data necessary to build this case management system on his home server using two DVDs that Venkata personally removed from DHS-OIG's headquarters and hand-delivered to Edwards outside of government premises on March 22, 2017.  *See generally* Trial Tr. 3/29/22 PM, 107:11–111:1 (Edwards); GEX 84; and GEX 19, at 12–13.

At no point during the execution of the scheme was Paradis informed that Edwards's case management system was being developed with stolen proprietary code and sensitive databases,

5

fraud, plain and simple, and the jury found as much beyond a reasonable doubt. *See United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016) (holding that misrepresentations include "not only false statements of fact but also misleading half-truths" as well as "the omission or concealment of material information, even absent an affirmative duty to disclose, if the omission was intended to induce a false belief and action to the advantage of the schemer and the disadvantage of the victim"); *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) ("A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a fact calculated to deceive another out of money or property."); *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000) (holding that defendant's "upbeat statements were misleading by their incompleteness"); *cf. United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1128 (D.C. Cir. 2009) ("[E]ven partially true statements can be actionable fraud if intentionally misleading as to facts.").

The evidence at trial further established the following facts beyond a reasonable doubt regarding Venkata's knowledge and intent. First, Venkata knew that Edwards was developing a case management system to sell to USDA-OIG through Paradis. Trial Tr. 3/29/22 PM, 43:21–44:11 (Edwards); *see also* Trial Tr. 4/5/22 PM, 92:20–93:12 (Patel). Second, as previously noted, Venkata personally set up a mirror version of EDS on a personal laptop and two servers located in Edwards's home with stolen proprietary code and sensitive databases that he *knew* Edwards was not authorized to possess. *See* Trial Tr. 4/4/22 AM, 38:19–39:4 (Steel) ("**Q.** Okay. So what, if anything, did Mr. Venkata tell you about his involvement in that commercial platform with Mr. Edwards? **A.** He said he had no involvement whatsoever, that he did not participate in any of the activities related to it, and that he was not a party to it. He additionally said that he had no knowledge of DHS information being exfiltrated, and *actually said it would be unethical to take*

7

developers in India.  *See* Trial Tr. 3/29/22 PM, 98:20–99:9 (Edwards).

Lastly, the jury heard evidence regarding Venkata's knowledge of the restrictions placed on the transfer of information outside of DHS-OIG, *see* GEX 1 (Executed Computer Access Agreement) and GEX 9 (EDS End User Agreement), as well as testimony from similarly situated employees who, like Venkata, understood these restrictions but, unlike Venkata, testified that they would have never engaged in Venkata's conduct.  *See, e.g.*, Trial Tr. 4/1/22 AM, 63:13–65:12 (Ambati); Trial Tr. 4/1/22 PM, 26:10–28:1 (Kuo); and Trial Tr. 4/5/22 AM, 43:6–45:7 (Nataraj).

Based on the foregoing facts, the jury rightly concluded that the conspirators devised or intended to devise a scheme to defraud USDA-OIG and that Venkata knowingly aided and abetted the scheme to defraud.  The jury reasonably determined based on this overwhelming evidence that Venkata knowingly and intentionally participated in a scheme to defraud USDA-OIG by concealing the use of stolen government property to develop a commercial database to be sold to USDA-OIG.  There is no basis to disturb Venkata's conviction for this straightforward fraud scheme, which is amply supported by the record.

### B.    Defendant's Motion for Judgment of Acquittal Has No Legal Support

To convict of wire fraud, the government must prove beyond a reasonable doubt that (1) Venkata "knowingly and willingly entered into a scheme to defraud" and (2) "an interstate wire communication was used to further the scheme."  *United States v. Alston-Graves,* 435 F.3d 331, 337 (D.C. Cir. 2006) (citing *United States v. Maxwell*, 920 F.2d 1028, 1035-36 (D.C. Cir. 1990)).  Moreover, in the D.C. Circuit, the requisite intent to defraud may be inferred from circumstances and need not be proved by direct evidence.  *See, e.g.*, *United States v. Alston*, 609 F.2d 531, 538 (D.C. Cir. 1979).  The jury was properly instructed on this count and convicted Venkata based on the above facts.

Venkata argues that the government did not prove the scheme to defraud element of the

9

back end given we had a breach, as well as procedures." Trial Tr. 04/04/22 AM, 98:14–99:11
(Steel). The jury may have rightly concluded that, had the conspirators succeeded in their scheme
to defraud, this risk could have been similarly transferred to USDA-OIG, thereby exposing the
agency to an unbargained-for risk of economic loss in the future. Because the material omissions
in the instant matter were directed to the pricing and the nature of the bargain contemplated by the
scheme to defraud, *Regent Office Supply* is inapposite. Even courts in the Second Circuit have
found *Regent Office Supply* inapplicable where, like here, the false representations misled victims
as to the nature and quality of the bargain. *See, e.g.*, *United States v. Kinney*, 211 F.3d 13, 18–19
(2d Cir. 2000) (holding that *Regent Office Supply* has no application where misrepresentations
affected the victims' understanding of the bargain and misled them as to the nature and quality of
the product) (collecting cases).

Venkata next cites to an Eleventh Circuit decision for the proposition that "even if a
defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must
end in an acquittal if the jury nevertheless believes that the alleged victims received exactly what
they paid for." Mot. at 4 (citing *United States* v. *Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016)).
In *Takhalov*, "the defendants . . . tricked men to come into the defendants' clubs" by hiring women
to "pose as tourists, locate visiting businessmen, and lure them into the defendants' bars and
nightclubs." 827 F.3d at 1310. *Takhalov* is inapposite for the same reason that *Regent Office
Supply* does not apply to the instant case: the material omissions in the instant case, unlike the
ones in *Takhalov*, struck at the core of the bargain. *See id.* at 1313–14 (stating that wire fraud
involves schemes in which a defendant "lies about the nature of the bargain itself," including a "lie
about the price" or a "lie about the characteristics of the good"). Just as importantly, *Takhalov's*
holding remains of questionable validity in the Eleventh Circuit and, as such, should not control

11

**A0309**

policies" and that "the misrepresentations did anything more than induce transactions that the insurers would have avoided, for essentially non-economic reasons, had they known the truth." *Id.* at 571. The Second Circuit rejected this argument because, like here, all the government needed to show was that "the misrepresentations were relevant to the insurers' economic decision-making because they believed that the STOLI policies differed economically from non-STOLI policies, and thus that the defendants' misrepresentations deprived the insurers of 'potentially valuable economic information.'" *Id.* at 574 (citing *United States v. Wallach*, 935 F.2d 445, 463 (2d Cir. 2007). As noted, the conspirators in the instant case omitted material facts that went directly to the pricing and characteristics of the case management system that they were developing. Accordingly, they intended to deprive USDA-OIG of information that went straight to the agency's economic decision-making. At bottom, the conspirators' lies in the instant case fall squarely within the confines of *Binday's* holding notwithstanding Venkata's misreading of that case. *See also United States v. Titilayo Akintomide Akinyoyenu*, 201 F. Supp. 3d 82, 86–87 (D.D.C. 2016) (J. Boasberg, J) (rejecting a pre-trial challenge to a mail fraud charge where the victims allegedly received "exactly what they ordered" because the alleged misrepresentations deprived the victims of information that, in effect, undermined the right to control money and property) (citing *United States v. Trie*, 21 F. Supp. 2d 7, 20 (D.D.C. 1998)); *United States v. Gatto*, 986 F.3d 104, 116–17, 124 (2d Cir. 2021) (affirming wire fraud conviction where the defendants deprived universities of information that would have helped them decide whether to award athletic-based aid to recruits because the "wire fraud statute is violated when the defendant prevents the victim from making an informed economic decision about the victim's property, regardless of who ultimately benefits from the victim's property").

In sum, the straightforward fraud scheme proven here—involving the intentional

13

**A0310**

interstate wire charged in Count Eleven of the Indictment. *United States v. Castellanos*, 731 F.2d 979, 984 (D.C. Cir. 1984) (holding that "no legal distinction is made between circumstantial and direct evidence in determining whether sufficient evidence supports the verdict"). The jury's finding in this respect should remain undisturbed.

Specifically, the jury heard the following evidence. On March 21, 2017, Patel texted Venkata to inform him that she had left two DVDs on Venkata's "chair" so that he could deliver them to Edwards; Venkata responded "[s]ure" and "will do." GEX 17, at 9. At trial, Patel testified that the two DVDs contained the USPS-OIG-related information and confirmed that she had left the DVDs on Venkata's office chair in a "yellow envelope." Trial Tr. 4/5/22 PM, 77:4–75:8 (Patel). The jury heard testimony confirming that Venkata's office was in fact located in the District of Columbia. Trial Tr. 4/4/22 AM, 35:12–19 (Steel).

The following morning, at approximately 9:24 AM (EDT), Edwards texted Venkata the following: "Sonal [Patel] told me that she is leaving 2 dvds with u; Can I come by at 11.15 and pick it up[?]" To which Venkata replied: "Sure Charles." GEX 19, at 12. At approximately 10:09 AM (EDT), Edwards placed a telephone call from Columbia, Maryland, to Venkata's cell phone for the purpose of arranging pickup of the DVDs. *See* Trial Tr. 3/30/22 AM, 7:2–10 (Edwards); GEX 36B, at 18. Approximately 90 minutes later, at 11:36 AM (EDT), Edwards placed a second call to let Venkata know that he "was going to pull in front of the DHS-OIG headquarters at Vermont Avenue" so that Venkata would "come out and give [Edwards] the two DVDs." Trial Tr. 3/29/22 PM, 105:14–107:19 (Edwards); GEX 36B, at 19. Edwards further confirmed at trial that Venkata did in fact meet him outside of DHS-OIG's headquarters in the District of Columbia and handed him the two DVDs. Trial Tr. 3/29/22 PM, 109:15–110:1 (Edwards).

15

his use or the use of another . . . any record, voucher, money, or thing of value of the United States or of any department or agency thereof." 18 U.S.C. § 641. It provides for punishment as a felony unless "the value of such property, in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000," in which case the violation is punishable as a misdemeanor. *Id.* The statute further provides that the "word 'value' means face, par, or market value, or cost price, either wholesale or retail, whichever is greater." *Id.*

To prove a felony violation of Section 641, the government must prove that (1) the defendant stole or knowingly converted property for his use or for the use of another; (2) the property belonged to the United States at the time it was stolen or converted; (3) when defendant stole or converted the property, he intended to deprive, without right, the owner of the use or benefit of the property; and (4) the property stolen or converted had, in the aggregate, a value of more than $1,000. *See* Final Jury Instructions, ECF No. 146, at 37; Young Law. Sect. of the Bar Ass'n of D.C., Criminal Jury Instructions for the District of Columbia, Instruction 5.351 (Barbara E. Bergman ed., 5th ed. 2021) [hereinafter "Red Book"].

To steal, under Section 641, means to "take away from one in lawful possession without right with the intention to keep wrongfully." *Morissette v. United States*, 342 U.S. 246, 271 (1952) (quoting *Irving Tr. Co. v. Leff*, 253 N.Y. 359, 364 (1930)). Conversion, unlike stealing, "may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful." *Id.* at 271–72. Conversion "may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use." *Id.* at 272. Thus, stealing is a subset of conversion, defined by the initial wrongful taking and the intent to keep permanently. *See id.* at

17

Section 228 explain that the "limits of the permitted use ordinarily are determined by the terms, express or reasonably to be implied, of the contract or other agreement between the parties, and the question becomes one of whether there is a material breach of the agreement." Restatement cmt. c. "Most unpermitted uses are sufficiently serious to constitute such a material violation," unless they are "minor, temporary, and unimportant deviations from the authorized use, which do no harm and are not intended as a defiance of the other's rights." *Id.* cmt. d.

### B.    The Government Proved That Defendant Violated Section 641 Beyond a Reasonable Doubt

As to EDS and the EDS databases, the evidence showed that, in early May 2016, Venkata agreed with Edwards and Patel to build a commercial version of EDS to sell back to the government at a profit. *See* Trial Tr. 3/29/22 PM, 30:7–37:12 (Edwards); *id.* at 43:13–44:11. It was an idea that the two had discussed "over the years." *Id.* at 34:23–35:7. Venkata told Edwards that if, after Edwards left the government, he "built a commercial viable case management system," Edwards would "be making millions." *Id.* Edwards and Venkata discussed this unlawful agreement in a phone call on May 11, 2016, and planned a lunch meeting to discuss it further, which was subsequently canceled due to Edwards's family emergency. *See id.* at 30:10–31:9. Edwards's testimony regarding the timing of these conversations was corroborated by telephone records and text messages. *See* GEX 36B, at 2; GEX 17, at 2.

On May 26, 2016, Edwards and Patel met with Peter Paradis at Matchbox Pizza to pitch him on their new case management system. *See* Trial Tr. 3/29/22 PM, 35:12–36:4 (Edwards). Edwards and Patel told Paradis that Venkata would assist in incorporating the eSubpoena module into the new system, relying on the fact that Venkata had agreed to do so in conversations earlier in the month. *See id.* at 36:19–37:12; GEX 11A, at 29. The next day, May 27, 2016, Patel copied the EDS source code and databases from DHS-OIG's servers onto two DVDs and gave them to

19

compile." *Id.*

As to PARIS and STARS, in March 2017, Edwards decided to set up PARIS and STARS on a server located in his home to show the programmers in India how the audit module should work. *See* Trial Tr. 3/29/22 PM, 98:25–99:4 (Edwards). In a series of text messages, Edwards explained his plan to Venkata: "I am trying to install Paris in another server . . . I have the really old code. I want to show the programmers how the Audit module should work . . . Imported all the data from stars." GEX 19, at 9. And he sought Venkata's assistance with resolving a problem with the program. *See id.* at 10. Venkata attempted to log into the server to address the problem, but the server crashed. *See id.* at 10–11; Trial Tr. 3/29/22 PM, 104:17–105:13 (Edwards).

Edwards reached out to Patel to copy PARIS and STARS from the DHS-OIG server onto DVDs, which he could use to reboot the program on his home server. Trial Tr. 3/29/22 PM, 106:4–12 (Edwards); GEX 18, at 55–56. Because she was teleworking, Patel asked Venkata to deliver the DVDs to Edwards. *See* Trial Tr. 3/29/22 PM, 106:4–12 (Edwards); GEX 17, at 9. Venkata obliged. Just three days after Edwards informed him that the PARIS server at his home had crashed, Venkata delivered the package containing the DVDs to Edwards outside DHS-OIG's offices. *See* Trial Tr. 3/29/22 PM, 107:11–19, 109:15–110:1 (Edwards); GEX 84. Edwards then installed PARIS and STARS from the DVDs and got the server up and running. *See* Trial Tr. 3/29/22 PM, 110:17–111:1 (Edwards). Venkata assisted Edwards in resolving problems with the investigations module and the time and attendance function. *See id.* at 110:17–120:14.

The government introduced a forensic image of the PARIS server seized from Edwards's home into evidence. *See* Trial Tr. 3/30/22 PM, 75:15–76:1 (Lowder); GEX 104. Agent Lowder testified that, during his examination of that server, he found "database files containing essentially the whole of our STARS back-end database that connects to the PARIS system" as well as

21

individuals whose data was breached.  Trial Tr. 3/31/22 AM, 9:4–7 (Balfour).

The foregoing evidence was sufficient to prove each element of a felony violation of Section 641 beyond a reasonable doubt.  As to the first element of a violation of Section 641, the jury could find that Venkata either stole or knowingly converted the property at issue.  The jury could find Venkata liable for stealing based on Patel's theft of EDS and the EDS databases on May 27, 2016, and of PARIS and STARS on March 21, 2017.  When Patel made unauthorized copies of those systems, she "[took]" them "away from one in lawful possession without right with the intention to keep wrongfully."  *Morissette*, 342 U.S. at 271 (quoting *Irving Tr. Co.*, 253 N.Y. at 364).  Further, the evidence was sufficient for the jury to conclude that Venkata joined the conspiracy in early May 2016, before the initial taking of the EDS system and databases, and that such taking was committed in furtherance of, and as a natural consequence of, the conspiracy.  *See United States v. Washington*, 106 F.3d 983, 1010–11 (D.C. Cir. 1997).

Alternatively, the jury could find Venkata liable for conversion of the property at issue, either as a principal, an aider and abettor, or a co-conspirator.  As the Supreme Court explained in *Morissette*, conversion is broader than stealing.  *See* 342 U.S. at 271.  The Restatement provisions cited in *Collins* make clear that the interference with property rights may occur over a period of time.  *See* 56 F.3d at 1421 (citing Restatement (Second) of Torts §§ 222A & 228 (Am. L. Inst. 1965)).  Indeed, the first listed factor is "the extent and *duration* of the actor's exercise of dominion or control."  Restatement (Second) of Torts § 222A (Am. L. Inst. 1965) (emphasis added).  The illustrations provided in the Comments reinforce that conclusion.  For example, the Comments to Section 227 explain that if B uses A's desk to write a letter without A's consent on one occasion, that is not a conversion, but if he uses the desk daily for six months, it is a conversion.  *See* Restatement (Second) of Torts § 227 Comments cmt. b, illus. 1 (Am. L. Inst. 1965).

23

benefit of its property, specifically, the right to control its use. *See* Restatement (Second) of Torts §§ 222A, 227 & 228 (Am. L. Inst. 1965). Ample evidence showed that Venkata knew he was not authorized to remove the programs and databases from government servers, to use them for commercial purposes, or to transfer them to Indian developers. *See* GEX 1 (Computer Access Agreement); Trial Tr. 4/1/22 AM, 63:14–64:6, 65:7–12 (Ambati); Trial Tr. 4/1/22 PM, 25:10–15, 26:10–28:1 (Kuo); Trial Tr. 4/5/22 AM, 43:6–45:7 (Nataraj); Trial Tr. 4/5/22 PM, 21:17–22:3 (Horton); *id.* at 91: 17–92:1 (Patel).

Fourth, the evidence demonstrated that the value of the property exceeded $1,000. The government introduced evidence that DHS-OIG spent over $2.3 million to acquire EDS, plus approximately $3.6 million in subsequent years to develop and improve it. *See* Trial Tr. 3/29/22 AM, 52:23–54:7 (Steel); GEX 16A (contract for acquisition of EDS). Agent Steel further testified, based on his observations of the PARIS system and his experience with DHS-OIG's comparable system, that it cost over $1,000 to develop. *See* Trial Tr. 4/4/22 AM, 16:18–17:13 (Steel).

## C.    Defendant's Arguments are Incorrect

Venkata argues that the evidence was insufficient because (1) "stealing" within the meaning of Section 641 requires asportation of tangible property; (2) the "serious interference" required to prove conversion requires that the owner be deprived of the possession or use of the property; (3) Edwards and Patel had made other copies of the property before he joined the conspiracy; and (4) "value" cannot be proven on the basis of production or acquisition costs. These arguments are incorrect.

### 1.    Section 641 Does Not Require Asportation

Venkata argues that "stealing" under Section 641 is identical to the common law crime of larceny, which required the physical carrying away, or asportation, of a tangible object. *See* Mot. at 7–8. The Court need not address this issue because, as will be discussed further below, the

25

Section 641 was to eliminate the technicalities and loopholes that existed between the various common law theft offenses:

> What has concerned codifiers of the larceny-type offense is that gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches. The books contain a surfeit of cases drawing fine distinctions between slightly different circumstances under which one may obtain wrongful advantages from another's property. The codifiers wanted to reach all such instances.

342 U.S. at 271. Accordingly, the Court explained that "[t]he history of § 641 demonstrates that it was to apply to acts which constituted larceny or embezzlement at common law and also to acts which shade into those crimes but which, most strictly considered, might not be found to fit their fixed definitions." *Id.* at 266 n.28.

Venkata's reading of the statute would create just the "gaps and loopholes," *Morisette*, 342 U.S. at 273, that Section 641 was designed to eliminate. As the First Circuit has explained, "reading the statute to require asportation would perforce limit § 641 to tangible property, as intangibles cannot be carried away. This reading of the statute is too narrow and is contradicted by the great weight of authority." *United States v. Herrera-Martinez*, 525 F.3d 60, 63 (1st Cir. 2008). Consistent with that conclusion, two circuits' pattern jury instructions expressly provide that physical asportation is not required to establish a violation of Section 641, and no circuit's jury instruction provides that it is. *See* Fifth Circuit Pattern Jury Instructions (Criminal Cases) 2.27 (2019) ("No particular type of movement or carrying away is required to constitute a taking."); Eleventh Circuit Pattern Jury Instructions, Criminal Cases O21 (2020) (same).

Courts have uniformly interpreted the word "steal[]" or "stolen" in other federal statutes to reach conduct broader than common law larceny. *See United States v. Turley*, 352 U.S. 407, 417 (1957) ("'Stolen' as used in 18 U.S.C. § 2312 includes all felonious takings of motor vehicles with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not

27

**A0317**

defendant's unauthorized use.  *See id.*  It did not hold that deprivation of use of possession of property is required in every case.  Such a rule would be flatly inconsistent with the Restatement provisions that it expressly adopted, which require consideration of all the relevant factors.  *See id.* at 1420 (citing Restatement (Second) of Torts §§ 222A & 228 (Am. L. Inst. 1965)).  Moreover, if that were the rule, many cases involving conversion of government information would have come out differently.  In such cases, the government necessarily retains possession and use of the information.  *See, e.g.*, *United States v. Matzkin*, 14 F.3d 1014, 1018–20 (4th Cir. 1994) (upholding conviction for converting confidential procurement information through unauthorized disclosure); *United States v. McAusland*, 979 F.2d 970, 974–76 (4th Cir. 1992) (same); *United States v. Barger*, 931 F.2d 359, 367–68 (6th Cir. 1991) (upholding conviction for converting law-enforcement manual by distributing copies); *see also United States v. Girard*, 601 F.2d 69, 71 (2d Cir. 1979) (noting that "the defendants herein could properly be found to have converted DEA's computerized records" by disclosing their contents).

### 3.    The Government Proved the Property's Value

Finally, Venkata argues that the government failed to prove that the value of the stolen property exceeded $1,000.  That, too, is incorrect.  Section 641 allows the government to prove value by reference to the property's "cost price."  Cost price is "the price that it costs to make a product, without a profit being added."   Cost Price, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/cost-price (visited June 3, 2022); Cost Price, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/at%20cost%20price (visited June 3, 2022) ("For the amount of money that was needed to make or get something: at an amount that yields no profit"); Cost Price, Black's Law Dictionary (11th ed. 2019) ("The price that a seller pays for something to be sold").  Courts uniformly hold that Section 641 permits proof of value by reference to the government's cost of

29

there was a market for case management systems. *See Abbott v. United States*, 239 F.2d 310, 312 (5th Cir. 1956) ("[T]he Government never established . . . that there was a market for the sale, purchase and trade in prints of geophysical maps . . . ."); *United States v. Nall*, 437 F.2d 1177, 1187 (5th Cir. 1971) (holding that owner's unsupported opinion as to securities' value was insufficient to establish market value). Indeed, the whole point of the scheme was to use the stolen property to produce a commercial case management system and sell it on that market. *See* Trial Tr. 3/29/22 PM, 11:6–15 (Edwards); Trial Tr. 4/5/22 AM, at 65:10–66:3 (Barbee). Based on the cost of acquiring EDS and PARIS, the improvements the government had made at least to EDS, and the fact that the systems were fully operational, *see* Trial Tr. 3/29/22 AM, at 31:11–24 (Steel); Trial Tr. 3/30/22 PM, 67:23–68:6 (Lowder), the jury could infer that the systems would be worth more than $1,000 on the market.

### III.    THE EVIDENCE IS SUFFICIENT TO SUSTAIN THE JURY'S VERDICT ON THE AGGRAVATED IDENTITY THEFT CHARGE

At trial, the government's evidence showed that Venkata stole, or aided and abetted Charles Edwards in stealing, STARS, which was a vast database belonging to USPS-OIG containing the names and social security numbers of hundreds of thousands of federal employees, including the named victim, Scott Balfour. Venkata and Edwards installed STARS on a server located at Edwards's home so that they could demonstrate USPS-OIG's case management system to the Indian programmers who were developing their commercial version of that system. The theft of the PII was not a matter of accident or coincidence. The defendants knew that the demo version of the case management system could not run without a database to connect to, and using the exiting database was the easiest solution. The presence of the PII therefore meaningfully advanced the unlawful scheme. But not only that—it put some 250,000 federal employees at risk for financial and reputational harm. Congress enacted Section 1028A to deter precisely this type of

31

facilitate, or have the potential of facilitating" that offense.  *Smith v. United States*, 508 U.S. 223, 238 (1993) (interpreting 18 U.S.C. § 924(c)); ECF No. 110, at 5–7.

### B.    The Government Proved that Defendant Violated Section 1028A Beyond a Reasonable Doubt

The government's evidence at trial proved each element of a violation of Section 1028A beyond a reasonable doubt.

First, the jury could find that Venkata knowingly transferred, possessed, or used Scott Balfour's name and social security number, or that he aided and abetted Charles Edwards in doing so.  The evidence showed that, on March 15, 2017, Edwards informed Venkata that he wanted to "install Paris in another server" so that he could "show the programmers how the Audit module should work."  GEX 19, at 9.  Edwards told Venkata that he had "[i]mported all the data from stars."  *Id.*  Edwards testified that both he and Venkata had worked on PARIS and STARS at USPS-OIG, and that the STARS database contained personal identifying information at that time. *See* Trial Tr. 3/29/22 PM, 99:14–100:7 (Edwards).  The jury could therefore infer that Venkata knew that "all the data from stars" included PII.

On March 19, 2017, Edwards told Venkata that the PARIS server, which Venkata had been working to configure, had crashed.  GEX 19, at 12. On March 22, 2017, just three days later, Venkata delivered a package containing two DVDs to Edwards on the street outside DHS-OIG headquarters. *See* Trial Tr. 3/29/22 PM, 107:11–19, 109:15–110:1 (Edwards); GEX 19, at 12.  The DVDs contained copies of the PARIS code and STARS database that Patel had made the day before.  *See* Trial Tr. 3/29/22 PM, 106:4–12 (Edwards); GEX 84.  From the circumstances, the jury could infer that Venkata knew the contents of that package.  With Venkata's assistance, Edwards then installed PARIS and STARS from the DVDs and got the server up and running. *See* Trial Tr. 3/29/22 PM, 110:17–120:14 (Edwards).  The forensic examination confirmed that the

33

Tr. 3/29/22 AM, 37:13–18 (Steel); Trial Tr. 3/30/22 PM, 69:19–70:5 (Lowder).  Agent Lowder further testified that PARIS could not work without connecting to the STARS database.  *See* Trial Tr. 3/30/22 PM, 69:1–13 (Lowder); *id.* at 70:18–19 ("[W]ithout the data, the database doesn't really work.").  And removing the PII from that database "would be kind of an enormous thing" because "the information is stored in so many diverse places within the database."  *Id.* at 71:3–13.  Thus, in order to set up his working model of the PARIS system, Edwards needed the data, including the PII, housed in the STARS database.

Fourth, Venkata knew that the STARS database contained the means of identification of real persons.  He had worked on PARIS and STARS during his previous employment at USPS-OIG and would have been familiar with the contents of the STARS database.  *See* Trial Tr. 3/29/22 PM, 99:21–100:7 (Edwards).

### C.    Defendant's Arguments Are Incorrect

Venkata advances two novel legal theories.  First, he argues that the government is required to prove "deceptive use" of the means of identification.  *See* Mot. at 16–21.   Second, he argues that the government is required to prove that the use of the means of identification was "integral" or "essential" to the commission of the predicate offense.  *See* Mot. at 23–25.  Both arguments are incorrect.

### 1.    The Government Is Not Required to Prove "Deceptive Use"

Venkata's first argument is that the government must show "deceptive use" of the means of identification.  Venkata's argument would add a limitation to the term "use" that has no basis in the statute's text and would effectively write out the two other means of violating the statute, "transfer" and "possess."  It should be rejected.

35

The Supreme Court has already construed the phrase "in relation to" in the context of 18 U.S.C. § 924(c), which, as this Court has recognized, served as a model for Section 1028A. *See* ECF No. 110, at 6. Section 924(c) imposes a mandatory minimum sentence of five years on "any person who, during and in relation to any . . . drug trafficking crime . . . uses or carries a firearm." 18 U.S.C. § 924(c)(1)(A). In *Smith v. United States*, the Court began by remarking that "[t]he phrase 'in relation to' is expansive." 508 U.S. 223, 237 (1993). The Court looked to the term's ordinary meaning for guidance: "[a]ccording to Webster's, 'in relation to' means 'with reference to' or 'as regards.'" *Id.* at 237–38 (quoting *Webster's New International Dictionary 2102* (2d ed. 1939)). It concluded that the phrase "in relation to" means, "at a minimum . . . that the firearm must have some purpose or effect with respect to the drug trafficking crime," that "its presence or involvement cannot be the result of accident or coincidence," and that "the gun at least must facilitate, or have the potential of facilitating, the drug trafficking offense." *Id.* at 238 (internal quotation marks and alterations omitted).

The phrase "in relation to" in Section 1028A should likewise be given its "ordinary or natural meaning." *Id.* at 228. Just as in Section 924(c), the ordinary meaning of "in relation to" in the context of Section 1028A is "with reference to" or "as regards." *Id.* at 237–38. And just as in Section 924(c), to "transfer[], possess[], or use[]" a means of identification "in relation to" one of the enumerated felonies means that such transfer, possession, or use "must have some purpose or effect with respect to" that felony. *Id.* at 238. In other words, there must be a causal relationship between the use of the means of identification and the commission of the predicate offense. Based on the statute's plain text and structure, that requirement applies to the "felony violation" as a whole, not specifically to the element of falsity or deception. There is simply no textual basis to limit the particular way in which the use of the means of identification furthers the predicate

37

as well.  It agreed with the D.C. Circuit's observation that "[i]t may well be that Congress, when it drafted the language of § 924(c), had in mind a more obvious use of guns in connection with a drug crime, but the language of the statute is not so limited." *Id.* at 239 (quoting *United States v. Harris*, 959 F.2d 246, 316 (D.C. Cir. 1992)).  Accordingly, the Court declined to adopt the defendant's proposed limiting construction, instead construing "in relation to" according to its plain meaning, as described above.

Venkata contends that the Court "went further" to limit Section 924(c) in *Muscarello v. United States*, 524 U.S. 125 (1998).  *See* Mot. at 16.  Not so.  *Muscarello*, like *Smith*, declined to adopt a proposed extratextual limitation on plain statutory text.  The question in that case was whether the phrase "carries a firearm" in Section 924(c) is limited to the carrying of firearms on the person, or whether it also includes conveying firearms in a vehicle.  *Id.* at 126–27.  The Court held that the ordinary meaning of the word "carry" includes carriage in a car.  *Id.* at 139.  Addressing Venkata's argument that this construction would expand the statute beyond what Congress intended, the Court pointed out that the terms "during" and "in relation to"—under their existing construction—already provided significant limits on the statute's scope.  *Id.* at 137–38.  In particular, the Court noted that "Congress added these words in part to prevent prosecution where guns 'played' no part in the crime." *Id.* at 137 (quoting S. Rep. No. 98-225, at 314 n. 819 (1983)).  That limitation, the Court concluded, was sufficient to "limit the statute's application to the harms that Congress foresaw." *Id.* at 138.

Thus, the lesson of *Smith* and *Muscarello* is the exact opposite of the one Venkata attempts to draw.  In both cases, the Supreme Court rejected extratextual limitations on Section 924(c), instead construing the terms of the statute according to their ordinary meaning.  It did so even though that meant applying the statute to facts beyond the "example . . . that most immediately

39

**A0323**

a requirement that is found nowhere in the statute's text.  *Cf. United States v. Reynolds*, 710 F.3d

434, 436 (D.C. Cir. 2013) ("[Defendant] turns to § 1028A's title—"aggravated identity theft "—

and to isolated statements in the legislative history referring to the stealing of information through

computer hacking and the like.  The statutory text being unambiguous, however, these tools cannot

aid him.").

Similarly, the rule of lenity has no application here.  To invoke that rule, the Court "must

conclude that there is a 'grievous ambiguity or uncertainty' in the statute."  *Muscarello*, 524 U.S.

at 138–39 (quoting *Staples v. United States*, 511 U.S. 600, 619 n.17 (1994)).  "The mere possibility

of articulating a narrower construction . . . does not by itself make the rule of lenity applicable."

*Smith*, 508 U.S. at 239; *see also Chapman v. United States*, 500 U.S. 453, 463 (1991) ("The rule

[of lenity] comes into operation at the end of the process of construing what Congress has

expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers.")

(quoting *Callanan v. United States*, 364 U.S. 587, 596 (1961)).  There is no grievous ambiguity

here.  The Supreme Court has already interpreted the terms "use" and "in relation to" in the context

of Section 924(c).  This Court should simply apply the constructions of those terms articulated in

*Smith* to the corresponding terms of Section 1028A.

>        ***b)***      ***Defendant's Proposed "Deceptive Use" Requirement Is Not***
>                  ***Supported by the Legislative History.***

Because the text of Section 1028A is unambiguous, there is no need to consult its legislative

history.  The Supreme Court has "explained many times over many years that, when the meaning

of the statute's terms is plain, [the court's] job is at an end."  *Bostock v. Clayton Cnty.*, 140 S. Ct.

1731, 1749 (2020).  "Legislative history, for those who take it into account, is meant to clear up

ambiguity, not create it."  *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011).  Where, as here, the

meaning of the statute's "text is plain and unambiguous, [the court] need not accept [defendant's]

41

**A0324**

> account information to steal the identity of the customers and conduct transactions at the financial institution. Scheller pleaded guilty to one count of obtaining unauthorized computer access to customer account information from a financial institution, in violation of 18 U.S.C. §§ 2, 1030(a)(2)(A), 1030(c)(2)(B)(i), 1030(c)(2)(B)(iii). On November 30, 2001, Scheller was sentenced to 36 months probation.

*Id.* In this example, Scheller did not use the means of identification in a deceptive manner herself. But her unauthorized possession, transfer, and use of identity information created the risk that others would. In her case, that risk materialized. Some individual "unknown to her" used the account information she had unlawfully obtained to conduct transactions under those customers' identities. Even though she did not intend, participate in, or even know about that conduct, the House Judiciary Committee considered her a "person[] involved in identity theft" who would be subject to enhanced penalties under Section 1028A. *Id.*

Similarly, here, Venkata unlawfully obtained and disseminated the PII, including names, home addresses, dates of birth, and social security numbers, of some 250,000 federal employees. Venkata's conduct can be characterized not only as use but also possession and transfer of that information. Whether any of those employees suffered actual financial or reputational harm was not the focus of the investigation or the government's trial presentation. *See Reynolds*, 710 F.3d at 436 (holding that proof of harm to "individuals whose means of identification were unlawfully used" is not an element of Section 1028A). But if no actual harm occurred, that was pure luck. Venkata's conduct created the same risk of harm as Suzanne Scheller's. Like the mix of "drugs and guns" covered by Section 924(c), Congress recognized that identifying information and fraud is "a dangerous combination." *Smith*, 508 U.S. at 240. It enacted Section 1028A, at least in part, to ensure that those who create that particular set of risks would be held accountable.

### c)   *No Court of Appeals Has Adopted Defendant's Proposed "Deceptive Use" Requirement.*

Venkata contends that all other circuits that have considered this issue have required

43

1068 (5th Cir. 2021) (en banc),[3] the defendant was convicted of a scheme to submit inflated claims

to Medicaid.  *Id*. at 321–22.  Relying on *United States v. Medlock*, 792 F.3d 700 (6th Cir. 2015),

the defendant argued that he did not "use" the patient's Medicaid reimbursement number within

the meaning of Section 1028A.  *See Dubin*, 982 F.3d at 325.  The Fifth Circuit "[did] not accept

*Medlock*'s definition."  *Id*.  Instead, it held that the plain meaning of "use" must control.  *Id*.  It

turned to the dictionary definitions of "use," which were to "take, hold or deploy (something) as a

means of accomplishing a purpose or achieving a result," "to employ for the accomplishment of

some purpose," or "to avail oneself of."  *Id*. (internal quotation marks omitted).  "Deciding whether

a person 'use[d]' something," it explained, "seems to be a relatively straightforward yes or no."

*Id*.  It affirmed the defendant's conviction on the ground that "Patient L's means of identification—

the patient's Medicaid reimbursement number—was used, or employed, by [the defendant] in the

reimbursement submissions to Medicaid."  *Id*. at 326.

Finally, in *United States v. Munksgard*, 913 F.3d 1327 (11th Cir. 2019), the defendant

forged the signature of another person in a document that he submitted to a bank in support of a

loan application.  *Id.* at 1329–30.  Citing *Miller* and *Berroa*, he argued that "use" within the

meaning of Section 1028A should be limited to "crimes in which the accused attempted to

impersonate, or act 'on behalf of' someone else."  *Id.* at 1330.  The Eleventh Circuit was "[not]

persuaded."  *Id.* at 1334.  It applied "the ordinary meaning of the term 'use.'—and, in particular,

how standard English-language dictionaries define the verb 'use' when employed in conjunction

with a particular object, as in to 'use[] . . . a means of identification.'"  *Id.*  After examining various

---

[3]        The Fifth Circuit granted rehearing en banc and vacated the panel opinion.  *See United States v. Dubin*, 989 F.3d 1068 (5th Cir. 2021).  The en banc court then affirmed the district court's judgment "for the reasons set forth in the panel's majority opinion."  *United States v. Dubin*, 27 F.4th 1021, 1022 (5th Cir. 2022) (en banc) (per curiam).  Accordingly, the original panel opinion in *Dubin* represents the en banc view of the Fifth Circuit.

45

A0326

holding that "[t]o 'use' a means of identification in this setting is '[t]o convert to one's service' or 'to employ' the means of identification." *Id.* at 626. It distinguished *Miller* and *Medlock* on the ground that the element of causation, required by the statutory term "in relation to," was lacking in those cases. *Id.* at 627–29. "The salient point," it explained, "is whether the defendant used the means of identification to further or facilitate the health care fraud." *Id.* at 628.

The First and Ninth Circuits have relied on Sixth Circuit case law to limit Section 1028A. In *Berroa*, the defendants fraudulently obtained medical licenses by bribing an exam administrator to falsify their test scores. 856 F.3d at 147. The government charged Section 1028A on the theory that they used their patients' names and addresses without authority when they wrote prescriptions using the fraudulently obtained medical licenses. *Id.* at 155. Citing *Miller* and *Medlock*, the First Circuit overturned their convictions on the ground that the term "use" "require[s] that the defendant attempt to pass him or herself off as another person or purport to take some other action on another person's behalf." *Id.* at 156–57. The facts of *Hong* were similar to *Medlock*. The defendant misrepresented the nature of services he had provided to certain patients in order to make them eligible for Medicare reimbursement. *See United States v. Hong*, 938 F.3d 1040, 1043 (9th Cir. 2019). The Ninth Circuit relied on *Medlock* and *Berroa* to hold that the defendant's conviction was deficient because he did not attempt to pass himself off as the patients on whose behalf he submitted fraudulent bills to Medicare. *Id.* at 1051.

In sum, although three circuits have limited the term "use" in various ways, none have adopted the "deceptive use" requirement that Venkata advances. The Sixth Circuit, in *Michael*, clarified that the plain meaning of the statute should control. Three other circuits have expressly rejected extratextual limitations on the statute's plain text. Notably, none of those three circuits that limited the term "use" even attempted to explain how the specific limiting constructions they

terms.

### 2. The Government Is Not Required to Prove that the Use of a Means of Identification Was "Integral" or "Essential" to the Commission of the Predicate Offense

Venkata contends that the use of a means of identification must be "integral" or "essential" to the commission of the predicate offense. *See* Mot. at 23–25. There is no support for that contention. It is true that Section 1028A requires a causal nexus between the use of the means of identification and the commission of the predicate offense. That requirement is established by Congress's use of the phrase "in relation to." As noted above, the Supreme Court has already construed the meaning of that "expansive" phrase in the context of Section 924(c). *See Smith*, 508 U.S. at 237–38. Lower courts look to *Smith* to construe the causal nexus required under Section 1028A. *See, e.g.*, *United States v. Mobley*, 618 F.3d 539, 549 (6th Cir. 2010). *Smith* does not require that the use of the means of identification be "integral" or "essential" to the predicate offense, only that it have "some purpose or effect with respect to" the commission of that offense or that it "facilitates or has the potential of facilitating" it. *Id.* As described above, the facts amply met that standard here. There is no basis to replace the Supreme Court's construction of the phrase "in relation to" with a novel, vague construction that is wholly unmoored from the statutory text.

Venkata quotes from several cases in which the court noted, as a factual matter, that the use of identifying information was essential to the underlying fraud. *See* Mot. at 23–24. But none of those cases held that that the statute required proof that the use of the means of identification was "integral" or "essential." *See United States v. Gatwas*, 910 F.3d 362, 367 (8th Cir. 2018) (noting that the "causation element in § 1028A(a)(1), 'during and relation to,' is potentially broad" and quoting *Mobley*, 618 F.3d at 549, for the proposition that "the identity theft must have some purpose or effect with respect to the predicate crime"); *United States v. Dubin*, 27 F.4th 1021, 1025 (5th Cir. 2022) (en banc) (Owen, C.J., concurring) (noting that the facts of that case were clearly

49

**A0328**

had done so because he wanted to distance himself from Mr. Edwards and Ms. Patel." *Id.* at 46:2–5. The foregoing testimony alone meets every element of Venkata's conviction under 18 U.S.C. § 1519, and Venkata offers no reason, let alone a compelling one, warranting disruption of the jury's verdict.

Instead, Venkata offers alternative interpretations of the evidence that rely more on speculation and selective tidbits than a firm foothold in the totality of the evidence. For example, Venkata argues that Agent Steel's literal answer: "He told me nothing about deleting these text messages" in response to the government's literal question: "What did Mr. Venkata tell you about when he deleted these text messages," *id.* at 45:24–46:2, is proof of the government's failure to produce evidence of deletion and Venkata's otherwise explicit effort to impede the investigation. *See* Mot. at 27–28. But Agent Steel immediately followed his answer with a clarifying, more precise, and more encompassing answer: "He told me he deleted *the communications* with Mr. Edwards following becoming aware of the investigation; and that he had done so because he wanted to distance himself from Mr. Edwards and Ms. Patel." Trial Tr. 4/4/22 AM, 46:2–5 (Steel) (emphasis added). In context, it is clear that Agent Steel meant *all* communications—including text messages—and that Venkata admitted to deleting *all* communications—including text messages—to create distance between himself and Edwards. That is the most natural interpretation of the evidence and, based on the jury's finding of guilt, how the jury perceived it at trial. Venkata's selective reimagining of Agent Steel's testimony should not be credited.

Next, Venkata presents alternative explanations for the missing emails, text messages, and call logs; but those explanations are grounded in sheer speculation, and it was well within the jury's discretion to reject them. For example, Venkata argues that the emails may have been missing because of a "syncing issue" between Venkata's phone and the email server, *see* Mot. at

51

Indictment, ECF No. 1 at ⁋ 11(b)).  Accordingly, the Court instructed the jury in relevant part:

> Mr. Venkata is charged with conspiring [(1)] to commit an offense against the United States; that is, theft of government property, in violation of 18 U.S.C. section 641; and [(2)] to defraud the United States.  These are called the objects of the conspiracy. . . .
>
> The government is not required to prove that either or both of those objectives was achieved.
>
> The elements of conspiracy, each of which the government must prove beyond a reasonable doubt, are that, *first*, between October 2014 and April 2017, an agreement existed between two or more people to commit at least one of the following objects of the conspiracy: [**A**], to steal or knowingly convert property belonging to the United States with an aggregate value exceeding $1,000, to wit, copies of the Department of Homeland Security – Office of Inspector General's [E]nforcement Database, EDS, [S]ystem; copies of DHS-OIG's EDS source code and database files; copies of the U.S. Postal Service – Office of Inspector General case management system; copies of the USPS-OIG's STARS database and PARIS code; or the PII, or personal identifiable information, of approximately 246,167 DHS employees, and approximately 6,723 USPS employees in violation of 18 U.S.C. section 641; **or** [**B**], to defraud the United States by devising, or intending to devise, a scheme to defraud, or for obtaining money or property from the United States Department of Agriculture – Office of Inspector General by means of materially false or fraudulent pretenses, representations, or promises, or by concealing material facts. . . .

Trial Tr. 4/7/22, 65:23–66:3, 66:15–67:13 (emphasis added).

The verdict form made clear that the jury found an agreement to commit both objects of the conspiracy.  On the verdict form, the jury checked "Yes" to both questions of (1) "Do you find beyond a reasonable doubt that there was an agreement to commit the offense of Theft of Government Property?" and (2) "Do you find beyond a reasonable doubt that there was an agreement to defraud the United States?"  ECF No. 154 at 1.  Therefore, even though the jury was instructed that it had to find only an agreement to commit one object to satisfy the first element of Conspiracy, the jury found an agreement here to commit both.

Venkata argues that the Court was "wrong" to instruct in the disjunctive because "[t]he illegal agreement alleged and put to the jury was that the co-conspirators agreed to defraud the

53

conspiracy to combine them for purposes of the jury instruction. Altering the objects of the conspiracy from the indictment, however, risks running afoul of the defendant's constitutional rights. *See United States v. Mitchell*, 85 F.3d 800, 810 (1st Cir. 1996) ("A court may not substantially amend the indictment through its instructions to the jury.") (quoting *United States v. Stewart Clinical Lab., Inc.,* 652 F.2d 804, 807 (9th Cir. 1981)) (internal quotation marks omitted). The jury instruction given was consistent with the language of Count One of the Indictment charging conspiracy, as is proper.

Venkata argues that the Court's instruction failed to inform the jury of "the essential nature of the conspiratorial agreement," which his motion describes as "to defraud the government by means of converting government software and selling it back to the government for profit." Mot. at 34. Venkata claims "the Government contended from the outset [of trial] that the co-conspirators agreed to defraud the government by stealing software *and* selling it back to federal agencies," as if that is inconsistent with the indictment. Mot. at 32 (emphasis in original). As explained above, the government charged both objects of the conspiracy in the indictment: to steal copies of the government systems and software, and to defraud the United States by devising a scheme to sell the "new" system to USDA-OIG. It was therefore appropriate and unsurprising that the government sought at trial to prove both objects of the conspiracy by presenting evidence and making arguments to that effect.

Venkata also relies on *United States v. Treadwell*, 760 F.2d 327 (D.C. Cir. 1985), but nothing in *Treadwell* supports a determination that the instruction given in the instant case was erroneous. *See* Mot. at 34. In *Treadwell*, the D.C. Circuit rejected the defendant's argument that the jury was misled by the instructions regarding multiple objects of the conspiracy. 760 F.2d at 329, 337. The jury instructions in *Treadwell* included a recitation of certain paragraphs of the

55

**A0331**

F.3d 749, 754 (D.C. Cir. 1998)).  There was no evidentiary predicate to support the theory of

defense instruction requested by Venkata.  Multiple versions of the defense theory of the case

instruction were presented to the Court, but the focus of Venkata's motion is the following

proposed instruction language: "Mr. Venkata . . . contends that he did not possess the requisite

state of mind because he engaged in the conducted related to Counts One [Conspiracy], Two [Theft

of Government Property], Eleven [Wire Fraud] and Twelve [Aggravated Identity Theft][4] based on

his reasonable belief that he was acting pursuant to the apparent authority of Sonal Patel, regardless

of whether or not she had the actual authority to sanction that conduct."  Mot. at 36 (citing ECF

No. 141 at 1-2).

The jury was provided a theory of defense instruction making clear the defense theory that

Venkata lacked the requisite *mens rea* to be convicted of the charged offenses.  The instruction

stated in pertinent part:

> Mr. Venkata contends that he did not have the required state of mind for counts
> one, two and 11.  With respect to count 13, Mr. Venkata contends that he did not
> knowingly possess, use or transfer information containing individual[s'] personal
> identifying information, and that any such possession, use or transfer was not in
> relation to the offenses of theft of government property or wire fraud.  Finally, with
> respect to count 16, Mr. Venkata contends that he did not intend to impede or
> obstruct a federal investigation.

Trial Tr. 4/7/22, 80:17–81:1.

The Court was justified in giving the above version of the defense theory of the case

instruction because there was no evidentiary predicate supporting the requested defense instruction

that Venkata had a reasonable belief he was acting pursuant to the apparent authority of Patel.

Venkata relies on evidence that Sonal Patel was Venkata's supervisor who gave him instruction as

part of a hierarchical organization.  Mot. at 36–37.  But virtually every employee has a supervisor,

---

[4]    The count of Aggravated Identity Theft ultimately presented to the jury was Count Thirteen
involving victim Scott Balfour.

evidence from which the jury could have inferred that Venkata believed his conduct was authorized. *See United States v. Crowder*, 543 F.2d 312, 317 (D.C. Cir. 1976) (holding that district court did not err by refusing to instruct jury on theory of defense that defendant contended could be "inferred from various wisps of evidence"); *see also United States v. Han*, 962 F.3d 568, 574 (D.C. Cir. 2020), *cert. denied*, 141 S. Ct. 1736 (2021) (holding that the "incredibility" of defendant's theory can provide a basis to find failure to provide a theory of defense instruction harmless); *United States v. Smyth*, 842 F. Supp. 20, 25 (D.D.C. 1994) (holding that court is not required to "give its imprimatur to contentions that have no evidentiary support").

## 2.    The Jury Instructions Substantially Covered the Requisite *Mens Rea*

Even assuming there had been sufficient evidence for the Court to give the defense theory of the case instruction proposed by Venkata, it would not have been a substantive addition beyond the instructions provided on the *mens rea* requirement.  In other words, the instruction requested by Venkata was already covered by the Court's instructions that were given to the jury.

The language requested by the defense for its theory of the case instruction does not present a novel theory and instead restates the defense view that Venkata lacked the *mens rea* necessary to find him guilty.  *See United States v. Pray*, 869 F. Supp. 2d 44, 51 (D.D.C. 2012) (theory of defense instruction merely "advanced general denials of guilt as to all charged offenses and assertions that the Government failed to meet its burden of proof").  Because the Court instructed the jury on the necessity of defendant possessing the relevant *mens rea*, it was unnecessary to reiterate this point through defendant's proposed theory of the case instruction.  As the D.C. Circuit has stated, "[a]s a general rule, the refusal to give an instruction requested by a defendant is

---

to provide EDS source code to anyone); Trial Tr. 4/4/22 AM, at 33:6–21, 40:6–41:15 (Agent Steel testified that Venkata gave a sworn statement that falsely asserted that he had never attempted to log into Edwards's server and had denied or minimized his involvement in the project during interviews).

Venkata's argument and concluded he did not act knowingly or believed he had the right to engage in the charged conduct because he reasonably believed he was acting pursuant to Ms. Patel's authority, then it had to acquit. *See Akhigbe*, 642 F.3d at 1084 (finding the instructions given "'substantially covered the same ground'" under *Hurt* as the good faith instruction sought by the defendant "because they made clear to the jury that if it believed Akhigbe's argument and concluded that he submitted false claims to Amerigroup due to mere negligence, then it had to acquit"). Because the Court's instructions required the jury to find the requisite *mens rea*, the Court did not err in giving the defense theory of the case instruction without the specific apparent authority language requested by Venkata.

<u>**CONCLUSION**</u>

The jury determined beyond a reasonable doubt that Venkata was guilty of the crimes charged in the Indictment. Venkata's post-trial motions provide no compelling basis to undo the jury's considered judgment. The jury's verdicts are supported by overwhelming evidence and consistent with applicable law. Venkata's motions should be denied and this case should proceed to sentencing as scheduled.

61

A0334

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 20-cr-00066-2 |
| v. | Honorable Randolph D. Moss |
| MURALI YAMAZULA VENKATA, | **HEARING REQUESTED PURSUANT TO LCRR 47(F)** |
| Defendant. | |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL

Kamil R. Shields
Pardis Gheibi (*pro hac vice*)
Tara N. Ohrtman (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W. Suite 700
Washington, D.C. 20006-5215
Telephone: (202) 956-7040
Facsimile: (202) 956-7676
Email: shieldska@sullcrom.com
Email: gheibip@sullcrom.com
Email: ohrtmant@sullcrom.com

Katherine M. Savarese (*pro hac vice*)
Jared H. Rosenfeld (*pro hac vice*)
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: savaresek@sullcrom.com
Email: rosenfeldj@sullcrom.com

Michelle Peterson
Chief Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C. 20004
Telephone: (202) 208-7500
Email: Shelli_Peterson@fd.org
*Attorneys for Defendant*

June 24, 2022

# TABLE OF CONTENTS

*Page*

ARGUMENT ...................................................................................................................1

I.  THE GOVERNMENT'S CONSPIRACY TO DEFRAUD AND WIRE FRAUD
    THEORY IS WHOLLY UNSUPPORTED BY THE EVIDENCE ...........................1

    A.  The Government Did Not Prove Any Scheme To Defraud ...................................1

    B.  The Government Did Not Prove An Interstate Wire .................................4

II. THE GOVERNMENT'S THEFT THEORY FAILS AS A MATTER OF LAW AND
    IS AGAINST THE WEIGHT OF THE EVIDENCE .......................................6

    A.  Stealing Under Section 641 Requires Asportation Or A Deprivation Of
        Ownership Rights ...................................................................7

    B.  Conversion Under Section 641 Requires A Deprivation Of Use Or Possession Of
        Property ...........................................................................7

    C.  The Government Did Not Prove Involvement Or Assistance By Mr. Venkata In
        Any Conversion ....................................................................10

    D.  The Government Did Not Prove That The Converted Property Had A Value Of
        More Than $1,000 ..................................................................11

III. THE GOVERNMENT'S EXPANSIVE AND ILL-DEFINED THEORY OF
     AGGRAVATED IDENTITY THEFT FAILS AS A MATTER OF LAW ...............14

    A.  The Government Did Not Prove That Mr. Venkata Used Any PII Deceptively to
        Facilitate Wire Fraud Or Theft Of Government Property .........................14

        1.  The Statutory Structure Supports A Deceptive Use Requirement ...........14

        2.  The Legislative History Supports A Deceptive Use Requirement ...........18

        3.  A Deceptive Use Requirement Is Consistent With Decisions Of Other
            Circuits ...........................................................................21

    B.  The Government Did Not Prove That Any Use of Mr. Balfour's PII Was Integral
        To The Alleged Wire Fraud Or Theft Of Government Property .....................23

IV. THE GOVERNMENT'S DESTRUCTION OF RECORDS THEORY IS
    UNSUPPORTED BY THE EVIDENCE ...................................................24

V.  THE JURY WAS WRONGLY INSTRUCTED ON THE CONSPIRACY CHARGE
    AND WRONGLY DENIED A DEFENSE THEORY OF THE CASE ....................26

    A.  The Jury Should Have Been Properly Instructed On The Nature Of The Alleged
        Conspiratorial Agreement For The Conspiracy Charges ..........................26

    B.  Rejecting Mr. Venkata's Theory of Defense Instruction Was Improper ...........27

        1.  Mr. Venkata Presented More Than Sufficient Evidence To Support The
            Apparent Authority Instruction ....................................................28

**2.** Mr. Venkata's Proposed Theory Of Defense Instruction Was Not Duplicative ................................................................................................29

**CONCLUSION** ......................................................................................................31

Defendant Murali Venkata respectfully submits this Reply Memorandum of Law

in further support of his Motion For Judgment Of Acquittal And For A New Trial.  For the

following reasons and those set forth in Mr. Venkata's opening memorandum, Mr. Venkata's

motion should be granted.

### ARGUMENT

**I.    THE GOVERNMENT'S CONSPIRACY TO DEFRAUD AND WIRE FRAUD THEORY IS WHOLLY UNSUPPORTED BY THE EVIDENCE**

Mr. Venkata's opening memorandum demonstrated that the Government failed to

prove that any of the defendants sought to cheat the government, that Mr. Venkata was aware of

any (non-existent) plan to cheat the government, or that the relevant wire communication crossed

state lines.  The Government's response merely confirms the merit of Mr. Venkata's motion:  it

mischaracterizes the law and record and utterly fails to rebut Mr. Venkata's arguments.

**A.    The Government Did Not Prove Any Scheme To Defraud**

As outlined in Mr. Venkata's opening memorandum, in order to sustain Mr.

Venkata's fraud-based convictions, there must be evidence that Mr. Venkata specifically

intended to harm the USDA-OIG and that defendants' misrepresentations or omissions to the

USDA-OIG were material.  *See* Def.'s Mem. 3-6; *United States* v. *Lemire*, 720 F.2d 1327, 1335-

36 (D.C. Cir. 1983) (observing that a "scheme to defraud must threaten some cognizable harm to

its target," using a misrepresentation or omission "that is intended or is contemplated to deprive

the [victim] of some legally significant benefit").  But the Government has not offered any such

evidence here.

The Government does not attempt to dispute these requirements nor does it cite

any cases to the contrary.  Instead, the Government spends several pages recounting trial

evidence that makes clear there was no scheme to defraud here.  At most, the evidence showed

that Mr. Edwards and Ms. Patel engaged in unethical behavior in attempting to reverse-engineer a new software product designed to mirror existing government programs, and that Mr. Venkata generally knew they were attempting to build a new product. *See* Def.'s Mem. 4-5 & n.2. But knowledge of a potential ethics violation is a far cry from aiding and abetting a scheme to defraud. *United States* v. *Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) ("Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain— which do violate the mail and wire fraud statutes."); *see also United States* v. *Akinyoyenu*, 201 F. Supp. 3d 82, 86 (D.D.C. 2016) (same).

Critically, the Government cannot point to *any* evidence that the new product that Mr. Edwards and Ms. Patel sought to sell to USDA-OIG was itself stolen property, or that it would not have functioned as promised. Def.'s Mem. 6. The Government's list of purportedly "misleading" statements—all of which were true—makes this clear: the new system was intended to mirror the functionality of EDS, but it was re-written and designed to be more modularized, without the "flaws" and "issues" of the existing program. Gov't Resp. 6. That fact, and the truth of all of defendants' representations to Mr. Paradis, is fatal to the Government's argument. *Lemire*, 720 F.2d at 1336 (noting that not every failure to disclose information "constitute[s] a sufficient indicium that the [defendant] intended any criminally cognizable harm"). There was simply no intent to harm USDA-OIG here, and indeed USDA-OIG suffered no harm—because it both received the free copy of EDS that it sought, never came close to parting with any money, and would still have received what it bargained for if it had paid for the new program.

The Government attempts to distinguish the cases cited by Mr. Venkata by repeating the same testimony of Mr. Paradis over and over: that stolen or counterfeit goods are worth less, to the tune of "50 cents on the dollar." But the fact that stolen goods may be worth less than non-stolen goods has no bearing on the value of the product that Mr. Edwards and Ms. Patel were trying to sell to USDA-OIG, because—as demonstrated above and in Mr. Venkata's opening memorandum—that product was not a stolen good. Thus, Mr. Paradis's testimony that he would not have been willing to pay full price for stolen goods is not relevant or dispositive here. Nor has the Government offered any other evidence of a misrepresentation that went to the core of the bargain or affected USDA-OIG's economic decision-making. Beyond speculating, without any factual basis, that the jury "may" alternately have concluded that the risk of a data breach could somehow have been "transferred" to USDA-OIG in the future if it had purchased EDS 2.0—which defies logic and is not supported by any evidence in the record—the Government fails to point to any evidence that USDA-OIG would not have received exactly what it had bargained for: a new and improved case management system. *See* Gov't Resp. 11; Def.'s Mem. 6; *United States* v. *Regent Office Supply*, 421 F.2d 1174, 1180 (2d Cir. 1970) (representations only "go beyond mere puffing and enter the realm of fraud where the product must inherently fail to do what is claimed for it").[1] Because the Government has failed to show

---

[1]      The two cases cited by the Government are inapposite and not to the contrary. *Akinyoyenu* dealt with a pre-trial challenge to the specificity of the indictment—not a post-trial challenge to the sufficiency of the evidence—and found it adequately alleged a scheme to defraud whereby the defendants falsely represented to customers that the prescriptions they were purchasing online would be valid, when in fact they were fraudulent and represented the sale of illegal drugs. 201 F. Supp. 3d at 87. Unlike Mr. Edwards's statements about EDS 2.0, the misrepresentations in *Akinyoyenu* went to "the heart of pharmaceutical purchases: the validity, necessity, and legality of prescriptions." *Id.* at 86. The Government fails to meet the standard articulated in *Akinyoyenu* here, as there is no evidence that EDS 2.0 was invalid or illegal. Similarly, *United States* v. *Gatto*, 986 F.3d 104 (2d. Cir. 2021), held that—based on the specific

---

-3-

**A0340**

any intent to harm USDA-OIG, or that any representations were false, fraudulent, or material, the scheme to defraud and wire fraud charges must be dismissed.

### B.    The Government Did Not Prove An Interstate Wire

As demonstrated in Mr. Venkata's opening memorandum, the Government also failed to prove the interstate element of wire fraud.  The Government relies on the following evidence to assert that "sufficient circumstantial evidence [exists] from which a rational juror could infer beyond a reasonable doubt" that an interstate wire took place on March 22, 2017:  (i) a text from Mr. Edwards to Mr. Venkata at 9:24 AM (EDT), asking Mr. Venkata to pick up two DVDs that Ms. Patel had left on Mr. Venkata's chair, (ii) a phone call from Mr. Edwards—who was in Columbia, Maryland, at the time—to Mr. Venkata at 10:09 AM (EDT) to arrange the pickup, and (iii) a subsequent call from Mr. Edwards to Mr. Venkata to let him know that Mr. Edwards was pulling up in front of DHS-OIG's headquarters in the District of Columbia at 11:36 AM (EDT), just before Mr. Venkata met Mr. Edwards and handed him the package from Ms. Patel.  Gov't Resp. 15-16.

The mere fact that Mr. Edwards and Mr. Venkata ultimately met in the District of Columbia, however,  proves *nothing* about where Mr. Venkata was during the 10:09 AM phone call *more than ninety minutes earlier*—particularly given that the most direct route from Mr. Venkata's home in Aldie, Virginia to the DHS-OIG offices in D.C. passes within 6 miles of the

---

facts presented—a jury could find an intent to defraud where there was evidence that defendants were highly sophisticated actors, went to great lengths to conceal their activities, and knew their conduct was illegal.  *Id.* at 114-15.  Here, by contrast, Mr. Venkata was neither furtive nor sophisticated:  he didn't hide anything from anyone—much less Mr. Paradis, with whom he never interacted—and there is no evidence that he knew what he was doing was wrong.  Indeed, Mr. Venkata's only alleged act in furtherance of the scheme was answering a single telephone call from Mr. Edwards, in which he agreed to meet him in broad daylight at DHS-OIG offices to hand him a package at the instruction of Mr. Venkata's supervisor, Ms. Patel.

-4-

**A0341**

Maryland border, and the office itself is also less than 6 miles from Maryland.  Other courts have

uniformly required more.  *Cf. United States* v. *Hoffman*, 901 F.3d 523, 547 (5th Cir. 2018)

(proving interstate nexus through testimony that emails were sent from Louisiana to California);

*United States* v. *Valdés-Ayala*, 900 F.3d 20, 33 (1st Cir. 2018) (proving interstate nexus through

direct testimony regarding the defendant's regular use of a nonprofit organization's email

account that had neither offices nor officers in Puerto Rico, and testimony of custodian of

records regarding lack of email servers located in Puerto Rico).  Nor could the Government rely

on the testimony of Mr. Venkata's neighbour, Narasimha Ambati, concerning Mr. Venkata's

regular commute, as it is not probative of where Mr. Venkata was *that particular morning*, much

less where Mr. Venkata was *more than three hours after* he would have taken the bus at 6:30

AM (EDT).  *See* Trial Tr., Afternoon Session, 100:22–102:6, April 6, 2022.

       The Government also fails to distinguish *United States* v. *Izydore*.  In *Izydore*, the

government attempted to prove an interstate phone call using a witness who testified that, after

the defendant returned to the defendant's home in Colorado, the witness had called the defendant

and left a message, prompting the defendant to return the call.  *See* Brief of United States at 19-

20, *United States* v. *Izydore*, 167 F.3d 213 (5th Cir. 1999) (No. 97–50537).  On cross-

examination, the witness admitted to not knowing where the defendant was when he returned the

witness's call.  *See Izydore*, 167 F.3d at 219–20.  Rejecting the government's argument that the

witness's testimony established the defendant's location at the time of the call, the court found

that the testimony did not form "evidence in the record which would indicate that [the defendant]

was outside the State of Texas when the conversation took place."  *Id.* at 220.  Although the

Government here baldly asserts that *Izydore* is "easily distinguishable," it does not explain how.

Gov't Resp. 14.  In fact, *Izydore* is on all fours with the facts here:  There exists no evidence,

direct or circumstantial, indicating where Mr. Venkata was at 10:06 AM (EDT) on March 22, 2017, only evidence indicating where he *might* have been three hours before the call, and evidence of where he was ninety minutes *after* the call, much like the testimony in *Izydore* that the defendant was in Colorado at some time before returning the witness's call (all the more so because, unlike Texas and Colorado, Maryland, Virginia, and the District of Columbia are adjacent to each other).  This is precisely the kind of evidence that was found insufficient in *Izydore* to prove an interstate nexus, and must equally be insufficient to demonstrate use of an interstate wire here.

## II.    THE GOVERNMENT'S THEFT THEORY FAILS AS A MATTER OF LAW AND IS AGAINST THE WEIGHT OF THE EVIDENCE

In an attempt to defend against Mr. Venkata's challenge to the theft charge and minimize Mr. Venkata's lack of involvement in the theft, the Government repeatedly mischaracterizes the charge as one of conspiracy—pointing to Mr. Venkata's alleged agreement to help Mr. Edwards develop a new case management system and his performance of discrete technical support work, and even asserting that the jury could have found Mr. Venkata liable for conversion as a co-conspirator.  Gov't Resp. 19-21, 23.  This is wrong.  To sustain the theft charge, the Government was required to prove that Mr. Venkata committed the offense directly or aided and abetted it—conspiracy was not charged and is not sufficient.  The Government is unable to offer such proof because, as demonstrated in Mr. Venkata's opening brief, the Government was ever deprived of the use or possession of its property and, in any event, the offense was complete before Mr. Venkata became involved.  Because the Government also failed to prove the value of the property at issue, this Court should grant Mr. Venkata a judgment of acquittal.

**A.     Stealing Under Section 641 Requires Asportation Or A Deprivation Of Ownership Rights**

As an initial matter, the Government spends a lot of time quarreling with a simple and uncontroversial proposition.  In this Circuit, contrary to the Government's tortured reading, stealing under section 641 "is basically the common law crime of larceny," which "requires a wrongful *taking and carrying away (asportation) of personal property* of another with fraudulent intent to deprive the owner of his property without his consent."  *United States* v. *Barlow*, 470 F.2d 1245, 1251 (D.C. Cir. 1972) (emphasis added); *see also Morissette* v. *United States*, 342 U.S. 246, 271 (1952) ("To steal means to take away from one in lawful possession without right with the intention to keep wrongfully.").  As demonstrated in Mr. Venkata's opening brief, Mr. Venkata did not "carry away" any Government property or intend to keep it, nor did the Government ever lose possession of its property.   For these reasons, Mr. Venkata cannot be liable for stealing under section 641.  To the extent that the jury convicted under a stealing theory, that conviction must be vacated.

**B.     Conversion Under Section 641 Requires A Deprivation Of Use Or Possession Of Property**

In this Circuit, as explained in Mr. Venkata's opening memorandum, "[t]he cornerstone of conversion is the unauthorized exercise of control over property in such a manner that *serious interference* with ownership rights occurs."  *United States* v. *Collins*, 56 F.3d 1416, 1420 (D.C. Cir. 1995) (emphasis in original).  "Serious interference," for the purposes of conversion, occurs when the owner is "deprived of the use or possession of its property."  *Id.* at 1421.  Unable to meet this standard, the Government apparently only nominally accepts *Collins* as binding precedent and attempts to reject its reasoning.  According to the Government, "serious interference" does not require "that the victim be deprived of the use or possession of the property."  Gov't Resp. 28.  Yet that is exactly what *Collins* held:  the defendant "could *not* have

-7-

**A0344**

seriously interfered with the government's ownership rights because the government was *never deprived* of the use or possession of its property." *Collins*, 56 F.3d at 1421 (emphasis added). Importantly, the Government also ignores the *Collins* court's explanation that conversion occurs when "[t]he interference is of such a magnitude that the converter must pay the rightful owner the full value of the property converted." *Id*. at 1420.[2]

Unable to justify Mr. Venkata's conviction under *Collins*, the Government turns to out-of-circuit caselaw to argue that conversion need not result in deprivation of use or possession. But the Second, Fourth, and Sixth Circuit cases cited by the Government have not adopted the "serious interference" standard. Because *Collins*—which notably post-dated all of the out-of-circuit cases cited by the Government—remains the controlling precedent in this Circuit, this Court must apply the "serious interference" standard, which is inextricably tied to the notion that "[t]he interference is of such a magnitude that the converter must pay the rightful owner the full value of the property converted." *Collins*, 56 F.3d at 1420. Under this standard,

---

2    In rejecting the deprivation-of-use-or-possession requirement, the Government goes so far as to argue that the any such requirement "would be flatly inconsistent with the Restatement provisions that [the *Collins* Court] expressly adopted, which require consideration of all the relevant factors." Gov't Resp. 29. Ignoring that *Collins* neither referenced nor invoked those factors, the Government's analysis misconstrues the relevance of the Restatement provisions. In explaining that "[n]o one factor is always predominant in determining the seriousness of the interference," the Restatement clarifies that "the question is nearly always one of *degree*." Restatement (Second) of Torts § 222A (Am. L. Inst. 1965) (emphasis added) ("Restatement"). "In each case the question to be asked is whether the actor has exercised such dominion and control over the chattel, and has so seriously interfered with the other's right to control it, that *in justice he should be required to buy the chattel*." *Id*. (emphasis added). Applying this standard, *Collins* concluded that the magnitude of the conversion is not "serious" if there is no deprivation of use or possession of property. 56 F.3d at 1421. This conclusion is entirely consistent with the Restatement provisions, which provide that conversion—as opposed to the lesser offense of trespass—occurs only where "the measure of damages is the full value of the chattel." Restatement § 222A. When there is no deprivation of use or possession of property, the measure of damages cannot be the "full value" of the property.

-8-

**A0345**

the Government failed to show that Mr. Venkata "seriously interfered" with the Government's ownership rights in the source code or PII, because the Government "was never deprived of the use or possession" of either. *Id.*[3]

As demonstrated at trial and in Mr. Venkata's opening memorandum, the Government failed to prove that Ms. Patel's copying of source code and PII interfered with either USPS-OIG's, DHS-OIG's, or USDA-OIG's "use" of the source code or PII in any way. Def.'s Mem. 10-12. Although the Government refers vaguely to a "right to control" its property, Agent Steel testified that "[t]he government can't sell government proprietary software," Trial Tr. Afternoon Session, 5:25–6:3, April 4, 2022, and the Government has not identified any other way in which that right was compromised. The Government's arguments about the potential "chilling effect" on whistleblowers are purely speculative, as its own witnesses conceded at trial. And the fact that the Government paid to offer credit monitoring for employees subject to the breach shows only that the conduct resulted in some financial harm, but this does not amount to

---

[3]    Even under the less stringent articulation of the Second and Fourth Circuits, the Government still fails to show conversion because, unlike in those cases, the defendants here did not meaningfully interfere with the Government's use of its property. In *United States* v. *Girard*, for instance, the Second Circuit upheld the conviction of a former DEA employee who sold "secure reports from the DEA files that would show whether any participant in the proposed operation was a government informant." 601 F.2d 69, 70 (2d Cir. 1979). *Girard's* conduct obviously and substantially diminished the value of the confidential government information because a government informant is of little use if their identity has been revealed to smugglers. In *United States* v. *Matzkin*, the defendant sold confidential bid information, which undermined the value of the government's bargaining position. 14 F.3d 1014, 1020-21 (4th Cir. 1994); *see also United States* v. *McAusland*, 979 F.2d 970 (4th Cir. 1992) (also involving confidential bid information). In these cases, the information was useful to the government *because* it was secret. By disclosing the information, the defendants necessarily compromised the government's "use" of that information.

meaningful deprivation of the use or possession of the source code or PII.[4]  To the contrary, the

evidence is clear that the Government's use of the EDS system was never interrupted.

### C.   The Government Did Not Prove Involvement Or Assistance By Mr. Venkata In Any Conversion

Tellingly, the Government entirely fails to respond to Mr. Venkata's argument

that his conviction under section 641 must fail for the independent reason that any theft or

conversion was complete prior to his involvement.  As Mr. Venkata demonstrated in his opening

memorandum, there is no evidence that he was involved in the "initial interference" with USPS-

OIG or DHS-OIG's ownership rights, which occurred years before Mr. Venkata entered the

picture, and the law is clear that conversion is not a continuing offense.  *See* Def.'s Mem. 12; *see*

*also United States* v. *Sunia*, 643 F. Supp. 2d 51, 75 (D.D.C. 2009) (analyzing "conversion of

property" under section 666(a)(1)(A), a closely analogous statute, and concluding that

conversion "is completed as soon as there has been an actual taking of the property").

The Government does not cite a single case to the contrary, and instead asserts in

passing only that the evidence was sufficient for the jury to conclude that Mr. Venkata joined the

conspiracy in early May 2016 before the initial taking of the EDS system.  But this is both a false

statement of the evidence and a misstatement of the Government's burden.  As Ms. Patel

testified—and as various DHS-OIG agents corroborated—she first downloaded a copy of EDS

---

[4]      This, of course, does not mean that Mr. Edwards and Ms. Patel's conduct was necessarily legal.  It simply means that section 641 is a poor fit.  As the Supreme Court has recently highlighted, Congress enacted other statutes such as the Computer Fraud and Abuse Act of 1986 (CFAA) after recognizing that "traditional theft and trespass statutes were ill suited to address cybercrimes that did not deprive computer owners of property in the traditional sense."  *Van Buren* v. *United States*, 141 S. Ct. 1648, 1652 (2021); *see also id.* at 1655 n.4 (reasoning that traditional notions of common-law property do not apply to CFAA because "it was the failure of pre-existing law to capture computer crime that helped spur Congress to enact the CFAA").

and shared it with Charles Edwards in 2014, with no assistance from Mr. Venkata.  Trial Tr.

Afternoon Session, 57, April 5, 2022.  Even if the conversion had occurred after Mr. Venkata

joined the conspiracy—which it did not—this would still not be sufficient to convict Mr.

Venkata, absent any evidence that he directly committed or aided and abetted in the conversion,

which the Government has not shown.

> **D.    The Government Did Not Prove That The Converted Property Had A Value Of More Than $1,000**

Even if the items were stolen or converted under section 641, Mr. Venkata's

conviction must nevertheless be vacated because the Government failed to prove that the items

had a "value"—defined under the statutes as either "face, par, or market value, or cost price,

either wholesale or retail"—exceeding $1,000 in the aggregate.  18 U.S.C. § 641.  *See Apprendi*

v. *New Jersey*, 530 U.S. 466, 476 (2000) ("[A]ny fact (other than prior conviction) that increases

the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and

proven beyond a reasonable doubt.").  The Government's attempt to undermine this conclusion

is unavailing.  As an initial matter, the Government forfeits any argument that the price of credit

monitoring associated with the breach of PII falls within the statutory definition of "value."

Instead, it relies entirely on the production cost of the source code to argue that its "cost price"

exceeds $1,000.  The Government's argument fails for several reasons.

First, the Government's invocation of the dictionary definition of "cost price" is

misguided.  Gov't Resp. 29.  The statute does not identify "cost price" in isolation; rather, it

identifies "cost price, either *wholesale or retail*," 18 U.S.C. § 641 (emphasis added), thereby

restricting the "cost price" to either the *wholesale* cost price or the *retail* cost price.  Much like

"face," "par," and "market value"—all of which aim to measure the commercial value of stolen

items—"cost price, either wholesale or retail" aims to measure the same.  That is consistent with

the statutory intent, which is to capture the benefit of the stolen item to the thief (i.e. the price at which the thief can *resell* the item). *See Churder* v. *United States*, 387 F.2d 825, 833 (8th Cir. 1968) (reasoning that the "obvious intent of the Congress in drawing the distinction between a theft's product value in excess of [$1,000] and value equal to or less than that amount" is to distinguish between offenders by measuring "the amount the goods may bring to the thief").

Cost of production is neither the retail nor the wholesale price—both of which measure the *purchase* price. Indeed, both cases cited by the Government also equate the "cost price" with the initial purchase price of the items. *See United States* v. *Meyers*, 443 F.2d 913, 914 (9th Cir. 1971) (equating the "cost price of the calculator" with the initial retail price); *United States* v. *Griffin*, 527 F.2d 434, 435–36 (5th Cir. 1976) (reasoning that the cost price of the property was the original sale price).

The Government has not identified a single case equating "cost price, either wholesale or retail" under section 641 with the production cost. Nor could it. The caselaw supports the opposite conclusion. In *United States* v. *Ligon*—the most factually analogous case—the court rejected the government's attempt to equate "value" of the stolen archeological resources with "the costs of the retrieval." 440 F.3d 1185 (9th Cir. 2006). The problem with the retrieval cost was not—as the Government argues—that it was too "hypothetical" and "speculative." Gov't Resp. 30. Indeed, the court took no issue with the *reliability* of the calculated amount. The problem with retrieval cost—much like the production cost of the source code here—was that it measured the cost of *services* needed to acquire the archeological resources. The *Ligon* court rightly concluded that such value "is not the equivalent of, nor is it encompassed by, 'face, par, or market value, or cost price, either wholesale or retail,' as those terms are used to define 'value' in § 641." *Id.* at 1185. Similarly, the evidence presented at trial

-12-

here demonstrated the price of *services* the Government used in order to develop the source codes—not the retail or wholesale price of the source code itself.  *Cf. United States* v. *Sargent*, 504 F.3d 767, 771 (9th Cir. 2007) (reasoning that the cost of delivering postage statements is the "cost price" of USPS's *services*, not the "cost price" of the postage statements themselves).  But in any event, to the extent that there is ambiguity as to the meaning of "cost price, retail or wholesale"—which there is not—it must be resolved in favor of Mr. Venkata under the rule of lenity.

In the alternative, the Government argues that the jury could have inferred that the source code had a market value exceeding $1,000 "[b]ased on the cost of acquiring EDS and PARIS, the improvements the government had made at least to EDS, and the fact that the systems were fully operational."  Gov't Resp. 31.  But any such inference is purely speculative.  *See Abbott* v. *United States*, 239 F.2d 310, 313 (5th Cir. 1956) ("Mere cost of production, cost of replacement, value to the owner, value to one who might have use of it under certain special circumstances, whatever else it might be, is not market value.").  And the Government failed to prove that there was a market for the original source code to begin with, which would have been impossible because the Government was not able to sell it.  *See* Trial Tr. Afternoon Session, 5:25–6:3, April 4, 2022 ("The government can't sell government proprietary software.").  At most, the evidence at trial proved that there was a market for EDS *2.0*, not the original EDS or PARIS, and the market for EDS 2.0 only existed because it *differed* from the original source code.  *See* Trial Tr. Morning Session, 42:22–43:2, March 31, 2022.  The original source code was available to other government agencies for free, Trial Tr. Morning Session, 45:22–25, March 31, 2022, and the Government provided no evidence that non-government agencies would have had any use for these government-tailored source codes—let alone would be willing to

purchase them.  Even assuming there was a market for the original source code, the Government

provided no evidence that the value of that source code on any such market exceeded $1,000.

*See United States* v. *DiGilio*, 538 F.2d 972, 980 (3d Cir. 1976) (highlighting that it is improper to

"permit the jury to substitute speculation for hard evidence of value" in order to sustain a felony

conviction under section 641).  Because the Government failed to prove that the property in

question had an aggregate value exceeding $1,000, Mr. Venkata's conviction under section 641

must be vacated under *Apprendi*.

## III.   THE GOVERNMENT'S EXPANSIVE AND ILL-DEFINED THEORY OF AGGRAVATED IDENTITY THEFT FAILS AS A MATTER OF LAW

### A.   The Government Did Not Prove That Mr. Venkata Used Any PII Deceptively to Facilitate Wire Fraud Or Theft Of Government Property

In his opening memorandum, Mr. Venkata demonstrated that the text, statutory

structure, legislative history, and decisions of other circuits regarding section 1028A all support a

deceptive use requirement, and that the Government failed to offer any evidence that Mr.

Venkata used PII deceptively to facilitate a predicate offense.  Unable to point to any such

evidence, the Government urges this Court to adopt a novel interpretation of section 1028A that

would reach further than any circuit has to date and permit Mr. Venkata to be convicted of

aggravated identity theft without having committed any identity crime.  This Court should reject

that invitation.

#### 1.    The Statutory Structure Supports A Deceptive Use Requirement

As Mr. Venkata argued in his opening memorandum, the text and statutory

structure of section 1028A(a) support a deceptive-use requirement.  Despite its insistence that the

text alone unambiguously supports a contrary interpretation, the Government provides little

textual analysis.  Instead, it relies almost entirely on *Smith* v. *United States*, 508 U.S. 223 (1993),

and argues that "[t]his Court should simply apply the constructions of those terms articulated in

*Smith* to the corresponding terms of Section 1028A." But, as this Circuit has explained, the same terms across different statutes should only be interpreted the same way if the two statutes (1) appear in the same act, (2) have the same elements, (3) carry the same penalty, or (4) have the same objective. *United States* v. *Villanueva-Sotelo*, 515 F.3d 1234, 1248 (D.C. Cir. 2008); *see also United Shoe Workers of Am., AFL-CIO* v. *Bedell*, 506 F.2d 174, 188 (D.C. Cir. 1974) (explaining that two statutes cannot be read *in pari materia* when they have "significantly different purposes").[5]

Sections 924(c)(1) and 1028A(a) do not meet any of these four requirements and thus cannot be read *in pari materia*. And for good reason. The Government's lengthy discussion of *Smith* and *Muscarello* v. *United* States, 524 U.S. 125 (1998), entirely overlooks that the interpretive analyses in both cases were driven in significant part by the unique statutory purpose, structure, and contextual background of section 924(c)(1). For instance, although the Government focuses almost entirely on *Smith*'s invocation of the dictionary definition of "use," it fails to acknowledge that *Smith* did not stop there. The *Smith* Court also looked to "experience" and common parlance before concluding that "it is both reasonable and normal to say that petitioner 'used' his MAC–10 in his drug trafficking offense by trading it for cocaine." 508 U.S. at 230. Indeed, in *Watson* v. *United States*, 552 U.S. 74 (2007), the Court explained that *Smith* stands for the proposition that "[w]ith no statutory definition or definitive clue, the meaning of the verb 'uses' has to turn on the language as we normally speak it." 552 U.S. at 79. *Smith* also invoked structural interpretation by turning to section 924(d), which referred to the

---

[5]    Besides, the D.C. Circuit has warned that the *in pari materia* doctrine is only applicable if the statute is ambiguous to begin with. *District of Columbia* v. *Gladding*, 263 F. 628, 629 (D.C. Cir. 1920). The Government turns the doctrine on its head by arguing the operative terms in section 1028A(a) are unambiguous *because* the Supreme Court has already interpreted the same terms in a different statute.

-15-

A0352

"use" of a "firearm" in the context of "transfer, s[ale], trade, gi[ft], transport, or deliver[y],"

thereby strongly supporting the conclusion that a firearm can be "used" as barter. 508 U.S. 223

at 234-35.  And in interpreting "in relation to," the Court relied in part on the broad legislative

purpose of section 924(c)(1), which it described as discouraging the "dangerous combination" of

"drugs and guns."  *Id.* at 240.  Similarly, in *Muscarello*, the Court concluded that the word

"carry" should not be limited to "carr[y] 'on the person'" only after consulting "the statute's

basic purpose [and] its legislative history."  524 U.S. at 132.

   Given that the Supreme Court's interpretation of "use" and "in relation to" in

*Smith* and *Muscarello* was driven by factors unique to section 924(c)(1), this Court cannot, as the

Government proposes, "simply apply" *Smith*'s interpretation of the relevant terms to the same

terms in section 1028A(a).  Not only would that violate well-established limitations on the *in

pari materia* doctrine, but it would also defy *Smith*'s own guidance that "[l]anguage . . . cannot

be interpreted apart from context."  508 U.S.at 229.  Instead, as Mr. Venkata explained in his

opening memorandum, this Court should be guided by the underlying *principles* of *Smith* and

*Muscarello*—namely, that the ordinary meaning of the language should be understood in context

and in light of the statutory purpose; that, at a minimum, "in relation to" requires facilitation; and

that the limiting phrase "during and in relation to" serves as a safeguard against "misuse of the

statute to penalize those whose conduct does not create the risks of harm at which the statute

aims."  *Muscarello*, 524 U.S. at 139.

   Beyond its misguided application of *Smith*, the Government's textual argument is

nothing more than an overly broad reading of the words "use" and "in relation to" in isolation.

But the Supreme Court "has long refused to construe words in a vacuum."  *Gundy* v. *United

States*, 139 S. Ct. 2116, 2126 (2019).  Rather, it has reasoned that "the words of a statute must be

read in their context and with a view to their place in the overall statutory scheme." *Id.*
Contextual interpretation is particularly important here. "[T]he word 'use' poses some
interpretational difficulties because of the different meanings attributable to it," and therefore
must "draw[] meaning from its context." *Bailey* v. *United States*, 516 U.S. 137, 143 (1995). The
key limiting phrase "during and in relation to" is similarly amorphous. *See Maracich* v. *Spears*,
570 U.S. 48, 59–60 (2013) (explaining that "indeterminate" phrases such as "in connection to"
must be interpreted in light of "a limiting principle consistent with the structure of the statute and
its other provisions"). Thus, the Government's attempt to foreclose any contextual inquiry is a
nonstarter.

The statutory structure of section 1028A(a), including its title and predicate
offenses, provide important context. As the Supreme Court has made clear, "the title of a statute
and the heading of a section are tools available for the resolution of a doubt about the meaning of
a statute." *See Almendarez–Torres* v. *United States*, 523 U.S. 224, 234 (1998). Moreover, as
*Smith* teaches, "[j]ust as a single word cannot be read in isolation, nor can a single provision of a
statute." 508 U.S.at 233. Section 1028A(a) must be read in light of section 1028A(c), which
enumerates the predicate offenses (*e.g.*, "relating to nationality and citizenship," "relating to
obtaining customer information by false pretenses," "false statements relating to programs under
the [Social Security] Act"). The nature of these predicate offenses, which lend themselves to
identity crimes, indicates that Congress was not concerned with just any random use of
identifying information; rather, it was concerned with identity crimes (i.e., deceptive use). The
statute was designed to punish the "use" of a victim's identifying information to commit an
identity crime in furtherance of the theft—for example, by impersonating the victim to obtain
government benefits. It was *not* reasonably intended to reach, for example, the "use" of a stack

-17-

of documents containing PII as a doorstop while hauling physical property from a government building.  When read in context, the ordinary meaning of the phrase "use" of identifying information "in relation to" a predicate offense refers to the commission of an identity crime in furtherance of the predicate offense.  *See Watson*, 552 U.S. at 79 ("'[E]veryday meaning,' [is] revealed in phraseology that strikes the ear as both reasonable and normal.").[6]  At the very least, the statutory context renders the operatives terms "use" and "in relation to" ambiguous, triggering lenity.

## 2.    The Legislative History Supports A Deceptive Use Requirement

"Beyond context and structure, the Court often looks to history [and] purpose to divine the meaning of language."  *Gundy*, 139 S. Ct. at 2126.  Contrary to the Government's unsupported assertion that Congress targeted the "dangerous combination" between "identifying information and fraud," Gov't Resp. 43, section 1028A(a) had a much narrower mandate:  it sought to single out the "most serious and harmful forms of" identity thefts for enhanced penalties.[7]  Thus, as Mr. Venkata detailed in his opening memorandum, Congress was concerned with the combination of *identity crimes* and fraud.  *See* House Hearing (Statement of Larry Johnson) ("Types of identity crime include identity theft, credit card fraud, bank fraud, check

---

[6]    Contrary to the Government's assertion, Mr. Venkata's interpretation would not "effectively write out" "transfer" and "possess."  Gov't Resp. 35.  As the legislative record makes clear, the distinction between these three means of violating the statute are as follows: a defendant violates the statute if he "actually put[s] th[e] means of identification to use," "transfer[s] it to another person or location where it can be put to use," or possess the identifying information with the requisite intent "but has not yet put it to use or transferred it elsewhere." H.R. Rep. No. 108-528, at 10 (2004).  Mr. Venkata's interpretation of the statute does not disrupt these distinctions.

[7]    *Identity Theft Penalty Enhancement Act, and the Identity Theft Investigation and Prosecution Act of 2003: Hearing on H.R. 1731 and H.R. 3693 Before the Subcomm. on Crime, Terrorism, and Homeland Sec. of the H. Comm. on the Judiciary*, 108th Cong. 10 (2004) (statement of Timothy Coleman, Counsel to the Assistant Attorney General, Criminal Division, U.S. Department of Justice) ("House Hearing").

fraud, false identification fraud, and passport/visa fraud.  Equally as important is that *identity*

*crimes* are *used to facilitate* and fund violent crimes such as narcotics and weapons trafficking,

organized crime, mail theft and fraud, money laundering, immigration fraud, and terrorism.")

(emphasis added).

      Recognizing that legislative history significantly undercuts its position here, the

Government attempts to steer the Court away from reviewing any legislative history at all.

According to the Government, the legislative history of section 1028A(a) is irrelevant because

the text unambiguously captures Mr. Venkata's conduct.  But this Court has already concluded

that the legislative history of section 1028A(a) is relevant, *see* ECF No. 110 at 6, and the

Government itself invokes this Court's analysis of the legislative history, *see* Gov't Resp. 37.

Besides, as explained above, the text of section 1028A(a) falls far short of unambiguously

capturing Mr. Venkata's conduct.

      Next, the Government argues that even if the legislative history is relevant, the

singular example of *United States* v. *Scheller* in the House Report is enough for this Court to

conclude that the legislative history supports the Government's interpretation of the statute over

Mr. Venkata's.  This argument also falters.  To begin with, the Government misreads *Scheller*.

There, Ms. Scheller was "involved in identity theft" because she  *transferred*  the victims'

identifying information to others who used it to commit identity theft.  H.R. Rep. No. 108-528, at

5 (2004).  Indeed, other courts have read this example similarly.  *United States* v. *Berroa*, 856

F.3d 141, 156 (1st Cir. 2017) ("Notably, each of these examples involved the defendant's use of

personal information to pass him or herself off as another person, or the transfer of such

information to a third party for use in a similar manner."); *United States* v. *Hong*, 938 F.3d 1040,

1051 (9th Cir. 2019) (same).

Even if this Court accepts the Government's misreading of *Scheller*, that example at most example injects ambiguity into the legislative history, which, as explained in *Villanueva-Sotelo*, would trigger lenity.  There, the D.C. Circuit acknowledged that although the "vast weight of the legislative history" supported the defendant's interpretation of section 1028A(a), "some bits of it arguably cut the other way."  515 F.3d at 1247.  But, the court reasoned, that did not tip the scale in favor of the Government's interpretation; to the contrary, it "merely reinforce[d] the need for the rule of lenity to resolve any remaining ambiguities."  *Id.*

The Government's reliance on *United States* v. *Reynolds*, 710 F.3d 434 (D.C. Cir. 2013), is similarly flawed.  There, the defendant forged the victims' signatures, but the reputational and financial harms commonly associated with identity theft did not materialize.  710 F.3d at 435.  By committing identity theft, however, Mr. Reynolds nevertheless "created the risks at which the statute aims."  *Muscarello*, 524 U.S. at 139.  *Reynolds* stands for the proposition that an identity crime still violates section 1028A(a) even if it did not lead to reputational and financial risks.  710 F.3d at 436.  It does not support the Government's argument that conduct that is *not* identity theft or identity fraud could nevertheless amount to aggravated identity theft because it *could lead* to identity theft or identity fraud, which then *could* lead to reputational and financial harms.  The Government's theory effectively equates any form of breach, leak, or misplacement of data with an "identity crime," which runs afoul of the unanimous recognition by circuit courts that a data breach is not synonymous with identity theft or identity fraud.  *Cf. McMorris* v. *Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 299–304 (2d Cir. 2021); *Attias* v. *Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017); *In re SuperValu, Inc.*, 870 F.3d 763, 769 (8th Cir. 2017).

-20-

**A0357**

**3.     A Deceptive Use Requirement Is Consistent With Decisions Of Other Circuits**

Finally, the Government's proposed reading also conflicts with the interpretations adopted by the First, Sixth, and Ninth Circuits—which require that the defendant either impersonate or act on behalf of the victim—and goes further than the interpretations adopted by the Second and Fifth Circuits—which encompass broader forms of deceptive use.[8]  The Government contends that no circuit has adopted Mr. Venkata's "deceptive use" requirement. But that mischaracterization ignores that the First, Sixth, and Ninth Circuits have gone *further* than Mr. Venkata proposes, limiting section 1028A(a) convictions to certain *types* of deceptive use.  And in every circuit to have considered the question, the defendants at issue had in fact used the victims' identifying information deceptively.  Indeed, the Government has not pointed to a single other case in any jurisdiction where the defendant has been charged with, let alone convicted of, a section 1028A(a) violation without having used the victim's identifying information deceptively.  It is thus unsurprising that no court has had to articulate the obvious proposition that a defendant must have committed an identity crime (i.e., used the victim's identifying information deceptively) in order to be convicted of aggravated identity theft.

Unable persuasively to argue that its interpretation is consistent with the First, Sixth, and Ninth Circuits, the Government dismisses the analysis by those circuits as "unpersuasive."  But the Government provides no support for this conclusory statement—nor

---

[8]     Although the Government characterizes the Eleventh Circuit as siding with the Second and Fifth Circuits, that characterization is questionable.  In *United States* v. *Munksgard*, the Eleventh Circuit upheld a defendant's conviction where he "forg[ed] the [victim]'s name to bolster a loan application."  913 F.3d 1327, 1335 (11th Cir. 2019).  Although the Eleventh Circuit purported to divert from a standard that requires that the defendant either impersonate or act on behalf of the victim, *id.* at 1334, forgery is a form of impersonation, *see United States* v. *Morel*, 885 F.3d 17, 23 (1st Cir. 2018).

could it.  All three circuits engaged in a holistic interpretation of the statute by evaluating the language of section 1028A(a) in light of its broader statutory context and legislative history rather than in isolation.  *See Berroa*, 856 F.3d at 156 (recognizing that giving "use" its "broadest possible meaning . . . would subsume the separate statutory terms 'transfer[ ]' and 'possess[ ]'" and turning to the legislative history, which "makes clear that the legislation was intended to address the growing problem of identity theft"); *United States* v. *Medlock*, 792 F.3d 700, 706 (6th Cir. 2015) ("Given the statutory scheme at issue here, 'use' must have a more limited definition than the government suggests."); *United States* v. *Miller*, 734 F.3d 530, 541 (6th Cir. 2013) (recognizing that the word "use" should not be "[d]efined in isolation from its statutory context"; rather, it should be defined in light of, among other things, "statutory purpose" and "context"); *Hong*, 938 F.3d at 1051 (agreeing with the analysis in *Berroa* and *Medlock*).

This Court need not go so far as the First, Sixth, and Ninth Circuits to vacate Mr. Venkata's conviction, since Mr. Venkata's interpretation is also consistent with the decisions of the Second, Fifth, and Eleventh Circuits.  The defendants in *Wedd*, *Dubin*, and *Munksgard* all used the identifying information deceptively.  Moreover, all three circuits tailored their holdings to the specific facts of each case without purporting to define the contours of all section 1028A(a) violations.  *United States* v. *Dubin*, 27 F.4th 1021, 1024 (5th Cir. 2022) (en banc) (Owen, C.J., concurring) (concluding that "[i]n health care benefit fraud cases that use real people's identifying information to perpetrate the fraud, the criminal enterprise depends entirely upon access to and unlawful use of 'a means of identification of another person'"); *Munksgard*, 913 F.3d at 1334–35 (reasoning that the "statutory context confirms" that "forging [the victim's] name to bolster a loan application facilitated the bank fraud"); *United States* v. *Wedd*, 993 F.3d 104, 122–23 (2d Cir. 2021) (invoking the "statutory context" to conclude that "[t]he victim

-22-
A0359

consumers' phone numbers plainly facilitated the fraudulent schemes" as the defendant used

them to "defraud by means of auto-subscribing").

        The Government's reliance on the Second, Fifth, and Eleventh Circuits is

misplaced. The Government is not asking this Court to join those circuits; it is asking this Court

to go further. This Court should reject the Government's invitation to adopt the broadest

application of section 1028A(a) in any jurisdiction by holding that a defendant need not commit

an identity crime to be convicted of aggravated identity theft.

    **B.**    **The Government Did Not Prove That Any Use of Mr. Balfour's PII Was**
            **Integral To The Alleged Wire Fraud Or Theft Of Government Property**

        Unable to offer any evidence that Mr. Balfour's PII was integral, essential, or

even central to the underlying scheme, the Government relies on an overreading of *Smith* to

argue that the statute contains no such requirement. But *Smith* identified facilitation as only a

"minimum" requirement, 508 U.S. at 238; *see also* Def.'s Mem. 16, and any mechanical

application of *Smith* would violate the *in pari materia* doctrine. Read in context and in light of

the legislative purpose, section 1028A(a) applies only when the misuse of the victim's

identifying information is the crux of the underlying scheme. *See* Def.'s Mem. 23. Otherwise,

the "use" of identifying information is too incidental to the predicate offense. This interpretation

is consistent with the holdings in *United States* v. *Gatwas*, 910 F.3d 362, 368 (8th Cir. 2018)

(identifying the use of identifying information as "essential" to the fraud), *United States* v.

*Harris*, 983 F.3d 1125, 1128 (9th Cir. 2020) ("This portion of Harris's scheme could not have

succeeded otherwise."), and *Dubin*, 27 F.4th 1021, 1025 ("He could not have effectuated the

health care fraud or the conspiracy to commit health care fraud without using Patient L's

identifying information."). Because in all three cases the defendants' use of the victims'

identifying information was in fact essential to the predicate offense, the relevant language

cannot be dismissed as mere dicta.

The Government also failed to show that Mr. Balfour's PII was "central" to the

underlying scheme, even if not essential. At most, the evidence showed that the version of the

Audit Module shown to the programmers during a remote demonstration included Mr. Balfour's

PII in the back-end. But this tenuous and random connection between Mr. Balfour's PII and the

underlying scheme does not render Mr. Balfour's PII "the key to duping the government."

*Dubin*, 27 F.4th 1021, 1025. Because the Government failed to prove that Mr. Venkata used Mr.

Balfour's PII deceptively or that the PII was integral, essential, or even central to the underlying

scheme, this Court should vacate Mr. Venkata's conviction.

## IV.    THE GOVERNMENT'S DESTRUCTION OF RECORDS THEORY IS UNSUPPORTED BY THE EVIDENCE

Mr. Venkata's opening memorandum described in detail the Government's failure

of proof with respect to his alleged destruction of emails and text messages and his alleged intent

to obstruct the Government's investigation. Specifically, the memorandum outlined (i) the

absence of any evidence that Mr. Venkata deleted the single email between him and Mr.

Edwards,[9] (ii) the undisputed evidence that Mr. Venkata maintained a copy of the email with Mr.

Edwards at his home, (iii) the undisputed evidence that Mr. Venkata affirmatively disclosed the

---

[9]     Agent Steel testified that "there were no e-mails" (plural) on Mr. Venkata's phone. Trial Tr. Morning Session, 44:18-20, April 4, 2022. This statement suggests only that there were no emails whatsoever on Mr. Venkata's phone, either with Mr. Edwards or with others. It does not provide *any* evidence of *why*. Nor does it reasonably support an inference that Mr. Venkata deleted one specific email with Mr. Edwards, particularly given Agent Steel's testimony that that same email remained on Mr. Venkata's home computer. *See* Trial Tr. Morning Session, 48:4, April 4, 2022. If Mr. Venkata had in fact deleted the email, it would have disappeared from both devices.

email to Agent Steel during his interview, demonstrating no intent to hide it, (iv) the absence of

evidence that Mr. Venkata deleted any text messages,[10] (v) the absence of any evidence about

when any text messages were deleted from Mr. Venkata's phone, (vi) the undisputed evidence

that Mr. Venkata affirmatively showed his text messages to Agent Steel during his interview,

demonstrating no intent to hide them, and (vii) the undisputed evidence that Mr. Venkata

disclosed to the Government the phone calls from Mr. Edwards on the same day he received

them, demonstrating no intent to hide them.  Def.'s Mem. 25-29.

   Unable to dispute this evidence, the Government rejects a "literal" reading of

Agent Steel's "clear and precise" testimony and instead invites the Court to interpret a *less*

specific portion of his testimony more broadly.  But Agent Steel was careful not to perjure

himself, and it is telling that he did not testify as the Government might have wished.  Having

failed to prove that Mr. Venkata deleted any emails or texts, or that he intended to obstruct the

Government's investigation—and in the face of evidence to the contrary—the Government is

grasping at straws.  As described in Mr. Venkata's opening memorandum, the Government's

attempted expansion of Agent Steel's testimony is contradicted by reading his statements in

context.  *See* Def.'s Mem. 27 n.8.  This Court should reject the Government's invitation to

stretch Agent Steel's testimony beyond the bounds of reason and relieve the Government of its

burden of proof.

---

[10] Like the emails, Agent Steel testified only that "there were no relevant messages in
there."  Trial Tr. Morning Session, 44:20-21, April 4, 2022.  Again, however, this provides no
evidence of *which* messages may have been missing or *why*.  In light of Agent Steel's subsequent
admission that Mr. Venkata "told me nothing about deleting these text messages," Trial Tr.
Morning Session, 45:24-25, 46:1-2, April 4, 2022, Agent Steel's statement that the messages
were missing, without more, does not reasonably support an inference that they were deleted.
Absent evidence to the contrary, which the Government failed to elicit, the more reasonable
inference is that they were merely outside of Mr. Venkata's message retention settings.

-25-

**V.    THE JURY WAS WRONGLY INSTRUCTED ON THE CONSPIRACY CHARGE AND WRONGLY DENIED A DEFENSE THEORY OF THE CASE**

**A.    The Jury Should Have Been Properly Instructed On The Nature Of The Alleged Conspiratorial Agreement For The Conspiracy Charges**

In his opening memorandum, Mr. Venkata demonstrated that the jury instructions on the conspiracy charges *in this case* could not properly be framed in the disjunctive because doing so would fail to convey the nature of the specific agreement alleged here:  a single conspiracy to steal government property *in order to* sell it back to federal agencies.  *See* Def.'s Mem. 31–34.  In light of the allegations in the Indictment, the way the Government has consistently framed its own case, and the evidence adduced at trial—including the absence of any allegation or evidence of an independent conspiracy *only* to steal government property without a corresponding purpose to sell it back—the disjunctive instruction here failed to instruct the jury as to the "essential nature of the conspiratorial agreement."  *United States* v. *Treadwell*, 760 F.2d 327, 337 (D.C. Cir. 1985).

Rather than respond substantively to Mr. Venkata's argument, the Government attempts to sidestep it, contending that the disjunctive conspiracy charge was proper because (i) it was consistent with paragraphs 11(a) and 11(b) of the Indictment, which charged Mr. Venkata with conspiring to defraud the United States and stealing its property, and (ii) a conviction of conspiring to commit either predicate is sufficient to establish a violation of the statute.[11]  But these arguments miss the mark, as Mr. Venkata does not dispute that "a single conspiracy may have a multiplicity of objects," *United States* v. *Clay*, 495 F.2d 700, 710 (7th Cir. 1974), or that

---

[11]    The Government also argues that properly charging the conspiracy in the conjunctive would have impermissibly "alter[ed] the objects of the conspiracy from the indictment."  Gov't Resp. 54–55.  Not so.  As the Government itself concedes, the Indictment charged Mr. Venkata in the conjunctive.  *See* Indictment ¶ 11; Gov't Resp. 55.

-26-

**A0363**

a jury instruction on conspiracy generally "may properly be framed in the disjunctive," *United States* v. *Simpson*, 228 F.3d 1294, 1300 (11th Cir. 2000).

Instead, judged by the standard in *Treadwell*, and as explained in Mr. Venkata's opening memorandum, the instruction to the jury on the specific conspiracy they were to consider *here* was defective. *See* Def.'s Mem. 31–34. The Government asserts that nothing in *United States* v. *Treadwell* is to the contrary, but that is not so. Although the Government attempts to gloss over this point, the jury instruction in *Treadwell* informed the jury of the fundamental nature of the conspiratorial agreement by recounting the "Object of the Conspiracy" paragraph, equivalent to the "Purposes of the Conspiracy" section of the Indictment here, which the jury instruction here did not include. *See Treadwell*, 760 F.2d at 337. Thus, unlike in *Treadwell*, the jury instruction here did not convey to the jury the "particularized description of the generic crimes charged" which was necessary to "provide[] the essential nature of the conspiratorial agreement" for the jury's consideration. *Id.*

## B.    Rejecting Mr. Venkata's Theory of Defense Instruction Was Improper

In his opening memorandum, Mr. Venkata also demonstrated that he was entitled to his proposed theory of defense instruction because it was a correct statement of the law, supported by trial evidence, and necessary to ensure that the Government was forced to carry its burden of proof. In response, despite conceding for the first time that a theory of the case instruction is appropriate for more than just affirmative defenses, the Government contends that Mr. Venkata's proposed apparent authority instruction was not supported by evidence and was duplicative of other instructions concerning mens rea. *See* Gov't Resp. 56–61. Both arguments are without merit.

1.    **Mr. Venkata Presented More Than Sufficient Evidence To Support The Apparent Authority Instruction**

The threshold for giving an instruction on the defendant's theory of the case is low.  A defendant's theory of the case need only have "a basis in the law and in the record," *Joy* v. *Bell Helicopter Textron, Inc.*, 999 F.2d 549, 556 (D.C. Cir. 1993), be "properly requested by counsel," *United States* v. *Mathis*, 535 F.2d 1303, 1305 (D.C. Cir. 1976), and be supported by "sufficient evidence from which a reasonable jury could find for the defendant on his theory," *United States* v. *Hurt*, 527 F.3d 1347, 1351 (D.C. Cir. 2008).  Mr. Venkata was not required to present compelling proof that he acted under Sonal Patel's apparent authority to be entitled to the instruction.  Rather, he only needed to show sufficient evidence that a reasonable jury *might* find for him.

Measured under this standard, the Government's contention that Mr. Venkata presented "no evidentiary predicate" for his theory of defense instruction is plainly wrong.  As outlined in Mr. Venkata's opening memorandum, there was ample evidence presented at trial of apparent authority, including that Ms. Patel was Mr. Venkata's direct and sole supervisor within a strictly hierarchical office structure, and that it was typical for Ms. Patel to contact Mr. Venkata about tech-related work tasks while in the workplace.  *See* Def.'s Mem. 36–37.  The Government thus misstates the record in arguing there was "simply no evidence" for the jury to infer that Mr. Venkata believed his conduct was authorized.  After all, under the Government's *own theory*, Mr. Venkata acted on the instructions of Ms. Patel.

The Government insists that the evidence was insufficient because Mr. Venkata's colleagues testified that they knew that supervisors do not have authority to break the rules or to authorize others to break the rules.  But that has no bearing on whether Mr. Venkata might have reasonably believed Ms. Patel's requests were proper.  As Ms. Kuo testified, she assumed that

requests by her supervisor in the workplace were "normal."  Trial Tr. Afternoon Session, 22:16–17, April 1, 2022.  A jury could reasonably infer that Mr. Venkata had the same assumption, particularly in light of evidence that Mr. Venkata had a uniquely isolated working environment and insular chain of command through which he received all of his directions at DHS-OIG through Ms. Patel.  *See, e.g.*, Def.'s Mem. 36–37 (summarizing Michael Horton's testimony as to Mr. Venkata's deference to Ms. Patel as his sole supervisor); Trial Tr. Morning Session, 44:25–45:3 & 81:11–16, April 1, 2022 (Narasimha Ambati's testimony that Judy Kuo gave him his assignments).  Unlike his testifying colleagues, Mr. Venkata had an unusually lengthy professional and personal relationship with Ms. Patel, which would have influenced his trust in the directions he received from her at work.  *Compare* Trial Tr. Afternoon Session, 44:14–17, 54:24–55:7, & 82:3–5, April 5, 2022 (Sonal Patel's testimony that she and worked with Mr. Venkata at DHS-OIG from 2010 to 2017, and at USPS-OIG before that, such that they "knew each other very well working together all these years" and socialized over the weekends), *with* Trial Tr. Morning Session, 44:4–9, April 1, 2022 (Narasimha Ambati's testimony that Ms. Patel was "just [his] coworker" for the five years that he worked for her, and that he never socialized with her outside of the office); *id.* at 97:15–20 (Judy Kuo's testimony that, although Ms. Patel was her direct supervisor, they never socialized outside the office).  Such evidence is more than enough to provide a "basis in the record" for the instruction.

### 2.    Mr. Venkata's Proposed Theory Of Defense Instruction Was Not Duplicative

The Government next contends that the proposed theory of defense instruction was "already covered by the Court's instructions" on the mens rea requirement.  Gov't Resp. 59.  Far from it.  *First*, the fact that the proposed theory of the case would negate mens rea cannot mean that a general jury instruction on mens rea will suffice.  *See Salley* v. *United States*, 353

F.2d 897, 898 (D.C. Cir. 1965).  The proposed instruction was not a "general denial[] of guilt."

*United States* v. *Pray*, 869 F. Supp. 2d 44, 51 (D.D.C. 2012).  Rather, the proposed instruction

underscored a specific factual theory that, if accepted, would have precluded a guilty verdict on

specific counts.  *See Levine* v. *United States*, 261 F.2d. 747, 748–49 (D.C. Cir. 1958) (theory of

the case instruction required where "facts present an evidentiary theory which if believed defeats

the factual theory of the prosecution.").  The Government ignores this argument completely.

     *Second*, the mens rea jury instruction falls short of "substantially cover[ing]" the

apparent authority theory of the case, despite the Government's best attempts to swat away Mr.

Venkata's right to his theory of defense instruction.  Gov't Resp. 60.  Indeed, a theory of the case

instruction is required where the defense theory is "not so obvious to any jury."  *Laughlin* v.

*United States*, 474 F.2d 444, 455 (D.C. Cir. 1972).  The Government does not pretend that the

defense's apparent authority theory would be "obvious," nor is it.  Gov't Resp. 59–61.  The

significance of Ms. Patel's apparent authority to Mr. Venkata's mental state would be far from

obvious to the typical juror.[12]  The instructions presented to the jury deprived Mr. Venkata of his

right to present his theory of the case, thereby depriving the jury from adequately evaluating the

evidence.  This error warrants a new trial.

---

[12]    The cases the Government cites are inapposite.  For example, while the Government relies on *United States v. Hurt*, there the defendant requested an instruction that he could not be convicted of theft of government property "if he had a good faith but mistaken belief that [a] check belonged to him."  527 F.3d 1347, 1352 (D.C. Cir. 2008).  And while the trial court did not adopt Hurt's proposed instruction, it used similar language, instructing that the government "must prove beyond a reasonable doubt that the defendant stole the money knowing it was not his" and that acquittal was required if the jury believed the defendant "was unsure about the true ownership of the money."  *Id.* at 1351–52.  Here, on the other hand, the language of the proposed jury instruction was substantially different and more specific than the Court's ultimate jury instructions.  The requested instruction described a theory that Mr. Venkata acted "based on his reasonable belief that he was acting pursuant to the apparent authority of Sonal Patel," ECF No. 141 at 1–2, but the actual instruction only stated (with respect to Counts One, Two, and Eleven): "Mr. Venkata contends that he did not have the required state of mind," ECF No. 146 at 50.

## CONCLUSION

For the foregoing reasons and those in Mr. Venkata's opening memorandum, a judgment of acquittal should be entered on all charges.  In the alternative, a new trial should be granted on any charges for which a judgment of acquittal is not entered.

Respectfully submitted,

/s/ Kamil R. Shields

Kamil R. Shields
Pardis Gheibi (*pro hac vice*)
Tara N. Ohrtman (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W. Suite 700
Washington, D.C. 20006-5215
Telephone: (202) 956-7040
Facsimile: (202) 956-7676
Email: shieldska@sullcrom.com
Email: gheibip@sullcrom.com
Email: ohrtmant@sullcrom.com

Katherine M. Savarese (*pro hac vice*)
Jared H. Rosenfeld (*pro hac vice*)
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: savaresek@sullcrom.com
Email: rosenfeldj@sullcrom.com

Michelle Peterson
Chief Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C. 20004
Telephone: (202) 208-7500
Email: Shelli_Peterson@fd.org

June 24, 2022

-31-

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| **v.** | ) | **Case No. 20-cr-00066-RDM** |
| | ) | |
| MURALI YAMAZULA VENKATA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**GOVERNMENT'S SUPPLEMENTAL BRIEF REGARDING *CIMINELLI v. UNITED STATES*, 598 U.S. 306 (2023)**

On August 29, 2023, the Court held oral argument on defendant Murali Venkata's Motions for Judgment of Acquittal and New Trial.    During oral argument, the Court invited the parties to submit supplemental briefing regarding the Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306 (2023), which invalidated the Second Circuit's "right to control" theory of wire fraud. The government respectfully submits that *Ciminelli* is not applicable to this case because the government has consistently relied on a traditional property-fraud theory, not a "right to control" theory.

**DISCUSSION**

**I.    *Ciminelli* Invalidated a Fraud Theory Based on Deprivation of the Intangible Right to Control One's Assets**

For decades, the Second Circuit recognized a theory of wire fraud known as the "right to control" theory.    That theory held that "[s]ince a defining feature of most property is the right to control the asset in question, . . . property interests protected by the wire fraud statute include the interest of a victim in controlling his or her own assets."    *United States v. Percoco*, 13 F.4th 158, 170 (2d Cir. 2021) (quoting *United States v. Lebedev*, 932 F.3d 40, 48 (2d Cir. 2019)), *vacated*

1

**A0369**

*and remanded*, *Kaloyeros v. United States*, 143 S. Ct. 2490 (2023).    Under that theory, the Second Circuit upheld wire fraud convictions based on "a showing that the defendant, through the withholding or inaccurate reporting of information that could impact on economic decisions, deprived some person or entity of potentially valuable economic information."    *Id.* (internal quotation marks omitted).    In *Ciminelli*, the Supreme Court held that the right-to-control theory is invalid because the wire fraud statute "criminalizes only schemes to deprive people of traditional property interests," and does not protect an intangible interest in "'potentially valuable economic information' 'necessary to make discretionary economic decisions.'"    598 U.S. at 309.

In *Ciminelli*, the government relied on the right-to-control theory "[t]hroughout the grand jury proceedings, trial, and appeal."    *Id.* at 310.    The government "successfully defeated [the defendants'] motion to dismiss by relying on that theory," "successfully moved the District Court to exclude certain defense evidence as irrelevant to that theory," and "relied on that theory in its summation to the jury."    *Id.* at 310–11.    Consistent with the right-to-control theory, the district court instructed the jury that "the term 'property' in § 1343 'includes intangible interests such as the right to control the use of one's assets'" and that it could find the defendants guilty if it found that they "'deprived [the victim] of potentially valuable economic information that it would consider valuable in deciding how to use its assets.'"    *Id.* at 311.    On appeal, the government "relied solely on the right-to-control theory" and the Second Circuit affirmed the convictions "based on its longstanding right-to-control precedents."    *Id.*

Before the Supreme Court, the government conceded that the right-to-control theory is invalid.    *Id.* at 316.    It nonetheless asked the Court to affirm the petitioner's convictions on the alternative ground that the evidence was sufficient to establish wire fraud under a traditional property-fraud theory.    *Id.*    Specifically, the government argued that the petitioner schemed to

2

**A0370**

obtain a traditional property interest, namely, "hundreds of millions of dollars in contract funds," through fraud.  *See* Brief for the United States at 32, *Ciminelli v. United States*, No. 21-1170 (filed Oct. 12, 2022).   The Court rejected the government's argument because that alternative theory was not presented to the jury or the lower courts.  *Id.* at 316–17.   It reversed the Second Circuit's judgment and remanded for further proceedings.  *Id.* at 317.   In a concurring opinion, Justice Alito expressed his understanding that the Court's opinion did not address "fact-specific issues on remedy outside the question presented," including "the Government's ability to retry petitioner on the theory that he conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, viz., valuable contracts."  *Id.* at 317–18.

## II.    The Government Has Consistently Advanced a Traditional Property-Fraud Theory in this Case

*Ciminelli* has no application to this case because the government has never relied on the right-to-control theory.   At every stage of the proceedings, the government has advanced a traditional property-fraud theory: that the defendants schemed to defraud USDA-OIG of a traditional form of property — money — by inducing it to purchase EDS 2.0 while misrepresenting and concealing the fact that EDS 2.0 was being developed using stolen government software, source code, and databases.   The government alleged this property-fraud theory in the Indictment, *see* ECF No. 1, ¶¶ 11(b), 12, 15(g), and relied on it in opposing the defendants' Rule 12 motions, *see* ECF No. 66, at 11–15.   It argued the same property-fraud theory to the jury in its opening statement, *see* Mar. 29, 2022 AM Trial Tr. 9:21–10:23, and in summation, *see* Apr. 6, 2022 PM Trial Tr. 14:5–14, 57:5–58:10.

Consistent with the government's property-fraud theory, the Court charged the jury with respect to Count One that "[t]o 'defraud the United States' means to cheat the United States

3

**A0371**

government or any of its agencies out of money or property."    ECF No. 146, at 33.    Similarly,

with respect to Count Eleven, the Court charged the jury that "[a] 'scheme to defraud' means any

plan, pattern, or course of action intended to deprive another of money or property or bring about

some financial gain to the person engaged in the scheme."    ECF No. 146, at 43.    These

instructions required the jury to find that the defendant schemed to defraud the government of

money or property.    They did not permit the jury to convict if it found that the defendants intended

to deprive the government of nothing more than "'potentially valuable economic information'

'necessary to make discretionary economic decisions.'"    *Ciminelli*, 598 U.S. at 309.

Finally, the government reiterated its property-fraud theory in its affirmative arguments in

response to the defendant's Motion for Judgment of Acquittal.    *See* ECF No. 169, at 4–9.    To

the extent the government addressed the right-to-control caselaw, it did so only in response to

defense arguments regarding those cases.    *See* ECF No. 169, at 12–13.    In sum, the government

has consistently relied on the traditional property-fraud theory that the defendants schemed to

obtain government funds by inducing USDA-OIG to purchase EDS 2.0 based on material

misrepresentations and omissions about their methods of developing that product.

Courts routinely affirm wire fraud and conspiracy convictions based on the theory that the

defendant schemed to obtain government contracts by misrepresenting the contractor's

qualifications or business practices.    For example, in *United States v. Leahy*, 464 F.3d 773 (7th

Cir. 2006), the defendants misrepresented businesses that they controlled as minority-owned or

women-owned to take advantage of a Chicago ordinance granting preference to such businesses

in city contracting.    *Id.* at 778–81.    Based on those misrepresentations, they won millions of

dollars in City contracts and subcontracts.    *Id.* at 780–81.    Similarly, in *United States v.

Maxwell*, 579 F.3d 1282 (11th Cir. 2009), the defendants fraudulently obtained contract funds set

4

aside under Miami-Dade County's Community Small Business Enterprise program and the federal "disadvantaged business enterprise" ("DBE") program by falsely representing that certain electrical work called for under the contracts would be performed by a qualifying small business or DBE. *Id.* at 1288–93. Other circuits have similarly affirmed convictions of defendants who misrepresented their compliance with the federal DBE program to win government contracts. *See, e.g.*, *United States v. Nagle*, 803 F.3d 167, 171–73 (3d Cir. 2015); *United States v. Brothers Construction Company of Ohio, Inc.*, 219 F.3d 300, 304–08 (4th Cir. 2000). In each of these cases, as here, the defendants schemed to deprive the government of a traditional form of property — money paid under government contracts — and they did so by misrepresenting the contractor's qualifications or business practices. The defendants' schemes were criminal because, under some circumstances, a prospective contractor's qualifications or business practices are material to the counterparty. *See, e.g.*, *Nagle*, 803 F.3d at 181 ("The DBE program cares about who performs the work.").

Notably, several of the defendants in these fraudulent inducement cases, like the defendant here, challenged their convictions on the ground that the government received the economic benefits of the bargain. For example, in *Leahy*, the defendants argued that the indictment failed to allege a deprivation of money or property because their companies, despite having misrepresented themselves as minority-owned or women-owned, nonetheless "fulfilled their obligations under the relevant contracts or subcontracts." 464 F.3d at 787. They asserted that "because the city would ostensibly have paid the same for the provided services regardless, Chicago lost no money." *Id.* The Seventh Circuit rejected that argument. It noted that, under established precedent, the mail and wire fraud statutes "do not require the government to prove either contemplated harm to the victim or any loss," and that "a defendant's honest belief that his

5

actions will ultimately result in a profit and not a loss is irrelevant for determining whether a violation has occurred." *Id.* at 786–87 (collecting cases).    The court concluded that "it does not matter that [the defendant] and his cronies thought that Chicago was getting a service worth every dime in the contracts." *Id.* at 789.    All that was required was "a willful act with the intent to deceive or cheat," which was demonstrated in that case by the fact that the defendant "deceived Chicago regarding the true status of his companies." *Id.*

The Eleventh Circuit rejected a similar argument in *Maxwell*.    There, the defendant asserted that "he did not deprive the County or the United States of money or property, because, in the end, the County and the United States received the electrical work they sought."    579 F.3d at 1302.    The Eleventh Circuit disagreed.    It noted that "financial loss is not at the core of these mail and wire frauds." *Id.*    Rather, the mail and wire fraud statutes "seek to punish the intent to obtain money or property from a victim by means of fraud and deceit." *Id.*    Thus, "[r]egardless of the quality or cost of the work completed by [the defendant's company]," the defendant committed fraud by "obtain[ing] construction contracts and substantial payments from the County and the United States for which [his company] was not eligible." *Id.* at 1302–03.    Finally, in *Brothers Construction*, the Fourth Circuit rejected the defendants' argument that the government suffered no loss for sentencing purposes because the state agency victim ultimately "received exactly what it bargained for" and "at no additional cost."    219 F.3d at 317–18.    The court concluded that "there was certainly loss as contemplated by the guidelines" because "the funds were not put to the intended use." *Id.* at 318.

These holdings are consistent with recent Supreme Court precedent reaffirming that the "scheme to defraud" element of the bank fraud statute, which is similarly worded to the wire fraud statute, "demands neither a showing of ultimate financial loss nor a showing of intent to cause

6

**A0374**

financial loss." *Shaw v. United States*, 137 S. Ct. 462, 467 (2016).    The Court observed that

"'[a] man is none the less cheated out of his property, when he is induced to part with it by fraud,'

even if 'he gets a quid pro quo of equal value.'"    *Id.* (quoting *United States v. Rowe*, 56 F.2d 747,

749 (2d Cir. 1932) (Hand, J.)).    Similarly, in the context of the wire fraud statute, the Court has

rejected the proposition that "a scheme to defraud requires a monetary loss."    *Carpenter v. United*

*States*, 484 U.S. 19, 26 (1987).

      In arguing for an economic-loss requirement, the defendant largely relies on a line of

Second Circuit precedent that attempts to distinguish "between schemes that do no more than cause

their victims to enter into transactions they would otherwise avoid—which do not violate the mail

or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an

essential element of the bargain—which do violate the mail and wire fraud statutes."    *United*

*States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007); *see* ECF No. 166, at 3–6.    But the reasoning

behind that distinction is unclear.    As the Second Circuit itself recognizes, the wire fraud statute

requires only that the misrepresentation be material.    *See United States v. Pierce*, 224 F.3d 158,

165 (2d Cir. 2000) (listing the elements of wire fraud).    The definition of materiality is well-

established.    *See Neder v. United States*, 527 U.S. 1, 16 (1999) ("[A] false statement is material

if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the

decisionmaking body to which it was addressed.'" (quoting *United States v. Gaudin*, 515 U.S. 506,

509 (1995))).    The Second Circuit's additional requirement that the misrepresentation go to "an

essential element of the bargain" functions as a kind of super-materiality requirement.    In his

concurring opinion in *United States v. Feldman*, 931 F.3d 1245 (11th Cir. 2019), now-Chief Judge

Pryor of the Eleventh Circuit observed that this requirement has no basis in either the statutory text

or the common law.    *See id.* at 1265–74 (W. Pryor, J., concurring).    Moreover, the Second

7

Circuit's "essential element of the bargain" requirement is difficult to square with the fraudulent inducement cases cited above, which are based on well-established principles of fraud.

The only D.C. Circuit precedent that defendant cites is *United States v. Lemire*, 720 F.2d 1327 (D.C. Cir. 1983); *see* ECF No. 166, at 3. But *Lemire* is not applicable. *Lemire* is an honest-services fraud case predating *McNally v. United States*, 483 U.S. 350 (1987). Before *McNally*, the courts of appeals construed the mail and wire fraud statutes to reach schemes to deprive the victim not only of money and property, but also of the intangible right to honest services. *See Skilling v. United States*, 561 U.S. 358, 400 (2010). The courts construed this honest-services fraud doctrine to reach intentional failures to disclose conflicts of interest in both the public and private sectors. *Id.* at 409–10.

*Lemire* is a private-sector honest-services fraud case. The government charged the defendant with wire fraud based on his failure to disclose to his employer that he had a financial interest in a transaction that he worked on in the course of his employment. *See* 720 F.2d at 1332–34. The court, consistent with the then-valid honest-services fraud doctrine, stated that "although the scheme to defraud must threaten some cognizable harm to its target, that harm need not be a deprivation of tangible property or money; criminal fraud encompasses schemes to defraud persons of significant intangibles as well." *Id.* at 1336. To avoid concerns about criminalizing "any intentional undisclosed breach of duty to an employer," the court limited private-sector honest-services fraud prosecutions based on undisclosed conflicts of interest to cases involving "failure to disclose something which in the knowledge or contemplation of the employee poses an independent business risk to the employer." *Id.* at 1337.

Four years later, in *McNally*, the Supreme Court invalidated the honest-services fraud doctrine on the ground that the mail fraud statute protects only "property rights," which did not

8

include an intangible right to honest services.    *See* 483 U.S. at 360.    In response to *McNally*, Congress enacted 18 U.S.C. § 1346, which provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."    Then, in *Skilling*, the Supreme Court held that Section 1346 reaches only schemes involving bribes and kickbacks and does not apply to undisclosed conflicts of interest.    *See* 561 U.S. at 410.    Thus, *Lemire* addresses a theory of wire fraud — deprivation of honest services through failure to disclose a conflict of interest — that has been twice invalidated by the Supreme Court.    *Lemire* is not relevant to the traditional property-fraud theory at issue in this case.

Here, the Court correctly and without objection instructed the jury that, to convict the defendant of wire fraud, it had to find that he knowingly devised or intended to devise a "scheme to defraud . . . by means of materially false or fraudulent pretenses, representations, or promises, or by concealing material facts."    ECF No. 146, at 43.    The Court defined "scheme to defraud" as "any plan, pattern, or course of action intended to deprive another of money or property or bring about some financial gain to the person engaged in the scheme" and defined "material" as having "a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed."    ECF No. 146, at 43–44; *see also United States v. Coughlin*, 610 F.3d 89, 107 n.11 (D.C. Cir. 2010) (approving similar jury instruction).

The evidence was more than sufficient to support the jury's verdict on the "scheme to defraud" element.    As discussed in the government's Opposition to Defendant's Motion for Judgment of Acquittal, the evidence showed that the defendants' scheme contemplated economic loss to the government because a product that is based on stolen property is worth less than a product that is developed in a legitimate manner.    *See* ECF No. 169, at 9–14.    But it was not necessary for the jury to make that finding.    All that the jury was required to find was that the

9

scheme sought to obtain government property — money — based on material misrepresentations

or omissions.    As to materiality, the jury heard the following testimony from Special Agent Peter

Paradis:

> Q.    If you knew the new system had been built using software copied from case management systems used at DHS-OIG and USPS-OIG, would it have mattered to you?
>
> A.    Yes.
>
> Q.    Why?
>
> A.    It would have been illegal, and it would have resulted in multiple procurement acquisition violations, ethics violations, conflict of interest, et cetera.    And I would have immediately contacted Mr. Horton directly, absent my chain of command, in order to make him aware of that, of the seriousness of it.
>
> Q.    If you knew the new system had been built using source code transferred to another country along with U.S. Government employees' personal information, would it have mattered to you?
>
> A.    Yes.
>
> Q.    Why?
>
> A.    For the same reasons, that that would be a violation of ethics rules, conflict of interest, multiple laws.    And it would have been – I would have been concerned about my own involvement at that point in engaging in furtherance of the pursuit.

Mar. 31, 2022 AM Trial Tr. 79:16–80:12.    Based on this testimony, the jury could properly

conclude that the defendants' misrepresentations and omissions regarding their business practices

and the manner in which they were developing EDS 2.0 had a "natural tendency to influence, or

[was] capable of influencing" the government's decision to purchase that product.    No more was

required to establish the existence of a "scheme to defraud" under a traditional property-fraud

theory.

10

## CONCLUSION

*Ciminelli* is not applicable to this case because the government advanced a traditional property-fraud theory.   The government presented sufficient evidence of that theory to support the jury's verdict.   The defendant's Motion for Judgment of Acquittal on Counts One and Eleven should be denied.

Respectfully submitted,

MATTHEW M. GRAVES                          COREY R. AMUNDSON
UNITED STATES ATTORNEY                     CHIEF, Public Integrity Section
For the District of Columbia               U.S. Department of Justice

By: */s/ Christine M. Macey*               By:   */s/ Victor R. Salgado*
    CHRISTINE M. MACEY                 VICTOR R. SALGADO
    D.C. Bar No. 1010730               D.C. Bar No. 975013
    Assistant United States Attorney   Senior Litigation Counsel
    Fraud, Public Corruption, and Civil Rights Section   Public Integrity Section
    601 D Street NW                    U.S. Department of Justice
    Washington, D.C. 20530             1301 New York Avenue, NW
    (202) 252-7058                     Washington, D.C. 20530
    christine.macey@usdoj.gov          (202) 353-4580
                                       victor.salgado@usdoj.gov

                                       By:   */s/ Celia R. Choy*
                                       CELIA R. CHOY
                                       D.C. Bar No. 1017211
                                       Trial Attorney
                                       Public Integrity Section
                                       U.S. Department of Justice
                                       1301 New York Avenue, NW
                                       Washington, D.C. 20530
                                       (202) 875-1557
                                       celia.choy@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                                    Plaintiff,          Case No. 20-cr-00066-RDM

v.                                                      Honorable Randolph D. Moss

MURALI YAMAZULA VENKATA,

                                    Defendant.

REPLY TO GOVERNMENT'S SUPPLEMENTAL BRIEF
REGARDING *CIMINELLI* v. *UNITED STATES*

On August 29, 2023, the Court held oral argument on Murali Venkata's Motions for

Judgment of Acquittal and New Trial.  During oral argument, the Court invited the parties to

submit supplemental briefing regarding the Supreme Court's decision in *Ciminelli* v. *United

States*, 598 U.S. 306 (2023).  On September 6, 2023, the government submitted a supplemental

brief.  On September 7, 2023, Mr. Venkata sought leave to file a reply, which the Court

permitted.

Murali Venkata respectfully submits this reply memorandum of law in response to the

government's supplemental brief regarding *Ciminelli*, and in further support of his Motion for

Judgment of Acquittal and for a New Trial.

DISCUSSION

As the Court noted during oral argument, the government's fraud theory comes down to a

"conceptual question about whether the jury could have found beyond a reasonable doubt that

the product . . . that was being sold was at least, in part, stolen."  Oral Arg. Tr. 47:23-58:3, Aug.

29, 2023.  The Court invited the government to identify trial evidence showing that the

defendants schemed to sell back stolen property rather than a truly new case management

system, thereby potentially misrepresenting the product they were selling.  The government

failed to identify any such evidence at argument or in its supplemental brief, however, because

there is no such evidence.  Rather, the evidence introduced at trial makes clear that Charles

Edwards did not incorporate stolen government code into the new case management system he

was building, including because he and his team re-wrote the new system using an entirely

different programming language.

During their meetings to discuss the project, Mr. Edwards told Peter Paradis that DHS's

current version of EDS was "built in cold fusion," an older programming language, and "the

coding is way old."  Def. Ex. 28A at 35, 2.  By contrast, he explained that EDS 2.0 was written

in C#, a newer programming language.  *Id.* at 2 ("You can try mine out and you see mine is

completely every word of it, every sentence in C# is written completely with security testing in

it."); *accord* Gov't Ex. 10A at 4 ("EDS is, the way it's designed is the design, the original design

is like technology like, the architecture is 10, 12 years, 15 years old.  So, with this new thing that

I'm talking about, the architecture is more like um, current in 5 years former."); Def. Ex. 26A at

2 ("It, it's not like DHS because DHS code is so, you know, cobbled together, you would get lots

of issues.  It's not, it's not that version.  It's later and it's, it's, it's something that any, you know,

regardless of where you are, you'll be able to customize it and figure it for your organization.").

The government has never characterized these statements about the programming language as

misrepresentations or offered any evidence that they are untrue or were intended to be

misleading.[1]

---

[1]    Indeed, Mr. Edwards even promised Mr. Paradis the opportunity to look at the code and
test out the system before paying for it, which would have exposed Mr. Edwards if the
new system had contained proprietary government code.  Def. Ex. 28A at 23 ("You

2

Regarding the development process, Mr. Edwards told Mr. Paradis: "I took me a long time because I completely re-wrote investigations, hotline, admin, and subpoena. The e-subpoena has a better look and flow. It looks, it runs exactly almost the same like how DHS OIG runs, but the load is faster because the way I'm bringing the templates down. So, mine is a faster handshake." Def. Ex. 28A at 4. Again, the government has never characterized the statement that Mr. Edwards completely re-wrote EDS 2.0 as a misrepresentation. It is also consistent with Mr. Edwards's trial testimony, during which he explained: "I wanted to build a case management system that regardless of which agency you worked in, it will not be written just for that agency. Any agency can share that and get that -- fill in certain information and build for them so they don't have to spend a lot of resources trying to configure it just for that organization. It will be easily adaptable, or you can use that case management across all inspector general offices. That was my plan. . . . I wanted to sell the latest technology." Trial Tr. Afternoon Session, 29:20-30:6, Mar. 29, 2022.

On direct, Mr. Edwards testified several times about why he needed to show his team of developers the existing version of EDS, which was so that they could see how the program looked and behaved, in order to reverse engineer a visually similar program with newer code:

Q. And why did you need a functioning version of EDS on your laptop?

A. To see how different people within the OIG would use the system to get from -- you know, how they would input information, how they would retrieve information, how they would be executing it.

Q. What were you going to do with the laptop, sir?

A. I was going to give it to the Indian developers for them to look at it.

---

don't, you have nothing to lose. We'll build it and give it to you, make changes, put in the demo environment, run it. And then when you're fine with it, go through the procurement thing so you have nothing to do lose at that time.").

3

Trial Tr. Afternoon Session, 62:10-18, Mar. 29, 2022; *see also id.* 45:12-17 ("I wanted to see a working version of how EDS worked so I can look at that and then see what did not work and then tie it into my new system so I can go back to Pete and say this is what my new system is going to be and build a commercially viable system and sell it to -- to him and the rest of the OIG community."); *id.* 61:3-4 ("I actually wanted to see how a working version is; so based on that, *I would build my -- my own*." (emphasis added)); *id.* 72:2-10 ("I wanted to see and I wanted the Indian programmers to see the same way how EDS functioned at DHS-OIG, that would function in my home server.  So they can see how the EDS functioned, how an investigator would see it and how an analyst would see it and how a manager would see it.  *So they can take a look at that and then build my next version of EDS.*" (emphasis added)).

Mr. Edwards also testified that, without more, having a copy of only the existing EDS code would not have been helpful, further reinforcing that his programmers were not merely copying old code.

> Q. If you just uploaded the EDS source code on to your server, would the Indian developers be able to work and develop your product?
>
> A. No.
>
> Q. Why not?
>
> A. Because they needed to see how the old EDS system functioned so they can look at it and then see what's working.  And then with my ideas and his and Ms. Patel's ideas, will be able to incorporate that into the next generation EDS.

*Id.* 94:24-95:7.  In the face of this evidence, no reasonable juror could have concluded that the defendants were attempting to sell back a copy or portions of the existing EDS code to the government.[2]

---

[2]    The government continues to point to Mr. Paradis's testimony that it would have mattered to him if he knew the new system "had been built using" stolen software and

4

Perhaps recognizing this, the government now attempts to pivot to a new theory of the scheme to defraud—that defendants misrepresented their qualifications or business practices. As the Court recognized during oral argument, however, this new theory is different than what the government asserted at trial.

> THE COURT: But is there any reason to think that Mr. Edwards indicated to Department of Agriculture that the coding was done solely in the United States and that there were not any Indian or other foreign coders involved in writing the code?
>
> MR. SALGADO: Mr. Paradis testified, I believe, that he did not find out that there were coders in India involved until later on in the investigation.
>
> THE COURT: Right. But the question is whether Mr. Edwards misled him in any way with respect to who was writing the code or what was being written.
>
> MR. SALGADO: That's part of the government's theory, that by not disclosing the involvement of Indian coders in developing this new product that – once again, was going to be sold to the USDA-OIG for purposes of housing sensitive information, PII, and the coders could have –
>
> THE COURT: This does strike me as a very different theory from the one that I heard from the government at trial. If the government's theory is that the fraud was misleading the Department of Agriculture by not disclosing to the Department of Agriculture that there were Indian programmers who were writing the code – I tried this case a long time ago, but I don't recall anything about that in the trial.

Oral Arg. Tr. 48:16-49:13, Aug. 29, 2023.

Even if the government had advanced this theory at trial, it did not offer evidence to support it. Mr. Edwards told Mr. Paradis that he was using a team of developers to build EDS 2.0, *see* Def. Ex. 28A at 2 ("I have 12 programmers working on this."); *id.* at 35 ("It's just one man trying to build this with 12 programmers."), but Mr. Paradis never asked for any additional details about the programmers or their business practices, nor did he describe any requirements regarding their qualifications. For this reason, the government's cites to *United States* v. *Leahy*,

---

source code, but this testimony is rendered purely hypothetical by the government's own evidence, which showed that the EDS 2.0 was not in fact built with stolen code.

5

A0384

464 F.3d 773 (7th Cir. 2006), and *United States* v. *Maxwell*, 579 F.3d 1282 (11th Cir. 2009), are

inapposite. In *Leahy*, the defendants explicitly misrepresented that businesses they controlled

were minority-owned or women-owned in order to take advantage of a Chicago ordinance

granting preference to such businesses in city contracting, and they ultimately won the contract

*on the basis of* those misrepresentations. 464 F.3d at 778-81. Similarly, in *Maxwell*, the

defendants explicitly misrepresented that certain electrical work called for under the contracts

would be performed by a qualifying small business, which was a specific requirement of the

contract. 579 F.3d at 1288-93.

As the jury was instructed here, the government was required to prove a scheme "to

obtain property *by means of materially* false" statements or half-truths—in other words, proof

that the defendants' false statements were the mechanism naturally inducing the victim to part

with their money. *See* Brief of United States at 47, *Ciminelli* v. *United States*, 598 U.S. 306

(2023) (No. 21-1170). Unlike in *Leahy* and *Maxwell*, however, there were no specific

qualifications or contractual stipulations that Mr. Edwards and his team of developers were

required to satisfy, and therefore no causal link between any alleged misrepresentations about

their qualifications and the inducement of Mr. Paradis to purchase their new case management

system. Unsurprisingly, there is also no evidence that Mr. Edwards made any such

misrepresentations about qualifications, since he had no reason to do so.

In advancing this new theory, the government also seemingly attempts to downplay the

materiality requirement. In its briefs in *Ciminelli*, the government acknowledged that, "[i]n the

contracting context, the materiality requirement requires the government to prove that a

reasonable person would attach, or it was evident that the victim did attach, *critical importance*

to the existence or nonexistence of a misrepresented fact in determining his choice of action in

the transaction—that is, that *the misrepresentation went to the essence of the contract*." Brief of United States at 11, 18-19, *Ciminelli*, 598 U.S. 306 (No. 21-1170). Here, by contrast, the government attempts to disclaim this same "essence of the contract" formulation as an unfounded "super-materiality requirement" and avoid it entirely. The government contends that, based on purely hypothetical testimony by Mr. Paradis, "the jury could properly conclude that the defendants' misrepresentations and omissions regarding their business practices and the manner in which they were developing EDS 2.0" were material under a less rigorous standard used outside of the contracting context and that "[n]o more was required to establish the existence" of a scheme to defraud. Not only does this formulation misstate the relevant standard for materiality and flatly ignore the causation requirement, but it also misstates the evidence.

In holding that "[t]he right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest," the *Ciminelli* Court recognized that pure omissions of information unrelated to the quality, adequacy, or price of goods being sold, or to any other aspect of a contract—such as the alleged omissions at issue here—cannot form the basis of a scheme to defraud. 598 U.S. at 316. Indeed, as the government acknowledged in its brief in *Ciminelli*, "[w]ithout a 'duty to speak,' a 'nondisclosure' may well not be fraudulent in the first place." Brief of United States at 47, *Ciminelli*, 598 U.S. 306 (No. 21-1170) (citing *Chiarella* v. *United States*, 445 U.S. 222, 235 (1980)). Although it does not say so directly, the government here relies almost entirely on a pure omissions theory, as it has been unable to identify any actual misrepresentations. Adopting the government's theory here would "vastly expand[] federal jurisdiction without statutory authorization. Because the theory treats mere information as the protected interest, almost any deceptive act could be criminal. The

theory thus makes a federal crime of an almost limitless variety of deceptive actions traditionally

left to state contract and tort law." *Ciminelli*, 598 U.S. at 315.

    For the foregoing reasons, Mr. Venkata respectfully requests that the Court dismiss the

scheme to defraud and wire fraud charges.

Respectfully submitted,

       */s/ Katherine M. Savarese*

Katherine M. Savarese (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email: savaresek@sullcrom.com

Kamil R. Shields
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W. Suite 700
Washington, D.C. 20006-5215
Telephone: (202) 956-7040
Facsimile: (202) 956-7676
Email: shieldska@sullcrom.com
