ORAL ARGUMENT NOT YET SCHEDULED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

No. 24-3021

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MURALI YAMAZULA VENKATA,
*Defendant-Appellant.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

---

APPENDIX FOR APPELLANT
VOLUME III OF VIII

---

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

MATTHEW L. FARLEY
Assistant Federal Public Defender
625 Indiana Ave. NW, Suite 550
Washington, D.C. 20004
(202) 208-7500
Matthew_Farley@fd.org

District Court
Cr. No. 20-066-RDM-2

# Appendix – Volume III
## Table of Contents

### ECF Filings

Opinion and Order Denying Motion for New Trial ........................... A0388
    01/03/24 [ECF No. 231]

Judgment .............................................................................. A0455
    01/31/24 [ECF No. 245]

### Transcripts

Gov. Trial Exh. 11 Transcript ............................................... A0463

Pretrial Conference (03/21/22) ............................................. A0519

Status Conference (03/25/22) .............................................. A0631

Jury Selection – AM (03/28/22) ........................................... A0659

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

MURALI YAMAZULA VENKATA,

*Defendant*.

Criminal Action No. 20-66 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

After a jury trial, Defendant Murali Yamazula Venkata was convicted of conspiracy in violation of 18 U.S.C. § 371 (Count One); theft of government property in violation of 18 U.S.C. § 641 (Count Two); wire fraud in violation of 18 U.S.C. § 1343 (Count Eleven); aggravated identity theft in violation of 18 U.S.C. § 1028A (Count Thirteen); and destruction of records in violation of 18 U.S.C. § 1519 (Count Sixteen). Dkt. 154 (Jury Verdict Form). Pending before the Court is Venkata's motion for judgment of acquittal or a new trial. Dkt. 166.

In one important respect, Venkata has already prevailed on this motion. After briefing was completed but before oral argument, the Court noted that the Supreme Court had granted *certiorari* in *Dubin v. United States*, No. 22-10, to consider a question closely related to Venkata's challenge to Count Thirteen, *see* Min. Order (Nov. 10, 2022), and the Court subsequently stayed the matter pending the Supreme Court's resolution of the question posed in *Dubin*, *see* Min. Order (Nov. 16, 2022). Then, after the Supreme Court issued its decision in *Dubin*, the government moved voluntarily to dismiss Count Thirteen with prejudice in light of that decision. Dkt. 206. The Court granted that motion, *see* Min. Order (Aug. 10, 2023), and later entered a housekeeping order dismissing Counts Twelve, Fourteen, and Fifteen, which

raised similar allegations of aggravated identity theft that the Court had declined to submit to the jury on grounds of multiplicity, *see* Min. Order (Nov. 14, 2023).

As a result, all that remains are Venkata's challenges to his conspiracy, theft of government property, wire fraud, and destruction of records convictions (Counts One, Two, Eleven, and Sixteen).  With the able assistance of pro bono counsel, Venkata raises multiple challenges to each.  For the reasons explained below, however, the Court concludes that Venkata is not entitled to a judgment of acquittal or a new trial with respect to any of the remaining charges.  The Court will, accordingly, **DENY** his challenges to Count Thirteen as moot, and will otherwise **DENY** his motion on the merits.

## I.  BACKGROUND

The Indictment alleged the following:  Venkata joined the U.S. Department of Homeland Security-Office of Inspector General ("DHS-OIG") in June 2010 as an Information Technology Specialist in the IT Division.  Dkt. 1 at 2 (Indictment ¶ 3).  Sonal Patel served as an Enterprise Applications Branch Chief in the DHS-OIG IT Division, and she supervised Venkata.  *Id.* at 2–3 (Indictment ¶¶ 4–5).  "Patel oversaw the development and maintenance of DHS-OIG's Enforcement Database System ('EDS')."  *Id.* at 2 (Indictment ¶ 4).  EDS was DHS-OIG's case management system.  *Id.* at 3 (Indictment ¶ 8).  DHS-OIG "obtained ownership rights to the EDS source code" in 2008 and "subsequently modified and enhanced" the system, including by creating the "eSubpoena module," which Venkata developed under Patel's supervision.  *Id.* at 3–4 (Indictment ¶ 8).  From February 2008 to December 2013, Charles Kumar Edwards worked at DHS-OIG, including serving for a time as the Acting Inspector General.  *Id.* at 1 (Indictment ¶ 2).  Edwards was Patel's direct supervisor.  *Id.* at 3 (Indictment ¶ 5).

Venkata, Patel, and Edwards had all previously worked for the U.S. Postal Service-Office of Inspector General ("USPS-OIG").  *Id.* at 1–3 (Indictment ¶¶ 2–4).  At USPS-OIG, Edwards had supervised Patel.  *Id.* at 3 (Indictment ¶ 5).[1]  "While at USPS-OIG, Patel worked on USPS-OIG's case management systems, including USPS-OIG's STARS database, which was used primarily for investigations and audits, as well as USPS-OIG's Performance and Results Information System ('PARIS'), which USPS-OIG employees used to interface with the STARS database."  Dkt. 1 at 3 (Indictment ¶ 5).  In 2009, now at DHS-OIG, Edwards "provided Patel with a CD containing USPS-OIG's STARS database, source code, scripts, and file server contents, which included the personally identifiable information ('PII') of USPS employees."  *Id.* At Edwards' direction, Patel subsequently copied "the contents of the CD onto the DHS-OIG server to enhance DHS-OIG's audit system."  *Id.*

In September 2015, after leaving DHS-OIG, Edwards founded his own company, known as Delta Business Solutions, Inc. or DBS, with its principal place of business located in Edward's residence in Sandy Spring, Maryland.  *Id.* at 2, 3 (Indictment ¶¶ 2, 6).  Eventually, Edwards and DBS sought to create and to market "a private, commercially owned version of a case management system to be offered for sale to government agencies."  *Id.* at 5 (Indictment ¶ 12).  Among other things, Edwards conspired with Patel and Venkata to sell such a system to the U.S. Department of Agriculture-Office of Inspector General ("USDA-OIG").  *Id.* at 5 (Indictment ¶ 11(b)).

---

[1] At USPS-OIG, Edwards hired Venkata as a contractor to assist with developing USPS-OIG's technology systems.  Dkt. 175 at 19 (Tr. 19:15–22) (Edwards).

Count One of the Indictment alleged that Venkata, Patel, and Edwards conspired to commit theft of government property and to defraud the United States. In separate subparagraphs, it alleged, first, that the three conspired:

> to willfully and knowingly steal, purloin, and convert copies of DHS-OIG's EDS system, copies of DHS-OIG's EDS source code and database files, copies of USPS-OIG's case management system, copies of USPS-OIG's STARS database and PARIS system, the PII of approximately 246,167 DHS employees and approximately 6,723 U.S. Postal Service ("USPS") employees . . . [,][2]

*id.* at 4 (Indictment ¶ 11(a)), and, second, alleged that they conspired:

> to defraud the United States by devising and intending to devise a scheme to defraud and for obtaining money and property from the U.S. Department of Agriculture-Office of Inspector General ("USDA-OIG") means of materially false and fraudulent pretenses, representations, and promises, and by concealing material facts[,]

*id.* at 5 (Indictment ¶ 11(b)).

In describing the "manner and means of the conspiracy," the Indictment alleged that "Venkata and Patel accessed and copied (1) DHS-OIG's EDS system; (2) DHS's EDS source code, including the eSubpoena module," which Venkata had created; "(3) DHS-OIG's database, which included the PII of DHS employees; and (4) USPS-OIG's STARS database and PARIS system, which included the PII of USPS employees," and that "Venkata and Patel delivered [those materials] to Edwards after . . . Edwards had left his employment with DHS-OIG." *Id.* at 6 (Indictment ¶ 15(a)) (capitalization altered). The Indictment further alleged that "Venkata and Patel transmitted [the materials to] Edwards to assist . . . Edwards with the creation and development of a private, commercially owned version of a case management system to be

---

[2] The Indictment also alleged a conspiracy to "steal, purloin, and convert . . . Multiple Activation Keys and a Key Management Services Code associated with various Microsoft software products." Dkt. 1 at 4–5 (Indictment ¶ 11(a)). The Court omitted that allegation, however, in charging the jury. *See* Dkt. 146 at 33–49.

offered for sale to government agencies for the benefit, enrichment, and profit of . . . Edwards and his business DBS," and that Edwards transmitted the material "to software developers in India who were assisting [him] with the creation . . . of [his own] version of a case management system for sale to government agencies." *Id.* at 6–7 (Indictment ¶¶ 15(c) & (e)) (capitalization altered). Finally, the Indictment alleged that "Edwards and Patel concealed their theft of EDS-related software, source code, databases, information, and PII from USDA-OIG . . . to encourage and induce USDA-OIG into purchasing EDS 2.0 for the benefit, enrichment, and profit of . . . Edwards and his business DBS." *Id.* at 7 (Indictment ¶ 15(g)) (capitalization altered).

In addition to these conspiracy allegations, the Indictment further alleged that Edwards and Venkata did, in fact, "willfully and knowingly steal, purloin, and convert copies of DHS-OIG's EDS system, . . . source code and database files, [and] case management system," and "copies of UPS-OIG's STARS database and PARIS system, [and] the PII of approximately 246,167 DHS employees and approximately 6,723 USPS employees" and that the value of this government property exceeded $1,000. *Id.* at 15–16 (Indictment ¶ 18). It alleged that they engaged in wire fraud by "devis[ing] a scheme to defraud USDA-OIG, and to obtain the property of USDA-OIG[,] by means of materially false and fraudulent pretenses, representations, and promises, and by concealing material facts," including the fact that the case management system that Edwards sought to sell to USDA-OIG was developed using stolen U.S. government property. *Id.* at 16 (Indictment ¶ 20). And it alleged that Venkata obstructed justice by destroying records "with the intent to impede, obstruct, and influence" an ongoing investigation. *Id.* at 20 (Indictment ¶ 35).

In total, the Indictment contained sixteen counts. It charged Venkata in eight of the sixteen: Conspiracy to Commit Theft of Government Property and to Defraud the United States

in violation of 18 U.S.C. § 371 (Count One); Theft of Government Property in violation of 18

U.S.C. § 641 (Count Two); Wire Fraud in violation of 18 U.S.C. § 1343 (Count Eleven);

Aggravated Identify Theft in violation of 18 U.S.C. § 1028A and 2 (Counts Twelve through

Fifteen); and Destruction of Records (Count Sixteen). *See* Dkt. 1. The government charged

Patel in a separate information with one count of conspiracy, in violation of 18 U.S.C. § 371.

*See* Superseding Information at 1, *United States v. Patel*, No. 19-cr-81 (D.D.C. filed Mar. 22,

2019) (Dkt. 3). Patel pleaded guilty on April 4, 2019. Min. Entry, *Patel*, No. 19-cr-81, (Apr. 4,

2019).

Edwards and Venkata initially entered pleas of not guilty, *see* Min. Entry (Mar. 6, 2020),

but Edwards later entered a plea of guilty as to Counts One and Two of the Indictment, *see* Min.

Entry (Jan. 14, 2022). Venkata proceeded to trial, which began March 29, 2022. *See* Min. Entry

(Mar. 29, 2022). After the government rested its case, Venkata moved for judgment of acquittal

under Rule 29 of the Federal Rules of Criminal Procedure, Dkt. 183 at 31 (Tr. 31:2–3), and the

Court reserved decision on the motion, *id.* at 98 (Tr. 98:8). The presentation of evidence closed

April 7, 2022, and jury deliberations began that same day. *See* Min. Entry (Apr. 7, 2022). In

light of Venkata's argument that the four counts alleging aggravated identify theft were

multiplicitous, and the government's concession that it would not, in any event, seek consecutive

sentences on those counts, the Court sent only one of the aggravated identify theft counts to the

jury—Count Thirteen—Dkt. 146 at 46, and the Court subsequently dismissed Counts Twelve,

Fourteen, and Fifteen, *see* Min. Order (Nov. 14, 2023). The jury concluded its deliberations on

April 11, 2022, and returned a verdict of guilty as to Venkata on each of the remaining charges:

Counts One, Two, Eleven, Thirteen, and Sixteen. *See* Min Entry (Apr. 11, 2022); Dkt. 154.

On May 20, 2022, Venkata filed a renewed motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and motion for a new trial pursuant Federal Rule of Criminal Procedure 33.  Dkt. 166.  The government opposed that motion.  Dkt. 169.  On November 16, 2022, the Court stayed proceedings on Venkata's pending motions in light of the Supreme Court's decision to grant a writ of certiorari in *Dubin v. United States*, in which the question presented was similar the question posed by Venkata's challenge to his § 1028A conviction.  *See* Min. Order (Nov. 16, 2022).  After the Supreme Court issued its decision in *Dubin* on June 8, 2023, the government moved pursuant to Federal Rule of Criminal Procedure 48(a) to dismiss Count Thirteen with prejudice.  Dkt. 206.  The Court granted that motion and dismissed Count Thirteen on August 10, 2023.  *See* Min. Order (Aug. 10, 2023).

On August 29, 2023, the Court heard oral argument on Venkata's Motion for Judgment of Acquittal and New Trial, Dkt. 166, and invited the parties to file supplemental briefs addressing the Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023).  Min. Entry (Aug. 29, 2023).  Arguing that the government's brief went beyond this limited mandate, Venkata sought leave to file a brief in reply and in further support of his motion, which the Court granted.  Dkt. 210; Min. Order (Sept. 11, 2023).  Briefing on Venkata's motion was completed on October 3, 2023, when Venkata filed his reply, Dkt. 211.

After these multiple detours, Venkata's motion is now ripe for resolution.

## II.  LEGAL STANDARDS

Defendant's motion is premised on Rule 29 and Rule 33 of the Federal Rules of Criminal Procedure.  Under Rule 29, the Court is required, on a defendant's motion, to enter "a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  In evaluating a Rule 29 motion, the Court must construe the evidence in the light

most favorable to the government and must affirm the jury's verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This analysis further requires the Court to "presume that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences," *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983), which means "a judgment of acquittal is appropriate only when there is *no* evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt," *United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983); *accord United States v. Branham*, 515 F.3d 1268, 1273 (D.C. Cir. 2008). In undertaking this analysis, the Court "owe[s] tremendous deference to [the] jury['s] verdict." *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990).

Under Rule 33, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The rules do not define 'interests of justice' and courts have had little success in trying to generalize its meaning," but the D.C. Circuit has held that "granting a new trial motion is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred." *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (internal citations and quotation marks omitted). The defendant bears the burden of demonstrating that a new trial is justified, *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982), and the Court has "broad discretion" in assessing whether the defendant has carried that substantial burden, *Wheeler*, 753 F.3d at 208.

### III.  ANALYSIS

Venkata challenges the sufficiency of each of his convictions, and he contends that the Court incorrectly instructed the jury in two respects.  The Court takes each of these arguments in turn.

### A.  Conspiracy to Defraud and Wire Fraud

Venkata first argues that the jury lacked sufficient evidence to convict him of either conspiracy to defraud the United States under 18 U.S.C. § 371 or wire fraud under 18 U.S.C. § 1343.[3]  Dkt. 166-1 at 10.  Section 371 provides, in relevant part, that it is a crime for "two or more persons [to] conspire . . . to defraud the United States, or any agency thereof in any manner or for any purpose," if a member of the conspiracy commits at least one overt act "to effect the object of the conspiracy."  18 U.S.C. § 371.  Section 1343 provides that it is a crime for someone, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," to "transmit[] or cause[] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice[.]"  18 U.S.C. § 1343.  Neither Section 371 nor Section 1343 requires that the defendant (or his co-conspirators) complete the alleged fraud.  Section 371 merely requires an agreement among two or more people to commit a fraud and a single overt

---

[3]  As discussed further below, Count One charged Venkata in the disjunctive with conspiracy to defraud the United States *and* conspiracy to commit the offense of theft of government property, Dkt. 1 at 4–5 (Indictment ¶ 11(a)–(b)), and the jury convicted him on both theories, Dkt. 154 at 1.  Accordingly, to prevail on his motion for judgment of acquittal on Count One, he bears the burden of demonstrating that the evidence was insufficient to support the jury's verdict on either theory.  Venkata's separate challenge to the jury's alternative finding that he conspired to commit the offense of theft of government property is discussed in the subsequent section.

act in furtherance of that conspiracy, and Section 1343 merely requires a scheme to defraud and a single interstate "wire" or "radio" communication in furtherance of that scheme.

In support of its conspiracy to defraud charge, the government alleged, in relevant part, that Venkata was a party to an agreement "to defraud the United States by devising [or] intending to devise a scheme to defraud [or] for obtaining money or property from the U.S. Department of Agriculture-Office of Inspector General ('USDA-OIG') [by] means of materially false [or] fraudulent pretenses, representations, [or] promises, [or] by concealing material facts." Dkt. 1 at 5 (Indictment ¶ 11(b)).  And, in support of the wire fraud charge, the government alleged that Venkata "knowingly devised a scheme to defraud USDA-OIG, and to obtain property of USDA-OIG by means of material false and fraudulent pretenses, representations, [or] promises, [or] by concealing material facts," *id.* at 16 (Indictment ¶ 20), or that he aided and abetted others in doing so, and that he "transmit[ted] [or] cause[d] to be transmitted by means of wire communications, in interstate commerce" a "[t]elephone call from . . . Edward's cell phone to [his] cell phone to arrange for . . . Edwards to pick up DVDs containing government software and information in the District of Columbia," *id.* at 17–18 (Indictment ¶ 22) (capitalization altered).

Venkata challenges his fraud convictions on the grounds that "[t]he evidence at trial was insufficient for a rational jury to find beyond a reasonable doubt that any of the defendants (much less Mr. Venkata) sought to cheat the government, that Mr. Venkata had any knowledge of the scheme, or that the relevant wire communication by Mr. Venkata crossed state lines." Dkt. 166-1 at 11.

## 1.

Venkata first argues that the government did not prove a scheme to defraud because, he asserts, it is not enough to show that the conspirators (or the principal for purposes of aiding and abetting liability) intended to deceive the government in a manner designed to induce a sale. Dkt. 166-1 at 10. Rather, on Venkata's view, proving a scheme to defraud requires also proof of an intent to *harm* the victim of the fraud. Dkt. 170 at 4. He further argues that "[t]here was simply no intent to harm USDA-OIG here, and indeed USDA-OIG suffered no harm—because it both received the free copy of EDS that it sought, never came close to parting with any money, and would still have received what it bargained for it if had paid for the new program." *Id.* at 5.

To the extent Venkata contends that no rational jury could have found for the government on the fraud charges because USDA-OIG "never came close to parting with any money," that argument fails. The government was not required to prove that the conspirators (or principal and aider and abettor) succeeded in their scheme to sell USDA-OIG a case management system developed using stolen property—what mattered is whether they "conspired" to defraud, 18 U.S.C. § 371, or "devised or intend[ed] to devise a scheme" to defraud, 18 U.S.C. § 1343. The fact that USDA-OIG was not actually defrauded is immaterial. *See United States v. Reid*, 533 F.2d 1255, 1264 (D.C. Cir. 1976) ("It is the scheme to defraud and not actual fraud that is required."); *United States v. Han*, 280 F. Supp. 3d 144, 153 (D.D.C. 2017) ("A defendant who devised a scheme to bilk a victim out of her money using wire communications but never received any property can be guilty of wire fraud." (cleaned up)).

Here, moreover, the scheme progressed well beyond the thresholds that Congress specified in Section 371 and Section 1343. With respect to Section 371, there was ample evidence that a named conspirator committed one or more of the over forty overt acts listed in

11

**A0398**

the Indictment.  Dkt. 1 at 7–15 (Indictment ¶ 16).  Most notably, the evidence supported the allegation that Patel and Edwards met with the Deputy Assistant Inspector General for Investigations at the USDA, Peter Paradis, Dkt. 175 at 24–25 (Tr. 24:23–25:3) (Edwards), on or about May 26, 2016, "to give a sales pitch to Mr. Paradis on the benefits of [Edward's] version of the next generation EDS," *id.* at 35 (Tr. 35:23–35:25) (Edwards), which was "well down the road of being near production ready for visual demonstration," Dkt. 178 at 45 (Tr. 45:12–45:13) (Paradis).  The evidence also showed that Edwards discussed potential pricing with Paradis— $150,000 for the first year and roughly $40,000 for "out-year operation" and maintenance fees. *Id.* at 46 (Tr. 46:10–16) (Paradis).  And, as to Section 1343, there was ample evidence, as discussed further below, that Venkata spoke with Edwards by telephone on March 22, 2017, to arrange for Edwards to pick up the DVDs containing government software and information and that Venkata was in the District of Columbia and Edwards was in Maryland, when this call occurred.  *See* Dkt. 176 at 6–7 (Tr. 6:9–7:10) (Edwards).  There was also evidence sufficient to permit a reasonable jury to find beyond a reasonable doubt that Venkata was aware of the alleged scheme to defraud by then, *see*, *e.g.*, Dkt. 175 at 43–44 (Tr. 43:21–44:11) (Edwards), and, accordingly, that the communication was in furtherance of that scheme.

Venkata's second argument—that there was no intent to harm, and thus no fraud, because the government would have received precisely what it bargained for—wades into a circuit split (and perhaps an intra-circuit split) on what is required to prove an intent to defraud.  Venkata grounds his argument in a line of Second Circuit decisions following *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970), and the Eleventh Circuit's decision in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016).  *See* Dkt. 166-1 at 12.  Under the Second Circuit view, "[a]lthough the government is not required to prove actual injury, it must, at a

minimum, prove that defendants *contemplated* some actual harm or injury to their victims.  Only a showing of intended harm will satisfy the element of fraudulent intent." *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987) (citing *Regent Office*, 421 F.2d 1174).  These cases draw "a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007); *see also Starr*, 816 F.2d at 98 ("[T]he deceit must be coupled with a contemplated harm to the victim," and "the harm contemplated must affect the very nature of the bargain itself.").  Or, in the words of the Eleventh Circuit, "if a defendant does not intend to harm the victim—'to obtain, by deceptive means, something to which [the defendant] is not entitled'—then he has not intended to defraud the victim." *Takhalov*, 827 F.3d at 1313 (quoting *United States v. Bradley*, 644 F.3d 1213, 1240 (11th Cir. 2011)) (alteration in original).  This is true, moreover, "even if the transaction would not have occurred but for the trick." *Id.*

The government, in contrast, invokes a line of decisions upholding wire and mail fraud convictions where the defendants misrepresented their eligibility and preferred-status to compete for government contracts.  In *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006), for example, the Seventh Circuit upheld the conviction of the defendants, who misrepresented themselves as minority- or women-owned businesses in order to qualify for certain city contracts.  In doing so, the court rejected the defendants' argument that "the city would ostensibly have paid the same for the services regardless" and it thus "lost no money," holding instead that neither the wire fraud nor the mail fraud statute requires "the government to prove either contemplated harm to the victim or any loss." *Id.* at 786–87.  As the court explained, the object of the fraud must be

money or property, but that does not mean that that the victim must suffer a financial loss. *Id.* at 787. Rather, it is sufficient that "the scheme precisely and directly target[s] [the victim's] coffers." *Id.* at 788.

Similarly, in *United States v. Maxwell*, 579 F.3d 1282 (11th Cir. 2009), the Eleventh Circuit upheld wire and mail fraud convictions, where the defendant obtained contracts set aside for disadvantaged business enterprises ("DBEs") by falsely representing that certain work required under the contracts would be performed by a qualifying DBE. Like the Seventh Circuit in *Leahy*, the Eleventh Circuit rejected the contention—central to Venkata's argument here—that no fraud can occur when the alleged victim received the precise services that it sought. *Id.* at 1302. As in *Leahy*, the court held that it was sufficient that the defendant "obtained . . . contracts and substantial payments . . . for which it was not eligible." *Id.* at 1303.

In the Court's view, *Leahy* and *Maxwell* are true to the plain language of Section 1343 and, by extension, to the plain language of Section 371. Section 371 makes it a crime to conspire to "defraud the United States, or any agency thereof in *any* manner or for *any* purpose." 18 U.S.C. § 371 (emphasis added). This language is, if anything, more expansive than the language contained in the first clause of the bank fraud statute, which makes it a crime "knowingly [to] execut[e] or attempt[] to execute[] a scheme . . . to defraud a financial institution." 18 U.S.C. § 1344(1); *cf. Loughrin v. United States*, 134 S. Ct. 2384 (2014) (construing the first and second clauses of § 1344 as independent prohibitions). Yet, in *Shaw v. United States*, 580 U.S. 63 (2016), the Supreme Court rejected an interpretation of the first clause of the bank fraud statute much like the argument that Venkata presses here. As the Court explained, "the statute, while insisting upon 'a scheme to defraud,' demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." *Id.* at 67. Then, borrowing from an opinion penned

by Judge Learned Hand, the Court added: "'A man is none the less cheated out of his property, when he is induced to part with it by fraud,' even if 'he gets a quid pro quo of equal value.'" *Id.* (quoting *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932)).  Applying that logic here, the Court has little difficulty concluding that Section 371 contains no financial-loss requirement.

Section 1341 is equally clear—if not clearer.  It makes it a crime to "devise any scheme . . . to defraud" and then adds, by way of explanation, *see McNally v. United States*, 483 U.S. 350, 358–59 (1987), that this denotes a scheme to obtain "money or property by means of false of fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341.  To be sure, this includes "only schemes to deprive people of traditional property interests." *Ciminelli v. United States*, 598 U.S. 306, 308–309 (2023).  But, as the Learned Hand quote conveys, one can be deprived of a traditional property interest even the absence of a quantifiable economic loss; it might take some of the sting out of the theft of your car, for example, to receive a cashier's check in the mail from the guilt-ridden thief, but you have, nonetheless, been deprived of a traditional property interest.  Moreover, as *Leahy* and *Maxwell* convincingly explain, the plain language of the wire fraud statute makes it a crime "to devise any scheme" to "*obtain*[] money or property by means of a false or fraudulent pretense[], representation[], or promise[]," 18 U.S.C. § 1341 (emphasis added).  The statutory requirement that the defendant seek to enrich himself—that is, to "obtain[] money or property"—does not mean that the victim must suffer a commensurate loss.

Indeed, even under the Second Circuit's own precedent, it seems that a misrepresentation (or, presumably, a material omission) regarding a bidder's qualification to enter into a contract can violate the wire fraud statute, even in the absence of a quantifiable loss.  In *United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991), the defendants "did not disclose that the [military]

15

**A0402**

equipment" that they sought to purchase were to be shipped "to prohibited destinations," *id.* at

413–14, and, at other times, affirmatively misrepresented the "end destinations[s]" for the

equipment, *id.* at 414.  On appeal, the defendants sought to set aside their conviction for

defrauding the vendor, arguing the vender "never suffered any economic harm." *Id.* at 420.  The

Second Circuit was unpersuaded and held that, although an intent to harm the victim is required,

that harm "need not be pecuniary in nature." *Id.*  Rather, all that is required is that "the deceit

practiced must be related to the contemplated harm, and that harm must be found to reside in the

bargain sought to be struck." *Id.*  As a result, the district court correctly instructed the jury that

"the government must prove the defendant contemplated harm," but that harm need not "be

monetary in nature," and "[i]t is sufficient if the contemplated harm goes to some essential

element of the bargain." *Id.*  It is sufficient, for example, "if the defendants intended by fraud or

misrepresentation to obtain from [the vendor military] equipment that [the vendor] would not

otherwise have sold to the defendants, were it not for the fraudulent representations." *Id.*

Finally, after endorsing these instructions, the Second Circuit distinguished its earlier decisions

in *Regents* and *Starr* by explaining that, in those cases, the "false representations were collateral

to the bargain and did not cause a discrepancy between benefits reasonably anticipated and actual

benefits received." *Id.*; *see also United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)

(reaffirming this reasoning).  Venkata repeatedly invokes the language from *Shellef*, 507 F.3d at

108, that "schemes that do no more than cause their victims to enter into transactions they would

otherwise avoid . . . do not violate the mail or wire fraud statutes," without including the second

half of the sentence, which specifies that "schemes that depend for their completion on a

misrepresentation of an essential element of the bargain . . . do violate the mail and wire fraud

statutes," 507 F.3d at 108.

Under any of these formulations of the relevant test, the government presented sufficient evidence at trial to permit a reasonable jury to find the requisite scheme to defraud. Paradis testified that he was assigned responsibility to identify an electronic case management system for USDA-OIG and that "cost was a severe consideration because of budgetary constraints." Dkt. 178 at 37, 39 (Tr. 37:13–23, 39:10–11) (Paradis). Paradis contacted Patel and others at DHS-OIG to discuss EDS, with the understanding that because EDS was built by government employees and was government owned, it could be transferred to USDA-OIG "at no cost or minimal cost." *Id.* at 40 (Tr. 40:5). Eventually, Patel told Paradis that "she was aware of another product that [Paradis] might be interested in," that Edwards "was working on a similar case management system," and that "it would be worth [his] while to become acquainted with that particular product." *Id.* at 42 (Tr. 42:9, 42:16–18) (Paradis). Although Paradis initially assumed that the new product was government-created and that, accordingly, it could be made available to USDA-OIG for free, he was eventually disabused of that notion and was told that it would cost about $150,000 "its first year" and roughly "$40,000 in out-year operation and [maintenance] fees." *Id.* at 46 (Tr. 46:12–16).

Despite multiple conversations with Patel and Edwards, Paradis was never told that the new product—referred to as EDS 2.0—was developed using the government's EDS and PARIS computer code. Most notably, Paradis testified that he understood "from what Mr. Edwards and Ms. Patel had told him that the new system was being built from scratch." Dkt. 178 at 78 (Tr. 78:19–25). He further testified as follows:

> Q.    Were you ever informed that the new system was being built using source code from case management systems belonging to DHS-OIG and USPS-OIG?
>
> A.    No.

17

**A0404**

Q.    Were you ever informed that they had copied the software of DHS-OIG and USPS-OIG to develop this new system?

A.    No, I was not told that.

Q.    Were you ever informed that they had transferred the software of DHS-OIG and USPS-OIG to coders in India to aid in developing the new system?

A.    No, definitely not.

Q.    Were you ever informed that they had used the personally identifiable information of employees of DHS and USPS to help develop and test the new system?

A.    No.

*Id.* at 79 (Tr. 79:1–15).

Paradis also testified that these misrepresentations and omissions were not only material, but were of critical importance, to the proposed contract—both to the value of the proposed product and to whether USDA-OIG would have even contemplated entering into such a contract.

Paradis testified as follows:

Q.    If you knew the new system had been built using software copied from case management systems used at DHS-OIG and USPS-OIG, would it have mattered to you?

A.    Yes.

Q.    Why?

A.    It would have been illegal, and it would have resulted in multiple procurement acquisition violations, ethics violations, conflict of interest, et cetera. And I would have immediately contacted Mr. Horton[, the DHS-OIG Chief Information Officer,] directly, absent my chain of command, in order to make him aware of that, of the seriousness of it.

Q.    If you knew the new system had been built using source code transferred to another country along with U.S. Government employees' personal information, would it have mattered to you?

A.    Yes.

18

**A0405**

Q.    Why?

A.    For the same reasons, that that would be a violation of ethics rules, conflict of interest, multiple laws. And it would have been—I would have been concerned about my own involvement at that point in engaging in furtherance of the pursuit.

Q.    If you knew the new system was developed using stolen government property, would that have affected what price you were willing to pay for the new system?

A.    Yes.

Q.    Can you explain that?

A.    Yes. From my experience over 34 years doing undercover work, if you're—in my capacity purchasing stolen goods, you pay a much reduced price on the dollar. It's like buying counterfeit money, you pay 50 cents on the dollar, things of that sort. So, I would not definitely pay full price for something if I knew it was stolen.

*Id.* at 79–80 (Tr. 79:16–80:23). Based on this testimony alone, a reasonable jury could have found beyond a reasonable doubt that the misrepresentations and intentional omissions went to "the essence of the contract" in order to convince the government to pay for a product it would not otherwise have bought.

In response, Venkata takes issue with Paradis's testimony and argues that there was no evidence that Edwards was seeking to sell the federal government its own computer code; rather, on Venkata's telling, Edwards was using programmers in India to write new computer code from scratch and was using the DHS-OIG computer code only as model to guide the coders. Dkt. 211 at 2. Yet, even the evidence that Venkata points to for this proposition does not entirely support that conclusion. For instance, Patel's statement that the original EDS's architecture is ten to fifteen years old while the defendants' system is "current in 5 years former" does not precisely support the theory that their system was yet to be built and was going to be re-written entirely

A0406

from scratch. *Id.*; Gov't Ex. 10A at 4. But, more importantly, even accepting that premise, Paradis's testimony and the government's theory of the fraud remain sound. What Paradis said—and what was central to the fraud—was that Edwards, with assistance from Patel and Venkata, was "using software" stolen from DHS-OIG to build his competing system, which he sought to sell back to the United States without revealing that the stolen code was "used" to develop his product. Dkt. 178 at 79–80 (Tr. 79:1–80:23) (Paradis). And a reasonable jury could readily have found beyond a reasonable doubt that that is exactly what the defendants were doing.

With help from Patel and Venkata, Edwards went to great lengths to reconstruct (on multiple occasions) an operating version of EDS on his home servers and laptop computer, Dkt. 175 at 41–42, 44–48 (Tr. 41:3–42:1, 44:21–48:9) (Edwards), and then planned to use the "investigative case management system" stolen from DGH-OIG to develop his commercial platform, *id.* at 45 (Tr. 45:7). Edwards testified that he sought to "tie" EDS "into [his] new system so [he] could go back to [Paradis] and say this is what my new system is going to be," *id.* (Tr. 45:12–15); that one of the key components that Paradis sought was the DHS-OIG eSubpoena module that Venkata built; and that he "need[ed] the eSubpoena requirements to build [his] commercial platform," *id.* at 55 (Tr. at 55:15–17), which Venkata provided, *id.* (Tr. 55:4–11); Gov't Exs. 27 & 28. Edwards testified that the Indian coders needed these requirements to build the commercial platform, Dkt. 175 at 56–57 (Tr. 56:11–57:23); that, more generally, he needed a "working version" of EDS on his laptop to show to "the Indian company," *id.* at 59 (Tr. 59:15–16); but that it was not working until Venkata configured the code on Edwards' laptop in July 2016, *id.* at 57–63 (Tr. 57:13–63:7); Gov't Ex. 19. Edwards flew to India with the laptop containing a copy of EDS, which he gave to the programmers, Dkt. 175 at

20

A0407

66 (Tr. 66:2–9) (Edwards), that because that laptop was "really slow, the Indian programmers needed to access [Edwards' home] server [remotely] to look to see how EDS functioned" so they could "build [Edwards'] next version of EDS," *id.* at 71 (Tr. 71:11–14). Further, with Venkata's help, Edwards installed a second, fully functional version of EDS on a separate server because "the Indian programmers were complaining that [the first server] was running out of space," *id.* at 88 (Tr. 88:20–24), and the programmers were working remotely on Edwards' servers so they could access to EDS and the related PII files, *id.* at 90 (Tr. 90:4–9).

On cross-examination, Edwards reaffirmed that he "used" the stolen management system and data to create his own version of EDS. He testified as follows:

> Q.    [. . .] As you testified yesterday, you wanted to build a case management system and then sell it back to the government for profit, right?
>
> A.    Yes.
>
> Q.    And that was based on stolen government information, right?
>
> A.    Yes.

Dkt. 176 at 70–71 (Tr. 70:20–71:2) (Edwards). From all of this (and additional) testimony, a reasonable jury would have had little difficulty finding beyond a reasonable doubt that defendants schemed to create a new version of EDS "based on stolen government information" and to sell that new version back to the government without disclosing that the new system was built "using" the government's own property. *See also, e.g.*, Dkt. 68 (Tr. 68:5–23) (Patel) ("'So, in short, it would be a case-management system based on a government system that would be sold to the government for a profit; is that fair?' 'But—yes.'"). And for the reasons Paradis gave, a reasonable jury could readily have found beyond a reasonable doubt that the defendants' misrepresentations and omissions were not merely material, but that they "'went to the essence of the [contemplated] contract.'" Dkt. 211 at 7 (citations omitted).

Venkata takes issue with this conclusion, arguing that the evidence shows that the plan was not to sell the government stolen property and that, instead, it shows that Edwards intended to re-write the relevant code. Dkt. 211 at 3. But little turns on whether he intended to borrow portions of the existing EDS code to recreate (and then to improve upon) the existing EDS or to write new code using the old code as a map to recreate (and then to improve upon) the existing EDS. Either way, the defendants "used" property stolen from the government to create a new product, and the jury could reasonably have found that, had this perfidy been disclosed, government procurement rules would have categorically barred the purchase and that, in any event, the tainted product would have been worth far less than a product developed without the benefit of stolen government property. Finally, the jury could reasonably have found that the tainted product was worth less because it was developed using stolen PII and concealing this fact from USDA-OIG could have "expose[d] the [agency] to costly legal entanglements" apart from the value of the electronic management system itself. *United States v. Sun-Diamond Growers of California*, 138 F.3d 961, 972 (D.C. Cir. 1998), *aff'd*, 526 U.S. 398 (1999); *see also United States v. Chandler*, 98 F.3d 711, 716 (2d Cir. 1996) (explaining that "[i]ntent to harm . . . can be inferred from exposure to potential loss," including "exposing [the target] to an unwanted risk" through the deceit).

At oral argument and in supplemental briefing, Venkata suggests the government's theory of fraud-in-the-inducement is irreconcilable with the Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023). In particular, he argues that *Ciminelli* held that "information needed to make discretionary economic decisions is not a traditional property interest" that is protected by the wire fraud statute and that the evidence offered at trial, even if viewed in the light most favorable to the government, proved nothing more than this type of

intangible, informational harm.  Dkt. 211 at 7; *see also* Aug. 29, 2023 Hrg. Tr. (Rough at 18–19).
This argument understates what the evidence actually established, and it overstates what the
Court held in *Ciminelli*.

To start, as just explained, the evidence presented at trial was sufficient to permit a
reasonable jury to have found beyond a reasonable doubt that defendants schemed to sell the
government a product that the government never would have purchased had it known the truth;
that the product, in any event, was worth far less than the government was led to believe it was
worth, since it was developed "using" stolen property; and that the product carried with it
undisclosed risks, since it was developed using the PII of thousands of unwitting individuals.  In
his final, post-trial brief, Venkata concedes that, even after *Cimenelli*, the wire fraud statute
applies to misrepresentations that go "to the essence of the contract" so long as they are intended
to obtain traditional property interests.  Dkt. 211 at 7.  Viewing this evidence in the light most
favorable to the government, there was ample basis for the jury to have found that defendant's
misrepresentations and intentional omissions went to the essence of the proposed contract.

Venkata's argument also overstates what *Ciminelli* held.  Venkata's argument is
correct—to a point.  The Supreme Court did hold that "the federal fraud statutes criminalize only
schemes to deprive people of traditional property interests," 598 U.S. at 309, and that the Second
Circuit stretched this concept of "property" too far in holding that the fraud statutes apply to
"'scheme[s] [that] den[y] . . . victim[s] the right to control [their] assets by depriving [them] of
information necessary to make discretionary economic decisions,'" *id.* at 314. (quoting *United
States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015)).  But that holding did not address whether the
fraud statutes apply to fraud in the inducement and, if so, what types of misrepresentations or
omissions are sufficient.  Rather, the Court was focused on the types of "property" that can

qualify as "'an object of their fraud.'" 598 U.S. at 312. At times, Venkata's briefing appears to

conflate the materiality required of the misrepresentation or omissions with the requirement that

the conspiracy be aimed at obtaining a traditional property interest. *See, e.g.*, Dkt. 211 at 7. But

here, in contrast to *Ciminelli*, the Court instructed the jury that it needed to find that the

defendants "intended to deprive" the victim—that is, USDA-OIG—"of money or property or [to]

bring about some financial gain to the person engaged in the scheme." Dkt. 146 at 43; *cf.*

*Ciminelli*, 598 U.S. at 311 ("[T]he District Court instructed the jury that the term 'property' in

§ 1343 'includes intangible interests such as the right to control the use of one's assets.'"). And

there was sufficient evidence for the jury to find beyond a reasonable doubt that the "object of

the fraud" was an unduly lucrative contract, which would have enriched Edwards (and arguably

Patel and Venkata). As Justice Alito explained in his concurring opinion *Ciminelli*, the majority

opinion did not address whether the government could retry the defendant "on the theory that he

conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, *viz.*, valuable

contracts." 598 U.S. at 317–18 (Alito, J., concurring). This case falls squarely within the type of

case that Justice Alito envisioned: a case in which the defendants schemed to obtain a traditional

form of "money or property"—about $150,000 in the first year and roughly $40,000 a year

thereafter.

Venkata also argues that the D.C. Circuit's decision in *United States v. Lemire*, 720 F.2d

1327 (D.C. Cir. 1983), requires a judgment of acquittal on the facts of this case. In *Lemire*,

applying pre-*McNally v. United States*, 483 U.S. 350, 360 (1987), honest-services-wire-fraud

doctrine, the court held that a breach of fiduciary duty that results from a failure to disclose a

conflict of interest is not itself a sufficient intangible interest to support a conviction under the

wire fraud statute. *Id.* at 1337. But, even putting aside the substantial developments in the

relevant law since 1983, the court was explicit that its "holding [did] not remove from the ambit

of wire fraud undisclosed conflicts that, accompanied by activity on the part of the employee,

carry a significant risk of identifiable harm to the employer apart from the loss of his employee's

loyalty and fidelity."  *Id.*  As the court further explained, this means that "a non-disclosure is

material only if the [defendant] 'has reason to believe that the information would lead a

reasonable [victim] to change its business conduct.'"  *Id.* at 1338 (quoting *United States v.

Ballard*, 663 F.2d 534, 541 (5th Cir. 1981)).  Accordingly, even if *Lemire* remains good law, it

would pose little difficulty to the government's case, which relied on evidence that defendants'

misrepresentations and omissions were designed to obtain a government contract that was over-

priced, that was barred by government procurement regulations, and that risked exposing USDA-

OIG to "costly legal entanglements" relating to the pilfered PII.

Finally, in the last couple sentences of his supplemental brief, Venkata argues that the

government's case relied "almost entirely on a pure omission theory" and that "[a]dopting the

government's theory . . . would 'vastly expand[] federal jurisdiction without statutory

authorization.'"  Dkt. 211 at 7 (quoting *Ciminelli*, 598 U.S. at 315).  This argument carries little

weight.  To start, Venkata does not even argue that the government relies exclusively on

omissions; only that it relies "almost" entirely on omissions.  But, more importantly, it is well

settled that a pure omission theory can suffice, if the concealment is material, intentional, and

calculated to defraud the victim out of "money or property."  *Cf. United States v. Philip Morris

USA Inc.*, 566 F.3d 1095, 1128 (D.C. Cir. 2009) ("[E]ven partially true statements can be

actionable fraud if intentionally misleading as to facts."); *United States v. Maxwell*, 579 F.3d

1282, 1299 (11th Cir. 2009) ("A scheme to defraud requires proof of a material

misrepresentation, or the omission or concealment of a material fact calculated to deceive

another out of money or property.").  Indeed, Venkata seems to concede as much by arguing that

"the pure omission of information unrelated to the quality, adequacy, or price of goods being

sold, or to any other aspect of a contract . . . cannot form the basis of a scheme to defraud."  Dkt.

211 at 7.  Here, the evidence included testimony regarding a series of half-truths about EDS 2.0,

which omitted any reference to the fact that this product was built using the government's own

property, *see* Dkt. 169 at 8, and those half-truths were—for the reasons the government has

explained—"related to" the value of the product and to other core "aspects of [the proposed]

contract."  Dkt. 211 at 7.

     The question is not whether this is the only possible understanding of the evidence, but

only whether "any rational trier of fact" could find these or similar facts beyond a reasonable

doubt.  *United States v. Battle*, 613 F.3d 258, 264 (D.C. Cir. 2010) (quoting *United States v.

Andrews*, 532 F.3d 900, 903 n.1 (D.C. Cir. 2008)).  The government clears that modest hurdle.

## 2.

     Venkata also argues that insufficient evidence was offered at trial to permit a reasonable

jury to find that he was aware of the scheme to defraud.  Dkt. 166-1 at 11; *id.* at 13 n.2.  Again,

although it possible to view the evidence in the manner that Venkata urges, that is not the test at

this point in the proceeding.  The Court must, instead, "view the evidence in the light most

favorable to the government, drawing no distinction between direct and circumstantial evidence,

and 'giving full play to the right of the jury to determine the credibility, weigh the evidence and

draw all reasonable inferences of fact.'"  *United States v. Williams*, 836 F.3d 1, 6 (D.C. Cir.

2016) (quoting *Battle*, 613 F.3d at 264).  Considered through this lens, Venkata's argument fails.

     Edwards testified that in early May 2016, Venkata agreed to help him build a commercial

case management system, Dkt. 175 at 30, 34, 37 (Tr. 30:7–22, 34:19–22, 37:2–12), which

Venkata had predicted would be worth millions of dollars, *id.* at 35 (Tr. 35:4–7).  Venkata was aware, moreover, that Edwards was using proprietary DHS-OIG and USPS-OIG material to build his commercial platform and was aware that Edwards planned to meet with Paradis to pitch this platform to USDA-OIG, *id.* at 43–45 (Tr. 43:4–45:17) (Edwards).  Edwards also testified that Venkata delivered some of the government-owned material to him, *id.* at 107–10 (Tr. 107:11–110:13); that Venkata repeatedly helped make the EDS and PARIS programs run on Edwards' home servers and laptop, *see, e.g.*, *id.* at 126 (Tr. 126:7–12); *id.* at 97 (97:15–104:7); Gov't Ex. 25; and that Venkata was aware that the Indian programmers were remotely accessing Edwards' servers to build the new program using EDS and PARIS as their model, *see, e.g.*, *id.* at 126 (Tr. 126:7–12).  And Venkata showed Edwards how the eSubpoena module to EDS worked because that aspect of the system was developed after Edwards had left DHS-OIG, *id.* at 42–43 (Tr. 42:5–43:12), and that module was critical to Edwards' efforts to sell EDS 2.0 to Paradis, *id.* at 36 (Tr. 36:19–24).

On cross-examination, Edwards' testimony was even more definitive.  He testified as follows:

> Q.    Right, okay.  And it's your contention that the first time my client sort of learned about this conspiracy and wanted to engage in this conspiracy was in early May, is that right?
>
> A.    Right.
>
> Q.    And that's before the meeting with Mr. Paradis, right?
>
> A.    Yes.
>
> Q.    That he was involved before that meeting?
>
> A.    Right.

Dkt. 176 at 74 (Tr. 74:11–20).  Although the defense then attempted to impeach this testimony, the effectiveness of that impeachment was a question for the jury—not the Court.  To take just one example, defense counsel asked Edwards whether he ever told Venkata "about why [he was] engaging the[] Indian developers, . . . which was to sell a commercial case-management system back to the government," and Edwards responded, "If you are asking me if I said those exact words, no, I did not."  Dkt. 177 at 20 (Tr. 20:1–6).  Defense counsel then made the strategic decision (presumably a wise one) not to follow up by asking whether he had ever conveyed that fact in any other words.  It was well within the province of the jury to decide to accord that cross-examination only limited weight.

The same is true of the testimony of Sonal Patel, who the defense called as a witness. Defense counsel asked, for example, whether Patel "ever explicitly [told] Mr. Venkata that [she was] utilizing government information to create a case management system that [she] would sell back to the government for a profit," and Patel responded, "no."  Dkt. 185 at 68–69 (Tr. 68:24–69:5) (Patel).  But counsel made the strategic decision to limit her question to any "explicit" statement, leaving the jury room to conclude based on other evidence—including Venkata's knowledge of the plan to sell EDS 2.0 to the government and his help in providing Edwards and the Indian programmers with access to a working version of EDS—that the concept was conveyed in other terms.  And, indeed, on cross examination, Patel testified that she "involve[d] him" in the conspiracy.  *Id.* at 84 (Tr. 84:13).

It would demand too much to require the government to offer proof of an "explicit" agreement to support a conspiracy charge, since those involved in criminal misconduct are often careful to avoid such obvious admissions of illegality.  For this reason, the Supreme Court has repeatedly held that "[t]he agreement need not be shown to have been explicit" and that an

agreement "can instead be inferred from the facts and circumstances of the case." *Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975) (citing *Direct Sales Co. v. United States*, 319 U.S. 703, 711–13 (1943)). Here, the jury had sufficient evidence to infer that Venkata was aware of the illegal purpose of the conspiracy and agreed to join in that scheme to defraud. *See United States v. Shi*, 991 F.3d 198, 205 (D.C. Cir. 2021) ("[S]ince a conspiracy is by nature secret, the jury may fairly infer the existence of the agreement through either direct or circumstantial evidence." (quoting *United States v. Morris*, 836 F.2d 1371, 1373 (D.C. Cir. 1988))); *United States v. Vega*, 826 F.3d 514, 523 (D.C. Cir. 2016) ("In most cases in which the defendant's state of mind is at issue, it may be near impossible to establish the requisite *mens rea* through direct evidence, and therefore proof must be inferred from circumstantial evidence instead." (internal citation and quotation marks omitted)).

**3.**

Finally, Venkata argues that the government offered insufficient evidence to permit a rational trier of fact to find beyond a reasonable doubt that he engaged in at least one wire or radio communication in furtherance of the alleged scheme to defraud. *See* 18 U.S.C. § 1343. The Indictment cites just one such interstate communication—a March 22, 2017, telephone call from Edwards' cell phone to Venkata's cell phone to arrange for Edwards "to pick up DVDs containing government software and information in the District of Columbia," Dkt. 1 at 17–18 (Indictment ¶ 22)—and the government limited its argument and proof to that single communication. Venkata claims that "[a]lthough [the Government] established that Mr. Edwards was in Maryland during the March 22, 2017 call with Mr. Venkata that it charged as the relevant 'wire,' the Government did not elicit testimony or adduce any other evidence about Mr. Venkata's whereabouts during the call." Dkt. 166-1 at 6.

29

**A0416**

That is incorrect—there was, in fact, ample direct and circumstantial evidence from which the jury could infer beyond a reasonable doubt that when the called occurred, Edwards was in Maryland and Venkata was not, and that, accordingly, the call constituted an interstate wire or radio communication made in furtherance of the scheme to defraud.  The evidence shows that on March 21, 2017, Patel texted Venkata, indicating that she "left a package on [his] chair with two DVDs" and that Edwards would contact him the next day to get them.  Gov't Ex. 17 at 9.  Venkata confirmed that he would deliver the DVDs to Edwards.  *Id.*  The next morning, Edwards texted Venkata: "Sonal told me that she is leaving 2 dvds with u[.]  Can I come by at 11.15 and pick it up[.]"  Gov't Ex. 19 at 12.  Venkata responded: "Sure Charles."  *Id.*  And then, at 10:09 a.m. on March 22, 2017, Edwards placed a cell phone call from Columbia, Maryland to Venkata's cell phone to arrange to pick up the DVDs.  *See* Dkt. 176 at 7 (Tr. 7:2–7:10) (Edwards); Gov't Ex 36B at 18 (14:09:10 UTC).  About ninety minutes later, Edwards again called Venkata to tell him that he was "going to pull in front of DHS-OIG headquarters at Vermont Avenue for [Venkata] to come out and give [Edwards] the two DVDs."  Dkt. 175 at 107 (Tr. 107:15–107:17) (Edwards); Gov't Ex. 36B at 19 (15:36:22 UTC).  Edwards further testified that Venkata did, in fact, come out and give him the DVDs.  Dkt. 175 at 107 (Tr. 107:18–19).

That evidence, plus two additional pieces of evidence, suffices.  First, Venkata's office was located in the District of Columbia.  Dkt. 182 at 35 (Tr. 35:12–19) (Steel).  And second, the jury heard testimony that Venkata's residence was in Aldie, Virginia, *see id.* at 52 (Tr. 52:1–2), and that his neighbor, Narasimha Ambati, regularly commuted with him on the 6:30 a.m. bus, which the neighbor testified was the only viable bus option, *see* Dkt. 180 at 48–49 (Tr. 48:9– 49:14) ("We only had limited buses in the morning, one at 6:30 in the morning.  So there was no

options.") (Ambati). So, in sum, the jury heard evidence that Venkata was in the District of Columbia around 11:30 a.m. at his office, and that he regularly took the 6:30 a.m. bus from Virginia to the District, which would place him in the District—and certainly not in Maryland—for the 10:09 a.m. call.

Venkata argues that this evidence is insufficient because the 11:30 a.m. meeting in the District does not show where Venkata was ninety minutes earlier, and the neighbor's testimony does not establish that Venkata took the bus to the District on that particular morning. This case, however, is a far cry from the case on which Venkata relies, *United States v. Izydore*, 167 F.3d 213, 219 (5th Cir. 1999), in which the government presented *no* evidence of a defendant's location at the time the telephone calls in question occurred and thus no evidence that "the telephone calls . . . crossed state lines." Here, in contrast, the government offered evidence from which a reasonable jury could infer that Venkata was in the District of Columbia when he received the call that Edwards placed from Maryland. Although the jury was required to find beyond a reasonable doubt that the interstate communication occurred, it was entitled to rely on both direct and circumstantial evidence in reaching its finding. *See United States v. Castellanos*, 731 F.2d 979, 984 (D.C. Cir. 1984) ("[N]o legal distinction is made between circumstantial and direct evidence in determining whether sufficient evidence supports the verdict."). When reviewing a conviction for sufficiency of the evidence, courts must "give full play to the right of the jury to . . . draw justifiable inferences of fact." *United States v. Tucker*, 12 F.4th 804, 826 (D.C. Cir. 2021) (cleaned up); *see also United States v. Slatten*, 865 F.3d 767, 792 (D.C. Cir. 2017) ("[T]he jury is entitled to draw a vast range of reasonable inferences from evidence, but may not base a verdict on mere speculation.") (cleaned up). Here, the inferences of fact were both supported by the record and entirely reasonable.

Although it is, of course, possible that some unique circumstances occurred on morning of March 21, 2017, which could show that Venkata broke from his usual routine of traveling to work in the District of Columbia by bus at 6:30 a.m.; that he instead traveled to Maryland, where he spoke to Edwards by telephone; and that he then arrived late at work but in time deliver the DVDs to Edwards. But that remote possibility, which finds no support anywhere in the record, is insufficient to conclude that no rationale jury could have found beyond a reasonable doubt that he was, in fact, at work in the District of Columbia. *Cf. United States v. Moody*, 903 F.2d 321, 333 (5th Cir. 1990) (concluding "that the circumstantial evidence of the Foundation's business practices . . . offers sufficient circumstantial evidence for a jury reasonably to deduce that the United States mails had been employed for the purpose of defrauding the Foundation").

## B.    Theft of Government Property

Venkata next challenges his conviction under 18 U.S.C. § 641 for stealing and/or converting DHS-OIG's EDS system, the EDS code and database files, USPS-OIG's case management system, USPS-OIG's STARS database and PARIS code, and the PII of thousands of government employees. Dkt. 1 at 15–16 (Indictment ¶ 17–18); Dkt. 154 at 2. On that charge, the government was required prove that Venkata "embezzle[d], st[ole], purloin[ed], or knowingly convert[ed] to his use or the use of another . . . any record, voucher, money, or thing of value of the United States or any department of agency thereof." 18 U.S.C. § 641. A violation of Section 641 constitutes a felony unless "the value of such property in the aggregate . . . does not exceed the sum of $1,000," in which case the violation is a misdemeanor. *Id.* The statute defines "value" to mean "face, par, or market value, or cost price, either wholesale or retail, whichever is greater." *Id.* Venkata argues that the government failed to prove that he stole or converted any U.S. property and that, even if he did, the government failed

32

**A0419**

to offer sufficient proof that the stolen goods had a value over $1,000.  The Court is unpersuaded and concludes that the government offered sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Venkata unlawfully stole or converted U.S. property in violation of Section 641 (or aided and abetted Edwards and Patel in their efforts to do so) and that he joined a conspiracy to commit the crime of theft of government property.[4]

As the Supreme Court explained in *Morissette v. United States*, 342 U.S. 246 (1952), Congress employed the sweeping terms used in Section 641 "to avoid gaps and loopholes between offenses," *id.* at 272–73.  The drafters of Section 641 were concerned, in particular, that "gaps or crevices [had] separated particular crimes of this general class[,] [allowing] guilty men [to] escape[] through the breaches," and they "wanted to reach all . . . instances" in which "one may take wrongful advantages from [the government's] property."  *Id.* at 271.  Congress, accordingly, painted with a broad brush, employing "overlapping" terms, including "embezzlement, stealing, purloining, and knowing conversion," in a single statute.  *Id.*  Although little turns on whether the theft of government property is characterized as stealing or conversion, the Court is persuaded that a rational jury could have found for the government under both theories.[5]

---

[4] Venkata objects to the jury instructions on the Section 371 conspiracy charge on the ground that the conspiracy charged in the Indictment, at least on his telling, was to defraud *by* stealing/converting rather than to defraud and steal/converting.  *See infra* at 58–60.  He does not, however, raise specific challenges in the alternative as to conspirator liability for the theft of government property.

[5] Venkata did not argue at trial and does not now argue that stealing and conversion constitute distinct legal grounds for liability such that the jury had to make a unanimous finding at to each, or such that the insufficiency of the evidence as to one theory but not the other would require a new trial.  The jury did, moreover, make separate findings with respect to each of the forms of government property set forth in Count Two of the Indictment.  *See* Dkt. 154 at 2.

**1.**

To start, there was ample evidence that the co-conspirators stole government property. As the Supreme Court explained in *Morissette*, "'[t]o steal means to take away from one in lawful possession without right with the intention to keep wrongfully.'" 342 U.S. at 271 (quoting *Irving Trust Co. v. Leff*, 171 N.E. 568, 571 (N.Y. 1930)). Here, the government presented evidence that Edwards, Patel, and Venkata planned to work together to develop the "next generation" of EDS, Dkt. 175 at 35 (Tr. 35:24) (Edwards); that Patel made a copy of the EDS source code and related databases from DHS-OIG's servers onto two DVDs and gave them to Edwards, Dkt. 175 at 39–40 (Tr. 39:25–40:3) (Edwards); Dkt. 179 at 95 (Tr. 95:23–25) (Reynolds); that long after Venkata was aware of the plan to use government code to develop EDS 2.0, and after Edwards told Venkata that the server in Edwards' home that was running PARIS and STARS ("Server 3") had crashed, Edwards asked Patel to obtain new copies of PARIS and STARS from DHS-OIG, Dkt. 175 at 106 (Tr. 106:6–12) (Edwards); Dkt. 185 at 77–78 (Tr. 77:4–78:8) (Patel); that because Patel was working from home at the time, she asked Venkata to deliver the DVDs to Edwards, *id.*; that just three days after Edwards informed Venkata that the server at his home that was running PARIS and STARS had crashed, Venkata took the DVDs from DHS-OIG and gave them to Edwards, Dkt. 175 at 104, 107 (Tr. 104:22–104:25, 107:18–19) (Edwards); and that just three days after that, Edwards messaged Venkata indicating that he had Server 3 running again, "except the investigation side," *id.* at 110 (Tr. 110:18–23); that Venkata responded by asking Edwards to confirm the remote log-in credentials for the "PARIS server," *id.* at 111 (Tr. 111:6–15); that when Venkata continued to have difficulty logging in, Edwards told him that the "Indian programmers [were] logged in and [did not] seem to have any issue," *id.* at 115 (Tr. 115:6–7); and, then, finally, Venkata was able to

A0421

log-in to the server running PARIS and STARS and to address the problem that Edwards had

identified, *id.* at 116 (Tr. 116:10–21).

Based on this testimony and the sequence of events, a rational jury could have found

beyond a reasonable doubt—at the very least—that Venkata physically removed two DVDs from

DHS-OIG headquarters that contained the PARIS case management system and the STARS

database and that he knew what he was doing.  There was also an abundance of evidence that

Venkata knew that he was not authorized to do so.  Gov't Ex. 1 (Venkata Computer Access

Agreement); Gov't Ex. 9 (EDS End User Agreement); Dkt. 174 at 31–35, 37, 40–44, 47–50 (Tr.

31:13–35:11, 37:4–18, 40:1–44:25, 47:22–50:10) (Steel);   Finally, the government offered

evidence that it suffered significant losses due to the removal of this system and database,

including incurring costs to provide credit monitoring services to the individuals whose PII was

stolen.  Dkt. 174 at 60–67 (Tr. 60:12–67:8) (Steel).

This evidence is sufficient to establish that Venkata stole or aided and abetted Edwards

and Patel in stealing the USPS-OIG's case management system, the PARIS computer code, the

STARS database, and the PII of approximately 6,723 USPS employees, as the jury unanimously

found.  Dkt. 154 at 2.  As the Court instructed the jury, "[t]o 'steal' means to take away from one

in lawful possession without right with the intention to keep wrongfully," Dkt. 146 at 37,[6]  and

when construed in the light most favorable to the government, that is what the evidence showed.

When Patel made unauthorized copies of PARIS and STARS on March 21, 2017, and Venkata

knowingly removed those copies from DHS-OIG headquarters and delivered them to Edwards,

Patel and Venkata "t[ook]" property "away from" the government "without right with the

---

[6] Although Venkata opposed the inclusion of "stealing" in the theft of government property jury
instruction, he did not oppose the Court's definition of the term.  *See* Dkt. 130 at 6–7.

intention to keep wrongfully." *Morissette*, 342 U.S. at 271 (internal quotation omitted).

Moreover, even if Venkata did not intend to personally maintain possession of the DVDs and

merely assisted Patel in passing the DVDs to Edwards, there is little doubt that, if the

government's view of the evidence is accepted, he aided and abetted Patel and Edwards in

stealing the government's property. *See* Dkt. 146 at 39–40. Finally, if there were any doubt

about this, there was evidence that Venkata joined the conspiracy as early as May 2016, Dkt. 175

at 34–35 (Tr. 34:19–35:17) (Edwards), and, as a result, he was responsible for the offenses

committed his co-conspirators in furtherance, and as a natural consequence, of the conspiracy.

Dkt. 146 at 41–42; *see also United States v. Washington*, 106 F.3d 983, 1010–11 (D.C. Cir.

1997) (discussing *Pinkerton* doctrine).

Venkata offers only one response to this understanding of the law and evidence. He

asserts that, "[i]n this Circuit, 'stealing' under section 641 requires 'a wrongful taking and

carrying away (asportation) of personal property of another with fraudulent intent to deprive the

owner of his property without his consent.'" Dkt. 166-1 at 15 (emphasis omitted) (quoting

*United States v. Barlow*, 470 F.2d 1245, 1251 (D.C. Cir. 1972)). From this premise, he draws

the inference that only "tangible" property can be stolen within the meaning of Section 641. *Id.*

at 16. And he then concludes that because the "source code and PII . . . remained precisely

where they started—in the possession of the government"—neither Venkata nor his co-

conspirators could have stolen (or aided and abetted another in stealing) the property at issue. *Id.*

That argument, however, substantially overreads the D.C. Circuit's decision in *Barlow*

and is at odds with other D.C. Circuit precedent. As an initial matter, it bears note that *Barlow*

did not define what it means to "steal" government property; rather, it described Section 641

more generally and—acknowledging a certain lack of precision—the court observed that Section

36

641 "basically" parallels "the common law crime of larceny," which, in turn, "requires [the] wrongful taking and *carrying* away . . . of *personal* property." 470 F.2d at 1251 (emphasis added). This matters for at least two reasons. First, the statutory text and the Supreme Court's decision in *Morissette* make clear that Section 641, more precisely understood, covers more than the common law of larceny, at least as defined in *Barlow*. The statute, for example, says nothing about "carrying" away and, far from applying only to "personal" or tangible property, the statute refers to "any record, voucher, money, or thing of value of the United States or any department or agency thereof," 18 U.S.C. § 641. Similarly, the definition of "[t]o steal" found in *Morissette* and employed in the instructions given in this case, says nothing about "carrying" away and says nothing about "personal" or tangible property. *Morissette*, 342 U.S. at 271.

Second, and even more to the point, D.C. Circuit precedent post-dating *Barlow* by almost a quarter century rejects the notion that Section 641 applies only to tangible property. Although *United States v. Collins*, 56 F.3d 1416 (D.C. Cir. 1995), addressed the sufficiency of a Section 641 conviction premised on a finding of unlawful "conversion" (rather than "stealing"), the court spoke more broadly to the meaning of the statute. As the court observed: "Congress did not limit those things which could be converted to 'tangible property,' but rather any 'thing of value.'" *Id.* at 1419 (quoting 18 U.S.C. § 641). Notably, the phrase "thing of value" applies across the boards to all applications of Section 641, and Venkata fails even to hint at a reason why Congress would have intended to criminalize the "conversion" of intangible property, but not the "stealing" of intangible property.

Nor does this construction of the statute require the Court to take sides in the broader debate about whether and when government information qualifies as a "thing of value of the United States" under 18 U.S.C. § 641, particularly in the context of leakers. *See e.g.*, Note,

37

**A0424**

Jessica Lutkenhaus, *Prosecuting Leakers the Easy Way: 18 U.S.C. § 641*, 114 Colum. L. Rev.

1167 (2014). As the Supreme Court recognized in *Carpenter v. United States*, 484 U.S. 19, 26

(1987), "[c]onfidential business information has long been recognized as property," and

businesses have "a property right in keeping confidential and making exclusive use" of that

information. That property interest, even if intangible, is subject to protection under the wire and

mail fraud statutes. *Id.* at 28. Here, DHS-OIG went to great lengths to protect the confidentiality

of its case management system and computer code and the PII it possessed, *see* Dkt. 174 at 31–

35, 37, 40–44, 47–50 (Tr. 31:13–35:11, 37:4–18, 40:1–44:25, 47:22–50:10) (Steel), and there is

no reason to conclude that the government's interest in protecting that intangible property is any

less compelling than the interest of private companies in preventing the theft of their intellectual

property. The co-conspirators, moreover, did far more than memorize information, *see United*

*States v. DiGilio*, 538 F.2d 972, 977 (3d Cir. 1976), or repeat something that they learned while

employed by the government; rather, they copied entire computer programs and databases—

character-for-character—and removed those exact, functioning copies from the DHS-OIG

headquarters. Section 641 applies to the theft of "*any* record, voucher, money, or *thing of value*

of the United States," 18 U.S.C. § 641 (emphasis added), and it is difficult to fathom a

construction of the statute in which entire, proprietary computer programs and databases

containing PII about thousands of individuals do not constitute "thing[s] of value."

　　Nor does the fact that the defendants left the government with its own copies of the

property at issue (*i.e.*, the case management system, source code, and PII), make a difference.

Dkt. 166-1 at 16; Dkt. 170 at 10. At oral argument, defense counsel suggested that property is

"stolen" only when the owner is deprived of its use; otherwise, the government must proceed on

a theory of conversion. *See* Aug. 29, 2023 Hrg. Tr. (Rough at 3:18–19). But that

misunderstands the nature of the property right at issue; the relevant bundle of sticks includes both the ability to use one's own property and the right to exclude others. *Cf. Carpenter*, 484 U.S. at 26 (explaining "the business had a right to decide how to use [its confidential information] prior to disclosing it"). To take just one example, a key component of the government's interest in its PII databases included the right to exclude others from making and removing copies of those databases, even though the government maintained its own copies of the databases. The same is true, moreover, of proprietary computer programs, particularly those used for law enforcement purposes.

**2.**

But, even if the term "steal" carries the narrow meaning that Venkata suggestions, the term "conversion" does not. As the Supreme Court explained in *Morissette*, unlike "stealing," "[c]onversion . . . may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful," and "may include misuse or abuse of property," such as "use in an unauthorized manner or to an unauthorized extent." *Morissette*, 342 U.S. at 271–72. Under Section 641, "[t]he cornerstone of conversion is the unauthorized exercise of control over property in such a manner that *serious interference* with ownership rights occurs." *Collins*, 56 F.3d at 1420. Moreover, as explained above, the D.C. Circuit held in *Collins* that, for purposes of Section 641, conversion includes "the misappropriation of intangible property." *Id.* at 1419.

Taking a slightly different tack from above, Venkata argues that the jury lacked sufficient evidence to convict him of conversion because (1) conversion requires a "serious interference with the [victim's] ownership rights," and (2) here, the government offered no evidence that either DHS-OIG or USPS-OIG was ever prevented from accessing or using any computer

39

**A0426**

program, computer code, or PII as a result of the defendants' actions.  Dkt. 166-1 at 16–20.  He

bases this argument almost entirely on the *Collins* decision, where the D.C. Circuit recognized

that Section 641 covers the conversion of intangible property, 56 F.3d at 1417—including "the

conversion of computer time and storage," *id.* at 1420—but does so only when the offending

"conduct seriously interfere[s] with the rights of the government," *id.* at 1421.  In that case, the

court concluded that the prosecution "did not produce a shred of evidence," *id.* at 1421, that the

defendant's use of his work computer "to create documents relating to his ballroom dance

activities," such as "a chapter newsletter" or "a ballroom dance competition calendar," *id.* at

1418, "seriously interfered with the government's ownership rights in its computer," *id.* at 1421.

Although the government offered evidence, and the defendant did not contest, that "he typed in

data and stored information on the computer regarding his personal activities," the government

offered "no evidence . . . that such conduct prevented him or others from performing their

official duties on the computer."  *Id.*

As an initial matter, the facts of this case are a far cry from those in *Collins*.  It is one

thing to use a work computer for a limited, personal purpose, resulting in no harm or cost to the

government.  It is something entirely different to make exact, unauthorized copies of confidential

government computer programs, computer code, and databases—including PII; to install those

copies on a personal laptop and three personal servers; to use the misappropriated material for

business purposes over a period of many months; and to invite computer programmers operating

overseas to access this confidential material, including the PII of thousands of individuals.  In

short, there is no plausible comparison.

Venkata nonetheless purports to find support in *Collins* for the proposition that "to rise to

the level of 'serious interference,' the defendant's conduct must have 'deprived [the owner] of

the use or possession of its property.'" Dkt. 166-1 at 16 (quoting *Collins*, 56 F.3d at 1421)

(alteration in original). That argument correctly quotes words that appear in *Collins* but takes

them out of context. The quoted language appears in the portion of the opinion describing the

Eighth Circuit's decision in *United States v. Wilson*, 636 F.2d 225 (8th Cir. 1980). Fairly

construed, however, the D.C. Circuit was not setting forth an all-encompassing test for

conversion. Rather, it was merely describing why the evidence was insufficient in the *Wilson*

case; it was insufficient because the defendant's use of his government secretary to type personal

documents did not "interfere[] with the secretary's official duties" in any way, and it did not

otherwise "interfere[] with the government's ownership rights." *Collins*, 56 F.3d at 1420–21

(citing *Wilson*, 636 F.2d at 225–28).

Venkata also suggests that conversion requires an "'interference . . . of such a magnitude

that the converter must pay the rightful owner the full value of the property converted.'" Dkt.

166-1 at 17 (quoting *Collins*, 56 F.3d at 1420 (citing Restatement (Second) of Torts § 222A));

*see also* Dkt. 170 at 11 & n.2. But this sentence does not mean that conversion is limited to

those circumstances in which the defendant deprives the victim of the use or possession of its

property. *Cf. id.* at 11 n.2. Rather, the sentence refers to the measure of damages in tort cases,

distinguishing between trespass to chattels, where the measure of damages is the diminished

value of the chattel, and conversion, where the measure of damages is the full value of the

chattel. *See* Restatement (Second) of Torts § 222A, comment c. The measure of damages,

however, merely stands as a proxy for what is undisputed here—that conversion applies only if

the defendant intentionally interferes with the victim's "dominion or control" over its property in

a manner that "seriously interferes with the [victim's] right . . . to control" that property. *See*

Restatement (Second) of Torts § 222A.

A0428

The examples provided in the Restatement, moreover, make clear that the dividing line between trespass on a chattel and conversion is "almost entirely a matter of degree" and that the test is not, as Venkata suggests, whether the victim remains free to use its property at the same time that it is subject to the defendant's misuse. The Restatement observes, for example, that if "A entrusts an automobile to B, a dealer, for sale," and "[o]n one occasion B drives the car, on his own business, for ten miles," no conversion occurs. Restatement (Second) of Torts § 222A, illustration 21. But if, on the same facts, B "drives the car 2,000 miles," then a conversion occurs. *Id.*, illustration 22. Under both scenarios, A neither possesses nor uses the car, and under both scenarios B misuses the car. What distinguishes the cases is the *extent to which* B exercises unauthorized control over the car in a manner that *seriously interferes* with A's *ownership rights*.

In any event, Venkata's understanding of conversion is at odds with *Morissette*. As relevant here, the Court observed as follows:

> Conversion . . . may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use. Money rightfully taken into one's custody may be converted without any intent to keep or embezzle it merely be commingling it with the custodian's own, if he was under a duty to keep it separate and intact. It is not difficult to think of intentional and knowing abuses and unauthorized uses of government property that might be knowing conversions but which could not be reached as embezzlement, stealing or purloining. Knowing conversion adds significantly to the range of protection of government property without interpreting it to punish unwitting conversions.

342 U.S. at 271–72. *Morissette* says nothing about preventing the owner from using or possessing its property. Indeed, if Venkata were correct that conversion required the owner to be unlawfully deprived of the use or possession of her property, it would—contrary to the teachings

42

**A0429**

of *Morissette*—be difficult to imagine a "knowing conversion" that would not also constitute "embezzlement, stealing, or purloining."

This, of course, still leaves the question of how to determine whether a defendant's interference with the victim's ownership interest is sufficiently serious to cross the line from trespass on a chattel to conversion—that is, sufficiently serious to require a tortfeasor to pay the victim for the entire value of the chattel. And, although Venkata resists this step, *see* Dkt. 170 at 11 n.2, the Restatement answers the question. It provides as follows:

> (2)    In determining the seriousness of the interference and the justice of requiring the actor to pay the full value, the following factors are important:
>
> (a)    the extent and duration of the actor's exercise of dominion or control;
>
> (b)    the actor's intent to assert a right in fact inconsistent with the other's right of control;
>
> (c)    the actor's good faith;
>
> (d)    the extent and duration of the resulting interference with the other's right of control;
>
> (e)    the harm done to the chattel;
>
> (f)    the inconvenience and expense caused to the other.

Restatement (Second) of Torts § 222A. "No one factor is always predominant in determining the seriousness of the interference," and the list of factors is not "exclusive." *Id.*, comment d. Moreover, in addition to considering "the conduct of the defendant," the Court must also consider "its consequences" and must, "[i]n each case, . . . ask[] . . . whether the actor has

exercised such dominion and control over the chattel[] and has so seriously interfered with the other's right to control it, that in justice he should be required to buy that chattel." *Id.*[7]

Here, the Court instructed the jury that it could find that Venkata or his co-conspirators "converted" the property identified in the Indictment only if it found beyond a reasonable doubt that "the unauthorized exercise of control over [the] property" occurred in a manner involving "serious interference with [the government's] ownership rights. Dkt. 146 at 37. Consistent with *Collins* and the Restatement, the Court further explained:

> In considering the seriousness of any interference with the government's property right, you may consider the following factors, among any other factors you consider relevant: (a) the extent and duration of the actor's exercise of dominion or control; (b) the actor's intent to assert a right in fact inconsistent with the government's right of control; (c) the actor's good faith; (d) the extent and duration of the resulting interference with the government's right of control; (e) the harm done to the property interest; and (f) the strength of the government's interest in maintaining confidentiality and the expense caused to the government. No one factor is necessarily predominant in determining the seriousness of the interference.

*Id.* at 38. The Court has little doubt that, based on the evidence presented at trial and this instruction, a rational jury could have found beyond a reasonable doubt that Venkata and his co-conspirators converted the government case management systems, computer code, and PII for their own purposes.

---

[7] When proposing jury instructions, Venkata sought to define conversion according to the standard set out in *Collins*, but he opposed the government's proposal that the Court include a definition of conversion from Section 228 of the Restatement (Second) of Torts, notwithstanding the fact that *Collins* relied on the Restatement. *See* Dkt. 130 at 7–8. Section 228 specifically discusses liability for conversion when one's use exceeds one's authorized use, while section 222A speaks more generally to what constitutes conversion. Venkata did not argue that the Restatement was an incorrect statement of the law; rather that it "would be duplicative and confusing to the jury, and [was] unnecessary in any event given that the D.C. Circuit's definition controls." *Id.* at 8.

To start, the "extent and duration" of the co-conspirators' "exercise of dominion or control" over the misappropriated case management systems, computer code, and PII was extensive. They obtained the case management systems and computer code in their entirety, and also obtained PII about thousands of individuals; they updated the materials they had to include the most recent developments in the DHS-OIG system (most notably, adding the eSubpoena module); they used this property extensively over a period of many months; they provided third-parties with access to this highly sensitive material; and they did so for commercial gain. *See, e.g.*, Dkt. 175 at 90–96 (Tr. 90:4–96:25) (Edwards); *id.* at 34–35 (Tr. 34:21–35:11). The evidence also showed that they intended "to assert a right inconsistent with [the government's] right of control." Patel and Venkata were government employees, and there was ample evidence that DHS-OIG went to great lengths to limit access to the computer code and database. Dkt. 174 at 31–35, 37, 40–44, 47–50 (Tr. 31:13–35:11, 37:4–18, 40:1–44:25, 47:22–50:10) (Steel) (detailing measures, including only allow IT administrators to access the web and database server, and only allowing developers to access the computer code, as well as information security policy, training, and computer access agreements). And Edwards, Patel, and Venkata personally signed agreements promising not to remove "DHS computer systems or software from government workspaces without express written permission." *Id.* at 42, 44–45, 46–50 (Tr. 42:23–25, 44:23–45:24); Gov't Ex. 1, 2, & 3; *see also* Dkt. 174 at 47–50 (Tr. 46:15–50:10) (Steel); Gov't Ex. 9. The co-conspirators, nonetheless, removed these materials, placed them on a private laptop and private servers, and then allowed programmers working in India to access the programs, computer code, and PII—with no assurances of confidentiality to the U.S. government or the individuals who entrusted their PII to the government. *See, e.g.*, Dkt. 175 at 99 (Tr. 99:1–18) (Edwards). Finally, there was also ample evidence that the co-conspirators,

including Venkata, acted in bad faith; that they interfered with the government's right to control

its software and PII over a prolonged period of time; and that they caused DHS-OIG substantial

harm and expense.  After the scheme was discovered, DHS-OIG had to inform Congress and

those affected about the breach of the PII, had to notify the public and those individually affected

by the breach, had to pay to provide credit monitoring services at a cost of about $400,000, and

had to conduct a security assessment.  Dkt. 174 at 60–67 (Tr. 60:12–67:8) (Steel).

For all of these reasons, the jury's verdict was supported by the record, and the Court

lacks a sound basis to intrude on the province of the jury.  *Cf. United States v. Matzkin*, 14 F.3d

1014, 1021 (4th Cir. 1994) (upholding conversion conviction under Section 641 for disclosure of

confidential government contract bid information); *United States v. Barger*, 931 F.2d 359, 368

(6th Cir. 1991) (upholding conversion conviction under Section 641 for taking and sharing

government manual with confidential government information); *United States v. Girard*, 601

F.2d 69, 71 (2d. Cir. 1979) (upholding conversion conviction under Section 641 for sale of

confidential Drug Enforcement Administration computerized files).

**3.**

Next, Venkata argues that "the Government failed to establish[] that the aggregate 'value'

of the copies source code and PII exceeded $1,000."  Dkt. 166-1 at 21.  Recall that a violation of

Section 641 is a misdemeanor if the "value of" the stolen or converted property "does not exceed

the sum of $1,000."  18 U.S.C. § 641.  The statute then defines "value" as "face, par, or market

value, or cost price, either wholesale or retail, whichever is greater."  *Id.*  According to Venkata,

"the Government attempted to meet the $1,000 threshold by pointing to the cost of producing the

source code, and of credit monitoring as a result of the data breach," and, on his telling, "neither

production costs nor mitigation falls within section 641's definition of 'value,' which aims to

measure the benefit to the thief—not the mitigation cost to the victim." Dkt. 166-1 at 22
(internal quotation omitted). The government responds that it proved the value of the property
by reference to its "cost price," which it alleges "was in the millions of dollars." Dkt. 169 at 32.
Alternatively, the Government posits that the jury was entitled to infer that the stolen property
was worth far in excess of $1,000 from the evidence that there is a market for case management
systems (which Venkata thought could be worth millions of dollars), that it cost millions of
dollars for the government to develop the EDS and PARIS systems, and that the systems were
fully operational. *Id.* at 32–33.

The Court agrees that the government presented sufficient evidence for the jury
reasonably to have found that the aggregate value of the stolen goods exceeded $1,000. The
government first relies on the "cost price, either wholesale or retail" of the stolen goods. "Cost
price" is "the amount of money that was needed to make or get something at an amount that
yields no profit." *At Cost Price*, Merriam-Webster, https://www.merriam-
webster.com/dictionary/at%20cost%20price; *see also Price*, Black's Law Dictionary (11th ed.
2019) ("[C]ost price": "The price that a seller pays for something to be sold."). The government
presented evidence at trial that it spent $2.3 million to develop EDS, plus about $3.6 million
improving it over the years. Dkt. 174 at 51–54 (Tr. 51:19–54:7) (Steel); Gov't Ex. 16A at 2
(contract for acquisition of EDS). Special Agent Chad Steel further testified, as an expert, that it
cost over $1,000 to develop PARIS. Dkt. 182 at 16–17 (Tr. 16:23–17:13) (Steel). This is
sufficient evidence from which a jury could conclude beyond a reasonable doubt that EDS, a
copy of which Patel stole in furtherance of the conspiracy after Venkata joined, cost over $1,000.

Venkata objects that the "production cost" is not the same as "cost price," and he asserts
that "production cost" is not one of the other value measures listed in the statute. Dkt. 166-1 at

22; Aug. 29, 2023 Hrg. Tr. (Rough at 14:24–15:2).  For support, Venkata relies on *United States v. Ligon*, 440 F.3d 1182 (9th Cir. 2006), a case that involved the theft of Native America petroglyphs.  In that case, the government attempted to prove value under Section 641 by pointing to the "archaeological value" of the petroglyphs, which, by regulation, is measured "in terms of the costs of the retrieval of the scientific information which would have been obtainable prior to the violation."  *Id.* at 1185 (quoting 18 C.F.R § 1312.14(a)).  In particular, the regulation requires "an analysis that 'go[es] back in time before the violation occurred and estimate[s] what it would have cost the United States to engage in a full-blown archaeological dig at the site' in order to obtain the archaeological information."  *Id.* (quoting *United States v. Quarrell*, 310 F.3d 664, 679 (10th Cir. 2002)) (alterations in original).  The Ninth Circuit was unpersuaded that this measure was "encompassed by" the statutory definition of "value," which includes only "'face, par, or market value, or cost price, either wholesale or retail.'"  *Id.* (quoting 18 U.S.C. § 641).  Venkata asks the Court to extend this reasoning to hold that Section 641's definition of "value" excludes any measure of the cost of services required to develop a product.  *See* Dkt. 170 at 15.  In his view, the "[c]ost of production is neither the retail nor the wholesale price—both of which measure the *purchase* price."  *Id.*

As an initial matter, the Court notes that Venkata's use of the phrase "[c]ost of production" is a bit of a misnomer because a substantial portion of the cost at issue was the price that DHS-OIG agreed to pay to a contractor to develop EDS.  Dkt. 174 at 52–53 (Tr. 52:23–53:9) (Steel).  But even putting that aside, Venkata's reading of the statute is at odds with the dictionary definition of "cost price," which includes the cost of services needed to make something.  *See At Cost Price*, Merriam-Webster (defining cost price as "the amount of money that was needed to make or get something at an amount that yields no profit").  Nor is the Court

persuaded that the additional statutory phrase, "either wholesale or retail, whichever is greater," alters this accepted meaning. To the contrary, if anything, that language broadens the scope of Section 641's felony provision by permitting the jury to apply the greater of the two most common measures of cost price. It would make little sense to allow the government to rely on its out-of-pocket cost when it purchases an electronic case management system off the shelf, but not to do so when it purchases the same system by entering a procurement contract for the services necessary to create the same system. Either way, the government has expended a specific "amount of money"—that is, it has incurred a "cost price"—to obtain a specific product.

In any event, a rational juror could have reasonably concluded that the "market price" was greater than $1,000. Under Venkata's definition, "market value" is "determined by market forces [and] the price at which the minds of a willing buyer and a willing seller would meet." Dkt. 166-1 at 21 (quoting *DiGilio*, 538 F.2d at 979). He further maintains that the government offered no evidence regarding the market value of the property at issue and that, as a result, "any conclusion about the respective market values of the source code and PII would be speculative." *Id.* at 22. He does acknowledge, however, that "[w]hen there is no commercial market for the items, the market value 'may be established by reference to a thieves' market.'" *Id.* (quoting *DiGilio*, 538 F.2d at 979; citing *United States v. Bigelow*, 728 F.2d 412, 414 (9th Cir. 1984) (considering illegal market for sale of IRS credentials)).

Here, a rational jury could have found beyond a reasonable doubt that the "market value" of the stolen property exceeded $1,000 in the aggregate. Although the jury was not entitled speculate, that did not foreclose the use of common sense: It heard testimony that it cost the government $2.3 million to develop EDS and that it invested an additional $3.6 million in the system. Dkt. 174 at 51–54 (Tr. 51:19–54:7) (Steel). It heard testimony that Venkata had

49

**A0436**

predicted that a commercial case management system would be worth millions of dollars. Dkt. 175 at 35 (Tr. 35:4–9) (Edwards). They heard testimony from Peter Paradis, Deputy Assistant Inspector General for Investigations at USDA-OIG, that Edwards hoped to sell EDS 2.0 to USDA-OIG for about $150,000 for the first year and roughly $40,000 for "out-year operation" and maintenance fees. Dkt. 178 at 46 (Tr. 46:10–16) (Paradis). Under these circumstances, the jury could reasonably have inferred that—had Edwards been required to purchase the stolen programs, code, and PII on the open market or from a "thieves' market"—he (or any competitor) would have happily paid well in excess of $1,000 for EDS, STARS, PARIS, and the PII of thousands of DHS and USPS employees.

### 4.

Finally, Venkata argues that any conversion that did occur "was completed years before [he] ever became involved with Mr. Edwards and Ms. Patel." Dkt. 166-1 at 20. The Court, once again, is unpersuaded. The government offered evidence that Venkata himself committed distinct acts of conversion when copying additional templates and new code onto Edwards' servers, Dkt. 175 at 80, 85 (Tr. 80:14–23, 85:4–24) (Edwards), and aided in stealing government property when he delivered DVDs containing stolen copies of the PARIS and STARS systems to Edwards, *id.* at 106–107 (Tr. 106:1–107:19); Gov't Ex. 17 at 9; Gov't Ex. 84. For the reasons explained above, this evidence was sufficient to sustain Venkata's conviction for theft of government property as a principal, aider and abettor, or co-conspirator.

In response, Venkata argues that "conversion is completed upon the initial interference with the owner's interest," Dkt. 166-1 at 20 (quoting *United States v. Beard*, 713 F. Supp. 285, 291 (S.D. Ind. 1989)), and that, here, the initial interference (if any) occurred when Edwards and Patel "made numerous copies of USPS-OIG and DHS-OIG source code and PII long before Mr.

Venkata was ever alleged to have joined their conspiracy," *id.*; *see also* Dkt. 170 at 13 ("[T]he law is clear that conversion is not a continuing offense.").  But the analysis that he relies upon from *United States v. Beard*, 713 F. Supp. 285 (S.D. Ind. 1989), is inapt.  In *Beard*, the defendant allegedly "diverted to his own person use approximately $27,000 in funds."  *Id.* at 286.  To avoid a statute of limitations problem, however, the government did not merely charge the defendant with unlawfully converting the funds, 18 U.S.C. § 641 (first paragraph), but also with unlawfully retaining the same funds with the intent to convert them to his use, *id.* (second paragraph).  The district court sensibly rejected this circumvention of the statute of limitations and held that someone who has already converted property to his own use cannot also be guilty of subsequently retaining that same property with the intent to convert it to his own use.  *Id.* at 289. As the court explained, the crime of retention with intent to convert "was added to [Section 641] to reach 'a new group of wrongdoers, not to multiply the offense' of the original embezzler or thief."  *Id.* (quoting *Milanovich v. United States*, 365 U.S. 551, 554 (1961)).

Nothing in *Beard* suggests that a group of co-conspirators cannot commit multiple instances of conversion, whether of different property or the same or similar property at different times.  The fact that Edwards had prior versions of PARIS and STARS, which he was unable to operate, for example, does not absolve Venkata of later stealing copies of PARIS and STARS, which he was then able to help Edwards install and operate on his private servers.  The government provided sufficient evidence of theft and conversion that were separate from any thefts that may (or may not) have occurred before Venkata joined the co-conspiracy in May 2016, before Venkata worked extensively to get the systems that Patel stole in late May 2016 to

function, and before Venkata himself removed distinct copies of PARIS and STARS from DHS-OIG's headquarters in March 2017.[8]

## C.    Destruction of Records

Venkata next challenges his conviction under 18 U.S.C. § 1519.  Under that statute, the government had to prove that Venkata "knowingly alter[ed], destroy[ed], mutilate[d], conceal[ed], cover[ed] up, falsifie[d], or ma[de] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation" of a "matter within the jurisdiction of any department or agency of the United States."  *Id.*  Venkata argues that "the evidence at trial was insufficient for a rational jury to find beyond a reasonable doubt that [he] knowingly deleted any text messages or emails, or that he had any intent to impede or obstruct the investigation."  Dkt. 166-1 at 33.

Venkata's challenge fails because Agent Steel's testimony, along with other evidence, provided a sufficient basis to sustain the jury's verdict.  At trial, Steel described the relevant portion of his May 16, 2017 interview of Venkata as follows:

> Q.    During this interview, did you ask him for an opportunity to look at his cell phone?
>
> A.    Yes, sir, I did.
>
> Q.    And that request was made in the context of this voluntary interview?

---

[8] Given this conclusion, the Court need not decide precisely when the crime of conversion was completed.  It bears note, however, that the conversion of computer software, code, and PII is not the same as the conversion of $27,000 in funds.  As explained above, the line between trespass to a chattel and conversion requires the fact finder to consider a range of factors, including "the extent and duration of the actor's exercise of dominion or control," "the extent and duration of the resulting interference," and "the harm done to the property interest."  *See* Dkt. 146 at 38.  As a result, although removing the software, code, and PII from DHS-OIG headquarters was likely sufficient to constitute "steal[ing]," it is unlikely that the property was "convert[ed]" until Edwards, with Venkata's assistance, was able to install and operate EDS and PARIS on his own laptop or personal servers.

52

**A0439**

> A.    Yes.  As a matter of fact, he offered to show us the information on his cell phone.  *He said that he had only had the one communication with Mr. Edwards, the phone call, but that that wasn't—that that was not on the cell phone.*  He had said he had deleted the message to distance himself from Mr. Edwards.  But he did show me the cell phone[] and showed me the times above and beyond.  He also showed me his e-mail account, which was Murali Mohan, and showed me that there were no e-mails in there; and showed his messaging, and that there were no relevant messages in there. . . .

Dkt. 182 at 44 (Tr. 44:7–21) (Steel) (emphasis added).

Government counsel then showed Steel an extraction report from Edwards' cell phone, which included well over two hundred text messages that Edwards and Venkata exchanged between July 15, 2016 and March 29, 2017, Gov't Ex. 19, and established that the messages "relate[d] to the work that Mr. Venkata did for Mr. Edwards" and that they were "[e]xtremely relevant" to Steel's investigation.  Dkt. 182 at 45 (Tr. 45:8–13) (Steel).  Counsel then asked, "And what did Mr. Venkata do with these text messages," to which Steel responded, "Deleted them, sir."  *Id.* (Tr. 45:14–16).  When counsel followed up by asking what Venkata told him "about when he deleted these text messages," Steel responded as follows:

> He told me nothing about deleting these text messages.  He told me that he deleted the communications with Mr. Edwards following becoming aware of the investigation; and that he had done so because he wanted to distance himself from Mr. Edwards and Ms. Patel.

*Id.* at 45–46 (Tr. 45:24–46:5).

Counsel then turned to Venkata's text messages with Patel and followed a similar script. He established that Venkata and Patel exchanged over one hundred text messages between July 14, 2016 and March 29, 2017, Gov't Ex. 17; that some or all of these messages were "extremely relevant" to Steel's investigation, Dkt. 182 at 46 (Tr. 46:15) (Steel); and that Venkata "[d]eleted them," *id.* (Tr. 46:17).  Significantly, when defense counsel questioned the foundation for Steel's conclusion that Venkata had "deleted them," Steel explained that he examined Venkata's cell

53

**A0440**

phone, that he specifically looked for but did not find communications with Edwards and Patel, but that he found "messages from other folks, both *before* and *after* this period." *Id.* at 46–47 (Tr. 46:22–47:9) (emphasis added).

Steel's testimony regarding Venkata's e-mail was similar. Counsel showed Steel an email sent on March 17, 2017 from Venkata to Edward stating: "Charles, I am working on it. I found user manual, may be useful to you. Attached audit file. Thanks, Murali." Gov't Ex. 25; *see also* Dkt. 182 at 47 (Tr. 47:16–20) (Steel). Steel further testified that the e-mail was relevant to his investigation and that the e-mail was not on Venkata's cell phone, although Steel was subsequently able to find a copy of it on Venkata's home computer. Dkt. 182 at 47–48 (Tr. 47:21–48:4).

Finally, Steel offered similar testimony regarding Venkata's call records. *Id.* at 48–49 (Tr. 48:5–49:9). Counsel showed Steel call records reflecting multiple telephone calls between Venkata and Edwards. Gov't Ex. 36B. He then turned Steel's attention to the final page of the exhibit, which showed calls between Edwards and Venkata on April 20, 2017—after the government investigation had become "overt." Dkt. 182 at 49, 50 (Tr. 49:2–5, 50:8–14) (Steel). Steel, once again, testified that, "[w]hen he looked at Mr. Venkata's cell phone," there was no evidence of these calls. *Id.* at 49 (Tr. 49:6–9).

Recapping Steel's testimony, counsel and the witness then had the following exchange:

Q.    Thank you, Your Honor. Were these calls on the phone when you looked
      at Mr. Venkata's cell phone?

A.    No, sir, they were not.

Q.    So just to recap, were the text messages there?

A.    No, sir.

Q.    Were the—was the e-mail there?

54

**A0441**

A.      No, sir.

Q.      Were the phone calls there?

A.      No, sir.

*Id.* at 49–50 (Tr. 49:18–50:1) (Steel).

Considered as a whole, this testimony and the accompanying exhibits provided the jury with ample basis to find beyond a reasonable doubt that Venkata knowingly altered or destroyed records with the intent to impede or obstruct an investigation conducted by DHS-OIG regarding Edwards, Patel, and (ultimately) Venkata's misappropriation and misuse of government property.  Virtually all of the information relevant to the investigation was no longer on Venkata's cell phone, and Venkata admitted that he "deleted the communications with Mr. Edwards following becoming aware of the investigation" and that he did so "to distance himself from Mr. Edwards and Ms. Patel."  *Id.* at 46 (Tr. 46:2–5) (Steel).  This testimony, moreover, is corroborated by the call records, which show that Venkata and Edwards spoke multiple times on April 20, 2017, after the government investigation had become public.  Gov't Ex. 36B; *see also* Dkt. 182 at 49 (Tr. 49:2–5) (Steel).  Given this evidence—and, in particular, Venkata's admission and the absence of any relevant text messages, e-mail, or call records on Venkata's phone—and given Venkata's untruthful responses to questions posed by Steel during the May 16, 2017 interview, a rational jury could reasonably have found that Venkata knowingly removed any incriminating evidence from his cell phone with the intent to impede or obstruct the ongoing investigation.

Venkata offers several reasons to discount this evidence, but his arguments are ones that—had he made them at trial—a rational jury could have decided to accept or reject.  With respect to the missing e-mail, Venkata first notes that the investigators did find the e-mail when

A0442

they searched Venkata's home, suggesting that perhaps Venkata's phone may have failed "to sync to the email server" and that Venkata did not delete the email from the email server. Dkt. 166-1 at 34. But this hardly demonstrates that the jury's verdict was unreasonable. To the contrary, there was no evidence suggesting that his cell phone failed "to sync to the email server," and the fact that he was less thorough than he might have been in erasing evidence of his crime is no defense. This is particularly so given the fact that the May 16, 2017 interview occurred at the DHS-OIG's offices, Dkt. 182 at 35 (Tr. 35:9–11) (Steel), and the reasonable inference that Venkata erased the incriminating evidence on his cell phone before volunteering that Steel could examine the phone in the hope of ending any investigation of his conduct before the investigators dug any deeper.

Venkata also argues that, understood in context, Steel's testimony that Venkata told him "that he deleted the communications with Mr. Edwards" after "becoming aware of the investigation" was limited to "phone calls between [him] and Mr. Edwards." Dkt. 166-1 at 35 n.8. But that, once again, was a question for jury. Venkata's counsel was free to cross-examine Steel about what he meant but, for strategic or other reasons, declined to do so. In any event, a rational jury could easily have understood Steel (and Venkata) to have referred more broadly to all "communications." Indeed, it would make little sense to delete call records to "distance" one's self from his co-conspirators, but to have left untouched the more incriminating e-mail and text messages. A call record merely shows that they spoke; the e-mail and text messages more definitively connected Venkata with his co-conspirators.

With respect to the text messages, Venkata leans heavily on Steel's testimony that Venkata "told [him] nothing about deleting these text messages." Dkt. 182 at 46 (Tr. 46:1–2) (Steel). That testimony, however, came in response to a question regarding what Venkata said

**A0443**

"about when he deleted these text messages." *Id.* at 45 (Tr. 45:24–25). More importantly, in the very next sentence of his testimony, Steel explains that Venkata "told [him] that he deleted the communications with Mr. Edwards following becoming aware of the investigation." *Id.* at 46 (Tr. 46:2–3). Fairly understood, Steel was simple being precise; Venkata did not separately address the text messages—and, in fact, he said "nothing about deleting . . . text messages." *Id.* at 46 (Tr. 46:1–2). Rather, he spoke more generally about deleting his "communications with Mr. Edwards." *Id.* (Tr. 46:2–3). It is only when that broad statement is considered alongside the evidence that Edwards and Venkata exchanged over two hundred text messages, none of which appeared on Venkata's phone, that the investigators (and the jury) would understand that Venkata was referring to call records, e-mail, *and* text messages.

Venkata further speculates, as he did with the e-mail, that "there are any number of reasons why a text message might not appear on someone's phone at a particular time." Dkt. 166-1 at 35–36. He asserts, for example, that "on an iPhone, the default setting is 30 days." *Id.* at 36. Far more than this would be required to set aside the jury's verdict. Among other difficulties, neither the government nor the defense offered any evidence regarding any such default setting—and, indeed, the Court has no way of knowing whether this assertion is correct (or was correct in 2017). But even more importantly, the argument is at odds with the evidence that was presented to the jury; Steel testified that, when he examined Venkata's cell phone, he found "messages from other folks, both *before* and *after* [the relevant] period." Dkt. 182 at 46–47 (Tr. 46:24–47:2) (Steel) (emphasis added).

Finally, Venkata concedes that "there is some evidence that [he] may have deleted" call records but maintains that "there is no evidence that he did so with the intent of obstructing the investigation," and, indeed, he "took it upon himself to report the calls from Mr. Edwards to his

supervisor . . . to pass along to the [g]overnment agents." Dkt. 166-1 at 36–37. That contention ignores Venkata's admission that he deleted "communications" to distance himself from Edwards and Patel. Dkt. 182 at 46 (Tr. 46:2–5) (Steel). It also ignores Steel's testimony that Venkata claimed (1) that "he . . . told Mr. Edwards that he would have to report any contact, at which point Mr. Edwards immediately ended the conversation," and (2) that this was "the only communication he had with Mr. Edwards." *Id.* at 38 (Tr. 38:3–6). The call records, in contrast, show that Edwards called Venkata multiple times on April 20, 2017, and that at least three of the calls were long enough for substantive discussions, Ex. 36B (112, 91, and 48 seconds). That evidence was more detailed and thus incriminating (and worthy of deleting) than Venkata's report that, "[w]hile looking at [his] phone, [he] noticed [that Edwards had] called [him]." Dkt. 185 at 16 (Tr. 16:10–11) (Horton). Indeed, if anything, the call records (which reflect multiple calls) raise questions about the veracity of Venkata's claim that he only recalled that Edwards had called him (that *very* day) after he reviewed his call records.

"[A] judgment of acquittal" is warranted "only when there is *no* evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt." *United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983). Here, there was more than sufficient evidence for a rational jury to have found beyond a reasonable doubt that Venkata deleted records from his cell phone, after he learned of the ongoing investigation, and that he did so with the intent to divert attention from his own wrongdoing and thus to obstruct or impede the investigation.

## D.    Jury Instructions

Venkata next challenges two aspects of the jury instructions: how the jury was charged on the conspiracy charges, and the exclusion of the defense's instruction concerning apparent authority. Neither challenge has merit.

**1.**

Venkata first argues that the Court erroneously instructed the jury that "the co-conspirators could be found guilty of participating in the conspiracy if the jury found that they had either agreed to defraud the government, *or* agreed to steal or convert U.S. property." Dkt. 166-1 at 39 (emphasis added). According to Venkata, this instruction was incorrectly phrased in the disjunctive. That was an error in his view because, as he sees it, "[t]he illegal agreement alleged and put to the jury was that the co-conspirators agreed to defraud the U.S. government *by* stealing or knowingly converting U.S. government property *and* selling it back to federal agencies." *Id.* at 39–40 (emphasis in original).

As an initial matter, even if this was an error, it was harmless. The jury found an agreement to commit *both* objects of the conspiracy. When asked "what specific offense or offenses do you unanimously find to have been the object or objects of the conspiracy," the jury responded that it found "beyond a reasonable doubt" both (1) "that there was an agreement to commit the offense of Theft of Government Property," *and* (2) "that there was an agreement to defraud the United States." Dkt. 154 at 1. The jury therefore found beyond a reasonable doubt *both* predicates that Venkata suggests were necessary to sustain a conspiracy conviction. So, even if the jury was improperly instructed that it could find either an agreement to commit theft or to defraud, it found both, negating any alleged error. *See United States v. McGill*, 815 F.3d 846, 888 (D.C. Cir. 2016) ("[I]nstructional error is harmless if it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967))).

In any event, the jury was properly instructed. First, the statute makes clear that a person can violate Section 371 by conspiring "*either* to commit any offense against the United States, *or*

to defraud the United States." 18 U.S.C. § 371 (emphasis added). The Court's instruction

tracked this statutory text. Second, the Indictment charged Venkata with multiple objects of the

conspiracy. It alleged that Venkata "knowingly and willfully conspire[d]" "a. to commit

offenses against the United States, that is: to willfully and knowingly steal, purloin, and convert,"

*and* "b. to defraud the United States." Dkt. 1 at 4–5 (Indictment ¶ 11(a)–(b)). Third, the jury

instructions laid out these two distinct objects of the conspiracy, Dkt. 146 at 33–34, in a way that

adequately informed the jury of the "essential nature" of the alleged conspiratorial agreements,

*see United States v. Treadwell*, 760 F.2d 327, 337 (D.C. Cir. 1985). The instruction included not

only used "the general language of the statute," but "inform[ed] the jury of the 'essential nature'

of the conspiratorial agreement[s]—the meeting of minds—that the government was required to

prove beyond a reasonable doubt." *Id.*; *see also* Dkt. 146 at 33–34. The Court's instruction to

the jury that "in determining whether this agreement was formed either to commit offenses

against or defraud the United States, the jury need only find that one of the illegal objects

specified . . . was entirely proper, since a single agreement may have more than one object."

*Treadwell*, 760 F.2d at 337.

## 2.

Venkata also argues that the Court erroneously declined to include a portion of his

requested defense theory of the case. *See* Dkt. 166-1 at 43–48. "A theory-of-defense instruction

is in order if there is 'sufficient evidence from which a reasonable jury could find' for the

defendant on his theory." *United States v. Hurt*, 527 F.3d 1347, 1351 (D.C. Cir. 2008) (quoting

*United States v. Glover,* 153 F.3d 749, 754 (D.C. Cir. 1998)). Notably, "[w]hat is required

before the theory of the case rule comes into play is a more involved theory involving 'law' or

fact, or both, that is not so obvious to any jury." *Laughlin v. United States*, 474 F.2d 444, 455 (D.C. Cir. 1972).

Venkata argues that the Court was wrong to reject the portion of his proposed theory-of-the-defense instruction that referred to "apparent authority." He claims that because there was evidence in the record about Patel's workplace authority over him and because authorization from a supervisor can affect a defendant's belief in the lawfulness of their conduct, he was entitled to a theory-of-defense instruction that he "'contends that he did not possess the requisite state of mind because he engaged in the conduct related to Counts, One, Two, Eleven, and Twelve[9] based on his reasonable belief that he was acting pursuant to the *apparent authority* of Sonal Patel, regardless of whether or not she had the actual authority to sanction that conduct.'" Dkt. 166-1 at 44 (emphasis added) (quoting Dkt. 141 at 1–2). The Court is unpersuaded.

First, the proposed "apparent authority" instruction risked confusing the jury. As Venkata concedes, the D.C. Circuit "has recognized that . . . 'authorization from one's superiors cannot convert illegal activity into legal.'" Dkt. 166-1 at 44 (quoting *United States v. North*, 910 F.2d 843, 885 (D.C. Cir. 1990)). That concession, moreover, is consistent with how the phrase "apparent authority" is generally used in the law; in agency law, for example, it refers to the "power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from, in accordance with the other's manifestations to such third persons." Restatement (Second) of Agency § 8; *see also Makins v. District of Columbia*, 277 F.3d 544, 549 (D.C. Cir. 2002). But that is not what Venkata sought to convey in his proposed instruction. Rather, he sought to explain to the jury that if he reasonably believed

---

[9] Venkata's proposed instruction referred to Count Twelve although the Court ultimately only submitted Count Thirteen to the jury for the aggravated identity theft counts. *See* Dkt. 141 at 1; Dkt. 146 at 46.

that his conduct was lawful because Patel was his supervisor and he was acting at her request, then the jury could "determine that he did not have the requisite intent to defraud." Dkt. 125 at 10–11 (Def. Proposed Jury Instr.). But that was simply another way of saying that he lacked the requisite state of mind, and using the legally inapt phrase "apparent authority" (rather than state of mind) would have only injected confusion into the instructions.[10]

Second, a "new trial is unwarranted" if the given instructions "substantially covered the same ground that [the defendant] requested in his proposed instruction." *Hurt*, 527 F.3d 1347, 1352. In *Hurt*, the district court refused to give a jury instruction on the defendant's specific theory that he had not violated Section 641 because he acted with a good-faith-but-mistaken belief so he lacked the necessary mens rea for the crime. *Id.* at 1351. The D.C. Circuit upheld the district court's decision because the instruction given by the district court sufficiently stressed the specific intent nature of the crime in a way that "covered the same ground" as the requested instruction. *Id.* at 1352. The same is true here. The jury instructions that the Court gave thoroughly covered Venkata's mens rea argument, albeit without referring (confusingly) to

---

[10]  That understanding is also consistent with the Court's pretrial observation that

> I don't think there's any problem in the world with your arguing—making mens rea arguments and saying that Mr. Venkata was told by his boss this was okay; he believed from his boss it was okay; there's no way in the world he has the mens rea necessary to establish the crime. I think that's entirely appropriate. I'm much more skeptical, though, of the notion that there's actually an affirmative defense that I should instruct the jury about, and that I should instruct the jury that if you find that there was reasonable reliance on apparent authority, that that's sufficient.

Dkt. 173 at 86 (Pre-Trial Conference Tr. 86:15–25); *see also id.* at 89 (Tr. 89:4–15). Here, Venkata does not argue that the Court should have provided additional detail or should have pointed to additional factual components in support of his theory that he lacked the requisite mental state to commit the crimes; instead, his argument turns on the Court's decision not to give what he refers to as an "apparent authority" instruction.

an "apparent authority" defense.  The final jury instructions on Venkata's theory of the case

informed the jury as follows:

> Mr. Venkata *contends that he did not have the required state of mind* for Counts
> One, Two, and Eleven.  With respect to Count Thirteen, Mr. Venkata contends
> that he did not knowingly possess, use or transfer information containing
> individuals' personal identifying information. . . .  Finally, with respect to Count
> Sixteen, Mr. Venkata contends that he did not intend to impede or obstruct a
> federal investigation.

Dkt. 146 at 50 (emphasis added).  That instruction, moreover, was given along with the Court's

detailed instructions relating to "the required state of mind."  The Court instructed the jury that

the government was required to prove beyond a reasonable doubt that "Venkata stole or

knowingly converted property for his own use or the use of another;" that to "steal" requires that

the defendant act with "intention to keep [the property at issue] wrongfully;" and that to act

"knowingly," the defendant must act "voluntarily and intentionally and not because of ignorance,

mistake, or accident."  Dkt. 146 at 29, 37.  In addition, and of particular relevance to Venkata's

reliance on Patel's supervisory role as it related to his state of mind, the Court instructed the jury

that it "should consider *all the circumstances in the evidence* that you think are relevant in

determining whether the government has proven beyond a reasonable doubt that the Defendant

*acted with the necessary state of mind*."  *Id.* at 30 (emphasis added).  Venkata did not then, and

does not now, argue that any of these instructions misstates "the required state of mind" to

violate Section 641 or that the jury failed to understand that it could look to *all* of the evidence,

including Patel's status as Venkata's supervisor, to decide whether he had "the required state of

mind."

Venkata argues that his "proposed instruction underscored a specific factual theory that,

if accepted, would have precluded a guilty verdict on specific counts."  Dkt. 170 at 33.  In

support, he cites *Levine v. United States*, 261 F.2d. 747 (D.C. Cir. 1958).  In *Levine*, the court

concluded that the trial judge erred by failing to instruct the jury as to *any* theory of the defendant's case and "only as to the factors the prosecution must establish beyond a reasonable doubt," where there was "an evidentiary theory which if believed defeats the factual theory of the prosecution." *Id.* at 748. Specifically, the trial judge had instructed the jury only that the prosecutor had to prove that the defendant falsely represented himself to be a police officer without any direction that they should acquit if they believed the defendant's theory that he represented himself not as a police officer but as an attorney, that is, an officer of the court. *Id.* Venkata overreads *Levine*. *Levine* established there is some entitlement to a theory-of-the-case instruction; it does not hold that a defendant is entitled to a theory of the case instruction of his choosing or require the court to single out particular evidence favorable to the defense.

Venkata's reliance on the D.C. Circuit's decision in *Salley v. United States*, 353 F.2d 897 (D.C. Cir. 1965), is also misplaced. In *Salley*, the court issued a narrow and specific holding about mistaken identity instructions in narcotics cases involving undercover agents. *Id.* at 899. The court concluded that although "trial judge was not obligated to give the charge in exactly the words requested by defense counsel," he was "obligated to instruct the jury that if there was a reasonable doubt as to the identification of the defendant as the person who made the sale, then the jury should acquit." *Id.* This was because "widespread police practice of utilizing undercover agents . . . creates added danger that the innocent may be convicted;" because an "undercover agent often files for as many as 100 warrants after his tour of duty, which generally lasts for a number of months;" because that practice creates a "possibility of error due to mistake and the fallibility of human memory is obvious;" and because "[o]ften the only chance a defendant has to defend himself without accusing the officer of total fabrication is to raise in the jury's mind a reasonable doubt as to whether the defendant was, in fact, the seller." *Id.* at 898–

99. No similar risk was present here and, in any event, the Court did bring Venkata's state-of-mind defense to the jury's attention.

Third, although a "theory-of-defense instruction is in order if there is 'sufficient evidence from which a reasonable jury could find' for the defendant on his theory," *Hurt*, 527 F.3d at 1351 (quoting *Glover*, 153 F.3d at 754), there must be more than "various wisps of evidence" and "impermissible speculation," *United States v. Crowder*, 543 F.2d 312, 317–18 (D.C. Cir. 1976). Here, there was extensive testimony by Venkata's former colleagues that it was well-understood in their workplace that supervisors could not authorize employees to break the rules or to take valuable, confidential property from DHS-OIG for their own use or the use of another. *See* Dkt. 169 at 60 n.5–9. There was also evidence that Venkata signed an agreement promising not to "remove DHS computer systems or software from Government work spaces *without express written permission*." Gov't Ex. 1. There was evidence that every time he logged onto EDS he had to click "I agree" on the EDS End User Agreement and Usage Warning," which advised: "[u]nauthorized or improper use or access of this system may result in disciplinary action, as well as civil and criminal penalties." Gov't Ex. 9. And Steel testified that Venkata not only denied any "knowledge of DHS information being exfiltrated," but "actually said that it would unethical to take DHS information" and that "he was not allowed or authorized to take DHS development tools from DHS-OIG." Dkt. 182 at 38–39 (Tr. 38:22–39:4).

In contrast, the only evidence to which Venkata directs that Court are generic (and uncontroversial) statements that requests from supervisors are "normal;" that Patel was Venkata's direct and only supervisor; and that they had a professional and social relationship such that he would likely have trusted her more than his colleagues may have. Dkt. 170 at 31–32. When considered in light of the evidence discussed above, the Court is hard pressed to

conclude that any of this constitutes more than a "wisp of evidence," if that, showing that Venkata lacked the requisite state of mind. But the Court nonetheless gave a theory-of-the-defense instruction that left that question to the jury. It would have been a step too far, however, for the Court to suggest to the jury that this evidence could, as a matter of law, support an "apparent authority" defense that differs in any way from a mere denial of "the required state of mind" to steal or convert government property.

Accordingly, the Court is unpersuaded that anything in or omitted from the jury instructions warrants a new trial.

### E.    Motion for a New Trial

Finally, although Venkata moves for a judgment of acquittal or for a new trial, his briefs fail to press any separate argument (other than his challenge to the jury instructions) that might justify granting him a new trial. Under Rule 33, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). But, as the D.C. Circuit has explained, the defendant bears the burden in pressing a Rule 33 motion, *Mangieri*, 694 F.2d at 1285, and a new trial "is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred," *Wheeler*, 753 F.3d at 208 (internal citations and quotation marks omitted). Because Venkata has not carried this heavy burden, the Court will deny his motion for new trial.

66

**A0453**

**CONCLUSION**

For the foregoing reasons, Venkata's motion for judgment of acquittal and new trial, Dkt.

166, is **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  January 3, 2024

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Columbia ▼

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| MURALI YAMAZULA VENKATA | ) Case Number: 20-CR-66 |
| | ) USM Number: 35716-016 |
| | ) Katherine Savarese |
| | ) Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1,2,11 & 16 _____
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:371 | Conspiracy to Commit Theft of Government Property to Defraud the United States | 4/30/2017 | 1 |

See Next Page

    The defendant is sentenced as provided in pages 2 through ___8___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

1/26/2024
Date of Imposition of Judgment

_Signature of Judge_

Randolph D. Moss, United States District Court
Name and Title of Judge

Jan. 31, 2024
Date

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1A

Judgment—Page ___2___ of ___8___

DEFENDANT: MURALI YAMAZULA VENKATA
CASE NUMBER: 20-CR-66

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:641 and 2 | Theft of Government Property and Aiding and Abetting and Causing an Act to be Done | 4/30/2017 | 2 |
| 18:1343 | Wire Fraud | 3/22/2017 | 11 |
| 18:1519 | Destruction of Records | 4/27/2017 | 16 |

**A0456**

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ___3___ of ___8___

DEFENDANT: MURALI YAMAZULA VENKATA
CASE NUMBER: 20-CR-66

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

Concurrent terms of 4 months as to Counts One (1), Two (2), Eleven (11) and Sixteen (16) of the Indictment.

☑ The court makes the following recommendations to the Bureau of Prisons:
The Court recommends incarceration at FCI Petersburg-- minimum security camp.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m.  on _____ .

☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☑ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**A0457**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3 — **Supervised** Release

| | Judgment—Page | 4 | of | 8 |

DEFENDANT: MURALI YAMAZULA VENKATA
CASE NUMBER: 20-CR-66

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:
24 months (2 years) to run concurrent as to counts One (1), Two (2), Eleven (11) and Sixteen (16) of the Indictiment.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well with any other conditions on the attached page.

**A0458**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

|  | Judgment—Page | 5 | of | 8 |

DEFENDANT: MURALI YAMAZULA VENKATA
CASE NUMBER: 20-CR-66

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

**A0459**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 3D — **Supervised** Release

Judgment—Page ___6___ of ___8___

DEFENDANT: MURALI YAMAZULA VENKATA
CASE NUMBER: 20-CR-66

## SPECIAL CONDITIONS OF SUPERVISION

Location Monitoring - You will be monitored by the form of location monitoring technology indicated herein in the first 8 Months of probation, and you must follow the rules and regulations of the location monitoring program. The cost of the program is waived. Location monitoring technology at the discretion of the probation officer, including: Radio Frequency (RF) Monitoring; GPS Monitoring (including hybrid GPS); SmartLINK; or Voice Recognition This form of location monitoring technology will be used to monitor the following restriction on your movement in the community: You are restricted to your residence at all times except for medical necessities and court appearances or other activities specifically approved by the court (Home Incarceration).

Financial Information Disclosure - You must provide the probation officer access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the United States Attorneys Office.

Financial Restrictions - You must not incur new credit charges, or open additional lines of credit without the approval of the probation officer.

Restitution Obligation You must pay the balance of any restitution owed at a rate of no less than $20 each month. Computer Search - You must submit your computers (as defined in 18 U.S.C. § 1030(e)(1)) or other electronic communications or data storage devices or media, to a search. You must warn any other people who use these computers or devices capable of accessing the Internet that the devices may be subject to searches pursuant to this condition. A probation officer may conduct a search pursuant to this condition only when reasonable suspicion exists that there is a violation of a condition of supervision and that the computer or device contains evidence of this violation. Any search will be conducted at a reasonable time and in a reasonable manner.

Computer Monitoring - You must allow the probation officer to install computer monitoring software on any computer (as defined in 18 U.S.C. § 1030(e)(1)) you use.

Community Service - You must complete 60 hours of community service within 20 months. The probation officer will supervise the participation in the program by approving the program. You must provide written verification of completed hours to the probation officer.

THE COURT FINDS that you do not have the ability to pay a fine and, therefore, waives imposition of a fine in this case.

You are ordered to make restitution to S.B. in the amount of $296. The court determined you do not have the ability to pay interest and therefore waives any interest or penalties that may accrue on the balance.

Restitution payments shall be made to the Clerk of the Court for the United States District Court, District of Columbia, for disbursement to the following victim:
Victim Name Amount of Loss
S.B.
Address to be provided by the government

The Probation Office shall release the presentence investigation report to all appropriate agencies,which includes the United States Probation Office in the approved district of residence, in order to execute the sentence of the Court. Treatment agencies shall return the presentence report to the Probation Office upon the defendans completion or termination from treatment.

Computer Monitoring/Search - To ensure compliance with the computer monitoring condition, you must allow the probation officer to conduct initial and periodic unannounced searches of any computers (as defined in 18 U.S.C. § 1030(e)(1) subject to computer monitoring. These searches shall be conducted to determine whether the computer contains any prohibited data prior to installation of the monitoring software, whether the monitoring software is functioning effectively after its installation, and whether there have been attempts to circumvent the monitoring software after its installation. You must warn any other people who use these computers that the computers may be subject to searches pursuant to this condition.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page   7   of   8

DEFENDANT: MURALI YAMAZULA VENKATA
CASE NUMBER: 20-CR-66

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment*** | **JVTA Assessment**** |
|---|---|---|---|---|---|
| **TOTALS** | $ 400.00 | $ 296.00 | $ | $ | $ |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| Payable to the United States District and | | | |
| Bankruptcy Court for the District of | | | |
| Columbia for disbursement to the following | | | |
| S.B. | | $296.00 | |
| 27198 Watkin Road | | | |
| Olmsted Twp., OH 44138 | | | |

| **TOTALS** | $ 0.00 | $ 296.00 |
|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☑ the interest requirement is waived for the   ☐ fine   ☑ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___8___ of ___8___

DEFENDANT: MURALI YAMAZULA VENKATA
CASE NUMBER: 20-CR-66

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑ Lump sum payment of $ __696.00__ due immediately, balance due

    ☐ not later than _____ , or
    ☑ in accordance with ☐ C, ☐ D, ☐ E, or ☑ F below; or

B  ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C  ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E  ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑ Special instructions regarding the payment of criminal monetary penalties:

    The financial obligations are immediately payable to the Clerk of the Court for the U.S. District Court, 333 Constitution Ave NW, Washington, DC 20001. Within 30 days of any change of address, you shall notify the Clerk of the Court of the change until such time as the financial obligation is paid in full.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**UNIDENTIFIED VOICE:**  Hi, sir.  How are you?

**PETE PARADIS**:  Good, how are you?

**UNIDENTIFIED VOICE:**  Good thanks.

**PETE PARADIS**:  Good.

**UNIDENTIFIED VOICE:**  Are you looking for a table or meeting some --

**PETE PARADIS**:  I'm meeting some folks.

**UNIDENTIFIED VOICE:**  Okay.  If you want to check in at the host stand, they're right up there on the right.  They can tell you if anyone else is here before you.

**PETE PARADIS**:  Thanks.

**UNIDENTIFIED VOICE:**  Are you waiting?

**PETE PARADIS**:  Yeah, I'm just checking in.

**UNIDENTIFIED VOICE:**  Okay.

**UNIDENTIFIED VOICE:**  How's it going?

**PETE PARADIS**:  Hi.  Good.  I'm supposed to meet three other folks here.  Maybe a Miss -- Charles Edwards maybe or Sonal Patel.

**UNIDENTIFIED VOICE:**  Michael? Pete?

**PETE PARADIS**:  Yeah.

**UNIDENTIFIED VOICE:**  These back steps all the way to the back.

**PETE PARADIS**:  Thank you.

(Unintelligible chatter)

**PETE PARADIS**:  How are you?  You look good.  How are you, dear?

**SONAL PATEL:**  How are you?

**PETE PARADIS**:  Good to see you.  Sorry I'm late.

**SONAL PATEL**:  That's okay.  I knew you had meeting until noon.

**PETE PARADIS**:  Well, I think my next job is gonna be taking the metro over and making it better.

**SONAL PATEL**:  You need to go one by one.

**PETE PARADIS**:  You look good.  I like the goatee.  It looks good.

1

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**CHARLES EDWARDS**:  How are you doing?

**PETE PARADIS**:  Good, good, good.

**SONAL PATEL**:  [INDISCERNIBLE]. Like relaxing, right?

**PETE PARADIS**:  I know.  That's -- I wish.  It was supposed to be, like, 90-degrees today they said.

**CHARLES EDWARDS**:  How are things with you?

**PETE PARADIS**:  Tiring to be quite honest with you.  I don't know.  I got my SES back September 30th of --

**[00:05:06]**

**SONAL PATEL**:  I told you [INDISCERNIBLE].  I just told him that [INDISCERNIBLE].

**PETE PARADIS**:  Yeah.  Yeah.  So that's nice but it's -- I guess what I'm tired -- I've got 29 and a half years now, and it's been tiring to continue to be fixing people's issues.  You know, whether it was in the first place I worked or the last place I worked, it seems that -- and it seems to be the same issues, you know.  And I'm not sure if that's just government in general.  Maybe it's time to retire, I don't know.  But I could have retired two and a half years ago but it's -- at least I'm in a spot now where I have some capacity to have my -- not that I didn't back there, don't get me wrong.  But at least with you, maybe in investigations it was different, but some capacity to affect positive change despite people's preconceived notions that you can't do that or we shouldn't do this.  I try to bring some credibility to the table and say: Here's potentially another avenue and let's talk.  I've done that or I've tried this and I failed at that or I succeeded at this, those things.  And yourself?  Doing well?

**CHARLES EDWARDS**:  Doing good.

**PETE PARADIS**:  Good, good, good.  You haven't changed other than you look more relaxed.

**CHARLES EDWARDS**:  Too relaxed.

**PETE PARADIS**:  You look 20 years younger.

**SONAL PATEL**:  I don't [INDISCERNIBLE]. I know. I thought that too.

**PETE PARADIS**:  Is that an earring?  You didn't have that before, did you?

**CHARLES EDWARDS**:  I had the earring but I never used to wear it.

**PETE PARADIS**:  Oh, okay, you had the hole?

**CHARLES EDWARDS**:  Yeah.

**PETE PARADIS**:  Maybe that's what I need to do.

**SONAL PATEL**:  I told him, he's been away from government too long.

2

**A0464**

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  Yea, maybe I should get an earring.  Maybe it'll help me.

**SONAL PATEL**:  Maybe you should wait for your retirement like him.

**CHARLES EDWARDS**:  It's not a rosy as you think.

**PETE PARADIS**:  Getting the earring?

**CHARLES EDWARDS**:  No, the relaxing.

**PETE PARADIS**:  Maybe for ten minutes, it might be an enjoyable thing.

**SONAL PATEL**:  Yeah, I'm sure.  You'd get bored easily.  Two months into it and all your projects are done and then you'll be like, okay, what next.

**PETE PARADIS**:  You know, you just -- sorry.  Go ahead.  Hi.  How are you?  You guys know what you --

**SONAL PATEL**:  I already know what I want.  I'm gonna have pizza.

**PETE PARADIS**:  I've never been here.

**SONAL PATEL**:  I was going to get a large.  We can share some.  I don't know what you want.  They have sandwiches, they have pizza.

**THE SERVER**:  Take a look at the menu and I'm gonna [INDISCERNIBLE] that pizza.

**PETE PARADIS**:  Yeah, yeah, go ahead.  You just said projects and it reminded me I forgot to bring -- I had some printouts of the lists of some of the projects from the old days, and I had it on my chair and I ran out.

**SONAL PATEL**:  [INDISCERNIBLE] from DHS?

**PETE PARADIS**:  Yeah, some of the things that we had talked about back then and stuff.  Anyway, I know them off the top of my head so.  I've never been here.  This is much bigger than I thought it was.

**CHARLES EDWARDS**:  [INDISCERNIBLE] too.

**SONAL PATEL**:  I have heard about this.  I had never been here, but I had heard about the pizza, really good and I had heard about things on the menu but I heard that their pizza is good. I know there's one in Capitol Hill, near Capitol Hill.

**CHARLES EDWARDS**:  So when did you move to Agriculture?

**PETE PARADIS**:  So I left DHS OIG in May of 2014 and I went over to the Pension Benefit Guarantee Corporation OIG which was very small.

**CHARLES EDWARDS**:  Aaron used to be there, right? Aaron Jordan [PH].

**PETE PARADIS**:  Yes, he was -- yeah, so I ended up -- he was the AIGI as of '15.  I ended up getting his slot but he had been away for about a year, I think it had been vacant, and they had

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

some people acting in the role so I went over there. And, again, there were only 27 people in the whole agency or the IG, so that was a little different than what I was used to.

**SONAL PATEL**: Yeah [INDISCERNIBLE].

**CHARLES EDWARDS**: We know -- we know the old IG [INDISCERNIBLE].

**PETE PARADIS**: Okay, yeah.

**SONAL PATEL**: He was at PBGC?

**PETE PARADIS**: Yeah. And so he left and the lady from Agriculture, Rebecca Batts (phonetic) became the IG.

**CHARLES EDWARDS**: She was there when I was there too.

**PETE PARADIS**: Yes. And then she retired and then Debra Stober-Springer [PH] who was the counsel was the acting IG. And then at the end when they had the position, they were selecting the position I guess, I guess it underwent several vacancies, I don't know what was going on, but Robert Westbrooks --

**CHARLES EDWARDS**: Oh.

**PETE PARADIS**: -- from Small Business Administration?

**CHARLES EDWARDS**: Yes.

**PETE PARADIS**: He was the deputy IG is now the IG over there. And that was a unique job. Very interesting mission. Almost like the insurance company of the government for default of pensions. But then I was there about 18 months and then I was selected for the slot now. And I'm at 14th and Independent so there's nothing to eat around there.

**SONAL PATEL**: That's what I was trying to look. I'm like you could go to the pond. [INDISCERNIBLE].

**PETE PARADIS**: Yeah, right. Yeah, it's the same thing. It would have been faster if I had walked here than taking the metro.

**CHARLES EDWARDS**: Is Phyllis still the IG there?

**PETE PARADIS**: Phyllis Fong (phonetic), yes. She is and David Gray is the deputy.

**CHARLES EDWARDS**: Very good.

**PETE PARADIS**: Yeah. She's been there a while I think. Yeah, so we have about 150 agents across the country. Yeah, it's, you know. They used to have over 300, years ago, and budget issues and things.

**SONAL PATEL**: [INDISCERNIBLE] about contract vacation, contract within one year of the contract they cut it down like so I know you [INDISCERNIBLE] not OIG.

4

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

[00:10:18]

**PETE PARADIS**:  At Agriculture, yeah.

**SONAL PATEL**:  They are [INDISCERNIBLE].

**PETE PARADIS**:  Yeah.  But it's, you know, it's -- so far it's been good.  Still in probation until October 1st so, you know, I don't want to yell at the wrong people or something but so I've been behaving myself, let's say that.

**SONAL PATEL**:  It will be tough when you have [INDISCERNIBLE].

**PETE PARADIS**:  Why do you say that?

**SONAL PATEL**:  Because you just tell people the way it is.  You dish it out the way it is.

**PETE PARADIS**:  All good things at the appropriate time.  Did you order, sir?  You're all set?

**SONAL PATEL**:  Yeah.

**PETE PARADIS**:  I'm gonna try this sweet and tangy calamari salad.  And do you have a Coke or a Pepsi?

**THE SERVER**:  Absolutely.  Do you have a preference?

**PETE PARADIS**:  I'll take a Coke, please.

**THE SERVER**:  So you have a calamari salad for you.

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  We're gonna share but --

**CHARLES EDWARDS**:  We're gonna share.

**THE SERVER**:  Great.  If there's anything else I can get you.

**CHARLES EDWARDS**:  You can just call me Charles.

**PETE PARADIS**:  Okay, thank you.  It's not something I'm, you know – like, I still bump into a couple of gentlemen I used to work for in the secret service that are long retired, and I'm still like "Hi, sir" and they're like, "Sir?"  But no disrespect intended.  Thank you, though.

**CHARLES EDWARDS**:  I'm glad that thanks for giving me the time [INDISCERNIBLE].  The whole investigative piece of idea started when I went to the IG from Postal Service.

**PETE PARADIS**:  Thank you.

**CHARLES EDWARDS**:  I have worked with the agents quite a bit and the problem at that time was, even today, is the investigators don't exactly know what they want and IT just creates something [INDISCERNIBLE].  That was a guess.  So I don't want -- I started out but I was solo over there.  The IG at the time told me she was having this new AIG Sam Maxi from NASA that

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

wanted to bring their system. Bringing a system from somewhere is never a good idea because a system is built on that particular environment. It's not easily transitioned. I set up to build it. So I set out to build that system over there in 17 agencies. But then I went to TSA, built one in TSA and then DHS. It's all same versions of it. But I had this idea that we need to be role based, we need to have security, and we also need to have a system that's modular. And we need to make a system simple. There's no agency, vendor that can do that. And I wanted to leave something not based on a software itself. I wanted to create something regardless of where you are, how big or small, should be able to have the system up and running. So, for instance, if you're able to -- if you need to work with templates. You give, I give you a template, you will go ahead and put your own stuff in it. That should fire up a script and create your [INDISCERNIBLE]. And let's say it needs to be -- you should be able to use your pin card to log into the system. But at the same time in your side from investigation, you should be able to manage all that, right? It should be modular. Say this piece of it you can work on now, the other piece of it we can work [INDISCERNIBLE]. You can do it. There was never a system that did a document search both for documents and the system, right. I also found over the years that most U.S. Attorneys that deliver a case, they had their own system. We cannot, we don't have our system to show them our case, right. So it should be compliant [PH] ready.

**[00:15:22]**

**PETE PARADIS**:  Integrated.

**CHARLES EDWARDS**:  Right. And also when the agents are out in the field, they should be able to work on a template. When they come to the office, it should sync.

**PETE PARADIS**:  Right.

**CHARLES EDWARDS**:  Then you should have, you know, where you're maintaining document support, you know, document management, records management, evidence management, you know, all of this needs to be easily configured, right? Because you're not building anything. Because you're building it, that involves a lot of work, a lot of costs, you see? Once you have the groundwork [INDISCERNIBLE], you just have the pieces to it.

**PETE PARADIS**:  Yeah.

**CHARLES EDWARDS**:  That's the idea I've been working on and I have it in all in concept ready and I'm starting now to do the pilot of it. But, I need to have somebody to work with, see. I can't just go build an organization without knowing that. That's one part I forgot. You know, there's not a system I know of right now that's 508 compliant. That's a big issue, you know. You should be able to look at structure and structure data. Data or classes should be able to do that. You have some apps out there that do a portion of it but not all of it. So, because -- it's not like you are inviting 5,000 people and 5,000 users. In your agency, you should be able to do things simple, you know. Fill out these fields and have them ready before you move onto the next, you know. Make each one of them, you know, implemental. That will happen here too. You know. And then you never did not have reports. You should be able to go to IT and say I need this report, I need this report. You have all this data out there and you, as an administrator, say I'm

6

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

going to pick and choose what I'm going to do.  The other problem that I often found is we have semiannual reports, right, six months/six months.  But we have cases that are open before that.

**PETE PARADIS**:  Yeah.

**CHARLES EDWARDS**:  And cases that are closed beyond that date.

**PETE PARADIS**:  Yeah.

**CHARLES EDWARDS**:  Right?  So you run the report before that start period to get some results and you're questioning that.  And you go back and run it within the same dates, the data has changed because people are closing out cases.  You need to be able to take data marks on that.  Here's a cue, I'm going to capture that, and I'm going to keep that stagnant.  You can go back any time and look at it.  The real data can change, but a snapshot for historical purposes need to be there.  So these are all the ideas that I've been having that I've been working on and you need to have open architecture.

**PETE PARADIS**:  I'm sorry?

**CHARLES EDWARDS**:  You need to have an open architecture.

**PETE PARADIS**:  Yes.

**CHARLES EDWARDS**:  For instance you need to have, whether it's a home or work flow or document management, they all need to be integrated.  And the thing is, when you have somebody, let's say roles based, I'm talking about and you're saying:  Oh, we don't want them to log in twice.  So they're been tying into your active directory, right?  Fine.  But then you have users that should be able to on one side that should be able to change the rules for them.  They're an agent, they're a supervisor, they're a deputy AIG, they're AIG.  All of those things.  And what you need to see may not be the same thing they need to see.  And also there's no picture like every 60 days or every 30 days, here is what you need to do for the SACs and ASACs.  There's nothing that will take care of that.  That needs to be there.  And most agents that keeping it, the agents want to protect their integrity, right?  They want to say this is the document that I wrote, not somebody else changed for them, right.  The document needs to be there.  I do find limited -- that's nothing that I wanted to -- but all of these things should be simple to be passed because people say they're building a system years together.

**PETE PARADIS**:  Right.

**CHARLES EDWARDS**:  I want to do something because I want to give a basic working system that is inexpensive that [INDISCERNIBLE].  If you see --

**PETE PARADIS**:  Thank you.

**THE SERVER**:  Can I offer any fresh pepper?

**PETE PARADIS**:  Yes, please.  Thanks.  Sorry.

**THE SERVER**:  Enjoy.

7

**A0469**

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  Thank you.

**CHARLES EDWARDS**:  And --

**PETE PARADIS**:  Sorry.  Sorry.

**SONAL PATEL**:  That's okay.

**[00:20:19]**

**PETE PARADIS**:  Thank you.

**SONAL PATEL**:  Actually, you know what?  We can give the extra back.

**CHARLES EDWARDS**:  I have written all of this in the proposal documents that you have, and I'm working on a pilot that I will have the pilot ready by October.  And my system from the time somebody says yeah to the time it's deployed will be six months.

**PETE PARADIS**:  The base foundation.

**CHARLES EDWARDS**:  No, the system that works for you.  The foundation I'm going to get done in three months.

**PETE PARADIS**:  Okay.

**CHARLES EDWARDS**:  The rest of it.  So there's many ways to do this.  You can do it software service.  You can deploy work service and I can maintain that for you.  Or somebody -- that's one option.  The other option would be if you say somebody has given something to you that I may need you to come and help integrate that. You know?

**SONAL PATEL**:  Let's say DHS OIG.

**PETE PARADIS**:  Right, right.

**CHARLES EDWARDS**:  One of the things, they're not 508 compliant.  They're not.  So some of the things that, you know, I would look at what they have but I can't -- I'm not going to just simply take that and make it sit on your desk.  I need to change a lot of the code to fit your environment so there's some rework there.  So because I understand the business side of it and I understand the technical side of it, I can help you do that.  My ultimate goal is to build my own.

**PETE PARADIS**:  Yes.

**CHARLES EDWARDS**:  That I think the IG communities not well served because there's not one system that, you know -- there's systems that can do pieces of it but then there are systems that are [INDISCERNIBLE] enterprise.  Millions of dollars.  We don't have that kind of money.

**PETE PARADIS**:  Yeah.

**CHARLES EDWARDS**:  Nobody has that.  And even now in DHS OIG, there's a lot of wasted money there.  Right?  The process, the approval, and the way the system is so complicated.  We

8

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

don't have to make it that complicated. You know, make it simple, easy to understand, but the most important is easy to use.

**PETE PARADIS**: Right. Because if the user community, as we know, doesn't accept it and have buy in then --

**SONAL PATEL**: I think that has been the constant thing with us and users, that they want it very simple, but they want to make sure they both acquired things. So the whole thing we were talking about, what he's saying, I think, as he's saying, the constant thing is management wants to make sure all of these things are captured. They want to -- they see everything together. If he's crazy, I don't have time for it. So he was saying yes. The whole key is how we package it up and present it to him. He gave me an example of desposation (phonetic) that right now desposation is like 120 all the things right there.

**CHARLES EDWARDS**: Too cumbersome.

**SONAL PATEL**: He's like it's a mental thing. Oh my God, I have to [INDISCERNIBLE]. Guidelines you could have some things on the side.

**PETE PARADIS**: Yes.

**SONAL PATEL**: Based on which one you want to add, you can just go there. So mentally they only look at what's left there, simple.

**PETE PARADIS**: Right.

**SONAL PATEL**: Even though we have all the data, it's how do you package it up.

**PETE PARADIS**: Now, is it -- so a lot of what I found was -- and I've got some questions that I've spent some time thinking about it. Again, you do recall I have no IT background so I appreciate you spending the time to break it down for me. And let me give you a little back story. So when I was going through the interview process over at Agriculture, I recognized the fact that they were not really hiring me or interviewing me for my investigative skills. It was more towards -- in fact, I even asked them during the interview: What, if you had to say -- if you don't mind answering one thing, what would that be? And they said it was the work with EDS.

**SONAL PATEL**: Oh, really?

**PETE PARADIS**: Yes. They said we -- we're in great need to develop something, et cetera, et cetera. So, I was selected, fast forward, now I really find out what had happened, and I told you a little of the back story, so, apparently they had at some point acquired a COTS product that the Air Force OSI was using.

**CHARLES EDWARDS**: Yup.

**PETE PARADIS**: And it was a pineapple, by way of example, and what they wanted was a watermelon. And –

**[00:25:20]**

9

**A0471**

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**SONAL PATEL**:  They tried to market it that way probably.

**PETE PARADIS**:  Right.  And it was sold to them that by not only the people, the Air Force I guess, not that they profited, but it was recommended, I should say, by the Air Force and then whichever vendor, I forget the name of the company, and then some of the folks internally that were literally burdened with trying to make this happen.  So those -- I feel bad for the agency people that really were set up to fail, in my opinion.  So they ended up spending over a year plus and over $1 million.

**SONAL PATEL**:  Wow.

**PETE PARADIS**:  Until there was a management change and the, my current manager pulled the plug on this thing and said we have nothing after all this time.  And a lot of it goes to what you were saying, sir, where we think we know what we want until we see it and then we realize that wasn't what we wanted and things of that sort.  And, it wasn't a performance-based contract.  It was, like, time and materials or whatever.  So they were basically running the clock up.  Oh, you want that color of the screen changed?  We can do that.  Now it's an extra thousand dollars or whatever.  So as I've kind of eluded to Sonal a little bit, I mean, I principally was brought in to try to help them identify and resolve or recommend some resolution in the case management quote/unquote process.  But having the exposure with EDS, I started to talk about an opportunity to serve in a greater sense the whole agency.  Not just the investigations with an intake module and investigative records but also the time management and perhaps office of counsel, blah blah blah.  So they have been -- I spent the last seven months establishing my credibility with these folks and with the IG.  They're very, very gun shy about spending any money and then what are they spending it on, et cetera.  So I've tried to be more relaxed in my approach instead of:  You got to have this.  This is the -- you know, and I am a proponent of it.  So I've tried to take measured steps to say and ease them into the -- number one, to accept me as a credible person that can deliver results.  Number two, if I put my name behind something, it's going to bear fruit for everybody.  Again, as long as it's a win/win for everybody and I'm not going to be embarrassed by the product, I'll support them.  And it works for the user.  That's the key thing, you know.

**CHARLES EDWARDS**:  For me, it's my credibility.

**PETE PARADIS**:  Right.

**CHARLES EDWARDS**:  So I need to get my name back.

**PETE PARADIS**:  Sure.  Right.  Okay.

**CHARLES EDWARDS**:  I took close to a million dollars from my retirement from my TSP and I rolled over into this company and that's why I have not paid myself a dime and I've been working on this.  To get to supplement my income, I've been teaching as a professor in forensics in law enforcement at a college in Maryland doing that just to get [INDISCERNIBLE].

**PETE PARADIS**:  Sure.

10

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**CHARLES EDWARDS**:  But I wanted -- I don't want -- I don't want to get into something that people think is not, you know, he's hungry.  I wanted, to me what you think of me is more important that I have to deliver, and I know there's not a system out there.  It's all complicated.  When I was told to -- if I didn't hire this AIG -- I mean, if they didn't hire this AIG, I would be fired [INDISCERNIBLE] agency took a look at that.  I didn't tell the IG but eventually the agency told the SAC.  And I told them you don't tell me anything that I think.  You just tell me I think I know what the process was but you know better than I did because you're living it --

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  -- day in and day out.  But tell me from an investigator's perspective, from a case agent, from an ASAC, SAC, from an analyst, from a DIG, from an AIG, from an executive perspective, then from from Grand Juries perspective, tell me how the system, what do you, you know, let's not worry about a system.  I'll figure that out.  Let's send in a piece of paper.  You just tell me how it's starts.  What's the process.

**[00:30:30]**

**PETE PARADIS**:  Like an end user model.

**CHARLES EDWARDS**:  Exactly.  You tell me and I'll rework it to fit that.  He started talking February 12th.  April 4th I had a pilot -- I have no contractor at that time.  I had no contract.  [INDISCERNIBLE] picked up a book.  I didn't even know that software.

**SONAL PATEL**:  Profusion?

**CHARLES EDWARDS**:  Profusion.  And then I hired an intern Melissa, two of them.  And after I finished building it, I went around the country along with the SAC, asked them to test the system and get their input.  I do know that too, that's exactly six months from the time we started they had a working module that includes [INDISCERNIBLE].  I went the other day to New Orleans.  I saw the [INDISCERNIBLE] IG.  I said hey, there's Carot [PH] That's my system.

**PETE PARADIS**:  Right, right, right.

**CHARLES EDWARDS**:  That came from two of the four.

**PETE PARADIS**:  Right.

**CHARLES EDWARDS**:  And just talking about this is -- you know, he knew his lane to tell me.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  And I knew it was my job to make sure -- I mean, we did it in such short time and we made it so simple. Of course there's some bugs.  That's why [INDISCERNIBLE].

**PETE PARADIS**:  For sure.

11

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**CHARLES EDWARDS**:  I called Melissa on the phone and I said go to this line and change the code on that one.

**PETE PARADIS**:  Right.

**CHARLES EDWARDS**:  But they had it working.  And they are going about this, they made it even better.  Then TSA had heard.  I had nobody else.  And TSA had their own system.   They would not even give us admin rights.

**SONAL PATEL**:  EXOS (phonetic) database.

**CHARLES EDWARDS**:  They had an action database and they had no IT rights over there, but I told her we will make it work.  I'll figure out a way.

**SONAL PATEL**:  They had that [INDISCERNIBLE] they were working with a contractor.  They rejected that.

**CHARLES EDWARDS**:  They spent a couple million dollars.

**SONAL PATEL**:  After a year, same thing.  They want to work, work.  When it wasn't testing, they were like it doesn't meet our requirements.  This work product doesn't work for us.  That's how they rejected it.  That's when [INDISCERNIBLE] that they are using now.

**PETE PARADIS**:  So where I stand now, and that's why it took me a little bit of time to get back to you relative to this, so establish my credibility relative to some other work I'm doing on some things and then befriended the CIO Craig who was Craig Gosha (phonetic) who is familiar with what was at NASA and Paris and all that stuff.  Come to find out, prior -- during the process when they were trying to -- before that Air Force project, he had been talking about this same type of concept.  And of course, you know, stove pipe thinking, the investigators didn't want to talk -- didn't want to hear what he had to say, et cetera.  So it fell on deaf ears.  So now that I come in and not being IT related but familiar with the talk, he's like:  You're the first person that's really ever listened to me.  So I said:  Look, here's what's out there now because my mandate is on -- is to get something as cheap as possible that's OIG centric, you know, familiar to get us on the way.  And I said:  In my mind, that's not the final solution.  But if it makes everybody happy on the front end, we got -- I gotta do something.  So then reached out, Sonal.  And then the biggest convincing part was the SACs and our legal counsel.  Because nothing happens where I'm at without the legal counsel.  So all the SACs were real reluctant.  When you even did the demo, you said:  Okay, are there any questions?  All along the way, maybe three people.  Legal counsel and two people from investigations asked questions.  So after the fact, though, come to find out, they were exposed to the concept and we didn't -- you didn't overdo it and I haven't overdone it with the talk about it, but they were exposed to the modular concept which was totally different than that Air Force thing.  So now I won them over in the mentality of thinking, okay, we're open to accepting this.  So what I'm trying to do is slowly creep in with this, knowing full well as we've discussed over the years, oh, there's a bug there, there's this, it has a band aid over a band aid over a band aid, and then the regression testing has to be done and if you put something here then it effects that.

12

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

[00:35:30]

**CHARLES EDWARDS**:  That's why my suggestion would be not to take -- not to take from another agency because you spend more time fixing the issue that that you are familiar with and just stop.  And you have 150 agents, right?

**PETE PARADIS**:  Yes.

**CHARLES EDWARDS**:  And you have what your structure is, you know, who is pilot, you know, that is what I was talking to you about how the system is gonna work.  And we have a pilot for you.  Because I need to build this anyway.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  If you like it, then you can have it.  If you don't like it, there's nothing for you to lose.

**PETE PARADIS**:  Well, so by way of not cutting my own throat with it because I don't want them to think oh look you brought us down this road.

**SONAL PATEL**:  You sold us on EDS.

**PETE PARADIS**:  And now you're -- right.  So now I'm trying to find -- and if you don't mind, one of the things I'd like to get out of this discussion is, again, I haven't been overboard with the sale of EDS but I've done some convincing of the concept versus that other thing that they were gun shy of.  I need to get some guidance or some technical insight on what's the best way to start to migrate the conversation with the upper management?  Because if I -- I'm supposed to have something on paper by September -- by, you know --

**SONAL PATEL**:  One thing that -- Jessica, right?

**PETE PARADIS**:  Yes, right.

**SONAL PATEL**:  She must have told you that IMB wants to trash EDS.

**PETE PARADIS**:  That was in -- yeah, and there was a meeting --

**SONAL PATEL**:  Nothing new, right?

**PETE PARADIS**:  Right.

**SONAL PATEL**:  And at that SAC conference, that's what she said.  The problem is they always say this is cracked, this is cracked.  But when you ask him:  Okay, then tell us what you want and then we'll give it to you.  So you could use that to your advantage.

**PETE PARADIS**:  Okay.

**SONAL PATEL**:  That they're all screaming over there.

**PETE PARADIS**:  Right.

13

**A0475**

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**SONAL PATEL**:  Even though you think the concept is great.  So you could say okay these are their pinpoints.  I found somebody else who delivers overriding these pain points and whichever way.  But cost is the main thing.

**CHARLES EDWARDS**:  Yeah, that's right. If you think -- if you think you wanted -- if you wanted -- wanted something really [INDISCERNIBLE] to have it working, and you're getting the system stuff, but you also need somebody who is familiar with the business side to have the transition to explain what you want. You know. An IT person who does not understand the layout of what your suggestion, of your organization.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  And an agent or somebody in the business side may not need somebody that has both a mix of that.

**PETE PARADIS**:  Sure.  So once the SACs were convinced of the concept and then legal counsel surprisingly was convinced of the -- I think even faster and I believe Antiginy (phonetic) may have called.

**SONAL PATEL**:  Who

**PETE PARADIS**:  Antiginy.  She as one of the legal -- I sent an email.

**SONAL PATEL**:  They haven't reached out to me.

**PETE PARADIS**:  Okay.  Well, she had asked me: Hey, do you mind if I reach out to Sonal?  We have some additional questions and some ideas.  I said:  Yeah, I don't think she would mind.  So I gave her your info.  This was probably a month ago or so.

**SONAL PATEL**:  Oh, okay.

**PETE PARADIS**:  But again so -- and I didn't -- and I appreciate the level of detail here because I didn't want to make it too business, you know, as a conversation but --

**SONAL PATEL**:  That's why I suggest lunch because you have questions, and I'm like you know why don't we sit together.

**PETE PARADIS**:  We can share, I didn't bring. So these are some of the things that I'm anticipating having for seven months now dealt with the skittishness of the front office and having dealt with listening to Craig and talking to Craig the CIO some of the things that he has told me that they weren't on board with or how to build your business case.  Not about this particular thing but about anything that I wanted to start.  So these were some of the things that we went over and, again, my big concern is that I got them down on the concept, if I can use that word, of EDS, the modular and I keep using that wiring harness example, plug and play, and all that.  You know, is this a total deviation or is it similar in concept?

**[00:40:40]**

14

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**CHARLES EDWARDS**:  Similar in concept but the problem is -- one thing you'll not have is you take EDS right now, right, EDS is tied to OIG  active [INDISCERNIBLE].

**PETE PARADIS**:  Yeah.

**SONAL PATEL**:  No, it's not.  We have to do user management, as you know.

**PETE PARADIS**:  Yes.

**SONAL PATEL**:  But you something we have created when somebody goes you have no.

**CHARLES EDWARDS**:  So you don't remove that person out, the person still exists.

**SONAL PATEL**:  In EDS, yes.

**CHARLES EDWARDS**:  Okay.  And the layout on the field officers, the structure of INB, that's our deviation filter.  You have to change all of that when you go to your agency.  That's one.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  The other thing is the way the -- the way they classify the cases, is it the same that's being classified to you?

**PETE PARADIS**:  Yeah.

**CHARLES EDWARDS**:  Okay.  And then the outcome isn't the same.  The reference data, the list is not the same.  If it's not the same, that has to be changed.

**PETE PARADIS**:  So like all the back table stuff.

**SONAL PATEL**:  Wait a minute.  What are you asking?  How this thing is different than EDS or how is implementing EDS versus implementing [INDISCERNIBLE]?

**PETE PARADIS**:  Thank you.  So I guess what I'm asking is I have to -- what I feel I need to do is build a business case subtly and then actually put, like, a white -- I do a lot by white paper and they found that to be okay.  I throw a lot of data because I can't -- how do you argue the data?  So if I put a white paper together as a sales pitch, so to speak, and ease him into it, am I saying -- is my white paper ultimately gonna say this was a modular -- again, I don't know the proper word, modular system EDS that is blah blah blah blah with all these different modules for all the user communities, but now this thing is totally -- it's not modular, it's not this, it's not that?

**SONAL PATEL**:  No, I think we have modules that you can see.

**PETE PARADIS**:  Yes.

**SONAL PATEL**:  But behind the scenes EDS is one big job.

**CHARLES EDWARDS**:  It's not modular.

**PETE PARADIS**:  Okay.  It appears to be.

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**SONAL PATEL**:  From the front it appears modular.  His modular approach is different.  What he's saying is plug and play literally.

**PETE PARADIS**:  Ah.

**SONAL PATEL**:  So right now he gives you two but you decided to have, let's say, I don't know if you guys have any property management system.

**PETE PARADIS**:  Well, it's terrible but yes.

**SONAL PATEL**:  So if you want to keep it for now, he can have it plugged into the existing so data is transferred over that you might not want to give.  That's what modular means.  He has -- he's gonna have his own evidence of property management piece, but the modular piece can be easily separated and yours can be plugged in.

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  That's with plug and play.

**PETE PARADIS**:  Okay.

**SONAL PATEL**:  Plus, I think this thing because what I've seen [INDISCERNIBLE] is the [INDISCERNIBLE].

**CHARLES EDWARDS**:  See, the -- I don't want to take too much credit, but this is an example when you're trying to pitch these two.

**PETE PARADIS**:  Yeah.

**CHARLES EDWARDS**:  The guy who created, whose idea it was, is my employee.

**PETE PARADIS**:  Yes, that's a good point.

**CHARLES EDWARDS**:  Right?  So I can help you if the option is to just take EDS and fix it there in your system, I can help you there because it came from my head.

**PETE PARADIS**:  Yes.

**CHARLES EDWARDS**:  But if you're taking a simpler approach, the same guy whose idea it was is not wanting to rebuild EDS because I've seen the flaws and wants to make it simple and module the way you can have.  Let's say you have Uber search.

**PETE PARADIS**:  Okay.

**CHARLES EDWARDS**:  You can plug in Uber search with API.  I can do that.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  Or let's say you have the law enforcement training piece, you already have an existing system that can plug that in.

**PETE PARADIS**:  Okay.

16

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**CHARLES EDWARDS**:  Or you have an existing let's say usury system already, let's say it's a [INDISCERNIBLE] system. If you want to add that later on, you can plug it in.  EDS right now, you built it, it's big whole thing.

**PETE PARADIS**:  Okay.

**CHARLES EDWARDS**:  But it appears like module.

**PETE PARADIS**:  That's what, and I never realized that.

**SONAL PATEL**:  Except ePas [INDISCERNIBLE].

**PETE PARADIS**:  I didn't realize that.

**SONAL PATEL**:  ePas because it's separate that's why [INDISCERNIBLE] separating IBM.

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  So except ePas, it's all one big code.  That's why whenever we make some change --

**PETE PARADIS**:  The regression test, yeah okay.  Now that makes a lot more sense.

**SONAL PATEL**:  But another difference that I saw with yours, like, besides [INDISCERNIBLE] and stuff, you may say something about it.  I think it's gonna be [INDISCERNIBLE] because then from your perspective you don't have to worry about PIV at all, it's already done detective directly.  Plus when people leave or come, nobody has to worry that there's quite a bit of overhead.

**[00:45:41]**

**PETE PARADIS**:  When they shut down the user in the system --

**SONAL PATEL**:  Over there --

**PETE PARADIS**:  -- which is the department's security operation people that do that, they're the ones that are issuing the card.

**SONAL PATEL**:  Mm-hm.

**PETE PARADIS**:  So it's not even our agency that does that.

**SONAL PATEL**:  No, but whoever is maintaining active directory --

**PETE PARADIS**:  Oh, yeah.

**SONAL PATEL**:  -- basically get email accounts and [INDISCERNIBLE]

**PETE PARADIS**:  Yes, okay, so that's the CIO --

**SONAL PATEL**:  And they make changes.

**PETE PARADIS**:  Okay.

17

**A0479**

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**SONAL PATEL**:  So what he's saying is this system will have an import [INDISCERNIBLE]

**PETE PARADIS**:  Yeah.

**SONAL PATEL**:  Back and forth.

**PETE PARADIS**:  Where as --

**SONAL PATEL**:  [INDISCERNIBLE].

**PETE PARADIS**:  Whereas EDS doesn't.

**SONAL PATEL**:  EDS does not.  We had a proposal.  These are the things that --

**CHARLES EDWARDS**:  Some history so that you know where I'm coming from.  So, I came from TSA to OIG, right.  So when I came here, I was in management.  And my next door -- my next office, my neighbor was Tom Frost who was just hired.

**PETE PARADIS**:  Over here.  At DHS, right.

**CHARLES EDWARDS**:  He was hired as the AIG.  So, his -- you know Two Finger?  Two Finger in secret service?  Tony Palestina (phonetic).

**PETE PARADIS**:  Yes, he was at TSA.

**CHARLES EDWARDS**:  Yeah.

**PETE PARADIS**:  I never called him that because he was a boss.

**CHARLES EDWARDS**:  Yeah.

**SONAL PATEL**:  Tony was your boss?

**PETE PARADIS**:  He was a boss.  I would never -- yeah.

**CHARLES EDWARDS**:  So --

**SONAL PATEL**:  He's a nice guy.

**PETE PARADIS**:  Yeah.

**CHARLES EDWARDS**:  So he and me are good friends at TSA.  We worked out at the gym together.  So he told us he'd rather talk to this guy who's got a system for us at TSA and he's over there now.  So Tom came to me and I said I'm done building law enforcement systems.  I don't want to do that anymore.  So he went to the IG and the deputy IG and told them:  I need Charles to build a new system for us.  So when they called me, I told them two conditions.  One, I need to control the people that are going to work on it.  I need to tell them what they need to do.  That's one -- condition one.  Second condition is I'm not taking anything from the old system.  I'm going to do it like the way I think it needs to do that and I'm going to direct it.  There's a PIO and all that, but I don't want anything going to anybody.  And me, talking investigative.  And then I said I'm gonna bring somebody to help me with this that I brought in from TSA.

18

**A0480**

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**SONAL PATEL**:  Anyone.

**CHARLES EDWARDS**:  Anyone.  Yeah.  So that's how it started.  But I knew at that time that we needed to have something that had, I wanted to do a modular piece at that time but Tom didn't want it like that.

**PETE PARADIS**:  Yeah.

**CHARLES EDWARDS**:  So I want to explain to Tom but Tom is stuck in his way.  Because Tom was keeping two separate books.

**PETE PARADIS**:  Yes.

**CHARLES EDWARDS**:  So I needed to -- you know, it was not my place to change that for him, but at the same time I needed to show him how the system works.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  So I couldn't do the modular piece, but if I had do it again, this is how I would do it.

**PETE PARADIS**:  Okay, so lessons learned.

**CHARLES EDWARDS**:  Lesson learned.

**PETE PARADIS**:  So the other one, was that IDMS?

**SONAL PATEL**:  We don't have 508 compliance as well.  I know we have to do it because we [INDISCERNIBLE].

**PETE PARADIS**:  Right.

**SONAL PATEL**:  A guy from [INDISCERNIBLE] has complained about it.

**CHARLES EDWARDS**:  And if your CIO wants to have multiple ATOs --

**PETE PARADIS**:  Right.

**CHARLES EDWARDS**:  -- he can do that.  Or if he wants to just have one ATO, he can do that either.

**PETE PARADIS**:  Right.

**SONAL PATEL**:  I think we have one but the substance makes it better.  Like they have one baked enterprise ATO and some systems where like INV can be a case management is somebody, part time is somebody so they can make their decisions.  I think multiple [INDISCERNIBLE].

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  We want to go there, it's too bumpy now.

19

**A0481**

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**CHARLES EDWARDS**:  The next gen, the EDS, you know, I call it a 22nd century EDS.

**PETE PARADIS**:  Okay.

**CHARLES EDWARDS**:  Because when I built the first one, that was Y2K.  Then I built the 20th century at TSA.  What EDS and OIG is the 21st century.  Then I'm thinking now it needs to be -- when I say 22nd century, I'm talking share point, right?

**PETE PARADIS**:  Yes.

**CHARLES EDWARDS**:  It needs to be -- it shouldn't be stuck on that pool, right.  It should be easily able to configure.  Not customize, configure.

**PETE PARADIS**:  I'm just taking notes so I can –

**[00:50:25]**

**CHARLES EDWARDS**:  Like, take stuff out of the box, right.  Like, most of the agencies use Microsoft Office, right?

**PETE PARADIS**:  Yes.

**CHARLES EDWARDS**:  They have Office, they have indoor server, they have SequenceServer.  It's all out of the box, right.  So you don't have to get additional license.  And just build from that and then you have this framework.  You just configure it in your needs.  You're not customizing, right.  So when you apply patches and say I'm the vendor, applying a patch, like SAP applying it to your agency or another agency, it should be seamless.  Shouldn't say, oh, it failed because you took something --

**PETE PARADIS**:  Yeah.

**CHARLES EDWARDS**:  -- that was failed and you tweaked it and changed it to fit your needs.  We've been saying configure that fit your needs.  Big difference

**PETE PARADIS**:  Yeah, so --

**SONAL PATEL**:  It would be cost saving.

**CHARLES EDWARDS**:  Oh, yes, absolutely.

**SONAL PATEL**:  If you've been configuring it yourself, right now like PIMS and stuff, they can retrain and you need to pay them.

**CHARLES EDWARDS**:  Yeah.

**SONAL PATEL**:  Like, with a vendor because they have their own and we want to change it for us, customize it to us, we have to pay them.

**PETE PARADIS**:  So that's a property inventory, PIMS?

**SONAL PATEL**:  Huh?

20

**A0482**

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  Is that property inventory?  Oh, you guys didn't build that?

**CHARLES EDWARDS**:  No.

**PETE PARADIS**:  Oh.  I thought you --

**CHARLES EDWARDS**:  That was --

**SONAL PATEL**:  He was connected by Michael.

**CHARLES EDWARDS**:  Mike from the security guy.

(Simultaneous speaking)

**SONAL PATEL**:  Actually, it was -- he used it for evidence management.

**PETE PARADIS**:  Okay.

**SONAL PATEL**:  So my thing from there and the same vendor is like oh I can give you evidence management [INDISCERNIBLE] but I think migration but once you, we gave it to facilities, and facilities management was [INDISCERNIBLE].

**PETE PARADIS**:  Right, right, right, right.

**CHARLES EDWARDS**:  Like, for instance, you know, what little I know about investigation and audit, like if there's a [INDISCERNIBLE], there's a complaint that comes in, right?

**PETE PARADIS**:  Mm.

**CHARLES EDWARDS**:  Whether it – let's say there's some allegation, right?  You have an allegation and you're sending a routing.  You can route it to a desktop visit or you can route it to based on the zip code to which SAC it needs to go and you give it X number of days or the hours.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  Look at it and close it.  You can close it or you can open a case.

**PETE PARADIS**:  Yes.

**CHARLES EDWARDS**:  If you open a case, then, you know, you have certain things that you need to fill out.  But then you need to have lights on it, milestones, right.  So, you know, is this done?  There's no checklist that's being generated like these are the things that require.  These are the things -- the last thing agents like is --

**PETE PARADIS**:  Admin work.

**CHARLES EDWARDS**:  Admin work, yeah.  Type it once and keep typing.

**PETE PARADIS**:  Right.

21

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**CHARLES EDWARDS**:  And how many offices even in the bureau, how many places you see the agents actually importing -- no, you have somebody else helping them, right?  But if it's soley the agent has to do stuff, then that much time he's not working on a case.

**PETE PARADIS**:  Right.

**CHARLES EDWARDS**:  And, you know, the thing is they should never make anything that's frustrating for them.  Some of them are old school.  They're not used to computers.  They should be able to have [INDISCERNIBLE].

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  Not too many systems have that.

**PETE PARADIS**:  We have -- unlike DHS, I think it's still the same way, in investigations, the administrative support staff, for the most part, I think, is part of investigations.  Where we are -- where I am, it used to be that way and then the office of management put them into their chain.  So they're the ones that do the procurement request and things like that.  So now what they've done is they have over time developed investigative technicians.  They call them IRS maybe, investigative research specialist maybe.

**SONAL PATEL**:  Are you saying they're trying to have that in DHS as well?

**PETE PARADIS**:  Yeah.

**CHARLES EDWARDS**:  1801s.

**PETE PARADIS**:  Right.

**SONAL PATEL**:  1801s, yes.

**PETE PARADIS**:  So they do that and they're the ones that are assisting the 1811s with the input and this and that.  But, you know, I don't know if that's -- to me, if you're in a -- not every office has that, so what do you do if we're in the Syracuse office, the two of us, and now there's nobody there administratively to input.  It should be -- we should be able to survive on our own.  So, as you go through, you're answering a lot of the -- so what you were getting at, if I may -- so you're saying that these, the milestones.  So is what you're saying there would be a notification or alert or some kind of --

**CHARLES EDWARDS**:  Yes.

**PETE PARADIS**:  So what does that?  Outlook email?

**CHARLIE EDWARDS**:  You can integrate Outlook email.

**PETE PARADIS**:  Is it a system that pops up a window?

**[00:55:39]**

**CHARLES EDWARDS**:  You can, you can, you can integrate Outlook messaging, right, alerts.

22

**A0484**

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  Okay.

**CHARLES EDWARDS**:  So you can have --

**SONAL PATEL**:  You can integrate that system itself too, right?

**CHARLES EDWARDS**:  Yeah.

**SONAL PATEL**:  And then they come in, then they log in, first thing is [INDISCERNIBLE].

**PETE PARADIS**:  Oh, so like Task.

**SONAL PATEL**:  These are the things, so they can take a look at it from [INDISCERNIBLE] if they log in.

**CHARLES EDWARDS**:  And it can also be like if you have -- if you have the SACs generate a weekly report.

**PETE PARADIS**:  Yeah, we do that.

**CHARLES EDWARDS**:  They have that.

**PETE PARADIS**:  It's done by a Word document sent by email.

**CHARLES EDWARDS**:  Yeah.  But if you're having that and you're pulling stuff from the system itself, then have the system generate that for you.

**PETE PARADIS**:  Right.

**CHARLES EDWARDS**:  And ready to go.  You just tweak what you need to --

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  -- tweak.  And let's saying you're doing a press release or you're doing an information report to higher ups, so when you're doing that, 1et's say there's going to be an arrest, you're looking for a press release, you're working with counsel.

**PETE PARADIS**:  Mm-hm.

**CHARLES EDWARDS**:  The system needs to generate that for you so you're not sitting there and typing it.

**PETE PARADIS**:  Right.

**CHARLES EDWARDS**:  Once you create that, it should be automatically, you know, filled in from the rest of it.  Like, if the same information coming different reports, have them already.

**PETE PARADIS**:  Sure.  So that goes to the question about reports and --

**SONAL PATEL**:  Templates?

**PETE PARADIS**:  Well, the old system had the Crystal reports and you would go into Microsoft.

23

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**SONAL PATEL**:  Sequel importing services.

**PETE PARADIS**:  Okay.  That's the -- that would be similar, the same --

**SONAL PATEL**:  Yeah because [INDISCERNIBLE] reports.

**CHARLES EDWARDS:**  You don't need that.

**SONAL PATEL**:  It's outdated.  Nobody uses that anymore.

**PETE PARADIS**:  Did I have it right? Microsoft,  I put Microsoft reporting services.

**SONAL PATEL**:  Yeah, that same thing.

**CHARLES EDWARDS**:  Same thing.

**PETE PARADIS**:  All right.

**SONAL PATEL**:  I'll be right back.

**PETE PARADIS**:  Yeah, sorry.  And I don't mean to be rude eating in front of you.

**CHARLES EDWARDS**:  No, no, no.

**PETE PARADIS**:  As Sonal knows, I rarely ever get out, let alone eat lunch.  It's usually a candy bar.  So here -- this is what I made as a note for myself and this is kind of an approach for to the front office.  So I had the front office and other discipline managers like the various modular features contained in the current EDS version.  How can I reassure them the same or similar functionality would be reflected, I guess the view, or actually operational?

**CHARLES EDWARDS**:  Operational.  When I show you the pilot.

**PETE PARADIS**:  Yeah.

**CHARLES EDWARDS**:  You give me some, like, your org structure or something.

**PETE PARADIS**:  Sure, sure.

**CHARLES EDWARDS**:  And I come back in October some time and we meet, I will demo it for you and show you that the system, not EDS, but the next gen.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  On the modular piece and have it show you not a proof of concept, I will show you a working order.

**PETE PARADIS**:  So what is your -- what do you think about -- so the screen comes up and you see the module.  What is your personal --

**CHARLES EDWARDS**:  It'll look the same.

24

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  Right.  Do you like that though?  Do you think that's -- do users like that, have you found, or do you think -- because I like that in a way but then the dashboard that was built, I really -- I had a managerial purpose, not a field guy purpose.

**CHARLES EDWARDS**:  So you need to have based on -- that's when I say role players.  You need to have the look based on -- you will tell me, you know, if it's the same system but you have it as an investigative system as well as management investigative system so when executives are looking at it, they need to look at the dashboard.

**PETE PARADIS**:  Yeah, high level.  Can I get another Coke when you get a minute?  Thank you, sir.

**[00:59:45]**

**CHARLES EDWARDS**:  [INDISCERNIBLE] you know, because when an agent logs in, you tell them what cases belongs to him that's open, what's closed, what's the new ones coming in, you know, the allegations.  All of that would be a good cooperation, what is progress.  Whatever that you think is best for the agents, you configured that way.  Because the data is there.  But from the management perspective, you're not interested in that.

**PETE PARADIS**:  Right.

**CHARLES EDWARDS**:  You want to know by -- or let's say you do the mouse and you have a map of the US.  You have an office in Atlanta.  You can move Atlanta, you can give it a pictorial view or a graphical view.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  Whichever one you choose.  Let's say we do the pictorial view or a map, you click on that and it will show you, well this office has this many agents, this many open cases, you know, this was the last thing that happened.  Whatever you're looking for the statistics.  What of interest to management, that's what should be display, right.  Or you might say when I come in Monday morning at 6:00 a.m., these are the five things that needs to be already run and ready for me.  If it's sitting in the queue.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  But that's for an executive.  As fact he may have a different -- when was the last time he did the – the ASAC did the 30-day review?

**PETE PARADIS**:  Yeah.

**CHARLES EDWARDS**:  You know.  What are the things, alerts he's looking for, he'll see it. So based on each goal, you know.

**PETE PARADIS**:  Because right now, to speak to the example of the map, if you go on our intranet site, there's a map and it has our office dot and you click on one, the only thing it does is it will bring up a -- it will bring you to the PVF [PH] section.  It will bring you to the section of

25

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

the PDF agency directory and show you the phone numbers and who's there.  That's all it does.  There's no interaction with any data or anything like that.

**CHARLES EDWARDS**:  Yeah.

**PETE PARADIS**:  If somebody which is management because it's not, even though they're INV people, the management team didn't update the phone number or that person retired and it's a new person.  You know, we gave them the info but they didn't update it and load it up, what you're looking at as a user is outdated information.  There's no ability to even to make a change.

**SONAL PATEL**:  So you are planning to make your own INV?   Because if they update that directory [INDISCERNIBLE].

**CHARLES EDWARDS**:  So, like, remember in [INDISCERNIBLE] part of the [INDISCERNIBLE] software that --

**SONAL PATEL**:  [INDISCERNIBLE].

**CHARLES EDWARDS**:  Yeah.  So you have the map and the cases where they're located, you know, the open cases, all of that can be done.  But for instance, we have another app, I don't know if we have it here, let's say you have an agent, an ASAC who's on leave for five days.  You don't want stuff to be sitting there.  You can go and say for these cases, I want this person to be approving it.  But for these timesheets, I want somebody else to be doing it.

**SONAL PATEL**:  Delegation?

**CHARLES EDWARDS**:  Delegation.

**SONAL PATEL**:  We have [INDISCERNIBLE] manager right now.

**CHARLES EDWARDS**:  You do?

**SONAL PATEL**:  But we have all [INDISCERNIBLE].

**CHARLES EDWARDS**:  And it will send an email out.

**PETE PARADIS**:  Right.

**CHARLES EDWARDS**:  So --

**SONAL PATEL**:  Even [INDISCERNIBLE] manager they are not doing.  This is more work for them.

**PETE PARADIS**:  Well, again, that's the thing.  My -- what I try to tell the people I work for is we can do the best we can to provide the best product.  Enforcing the use of it is a whole other story.  And it's done by performance management metrics or a cigie peer review.

**SONAL PATEL**:  There's this milestone thing.

**PETE PARADIS**:  Yeah.

26

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**SONAL PATEL**:  Because that's something we don't have right now.  And I think they tried to do it [INDISCERNIBLE].  I know [INDISCERNIBLE] was there and then again started up like having some -- I forgot the term that they used but once a complaint assigned, they wanted some research time but if they can do the case on that or send it back.

**PETE PARADIS**:  Right, right.

**SONAL PATEL**:  Currently, what's happening is as soon as they send the cases to the agents and the investigation is assigned to the person, even if they receive it, they don't think it is and --

**PETE PARADIS**:  And the clock is ticking.

**SONAL PATEL**:  And you created a number.  You still have to have something basically.

**PETE PARADIS**:  Right.

**SONAL PATEL**:  So what you said makes sense.

**CHARLES EDWARDS**:  Where's the bathroom?

**SONAL PATEL**:  So you go down.  You go down and then left.

**PETE PARADIS**:  You're right.  Because it's following the agent manual or the policy that says upon initiation of an investigation, you have X days and you have to do these.  Or to close it, the record number, you have to submit a memo or a report.

**[01:05:03]**

**SONAL PATEL**:  These are the basic things before you do that.

**PETE PARADIS**:  Right.  Even though it may not, right.

**SONAL PATEL**:  You still have to do their things.

**PETE PARADIS**:  Right.  And then they're saying what?

**SONAL PATEL**:  So what he said is yeah that it's true because [INDISCERNIBLE] where he [INDISCERNIBLE] between complaints at some point a case.

**PETE PARADIS**:  One of the big things and, again, wasn't kidding when I said the office of counsel.  I mean, they're --

**SONAL PATEL**:  E-subpoena?

**PETE PARADIS**:  They really, I would say they -- they're running with the IG, the whole agency, and that e-subpoenas thing was outstanding.  I mean, they were -- I think that's the only reason why they brought on board.

**SONAL PATEL**:  Oh, really?

**PETE PARADIS**:  Oh yeah because other than that, they were very skeptical.

27

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**SONAL PATEL**:  I can tell him the concept. But I know he must have had, because in Postal also have it. In Postal they had it. I think you can tell him the concept that you had. And if he is building [INDISCERNIBLE] sometimes.

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  Sometimes if one is special to it [INDISCERNIBLE] ensures that you can [INDISCERNIBLE] --

**PETE PARADIS**:  Right.

**SONAL PATEL**:  -- to make sure [INDISCERNIBLE].

**PETE PARADIS**:  Right.  Because what my boss and I were originally talking about, there she's like:  Hey, don't get too big you'll scare people away, even first, before I called you.  And I said:  I don't want to get -- I'm not trying to scare people away or get too big, but I want them to know that this isn't selfish to us.  It has an ability or this concept, pardon me, has an ability to benefit others.  She said:  Well, we really are only looking for the complaint intake stuff to shake hands with the investigation stuff.

**SONAL PATEL**:  You still need subpoena would be part of your case management.

**PETE PARADIS**:  Right.  And that's what I said.  I said:  Look, who do you have to get as an ally from these other AIGs?  I would think you need the head counsel to help support this.  And like you just said, if we can, without too much effort, do we need property management right now?  No, we got something.  But if you can get that to convince them to say hey we support that, why wouldn't you do that, you know.  He looks good though, doesn't he?  He looks very relaxed.  Good for him.

**SONAL PATEL**:  That's the first thing that came to my mind right now.

**PETE PARADIS**:  I was just complimenting you again on how relaxed you look which is -- I'm jealous.  I wish I was that relaxed.

**SONAL PATEL**:  I have a long time to go.

**PETE PARADIS**:  So this -- go ahead.

**SONAL PATEL**:  The e-subpoena, I know you have a system, e-subpoena, the newly created, I don't think he had a chance to see it, but their counsel is interested and that's one of the reasons why they're doing it.  And I was telling him you had one at Postal.

**CHARLES EDWARDS**:  Yes.

**SONAL PATEL**:  But I'm a perspective I can tell you the concept of ours and then you can input whatever they give you.

**CHARLES EDWARDS**:  Easily to do that.

**PETE PARADIS:**  Yeah, that was --

28

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**SONAL PATEL**:  Tell me the concept you're [INDISCERNIBLE].

**PETE PARADIS**:  That was the big -- again, they say no to everything except when they saw that, I was expecting some resistance and they were like -- that's when they said hey we'd like to reach out to Sonal directly and I was like okay.  And they're like we really, really -- can you tell us more about it?  And I said I can't.  I'm not IT technical, and I wasn't there at the time so you'd have to see her.  But they, if we can get them as an ally to investigation --

**CHARLES EDWARDS**:  Maybe I can do the pilot live, that would show them.

**SONAL PATEL**:  Yeah, I think that would be good.  The one piece I can tell you the concept, what it is.  Actually Murali built it, so he can give you the concept.

**PETE PARADIS**:  Murley (phonetic) one or two?

**SONAL PATEL**:  The pink one is gone.

**PETE PARADIS**:  Murley one was the thinner one?  I could never --

**SONAL PATEL**:  [INDISCERNIBLE].

**PETE PARADIS**:  Oh, that's why – anyway, that was a big -- so I had a note for that.  And I know your numbers are have changed, Sonal, over the time but relative -- the big concern with that other OSI product, I forgot the name -- they called it Leads.  I don't know if that's what we call -- L-E-A-D-S.  I don't know if that's what we called it or the Air Force called it that, but it was just -- it was a money pit.  And they -- we didn't have any FTEs associated with it other than the INV people trying to work with the Air Force people.

**[01:10:23]**

**SONAL PATEL**:  I think what you're saying, you might have one IT person.

**PETE PARADIS**:  Yeah.

**SONAL PATEL**:  But you need them as more IT people?

**PETE PARADIS**:  Yeah.

**SONAL PATEL**:  Because you're already gonna build --

**PETE PARADIS**:  Sure.  Right.

**SONAL PATEL:** -- a piece in it.  Once you're gone, we can show it to IT people to manage and maintain.

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  So the major thing is going to be on -- [INDISCERNIBLE] the rest of the system is gonna be faced with.  INV who manages, like you are single handed and you didn't have as much weight.  I'm sorry to say that.

29

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  No, you're right.

**SONAL PATEL**:  You wanted to do things, you wanted [INDISCERNIBLE], nobody supported you.  You met the requirements, you [INDISCERNIBLE] monitored.  If you have a group of one or two people who are doing that and I don't know [INDISCERNIBLE] starting to go back [INDISCERNIBLE] but somebody like us or you or somebody, right, who can, like, direct that, it's not just quality control.  No matter which kind of products you pick.  Like [INDISCERNIBLE] product, you got to ensure 110 percent success, because from their perspective they need both modules from agents' perspective. They need to be working the weekend, somebody and that person has to be available to resolve that thing, at the same time. Whoever is looking, they can tell the agency, withing 2 days, a minute you went from this to this but you did not have this, this, this.  So just making system type if we have some new interaction, that would be if the system [INDISCERNIBLE].

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  All the [INDISCERNIBLE] EDS --

**PETE PARADIS**:  Yeah.

**SONAL PATEL**:  -- they say systems is not allowing me to do this.  If we have that, that's gonna ensure 110 percent success. That was a big thing at [INDISCERNIBLE].

**PETE PARADIS**:  There were people that did that?

**SONAL PATEL**:  Yes.

**CHARLES EDWARDS**:  I had -- I had -- I had -- there ended up being two people.  Initially there was only one person who was [INDISCERNIBLE] and that's all she did.  She's not an agent but she's an investigative analyst, but she did quality control.  She checked.  And she had a lot of weight because she had rapid access to AIG and the deputy and she would tell them.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  So you need to have somebody within -- because nobody knows your process better than the people in your group.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  IT will, you know.

**PETE PARADIS**:  No, I'm with you.

**SONAL PATEL**:  And that person being your intake for your bug or any issues, they can be the funnel between like whoever the users or that person and one other person can configure it helping them [INDISCERNIBLE].

**PETE PARADIS**:  Yeah.

30

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**SONAL PATEL**:  But [INDISCERNIBLE] I think Rosemarie made a big chunk of [INDISCERNIBLE] and then the main thing was people are frustrated they had somebody to talk to.

**PETE PARADIS**:  Sort of a help desk so to speak.

**SONAL PATEL**:  So to speak but little better than that.

**PETE PARADIS**:  Yeah, yeah, yeah, definitely.

**SONAL PATEL**:  Little little little within your house.

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  A little more than they believe in.  Not just somebody they sent it and expect it.  Somebody that can relate it who on their side.

**PETE PARADIS**:  Right.

**CHARLES EDWARDS**:  I mean, at the end of the day, which way you want to go --

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  -- based on if they decide that nobody wants to, you want to just take an existing one and do that, I can do that for you too.  But you don't need to get a whole group.

**PETE PARADIS**:  Right.

**CHARLES EDWARDS**:   You don't need to get a whole FTE.

**PETE PARADIS**:  Right, right, right.

**CHARLES EDWARDS**:  You know, besides me, there might be one other person.  That's it.

**PETE PARADIS**:  Okay.  So cause right now --

**SONAL PATEL**:  That would be cheaper, yes.  You get free EDS and then you still have it suited to your needs.  What Craig is saying, that's what I asked the other day and he's like:  Oh, we're just going to run it on our system.  And I'm like:  How many people are managing it?  It's not that simple.  It's not that simple.

**PETE PARADIS**:  That's what I'm trying to -- I said you used to have a shop of -- you had a lot of aid or whatever in that group.

**CHARLES EDWARDS**:  DHS OIG, DHS OIG got Paris -- when DHS OIG got stood up, I gave them a free copy.

**SONAL PATEL**:  Oh yeah, I remember this, a whole laptop.

**CHARLES EDWARDS**:  A whole laptop and we gave them to a person named Michael, a contractor to deploy it.  I did the same thing for Labor, you know, you just can't take one system and --

31

**A0493**

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  Stick it on the other one.

**CHARLES EDWARDS**:  I gave the same thing to the State department.  I gave it to DSS, they build it because they have a team.  I gave it to other agencies like FHFA or those people because they were able to, they had other people, a group working on it.  And it took a lot of time, they had to fix a lot of it so, you know, you can't just need something –

**[01:15:50]**

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  And assume it's gonna work.

**CHARLES EDWARDS**:  It's not right.

**PETE PARADIS**:  Yeah so that's -- I mean, you need a whole branch, so to speak.  Because it's not --

**SONAL PATEL**:  Not branch.  You need at least a few people dedicated to it.

**PETE PARADIS**:  Well, this is what we've talked about before and you made this point, people have to understand there's the daily grind.

**CHARLES EDWARDS**:  Yeah.

**SONAL PATEL**:  Maintenance is different than development and enhancements.  Maintaining day to day is different.  That is the one that gets so many FOIA reports, other reports, other systems are working, making sure, like, you know.  Back ends are maintained.  That is separate.  Anybody that has any tickets and bugs that goes into maintenance, but the department enhancement people, they just secure the [INDISCERNIBLE].

**PETE PARADIS**:  Sure.  And I think that that was mishmash and it was very stressful and all that.

**SONAL PATEL**:  Yeah.

**PETE PARADIS**:  Plus you're in line with audit wanted something, maybe legal counsel needed something, and then you had reports that data needed to be pulled.

**SONAL PATEL**:  And if they had a hot report then we drop all department.

**PETE PARADIS**:  Right, right, right.

**SONAL PATEL**:  And we just switch.

**CHARLES EDWARDS**:  Initially here we had only one person do and one assigned to the whole project.  And I gave her FTEs because I knew that we needed a team to.

**PETE PARADIS**:  Sure.

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**SONAL PATEL**:  No but even if that case, Chief, Yvonne and I just made the remember it goes [INDISCERNIBLE] outside.  We gave them requirements, so we didn't do in-house for the first one.

**PETE PARADIS**:  Okay.

**SONAL PATEL**:  There no way I could have done it with one FTE.

**CHARLES EDWARDS**:  I got it.

**SONAL PATEL**:  All three.

**CHARLES EDWARDS**:  That's right.  I mean TSA.

**SONAL PATEL**:  Tuey.

**CHARLES EDWARDS**:  Tuey.

**SONAL PATEL**:  Parental.

**CHARLES EDWARDS**:  Parental.

**SONAL PATEL**:  But the thing was it took three of us two months, two months.  It took us two months to get this done.  Because once implemented, [INDISCERNIBLE].

**PETE PARADIS**:  That was that IDMS?

**SONAL PATEL**:  IDMS was before that.

**PETE PARADIS**:  Before EDS.

**CHARLES EDWARDS**:  [INDISCERNIBLE].

**PETE PARADIS**:  Oh, okay

**SONAL PATEL**:  That's what they tried to originally try to imitate Paris and then they [INDISCERNIBLE].

**PETE PARADIS**:  Okay.

**SONAL PATEL**:  Yeah.  [INDISCERNIBLE].  We used to go somewhere and show off [INDISCERNIBLE] that means I have a request for a laptop so I had to make sure the request for laptop I had installed the database [INDISCERNIBLE].

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  [INDISCERNIBLE].  Oh he's [INDISCERNIBLE].

**PETE PARADIS**:  Yeah, yeah, right.

**SONAL PATEL**:  [INDISCERNIBLE]  I didn't want to say much the other day before I said it.

**PETE PARADIS**:  Yeah.

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**SONAL PATEL**: But [INDISCERNIBLE] using it.  He cannot.

**PETE PARADIS**:  And that's -- and I like the guy, but I think that's -- they're loud.  Part of what -- well, that's part of Phyllis Wong's concern about people making commentary or thinking it's that easy and then, you know, they step out on a limb and a tree branch cracks off and now, you know, what happens?  And so that is why she's like she'll ask me --

**SONAL PATEL**: [INDISCERNIBLE].

**PETE PARADIS**:  Right.

**SONAL PATEL**:  Because probably he hasn't done this before, I don't know.

**PETE PARADIS**:  Well, they're using, they use Oracle now and one of his reasons to do something Sequel Server based is you won't have to pay all of that Oracle licensing and all this and that.  So that's -- I made a note of that and I meant to -- eventually I'm gonna say exactly what are we talking about savings?  Because --

**SONAL PATEL**:  But yours is Sequel Server too.

**PETE PARADIS**:  Yeah but what I'm saying is if I can convince the savings, it's really not above and beyond, it's redirecting existing expenditures.

**[01:20:40]**

**CHARLES EDWARDS**:  Mine, we don't have to do [INDISCERNIBLE].  If I don't deliver, I don't get paid.

**SONAL PATEL**:  Fixed price.

**CHARLES EDWARDS**:  Fixed price.

**SONAL PATEL**:  Fixed price for common space.

**CHARLES EDWARDS**:  Yeah, if I deliver it --

**SONAL PATEL**:  Which is something that [INDISCERNIBLE] loves.  I have to take [INDISCERNIBLE].

**PETE PARADIS**:  You know, you made a comment earlier a couple times and I've recently heard it the other day about I talked to somebody in HR about 508 compliant – 208 – 508 compliance and I said:  Oh, can we put a PowerPoint about some type of annual recertification training on the DHS connect?  Well, they have what's called Agriculture learned.  And she said: Well, is it 508 compliant?  I go:  It's a PowerPoint.

**SONAL PATEL**:  It needs to be 508 compliant.  [INDISCERNIBLE].

**PETE PARADIS**:  Right.  So that -- I would never think of that for me.  But so that's interesting that -- that's an important thing to consider.

34

**A0496**

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**SONAL PATEL**:  Plus from Craig's perspective, [INDISCERNIBLE].  From Craig's perspective, when we've been talking, he's talking the ATO.

**PETE PARADIS**:  Authority to operate, yeah.

**SONAL PATEL**:  The way he is going right now continues [INDISCERNIBLE].

**PETE PARADIS**:  You said that, yeah.  Which is something you get the department to --

**SONAL PATEL**:  Approve it.  But I don't really know whether it's there or not.

**PETE PARADIS**:  I doubt it.

**SONAL PATEL**:  What he's saying is his systems comes with -- system security [INDISCERNIBLE] document.  System design document.

**PETE PARADIS**:  Okay.

**SONAL PATEL**:  And he said he can hire somebody to help them create SSP.  SSP, system security plan, it is one of the big documents six or seven -- five or six artifacts that you need to have for authority to operate.  Because from what Craig said, it looks like the old way of doing it [INDISCERNIBLE].

**PETE PARADIS**:  Yeah.

**SONAL PATEL**:  If he comes with that to begin with --

**PETE PARADIS**:  The continuous.

**SONAL PATEL**:  No.

**PETE PARADIS**:  Or the plan.

**SONAL PATEL**:  For first time, I don't know if you guys have continuous.

**PETE PARADIS**:  I doubt it.

**SONAL PATEL**:  I doubt that.  What you need to do is you need to do this onboarding with six or seven artifacts, different documents.  System security plan is the biggest document.  It could be, like, close to 70 to 100 pages.

**PETE PARADIS**:  How many?

**SONAL PATEL**:  70 to 100 pages.

**PETE PARADIS**:  Seven thousand, two hundred?

**SONAL PATEL**:  70 to 100.

**PETE PARADIS**:  Oh, 70 to 100, okay.

**SONAL PATEL**:  Depending on what kind of controls you have.  In DHS, we have tons of controls.  For 300 – we have tons of controls. I don't know what Craig is doing but when he

35

came, we were talking about it.  And when he mentioned the ATO thing, that's when I asked him and he said when you guys are [INDISCERNIBLE], he can provide that document so that way Craig and his team doesn't have to have.  Normally it's an ISSO who does it.

**PETE PARADIS**:  Yeah.

**SONAL PATEL**:  But in this case -- and it's actually what they used to do with articles and DHS trash [INDISCERNIBLE] SSP system design document, we had to create it because I created it at TSA and then they were like:  I don't want it. Lucky me. I had to get out of that.

**PETE PARADIS**:  Hm.

**SONAL PATEL**:  So that is a big, big overhaul.  If he does that -- even if you have to pay him a little for that, that's a big --

**PETE PARADIS**:  In the long run.

**SONAL PATEL**:  It's a good starting point when you're doing it for the first time.  You can then maintain it and update it.  But from the first get-go, it's a lot of work.

**PETE PARADIS**:  What about the SORN and all that other stuff, are those part of the --

**SONAL PATEL**:  That's part of ATO.  Now for SORN and all [INDISCERNIBLE] counsel's office will be.

**PETE PARADIS**:  Yeah.

**SONAL PATEL**:  They will be preparing TIA and SORN.  People have, plus they do PTM, which is privacy threshold management.  PTM [INDISCERNIBLE] if you need PIA.  And you would have PIA because you're going to have privacy with me.  And then you'll have to -- [INDISCERNIBLE] different architects to get ATO.

**[01:25:06]**

**PETE PARADIS**:  And that's another reason to kind of be friendly with OC to get them – hey, we're doing stuff to help you.

**SONAL PATEL**:  We can take these templates because SORN is more of not in-house system, what are the things stored.

**PETE PARADIS**:  In it.

**SONAL PATEL**:  In it.  So it's more of that.  It's not about the system so much.  It's about what is stored in it.

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  And you are supposed to store public [INDISCERNIBLE].  Yeah, can you –

**THE SERVER**:  Sure.

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  No, it's been a, like I said, to work somewhere where they principally do stuff by paper, I'm like oh my God.

**SONAL PATEL**:  It's tough.

**PETE PARADIS**:  Terrible.

**SONAL PATEL**:  In our case, who is going to run everything?  Because I'm thinking [INDISCERNIBLE] is always the counsel [INDISCERNIBLE].

**PETE PARADIS**:  Right.

**SONAL PATEL**:  He decided he doesn't want [INDISCERNIBLE].

**PETE PARADIS**:  Where is he getting that from, I wonder.

**SONAL PATEL**:  Lately, do you remember how we used to have people complain before?  At the SAC Conference [INDISCERNIBLE].  Now people don't have people complain as much.  Otherwise remember before we always used to be hear people complain.

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  Now they have don't have that anymore.  They say there's not much [INDISCERNIBLE] for EDS.

**PETE PARADIS**:  You mean people are not complaining or they don't allow you to go to --

**SONAL PATEL**:  They don't allow us.  [INDISCERNIBLE] they don't have much complaints.

**PETE PARADIS**:  Well that's good.

**SONAL PATEL**:  But then from SAC Conference [INDISCERNIBLE] assessment.  I don't know where it's going or what it's doing.  Yes, it has [INDISCERNIBLE] what you want because [INDISCERNIBLE] there has been nobody before you and after you there was nobody to give us requirements.

**PETE PARADIS**:  Maybe I should go back.

**SONAL PATEL**:  You won't believe.  They had been on detail over there for 30 days.

**PETE PARADIS**:  Oh, they had --

**SONAL PATEL**:  [INDISCERNIBLE].

**PETE PARADIS**:  Oh yeah, yeah, yeah, yeah.

**SONAL PATEL**:  He gave us requirements for five different things.

**PETE PARADIS**:  In 30 days?

**SONAL PATEL**:  While you were there, get me that, get me that, get me that.

**PETE PARADIS**:  Yeah, yeah, yeah.

37

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**SONAL PATEL**: We were talking about this already. I'm like. So he would just compliment it, send it [INDISCERNIBLE], they say yay/nay and get it done.

**PETE PARADIS**: That's good. You had an insider there, right?

**SONAL PATEL**: No. [INDISCERNIBLE] just like you are bringing in anything, Yvonne doesn't bring in anything. He had to update ePas. Yvonne is doing everything in ePas.

**PETE PARADIS**: That's the performance enhancement thing, yeah.

**SONAL PATEL**: She loads up everything for everybody because nobody knows [INDISCERNIBLE]. Sorry, I didn't mean to make you --

**PETE PARADIS**: No, it's okay. I didn't understand this question and I'm kind of just -- and maybe it's not even a real question. Back end -- back end database?

**CHARLES EDWARDS**: Sequel Server.

**SONAL PATEL**: Sequel Server.

**PETE PARADIS**: So that's what that is.

**SONAL PATEL**: That's back end piece.

**PETE PARADIS**: Would there be a way, this is one of the concerns I think that my boss would have, and I think you may have experience with that migration from IDMS to BDS, is there a way to take the -- so you have a legacy database and then with the data and now you're gonna have this. Do you just retire the legacy database with a footnote in the SARC or SAR and say -- because they call it whatever -- and then so now you're constantly checking two systems or is there a way to migrate the data?

**SONAL PATEL**: Our experience when you're doing the IDMS to this one, we can fit some, we cannot fit all. We had the one from [INDISCERNIBLE]. That was --

**CHARLES EDWARDS**: [INDISCERNIBLE] the rest of it but in that case it was not [INDISCERNIBLE].

**SONAL PATEL**: Yeah, they didn't want --

**PETE PARADIS**: Okay.

**CHARLES EDWARDS**: Because IT doesn't understand what the data means.

**PETE PARADIS**: Sure.

**CHARLES EDWARDS**: Because when you look at -- when you look at [INDISCERNIBLE] they're saying allegations, right? What is an allegation? What different types? I mean, IDMS might call it something else. So when the data does not fit into the import, there was several left and he gave them one month, two months, three months, six months, and they still didn't get

38

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

around to validating it. They need somebody from date, you know, who has some authority to say --

**PETE PARADIS**: Yes.

**CHARLES EDWARDS**: -- well, you know what? This is what that means and go ahead and mark that and move. They need to have, like, a checklist, right?

**PETE PARADIS**: Yeah.

**SONAL PATEL**: But still I think that is something that you have to analyze it.

**CHARLES EDWARDS**: Yeah, yeah.

**PETE PARADIS**: Thank you. Can I get another coke?

**THE SERVER**: Yes.

**PETE PARADIS**: Thank you. Are you done with this?

**SONAL PATEL**: Yeah.

**PETE PARADIS**: When you get a minute. Sorry. Thank you.

**[01:30:51]**

**CHARLES EDWARDS**: The last thing you want is maintain two systems.

**PETE PARADIS**: Right. So that's why that's the big -- I know that will be a big question. And so that thing is Oracle based.

**CHARLES EDWARDS**: Doesn't matter.

**SONAL PATEL**: Doesn't matter.

**CHARLES EDWARDS**: Doesn't matter.

**SONAL PATEL**: It [INDISCERNIBLE].

(Simultaneous speaking)

**CHARLES EDWARDS**: No matter where it is, we will export that as a tech spot, like a CSB file or a fixed link file something, the way it needs to be formatted into the new server and we'll run a process and import all of that. First we'll import it into a test environment and see how much actually went through and how much failed.

**PETE PARADIS**: Thank you.

**SONAL PATEL**: We did that at TSA.

**CHARLES EDWARDS**: Yeah.

39

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**SONAL PATEL**:  TSA used an Access database.  Very basic.  Very different structure than is being implemented.  We had a stylist.  I was going on maternity leave so.

**CHARLES EDWARDS**:  So her assistant from the state department, I hired her.

**SONAL PATEL**:  Then he came on board, he wrote all the scripts from -- take data from here, map it to -- so while that was going on and testing was going on [INDISCERNIBLE], he was doing all these threats and running it and seeing so when the D day came --

**CHARLES EDWARDS**:  It was good.

**SONAL PATEL**:  And we had [INDISCERNIBLE].

**PETE PARADIS**:  Right.

**SONAL PATEL**:  He ran all his scripts and of course somebody had to go in and [INDISCERNIBLE].

**PETE PARADIS**:  Yeah, yeah, yeah.

**SONAL PATEL**:  But we did do that at TSA, you're right.

**CHARLES EDWARDS**:  [INDISCERNIBLE].

**SONAL PATEL**:  We can do it here [INDISCERNIBLE].

**PETE PARADIS**:  Because that's their big --

**CHARLES EDWARDS**:  No, you don't want it.

**PETE PARADIS**:  Right, I agree with that.

**CHARLES EDWARDS**:  You don't want to push -- you don't want to say I have to go look [INDISCERNIBLE].

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  So let me run it in this one and let my run it in this one.  Now who is gonna integrate both of that?

**PETE PARADIS**:  Because remember a lot of the -- and I forget --

**SONAL PATEL**:  We had some fresh new data.

**PETE PARADIS**:  Yeah, it would say legacy.  The term was there.

**SONAL PATEL**:  Yeah, there was a table called legacy.

**PETE PARADIS**:  Right.

**CHARLES EDWARDS**:  How the information is stored in a different system, an agent knows what each one --

40

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  And as long as somebody sits and tells you what it means, where it needs to match.

**PETE PARADIS**:  Sure.  Speaking of than, I think I had something, I'm sort of familiar with the data dictionary thing.  Is that something that we build in talking to you or is there, like, a framework of a data dict-- how does that work?

**CHARLES EDWARDS**:  Well, the first thing that you would -- you would I call it pilot let's say.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  You would give me all your organization instruction, and I could go to your SAR , SARC so I could look at it.

**PETE PARADIS**:  Right.

**CHARLES EDWARDS**:  But these are the field officers.  You don't have to give out your name and all that.  We can fill it with [INDISCERNIBLE], but for it to look.  Because you don't want to demo something that is not familiar.

**PETE PARADIS**:  Correct.

**CHARLES EDWARDS**:  Then you can be [INDISCERNIBLE].  So then you'll give that.  All your office is organized.  All your -- how many people [INDISCERNIBLE].  And, you know, when you pick a case, what type of cases do you have that all the reference there that you build a better business.  I mean, I can come and put something but if it's not the same -- because people when they look at something, that 30 second click, they don't see the action there, they're like oh, that's not [INDISCERNIBLE] to [INDISCERNIBLE].

**PETE PARADIS**:  So we were using, and I had the name and the name just came to me, I don't remember if it's N-E-I-M-S or N-I-E-M-S.

**SONAL PATEL**:  NEMIS.

**PETE PARADIS**:  Yeah, remember that thing?

**SONAL PATEL**:  That was NEMIS.

**PETE PARADIS**:  Right.  I don't know if you were familiar when we were doing it but it was that --

**CHARLES EDWARDS**:  That's the one from the --

**SONAL PATEL**:  Isn't that the law enforcement thing?

**PETE PARADIS**:  It was a DHS unit that --

**CHARLES EDWARDS**:  That's the one that CBD. Right?

41

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  Well, they were doing -- that was the entity within DHS that created a --

**CHARLES EDWARDS**:  NEMIS, I thought you talking about FEMA..

**PETE PARADIS**:  -- common naming system.

**CHARLES EDWARDS**:  [INDISCERNIBLE], right?

**PETE PARADIS**:  Yeah, the common naming system.  But I guess if you build something new, we could use our own labels.

**CHARLES EDWARDS**:  Yeah, whatever labels that you have.

**PETE PARADIS**:  Car is car and this and that and the other.

**SONAL PATEL**:  I think it would be part of the documentations.  It would be more like but I don't know how it's gonna sort out, like, I don't know how you think of this.  Some people give you documentation and [INDISCERNIBLE] and hold onto source code.  Some want to give you, like, no data dictionary because they want to keep controls or whatever.  Normally, you still give them documentation.  What are the entities that basically you might still be giving them the ER diagram, simple ER diagram, how things relate.

**PETE PARADIS**:  Like a work flow?

**[01:35:49]**

**CHARLES EDWARDS**:  Yeah.

**SONAL PATEL**:  Work flow and --

**PETE PARADIS**:  Structure of the architecture.

**SONAL PATEL**:  Structure.

**PETE PARADIS**:  What do you call, that ER?

**SONAL PATEL**:  ER diagram.  ER diagram is more database related.  It's called entity diagram.  So more like this is --

(Simultaneous speaking)

**PETE PARADIS**:  Oh, yeah, yeah, okay.

**SONAL PATEL**:  These are different parts.  That's how it's put in.

**PETE PARADIS**:  I'm eating up a lot of your time.

**CHARLES EDWARDS**:  No, I can come up with an idea that I have and he can tell me if it is [INDISCERNIBLE].

**SONAL PATEL**:  I think I still like your original idea that you can have your pilot.  Once like of course make sure in the pilot, as you guys talked about, that it's more like they're awe struck.

42

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

Looking at that, then they can be like oh, okay. This looks good. But it would be good to have this, this, and this or this, this. So you have something that's starting to point that would address how they're able to visualize what they want. But if they already see a visual in front of them, then that's going to get creative juices flowing. I see this but it should be here or that or this. So on your idea of a pilot and then modifying it is also a great idea.

**PETE PARADIS**: One of the big things that the hotline -- and that's the next -- again, if you gotta go, let me know -- the hotline people is equally as important to win them over. And they haven't been involved other than Jessica.

**SONAL PATEL**: Jessica and there was a gentleman.

**PETE PARADIS**: Dan.

**SONAL PATEL**: Dan was here.

**PETE PARADIS**: They're the managers. They're not the actual hands on. The hands on people are the ones that I've been told will have to be won over. So I keep trying to explain and I've actually gone to the OIG website, pardon me, for DHS and brought up the form, the complaint form and said -- they said yeah we have that, look, go on -- so I said okay. I said: When I fill in yours, Agriculture, what happens next when I hit submit? And they said oh. I said: Does it probably become a PDF to an Outlook email? And they said: No, it doesn't. I said: What does it do? And it becomes -- and I don't know if this is accurate, but they believe or they explained to me it becomes text within an email. It's not even a PDF.

**SONAL PATEL**: Basically everything is according to the body of the email and emailed to them so then they copy on.

**PETE PARADIS**: They do that and I said: Okay, so you cut and paste the body. Yup. I said: How do you, how does the data, the complainants name and the date of incident and all that stuff get into the database? So they said: Well, we type it. I said: Oh, so you have to use labor? Yes. So now this form for DHS is the person that -- the complainant does the labor, they enter the stuff. When they hit submit, it turns and burns and gets viral scanned and all that, but it populates itself without any human interface into the fields, creates a complaint number, sends the complainant most likely an email back and all that. Oh, I don't believe that can happen.

**CHARLES EDWARDS**: Oh, yes.

**PETE PARADIS**: I said: Well, it does. I worked on it with the team and it does happen.

**SONAL PATEL**: Not just that. All the components. Now we have the DHS connects attachment.

**PETE PARADIS**: Okay.

**SONAL PATEL**: So TSA, CRCL, they all go to DHS connect, submit it, upload their attachments, hit submit, you have [INDISCERNIBLE] with attachments.

43

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  So is that -- so I guess the question here when Craig and I were talking, that's -- pardon my ignorance -- that's a web based --

**CHARLES EDWARDS**:  Service.

**PETE PARADIS**:  -- service, right.  So it would be -- that's what we would be looking to do.

**CHARLES EDWARDS**:  Yeah.

**PETE PARADIS**:  Because --

**SONAL PATEL**:  I think that would be an extension of your hotline.  But again you won't be able to control where the intake is and so I think it would have to be two pieces.  Your system by default would come in with the plug in.  Ready to accept data.

**PETE PARADIS**:  Yes.

**SONAL PATEL**:  But there has to be something on the other side.

**CHARLES EDWARDS**:  Yeah.

**SONAL PATEL**:  And depending on what your website is expecting, like in our case we would build PHP because ours is based in [INDISCERNIBLE] and not in [INDISCERNIBLE].

**PETE PARADIS**:  Yes.

**SONAL PATEL**:  In your case, depending on what it is, what we could do is your existing form, he can just take that.

**PETE PARADIS**:  It's terrible.  I would want -- and I know you said they're removing some of the fields.

**SONAL PATEL**:  When you get a chance, look at DOD IG's form.  They're trying to build something like that.

**PETE PARADIS**:  Okay.  But I like --

**SONAL PATEL**:  I know.

**PETE PARADIS**:  -- the level of detail we put into the other form but okay.

**[01:40:45]**

**SONAL PATEL**:  But, no, this system would be ready to accept.  [INDISCERNIBLE] front end.. Like you can take a two step in the beginning, leave whatever you have, and then they can submit, he can give something that would bring that from there and import it in this.

**CHARLES EDWARDS**:  So you don't have to type it again.

**SONAL PATEL**:  It is a standard thing.

**PETE PARADIS**:  Yeah, I got you.

44

**A0506**

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**CHARLES EDWARDS**:  And then if you don't like that, then you can do that part. But for right now, huh?

**SONAL PATEL**:  If you have this template concept and documents, can you not extract from the email too so that they don't have to do anything?

**CHARLES EDWARDS**:  Yes.

**SONAL PATEL**:  So your injection service can get an email.  So you upload that email to this injection service and you always have everything in the same format when it comes from the public website.

**CHARLES EDWARDS**:  Yeah.

**SONAL PATEL**:  You can take it there.

**CHARLES EDWARDS**:  [INDISCERNIBLE].

**PETE PARADIS**:  Because they had --

**SONAL PATEL**:  That's a separate piece, in my opinion.

**PETE PARADIS**:  It doesn't have to be done on the front end.

**CHARLES EDWARDS**:  Right.

**SONAL PATEL**:  Can we have the check, please.

**PETE PARADIS**:  But what I'm getting at is the credibility aspect of, yes, this can – because, again, if it's too much at first, it's never gonna get off the ground.

**SONAL PATEL**:  Exactly.

**CHARLES EDWARDS**:  No, exactly.

**PETE PARADIS**:  And it may be interfering with each other.

**SONAL PATEL**:  I agree.

**PETE PARADIS**:  So if we start with something small and then -- but I would like to be able to promise people, yes, I can have somebody that knows what we're talking about.

**CHARLES EDWARDS**:  Because it's modular and because it's component, the department we can add whatever you want.

**SONAL PATEL**:  Can we have the tab?

**THE SERVER**:  Yup.

**PETE PARADIS**:  So these are hypotheticals, I guess, or goes toward -- and you've answered some of this in a way.  So what would your honest recommendation from my path forward be based on all the politics I have to deal with?  And, before you answer, what I feel obligated to

45

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

give them because you're talking let's say October-ish or whatever, even if it's a little bit more forward progress on the other thing even though I don't know -- I wouldn't want to waste your time, but I have to do some convincing, you know.  If we got the specs for the laptop and then part of my difficulty is Craig works on Kansas City so I can't face-to-face with him every day in person, but I'd like to be able to keep that moving along.  Can you split --

**SONAL PATEL**:  I'll just take my piece.

**PETE PARADIS**:  Can you split that up?  Young man?  I'm sorry, are you able to divide that somehow?

**THE SERVER**:  Sure.

**SONAL PATEL**:  If you don't mind.

**PETE PARADIS**:  Or can you do it as --

**THE SERVER**:  How do you want it divided?  Three ways?

**CHARLES EDWARDS**:  Three ways.

**SONAL PATEL**:  Yeah, sure.

**THE SERVER**:  Are we doing cash and credit?  I'll split it three ways.

**PETE PARADIS**:  Sorry, I'm old school.

**SONAL PATEL**:  He can charge and we can give him cash if it's easier.

**THE SERVER**:  So, you want me to just charge you?

**PETE PARADIS**:  Whatever works.

**CHARLES EDWARDS**:  Charge him for his and we'll give cash for ours.

**THE SERVER**:  Okay.

**PETE PARADIS**:  Whatever works.

**THE SERVER**:  So let me make sure.  Am I just charging for the salad or am I charging for the whole thing?

**PETE PARADIS**:  The whole thing.

**SONAL PATEL**:  The whole thing.  You can charge him for salad and you can have us.

**PETE PARADIS**:  I guess they're gonna pay you in cash, right?  And then just charge me for the salad on the credit card.

**SONAL PATEL**:  Charge him for the salad and others --

**PETE PARADIS**:  Sorry.  We should have --

46

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**THE SERVER**:  No, it's fine.

**SONAL PATEL**:  Sorry.

**PETE PARADIS**:  So I need to give something.  You know what I mean?

**SONAL PATEL**:  From my perspective, there are two ways to go.  Think also model users, not just saving.  Okay.  Let's say you take -- I'm gonna go [INDISCERNIBLE] on both sides.  Let's say you take EDS.  They're thinking that there is not front end cost, they just got it.  Even though they're not realizing, it will take a few months, okay, once I give it on the laptop, they're gonna load it, they're gonna go through it, they're gonna customize it.  It's going to be easily three months.  That's --

**CHARLES EDWARDS**:  The other thing is whether you take the laptop or they give you it in CDs or DVDs, whatever they need it for, no matter what comment you get, for it to be in your place, you need to have somebody like her or me to show them, otherwise it's just gonna be another wasted.

**PETE PARADIS**:  Wasted effort.

**CHARLES EDWARDS**:  Somebody who knows the, how the system was built and somebody who has an understanding of both IT and the investigative side to make it work.  Because getting just a contract of somebody --

**PETE PARADIS**:  And that's what she's afraid of.

**[01:45:50]**

**CHARLES EDWARDS**:  Yeah. It's just money wasted.

**PETE PARADIS**:  In a way, you know.  So you're talking an FT -- we've talked before.

(Simultaneous speaking)

**CHARLES EDWARDS**:  You talked to me as a contractor.

**PETE PARADIS**:  But a subject matter as a specific expert.

**SONAL PATEL**:  We can go through it, why this, it fits because it's not just fixing it.  When you customizing it, it's easily fixed.

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  Even if Craig has somebody who knows people or someone, they won't know the pieces of the system.

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  How it will integrate in a new place.  Which is what, like, you know, I called and he said:  I have people that can work on this.  They're like, really?

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  But he doesn't because he has to have vacancy. Right now we're Oracle based and he's already said to me off to the side:  These Oracle people won't be able to do this.

**CHARLES EDWARDS**:  Yeah.

**SONAL PATEL**:  Yeah, I had a tough time --

**PETE PARADIS**:  Unless they have equal training.

**SONAL PATEL**:  Sequel Server. But still it's not gonna be that simple.  It's gonna take even more time.

**PETE PARADIS**:  Thanks.

**SONAL PATEL**:  It's gonna take even more time.  So I think you need to lay out two sides of the proposals.  My understanding is let them pick, pros and cons on both, based on what he's talked about.  And I don't know how you -- again, I would still feel that you're the subject matter expert.  Of course they're not gonna hire a 15 like me to do anything so they could keep -- bring him for contract.

**CHARLES EDWARDS**:  And for me, for me to come back, forget my name.  That's all.  That's the [INDISCERNIBLE] and this is my baby and I want to see my baby succeed, you know, because it all came from my head.  And I want to make sure wherever it gets implemented that it's a success, not a failure.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  And not somebody wasted time and FTE and some type of -- so I have dual purpose.  I'm selfish to say, I left a I'm necessary -- for somebody else in my place probably wouldn't have gone through what I went through but it is done.  But I want to have some way to salvage my little name that I have.  And I also want to give [INDISCERNIBLE]. I'm happy what I'm doing but that [INDISCERNIBLE].

**PETE PARADIS**:  Sure, sure, sure.

**CHARLES EDWARDS**:  And I'm not gonna be expensive, so.

**PETE PARADIS**:  So this kind of goes into the next thing.  I trust who can deliver and who I've worked with and who have delivered results.  I don't care if they're this level or if they're this level and I'm sure you -- haven't worked with you --

**CHARLES EDWARDS**:  This level --

**PETE PARADIS**:  You guys are the same thing.  So if we -- you know how I think.

**CHARLES EDWARDS**:  If you were not working as a government employee, she's not, she would be working with you.

48

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  Right.  But you know how I think and that -- those concepts and the list which I forgot to bring is all stuff I would like to see because I know those things have benefits to the user community in time.

**SONAL PATEL**:  What I think, his proposal is gonna be [INDISCERNIBLE] in the long time, in the long run.  You will take EDS as it is but then you're going to spend more time packing it, modifying it.  That is a big cost to EDS.  But in his case, you starting at 20, 30, or 40 seconds into it.  In our case you're taking something old, so if everybody is up there, you'll still be behind because you're starting with something.  That's gonna be the biggest thing.  I understand you don't have anything right now but then you're still always gonna be behind.  As we go and it comes to IT, there's gonna be more and more [INDISCERNIBLE].

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  And we're gonna be starting out with ASP [INDISCERNIBLE].  You're not gonna apply.  We're gonna go over and make it work.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  Others still have a couple innovations to get where you are.  So that piece you don't have to do.

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  Like, I cannot change the code.  I want to do it --

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  -- but I can only take a piece at a time.  But it's gonna take me some time.

**PETE PARADIS**:  Well, right.  There's staff, money, this, that, and the other.

**SONAL PATEL**:  I cannot shut down and, like, do the whole thing.

**PETE PARADIS**:  Like the metro system, right?

**CHARLES EDWARDS**:  Yeah.

**SONAL PATEL**:  Like a metro system.

**PETE PARADIS**:  All right.  So what do you recommend knowing where I'm sitting and the politics I have to navigate?

**SONAL PATEL**:  Actually, instead, I have other things.

**[01:50:47]**

**PETE PARADIS**:  So knowing the politics that I have to navigate, what are you -- I'm looking for some suggestion -- again, I'm gonna work on some white paper stuff.  Before I approach anybody else, I would feel I would need some review to make sure in my own speak I'm saying

49

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

the right thing, not misrepresenting something, et cetera. But what do you think? What are your ideas?

**CHARLES EDWARDS**: Well, I mean --

**SONAL PATEL**: I think you need to make them realize what is important to them, diplomatically. To be honest, his way is the best way. That's my thing. Of course I respect him but I love my product because it's something I've developed. But I know in my system one of the things I still need to do. I would say that most of the things I need to do, his comes equipped with plus some more. So I would recommend you need to diplomatically show them the return on investment over the time. Tell them there's 1 million you lost. If you can show them return on investment, you are the numbers guy. Do it right now how much time it takes to do this, do this. How much time it takes just to do this. Come with some labor hours. They're spending it already. If you go to EDS, you still need to spend three to six months with this many people and you still end up with the old thing.

**CHARLES EDWARDS**: And even with this thing with the EDS old version, they're still gonna have two people modified and work it and build it to make it work. It's still gonna take them -- they cannot do it in a month. They cannot do it in two months.

**PETE PARADIS**: Sure.

**CHARLES EDWARDS**: They cannot even do it in three months. It's gonna take them six months to do that anyway to make it the way you want. Four months to six months, that's what I'm saying. You can have something working that does not have any of those bugs in the same six months here and the cost will be less. But either one, whichever you think is cost effective and you do analysis, and that you think they're gonna buy, if you need my help, I'll help you with either one of them.

**PETE PARADIS**: Right. So towards being able to do a labor assessment, and we can do a lot of that like you know how we had project codes and web TA and all that stuff, so I can use that data the kind of build that case. But to do a cost assessment, I gotta know the other cost.

**CHARLES EDWARDS**: Right.

**PETE PARADIS**: So I would need to, you know, have some -- like, we'd have to have some kind of discussion on whatever the contractual stuff would be. Maybe just from a high level to be able to infuse into the white paper.

**CHARLES EDWARDS**: Right. I can -- I don't want to cut myself out.

**PETE PARADIS**: Sure.

**CHARLES EDWARDS**: By saying well you did [INDISCERNIBLE].

**PETE PARADIS**: Right, right.

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**CHARLES EDWARDS**:  I may not be the true [INDISCERNIBLE] but a rough idea.  Based on my opinion and Sonal and I give her my input so she can do it with us touch, and say if you kept EDS can do it just for FTE what the cost would be.

**PETE PARADIS**:  Sure.

**CHARLES EDWARDS**:  Which is take mine and use mine, what would be the cost?

**PETE PARADIS**:  Okay.  All right.

**CHARLES EDWARDS**:  It'll give you some idea.

**PETE PARADIS**:  All right.  So here's what I see on my end as a take away.  I'm gonna kind of go through my notes.  I'll flesh this out for myself a little bit more thoroughly based on my notes and stuff.  And then would you recommend sitting down again?  I need help developing the position paper, I guess is what I'm saying.

**SONAL PATEL**:  I would say that you double up that.  Meanwhile so they don't feel that you're dragging your feet.  By the way, I'm still waiting on Emily from Leads.

**PETE PARADIS**:  Okay.

**SONAL PATEL**:  Have them send the laptop.  I can still give it to them.

**PETE PARADIS**:  What does the laptop need on it?

**[01:55:07]**

**SONAL PATEL**:  It will need -- I thought I sent the email from Judy.  I can send it to you again.

**PETE PARADIS**:  Yeah, send it because if it's going to Craig, I mean, he's got a lot going on and I don't know if --

**SONAL PATEL**:  That's fine.  I'll send you the email.

**PETE PARADIS**:  Okay.

**SONAL PATEL**:  But that way they'll see that she's writing your paper.

**PETE PARADIS**:  Because I was asked about it last Thursday like specifically sometimes you used to do it this to me, sir, during those meetings you'd go:  All right, so where do we stand on that?  And I was like -- you know, I got one of those eyeballs the other day, and I'm like I got the message.  I'm on it.

**SONAL PATEL**:  I'll send you that today.

**CHARLES EDWARDS**:  You can also tell me I'm -- from the first of June to the end of the month, I'm not here.

**PETE PARADIS**:  Okay.

51

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**CHARLES EDWARDS**:  I'm on travel. I'm still going to be working on my stuff, but she can always -- you can always email me.

**PETE PARADIS**:  Okay.

**CHARLES EDWARDS**:  I'm just not here in Maryland.  In the summertime off, I get my --

**PETE PARADIS**:  More relaxed.  You get more relaxed.  I wish I had that trouble.

**CHARLES EDWARDS**:  So you can -- you probably might need, you know, if it takes the laptop, how many FTEs, contractors, would you need to, for how long, one month, six months, whatever, and then you can flush it to me and I'll give you my part.  And then whatever rate, present rate, ballpark rate, you can look at it.

**PETE PARADIS**:  I think they used like 12 step 8.  Well, when they do, like, salary and stuff or awards, it's a 12 --

**SONAL PATEL**:  [INDISCERNIBLE] in this case --

**PETE PARADIS**:  Because you're a technical expert.

**SONAL PATEL**:  Yeah, technical expert and [INDISCERNIBLE] contract that he's trying to get.

**CHARLES EDWARDS**:  That has the rates.

**SONAL PATEL**:  That has the standard GSA, they have the rates.  But my thing is, what you're saying is fine but Craig has to accept it.

**PETE PARADIS**:  Accept what?

**SONAL PATEL**:  The proposal.

**PETE PARADIS**:  This thing?

**SONAL PATEL**:  No.  Even when he waits because in his mind he's thinking give us the laptop and my folks can make it work.

**PETE PARADIS**:  But I have to talk to him.  I mean, again, one thing I've learned as I got older, I know when I'm right and somebody's wrong, but I've learned the right time to argue something and it's why waste my time today when I know I'm going to have to do it again in a month.  I might as well wait for the month. So.

**SONAL PATEL**:  [INDISCERNIBLE].

**PETE PARADIS**:  Okay.  Can I get your email address?

**CHARLES EDWARDS**:  Sure. You don't have my card? Do you?

**SONAL PATEL**:  I haven't seen you.

52

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  Don't scratch that real gold off from there.  There ya go.  I think that's the right one.  Yeah. For, like, the first two months, I was handing stuff out from PBGC by accident.

**SONAL PATEL**:  That is so funny.

**PETE PARADIS**:  Oh, yeah yeah. And people were like you still work there too?  And I'm like: What are you talking about?

**SONAL PATEL**:  Or you can sent me an email at this thing.

**CHARLES EDWARDS**:  I'll do that too.

**PETE PARADIS**:  And I was like -- I gotta take this or I'm gonna be in trouble if I don't.

**SONAL PATEL**:  Yes.

**CHARLES EDWARDS**:  It's EdwardRR1@verizon.net.

**PETE PARADIS**:  Okay.

**CHARLES EDWARDS**:  I'll send you an email.

**PETE PARADIS**:  Excellent.  So your travel is vacation related?

**CHARLES EDWARDS**:  I'm taking my son overseas to get him treated.

**PETE PARADIS**:  Okay.

**CHARLES EDWARDS**:  He's got a skin condition.

**PETE PARADIS**:  I'm sorry to hear that.

**CHARLES EDWARDS**:  So while the treatment is going, I'm going to be working.

**PETE PARADIS**:  Sure, sure, sure.

**CHARLES EDWARDS**:  And I'm not teaching for the summertime for July so one month I'm going to be working on my system.

**PETE PARADIS**:  Good.

**CHARLES EDWARDS**:  It's all in the laptop.

**PETE PARADIS**:  Good luck with the purpose of the trip.  All right.

**SONAL PATEL**:  I don't think I have your email.

**CHARLES EDWARDS**:  You don't?

**PETE PARADIS**:  Judy is doing well?

**SONAL PATEL**:  She's doing well.

**PETE PARADIS**:  Good.  I miss her.

53

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**CHARLES EDWARDS**:  Is this your cell number?

**PETE PARADIS**:  Yeah, I think.  Let me see.  Yeah, the bottom one is, yup.

**CHARLES EDWARDS**:  All right.  I'll send you a text.

**PETE PARADIS**:  Okay.  I miss Judy.

**SONAL PATEL**:  Oh yeah.

**PETE PARADIS**:  She worked hard, man.

**SONAL PATEL**:  She's more diplomatic now.  I'm trying to give them benefit more to that because anything and everything handle it and I'm like no you write it that's fine.  I'll change it if it needs to be.

**[2:00:07]**

**PETE PARADIS**:  You can't do it all.

**SONAL PATEL**:  No but the thing is I'm preparing it.  I tell them:  Tomorrow you can take my position.  If you want to say that no, no, no, I don't want to do it, Sonal, you do it, then you'll never be prepared for that.

**PETE PARADIS**:  That's a good point.  And you may win the lottery, who knows.

**SONAL PATEL**:  Who knows?  Because I know I cannot retire right otherwise.

**CHARLES EDWARDS**:  It's not as fun as you think.

**PETE PARADIS**:  Sure.  Says the guy that's retired.

**SONAL PATEL**:  And relaxed.

**PETE PARADIS**:  With the two earrings.

**SONAL PATEL**:  Huh?

**PETE PARADIS**:  With the two earrings.

**SONAL PATEL**:  With the two earrings, yeah, I know.  I wonder when at some point in AT we used to ride motorcycle and have all those --

**CHARLES EDWARDS**:  I did.

**SONAL PATEL**:  You did?

**CHARLES EDWARDS**:  Yeah.

**SONAL PATEL**:  I was just going to [INDISCERNIBLE].

**CHARLES EDWARDS**:  More like in the '70s.

**SONAL PATEL**:  Oh, okay.

54

**A0516**

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  Thank you.  I think that's your pen.

**CHARLES EDWARDS**:  Yes.

**PETE PARADIS**:  Well, I appreciate your time very much.

**CHARLES EDWARDS**:  It was very nice meeting you.

**SONAL PATEL**:  I think this is better than, you know, me talking to you.

**PETE PARADIS**:  Yeah, yeah, yeah.

**SONAL PATEL**:  So that's why I'm like let's try and work together on it.

**PETE PARADIS**:  Sure.

**SONAL PATEL**:  That's why.  Thank you.

**THE SERVER**:  Thank you guys.  Have a good day.

**CHARLES EDWARDS**:  The questions that you have.

**PETE PARADIS**:  Yup.

**CHARLES EDWARDS**:  I'll type up some answers.

**PETE PARADIS**:  Oh, thank you.  Sure.

**CHARLES EDWARDS**:  [INDISCERNIBLE].

**PETE PARADIS**:  Okay.

**CHARLES EDWARDS**:  [INDISCERNIBLE].

**PETE PARADIS**:  Thank you very much.

**SONAL PATEL**:  Which way are you going back across?

**CHARLES EDWARDS**:  Your side.

**SONAL PATEL**:  Okay.  Can you drop me off?

**CHARLES EDWARDS**:  Yeah.

**PETE PARADIS**:  Such a nice day, I'm gonna walk.

**SONAL PATEL**:  No, I want to be sooner because if I take the metro sometimes I wait for ten minutes the metro itself because that platform at this time.  It's almost like a maze, right?

**PETE PARADIS**:  It's interesting how they use the inner courtyard or they tore a building down or something in between but that's kind of interesting.

**SONAL PATEL**:  Especially for such nice days.

55

**A0517**

**Pete Paradis and Charles Edwards 5-26-16.**
**Department of Homeland Security-Office of Inspector General**

**PETE PARADIS**:  Yeah.

**SONAL PATEL**:  I guess you're taking the metro back?

**PETE PARADIS**:  Likewise, sir.  Good to see you.  No, actually, I'm gonna walk because it's so nice out.

**SONAL PATEL**:  Okay.  You can just send me an email or call me.

**PETE PARADIS**:  All right.  I'm not going anywhere all summer because I'm not retired.

**SONAL PATEL**:  I will be -- I'll be a few days here and there but not a big one.

**PETE PARADIS**:  Sounds good.

**CHARLES EDWARDS**:  You can get in touch with me at any time.

**PETE PARADIS**:  Thank you.  And then again to show I'm not dragging my feet --

**SONAL PATEL**:  I'll send you the specs today.

**PETE PARADIS**:  All right.  Be safe.  Thank you.  Take care.

**[02:05:48 End of Recording]**

56

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3       UNITED STATES OF AMERICA,
                                                 Criminal Action
 4                 Plaintiff,                    No. 1:20-cr-0066

 5            vs.                                Washington, DC
                                                 March 21, 2022
 6       MURALI YAMAZULA VENKATA,
                                                 2:13 p.m.
 7                 Defendant.
         _____/
 8

 9

10            TRANSCRIPT OF VIDEO PRETRIAL CONFERENCE HEARING
               BEFORE THE HONORABLE RANDOLPH D. MOSS
                     UNITED STATES DISTRICT JUDGE
11

12

         APPEARANCES:
13

14       For the Government:      CELIA CHOY
                                  VICTOR SALGADO
15                                  U.S. Department of Justice-CRM
                                    1301 New York Ave, NW-10th Floor
                                    Washington, DC 20005
16

17                                CHRISTINE MACEY
                                    U.S. Attorney's Office for the
18                                  District of Columbia
                                    555 Fourth Street, NW
19                                  Washington, DC 20530

20       For the Defendant:       KAMIL SHIELDS
                                  PARDIS GHEIBI
21                                TARA OHRTMAN
                                    Sullivan & Cromwell LLP
22                                  1700 New York Ave, NW, Suite 700
                                    Washington, DC 20006
23

                                  KATHERINE SAVARESE
24                                  Sullivan & Cromwell LLP
                                    125 Broad Street, Suite 4000
25                                  New York, NY 10004
```

1    For the Defendant:        MICHELLE PETERSON
                               Federal Public Defender's Office
2                              for the District of Columbia
                               625 Indiana Ave, NW, Suite 550
3                              Washington, DC 20004

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Court Reporter:          JEFF M. HOOK
                              Official Court Reporter
                              U.S. District Court
24                            333 Constitution Avenue, NW
                              Room 4700-C
25                            Washington, DC 20001

**P R O C E E D I N G S**

1          **DEPUTY CLERK:**  This is criminal action 20-66, the

2      United States of America vs. Murali Yamazula Venkata.  The

3      defendant is present by video.  Will counsel, starting with

4      the government, please identify themselves for the record.

5          **MR. SALGADO:**  Good afternoon, Your Honor.  Victor

6      Salgado for the government.

7          **THE COURT:**  Good afternoon, Mr. Salgado.

8          **THE DEFENDANT:**  Good afternoon, this is

9      Mr. Venkata.

10          **THE COURT:**  Good afternoon.

11          **MS. CHOY:**  Celia Choy for the government.  Good

12      afternoon, Your Honor.

13          **MS. MACEY:**  Good afternoon, Your Honor.  Christine

14      Macey, also on behalf of the United States.

15          **THE COURT:**  Good afternoon.

16          **MS. SHIELDS:**  Good afternoon, Your Honor.  Kamil

17      Shields on behalf of Mr. Venkata.

18          **THE COURT:**  Ms. Shields, just so your know, your

19      microphone is a little bit muffled sounding.

20          **MS. SHIELDS:**  Let me see if I can try to improve

21      that, apologies.  Can you hear me?

22          **THE COURT:**  I can hear you, but it is a little

23      muffled.  As we get into the arguments, I don't want you to

24      have difficulty being heard.

1              MS. SHIELDS:  Your Honor, I may have to dial in,

2       apologies.

3              THE COURT:  Well, we can try this and see how it

4       goes.

5              MS. SHIELDS:  Thank you, Your Honor.

6              THE COURT:  Okay.

7              MS. SAVARESE:  Good afternoon, Your Honor.

8       Katherine Savarese for Mr. Venkata.

9              THE COURT:  Good afternoon.

10             MS. GHEIBI:  Good afternoon.  Pardis Gheibi for

11      Mr. Venkata.

12             MS. OHRTMAN:  Good afternoon, Your Honor.  Tara

13      Ohrtman for Mr. Venkata.

14             THE COURT:  Good afternoon.

15             MS. PETERSON:  And good afternoon, Your Honor.

16      Michelle Peterson, also on behalf of Mr. Venkata, although I

17      will not be making any arguments today.

18             THE COURT:  Well, good to see you.  So before we

19      get going, let me just confirm with Ms. Shields that

20      Mr. Venkata consents to our proceeding with the pretrial

21      conference today by videoconference instead of doing it in

22      person?

23             MS. SHIELDS:  Yes, Your Honor, that's correct.

24             THE COURT:  Well, in light of the pandemic -- and

25      I see Mr. Venkata shaking his head yes, so I conclude that

**A0522**

1    it's appropriate for us to proceed by videoconference today.

2    Maybe the introductions is one good point to start, by just

3    talking about the courtroom and the courtroom setup.  I know

4    that things are currently a little bit -- are substantially

5    better with respect to the pandemic.  I still have concerns

6    about the pandemic.  We see the numbers in Europe are going

7    back up, and I want to make sure we're protecting the safety

8    of the jurors and everyone involved.

9         So my current intention is to continue with the

10   process that I've been using that Mr. Salgado's familiar

11   with because he just had a trial in front of me, of using

12   the gallery for the jurors; and having the jurors sit in the

13   gallery, and having the witness sit in the first or second

14   seat of the jury box.  And we'll have the plexiglass, and I

15   expect everyone to do their best to maintain social

16   distancing in the courtroom.

17        The one thing I will note about that is I don't

18   know if this is what the defense actually has planned for

19   trial, but it appeared to me that at least one of the

20   submissions that the defense -- maybe it was the voir dire,

21   was contemplating seven people in the courtroom which would

22   just be an awful lot for purposes of maintaining social

23   distancing.  And you're welcome to come over and look at the

24   courtroom and see what the table looks like.  There will be

25   a marshal in the courtroom as well.  I think seven people

1    may be a little challenging, but you're welcome to look and

2    see.  I'll defer to you all about how comfortable you are

3    about being in close proximity to each other.

4         But with respect to being in close proximity to

5    everyone else, we need to protect the jurors and the

6    government lawyers as well.  I wouldn't want your table to

7    start spilling over into their space as well.

8         **MS. SHIELDS:**  Understood, Your Honor.  The defense

9    expects we'll have four people sitting at counsel table at

10   any given time, but we'll go over and look at the layout.

11   And also, we are very much taking Your Honor's concerns

12   under advisement.

13        **THE COURT:**  You're welcome to rotate folks, too,

14   if that's one of the things you want to do, that's fine with

15   me.  And then the other question is how many jurors we want

16   to seat.  I guess my inclination would be to seat two

17   alternates.  Again, you can seat more alternates, but then

18   you end up with more people in the courtroom.  I always

19   frankly hate it at the end when I have someone who sits

20   through a long trial and then you have to tell them sorry,

21   we don't need you.  And I realize there's a balance and you

22   don't want to have to retry a case if you have three jurors

23   who get sick or have problems.  I've had three or four -- I

24   think four trials during the pandemic, and I've not lost

25   more than two jurors in any of those cases, but anything's

1  possible.  So my recommendation, subject to your different

2  views, would be that we seat two alternates.

3           Any difference of views on that, Mr. Salgado?

4           MR. SALGADO:  Two alternates is fine with the

5  government, Your Honor.

6           THE COURT:  Ms. Shields?

7           MS. SHIELDS:  That's fine with the defense, Your

8  Honor.  Thank you.

9           THE COURT:  And then what I do is, probably like

10  other judges in this district, I ask the parties just to

11  come up with a number at random between one and 14.  You can

12  each choose one.  That will be the alternate seats.  We

13  obviously won't let the alternates know that.  So if you

14  want to just each give me -- Ms. Shields and Mr. Salgado,

15  each give me a number between one and 14, we'll treat those

16  as the alternate seats.

17           MS. SHIELDS:  Mr. Salgado.

18           MR. SALGADO:  You can go first, Ms. Shields.

19           MS. SHIELDS:  I'm going to say 11 then, Your

20  Honor.

21           THE COURT:  Number 11, okay.  Mr. Salgado.

22           MR. SALGADO:  We'll go 13, Your Honor.

23           THE COURT:  So those will be the two alternate

24  seats.  And then for the jury selection process, what we'll

25  do is we're going to use the ceremonial courtroom.  I'll go

1    through the standard process, you've seen the voir dire of

2    how I do it with the questions.  I will ask you -- allow you

3    all to ask follow up questions.  I'd just ask that you not

4    use it as an opportunity to begin your argument or arguments

5    in the case or to ingratiate yourselves with the jurors.

6    I've had lawyers who have taken the opportunity to say oh,

7    you went to such and such school, I went to that school and

8    it's a great school.  I'm thinking no, that's not the

9    purpose of this, so avoid that.  You're welcome to ask

10   follow up questions that are appropriate.

11          And what we'll do is we'll do the peremptory

12   strikes first for the non alternate jurors and then for the

13   alternate jurors.  So when you do the peremptories, you can

14   strike anyone in seats one through 14 except for 11 or 13.

15   So when you do your initial strikes, don't strike anybody in

16   seats 11 or 13.  And then when we come back to do your

17   peremptories, only strike either -- since you'll only have

18   two strikes, someone in 11 or 13.  And if -- that seat will

19   then get filled with the next person in number who's not

20   already on the jury at that point.

21          Were there any comments on the proposed voir

22   dire -- which I think I streamlined it a little bit, but I

23   think it tracked fairly closely with what the parties had

24   suggested.  Ms. Shields, did you have any further

25   suggestions on the voir dire?

**A0526**

1          **MS. SHIELDS:**  No, Your Honor.

2          **THE COURT:**  Mr. Salgado?

3          **MR. SALGADO:**  No, Your Honor, no questions -- no

4     comments.

5          **THE COURT:**  Okay, thank you.  We have to -- things

6     do move a little bit more slowly during the pandemic, so we

7     just have to make sure we maintain our pace just so that we

8     don't have to drag everyone back for a second day for the

9     exercising of the peremptories, if we can get it all done in

10    a day.  But it does tend to be a pretty full day when we do

11    this.  So that's what I have by way of preliminaries before

12    we turn to the stack of motions.

13         Anything else, Ms. Shields, you want to raise

14    before we turn to the motions?

15         **MS. SHIELDS:**  No, Your Honor.

16         **THE COURT:**  Mr. Salgado?

17         **MR. SALGADO:**  Well, Judge, there was something

18    that we wanted to address, perhaps not at the top of the

19    hearing.  We can maybe do it at the end of argument.  It

20    relates to anticipated expert testimony from the defense.

21    But if Your Honor has a preference, we can deal with it now

22    or we can wait until later.

23         **THE COURT:**  I'm happy to wait on that, so we'll do

24    that at the end.

25         **MR. SALGADO:**  And I believe Ms. Macey had a

1    housekeeping item as well.

2              **THE COURT:**  Okay.  Ms. Macey.

3              **MS. MACEY:**  Thank you, Your Honor.  Yes, I do just

4    have one scheduling issue I wanted to raise for the Court --

5    it's actually two issues.  So I have two cases that I

6    handled in district court that are set for argument before

7    the D.C. Circuit that could be a scheduling issue for our

8    trial.  The first is scheduled for Monday, April 4th at

9    9:30.  The second is less likely I think to be a conflict.

10   That one's scheduled for the following Monday, so Monday,

11   April 11th.  I have been told by the supervisors in the

12   appellate section at the U.S. Attorney's Office that I

13   should plan on being required to be there.  They were still

14   awaiting the new protocols from the D.C. Circuit in terms of

15   how many people they were allowing in the courtroom and

16   whether trial counsel was still obligated to be there.  But

17   I wanted to flag that sooner rather than later for Your

18   Honor.

19             **THE COURT:**  And will you need to be in our

20   courtroom on the 4th or could you simply be absent if you

21   needed to be somewhere else during that period of time?

22             **MS. MACEY:**  If -- depending on the posture.  I

23   wouldn't want to miss if we're doing closing arguments or

24   something of that sort.  But if we are at a posture where

25   the jury is deliberating, I certainly have no problem with

 1 | the Court proceeding under the schedule it would like and

 2 | having co-counsel handle anything that arises.

 3 | **THE COURT:**  I would imagine if the jury were

 4 | deliberating, that wouldn't be a problem.  We may have to

 5 | see how this goes.  The only thing is -- I mean, I

 6 | appreciate your scheduling issue, but there are a number of

 7 | lawyers on your team.  The thing I hate doing is

 8 | inconveniencing the jurors.  You're going to find there's

 9 | going to be some juror who has travel plans, and they're

10 | going to say I've got to be a wedding in Texas on Thursday.

11 | And I'm going to have to make a decision about whether to

12 | say to that juror you can't go to the wedding on Thursday or

13 | saying to you that you need to -- if the Court of Appeals

14 | needs you, you need to be there and someone else needs to

15 | cover for you in the trial, okay?

16 | **MS. MACEY:**  I understand, Your Honor.

17 | **THE COURT:**  We can play that by ear.  That raises

18 | a good question, which is what is the government's best

19 | estimate as to how many days we're going to need for trial?

20 | Things are presumably somewhat slimmed down now.

21 | **MR. SALGADO:**  That's correct, Your Honor.  I think

22 | we initially estimated a week and a half of testimony.  That

23 | obviously contemplated Mr. Edwards would be at counsel

24 | table.  That is no longer the case.  We have taken great

25 | effort to streamline our presentation.  And as a matter of

 1  fact, one of the things that we notified counsel of last

 2  night was that we are dropping -- or walking away from some

 3  of the allegations that do not directly implicate

 4  Mr. Venkata -- not all of them, some.  Again, that's done in

 5  an effort to streamline our presentation along with other

 6  consolations.

 7          At this time, depending of course on

 8  cross-examination and the length of cross-examination, we

 9  have two cooperators here.  I think our best estimate is

10  perhaps anywhere from three and a half to four and a half

11  days for our presentation.

12          **THE COURT:**  For your presentation, plus another

13  day for jury selection?

14          **MR. SALGADO:**  Correct.  We might be wrapping up

15  our case-in-chief Thursday or Friday.

16          **THE COURT:**  Thursday or Friday, okay.  And what

17  about the defense?

18          **MS. SHIELDS:**  Your Honor, actually that is a

19  question that we had.  Does Your Honor sit on Fridays?

20          **THE COURT:**  Yes, I'm going to, for a shorter trial

21  like this I will.

22          **MS. SHIELDS:**  Okay, fantastic.  Now, I think that

23  depending on how the evidence comes in and obviously

24  cross-examination, I would say that the defense case would

25  be at most two days.  So reasonably we could be finishing up

1     on the 6th.

2              **THE COURT:**  So does everyone think I'm safe

3     telling the jury pool that we anticipate that the

4     presentation of the evidence will be complete by April 6th,

5     and that they will deliberate however long they deliberate?

6              **MS. SHIELDS:**  I think that's fair, Your Honor,

7     yes.

8              **MR. SALGADO:**  I think that's fair, Your Honor.

9     Especially openings, we don't anticipate longer than 20

10    minutes on the government side.  And for closing, obviously

11    subject to imponderables and items that come up throughout

12    trial, our closing will probably be, again, 45 to 50

13    minutes, maybe 10, 15 minutes for rebuttal.  So I think

14    April 6th is reasonable.

15             **THE COURT:**  Okay.  Well, that's always a balance,

16    because you don't want to over promise to the jury.  On the

17    other hand, if you build in too much cushion, you lose some

18    prospective jurors who have plans and can't sit for that

19    long.  That strikes me as probably a reasonable balance, so

20    that's what we'll do.

21             Well, I'm just happy to work my way through the

22    motions.  I think probably the easiest way to do it is just

23    doing them one at time and to hear from both sides.  Some of

24    them I probably can just give you my ruling on now, some of

25    them I may need to give you a little later.  But why don't

1   we just start.  And the first one I have on my list may be

2   the first one on your list, which is the motion to dismiss

3   count two for duplicity.

4        Ms. Shields, do you want to start with that one?

5        **MS. SHIELDS:**  Your Honor, my colleagues

6   Ms. Savarese, Ms. Gheibi and Ms. Ohrtman will be addressing

7   Your Honor on those motions to dismiss.  So I'll be turning

8   it over to them to address the arguments.

9        **THE COURT:**  Okay, thank you.

10       **MS. OHRTMAN:**  I believe this would be me, so thank

11  you, Your Honor.  Tara Ohrtman for the defendant.  As

12  explained in the motion, we challenge count two of the

13  indictment for duplicity.  The indictment enumerates the

14  five types of federal property that Mr. Venkata and his

15  former colleagues are alleged to have stolen.  And these

16  include, one, copies of DHS-OIG's EDS case management

17  system, including source code and --

18       **THE COURT:**  I'm sorry, can I ask you -- I

19  apologize, can I ask you -- and I know for part of it you're

20  just reading something, but if you can slow down, it's going

21  to make the court reporter's life much easier.

22       **MS. OHRTMAN:**  Yes, I'm so sorry, Your Honor.

23       **THE COURT:**  It's okay, thank you.

24       **MS. OHRTMAN:**  So the five types of federal

25  property that Mr. Venkata and his former colleagues are

1    alleged to have stolen include, first, copies of the DHS-OIG

2    EDS case management system, including source code and

3    database; two, copies of USPS-OIG's PARIS case management

4    system and the STARS database; three, the personally

5    identifiable information, or PII, of approximately 246,167

6    DHS employees; four, the PII of approximately 6,723 USPS

7    employees; and five, multiple activation keys and a key

8    management services code associated with various Microsoft

9    software products.

10           I believe Mr. Salgado indicated a moment ago the

11   government informed us last night that it does not intend to

12   prove up the theft of the last items in this five-part list

13   as the other evidence does not implicate Mr. Venkata.

14        **THE COURT:**  So that's the activation -- I'm sorry,

15   is that the activation keys that I should cross off the

16   list?

17        **MS. OHRTMAN:**  Yes, the multiple activation keys

18   and the key management system code -- or sorry, the key

19   management services code.

20        **THE COURT:**  Okay.

21        **MS. OHRTMAN:**  So the first thing we see on this

22   indictment is the charging of remaining four unrelated

23   allegations of theft under one count.  Federal rule of

24   criminal procedure 12(b)(3)(B)(i) states that charging

25   multiple offenses under one count can create grounds for

1  | dismissal of that count.  The government argues that these

2  | thefts were all pleaded correctly because they were part of

3  | a continuing offense.  However, the indictment fails to

4  | adequately demonstrate the relatedness of the thefts to one

5  | another such that they might be considered a continuing

6  | offense.  A circuit split exists as to whether a section 641

7  | allegation can be charged as a continuing offense as a

8  | matter of law.  The Second Circuit found that this was

9  | possible in United States v. Girard, while the Fifth Circuit

10 | found that it was not in United States v. Reagan.  The

11 | government has not cited a case from within the D.C. Circuit

12 | to support the contention that in this jurisdiction, a

13 | section 641 charge may be considered a continuing offense.

14 | And in fact --

15 |        THE COURT:  Just to interrupt you, I think the

16 | government disavows that that's what its theory is.  My

17 | understanding is they're not arguing that it's a continuing

18 | offense, but they're arguing that it's part of a common

19 | scheme.  But I take it that the position is that there are

20 | individual offenses within a common scheme is my

21 | understanding of the government's position.

22 |        MS. OHRTMAN:  Yes, Your Honor, but we -- one, in

23 | terms of the case laws that they cited within that

24 | allegation, the cases that they cited with respect to the

25 | continuing scheme theory are United States v. Powell and

1   United States v. Girard.  And in United States v. Powell,

2   there's a much closer nexus between the alleged counts of

3   fraud within this continuing scheme.

4           **COURT REPORTER:**  Excuse me, Ms. Ohrtman.  This is

5   the court reporter.  Can I ask you to slow down, please.

6   I'm really having trouble understanding you.  I'm not sure

7   if it's the Zoom connection.  I'm sorry to interrupt, and

8   thank you.

9           **MS. OHRTMAN:**  No, I'm so sorry.  So looking at

10  some of the case law that was cited by the government in

11  their briefs.  In United States v. Powell, the government

12  alleged several related fraudulent receipts of Social

13  Security benefits in one count.  But this was a case in

14  which a young woman who shared a bank account with her

15  grandmother did not report her grandmother's death to the

16  government and continued to receive the benefits.  And the

17  government -- rather, the Court found that because these

18  benefits were paid out as a regular and automated payment,

19  that there was a closer nexus between them than between, for

20  example, if someone broke into the same bank account -- or

21  bank vault five times, that would be five separate offenses

22  that had been committed because the criminal activity

23  started and stopped with each distinct break in.  So it's a

24  slightly different situation there.

25          Similarly, in United States v. Girard, another

1    case that the government cited, the records of four

2    different DEA employees were pulled from a computerized

3    system.  But the facts are slightly blurry within that case.

4    But it seems like all of those records were pulled at the

5    same time.  So again, there's a much closer nexus between

6    all of the alleged counts in that case than there are in

7    Mr. Venkata's case where there are a bunch of discrete

8    instances of alleged theft over a series of years.

9            THE COURT:  Ms. Ohrtman -- am I saying that right?

10           MS. OHRTMAN:  Yes, Your Honor.

11           THE COURT:  So I think I need to somewhat better

12   understand the government's case and the allegations here.

13   As I've observed in the past, the judge is often the person

14   who knows the least about what the evidence is going to show

15   in the case, at least at this stage of the process.  But

16   every time I was thinking about this motion -- as well as, I

17   think, the statute of limitations motion, but perhaps most

18   on this motion, there's an old Johnny Cash song that kept

19   coming to mind called One Piece at a Time.  I don't know if

20   you've ever -- if any of you know this song, but it's a song

21   about a guy who decides he's going to steal a Cadillac from

22   the factory that he works in.  He brings one piece home

23   every day in his lunch box.  And after many, many years he

24   assembles the Cadillac, and it turns out he has a 1957, '58,

25   '59, '60, '61, '67, '68, '69, '70, '81 and so on Cadillac.

1    One side's got a fin, one side's got two headlights, the

2    other's got one because he didn't think about the fact the

3    model changed it because it's so many years.  But the point

4    is there was one scheme to steal a Cadillac, and it took

5    place over many years.

6              What I assume the government's theory of the case

7    here is that this actually is the same as Johnny Cash's One

8    Piece at a Time; and that the co-conspirators in this case

9    decided to steal the system, and to update it and then sell

10   it back to the Department of Agriculture without telling the

11   Department of Agriculture that in fact what they were buying

12   was in substantial portion U.S. property already.  And that

13   when -- assuming the facts and assuming the allegations, the

14   EDS system is stolen and the EDS source code is stolen and

15   this STARS system is stolen.  At least as to those pieces,

16   that was the left wheel and the right wheel and the hood of

17   the Cadillac that was being stolen to assemble later and to

18   sell back to the Department of Agriculture.  It may be that

19   the PII fits into a different category, and that that was

20   perhaps incidental or that wasn't really what they were

21   intending to go after.

22             But do you want to address that?

23             **MS. OHRTMAN:**  Your Honor, I think that my

24   colleague Ms. Gheibi will speak to this a bit more directly

25   in addressing other parts of count two in the subsequent

**A0537**

1    discussion of her motion.  But I think it's important to

2    distinguish that our client Mr. Venkata is not his

3    co-conspirators, and that they had a much broader view of

4    what was going on here than he did.  So again, this motion

5    was written when Mr. Edwards was still Mr. Venkata's

6    co-defendant.  I think that this argument might play out

7    rather differently if he were still involved in the case.

8            But I think that taken from Mr. Venkata's

9    perspective, it's much more difficult to come to the

10   conclusion that anything that he did was part of what he saw

11   as a continuing scheme.  I think that that allegation can be

12   made much more readily to his former co-conspirators than to

13   him.

14           **THE COURT:**  So that is something I was wondering

15   about.  I spent some going through the indictment and trying

16   to figure out which allegations relate to Mr. Venkata, and

17   whether there are allegations that he personally was

18   involved in stealing or misappropriating each of I guess the

19   four remaining categories that you've identified on that.

20   And I suppose that's a question just for the government when

21   I get to the government, is whether in fact there's anything

22   else that needs to be dropped or whether there are

23   allegations in the complaint that tie Mr. Venkata -- not to

24   the conspiracy, but to actual allegations that he personally

25   was involved in misappropriation of any of those items.

**A0538**

1            But putting that aside though, Ms. Ohrtman, I

2    guess I still have the question in my mind about if in fact

3    there is a basis in the indictment to conclude that

4    Mr. Venkata is charged with conduct relating to the theft of

5    the four categories, why isn't that the One Piece at a Time

6    analogy?

7            **MS. OHRTMAN:**  Again, Your Honor, I think I would

8    point back to the case law that's cited, and the fact that

9    within each of those instances, it is a matter -- for

10   example, with Ms. Powell and the Social Security benefits

11   that she received, the only thing that she really did was

12   not tell the government that her grandmother had died and

13   she continued to receive these benefits.  That's really one

14   action that led to all these instances of her receiving

15   government property that she shouldn't have received.

16           Similarly with Girard, it was -- to the best we

17   can tell from what was alleged in that indictment, it was

18   one instance of going into a DEA database and pulling some

19   records for four different people.  And those four different

20   people were all charged as separate offenses.  So again, I

21   think that just with the case law cited, it doesn't seem

22   like it's a similar situation to these allegations of --

23   even if it was One Piece at a Time of EDS over many years,

24   that it was quite the same sort of either temporal or action

25   based nexus for these alleged thefts.

1         **THE COURT:** So if I were to agree with you, why

2    wouldn't a unanimity instruction suffice?

3         **MS. OHRTMAN:** So here, Your Honor, I actually

4    would like to turn back to the elements that go into a

5    violation of section 641. For one of these allegations to

6    be correctly alleged, there have to be four essential

7    elements proven. The first is dealing with converting. The

8    second is the intent to steal or convert. The third is that

9    what was stolen was a thing of value. And the fourth is

10   that that thing of value belonged to the government.

11        In the 2016 case United States v. Lee, the Second

12   Circuit found that in a section 641 charge, quote, "The

13   value of the thing taken, whether great or small, is an

14   element of the offense." So one thing that's important to

15   note, Your Honor, is that within the indictment itself,

16   there are five items that are alleged to have been stolen,

17   and there are only actual values attached to two of them.

18   And these are EDS, and then the multiple activation keys and

19   other Microsoft products that were just essentially struck

20   from the indictment because the government does not intend

21   to prove their theft by Mr. Venkata.

22        So what they're arguing essentially is that

23   because no value was attached by the government to the USPS

24   system and the two sets of PII, they've essentially failed

25   to allege a critical element of this charge under section

1    641 for each of these items.  And therefore, we would ask

2    you to either dismiss the count entirely or else dismiss

3    just those charges within the count, because elements of the

4    count as to those three items have not been met.

5         **THE COURT:**  Well, so does the case law say that a

6    specific dollar value has to be alleged or just that on

7    reading the indictment, one has to reasonably conclude that

8    it's a thing of value?  In other words, going back to my

9    Cadillac example, if the allegation was that someone stole a

10   Cadillac, is that defective if it doesn't say the Cadillac

11   was worth $10,000?

12        **MS. OHRTMAN:**  Your Honor, I can't say that I found

13   much case law directly on that point.  I believe that's what

14   United States v. Lee was saying.  There, the Second Circuit

15   was essentially saying that some value had to be proven.

16   And there, it was an issue of whether or not it was a felony

17   versus misdemeanor charge.  So there, the monetary value

18   really was at issue.  But here, I think, especially for

19   something -- a Cadillac has an ascertainable valuable given

20   that it's something that's sold on the market.  For

21   something like PII, you know, I think it's much more

22   difficult to ascertain what the value would be for it since

23   there really isn't a market for PII.

24        So I think that in order to make sure that this

25   was a charge that is being made correctly, we'd at least

**A0541**

1    like to have some estimate of value attached to those PII

2    sets so that the jury would know essentially what

3    Mr. Venkata is being charged with having stolen.

4            **THE COURT:**  Well, that might be right for the PII,

5    but what about -- it does strike me that the Postal Service

6    system is something that would appear to be of inherent

7    value.  It's hard to believe, just reading the allegation,

8    that you wouldn't be on notice that that was a valuable

9    thing.

10           **MS. OHRTMAN:**  Yes, we certainly don't disagree

11   with that, Your Honor.  But I will note that the government

12   did provide the initial service contract for the creation of

13   the EDS database which was valued at $3,000,000 based on the

14   contracting there.  And they didn't provide any such

15   contract or any other showing of worth for USPS-OIG's

16   similar database system -- or case management system and

17   database.

18           **THE COURT:**  Well, that may be something they have

19   to prove up at trial, but for purposes of just determining

20   whether the indictment is sufficient, I think the question

21   is really whether you were on notice that it's a thing of

22   value.  And it does seem to me that it's hard to dispute the

23   proposition that the database is not a thing of value.  I do

24   want to hear from the government with respect to the PII,

25   because that's a little less clear to me that that's

1    something that would be of value to somebody because I'm not

2    entirely sure even what was in the PII.

3         MS. SHIELDS:  Your Honor, if I can just add with

4    respect to the USPS case system.  I know that there's an

5    inherent value to some these case systems.  And the

6    government's indictment does allege obviously that there was

7    a value for EDS, because the allegation is that Mr. Edwards

8    attempted to sell EDS to USDA-OIG.  There's no similar

9    allegation for USPS-OIG and for -- I'm sorry, for that case

10   system.  So based on the face of the indictment itself, the

11   defense has no motive of what the value is for either the

12   PII or for anything related to the USPS case management

13   system.

14        THE COURT:  Although that strikes me as the sort

15   of thing that could be addressed through discovery or a bill

16   of particulars rather than through something that needs to

17   be in the indictment.

18        MS. SHIELDS:  Your Honor, I would agree that

19   certainly it should be addressed in discovery.  We've had no

20   discovery to that effect.  But I do think that based on the

21   face of the indictment itself, there's no way you can show

22   any value for the USPS case management system.  And given it

23   is an element of the offense, it is something that the

24   government should have pleaded and did not.

25        THE COURT:  You're still coming through pretty

1    tinny with your voice.  I don't know if there's a better

2    microphone you can use.  Even sometimes I find that when

3    people use the earphones with a microphone, that the sound

4    is better.  I don't know if you have anything else you can

5    try, but it's a little hard to hear you.

6            Mr. Salgado, do you want to respond?

7            **MR. SALGADO:**  Your Honor, Ms. Choy will handle

8    this part of the argument.

9            **THE COURT:**  Ms. Choy.

10           **MS. CHOY:**  Thank you.  So in cases where the

11   government -- when there are multiple related violations of

12   the same statute, the Constitution and the Federal Rules

13   give the government substantial leeway in deciding how to

14   charge those offenses.  The government can charge each

15   violation of the statute in a separate count.  Or if the

16   offenses can fairly be regarded as a single continuing

17   scheme as the D.C. Circuit said in Shorter, or as a single

18   course of conduct as the D.C. Circuit said in Bruce, then

19   the government can elect to charge them in a single count.

20   And that's what the government has done here.

21           I'd like to just clarify, if I may, the

22   allegations in the indictment.  You've heard the defense

23   characterize this as five different types of property, and I

24   don't think that's quite right.  The indictment alleges that

25   the PII was housed within the databases that were part of

1   the respective case management systems.  So you have the

2   USPS-OIG system which consists of a database and also a user

3   interface.  And those are integrated with the PII that

4   belongs to the USPS employees.  The same thing for the EDS

5   system, you have a case management system that is connected

6   to a database and the database houses the PII.  So it's sort

7   of artificial to pull this out as separate objects of the

8   theft.  At most, we think there would be two violations of

9   the statute here:  The theft of the USPS system that

10   includes the PII, and the theft of the EDS system that

11   includes that PII.

12        And I'd just like to briefly mention the theft of

13   the activation keys which, as Mr. Salgado mentioned, we're

14   not planning to pursue that allegation at trial.

15   Specifically, those are the Microsoft activation keys that

16   Ms. Patel e-mailed to Mr. Edwards on November 4th, 2015.

17   And that's alleged at paragraph 16C of the indictment.  So

18   there may be evidence at trial that comes out relating to

19   other activation keys, which would be uncharged overt acts.

20   We're not saying we're not going to introduce any evidence

21   related to activation keys, but we're not going to be

22   proving up that November 4th, 2015 transfer as one of the

23   theft offenses.

24        **THE COURT:**  So let me ask you a question,

25   Ms. Choy.  If the government's position is that there really

1    were two thefts -- or at least that it's pursuing at this

2    point, and perhaps it's electing not to pursue a theft -- or

3    what was once a theft.  The two thefts are, I take it, the

4    EDS system which included copies of the EDS source code and

5    databases and included the PII, and that's theft one.  And

6    theft two is theft of the Postal Service system which

7    included the STARS database and the PARIS system and the

8    related PII.

9            Why not elect -- to the extent there's any

10   ambiguity in the indictment, to simply be pursuing two

11   thefts, those two thefts?  And when it comes to questions of

12   valuation, if that's an issue, you would have some leeway

13   with respect to what you can show with respect to what the

14   value was.  But I'm not sure that you're -- and you can tell

15   me whether you have evidence on this, but I'm not sure

16   you're going to be trying to prove that the value of the EDS

17   or the Postal Service systems was substantially enhanced

18   because they contained the PII.  In some respects, it

19   actually occurred to me that it was less valuable to the

20   co-conspirators here because it included the PII.  Because

21   the goal was to sell this back to -- allegedly was to sell

22   it back to the Department of Agriculture as a commercial

23   product.  And if that commercial product had DHS or Postal

24   Service PII in it, that would have blown the deal.  And so

25   it's unclear to me exactly what value, if any, the PII had

1    to them.

2         So why not just -- and this is a long question --

3    or a long way of saying why not just elect then that what

4    you're going to do is pursue allegations with respect to two

5    thefts, the EDS system which includes the source code, and

6    misappropriation of the USPS-OIG systems including the

7    relevant databases?

8         **MS. CHOY:**  Sure.  Well, let me first get to the

9    question about how to charge this.  And then I think your

10   question also encompassed some more substantive issues about

11   the nature of the counts.  But as to this duplicity

12   question, I think we could have charged it in two counts.

13   The government is able to decide how to charge it.  And I

14   think the important point here is that the decision to

15   charge it in one count does not prejudice the defendant in

16   any way.

17        As Your Honor noted, a unanimity instruction would

18   cure any potential problem with jury unanimity here.  And

19   had we broken this up into two separate counts, each one

20   would look exactly like count two except you would see a

21   different type of property alleged.  I can't see any reason

22   why the defendant would have been better off in that

23   situation than the way that we did charge it.  And that

24   tells you that there's really no prejudice here and no

25   reason to dismiss this count.

1          Now just getting into the PII issue.  So the theft

2     of the PII was not incidental to the scheme, it was integral

3     to the scheme.  I think we'll get into this more with

4     respect to the aggravated ID theft counts.  But what the

5     defendants here were doing was building a working model of

6     these two systems that they could provide to the Indian

7     developers to assist them in creating the revamped EDS 2.0

8     system.  And in order to build this working model, as I

9     said, these systems -- it's a portal that's integrated with

10    a database.  And in order to have it work, you need to have

11    that database and you need to have that data present in the

12    environment.

13         So they could have chosen to steal only the source

14    code of the these two systems and not the databases, not the

15    PII, but they chose to steal those databases as well because

16    they needed those databases to make the source code run.

17    And that's something we expect to come out at trial.

18         **THE COURT:**  To run as part of the testing process?

19         **MS. CHOY:**  Correct.

20         **THE COURT:**  But presumably that source code would

21    not have been in there then when they brought it to the

22    Department of Agriculture to try and sell it to them?

23         **MS. CHOY:**  The PII would not have been in the

24    product.

25         **THE COURT:**  Right, that's what I mean.

1          **MS. CHOY:**  That's correct.

2          **THE COURT:**  So your view is that the PII was

3    valuable and necessary to the scheme, because it was used to

4    beta test the revisions or changes that were made to the

5    systems to make sure they were working?

6          **MS. CHOY:**  They were used to make sure that the

7    demo model that they were providing to the Indian developers

8    was working.  So they wanted to show the Indian developers

9    this is how the system should work, and so they provide them

10   this model.  It needs to be functional, and in order to be

11   functional it needs to have PII.  So to connect -- sorry,

12   were you about to ask a question, Your Honor?

13         **THE COURT:**  No, no, I just said I see, that's all.

14         **MS. CHOY:**  Okay.  You were also touching, Your

15   Honor, on this claim that the indictment fails to state an

16   offense because we haven't specifically alleged the value of

17   the USPS system.  And I agree with Your Honor, it's not our

18   burden at this stage to put a specific number on it.  Our

19   burden at this stage is to plead that the thing that was

20   taken was one of the four enumerated objects of theft in

21   section 641, which is records, money, vouchers or things of

22   value.  And a software system is a traditional form of

23   property, just like a car or a physical computer.  And so by

24   alleging that a software system was stolen and that was

25   property of the United States, that we've met our pleading

1   burden with respect to that element.

2        **THE COURT:**  I guess one of the things -- I'm just

3   looking at the statute here.  It's not a hundred percent

4   clear to me that the value requirement applies to everything

5   under the statute, because the statute applies to the

6   conversion of any record, voucher, money or thing of value.

7   I suppose it's not clear to me whether value modifies record

8   or not.  PII is presumably records of the United States as

9   some of the other materials may be as well.

10       **MS. CHOY:**  Right, Your Honor, I would agree with

11  that.  I think that the PII was part of the thing of value,

12  and so we don't need to reach this.  But you could also

13  decide that the PII were records.  And I would say it does

14  not make sense for the "of value" to apply to everything in

15  that series, because then you would have money of value

16  which seems like it would be surplusage.  So I think there

17  are a few ways that you could find this allegation to be

18  sufficient.

19       **THE COURT:**  All right.  Ms. Ohrtman, anything

20  further you want to say?

21       **MS. OHRTMAN:**  Not at this moment, Your Honor.

22  Thank you.

23       **THE COURT:**  So with respect to the duplicity

24  motion, with the exception of the fact that -- I'm going to

25  grant it in part based on the government's election to

1    withdraw its allegations with respect to the Microsoft

2    service codes and the Microsoft software products.  I'm

3    going to grant the motion with respect to that as conceded.

4    And otherwise, I'm going to deny the motion, but without

5    prejudice.  I think these are just issues that we're going

6    to have to work through in figuring out how to charge the

7    jury properly as the evidence -- or after the evidence has

8    come in.  We'll have to figure out what to say about this in

9    the preliminary instructions, but I think this is an issue

10   that is better resolved later in the proceeding.

11           So that then leads me to the second motion, which

12   is the motion to dismiss counts one and 11 for lack of

13   specificity.  Who has the lead on those?

14           **MS. SAVARESE:**  I do, Your Honor.  Katherine

15   Savarese for the defendant.  So as you just mentioned, as a

16   point of clarification, we don't understand counts three

17   through 10 to apply to Mr. Venkata.  So we're only going to

18   focus on count 11 with respect to the wire fraud charges as

19   well as count one.

20           **THE COURT:**  I think that's correct.  Mr. Salgado

21   can correct us, but that's my understanding.

22           **MS. CHOY:**  That's correct.

23           **MR. SALGADO:**  Ms. Choy will handle all Rule 12

24   motions, Your Honor.

25           **THE COURT:**  All right, thank you.

**A0551**

1          **MS. SAVARESE:**   So in counts one and 11, the

2     indictment charges Mr. Venkata with conspiracy to defraud

3     the United States in violation of 18 U.S.C. 371, and with

4     wire fraud in violation of 18 U.S.C. 1343.   As alleged in

5     the indictment and as articulated by the government in its

6     response brief, the basis for both sets of charges is an

7     alleged scheme to defraud the Department of Agriculture of

8     money and property by means of false and fraudulent

9     representations to witness one, who was alleged to be a

10    Department of Agriculture employee.

11          However, a careful examination of the indictment

12    reveals that there's not a single substantive allegation

13    that Mr. Venkata made any such misrepresentations, aided in

14    the making of them or had any awareness that they were being

15    made.   Indeed, there are no allegations whatsoever that

16    Mr. Venkata had any interactions with the Department of

17    Agriculture or that he knew anything about Charles Edwards

18    and Sonal Patel's representations to the Department of

19    Agriculture.   Similarly --

20          **THE COURT:**   So Ms. Savarese, let me interrupt you

21    there just for a second, because I agree with what you've

22    said thus far.   But I suppose the question to my mind is

23    whether the government's theory here is a section 2 theory;

24    and that what Mr. Venkata is guilty of is aiding and

25    abetting the others who were making false representations or

1  who were engaged in fraudulent conduct vis-a-vis the

2  Department of Agriculture.  I suppose that goes to count 11.

3  As to count one, it's a conspiracy count, and so he didn't

4  personally need to make any representations as long as he

5  intentionally or voluntarily joined the conspiracy and

6  shared in its criminal purpose.

7         **MS. SAVARESE:**  Right.  As to the aiding and

8  abetting theory, we don't think that that is sufficiently

9  alleged in the indictment either.  Because again,

10  Mr. Venkata's not alleged to have -- if you look at the

11  specific acts that Mr. Venkata is alleged to have

12  undertaken, they don't -- they're not in furtherance of any

13  of the misrepresentations -- alleged misrepresentations that

14  were made to the Department of Agriculture.  They have

15  nothing to do with any of Mr. Edwards or Ms. Patel's

16  interactions with the Department of Agriculture.

17         **THE COURT:**  Although, wire fraud involves more

18  than just misrepresentations.  And so as long as he was

19  aiding and abetting in some aspect of the wire fraud, that

20  probably would be sufficient.  The fraud, as I understand

21  it, was to take the property of the Department of Homeland

22  Security and the Postal Service, repackage it and sell it

23  back to the Department of Agriculture as though it were an

24  official or commercially available product.

25         I guess I'm wondering whether this telephone call

1    to -- conversation with Mr. Venkata and then delivering to

2    Mr. Venkata some of the software for those purposes is

3    sufficient.  And in that regard, I do think it's significant

4    that counts three through 11 start by incorporating all the

5    allegations in counts one through 16, so everything else

6    gets incorporated.  And so there are all the allegations

7    that -- about Mr. Venkata participating in this scheme to

8    steal the property from the Department of Homeland Security

9    and the Postal Service, and to then sell it to the

10   Department of Agriculture as though it were a commercially

11   developed product.

12        **MS. SAVARESE:**  Your Honor, I think the way you

13   articulated it sort of puts into stark relief the problem

14   here.  There are certainly allegations that Mr. Venkata

15   participated in a scheme to steal property from DHS-OIG and

16   USPS-OIG that is alleged more fully in the indictment.  What

17   is not alleged in the indictment is that Mr. Venkata

18   participated in the second portion of what you just

19   articulated, which is the scheme to sell it back to the

20   Department of Agriculture.  There's simply no allegations

21   that Mr. Venkata had any knowledge of or any involvement in

22   any scheme to sell this product back to the government.

23        And I think one example of this is the contrast

24   between paragraphs 15F and 15G in the indictment.  If you

25   look at paragraph 15F, all three defendants are alleged to

 1   have concealed the theft of DHS property from DHS itself.

 2   And we contest that that's adequately alleged.  But if you

 3   look at paragraph 15G, only Mr. Edwards and Ms. Patel are

 4   alleged to have made false representations to witness one to

 5   induce the Department of Agriculture to purchase EDS 2.0.  I

 6   think this sort of really distills -- the problem we have

 7   here is there's simply no allegations whatsoever that

 8   Mr. Venkata had any awareness of, he aided and abetted or

 9   that he participated in any way the second part of the

10   scheme involving the Department of Agriculture.

11         THE COURT:  My recollection of the charging

12   language under section 2 is that the person who's charged

13   with a section 2 violation does have to share in the

14   criminal purpose of the activity for which he or she is

15   aiding and abetting.  And we don't know what the evidence is

16   going to prove at trial here, but I don't think that

17   Mr. Venkata would have personally been involved in any

18   misrepresentation to the Department of Agriculture if he

19   knew, for example -- and I think there's some reason to --

20   you know, in the allegations of the complaint that this is

21   what the government's alleging, that he understood that they

22   were stealing the material from the Department of Homeland

23   Security.  They had to hide it from the Department of

24   Homeland Security so the Department of Homeland Security

25   wouldn't tell their potential customers that it was actually

1    the Department of Homeland Security's product with the idea

2    of then selling it back.

3           And even if Mr. Venkata had made any

4    misrepresentation to the Department of Homeland Security,

5    what 1343 applies to is a scheme or artifice to the fraud.

6    And I think the government would have to simply prove that

7    he shared in the overall criminal design or purposes of the

8    alleged wire fraud, and that he engaged in some conduct to

9    aid and abet or with the intention to further that crime.  I

10   guess without knowing the evidence in this case, I was able

11   to discern, or at least believe, that that's what the

12   government is charging from reading the indictment.  And

13   that seems to me, at least for purposes of the sufficiency

14   of the indictment, is probably sufficient.  Whether the

15   government's going to be able to actually deliver on that

16   charge at trial, I don't know.

17          **MS. SAVARESE:**  Your Honor, we -- it's our position

18   that the indictment does not allege that Mr. Venkata shared

19   in this criminal purpose.  Again, as I mentioned, if you

20   look at the allegations that underlie -- so basically if you

21   compare paragraphs 21 and paragraph 22, so the allegation

22   underlying counts three through 10 and count 11, it's very

23   clear that there is a shared criminal purpose shared by

24   Mr. Edwards and Ms. Patel as articulated in -- or as alleged

25   in paragraph 21.  And there were multiple wire transmissions

**A0556**

 1    that alleged that criminal purpose.  If you look at

 2    paragraph 22 of the indictment, it's a phone call in which

 3    Mr. Venkata called Mr. Edwards to -- rather, Mr. Edwards

 4    called Mr. Venkata to ask, "Where am I meeting you to pick

 5    up these DVDs?"

 6          Now, the allegations regarding the DVDs do not

 7    make clear that Mr. Venkata had any knowledge of what was

 8    contained on the DVDs.  He was allegedly told by Ms. Patel

 9    to hand off the DVDs to Mr. Edwards.  But again, that --

10    it's our position that that falls short of an allegation

11    that Mr. Venkata shared in a larger criminal purpose rather

12    than just merely passing off DVDs from his boss to somebody

13    that he knew that she was working with.  I think it's

14    also --

15          **THE COURT:**  Although the allegations are more than

16    that.  The allegations are that Mr. Venkata was working with

17    Mr. Edwards at Mr. Edwards' home to develop the product.  So

18    it wasn't just that he -- you know, at the direction of his

19    boss he wanted to drop something off, delivered some

20    package.  But that he was actually involved in developing

21    this new product at Mr. Edwards' home, which he presumably

22    knew was not performing services for the Department of

23    Homeland Security since Mr. Edwards didn't work there.

24          **MS. SAVARESE:**  We don't see any allegations in

25    those allegations that Mr. Venkata was performing favors for

**A0557**

1    Mr. Edwards and Ms. Patel.  We still don't see any

2    allegations that would indicate that Mr. Venkata knew what

3    their larger purpose was.  From our reading of the

4    indictment of the allegations in the indictment, it alleges

5    that Mr. Venkata did perform work at the behest of Ms. Patel

6    and Mr. Edwards.  But there's no allegation that he had any

7    awareness of the larger scheme here, and how it applied to

8    the Department of Agriculture.  On the face of the

9    indictment --

10          **THE COURT:**  There is the allegation in count one,

11   which is incorporated later in the complaint, that

12   Mr. Venkata and others did knowingly and willfully conspire,

13   combine, confederate and agree together with each other, and

14   with others known and unknown to the grand jury, to defraud

15   the United States by devising and intending to devise a

16   scheme to defraud and for obtaining money and property from

17   the Department of Agriculture.  And then there also is just

18   the fact that in count 11, it charges -- it does charge

19   under section 2.  And the only way I understand the

20   reference to section 2 is that it's an allegation that the

21   defendants made in that count aided and abetted the scheme.

22          So again, if we're just talking about providing

23   notice to the defense, and also ensuring that there was a

24   sufficient determination by a grand jury that there was

25   probable cause, it's not quite as bare bones I suppose as

**A0558**

1   you suggest.

2         **MS. SAVARESE:**   Certainly -- and we don't dispute

3   that there is an allegation in count one that does basically

4   regurgitate the elements of the defense and say that he

5   participated in a scheme to defraud the United States.

6   However, I think the point that we're making here is there's

7   quite a stark contrast between the subsequent substantive

8   allegations and overt acts with respect to Mr. Venkata on

9   the one hand, and with respect to Mr. Edwards and Ms. Patel

10  on the other hand.  Whereas the indictment alleges that

11  Ms. Edwards -- Mr. Edwards and Ms. Patel had communications

12  with the Department of Agriculture, and made representations

13  and concealed facts from the Department of Agriculture.

14  There are no such allegations -- specific allegations with

15  respect to Mr. Venkata.

16         We also note that I think it's telling that in the

17  government's own response brief, they didn't point to a

18  single allegation in the indictment regarding Mr. Venkata.

19  They focused solely on the allegations regarding Mr. Edwards

20  and Ms. Patel.  We've also at this point had the opportunity

21  to review voluminous discovery materials.  We've not seen

22  anything that indicates that Mr. Venkata did share in the

23  criminal purpose of Mr. Edwards and Ms. Patel with respect

24  to the Department of Agriculture, and I think that's the

25  critical fact here.

1        **THE COURT:**  There is the allegation in paragraph

2    20, the wire fraud count, that says, "Defendants Edwards and

3    Venkata knowingly devised a scheme to defraud USDA-OIG, and

4    to obtain property of the USDA-OIG by means of materially

5    false and fraudulent pretense representations and promises

6    and by concealing the material facts."  I mean, as you know,

7    it's often the case that just reciting the statutory

8    elements is sufficient.  That's not always the case where

9    there may be some failure to place the defense on the

10   notice -- on notice of what the actual charges are here.

11       But it does seem given the utter breadth of the

12   indictment that the defense is pretty well on notice.  And

13   what I take that allegation to mean is that Mr. Venkata did

14   in fact share in the criminal purpose of the alleged wire

15   fraud to defraud the Department of Agriculture.  Obviously

16   if the government can't prove at trial that Mr. Venkata was

17   aware of any scheme to defraud the Department of Agriculture

18   and didn't share in that criminal purpose, then either the

19   jury is going to decide it your way on that point or you can

20   file a motion under Rule 29 with the Court if the government

21   just doesn't have the evidence of that.

22       **MS. SAVARESE:**  I'd just like to circle back, Your

23   Honor, to the decision you made between counts one and count

24   11.  As I understand it, it's your view that count 11 is

25   adequately plead on an aiding and abetting theory with

1    respect to Mr. Venkata, but count one, given that it is a

2    conspiracy charge -- and as I mentioned, we don't see

3    allegations that Mr. Venkata had any knowledge of

4    representations that were being made to the Department of

5    Agriculture, I'm wondering if you view a distinction there.

6              The final point I would just make is one of the

7    cases discussed by both parties in the briefing was United

8    States v. Nance.  You know, despite the government's claim

9    that that case was limited to its unusual facts, we actually

10   think is it is much more on point here with respect to

11   Mr. Venkata.  In Nance, the indictment accused the defendant

12   of falsely making, quote, the following representations, and

13   then failed to actually include the following

14   representations.  We view that as quite similar to

15   Mr. Venkata here.  He's alleged to have knowingly devised a

16   scheme by means of material false -- materially false and

17   fraudulent pretenses, representations and promises by

18   concealing material facts.

19             But with respect to Mr. Venkata, putting aside

20   allegations with respect to Mr. Edwards and Ms. Patel, we

21   think the following misrepresentations were left out here as

22   well.  We think that that count is not adequately pled with

23   respect to Mr. Venkata.  As for the other arguments advanced

24   in our papers, we rest on the papers with those with respect

25   to materiality and a number of other points.  But the main

1    point that we wanted to advance here is just the lack of

2    concrete allegations with respect to Mr. Venkata.  Thank

3    you.

4              **THE COURT:**  Although I noticed this is different

5    from Nance not only with respect to the obvious error that

6    occurred in Nance where they left something out of the

7    indictment.  But also, here there's a fairly detailed

8    description of what the fraud -- what the wire fraud was and

9    what the scheme to defraud was.  I suppose the question is

10   just what Mr. Venkata's role was in that.  There are

11   conclusory allegations with respect to his role.  And then

12   the one non conclusory allegation is the wire transmission

13   from March 22nd, 2017 which seems to me would support a

14   section 2 claim.

15             But I think maybe this is a good time to hear from

16   Ms. Choy, and ask Ms. Choy what the theory is, and whether

17   it is a section 2 theory or whether the government is

18   contending that Mr. Venkata actually himself made

19   misrepresentations to the Department of Agriculture or

20   whether he just simply joined the scheme to do so without

21   doing so himself.

22             **MS. CHOY:**  Right.  With respect to count one, the

23   allegation is that Mr. Venkata knowingly and willfully

24   joined the conspiracy aware of its unlawful ends.  That's

25   all that's required to allege a conspiracy.  The defendant

1    does not have to know all of the details of the conspiracy,

2    does not have to participate in all of the overt acts.  With

3    respect to the wire fraud, similarly it's a scheme to

4    defraud.  And the allegation is that Mr. Venkata

5    participated in that scheme to defraud knowing its unlawful

6    ends.  And so these arguments about Mr. Venkata's knowledge

7    of the extent of the scheme, I think those are arguments

8    that will be raised at trial I'm sure, and appropriately so,

9    or maybe on a Rule 29 motion.  But for purposes of a motion

10   to dismiss, it's a notice pleading standard, not a

11   sufficiency standard, and the allegations in the indictment

12   clearly meet that standard.

13        THE COURT:  What is the answer to the question

14   about what the theory is with Mr. Venkata?  I'm not at all

15   concerned about the conspiracy charge, but on the wire

16   fraud, what is the government's theory?

17        MS. CHOY:  The theory is that he was a participant

18   in the scheme to defraud.  And so knowing the -- that

19   Edwards intended to develop this product to sell back to

20   USDA, based on these fraudulent pretenses, he knowingly

21   assisted Edwards in that endeavor.

22        THE COURT:  Ms. Savarese, anything further you

23   want to add?

24        MS. SAVARESE:  Nothing further, Your Honor.

25        THE COURT:  Well, I think the indictment is

1    sufficient.  We'll see what happens at trial, and whether I

2    need to take any further action at that point.  But I don't

3    think that counts one or 11 fail for lack of specificity, so

4    I'll deny that motion.  This leads me to the motion to

5    dismiss count two in part on statute of limitations grounds.

6           And I'll say by way of preface here, this does

7    strike me as different than the question of charging an

8    entire scheme in one count.  And if there are separate

9    violations, I think each violation does need to be within

10   the statute of limitations.  So I guess what I'm going to

11   want to hear from the government on this point is what are

12   the particular alleged thefts or misappropriations for

13   purposes of count two, and when did they occur for purposes

14   of the statute of limitations.  Particularly given the fact

15   that I think the government correctly disavows a continuing

16   violation theory at this point.

17          But I'm happy to start with -- well, maybe it

18   makes sense on this one for me to start with the government,

19   and then I'll give the defense an opportunity to respond

20   since I'm the one raising the question.

21          **MS. CHOY:**  Right.  So the specific taking of

22   property is alleged in paragraph 16K, which is Patel's

23   May 27th, 2016 copying of the EDS system.  And paragraph

24   16KK -- I'm sorry, 16MM, which is the copying and taking of

25   the USPS system.

**A0564**

1          THE COURT:  And those copyings then include the

2     copying of the source code as well as the database which had

3     the PII in it?

4          MS. CHOY:  Correct.

5          THE COURT:  And then going back -- oh, go ahead.

6          MS. CHOY:  Both of those takings occurred after --

7     within the limitations period.

8          THE COURT:  I think March 2015 is my recollection.

9          MS. CHOY:  Correct.  And so I don't think the

10    parties are actually very far apart on this issue.  We

11    recognize that we can't convict Mr. Venkata based on --

12    solely on conduct that occurred before March 5th, 2015.  The

13    question is just how to handle this issue.  We think it

14    could be fully resolved through a jury instruction to that

15    effect, if necessary, if it's even required after we see how

16    the facts come out at trial.  It's not necessary to dismiss

17    the indictment or part of the indictment.

18          THE COURT:  So turning back to paragraph 18 of the

19    indictment, which is the paragraph that I think the defense

20    is focused on here.  Obviously the reference to October of

21    2014 may be problematic.  But is there anything in there --

22    I mean, I suppose at this point I've already treated the

23    allegations with respect to the multiple activation keys,

24    the key management services code as stricken since the

25    government has elected not to pursue that.

1        So anything that remains in there, that is an

2   issue that I need to address.  And perhaps at this point,

3   the government can simply elect not to pursue some other

4   charges mentioned in there.

5        **MS. CHOY:**  We intend to prove up count two

6   entirely based on conduct that occurred within the

7   limitations period.  So the only allegation in the

8   indictment that are from before that period are paragraphs

9   16A and B.  Those are relevant to the conspiracy, but we're

10  not going to rely on those allegations for count two.

11       **THE COURT:**  Okay.  So who's got this one for the

12  defense?

13       **MS. SHIELDS:**  Your Honor, I can handle it.  I

14  think that we agree that obviously certain of these charges

15  are outside of the statute of limitations period for

16  Mr. Venkata.  And I do think that that can be resolved, as

17  Ms. Choy suggested, in any jury instruction.

18       **THE COURT:**  Okay.  So then what I'm going to do is

19  I will deny this motion -- why don't I do this:  I'll deny

20  the motion in part and grant it in part.  Just to the extent

21  that there are any allegations in count two of a theft

22  occurring before March of 2015, the Court will grant the

23  motion as to that.  I'm not sure there is anything, but if

24  there is, I'll grant it as to that.  Otherwise, I'll deny

25  the motion.

1    So then that brings us to -- oh, this brings us to

2    what I think is to my mind perhaps the most interesting and

3    perhaps trickiest of the questions, which is the adequacy of

4    the allegations as to 1028A.  And I'll tell you, I've spent

5    a little bit of time thinking about this, and it may be that

6    Ms. Choy has already addressed in part the concerns that

7    I've had with respect to this.  The parties don't really

8    extensively brief this question, but I've spent a fair

9    amount of time just worrying about what, during and in

10   relation to a felony violation.

11        And I tend to doubt that it's sufficient if

12   somebody steals a government laptop and they know that the

13   laptop has PII on it, and therefore they actually steal the

14   PII.  And they get it home, and as was their plan all along,

15   they wipe the laptop and sell it as a new laptop.  It's hard

16   for me to believe that that is what Congress intended to

17   reach with the enhanced penalties under 1028A.  And in fact,

18   doing some research on the issue, I think there's good

19   reason to think that's not what Congress intended with that

20   language.

21        There's no D.C. Circuit opinion interpreting that

22   language, but I think the history of what happened here is

23   that the Supreme Court in Smith vs. United States

24   interpreted the same language for purposes of 924(c).  And

25   as you all probably know, 924(c) applies to the use of a

1    firearm in relation to a drug trafficking crime.  And the

2    Supreme Court in the Smith case concluded that the phrase

3    "in relation to" means having some purpose or effect with

4    respect to a predicate crime.  It then said, "In other

5    words, the in relation to element is met with the identity

6    theft" -- I'm sorry, I'm reading the wrong thing here.

7           So the language from Smith was -- oh, is that,

8    "924(c) is not violated unless the use of the firearm

9    facilitates or furthers the drug crime."  And the Supreme

10   Court in Smith construed the language that way.  It was an

11   opinion by Justice O'Connor.  She quotes from the

12   dictionaries, and then she says:

13          "The phrase 'in relation to' thus, at a

14       minimum, clarifies that the firearm must have some

15       purpose or effect with respect to the drug

16       trafficking crime; its presence or involvement

17       cannot be the result of accident or coincidence.

18       As one court has observed, the 'in relation to'

19       language 'allays explicitly the concern that a

20       person could be' punished under section 924(c) for

21       committing a drug trafficking offense 'while in

22       possession of a firearm' even though the firearm's

23       presence is coincidental or entirely 'unrelated'

24       to the crime."  And then she says:  "Instead, the

25       gun at least must 'facilitate, or have the

1          potential of facilitating,' the drug trafficking

2          offense."

3               And then Congress -- that was back in 1993 that

4     the Supreme Court reached that decision.  And then Congress

5     enacts 1028A.  And in enacting 1028A, Congress -- at least

6     the legislative history suggests that Congress borrowed the

7     in relation to language from 924(c).  And the provision was

8     jointly proposed by the Department of Justice and by Senator

9     Feinstein.  And in explaining the language in 1028A, the

10    Justice Department noted that it had modeled the language on

11    924(c).  And in the hearings before the Subcommittee on

12    Crime, Terrorism and Homeland Security, the committee at

13    least indicates that the language is modeled on the 924(c)

14    language.

15              And then there is a little bit of case law that

16    has reached that conclusion, that in light of that history,

17    it makes sense that the language in 1028A should have the

18    same meaning as the language in 924(c).  And in fact, the

19    Justice Department filed a brief in a case in the Supreme

20    Court on the meaning of 1028A.  The Justice Department

21    itself argued that the language in 1028A should be read in

22    light of the language from 924(c).

23              And there's some precedent in which courts have

24    done the same.  The Sixth Circuit has read 1028A in light of

25    Smith to require that the in relation element include a

1   showing that the identity theft facilitates, or has the

2   potential of facilitating, the predicate felony.  And then

3   the Sixth Circuit's model jury instructions track that same

4   approach.

5          So I think there's a pretty good case that can be

6   made for the proposition that the in relation to language,

7   even though it's extremely broad language, should be read

8   and understood to mean that the identity theft facilitated

9   or furthered one of the enumerated crimes in 1028A.  And so

10  coming into today's hearing, I was skeptical about those

11  counts.  Although it may be that Ms. Choy has the answer to

12  me, which is that it actually was that the theft of the PII

13  in fact was intentional; and that it was for purposes of

14  facilitating the wire fraud at least, to the extent that it

15  was then used to develop a product that was going to be sold

16  back to the Department of Agriculture.

17         So that's my -- that's my preliminary thoughts

18  with respect to that count, but I'm happy to hear from all

19  of you.  Why don't I start with the defense on this one.

20         **MS. GHEIBI:**  Hi Judge Moss, can you hear me okay?

21  I'm not sure if my voice is coming through.

22         **THE COURT:**  It's not super loud.  I don't know if

23  there's a way to make your microphone louder.  My speakers

24  are all the way up, though.

25         **MS. GHEIBI:**  Okay.  I can just speak louder.

1           THE COURT:  That's fine.

2           MS. GHEIBI:  Let me just start off by saying that

3     I agree that it is the most interesting legal question.  And

4     we came in basically with the theory that you advanced, that

5     this is almost -- that this was almost a quasi reenactment

6     of the Smith interpretation.  Because by the time --

7     notably, by the time that 1028A was enacted, Smith had

8     already been on the books for 10 years.  And as we've

9     indicated, the legislative history made it very clear that

10    Congress essentially took this term of art and injected it

11    into 1028A.

12          And the Sixth Circuit, in U.S. v. Michael, cited

13    to Smith for that same exact interpretation.  And we'll take

14    it a step further and note that the Second Circuit, the

15    Eleventh Circuit, the Fourth Circuit in an unpublished

16    opinion have all cited to Michael to essentially advance the

17    same interpretation.  The Eighth Circuit in dicta recently

18    said that -- basically advanced the same interpretation,

19    that it can't be incidental or accidental.  But it must, at

20    a minimum -- again, quoting directly from Smith, "At a

21    minimum, it has to have some effect or purpose with respect

22    to the underlying offense."  And we think the government in

23    the indictment on its face fundamentally misapplied the

24    statute.

25          Now, I heard Ms. Choy describe that this PII was

1    necessary, because they needed to test it and beta test it

2    in order to prepare it for the government.  That is a novel

3    theory that we had not heard until a week before the trial.

4    That's nowhere in the indictment.  All the indictment said

5    was that the DHS case management system and the USPS case

6    management system were used to allegedly advance the fraud,

7    and that they happened to include PII which seems to be a

8    purely incidental possession or transfer of the PII.

9            And we think it would be particularly dangerous to

10   allow the same indictment to move forward and the charges to

11   go to trial, because then that would allow the government to

12   essentially weaponize 1028A which comes with a two-year

13   mandatory minimum; to then tack on an aggravated ID theft

14   charge on top of the underlying predicate offenses in order

15   to essentially gain the upper hand prior to trial.  But we

16   do think that what the indictment alleges, despite what

17   Ms. Choy has advanced today during the hearing -- again,

18   seven days prior to trial, the indictment doesn't allege

19   that the PII was in any way used to facilitate the

20   underlying purpose of the wire fraud.

21           And I do have to add that the government's

22   allegation identifies two predicate offenses.  The first one

23   is the theft.  So the wire fraud is one of them, the other

24   one is theft.  So essentially the argument is that because

25   the PII was included on the USPS case management system, the

1    theft of the PII was during and in relation to the theft of

2    the case management system which, again, just conveyed a

3    fundamental misunderstanding of the statute.  Because there

4    was no way the PII that was allegedly on the case management

5    system could have in any way furthered the theft of the case

6    management system.

7           And an analogy to that would be U.S. v. Shuler,

8    which is a Tenth Circuit opinion interpreting 924(c), the

9    statute you cited earlier.  In that case, the defendants

10   allegedly went into the store and they stole firearms.  And

11   the government alleged that they carried or used the

12   firearms during and in relation to the robbery.  And the

13   court dismissed that count based on the theory that -- you

14   know, essentially rejecting this very literal reading of

15   during and in relation to, because under Smith it has to

16   further it.  And there's no way --

17          THE COURT:  Can you give me the citation to that

18   case, please?

19          MS. GHEIBI:  Sure, it's 181 F.3d 1188.  And the

20   theory was that the firearms were the objects of the

21   robbery.  There was no allegation that they furthered it.

22   The same is true here.  The vast majority of the allegations

23   in the indictment with respect to the PII, at least with

24   respect to Mr. Venkata, is that he was involved in the theft

25   of the case management system which included the PII.  And

1    sure, perhaps the indictment alleges that the PII was the

2    incidental object of the theft perhaps, but in no way

3    furthered or advanced it.

4         Again, we'd like to point out that the

5    allegations -- if you look at the allegations in the

6    indictment with respect to Mr. Venkata, this novel theory

7    advanced by Ms. Choy is nowhere to be found in the

8    indictment.  And we think there's a serious issue of notice

9    if we allow the government to advance these four counts of

10   PII which can have consecutive sentences, because a week

11   before the trial they've identified this theory.

12        And one last thing I'll mention is that we

13   recently -- the government recently let us know that the PII

14   of the four individuals were USPS PII.  So USPS

15   individual -- personally identifying information with

16   respect to USPS-OIG individuals.  So we are disputing the

17   fact that the government should not have charged four

18   separate charges of the aggravated identity theft.  Because

19   if they all belong to USPS-OIG individuals, then the

20   underlying acts, whether it's the predicate offense and

21   everything else, was the same.  And we'd like to direct the

22   Court's attention to U.S. vs. Miller, which is a Seventh

23   Circuit case.  And the citation for that is 883 F.3d 998.

24   In that case, the court essentially held that if the

25   offenses -- quote, unquote offenses came from the same

1      underlying scheme or transaction, that there can only be one

2      charge of 1028A.

3               Citing to the Supreme Court in Bell and the

4      underlying rule of lenity, that the statute is ambiguous

5      with respect to unit of prosecution.  In that case -- just

6      to give you some context on the facts.  In that case, the

7      defendant allegedly had a book of 200 PIIs with respect to

8      200 different individuals.  And he used this information in

9      a continuing scheme of credit card fraud.  And the court

10     essentially held that it would be unreasonable to think that

11     Congress would have wanted this act to give rise to 200

12     separate counts of aggravated identity theft, and that there

13     could only be one count.

14               So on that ground, we are -- and it's worth

15     mentioning that the government's alleging that the

16     defendants stole over 250,000 PII.  And it would be

17     unreasonable to think that Congress wanted DOJ to have that

18     level of discretion, to charge anywhere between one count of

19     aggravated identity theft to 250,000 counts of identity

20     theft stemming from the same underlying scheme.

21               So I'll stop there.  Thank you.

22               THE COURT:  Thank you, very helpful.  Ms. Choy.

23               MS. CHOY:  Sure, thank you.  So paragraph 16KK of

24     the indictment -- and it's on page 14.

25               THE COURT:  I'm sorry, say that again.  16 what?

**A0575**

1        **MS. CHOY:**  16KK on page 14 of the indictment

2     alleges that Mr. Venkata assisted Mr. Edwards in setting up

3     the PARIS server, which is the USPS system, complete with

4     all the data from STARS, which is the database that houses

5     the PII, on a server at his home in order to assist the

6     developers in India in seeing how the system under

7     development should work.  So that, Your Honor, is our theory

8     of how the theft of the PII furthered the scheme in this

9     case.

10        Similar allegations appear at paragraph 15E of the

11     indictment, which is the manner and means of the conspiracy.

12     So I don't think we have any dispute with respect to your

13     reading of the precedent of what's required.  We just

14     believe that the indictment has adequately alleged that

15     element in this case.  And given that, we should be given

16     the opportunity at trial to prove that up.

17        **THE COURT:**  What about the defense's argument that

18     at most, there should be only one count under 1028A?

19        **MS. CHOY:**  That argument is not raised in their

20     briefs, Your Honor, so I'm not prepared to address it.  I

21     haven't heard that argument before.  If Your Honor's

22     interested in that, I would ask for the opportunity to

23     submit some briefing.

24        **THE COURT:**  Well, I think that would be -- I may

25     have to think a little bit about these issues, but when

59

1    would you like to file something on that?  Obviously we're

2    running short on time, but sometime in the next couple of

3    days?

4              **MS. CHOY:**  Well, I think it would make sense for

5    the defense to file something first given that they seem to

6    be asking for a dismissal of counts, and then we could

7    respond.

8              **THE COURT:**  Ms. Gheibi.

9              **MS. GHEIBI:**  Sure, we're happy to submit

10   something.

11             **THE COURT:**  Could you do it by midday tomorrow

12   even?  It sounds to me like you may just need to point us

13   towards U.S. vs. Miller.

14             **MS. GHEIBI:**  Sure, yeah, I'm happy to do that.  We

15   can do that by midday tomorrow.  Again, it will just be a

16   summary of what we articulated.  We think it's a pretty

17   straightforward issue, but yes, we'll submit that.

18             **THE COURT:**  Ms. Choy, what about responding to

19   that?

20             **MS. CHOY:**  Could we have 24 hours to respond?

21             **THE COURT:**  Yes, that would be fine, so midday on

22   Wednesday.  So I'll think about that.

23             I'm sorry, I'm squinting as I'm looking to make

24   sure I say your name right.  Is it Ms. Gheibi?

25             **MS. GHEIBI:**  Gheibi, yes.

1          THE COURT:  Ms. Gheibi, what about Ms. Choy's

2     comeback, that in fact the indictment does include the

3     allegations as she's described them?

4          MS. GHEIBI:  Well, I think unless I misheard, the

5     only one I caught was KK at the bottom of page 14.  There's

6     no mention of PII or how the PII was used.  There's a

7     discussion that, again, the EDS system was somehow involved

8     in this, and the STARS system was somehow involved in this.

9     And so it seems like, sure, these systems were involved and

10    there was PII incidentally included on them.  But the

11    government hasn't actually drawn a causation nexus, which is

12    what's required under the Smith case law, between the PII

13    and the underlying fraud.

14          If I take a bag to a bank robbery and I

15    accidentally leave a gun in there, am I going to be charged

16    with section 924(c) if the bag was used in furtherance of

17    the robbery to fill it with cash and it happened to include

18    by accident a gun that I didn't know about or I wasn't aware

19    about, and there isn't an actual nexus drawn between the gun

20    and the robbery.  I mean, again, section KK --

21          THE COURT:  But this does draw the nexus in that

22    it makes the point that the data was imported from STARS to

23    assist the developers in India in seeing how this system

24    under development should work.  And therefore, as I

25    understand it, the data was used to show the developers how

**A0578**

1     the system would work.  And that the developers in India had

2     to know how the system would work so that they could then

3     create the new product to be sold to the Department of

4     Agriculture.  Unless there's some other data other than PII.

5     But as I understand it, that's what the data was, was the

6     PII.

7              MS. GHEIBI:  Well, I think that the data might

8     have been for a whole host of things.  I mean, every time --

9     unless we're misreading this, every time the government sort

10    of -- I mean, I'm looking at five, allegation five on page

11    three:  "Defendants Edwards and Patel had a CD including

12    USPS-OIG database, source code, script, file server content

13    which included PII."  So there is a lot of stuff in there

14    that's included within the database other than PII.

15             So again, we'll reiterate that the indictment on

16    its face doesn't allege that the PII was used, or that

17    Mr. Venkata had any involvement in sending the PII directly

18    to the Indian developers in India -- at least we don't see

19    that allegation in the indictment.  But we're happy to --

20             THE COURT:  Although there is that paragraph 15E

21    which also says that one of the manner and means of the

22    conspiracy was transferring the stolen PII to the software

23    developers in India who were assisting Defendant Edwards

24    with the creation and development of a private, commercially

25    owned version.  So if you combine that allegation with the

1    latter one, it may not be the clearest thing in the world,

2    but it does seem to raise the issue, to raise that argument.

3    It certainly doesn't seem like Ms. Choy is inventing this

4    for the first time today.

5            MS. GHEIBI:  I believe that allegation is only

6    with respect to Mr. Edwards.  But Mr. Edwards was -- at the

7    top of page seven:  "Defendant Edwards used, possessed and

8    transferred the stolen documents/information, including the

9    PII."  I don't think there are allegations with respect to

10   Mr. Venkata.

11           THE COURT:  Except for in 16KK.

12           MS. GHEIBI:  Except for in 16KK.  But again, we'd

13   like to point out that every time the government -- I mean,

14   the government seemed pretty focused on the PII.  So every

15   time they mentioned PII they identified it specifically in

16   the indictment, and in that one they don't.  So the

17   defendant can't be asked to guess as to the meaning of the

18   indictment or what it's trying to convey when all it says is

19   that the databases were essentially -- or at the very least,

20   some aspect of the database.  Again, we don't think that KK

21   provides any sufficient notice of the PII.

22           THE COURT:  I'm sorry, but if you go back to

23   paragraph 15A, it refers to the U.S. Postal Service OIG's

24   STARS database and PARIS system, which included PII of U.S.

25   Postal Service employees.

53

1       **MS. GHEIBI:**  Right, which incidentally included

2    PII, but that doesn't mean that 16KK is alleging that the

3    PII was used in furtherance of it, right, it's alleging that

4    the database.  And it's entirely possible that there are

5    aspects of the database not including the PII used.  If the

6    government wanted to allege that the PII -- that Mr. Venkata

7    was involved in the transfer of the PII at that point to the

8    Indian developers, it had to have alleged it.  We were not

9    on notice.

10      **THE COURT:**  Although if you read 15A and 16KK

11   together, you've already defined in 15A the PARIS system as

12   including the PII on U.S. Postal Service employees.  And

13   then in 16KK, it says that the PARIS system with data

14   imported from STARS was then transferred to India.  So if

15   you read those paragraphs together, the earlier paragraph

16   refers to STARS as well.  I don't think it's an unreasonable

17   reading of that, that what this is alleging is that the

18   STARS and PARIS systems included the PII on U.S. Postal

19   Service employees.  And that Mr. Venkata assisted

20   Mr. Edwards to install and configure the PARIS -- configure

21   PARIS with STARS on his home server to assist developers in

22   India in seeing how the system under development should

23   work.

24      **MS. GHEIBI:**  That assumes that the only data on

25   STARS was the PII, which at least we don't read -- I mean,

A0581

54

1    we read the indictment as saying the STARS database included

2    various different things including PII.  And that KK then

3    alleges some data from the STARS database was just sent, not

4    that PII was sent.  I mean, I would tend to agree with you,

5    Judge Moss, if the government had said something along the

6    lines of with the data imported from STARS, and that that

7    was then used to facilitate the work of the Indian

8    developers, but they don't allege that.

9         **MS. SHIELDS:**  Your Honor, if I may, I think that

10    one of the fundamental issues is what you raised from the

11    very beginning, which is that looking to see in this

12    indictment what Mr. Venkata is specifically alleged with.

13    And Your Honor's had to cobble together various pieces of

14    the indictment in order to understand what the government is

15    charging.  And while the defense obviously agrees that the

16    government doesn't need to prove its case in the

17    indictment -- a point raised by Ms. Savarese, by Ms. Gheibi,

18    by all the defense, is that these indictments are not

19    sufficient on their face to provide the defense notice with

20    what's being charged here.  They both fail as a legal and a

21    factual matter.

22         **THE COURT:**  Well, I think I have to think about

23    this one a little bit further.  And in addition to

24    addressing the Miller decision in whatever you're filing

25    tomorrow and the next day, if there's anything else you want

1    to add with respect to this issue -- and by this issue I

2    mean whether the 1028A counts are adequate and also whether

3    there should be more than one of them, I'd be happy to

4    consider that.

5            I still have the motion to dismiss counts one and

6    two for failure to state a claim, and the motions in limine.

7    Why don't we take a short break now.  I'd like to get this

8    done today if we can, and it's already close to 4:00

9    o'clock.  But why don't we take a break until five minutes

10   after 4:00 and come back.  Hopefully we can get through the

11   rest, if not we'll have to schedule a time to do that.

12           (Recess taken at 3:52 p.m.)

13           (Back on the record at 4:06 p.m.)

14           **THE COURT:**  One last thing I wanted to note with

15   respect to the 1028A issue is, putting aside the question

16   for now as to whether the indictment was sufficient and

17   whether the defense should have been on notice with respect

18   to the theory that Ms. Choy has outlined, this idea of a

19   question as to whether the defense is in fact surprised to

20   learn that today, whether you feel as though you need

21   additional time for preparation.  You should let me know

22   promptly if that's the case.

23           **MS. SHIELDS:**  Understood, Your Honor.  This is the

24   first time we've heard this theory that Ms. Choy

25   articulated.  We can confer, though, and we'll let Your

**A0583**

1  Honor know.  But I think we are prepared to proceed on

2  Monday.

3           **THE COURT:**  Okay, that's fine.  Let me know if

4  there is an issue with respect to that.  I will say, I don't

5  really fault Ms. Choy for not developing this argument more

6  in her opposition brief, because quite frankly the arguments

7  on both sides were not terribly well developed.  I think

8  there was maybe a sentence or two that referred to the in

9  relation to language, and it was almost in passing.  So the

10  government responded almost in passing to the argument with

11  respect to in relation.  And I think perhaps all of us in

12  getting ready for today's hearing and focusing on it

13  developed the arguments more than they were developed in the

14  briefing, which is independent of the question whether the

15  language is sufficient.

16           So why don't we move on to the last of the motions

17  to dismiss.  I have a suggestion with respect to this one.

18  This is the motion to dismiss counts one and two, in part

19  for failure to state an offense.  And as I understand the

20  motions, really they don't object or seek dismissal outright

21  of the counts, but they object to the language of purloining

22  and stealing, but not the language of conversion and some of

23  the other language.  This strikes me as an issue that is

24  best perhaps best dealt with simply in the jury

25  instructions.  But if anyone disagrees with that or thinks

1     we should address it now, I'd be happy to do so.

2           Who has this one for the defense?

3           **MS. GHEIBI:**  I do again.  So we agree that that

4     issue can be resolved with respect to the jury instructions.

5     As we said, we don't think there's any real allegation of

6     theft in the common law sense of the term.  But we would

7     like to advance -- and we acknowledge that this would be the

8     first time for advancing this, but we would like to

9     challenge the theft charge with respect to Mr. Venkata as

10    insufficient.  In looking at the facts, we don't believe

11    that any of the facts actually allege that Mr. Venkata was

12    involved in any of the thefts.  Every time -- I'm sorry, I

13    didn't mean to cut you off, Judge, if you were about to say

14    something.

15          **THE COURT:**  No, no, I was just looking at the

16    indictment.

17          **MS. GHEIBI:**  Sure.  So as Ms. Choy earlier

18    identified with you in a discussion, there really are only

19    two things that are alleged to have been stolen:  The

20    USPS-OIG system which included the PII, and the DHS-OIG

21    system which included the other PII.  And every time

22    Mr. Venkata is alleged to have come into contact with this

23    property or this item or information, the item was alleged

24    already stolen.

25          The indictment alleges that Ms. Patel copied from

**A0585**

1    the government's system and took a disc and handed it to

2    Mr. Edwards; that Mr. Venkata allegedly fixed the computer

3    that had the stolen DHS-OIG system on it; that Mr. Venkata

4    allegedly gave a DVD to Mr. Edwards on which Ms. Patel had

5    downloaded the information on.  There's no allegation that

6    Mr. Venkata was involved in the theft.  At best, the

7    indictment alleges that he was in possession of stolen

8    property which the government doesn't charge him with.  They

9    charged him with a 641 charge.  That's nowhere to be found

10   in the indictment, so we're challenging that as

11   insufficient.

12        **THE COURT:**  Well, Ms. Choy's probably not ready to

13   respond to that since this is the first time it's been

14   raised.

15        **MS. GHEIBI:**  We understand.

16        **MS. CHOY:**  Right, Your Honor, we'd ask for

17   briefing on that if the defense is planning to press it.

18   I'd also note that the deadline for moving to dismiss passed

19   many months ago.

20        **THE COURT:**  You're welcome to file a motion, and

21   the government is welcome to oppose it, both on the

22   substance as well as on procedural grounds.  In doing so,

23   I'll just have to sort that out on the papers.  The one

24   thing I will say, though, is I'm not at all convinced that a

25   theft of the nature of what we're talking about here is

**A0586**

1    something that's pinpointed at one moment in time, and that

2    the moment that somebody copies something onto a disc

3    constitutes the theft.  Because we're talking about here

4    conversion of government property, and it strikes me that

5    that is likely something, at least to the extent you're

6    dealing with conversion, that takes place over some time.

7         And I think you yourselves have argued in your

8    papers and said there's no purloining or stealing here

9    because the government wasn't deprived of the use or the

10   access to its -- of its property.  And I suppose by the same

11   token, the question is if there's a conversion, when the

12   conversion occurs.  And I'm not at all convinced or sure

13   that a conversion occurs when someone sits at their computer

14   and copies something onto a disc at that point in time.  You

15   may have to pinpoint and think hard about when it is the

16   conversion would actually occur.  I think it has to be

17   something that is then -- I'm just taking a look at the

18   language of 641.  It has to be converted to the other

19   person's use or the use of another.  So it may be that that

20   doesn't actually occur at the moment of copying, but until

21   it actually is subject to or in a form that can then be used

22   by someone else.  But you're welcome to submit something,

23   and the government's welcome to oppose it on substantive or

24   procedural grounds.

25        So I'm going to then simply deny the motion that's

1    currently filed to dismiss counts one and two for failure to

2    state an offense without prejudice, and simply reserve the

3    ability to raise those issues with respect to the

4    appropriate jury instructions.  I will say, you should go

5    back and take a look at the preliminary instructions --

6    actually, I haven't circulated them yet.  I have to

7    circulate the preliminary instructions, and I haven't done

8    that yet because I was waiting to resolve some of these

9    issues here today.  But take a look and make sure the

10   language of the preliminary instructions doesn't create a

11   problem.  I think there's probably a way that we can be

12   vague enough at the preliminary instructions side that I'm

13   not prejudicing one side or the other on this issue.

14           So that then brings me to the motions in limine.

15           **MS. CHOY:**  May I ask one more question?

16           **THE COURT:**  Yes.

17           **MS. CHOY:**  To the extent that defense would like

18   to file an additional motion to dismiss on the grounds we

19   just discussed, would you like to set a briefing schedule

20   for that given that --

21           **THE COURT:**  I was kind of assuming the same

22   schedule, Ms. Gheibi, unless that's impossible.

23           **MS. GHEIBI:**  I'm not sure that's possible.  But in

24   light of the discussions, we'll take back the issue and

25   confer among ourselves as to whether or not we will file

1     something like that, knowing that it will be subject to

2     substantive as well as procedural objections.  But we'll

3     take that back without committing to a particular deadline,

4     if that's okay, given the fact that tomorrow at noon we have

5     the 1028A deadline.

6            THE COURT:  Well, let me say with respect to this

7     that without prejudice to the government arguing that it's

8     not timely, I do want you to file, if you're going to file

9     anything with respect to this issue, no later than noon on

10    Wednesday so there's some opportunity to respond unless

11    you're all going to get back to me and tell me that you

12    think the trial has to be postponed for some reason.  But

13    given our current trial schedule, I think that Wednesday's

14    probably the drop dead date to file something like that.

15    And as I said, that's without prejudice to the government

16    arguing that it's untimely.

17           MS. GHEIBI:  Got it.

18           THE COURT:  So that takes me to the motions in

19    limine.  The first one is the motion in limine to preclude

20    use of the term EDS 2.0.  Who has that one for the defense?

21           MS. SHIELDS:  Your Honor, I am going to address

22    that, and note that because Mr. Venkata is not alleged to

23    have ever used the term EDS 2.0, that's not something that

24    we intend to proceed with.

25           THE COURT:  Do you mean you're dropping the

**A0589**

1    motion?

2              **MS. SHIELDS:**  Yes.

3              **THE COURT:**  So that --

4         **MS. SHIELDS:**  That was an argument that was

5    advanced by Mr. Edwards, so Mr. Venkata -- we don't need to

6    proceed with that.

7         **THE COURT:**  That motion then is withdrawn.  Then

8    there's the next motion in limine to preclude the government

9    from presenting evidence relating to the computer access

10   agreements.

11        **MS. SHIELDS:**  Yes, Your Honor, I'm handling that.

12   As noted in the original briefing, the computer access

13   agreements, purportedly the government claims that they're

14   using them to support the defendant's mens rea, or intent.

15   But because of the language of the computer access

16   agreements, that these defendants knowingly stole this

17   information, in their response to that motion they state

18   that they're not entering these pieces of evidence because

19   they're not claiming that the defendants actually violated

20   these agreements.  But that's exactly what they are

21   claiming.

22             They are claiming that because these defendants

23   violated these employee agreements, that that somehow means

24   that they had the requisite mens rea to commit the charged

25   acts.  Again, these are employment agreements.  It's not

**1**  clear why an employment agreement and why the violation of a

**2**  company policy should be relevant to a criminal offense.  So

**3**  I think that it is pretty clear from the government's own

**4**  briefing that this is an issue that is just not appropriate

**5**  for a trial determination.

**6**  　　　　　**THE COURT:**  I guess I'm open to the notion of a

**7**  limiting instruction I suppose, if you think that's

**8**  appropriate.  But it strikes me that this is pretty central

**9**  evidence for the government with respect to the charges in

**10**  the case and the mens rea.  Among other things, we're going

**11**  to get in a little while to the defense arguing that it

**12**  ought to be able to argue that Mr. Venkata was acting with

**13**  authorization.  Even if the Court concludes that the

**14**  affirmative defenses are not proper, you're certainly able

**15**  to argue, and the government certainly has to prove, that

**16**  Mr. Venkata was -- that he knew that he was improperly

**17**  taking property.  I think the government has conceded that

**18**  it's a willfulness standard here.

**19**  　　　　　So having been told by your employer and having

**20**  signed a piece of paper from your employer acknowledging

**21**  that you cannot remove any of the software without express

**22**  written permission strikes me as evidence that goes to -- is

**23**  central to the government's case, as one can imagine.

**24**  　　　　　**MS. SHIELDS:**  Your Honor, I would agree.  And we

**25**  will argue that Mr. Venkata was provided with proper

1    authorization for certain elements of the government's case.

2    But it is, again, unclear to me how an employment agreement,

3    a document that an employee signs, would be relevant to an

4    intent for a criminal offense.  And I think that the concern

5    here is that the standards of whether or not Mr. Venkata

6    specifically followed the dictates of this employee policy,

7    I don't think that that demonstrates the mens rea that's

8    required for a theft of government information.  It's simply

9    that he allegedly violated a company policy.  And there's

10   nothing here that says that violation of this company policy

11   could result in any sort of criminal action.  There's

12   nothing that ties the employee policy to a criminal offense.

13            **THE COURT:**  Who's responding for the government on

14   this one?

15            **MR. SALGADO:**  I am, Judge.  So obviously we do not

16   concede one inch on the argument that any and all evidence

17   of mens rea needs to be tied to a criminal statute.  This

18   evidence, as Your Honor just pointed out, goes to the

19   defendant's -- Mr. Venkata's knowledge that this data was to

20   be protected, this data was sensitive, and that he was duty

21   bound to protect it.  We're not going to argue that his

22   conduct violated the agreements.  The way we intend to

23   present this testimony at trial is to ask witnesses whether

24   the sensitive data would have been covered by these types of

25   agreements.

1          Because again, what we're looking for here, the

2     probative component of this evidence isn't that he violated

3     the agreement, it's that he was put on notice that the data

4     was to be protected.  That's why it's relevant under U.S. v.

5     Latin.  Knowledge is -- in cases where knowledge is of

6     consequence, any evidence going to that knowledge is

7     admissible as relevant.

8          And just to Ms. Shields' point, we have noticed

9     up -- this is sort of belt and suspenders, right.  We have

10    noticed up as an exhibit the end user agreement for EDS that

11    clearly states that any improper use or access of the data

12    would subject the individual, the end user -- in this case

13    Mr. Venkata, to civil and criminal proceedings.  So that's

14    as far as the relevance of the evidence goes.  We do not

15    believe that the allegations of prejudice are availing to

16    the defense.  And as Your Honor noted, to the extent that

17    anything happens at trial, either imponderables or

18    otherwise, a limiting instruction would take care of any of

19    those concerns.

20         But you don't even have to go that far.  Again, we

21    don't know how this is going to develop at trial.  But the

22    Judge's -- the Court's instruction to the jury are clear,

23    right, these are the elements, this is what you have to

24    find.  I suspect that nowhere in those instructions will

25    Your Honor include the computer access agreements as an

```
 1   element --

 2          THE COURT:  I'm sorry, include what, Mr. Salgado?

 3          MR. SALGADO:  The computer access agreements.

 4          THE COURT:  I see.  Any final words on this one,

 5   Ms. Shields?

 6          MS. SHIELDS:  No, Your Honor.  Again, I think that

 7   I understand that the claim is that these computer access

 8   agreements will show that Mr. Venkata was duty bound to hold

 9   this information.  Again, that's within an employee context,

10   within an employee administrative proceeding, certainly not

11   for purposes of a criminal proceedings.  If Your Honor does

12   agree that this is relevant -- again, the defense contests

13   that, we do think a limiting instruction would be

14   appropriate.

15          THE COURT:  Well, I agree about the limiting

16   instruction.  I'm going to deny the motion, but will

17   consider an appropriate limiting instruction.  It does

18   strike me that it's not a question about whether Mr. Venkata

19   was duty bound and whether he violated some duty, but

20   whether he was aware of the fact that the databases and

21   software were highly protected property.  And that not only

22   could one not remove it from the facility, but that one

23   could not do so without written consent.  So I think it's

24   highly relevant in that regard, but I don't think that it's

25   relevant to show that he violated a duty of some type and
```

1    that therefore a limiting instruction is necessary to do

2    that.

3          Then the next one I have up is the -- I guess this

4    may be the last one that I have, which is the government's

5    motion in limine to preclude two or possibly three

6    affirmative defenses.  The government wants to preclude an

7    affirmative defense of public authority or entrapment by

8    estoppel, and also wants to preclude a derivative entrapment

9    affirmative defense.  I'm happy to hear from the parties on

10   this one as well.

11         Who has this one for the defense?

12         **MS. SHIELDS:**  Your Honor, I do.  I don't know if

13   you want to start with the United States since it's their

14   motion or do you want me to address it now?

15         **THE COURT:**  Oh, fair enough.  Why don't I start

16   with the United States.

17         **MS. CHOY:**  Thank you, Your Honor.  So the public

18   authority and entrapment defenses, they're narrowly tailored

19   affirmative defenses, and they're really aimed at curbing

20   abusive law enforcement practices.  So for example, the

21   public authority defense would apply where an official

22   authorizes a citizen to do something that's otherwise

23   illegal, usually as part of a covert law enforcement

24   operation or a public safety measure.  So for example, if

25   the FBI directed a confidential informant to engage in a

**A0595**

1    controlled drug purchase, and then turned around and tried

2    to prosecute that informant for violating narcotics laws,

3    that person would have a public authority defense.  Or if a

4    fireman directed a citizen to break a window to save a

5    person inside a burning building, and then tried to

6    prosecute that person for breaking and entering, that person

7    would have a public authority defense.

8          Similarly, entrapment applies when the crime

9    originates from the government as opposed to from a citizen,

10   and the citizen was not predisposed to commit the crime.

11   Both these defenses apply where even though the citizen has

12   committed a crime, it would be unfair to prosecute them

13   because of something the government did.  So Mr. Venkata, by

14   asserting his defenses, is attempting to stretch them really

15   beyond all recognition such that they would apply in a wide

16   range of situations where a defendant follows direction from

17   a supervisor who happens to be a government employee or is

18   recruited to commit a crime by a co-conspirator who happens

19   to be a government employee.  So that effort, Your Honor,

20   should be rejected.

21         So I'll start with public authority.  In our

22   opening papers, we addressed all variants of public

23   authority defense.  But in the defendant's opposition, it

24   becomes clear that he is asserting the defense of apparent

25   public authority and not actual public authority or

**A0596**

1    entrapment by estoppel, so I'll just address that.  So there

2    are two problems with this defense.  The first is that

3    reliance on apparent public authority is not a valid

4    defense.  And the second is that even if it were,

5    Mr. Venkata could not establish it as a matter of law.

6         So first, the Court should hold that there is no

7    apparent public authority defense.  The D.C. Circuit

8    expressly rejected a very similar line of argument in the

9    North case set in our briefs.  In that case, the defendant

10   claimed that reasonable good faith reliance on his

11   superior's apparent authorization was a complete defense to

12   the charges.  And the D.C. Circuit rejected that claim

13   saying following orders is not a defense.

14        So the defense that Mr. Venkata is attempting to

15   assert here is very similar to the one that was rejected in

16   North.  He's requested a preliminary instruction that acting

17   on a reasonable belief that you're acting as an authorized

18   government agent is a complete defense.  So I struggle to

19   see any daylight between the defense that was rejected in

20   North and the one that Mr. Venkata is asserting here.  In

21   addition, other circuits have really addressed this even

22   more directly addressing the apparent public authority

23   defense in those terms.  And every single one that has

24   decided this issue has said that reliance on apparent public

25   authority is not a defense.  And those cases are collected

1    in footnote one of the government's motion.

2          And there's good reason why the circuits are

3    unanimous on this issue.  When a defendant asserts that he

4    mistakenly believes that an official had authority to permit

5    him to commit a crime, he makes a mistake of law.  And

6    long-standing common law principles say that mistake of law

7    is not a defense.  So in light of North, and the unanimous

8    consensus of all the circuits, we'd ask the Court to --

9          **THE COURT:**  I'm sorry, Ms. Choy -- and I don't

10   think this necessarily goes to the availability of the

11   defense, but I think I disagree with you that mistake of law

12   is not a defense in this case.  Because I think the

13   government concedes that the standard is willfulness, and so

14   it may well be that mistake of law is a defense to a mens

15   rea requirement that is as high as the willfulness

16   requirement.  In other words, you had to know it was

17   unlawful in some way.

18         **MS. CHOY:**  That's a fair point, Your Honor.  I

19   think in offenses where it's a willfulness standard, a

20   mistake of law would go to negating mens rea.  It still

21   wouldn't be an affirmative defense, which is what

22   Mr. Venkata is seeking here.  So his point is there is no

23   affirmative defense of reliance on apparent public

24   authority.  And the second is even if that were a defense,

25   Mr. Venkata could not establish it here as a matter of law.

1    He had an opportunity in his response to proffer facts that

2    he thinks would meet the standards, and has failed to do so?

3    Even under the broadest formulation of the apparent public

4    authority defense -- which was the one stated by Judge

5    Wilkie in the Barker case, the defendant has the burden to

6    show facts justifying a defendant's reasonable reliance on

7    the official's apparent authority; and also a legal theory

8    on which to base a reasonable belief that the official

9    possessed such authority.

10           So here, there are no facts or a plausible legal

11   theory that would justify a belief that Ms. Patel had

12   authority to sanction violations of the criminal law.  And

13   so I think the confusion here with the defense is the

14   question is authority to do what, right.  They're seeking to

15   argue that -- I mean, they point to the fact about

16   Ms. Patel's job responsibilities, the fact that she was a

17   supervisor, that she was managing the IT systems, that she

18   had some authority with respect to the code and the

19   software.  All of that I think may go to mens rea, and

20   they're entitled to argue that at trial.  But none of it

21   goes to Ms. Patel's authority to permit conduct that would

22   otherwise be unlawful.  And that's the authority that is at

23   issue in the public authority defense.  So we think it would

24   be appropriate to preclude him from asserting this defense

25   at trial.

**A0599**

1          And just one last point, Your Honor, is that we

2     think it is very important to resolve this issue before

3     trial.  There are going to be really important effects on

4     the conduct of the trial whether this defense is allowed to

5     go forward or not.  You have the preliminary instructions to

6     the jury.  They've requested a preliminary instruction on

7     apparent public authority.  It will undoubtedly affect both

8     sides' strategies.  It might affect evidentiary

9     determinations.  And if it turns out that he can't

10    establish -- if this is a defense and he can't establish it,

11    allowing the defense to make arguments and opening

12    statements, to present evidence will be very confusing to

13    the jury.  So we'd ask that you do resolve this before

14    trial.

15          **THE COURT:**  All right, thank you.  Ms. Shields --

16    oh, actually do you want to address the entrapment as well,

17    and then we'll just deal with the other, Ms. Choy?

18          **MS. CHOY:**  Sure.  So the type of entrapment that

19    Mr. Venkata is asserting here is derivative entrapment,

20    which is entrapment via an unwitting government agent.  And

21    the standard for derivative entrapment is set forth in

22    United States v. Washington, which is cited on page 12 of

23    the government's opening brief.  And that standard is a

24    demanding one, it's a very narrowly available defense.

25          In Washington, the D.C. Circuit said:  "The

1     derivative entrapment defense may only be raised if the

2     alleged inducement communicated by the unwitting

3     intermediary is the same inducement directed at the same

4     target as the inducement that the government agent directs

5     the intermediary to communicate."  So in other words,

6     derivative entrapment only applies when the unwitting

7     intermediary is a conduit of inducement that's coming from

8     the government towards a particular individual.

9            So Mr. Venkata would have to show that Mr. Paradis

10    specifically directed Mr. Edwards and Ms. Patel to induce

11    him to commit a specific crime using a specific type of

12    inducement, and there just isn't any evidence that that

13    happened.  There are no facts indicating that Ms. Patel

14    communicated any inducement at all to Mr. Venkata, much less

15    that she did so at the explicit direction of Mr. Paradis.

16    The only fact that Mr. Venkata has pointed to in his

17    opposition is the communications from Paradis to Edwards and

18    Patel, plus the fact that Paradis was aware that Mr. Venkata

19    was involved with the scheme.  And that just doesn't come

20    close to meeting the Washington standard.

21            **THE COURT:**  Ms. Shields.

22            **MS. SHIELDS:**  Yes, Your Honor.  First I'll respond

23    to the public authority defense.  I think Ms. Choy suggests

24    that the state of the case law is that this is settled in

25    the D.C. Circuit, and it's not.  Ms. Choy and the United

84

1   States pointed to a number of out-of-circuit cases relating

2   to the public authority defense.  It is Mr. Venkata's

3   position that the apparent authority defense has not been

4   addressed fully, it's not been rejected in the D.C. Circuit,

5   and that it is still available to the defense in this case.

6              Further -- and I want to start off with the

7   notion -- which is actually what Ms. Choy ended with, which

8   is that this would somehow prejudice the government and

9   would dictate the defense's trial strategy -- excuse me, the

10   government's trial strategy.  Your Honor, this is a very

11   important issue for the government -- I'm sorry, for the

12   defense.  Whether or not Mr. Venkata was authorized to

13   engage in this conduct is a central tenet of the defense.

14   As I noted in response to the argument about the computer

15   access agreements, those agreements do note that you can

16   only not remove information without express written

17   permission.

18              It is the defense's position that Mr. Venkata had

19   permission and had authorization to engage in the very

20   conduct that he is alleged to have engaged in by the

21   government.  This is not an example of someone who was

22   directed to do this without authority.  Ms. Patel was

23   Mr. Venkata's boss.  The information that is at issue is

24   information that was core to both of their work as computer

25   programmers at DHS-OIG.  So it is the defense's position

1    that this falls within Ms. Patel's core authority to

2    authorize, and that she did so here, and that a defense

3    would be appropriate.

4         **THE COURT:**  So first of all, I have to say, I'm a

5    little surprised by your assertion that it's the government

6    that's suggesting that this is well established when it's

7    not well established.  Because I was a little taken back by

8    the assertion in your brief which said:  "It is well

9    established in this circuit that the public authority

10   defense includes the defense of good faith and reasonable

11   reliance on apparent authority," citing to Judge Wilkey's

12   separate opinion in Barker.  And it's clear to me that

13   that's not the law.

14        And if one's going to take the law from the Barker

15   decision, then Judge Merhige's concurring opinion would be

16   the narrower opinion and that would be the controlling

17   opinion.  So to the extent that there's controlling law at

18   all that comes out of Barker, I think it is the Judge

19   Merhige standard.  And Judge Merhige articulates a standard

20   which I don't think has been rejected by the D.C. Circuit,

21   and I think arguably is relevant law.  But I think the D.C.

22   Circuit has also indicated that it's unclear what the

23   published standard is.  But if they say there is a standard

24   in the D.C. Circuit, I suppose it's Judge Merhige's

25   articulation, which is:  "The defense is available if, and

1   only if, an individual reasonably, on the basis of an

2   objective standard, relies on a conclusion or statement of

3   law issued by an official charged with interpretation,

4   administration and/or enforcement responsibilities in the

5   relevant legal field."

6        I think to the extent there is an affirmative

7   defense that's currently recognized in the D.C. Circuit,

8   that's what the defense was.  I think you all cite in your

9   briefs to an opinion out-of-circuit by another circuit that

10  simply misread the Barker case as saying that -- or believed

11  that Judge Wilkey's opinion was the controlling opinion in

12  that case, but it's just plainly not to my mind.

13       I have to say, I'm somewhat -- I'm fairly

14  sympathetic to Ms. Choy's articulation of the rationale

15  here.  I don't think there's any problem in the world with

16  your arguing -- making mens rea arguments and saying that

17  Mr. Venkata was told by his boss this was okay; he believed

18  from his boss it was okay; there's no way in the world he

19  has the mens rea necessary to establish the crime.  I think

20  that's entirely appropriate.  I'm much more skeptical,

21  though, of the notion that there's actually an affirmative

22  defense that I should instruct the jury about, and that I

23  should instruct the jury that if you find that there was

24  reasonable reliance on apparent authority, that that's

25  sufficient.

1          And the reason that troubles me is because it

2     involves the Court in suggesting that Ms. Patel had apparent

3     authority to authorize the taking of the property.  That's

4     where I think Judge Merhige's articulation comes in.  That's

5     a pretty high standard to do that.  There's no reason -- as

6     I said, you can still argue lack of mens rea and rely on a

7     lot of the same arguments and analysis.  So it really is

8     largely, I think, a question of perhaps how you frame your

9     actual arguments to the jury as well as my instructions.

10          I will look at this a little bit further, because

11     I want to go back and reread a couple of the cases on it.

12     But my current take on it is that the public authority

13     defense is a narrow one, and that nothing's been presented

14     to me to make me believe that it's available in this case.

15     And in particular, as I understand it -- well, let me just

16     leave it at that.  So I'm not convinced that it's available

17     at this point.  I'm going to tentatively deny this aspect of

18     the motion.  But I will go back and read the cases a little

19     bit further, and if I change my mind on that I'll let you

20     know.

21          And then do you want to address the derivative

22     entrapment?

23               **MS. CHOY:**  Tentatively deny --

24               **THE COURT:**  I'm sorry?

25               **MS. CHOY:**  I'm sorry, Your Honor, I --

**A0605**

1    **THE COURT:**  You're right, I always forget whose

2    motion it is.  I'm tentatively granting the motion -- yes,

3    thank you, Ms. Choy.  I'm tentatively granting the motion,

4    but if I have a change of heart I will let you know -- as to

5    the public authority.  So I guess want to hear about the

6    derivative entrapment as well, Ms. Shields.

7    **MS. SHIELDS:**  Your Honor, I do want to be clear,

8    though, because one of the things that Ms. Choy said is that

9    this public authority defense would change the trial

10   strategy of both the government and some -- I want to be

11   clear that you are saying, Your Honor, that we can argue

12   that this would impact mens rea.  And that if Ms. Patel had

13   the authority to do so, that that would undermine

14   Mr. Venkata's mens rea for the charged crimes.

15   **THE COURT:**  Well, I was with you up and to the

16   last second when you said if Ms. Patel had the authority,

17   that would undermine Mr. Venkata's mens rea.  I think you're

18   entirely entitled to argue whatever you think is appropriate

19   with respect to Mr. Venkata's mens rea.  And if somebody who

20   was his superior told him it was okay to do something -- for

21   example, if there was evidence of that, I think that that

22   would be entirely legitimate for you to argue that that goes

23   to his mens rea.  Whether you start introducing evidence

24   with respect to what Ms. Patel's actual authority was -- I

25   mean, if you have evidence about that, I'd want to know what

**A0606**

1    that evidence was.  And maybe it changes my view with

2    respect to this motion.  I didn't see any references to that

3    in the briefs.

4         But if you have a witness, for example, who's

5    going to take the stand and say that this was entirely

6    within Ms. Patel's authority to authorize this, then it

7    seems to me you are relying on the affirmative defense at

8    that point and not simply on Mr. Venkata's mens rea, which

9    turns on what Mr. Venkata believes, not what some witness

10   might say with respect to what Ms. Patel's actual authority

11   was.  And I take it you're not even arguing that there's an

12   actual authority defense here, but it's just an apparent

13   authority defense.  So I'm not quite sure where that

14   evidence would come in anyway with respect to what her

15   actual authority was.

16        So I think we're in agreement about this.  We may

17   have to keep an eye on it as we proceed through trial.  And

18   if there's additional evidence that I haven't seen, maybe

19   that changes my view on this.  But based on what I've seen,

20   I think you're entitled entirely to argue whatever you think

21   appropriate with respect to Mr. Venkata's state of mind.

22   And I can see why, for example, if Mr. Venkata were to take

23   the stand -- and I'm not suggesting he should or shouldn't.

24   But if he took the stand and said that Ms. Patel told him

25   that it was fine, that he trusted Ms. Patel, that she was

1    his boss and he assumed everything his boss said was okay

2    and he had no reason to doubt her, that seems that just goes

3    to Mr. Venkata's state of mind.

4              Ms. Choy, any disagreement with that?

5              **MS. CHOY:**  No, Your Honor.

6              **THE COURT:**  Okay.

7              **MS. SHIELDS:**  Your Honor, I think the evidence

8    that we would point to -- and it sounds like Your Honor does

9    not agree that that's sufficient, is that Ms. Patel -- we

10   would have witnesses that would say that Ms. Patel had the

11   authority to direct and oversee and evaluate the work of

12   those in her -- and I don't want to say employ, but within

13   her supervision.  And that individuals that were -- have

14   similar positions to Mr. Venkata would say that Ms. Patel

15   could direct them to do this kind of work; could direct them

16   to work on pieces of EDS source code; could direct them to

17   work on pieces of the modules there; and that that is

18   exactly what he did.

19             So I just want to understand, Your Honor.  You're

20   saying that that evidence, because it would be coming from

21   other employees and would go to Mr. Venkata's belief about

22   that authority, would not come in?

23             **THE COURT:**  No, no, I don't know the answer to

24   that as I sit here now.  If it goes to Mr. Venkata's belief,

25   and you are offering it for purposes of showing that he had

1    a reasonable belief and that others had similar beliefs and

2    that that was how it was understood, I think that probably

3    does come in.  Where I'm drawing the line is at a suggestion

4    that she actually had the actual or apparent authority to

5    authorize Mr. Venkata to take the property and give it to

6    Mr. Edwards versus -- I mean, there's probably not going to

7    be a dispute in this case that she had the authority to tell

8    Mr. Venkata and others working under her that they ought to

9    go and make adjustments to the software.  She had an IT

10   role, and to the extent she's directing them what to do in

11   their professional capacities, I don't see that that's even

12   an issue.

13        But where I'm drawing the line -- and I realize

14   that it's not a precise line.  It's a little hard for me to

15   draw a precise line without actually having the evidence in

16   front of me.  But the line that I would draw is between

17   offering evidence with respect to what Mr. Venkata's state

18   of mind was versus either implicitly through the way you're

19   questioning witnesses or expressly through the argument that

20   you're making to the jury, that the jury should acquit

21   Mr. Venkata because Ms. Patel actually had the authority to

22   authorize him or had the apparent authority to do so, and

23   that that is an affirmative defense.

24        So I think most of what you want to do probably

25   comes in anyway to state of mind of, but that's the way it

92

1    ought to be framed.

2        **MS. SHIELDS:**  Understood.  Thank you, Your Honor.

3    With respect to the issue of derivative entrapment -- and

4    again, Your Honor, we would note that derivative entrapment

5    is recognized as a defense in the D.C. Circuit.  Again, we

6    don't know how the evidence is going to come in, but we

7    understand that Ms. Patel was induced to commit the alleged

8    acts through communications she had with Peter Paradis, and

9    that that inducement was communicated to Mr. Venkata.  And

10   as part of Mr. Venkata's work -- which was, again, done at

11   the behest of Ms. Patel, that that entrapment occurred

12   through those conversations.

13       **THE COURT:**  Ms. Choy -- I guess Ms. Choy's already

14   addressed this.  Anything further, Ms. Choy?

15       **MS. CHOY:**  Only, Your Honor, that the defense has

16   the burden to come forward with evidence of inducement.  In

17   response to a motion in limine to preclude this, they had an

18   opportunity to do that.  And they have not come forward with

19   any evidence that any inducement was communicated to

20   Mr. Venkata, much less that it was done so at the express

21   direction of Mr. Paradis.

22       **THE COURT:**  Ms. Shields, what's your response to

23   that?

24       **MS. SHIELDS:**  Your Honor, in the -- in

25   Mr. Venkata's response, we cite various allegations from the

1    indictment itself that show that the work, when it occurred,

2    occurred at the behest of Mr. Paradis; that the

3    communications -- in fact, the first communication, at least

4    of which we're aware, where there's an audio recording,

5    Ms. Patel says that the work on the case management

6    system -- what we call EDS 2.1, hadn't even occurred yet.

7    And that it was Mr. Paradis who was asking her questions

8    about that.  And then there were additional questions about

9    what things would cost.

10            But the inducement to do the work that's the

11   challenged work occurred at the hands of Mr. Paradis.  And

12   then the communications, we understand, that occur between

13   Ms. Patel and Mr. Venkata, to the extent that Mr. Venkata

14   was told much about what was going on -- which, again, we

15   contest occurred, that that was an inducement that came from

16   Mr. Paradis.

17            **THE COURT:**  What was the inducement?

18            **MS. SHIELDS:**  Complete the case management system

19   that was ultimately sold for commercial purpose.

20            **THE COURT:**  And what was the inducement to

21   Mr. Venkata?  What was he promised or told he'd get?

22            **MS. SHIELDS:**  Specifically, there was the

23   eSubpoena module which Mr. Venkata was responsible for.

24   Mr. Paradis on numerous occasions ask asked about the new

25   case management system, asked if there would be an eSubpoena

94

1    module.  You see that reflected in the indictment and in the

2    discovery that the government has turned over to this point.

3            MS. CHOY:  Can I respond, Your Honor?

4            THE COURT:  You may.

5            MS. CHOY:  The inducement that's relevant to

6    entrapment is inducement to commit a crime.  There's no

7    evidence of that here.  What they need to show is that

8    Mr. Paradis told them go out and steal government property.

9    Just saying oh, yes, I'd like to learn more about your new

10   system, knowing nothing about at that point the theft of

11   government property, is not the relevant kind of inducement

12   even if that had been communicated to Mr. Venkata, which

13   there's no evidence that it was.

14           THE COURT:  Ms. Shields.

15           MS. SHIELDS:  I think, Your Honor, the eSubpoena

16   module, it's not simply oh, go out and create this system.

17   It's that Mr. Paradis specifically requests a case

18   management system that includes the eSubpoena module.  In

19   some of the communications that we've seen in discovery, he

20   references the fact that it should look like the current

21   eSubpoena module that is in EDS.  Thus, the inducement was

22   to commit the theft of government information that's charged

23   in the indictment.

24           THE COURT:  If a federal agent goes to somebody

25   and says to them:  I'd like you to develop an app for

1   restaurants like Yelp and that type of thing is what I want

2   you to do, and I'd like to buy that if you have some

3   restaurant ratings and reservation system like Yelp, that

4   doesn't strike me as entrapment.  The person can go back and

5   create something that's like Yelp or they can go steal Yelp

6   and transfer it to the person.  But simply asking for

7   something that's like something that otherwise exists

8   doesn't necessarily constitute entrapment.

9        MS. SHIELDS:  Your Honor, respectfully, I think

10   this is more than just saying we want something like Yelp.

11   When Peter Paradis speaks with Ms. Patel, he is saying:  We

12   want -- what I want is EDS.  We previously had a system,

13   that doesn't work; I want EDS, and it will have the

14   eSubpoena module like what is in the current system.  So

15   it's not just create something that is like this, it's that

16   we want the toolbox, the building blocks that are part of

17   this system, we want this in the new system.

18        Mr. Venkata was the developer responsible for the

19   eSubpoena module.  Mr. Paradis knew this.  Thus, in that

20   communication, that we want this piece of the puzzle, that

21   then Ms. Patel directs to Mr. Venkata, it's the defense's

22   position that that is derivative entrapment.

23        MS. CHOY:  May I respond, Your Honor?

24        THE COURT:  You may.

25        MS. CHOY:  There's quite a lot of tension in the

1    argument that Mr. Venkata was entrapped -- was induced to

2    commit a crime, and the argument that he didn't know that

3    what he was doing was a crime.  I'm not sure how those two

4    things are consistent.

5           **THE COURT:**  Well, the defense can make alternative

6    arguments or they can decide which argument they ultimately

7    want to run with.  I realize there's a tension, but that's I

8    think not dispositive for present purposes.  I guess the

9    real question -- oh, go ahead.

10          **MS. SHIELDS:**  I'm so sorry.  But the concern here,

11   Your Honor, is that a lot of evidence that we're seeing is

12   based on the indictment itself, some of what the government

13   has turned over in discovery.  And we are going to address

14   some of the government's discovery challenges in a bit

15   hopefully.  But this is what we understand occurred, and

16   thus we think that at this stage, depending on how the

17   evidence turns out, that we would be entitled to an

18   entrapment defense if the evidence comes in the way that we

19   expect it might.

20          **MS. CHOY:**  Well, whether Mr. Venkata was induced

21   to do something is within Mr. Venkata's own knowledge.  He

22   knows what was told to him, what was promised to him, what

23   pressure was put on him.  And so if those facts existed,

24   then the defense should have brought them out in response to

25   our motion.  The fact that they didn't suggests that those

**A0614**

1    facts don't exist.

2         **THE COURT:**  Ms. Shields, I guess the question is,

3    is there or will there be evidence -- I mean, more the

4    question I guess is not whether there is, but whether there

5    will be evidence at trial that Ms. Patel went to Mr. Venkata

6    and said that witness one has said that he wants EDS; and he

7    wants us to create and to give him a copy of EDS with the

8    module that you've built for eSubpoena; and he's asking us

9    to give him what belongs to the Department of Homeland

10   Security or something along those lines.

11        **MS. SHIELDS:**  Your Honor, we can't make the

12   determination right now about whether or not our client will

13   testify, and that's part of the issue, is that.  But we do

14   have a good reason to believe that there is evidence that

15   can come out through the government's witnesses that there

16   was inducement that was articulated to Mr. Venkata.  And

17   that's why particularly we think that it's not -- we don't

18   think that Your Honor should right now make a determination

19   that the defense should be barred from pursuing that as a

20   defense at the close of evidence.

21        **THE COURT:**  But you're not asking to be able to

22   open on that or otherwise to address it until I rule on the

23   question?

24        **MS. SHIELDS:**  I think, Your Honor, we would like

25   the ability -- it sounds like what the government is asking

1    is that we be precluded from potentially pursuing that as a

2    defense at trial.  And we're not planning to open on it, but

3    we don't want to be barred from that evidence coming out.

4    To the extent there are questions that we ask the

5    government's witnesses about that, we don't want this to

6    come up where the government says that you're not entitled

7    to ask those questions.

8         **THE COURT:**  It may be, Ms. Shields, that what we

9    have to do on this if we get to trial is if you flag for us

10   that this is coming, it may be that I'm going to want just a

11   proffer from the witness outside the presence of the jury.

12   And we'll just see if there's a basis for the line of

13   questioning with the witness before the jury is brought in

14   to ask the questions in front of the jury.

15        **MS. SHIELDS:**  Understood, Your Honor.

16        **THE COURT:**  Ms. Choy, anything else on this one?

17        **MS. CHOY:**  No, Your Honor.

18        **THE COURT:**  I mean, just to be clear about this,

19   Ms. Shields, I think this is going to be a tough one for you

20   based on what I've heard.  But I'm not precluding you at

21   this point, I think you're entitled to pursue it.  And if

22   there's a factual basis for it, I'll let you do it.  But we

23   just may have to do some proffers outside the presence of

24   the jury if need be on those questions.

25            So I'm going to defer ruling on the entrapment

1    motion at this point pending trial.

2              **MS. SHIELDS:**  Thank you, Your Honor.

3              **THE COURT:**  Did I gather there was a discovery

4    issue that I need to address as well?

5              **MS. SHIELDS:**  Your Honor, we did send a letter to

6    the government.  The government has, in our view, turned

7    over various pieces of material quite late, including

8    materials received last week that have been in the

9    government's possession for sometime.  We sent a letter to

10   the government seeking various categories of information,

11   including any materials related to the plea agreements of

12   Charles Edwards and Sonal Patel.  We understand that they

13   said that they were going to turn over the transcripts,

14   they've ordered them.  I want to be clear that it's not

15   solely the transcripts, but all materials related to the

16   plea agreements of Mr. Edwards and Ms. Patel as well as

17   additional categories of information; some information that

18   would go to Ms. Patel's authorization and what she told

19   Mr. Venkata.

20              The other issue, Your Honor, that we had

21   requested -- and I think that Ms. Macey was going to speak

22   to her colleagues, we have -- one of our government

23   witness -- I'm sorry, one of our defense witnesses is a

24   government employee.  There is some concern about making him

25   available.  We would request that the department assist in

1    making Mike Horton available as a defense witness.

2            **THE COURT:**  Is he under subpoena?

3            **MS. SHIELDS:**  He is -- currently the subpoena has

4    been challenged, because the claim is that we have not

5    provided sufficient information as to why he would be

6    relevant.  This is Mr. -- this is the chief information

7    officer at DHS-OIG.  There are communications between

8    Mr. Venkata and this individual.  We feel that this

9    individual's highly relevant, and we would request that the

10   government assist in making him available for trial.

11           **THE COURT:**  Mr. Salgado.

12           **MR. SALGADO:**  Judge, not to blindside my

13   colleague, but Ms. Macey, do you have anything to add to

14   this?

15           **MS. MACEY:**  I really don't, Your Honor.  This has

16   been kind of a late development.  This all just came to a

17   head today where the office of general counsel at DHS had

18   made their determination under Touhy and found that the

19   defense had not made an adequate proffer or findings for

20   them to do.  So this is something that I need time

21   internally to speak with my management about, but that is

22   something that we will do and get back to the defense on.

23           **THE COURT:**  And I will say in response that I

24   think the Touhy regulations need to be understood and

25   applied in light of the defendant's Fifth and Sixth

1    Amendment rights.  A defendant does have a right to compel

2    the testimony of witnesses in his defense.  If need be, you

3    ought to contact me and I will resolve the issues quickly.

4    But I don't think that an agency should have veto power,

5    notwithstanding the Touhy regs, over the defense's decision

6    to call a witness -- which we shouldn't really be second

7    guessing the defense's judgment about that.  And quite

8    frankly, I think that if Ms. Shields has made a

9    determination this is probably one of the few witnesses that

10   she intends to and wants to call in Mr. Venkata's defense,

11   it's a little hard for me to believe that this is not a

12   witness of some significance.  I don't assume and I don't

13   have any reason to believe that she would, as a matter of

14   her strategy, want to put a witness on who doesn't have

15   anything to say or that is not relevant.  I trust her as an

16   officer of the court to not use this for simply purposes of

17   harassing.

18         So this is all to say I would encourage you to

19   encourage the agency to try and resolve this issue, and if

20   not I can get involved.

21         **MS. MACEY:**  Yes, Your Honor.

22         **THE COURT:**  Anything else that I need to address

23   before we adjourn?

24         **MR. SALGADO:**  Judge, just to confirm I heard

25   Ms. Shields correctly, she's asking for communications

**A0619**

1   between government counsel and Ms. Patel and Mr. Edwards'

2   counsel relevant to plea negotiations.  We confronted this

3   issue in a prior case, Your Honor.  The department's

4   position is that those underlying communications from

5   attorney to attorney are not discoverable in the first

6   order.  But obviously if the Court feels differently, we

7   would do so pursuant to a court order.

8          **THE COURT:**  My recollection in the other case is

9   that it ended up not being an issue because I'm not sure

10  there was anything there.  Is there something here to turn

11  over?

12         **MR. SALGADO:**  We haven't -- frankly, Your Honor,

13  we haven't looked at the communications with Ms. Patel's

14  lawyer back then, back in 2019.  With respect to the

15  communications involving Mr. Edwards' lawyer and his plea,

16  there was a back and forth.  But again, without having

17  looked at those communications recently, nothing comes to

18  mind that would be material to this case or that could be an

19  adopted statement by either Mr. Edwards or Ms. Patel for

20  that matter.

21         And frankly, Your Honor, the department's position

22  is that these are dead ends, because we can't -- defense

23  counsel cannot cross-examine a cooperating defendant with

24  his or her attorney's statements mechanically speaking.  If

25  there is, of course, a benefit conceded to the defendant --

**A0620**

1    I'm sorry, to the cooperating defendant, that could be

2    deemed Giglio.  Of course we would disclose that, right, as

3    a matter of course.

4              But I guess I just want to flag this issue for the

5    Court.  We're going to take a look at those communications

6    with an eye towards any potential benefits or Giglio or

7    other discoverability concerns.  But we want to make sure

8    that the Court's position would be that to the extent that

9    there is -- there are any such communications, that we would

10   do so -- we would disclose them rather than disclose the

11   facts via discovery letter -- via disclosure letter.

12          **THE COURT:**  I think if there is something that

13   bears on the testimony of any witnesses, that you should

14   disclose it.  But let me check and see what's there first,

15   and then we can see where we go from there.  And if need be,

16   again, the parties can contact the Deputy Clerk, let her

17   know and then we can get together and talk about it.

18          **MR. SALGADO:**  Will do, Your Honor.

19          **THE COURT:**  Let me ask you, Mr. Salgado, have I

20   entered any orders that I need to with respect to any grand

21   jury material or the release of any material?  I just want

22   to make sure I'm not holding up your turning over anything

23   that you need to turn over.

24          **MR. SALGADO:**  No, not that I'm aware of, Your

25   Honor.  But Your Honor, two additional items, one that just

**A0621**

1   popped up.  Hearing defense counsel's argument on the mens

2   rea item as a backup or as a fallback on the public

3   authority item, it occurred to me that we have not asked for

4   a willful blindness instruction.  But I, for one, anticipate

5   that the evidentiary predicate will be developed at trial

6   either through argument or cross-examination.  So we just

7   want to flag that for the Court, that even though we --

8        THE COURT:  I missed, Mr. Salgado, what sort of

9   instruction you were saying.

10        MR. SALGADO:  Willful blindness.

11        THE COURT:  I see.  No one is locked in on the

12   instructions at this point, we still have the final

13   instructions.  I realize that that all depends on what

14   happens at trial.  You're all welcome on both sides to

15   argue -- or to request any additional instructions.

16        MR. SALGADO:  Thank you, Your Honor.  And lastly,

17   we are prepared to proceed with the trial on Monday, but

18   there are two items that we have not been fully looped in.

19   We recognize that defense counsel is under no obligation to

20   turn over a witness list or discovery.  But they have made

21   representations to the Court that they have a trial

22   presentation ready or that there is evidence of written

23   authorization involving Mr. Venkata that go to the public

24   authority defense or in the alternative to his mens rea.  We

25   have not received any of those documents.

1          And secondly, we understand that the defense has

2     commissioned the analysis of an expert that they intend to

3     present at trial.  We have not received any materials by way

4     of expert report or expert disclosures as required under

5     Rule 16.  We're a week out, we don't anticipate that expert

6     evidence yielding any benefit to the defense or changing the

7     landscape of our case.  But to the extent that it's out

8     there, and to the extent that they intend to use it -- even

9     to cross-examine our agents, the ones who looked at the

10    devices, we'd ask that they turn them over so that we can

11    factor that into our presentation.

12          **THE COURT:**  Ms. Shields.

13          **MS. SHIELDS:**  Certainly.  Your Honor, the reason

14    that the defense ended up requesting this expert at a late

15    date was because of the government's late disclosure of the

16    fact that PII had been found on Mr. Venkata's devices.  And

17    it seemed -- and at this point, we do not anticipate calling

18    an expert.  But again, the landscape seems to be shifting.

19    The government stated that it was going to dismiss the

20    charge with respect to activation keys.  Ms. Choy also

21    represented that even though that would be dismissed,

22    certain information about activation keys would be

23    addressed.  I was actually going to address that, Your

24    Honor, to ask if the government intends to do a 404(b)

25    notice.  I think that the issue is that we are learning

1    things very, very late in the game as to what the government

2    intends to claim at trial with these issues.  So right now,

3    we do not anticipate providing an expert report.

4           I did want to note that to the extent that the

5    government is claiming that they're going to rely on

6    information about activation keys in some other way, we

7    would seek 404(b) notice and, at that point, may request

8    some additional discovery by an expert.

9           **MR. SALGADO:**  Judge, I --

10          **THE COURT:**  Your point is not to call an expert,

11   is that correct?  Your plan currently is not to call an

12   expert?

13          **MS. SHIELDS:**  No, that's right.

14          **THE COURT:**  If you think you might, you should

15   make the disclosure to play it safe.  If you really don't

16   think you're going to, that's fine that you not do it.  But

17   the one thing I will say to everyone involved here is I

18   strongly encourage you all to share as much information as

19   you possibly can as early as you can.  And that goes for

20   indicating the witness you're intending to put on,

21   disclosing for the government any Giglio material,

22   disclosing any discovery, disclosing any demonstratives.

23   Because everyone is looking to get a little bit of an

24   advantage strategically at a trial, and doesn't want to turn

25   things over before they have to.

**A0624**

 1        I've got to tell you, the advantage you get is

 2   virtually none by doing that.  You run the risk of really

 3   coming off the rails where I'm going to have to delay trial

 4   in some way because of it or I'm going to have to give some

 5   instruction.  So I implore everybody to be as open as you

 6   can be about exchanging information.  I realize there's some

 7   things you can't exchange, and the defense isn't required to

 8   disclose their witnesses or their strategy at this point in

 9   the process.  But to the extent you can be open, the trial

10   just goes much more smoothly for everyone involved,

11   including your respective clients.

12        I do need a witness list from everybody for

13   purposes of the voir dire.  It can be completely

14   overinclusive.  I just want make sure that we don't find

15   ourselves halfway through trial and have a juror who raises

16   his or her hand and says I know that witness, and we have a

17   problem on our hands.  So I won't attribute any witness to

18   either party, and so if the witness is never called the jury

19   won't hold it against you.  But I don't know, have I given

20   you a date to give me the list yet?

21        **MR. SALGADO:**  I don't think there's a list, Your

22   Honor -- a date, Your Honor.

23        **THE COURT:**  I just need --

24        **MS. SHIELDS:**  I think Ms. Peterson -- I'm sorry, I

25   think Ms. Peterson provided a date that either at this date

1    or the first date when we -- next Monday to provide the

2    witness list.  But Your Honor, we're happy to provide that

3    before then.

4         **THE COURT:**  Well, I think I probably should have

5    it on Friday just so that I can incorporate it into the voir

6    dire and have the voir dire ready to go Monday morning.  And

7    so I'll just direct that the parties give me their all

8    encompassing lists -- I'm not going to even identify the

9    individuals necessarily as witnesses.  I'm going to say

10   these are names you may hear or witnesses who may appear, so

11   you don't need to worry about that.  And that would be very

12   helpful to me.

13        Another thing I will mention as well is that I

14   know some judges may be a little laxer about this than I am.

15   But if you're refreshing the recollection of a witness, you

16   should not hold in your hand a document that you're

17   refreshing the recollection of the witness with and say, you

18   know, don't you remember saying the following, and the

19   witness says I don't remember saying the following.  You

20   just achieved what you want to achieve.  You need to put the

21   document in front of the witness, ask the witness to look at

22   document, say having looked at document please put it aside,

23   is your recollection now refreshed.  So don't use the

24   process of refreshing the recollection as a means of counsel

25   testifying.

109

 1          And similarly, if you don't actually have a basis

 2     to believe that the witness is going to give you an answer

 3     on a question, you ought not ask it.  So you ought not say

 4     well, would it surprise you to know, when in fact there's no

 5     evidence that reflects that one way or the other, and the

 6     witness has no knowledge one way or the other on that.

 7     That's completely improper, and I will police those types of

 8     things pretty carefully.

 9          MR. SALGADO:  Thank you, Your Honor.

10          THE COURT:  Mr. Salgado, anything before we

11     adjourn?

12          MR. SALGADO:  I don't believe so, Your Honor,

13     nothing from the government.

14          THE COURT:  Ms. Shields, anything else?

15          MS. SHIELDS:  Nothing from the defense.  Thank

16     you, Your Honor.

17          THE COURT:  Well, I look forward to seeing you all

18     on -- oh, and Monday morning, I think everyone should be

19     here -- let's have counsel there no later than 9:00 a.m.

20     That way we'll actually start right away at 9:30 as soon as

21     we get the jurors in the ceremonial courtroom with the voir

22     dire process.  And hopefully we can move through that

23     relatively expeditiously.

24          Kristin, anything else I should -- oh, I know one

25     more thing before we adjourn, which is Mr. Salgado, do you

110

1    want to put on the record whether there was a plea offer in

2    the case and whether it was considered and rejected?  I just

3    don't know one way or the other.

4          MR. SALGADO:  Your Honor, there were I believe

5    four plea offers extended to Mr. Venkata in the last 18

6    months, all of which contemplated a guilty plea as to count

7    16 of the indictment -- that's 18 U.S.C. 1519, obstruction.

8    On all four occasions, Mr. Venkata indicated his inclination

9    to enter a guilty plea, but ultimately decided not to.

10         THE COURT:  Mr. Venkata, have you been presented

11   with a plea?  And you don't need to tell me about the

12   discussions with your counsel, but have you had adequate

13   time to discuss those plea offers with your counsel?

14         THE DEFENDANT:  Yes, Your Honor.  Yes, I did

15   discuss with my attorney, yes.

16         THE COURT:  And are you fully satisfied with the

17   assistance of your counsel in the case?

18         THE DEFENDANT:  Yes, yes, I'm happy with my

19   counsel.

20         THE COURT:  And do you feel as though you've had

21   enough time to consider whether to accept the plea or not?

22         THE DEFENDANT:  Yes, yes, I have enough time to

23   consider, yes.

24         THE COURT:  And did you get enough time -- have

25   enough time to talk with your lawyer about the plea offers?

111

 1            **THE DEFENDANT:**  Yes, I talk many times, yes.

 2            **THE COURT:**  And have you made a decision that

 3     you'd like to reject those offers?

 4            **THE DEFENDANT:**  Yes, for some reason, because it's

 5     a really high punishment for me for my --

 6            **MS. PETERSON:**  Mr. Venkata, it's a yes or no

 7     question.  It's a yes or no question.

 8            **THE COURT:**  Thank you, Ms. Peterson.  I was

 9     getting ready to interrupt him as well.  I don't need to

10     know about your rationale, I just want to make sure that

11     you've made the decision.

12            **THE DEFENDANT:**  Yes.

13            **THE COURT:**  Okay.  Kristin, anything else we

14     should touch on before we adjourn?

15            **DEPUTY CLERK:**  No, Your Honor.

16            **THE COURT:**  Well, this was very productive, so

17     thank you all.  I look forward to seeing you on Monday.

18        (Proceedings adjourned at 5:15 p.m.)

19

20

21

22

23

24

25

**A0629**

1            **C E R T I F I C A T E**

2

3            I, **Jeff Hook, Official Court Reporter**,

4    certify that the foregoing is a true and correct transcript

5    of the remotely reported proceedings in the above-entitled

6    matter.

7                      **PLEASE NOTE:**  This hearing occurred during

8    the COVID-19 pandemic and is therefore subject to the

9    technological limitations of court reporting remotely.

10

11

12

13    **April 12, 2022**                     _Jeff M. Hook_

14        **DATE**                              **Jeff M. Hook**

15

16

17

18

19

20

21

22

23

24

25

**A0630**

1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES OF AMERICA,
                                        Criminal Action
4              Plaintiff,              No. 1:20-cr-0066-2

5         vs.                          Washington, DC
                                       March 25, 2022
6    MURALI YAMAZULA VENKATA (2),
                                        2:11 p.m.
7              Defendant.
     _____/
8

9

10           TRANSCRIPT OF VIDEO STATUS CONFERENCE
           BEFORE THE HONORABLE RANDOLPH D. MOSS
             UNITED STATES DISTRICT JUDGE
11

12

     APPEARANCES:
13

     For the Government:      CELIA CHOY
14                            VICTOR SALGADO
                              U.S. Department of Justice-CRM
15                            1301 New York Ave, NW-10th Floor
                              Washington, DC 20005
16
                              CHRISTINE MACEY
17                            U.S. Attorney's Office for the
                              District of Columbia
18                            601 D Street, NW
                              Washington, DC 20530
19

20   For the Defendant:       KAMIL SHIELDS
                              PARDIS GHEIBI
21                            TARA OHRTMAN
                              Sullivan & Cromwell LLP
22                            1700 New York Ave, NW, Suite 700
                              Washington, DC 20006
23
                              KATHERINE SAVARESE
24                            Sullivan & Cromwell LLP
                              125 Broad Street, Suite 4000
25                            New York, NY 10004

A0631

```
 1   For the Defendant:        MICHELLE PETERSON
                               Federal Public Defender's Office
 2                             for the District of Columbia
                               625 Indiana Ave, NW, Suite 550
 3                             Washington, DC 20004

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Court Reporter:           JEFF M. HOOK
                               Official Court Reporter
                               U.S. District Court
24                             333 Constitution Avenue, NW
                               Room 4700-C
25                             Washington, DC 20001
```

P R O C E E D I N G S

**DEPUTY CLERK:**  We are on the record for criminal case 20-066, United States of America v. Murali Venkata. Starting with the government, please introduce yourselves for the record.

**MR. SALGADO:**  Good afternoon, Your Honor.  Victor Salgado for the government.

**MS. CHOY:**  Good afternoon, Your Honor.  Celia Choy for the government.

**MS. MACEY:**  Good afternoon, Your Honor.  Christine Macey also on behalf of the government.

**THE COURT:**  Good afternoon.

**MS. SAVARESE:**  Good afternoon, Your Honor. Katherine Savarese on behalf of the defendant.

**MS. SHIELDS:**  Good afternoon, Your Honor.  Kamil Shields on behalf of Mr. Venkata.

**MS. GHEIBI:**  Good afternoon, Pardis Gheibi on behalf of Mr. Venkata.

**THE DEFENDANT:**  Good afternoon, Your Honor, this is Mr. Venkata.

**MS. OHRTMAN:**  Good afternoon, Your Honor.  Tara Ohrtman on behalf of Mr. Venkata.

**MS. PETERSON:**  And good afternoon --

**THE COURT:**  Ms. Peterson, that leaves you -- hi. So first of all, just before we get going, Ms. Savarese,

1    have you conferred with Mr. Venkata about whether he has any

2    objection to our proceeding today by videoconference?

3        **MS. SAVARESE:**  He does not, Your Honor.

4        **THE COURT:**  So thank you for gathering on short

5    notice.  I'm not sure whether there's anything that we need

6    to do right now, but with trial approaching so quickly, I

7    did want to just check in briefly with you all about the

8    motion to strike that was filed late yesterday evening.  I

9    really don't have any sense of the substance of the issues

10   at this point.  I'd have to look at the documents and see

11   whether there really is any prejudice to the defense by the

12   modification of the government's exhibit list.

13        But the reason that I really wanted to talk

14   quickly now is that the jury office, I think by 4 o'clock

15   today, is going to be posting on its system whether jurors

16   need to come in or not on Monday.  And I couldn't quite

17   discern from the motion whether the defense is of the view

18   that this issue may require additional time for trial

19   preparation, whether the defense is requesting or would

20   request an adjournment.  I didn't want to go to the expense

21   and trouble of bringing everyone in, the prospective jurors

22   on Monday, to have the defense stand up and say:  Judge,

23   either we need to strike these documents or at a minimum

24   postpone the trial.

25        So I wanted to check in and see if the defense is

1    seeking a postponement, and whether you need additional time

2    to get ready in light of the modification of the

3    government's exhibit list.

4         **MR. SALGADO:**  Judge, before the defense responds,

5    can the government provide some context?

6         **THE COURT:**  Sure.

7         **MR. SALGADO:**  Judge, we were taken aback when we

8    saw this late filing last night.  Not only is it highly

9    inadequate in that it doesn't address specific exhibits and

10   their relevance, it is at times very inaccurate and highly

11   misleading.  Let me start with the misleading.  The defense

12   points to Jencks evidence that we produced in the last

13   couple of days, quote, in violation of the January 18th

14   deadline.  Your Honor, that Jencks didn't exist on

15   January 18th.  It is a factual and legal impossibility that

16   it was produced in violation of that deadline because it

17   didn't exist.  The defense knows that.  And yet they make

18   that allegation in the middle of the night, you know, hoping

19   perhaps to distract us from trial preparation, and here we

20   are.

21        How is it misleading otherwise?  They talk about

22   exhibits that we've revised substantially, right.  There's a

23   little bit of inference here, but nine of those exhibits

24   that they talk about, Your Honor, five are transcripts to

25   audios that were produced in discovery, noticed up as

1    exhibits, and the drafts of those transcripts were also

2    noticed up as exhibits.  All we did was swap out the

3    finalized versions with the draft versions, and they call

4    that substantial revisions, as if there's some surprise

5    here.

6        The remaining four exhibits, Your Honor, on the

7    computer reports -- and we can get into the details of those

8    and the quote, unquote new exhibits, which aren't new

9    because they were produced in discovery as well.  Those,

10   Your Honor, had been noticed up as exhibits.  The top line

11   of the report identifying the findings of those devices,

12   those four devices, have been produced.  They were put on

13   notice, and we told them at the time of production:  Look,

14   when we get closer to trial, we're going to meet with the

15   individuals who conducted these reviews, and we're going to

16   refine those in terms of what we're going to present to the

17   jury, excerpts of EDS code, excerpts of PII, right.  They

18   knew that.  And yet here they filed this and claim we are

19   somehow taking them by surprise.

20       This -- I can keep going, Your Honor, but I just

21   wanted to provide that context.  We were taken aback last

22   night.  They know that the remedy they're seeking,

23   suppression, is not warranted here, even in cases of belated

24   discovery, which is not the case here.  They know that

25   that's not warranted, and yet they didn't include that in

1  their filing.  They must have reviewed case law saying that,

2  and yet they went forward with their filing knowing that the

3  remedy is completely unwarranted.

4      Your Honor, we understand zealous representation

5  needs to be zealous, but creating facts and the law, we

6  think, is somewhat inappropriate.  We just wanted to say

7  that, and we'll defer to the Court on what Your Honor wants

8  to do next.

9      **THE COURT:**  Okay.  Thank you, Mr. Salgado.

10  Ms. Savarese.

11      **MS. SAVARESE:**  Your Honor, the government's late

12  disclosures are part of a repeated pattern of late

13  disclosures that has been prevalent throughout this case for

14  the past several months, which we find extremely troubling.

15  After the government's late disclosure of important forensic

16  evidence in January, we repeatedly asked the government to

17  turn over all relevant discovery materials, and to identify

18  the forensic evidence that they planned to introduce at

19  trial in order to give us time to analyze it.  Despite those

20  requests, the government is continuing to identify new

21  exhibits, well after the Court's February 28th deadline,

22  that contain or involve additional forensic analysis.

23      They're also producing to us handwritten notes

24  from interviews that should have been turned over before the

25  discovery deadline months ago.  So this is, again, not only

1    the belated identification of exhibits, but again more

2    discovery materials that were never turned over to us by the

3    government by the discovery deadline, as well as additional

4    Jencks material, some of which were in existence prior to

5    the Court's Jencks deadline.

6        These documents have been coming in on an almost

7    daily basis, often late in the evening, leaving us very

8    little time to review and to rethink our trial strategy

9    based on them.  Pretrial deadlines are designed to provide

10    the defense with fair notice of the government's theory of

11    the case so that we can prepare for trial.  The government's

12    provided no justification whatsoever for its late submission

13    of these materials and, as I mentioned, its continuing

14    pattern of late disclosures is troubling.  And at this

15    point, it's negatively impacting our trial preparation and

16    strategy.  We need to understand when the government's

17    exhibits will be final and when we'll receive all Jencks

18    materials.

19        Your Honor asked whether -- if you're not inclined

20    to strike the exhibits, we would seek a continuance.  I

21    think we would.  We had previously discussed the possibility

22    of beginning -- keeping our jury selection on Monday the

23    28th, but beginning with opening arguments later in the

24    week.  We think that two days could allow us to get our arms

25    around these materials.

1          So if Your Honor's not inclined to strike these

2     new exhibits, we would ask to begin opening arguments on

3     Thursday to give us time to get our arms around everything.

4          **THE COURT:**  Well, can you explain to me a little

5     bit more about how this changes your trial strategy?

6     Because there may just be a real disconnect between the

7     parties here.  But the way Mr. Salgado describes it, this is

8     the type of fine-tuning that takes place all the time on the

9     eve of trial, and is not anything that came or should have

10    come as a surprise.

11         So if you can explain to me why this is

12    significant and how it might actually change, for example,

13    how you would open to the jury.

14         **MS. SAVARESE:**  Certainly.  So the forensic

15    evidence -- there's a voluminous amount of forensic evidence

16    in this case and, as we've discussed, some of it was

17    disclosed to us late.  And so we have been trying,

18    scrambling the past couple of weeks to get our arms around

19    everything.  Exhibits 79, 80 and 84, which are all new

20    exhibits, all contain additional documents that reflect

21    additional forensic analysis, which were not identified as

22    part of the government's initial exhibit list.  And it's

23    just more highly complicated, dense material that we have to

24    get our arms around and understand how it factors into our

25    case.

1    MR. SALGADO: Judge, can I -- again, I'm sorry for

2  interrupt -- I'm not interrupting, I believe she was done.

3    THE COURT: Go ahead.

4    MR. SALGADO: Do you know what Exhibit 84 is,

5  which Mr. Savarese has characterized as forensic analysis

6  deep, you know, complex, et cetera? They are literally two

7  screenshots of two DVDs, the DVDs that Mr. Venkata stole

8  from DHS containing the USPS-OIG data and software and gave

9  to Mr. Edwards, discussed in paragraph 16MM of the

10  indictment. That's what she just described as complex

11  analysis, literally two pictures of DVDs that we're going to

12  show the witnesses for identification. Again, she continues

13  to describe --

14    MS. SAVARESE: The government --

15    THE COURT: Wait, wait. Let Mr. Salgado finish,

16  and then I'll come back to you, Ms. Savarese.

17    MR. SALGADO: She continues to describe these

18  updates, these supplements as analysis. That is not the

19  case. The analysis isn't the reports. All of the reports

20  were turned over and noticed up as exhibits. What we're

21  updating the exhibits with, as Your Honor put it, it's the

22  fine-tuning. We're providing -- we're updating the exhibits

23  with literally screenshots of the stolen data, right, and

24  evidence of remote logins and evidence of installation. All

25  of that was already noticed up in the top line report, that

1   were noticed up as exhibits within the deadline.

2          So I continue to be -- it's stunning, Your Honor.

3   So far, I've talked about particular exhibits.  You haven't

4   heard Ms. Savarese talk about one exhibit in particular,

5   other than mentioning three exhibits, one of which is just a

6   screenshot.  So let's get to it.  If they're making these

7   allegations, let's talk about the Jencks that existed and we

8   didn't turn over.  Let's talk about that.  They don't want

9   to mention it, because they can't.

10         **MS. SAVARESE:**  I believe those materials were from

11  an interview of Ms. Patel that occurred prior to the Jencks

12  deadline, handwritten notes from that interview.

13         **MR. SALGADO:**  The handwritten --

14         **MS. SAVARESE:**  I don't want to get into --

15         **THE COURT:**  I'm sorry, hold on a second,

16  Mr. Savarese.  I want to hear Mr. Salgado's response to the

17  handwritten notes, I'm curious.

18         **MR. SALGADO:**  So the handwritten notes were not

19  provided, but the report summarizing in detail her

20  statements on three proffers -- and, of course, you also

21  have her grand jury testimony, those were produced.  We went

22  back and we looked at what was missing, and we noticed that

23  the handwritten notes were not provided.  And, of course,

24  those are -- you know, it's Jencks to start with, those are

25  the agent's notes.  But you have the statements of Ms. Patel

1    in the reports, so it's not a late disclosure of Jencks.

2          **THE COURT:**  Mr. Salgado, are these the notes that

3    were used to prepare the reports?

4          **MR. SALGADO:**  Correct.

5          **THE COURT:**  I see, okay.  Ms. Savarese.

6          **MS. SAVARESE:**  Your Honor, I don't think it's

7    appropriate to get into a tit for tat here.  I will say we

8    have received handwritten notes that are not entirely

9    consistent with the memorandum that we received.  So it's

10   important to us to get both the handwritten notes and the

11   memorandums in a timely way, so that we can compare them and

12   make sure that they are consistent.

13         I would also say that it's not a fair

14   characterization that all of these are just modifications to

15   existing exhibits.  There are brand new exhibits that have

16   been identified.  Again, Your Honor, it's really the

17   cumulative effect of what has been going on here and what we

18   are trying to handle, what we are trying to get our arms

19   around as we prepare for trial.  I know that, in the past,

20   we have discussed the potential of the need for a short -- a

21   very brief continuance of just a couple of days.  I believe

22   Your Honor had put the option on the table of beginning

23   openings later in the week after selecting the jury on

24   Monday.

25         At this point, given what we've been contending

1    with, we would seek a short continuance here.

2    　　　　THE COURT:  So I'll tell you, the biggest problem

3    I have -- and maybe it's not a problem, is I am starting

4    another trial on the 12th.  I have hearings for a good part

5    of the day, including the pretrial conference for that case,

6    on the 11th.  I have some additional matters that are

7    scheduled for the 8th on the theory that, at most, the jury

8    in this case would be deliberating at that point in time.

9    If everyone can tell me that if we start on Wednesday or

10   Thursday, that we -- the case is going to certainly still be

11   to the jury by the 8th, then it's not a problem.  If I don't

12   know that, then it is a problem, because then you're pushing

13   someone else's trial off.  So I don't know the answer to

14   that question.

15   　　　　I mean, we talked about this, Mr. Salgado, last

16   time.  I can't remember what you told me about how many days

17   you anticipate your case will take.

18   　　　　MR. SALGADO:  We think three, three-and-a-half to

19   four days, Your Honor, of witness testimony.  Again, we have

20   two cooperators, so of course that is largely dependent on

21   how extensive cross-examination is of our two cooperators.

22   　　　　THE COURT:  So if we pick the jury on Monday and

23   if we were to start on Tuesday, that would mean that the

24   government would hopefully be done by Friday.

25   　　　　Is that right, Mr. Salgado?

1          **MR. SALGADO:**  If we start witness testimony on

2    Wednesday, Your Honor?

3          **THE COURT:**  No, if we started the witness

4    testimony on Tuesday.  You probably would have openings

5    Tuesday morning, which I take it are not going to be very

6    long, and then you'd call your first witness that morning.

7          **MR. SALGADO:**  That's right.  If we picked a jury

8    on the 28th and we start openings first thing on the 29th

9    and move into our first witness, we are somewhat/fairly

10   confident that we'll finish our presentation by Friday,

11   correct.

12         **THE COURT:**  Ms. Savarese, remind me about how much

13   time you thought the defense was going to need.

14         **MS. SAVARESE:**  We think we would likely need a

15   day, at most a day and a half.  We don't anticipate much

16   longer than that.

17         **THE COURT:**  Well, this is what I think we should

18   do.  I don't want to jam the defense, whether it's because

19   of the fault of the government or it's simply because -- I

20   see you're shaking your head, Mr. Salgado.  I'm not saying

21   it's the fault of government.

22         **MR. SALGADO:**  No, no, I'm sorry, Your Honor, I

23   don't mean to interrupt.  They have not made a showing, Your

24   Honor, that they need a continuance.

25         **THE COURT:**  So, yeah, I'm not -- what I was going

1    to say is what I would like to do is go forward on Monday

2    with the jury selection.  We may have to stay after the jury

3    selection on Monday or come in Tuesday morning and talk

4    about this.

5         But what I'd like, Ms. Savarese, is if you can

6    actually submit to the Court this afternoon the documents

7    that you've indicated that raise the problem here, that were

8    lately designated as exhibits -- or designated late as

9    exhibits, if you can submit those to me by 5 o'clock today.

10        Mr. Salgado, I know you all have got a lot of

11   other things on your plate, but if there's somebody on your

12   team who can file a response to the defense motion before --

13   I guess by the end of the day Sunday, then on Monday I can

14   look at this and just see if there's an issue or not.  I

15   guess I'm not sure I'm inclined to push -- even if there's

16   some need, I'm not sure it's a need to be pushed all the way

17   out until Thursday.  Whether we come back on Wednesday to

18   start instead of Tuesday, I'll just have to decide that on

19   Monday when I've had a chance to look at all of this.

20        **MR. SALGADO:**  That sounds great for the

21   government, Your Honor.

22        **MS. SHIELDS:**  If I may add, it's not the only

23   issue that Ms. Savarese identified.  In addition to the

24   exhibits, it's also, as noted, the Jencks.  There have been

25   multiple Jencks productions very late at night.  I did want

1    to raise the issue about the handwritten notes.  When we did

2    test all of those notes against the materials that the

3    government has produced, we did actually identify -- we did

4    identify an issue that, for us, was a Brady issue earlier.

5    So as a result, we have been on high alert that the

6    government is providing accurate disclosures of what these

7    witnesses are saying.  And they're also creating, because of

8    the repeated interviews with witnesses, multiple Jencks.

9         So I want to be clear, Your Honor, that both the

10   exhibits that are coming in late -- and these are new

11   exhibits, but also all of this additional discovery.  And

12   it's more than just fine-tuning --

13   **THE COURT:**  I'm sorry, Ms. Shields, with respect

14   to that issue, I mean, you know well that -- I mean, I got

15   the government to agree to produce the Jencks material

16   earlier.  And based on the government's agreement, I ordered

17   that they do so.  But they're not required to do that.  And

18   there's some jurisdictions where judges say, you know:  The

19   government can produce the Jencks right after the witness

20   testified, and it might mean you need an adjournment.

21        So I don't think it's a basis for pushing the

22   trial off that the government is supplementing.  And

23   frankly, this is what I expected everyone in the case -- as

24   things come to their attention that they missed that they

25   should have done earlier, I expect them to produce it as

1  soon as they can.  So I don't think that's a basis for

2  putting the trial off because, in another world, you

3  wouldn't get the Jencks material until after the witness has

4  even testified.

5  **MS. SHIELDS:**  Your Honor, I do understand that and

6  agree, and understand that the obligation is for the

7  government to turn over Jencks after direct.  However, the

8  difference here is that it's not just simple witness

9  statements, it's repeated statements about the exact same

10  topics.  So what we have is a situation in which we are

11  testing, for purposes of impeachment, various different

12  kinds of statements that have been coming in from the

13  defense very, very late.

14  So this is not just one statement by a witness.

15  It is that we are seeing handwritten notes and then

16  additional, at least two to three, different reports from

17  some of these witnesses.  So in each case we're going back

18  and looking at what has been said previously.  I think that

19  this is a very unique situation, Your Honor.  I actually

20  have not seen a situation in which we've had three different

21  Jencks submissions for a witness.

22  **THE COURT:**  That strikes me as just -- from your

23  perspective, that's just nothing but good news, right?  You

24  get one Jencks, you can cross on the one; you get three, you

25  can cross on the three.

1    **MS. SHIELDS:**  But, Your Honor, you have to test

2    against all of those.  And it's not as -- we did have an

3    earlier issue where we felt the government did not make a

4    sufficient Brady disclosure, so we warned Mr. Salgado.  And

5    Mr. Salgado, Ms. Choy and Ms. Macey were not informed of

6    this motion late at night.  We told them yesterday afternoon

7    that we intended to file a motion to strike.  There's been a

8    repeated pattern from the defense of letting the government

9    know:  When are we getting this, we have not seen this

10    before.  So this is not coming out of nowhere for the

11    defense -- excuse me, for the government.

12    And I do think, Your Honor, that this is a

13    situation in which more time is needed to wrap our arms

14    around this.  This is a case that, as we -- it is our view

15    that Mr. Venkata's role was very, very minimal; that there

16    was a much larger conspiracy; and that we need to understand

17    how Mr. Venkata interfaces with the very statement that the

18    government's been providing about Mr. Edwards and Ms. Patel.

19    **THE COURT:**  Well, so I will review the materials

20    when they come in.  I'll review the government's submission

21    and then we can talk about this, I guess, after jury

22    selection, probably on Monday.  It will be a long day, but

23    we can talk about it then.  But I think everyone should be

24    ready to proceed on Tuesday.  But I will be open to

25    considering pushing that back a day or a day and a half, or

1    something like that, if I'm really convinced that the

2    defense really needs the time in order to adequately

3    represent Mr. Venkata.  Because at the end, lawyers can

4    fight, but what this is about is about Mr. Venkata receiving

5    a fair trial, and I understand that.

6            But there are big teams on both cases and, quite

7    frankly, the teams on both sides here are vastly larger than

8    I see in usual cases -- in cases that are far more

9    complicated than this one.  So I think there are a lot of

10   resources out there to deal with the case, but we'll -- I'll

11   make a final determination on this Monday.  Because right

12   now, I'm just guessing because I haven't seen the exhibits.

13   I don't know how different they are from what was previously

14   filed, and I'm just hearing Mr. Salgado's response.  He

15   hasn't had a chance to put anything in writing.

16            **MS. SHIELDS:**  Thank you, Your Honor.  Thank you.

17            **THE COURT:**  Anything else that you wanted to raise

18   now?  I know I've got some outstanding motions, and I will

19   be getting you decisions on at least some of that shortly.

20   It may be that, as suggested, that there are pieces of it

21   that are going to have to get pushed back into the trial.

22   But anything that's going to affect openings, I'm going to

23   do my best to get to you -- or I will get to you before you

24   open.

25            **MR. SALGADO:**  Judge, we had one item that's going

1   to impact the earlier stage of our presentation.  Agent --

2   Special Agent Chad Steel, he is a witness who can speak to

3   three or maybe even four items of relevance to our

4   presentation.  What we would like to do, just so that our

5   presentation is more streamlined for the jury, is to put him

6   as number one in our witness order so that he can provide an

7   overview of the systems and the allegations and the

8   investigative steps, educate the jury on the architecture of

9   this case, if you will.  And then call a number of

10  witnesses, and then recall Agent Steel so that he can

11  testify on the other items of relevance to the case.  We

12  wanted to front that with the Court, see if that's okay with

13  the Court.

14         And if it is, we'd ask that cross-examination be

15  limited, of course, to the scope of the two items that he's

16  going to testify up top so that we don't spiral out of --

17  spiral into the other topics that he's going to testify to

18  later on.  More of -- well, let me provide a little bit more

19  context.  He interviewed Mr. Venkata twice.  He's the one to

20  whom Mr. Venkata lied repeatedly about his involvement.

21  He's the one who identified the deleted, the destructed

22  evidence.

23         So we want to leave that for the end of the trial.

24  And to the extent that we can limit cross on those subjects

25  when he presents up top, we'd appreciate that.

1          **THE COURT:**  Ms. Shields.

2          **MS. SHIELDS:**  Ms. Peterson, you can go ahead, I

3     think we're going to say the same things.

4          **MS. PETERSON:**  Your Honor, I have a problem with

5     the government thinking that they can choreograph this in

6     such a way that they put a witness on at the beginning of

7     the case, and we aren't allowed to cross-examine that

8     witness as to their bias, motives to lie, credibility, all

9     of these other factors, until the very end of the case.  The

10    government's also not entitled to put a witness on to tell

11    their story.  The witness has to testify as to what they

12    have firsthand knowledge of.  We don't need a second opening

13    statement by a witness.

14         **THE COURT:**  Yeah, and I assume that that's not

15    what Mr. Salgado meant.  But sometimes you do have witnesses

16    who -- their factual presentation is one that helps frame

17    things for a jury, whereas other witnesses, their factual

18    presentation is a narrower one.  But I do think it's a fair

19    point that you raise with respect to the scope of the cross.

20    I guess my just initial reaction to this is -- I mean, I

21    think you're right, and that you're allowed to cross on

22    anything you would be allowed to cross on with respect to

23    the testimony that's given, including the credibility of the

24    witness and anything that may go to bias and so forth.

25              Usually I will give the defense some leeway to go

22

 1   beyond the scope of the direct on the theory that the

 2   defense could just call that witness in their case-in-chief

 3   anyway.  And it's oftentimes less efficient to bring someone

 4   back to answer those additional three questions that go

 5   somewhat beyond the scope.

 6          So I think my reaction to this is that,

 7   Ms. Peterson, you're right in that if the witness is put on

 8   the stand, you're entitled to cross fully with respect to

 9   what the testimony is, and that that would include any cross

10   relating to bias.  And it may be that some of that would

11   touch on some of the issues that Mr. Salgado wants to

12   postpone.  But that what I would do is if -- allow

13   Mr. Salgado to put the witness on twice, if that's what they

14   want to do.  And I would allow the defense, frankly, to do

15   the same if they wanted to do so with the witness.  Allow

16   you fully to cross on that testimony; not give the defense

17   the extra rope the first time up as long as there's a

18   promise for me -- to me that the witness is coming back so

19   that you can then cross the second time.  And then to the

20   extent you want to go somewhat beyond the scope of the

21   direct, I probably would provide you with that leeway so you

22   just don't have to call the witness to come back.

23          Is that sensible, Ms. Peterson?

24          **MS. PETERSON:**  I guess we're going to have to see

25   how it plays out, because I don't know what this witness is

 1    going to say.  But if the witness says something on direct

 2    that we need to fully examine at that point, I don't -- we

 3    can't have the jury have this witness get off the stand

 4    thinking that we have not thought him to be untruthful until

 5    he says something later in the trial.

 6         **THE COURT:**  I agree completely.  I think you're

 7    right, Ms. Peterson, that we may just have to see how this

 8    goes.  But what I'll say is that if the government wants to

 9    call the witness twice, I will allow the government to do

10    that; and that you're entitled to conduct whatever cross you

11    think is appropriate.  And if Mr. Salgado wants to object to

12    that cross as going beyond the scope or being improper in

13    some way, I'll address that objection if and when it comes

14    up.

15         **MS. PETERSON:**  Right, I have no objection to the

16    notion of letting him testify twice, if that's what he wants

17    to do.  My objection is to the notion that we would somehow

18    be limited on the cross-examination we could do.  So I think

19    we can address it at that point.

20         The other point I would make is, obviously, I

21    assume that the government has not -- does not intend to

22    have this witness sitting at counsel table, because we would

23    object to the witness sitting at counsel table if he's going

24    to be testifying later in the case.

25         **THE COURT:**  You're right about that.

1    **MR. SALGADO:**  That's consistent with the

2    government's plan, Your Honor.

3    **THE COURT:**  I should say, the only limitation that

4    I'm thinking about at all here, Ms. Peterson, with respect

5    to the scope of the cross, is not really even with the

6    scope, but that you can cross fully and completely with

7    respect to the testimony that is presented.  And the only

8    limitation that I might contemplate is where, in the

9    ordinary course, I might allow you to go beyond the scope so

10   you don't have to recall the witness yourself, I may decide

11   to wait and allow you to do that the second time rather than

12   the first time the witness appears.

13   **MS. PETERSON:**  I understand.  We'll discuss it

14   amongst ourselves and, if we have other concerns, we'll

15   raise them at the appropriate time.

16   **THE COURT:**  Fair enough.  Everyone preserves

17   whatever objections they have, which is fine.

18           Anything else?

19   **MS. PETERSON:**  If Mr. Salgado is done, I have one

20   other issue, which is just to make sure I understand.  When

21   the Court is doing the jury selection, will the overflow

22   room be available?  Because I'm trying to figure out whether

23   we can limit the number of us that are in the courtroom and

24   still be able to see what's happening.

25   **THE COURT:**  That's a good question.

1        **MS. PETERSON:**  I would be content to be in the

2    overflow room as long as I could see and hear everything

3    that was happening.

4        **THE COURT:**  So my plan is to bring the individual

5    members of the panel into, I think, it's Judge Walton's

6    courtroom -- I think that's what we're going to be using,

7    for doing the individual voir dire.  And if that's what

8    you're concerned about, I think I am not going to have the

9    overflow room available for that.  And I'll tell you, the

10    reason for that is that if there's anything that is private

11    or confidential that we want to discuss with a witness, you

12    have to turn off all of the A.V. in the overflow to do that,

13    although maybe you can do it with the husher.

14        But the flip side of it is there's plenty of room

15    in that courtroom, because there's only going to be one

16    juror in there, no witnesses.  And so this is all lined up

17    to say you're perfectly welcome to sit in that room, what

18    will be Judge Walton's courtroom, to observe from there.  So

19    I have no problem with that at all.  That goes for the

20    public as well, anyone is welcome in that room.  It's just a

21    little bit easier for me to police the privacy that way and

22    to excuse people into the hallway if there are members of

23    the public who are there, if we're discussing something

24    that's personal.  This doesn't strike me as a case that's

25    likely to raise issues that are personal in the same way

 1    that you see with other cases.

 2        MS. PETERSON:  Very well, we'll figure it out

 3    Monday morning.  We'll all be there, but I do want to be

 4    mindful of trying not to have so many people in the

 5    courtroom.

 6        THE COURT:  The one thing is I think that --

 7    although we'll need to confirm, and Kristin unfortunately is

 8    not here today so you may have to confirm this on Monday

 9    morning.  I think the ceremonial courtroom is either going

10    to have the overflow courtroom for that, for my asking of

11    the questions -- which I'm not sure you need to watch

12    because you know what they say anyway.  But I'm not sure --

13    I think the overflow is available for that, or at least that

14    the public line will be open for that.  But that when we go

15    into Judge Walton's courtroom, there's enough room in there

16    that I'm not using the overflow because anyone who wants to

17    come in is welcome.

18        MS. PETERSON:  And at that point, the juror would

19    be sitting in the jury box?

20        THE COURT:  Will be sitting, yes, in the jury box,

21    the same spot where witnesses have been sitting.

22        MS. PETERSON:  Got it, okay.  We can make that

23    work.

24        MR. SALGADO:  Judge, one indulgence, I just want

25    to make sure my co-counsel -- we're in separate locations,

1    they don't have anything to add?

2        **MS. MACEY:**  We do not.  Thank you, Your Honor.

3        **MR. SALGADO:**  Thank you, Your Honor.

4        **THE COURT:**  Well, I look forward to seeing you all

5    on Monday morning.  I'll be getting more materials from you

6    and you'll be getting more from me in the meantime.

7        **MR. SALGADO:**  Your Honor, the government's

8    response, is there a fixed time?

9        **THE COURT:**  5:00 p.m. on Sunday.

10        **MR. SALGADO:**  5:00 p.m. on Sunday, okay.  Thank

11    you.

12        **THE COURT:**  I would wish you all a nice weekend,

13    but I'm pretty confident you're not going to have one.

14        **MR. SALGADO:**  Thank you, Judge.

15        **THE COURT:**  I'll see you on Monday.  Thank you.

16        (Proceedings adjourned at 2:45 p.m.)

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3                I, **Jeff Hook, Official Court Reporter,**

4     certify that the foregoing is a true and correct transcript

5     of the remotely reported proceedings in the above-entitled

6     matter.

7                **PLEASE NOTE:**  This hearing occurred by

8     videoconference and is therefore subject to the

9     technological limitations of court reporting remotely.

10

11

12

13     _____          _____

       April 30, 2024

14          **DATE**                   **Jeff M. Hook**

15

16

17

18

19

20

21

22

23

24

25

1                   IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
2

3   UNITED STATES OF AMERICA,
                                            Criminal Action
4              Plaintiff,                   No. 1:20-cr-0066-2

5          vs.                              Washington, DC
                                            March 28, 2022
6   MURALI YAMAZULA VENKATA (2),
                                            9:03 a.m.
7              Defendant.
    _____/
8

9

            TRANSCRIPT OF JURY SELECTION - A.M. SESSION
10           BEFORE THE HONORABLE RANDOLPH D. MOSS
                 UNITED STATES DISTRICT JUDGE
11

12

    APPEARANCES:
13

    For the Government:        CELIA CHOY
14                             VICTOR SALGADO
                               U.S. Department of Justice-CRM
15                             1301 New York Ave, NW-10th Floor
                               Washington, DC 20005
16
                               CHRISTINE MACEY
17                             U.S. Attorney's Office for the
                               District of Columbia
18                             601 D Street, NW
                               Washington, DC 20530
19

20  For the Defendant:         KAMIL SHIELDS
                               PARDIS GHEIBI
21                             TARA OHRTMAN
                               Sullivan & Cromwell LLP
22                             1700 New York Ave, NW, Suite 700
                               Washington, DC 20006
23
                               KATHERINE SAVARESE
24                             Sullivan & Cromwell LLP
                               125 Broad Street, Suite 4000
25                             New York, NY 10004

| | | |
|---|---|---|
| 1 | For the Defendant: | **MICHELLE PETERSON** |
| 2 | | Federal Public Defender's Office for the District of Columbia |
| 3 | | 625 Indiana Ave, NW, Suite 550 Washington, DC 20004 |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | Court Reporter: | **JEFF M. HOOK** Official Court Reporter |
| 24 | | U.S. District Court 333 Constitution Avenue, NW Room 4700-C |
| 25 | | Washington, DC 20001 |

1              **P R O C E E D I N G S**

2              **DEPUTY CLERK:**  This is criminal action 20-66, the

3     United States of America vs. Murali Yamazula Venkata.

4     Counsel appearing for the government, please approach the

5     podium and identify yourself for the record.

6              **MR. SALGADO:**  Good morning, Your Honor.  Victor

7     Salgado for the government.

8              **THE COURT:**  Good morning.

9              **MS. CHOY:**  Good morning, Your Honor.  Celia Choy

10    for the government.

11             **THE COURT:**  Good morning.

12             **MS. MACEY:**  Good morning, Your Honor.  Christine

13    Macey, also on behalf of the United States.

14             **THE COURT:**  Good morning.

15             **DEPUTY CLERK:**  Defense counsel.

16             **MS. SHIELDS:**  Good morning, Your Honor.  Kamil

17    Shields on behalf of Mr. Venkata.  I'm here with my

18    colleagues Shelli Peterson, Katherine Savarese, Pardis

19    Gheibi and Tara Ohrtman.

20             **THE COURT:**  Good morning.  I was going to suggest

21    that we do that going forward to speed things along, just

22    let one counsel introduce everybody.  Thank you.

23             So I wanted to turn quickly to the motion to

24    strike as that affects, I think, what we tell prospective

25    jurors about trial days.  One thing I did want to mention --

1    and I don't know if I mentioned to you previously, is when

2    we're doing the jury selection, if it's apparent to counsel

3    on both sides that I should strike somebody for cause, give

4    me a signal before we spend 10 minutes or 20 minutes going

5    through a bunch of other questions.  Just give me a glance,

6    raise your hand, and if everyone seems to be of the view

7    that we should just dismiss a juror, we can just move on to

8    the next juror that way.

9         So I have reviewed the defendant's motion to

10   strike exhibits and the government's response.  I'm happy to

11   hear from you with respect to this.  I have to say, my

12   reaction on reading it and looking at the documents is that

13   there's a little bit that's new here, but not much.  So I'm

14   not sure that it's something that requires delay.  But on

15   the other hand, I do want to make sure that Mr. Venkata gets

16   a full and complete defense.

17        So I'm happy to hear -- why don't I start with

18   Ms. Shields.

19        **MS. SHIELDS:**  Good morning, Your Honor, and thank

20   you.  At this point, Your Honor, the defense has prepped, we

21   are ready to move forward with trial.  We do contend that

22   the exhibits that were -- that came in late were late

23   disclosed, were relevant and were material to our

24   preparation.  But in the honor of moving this along, Your

25   Honor, we're ready to move forward.

1        **THE COURT:** Okay. Perfect, that's helpful. Thank

2    you. In that case, anything else that anyone wants to raise

3    before we begin the jury selection? We actually have a very

4    good pool that are already here -- all here already, so we

5    can start -- we can bring them into the courtroom.

6        Mr. Salgado?

7        **MR. SALGADO:** Yes, Judge, we have two items that

8    can wait until after we select the jury.

9        **THE COURT:** Do you want to tell me what they are?

10        **MR. SALGADO:** Sure. On the preliminary

11    instructions, if possible, we would like the Court to

12    consider instructing the jury on circumstantial evidence.

13    We believe it would be helpful in letting them know they can

14    keep an eye out and keep an ear out for either direct or

15    circumstantial evidence.

16        The second item, Your Honor, relates to one of the

17    individuals on counsel's witness list, that is Madhuri

18    Edwards. That's Charles Edwards' wife.

19        **THE COURT:** I'm sorry, I can't quite hear you.

20        **MR. SALGADO:** Can you hear me now?

21        **THE COURT:** Yes.

22        **MR. SALGADO:** Sorry. Should I back up to the

23    first item?

24        **THE COURT:** No, the first item I heard, but you

25    were talking about the witness.

1    **MR. SALGADO:**  The witness -- one of the

2   individuals on their witness list is Madhuri Edwards, that's

3   Charles Edwards' wife.  She's on their witness list.  We

4   don't know if they're going to call her or not.  To the

5   extent that they are, we'd like to get perhaps one to two

6   day advanced notice so that we can address some potential

7   marital privilege issues, and if needed, so that we can

8   brief them.

9        **THE COURT:**  Okay, thank you.  So Kristin, should

10  we go ahead and bring the jurors in?

11       **DEPUTY CLERK:**  Sure, Your Honor.

12       **THE COURT:**  I will step off the bench and you can

13  get folks ready.  Thank you.

14       (Recess taken at 9:08 a.m.)

15       (Back on the record at 9:27 a.m.)

16       (Prospective jurors present)

17       **DEPUTY CLERK:**  Your Honor, this is criminal action

18  20-66, the United States of America v. Murali Yamazula

19  Venkata.  The defendant is present in the courtroom.  Will

20  counsel, starting with the government, please approach the

21  podium and identify yourselves for the record.

22       **MR. SALGADO:**  Good morning, Your Honor.  My name

23  is Victor Salgado.  I'm with Celia Choy and Christine Macey.

24  We represent the United States Government.

25       **THE COURT:**  Good morning.

1    **MS. SHIELDS:** Good morning, Your Honor. Good

2    morning. Kamil Shields representing Mr. Venkata along with

3    my colleagues Shelli Peterson, Katherine Savarese, Pardis

4    Gheibi and Tara Ohrtman.

5    **THE COURT:** Good morning. And good morning to all

6    of you, and welcome to the United States District Court. I

7    am Judge Moss, and I will be the presiding judge in this

8    case. You have been called into this courtroom for possible

9    selection in a criminal case entitled United States vs.

10   Murali Yamazula Venkata.

11   Would you all please stand so that the Deputy

12   Clerk can swear you in, and then we can proceed.

13   **DEPUTY CLERK:** Please raise your right hand. Do

14   you, and each of you, solemnly swear that you will well and

15   truly answer all questions propounded to you by the Court,

16   so help you God?

17   (Prospective jurors unanimously affirm)

18   **DEPUTY CLERK:** Thank you. You may be seated.

19   **THE COURT:** The purpose of jury selection, which

20   you'll hear referred to as voir dire, is to select jurors

21   who have no prior knowledge of the case, and no bias toward

22   either side in the case. In short, it is our aim to select

23   a jury of 12, with two alternates, that will reach a verdict

24   based solely on the evidence presented in this courtroom and

25   the law as I instruct you.

1    During this process, you will be introduced to the

2    participants in the trial, and I will ask you a series of

3    questions that the lawyers and I think will be helpful to us

4    in selecting a fair and impartial jury.  You, of course, are

5    bound by the oath you've just taken to truthfully answer

6    those questions.

7          This is a criminal case entitled United States vs.

8    Murali Yamazula Venkata in which the defendant, Murali

9    Venkata, was charged in an indictment with violations of

10   federal law.  Specifically, the indictment charges

11   Mr. Venkata with conspiracy in violation of 18 U.S.C.

12   section 371; theft of government property in violation of 18

13   U.S.C. section 641; wire fraud in violation of 18 U.S.C.

14   section 1343; aggravated identity theft in violation of 18

15   U.S.C. section 1028A; and destruction of records in

16   violation of 18 U.S.C. section 1519.  The indictment is not

17   evidence of guilt.  Mr. Venkata has pleaded not guilty to

18   these charges, and he maintains his innocence.

19         You all should now have an index card and a pen or

20   pencil.  Does everyone have that?  Okay.  If you've not

21   already done so, please write your juror number in the upper

22   right-hand corner of your index card.  I'm now going to ask

23   you a series of questions.  They are all yes-or-no

24   questions.  If you have a yes answer to a particular

25   question, please write the number of the question on your

1  card.  Don't write yes or why you have the yes answer, just

2  write the number.  After I finish asking you all the

3  questions, I, along with the lawyers and my staff, will

4  leave and head down the hall.  The Deputy Clerk will then

5  escort each of you one by one where you will meet with me

6  and the lawyers.  At that point, I will ask that you give

7  your card to the Deputy Clerk and come sit in the jury box

8  in that courtroom.  I will then ask you about your answers,

9  and I will provide the lawyers with the opportunity,

10  briefly, to follow up on our discussion.

11          So here are my questions:

12          Number one:  Do you no longer live in the District

13  of Columbia?

14          Number two:  Do you know or have you heard

15  anything about this case?

16          Number three:  The United States is represented by

17  attorneys Victor Salgado, Celia Choy and Christine Macey,

18  who will be assisted by Michon Tart, a paralegal.  Do you

19  know these individuals, either personally or professionally?

20          Number four:  The defendant in this case is Murali

21  Mohan Yamazula Venkata.  Do you, a family member or a close

22  friend know of Mr. Venkata?

23          Number five:  Mr. Venkata is represented by

24  attorneys Kamil Shields, Katherine Savarese, Pardis Gheibi,

25  Tara Ohrtman and Shelli Peterson, who will be assisted by

1    paralegals Ellie Loigman and Rachel Mrkaich.  Do you know

2    these individuals, either personally or professionally?

3              Number six:  If I can ask you to take a minute to

4    look at the other potential jurors.  Do you recognize or

5    think you know any of the other potential jurors in this

6    panel?

7              Number seven:  During the presentation of

8    evidence, you may hear testimony from or about the following

9    persons:  Narasimha Ambati, Scott Balfour, Russell Barbee,

10   Michael Carlson, Timothy Chaffey, Kenneth Cleevely, Anne

11   Coffey, Robert Duffy, Charles Edwards, Madhuri Edwards,

12   Robert Fritzen, Christie Gardner, Michael Horton, Senator

13   Ron Johnson, Judy Kuo, Kevin Lin, Chris Lowder, Mohammad

14   Mahmud, former Senator Claire McCaskill, Lillian Morales,

15   Cara Murren, Murali Nataraj, Steve Nguyen, Peter Paradis,

16   Sonia Patel, Michael Redmond, Fred Reynolds, Chad Steel,

17   Damon Thompson and Brea Ulbright.  Do you know of any of

18   these individuals?

19             Question number eight:  The courtroom deputy is

20   Kristin Thompson.  The court reporter is Jeff Hook.  And my

21   law clerks are Amanda Chuzi, Zach Glubiak and Peter Kallis.

22   Do you know me or any member of my staff?

23             Question nine:  The government has the burden of

24   proving Mr. Venkata guilty beyond a reasonable doubt, and he

25   is presumed innocent unless and until the government meets

1    that burden.  The burden of proof never shifts to

2    Mr. Venkata, and he has no obligation to offer his own

3    evidence.  Would you have any difficulty or hesitation with

4    respecting this allocation of the burden of proof?

5         Question number 10:  There's been an indictment in

6    this case.  An indictment is not evidence of a crime, it

7    merely initiates a case.  It is a formal way of presenting

8    the charges.  The indictment here informs Mr. Venkata, the

9    Court and the members of the jury of the charges against

10   him.  Would the fact that an indictment charges Mr. Venkata

11   make it difficult for you to apply the presumption of

12   innocence?

13        Question 11:  A defendant has a constitutional

14   right not to testify, and if Mr. Venkata decides not to

15   testify, I will instruct you that you may not hold his

16   silence against him in any way.  Would you have any

17   difficulty following that instruction?

18        Question 12:  Do you currently have an opinion

19   regarding Mr. Venkata's guilt or innocence in this case?

20        Question 13:  Mr. Venkata, as I mentioned earlier,

21   is charged with conspiracy, theft of government property,

22   wire fraud, aggravated identity theft and destruction of

23   records.  Is there anything about the nature of these

24   charges that would make it difficult for you to render a

25   fair and impartial verdict if you are chosen as a juror?

1     Question number 14:  Do you have any strong

2     opinions about the Department of Homeland Security, the

3     Department of Agriculture or the Postal Service that would

4     make it difficult to be a fair and impartial -- to be fair

5     and impartial in this case?

6     Question number 15:  Do you have any experience

7     with an Office of Inspector General for any federal agency?

8     Question number 16:  Do you have any experience

9     with software programming or development or with working in

10     information technology more broadly?

11     Question 17:  Have you ever been the victim of

12     identity theft?

13     Question 18:  Do you have any strong positive or

14     negative views about India, other countries on the South

15     Asian subcontinent or individuals from those places?

16     Question 19:  Have you served previously on a

17     grand jury or a trial jury in a criminal or civil case in

18     any court?

19     Question 20:  Have you ever been a witness in any

20     court case?  Have you ever been a party to a court case?

21     Question 21:  Have you, a family member or a close

22     friend been the victim of a crime?

23     Question 22:  Have you, a family member or a close

24     friend had any legal training or ever worked at a law

25     office?

1      Question 23:  Have you, a family member or a close

2   friend ever been detained by the police, arrested or charged

3   with a crime?  Have you, a family member or a close friend

4   ever been investigated by a federal, state or local law

5   enforcement agency?

6      Question 24:  Do you have any strong opinions

7   about criminal defendants, defense attorneys or prosecutors

8   that would make it difficult for you to render a fair and

9   impartial verdict if you are chosen as a juror?

10      Question 25:  There may be testimony from law

11   enforcement officers in this case.  Would you tend to

12   believe or disbelieve their testimony or find them more or

13   less credible than other witnesses because they are law

14   enforcement officers?

15      Question 26:  You may hear testimony in this case

16   from individuals cooperating with the government pursuant to

17   a plea agreement.  Do you have any strong feelings one way

18   or the other in connection with the use of witnesses who are

19   cooperating in exchange for a possible reduction of their

20   sentence that might prevent you from rendering a fair and

21   impartial verdict in this case?

22      Question 27:  Have you, a family member or a close

23   friend ever worked for any of the following organizations:

24   First, a federal agency; second, any type of federal, state

25   or local law enforcement agency; third, a local, state or

1    federal prosecutor's office, including the United States

2    Attorney's Office or the Department of Justice; fourth, any

3    public defender or private criminal defense office; and

4    fifth, any jail, prison or other type of penal institution?

5        Question 28:  Do you have any health problems that

6    would interfere with your ability to sit as a juror in this

7    case?  Do you take medication that makes you drowsy or makes

8    it difficult to remain alert during these proceedings?  Do

9    you have any problems with your hearing or eyesight?

10        Question 29:  Are you, or is anyone with whom you

11    live or with whom you need to have frequent contact, at

12    heightened risk of severe illness from COVID-19?

13        Question 30:  Do you have any difficulty reading,

14    speaking or understanding English?

15        Question 31:  We expect the presentation of

16    evidence in this trial to conclude by April 6th.  After the

17    close of the evidence, the jury will deliberate until it has

18    reached a decision.  Would serving as a juror in this case

19    be an extreme hardship to you?

20        Question 32:  My final question is what I call my

21    catchall question.  This asks whether there is any other

22    reason that I haven't asked about that might make it

23    difficult for you to sit fairly, impartially and attentively

24    as a juror?  Perhaps you have a religious, moral or

25    philosophical reason that you believe would make it hard for

1   you to be fair.  In sum, is there some other reason that

2   would make it difficult for you to sit as a fair and

3   impartial juror in this case?

4          Now, as I explained, counsel and I are going to

5   head to a different courtroom where we will explore these

6   questions and answers with each of you.  The Deputy Clerk

7   will bring you to the courtroom one by one with your card.

8   We'll go over the information that you've listed and have a

9   discussion with you about it.  Feel free to take your mask

10  off, or to leave it on, when you're talking.  As you can

11  see, I've taken my mask off when I'm talking, but I defer to

12  everyone else's personal judgment about what they're

13  comfortable with.

14         We will be starting on the right in the front row,

15  and just make our way through however many of you we need to

16  talk to.  If you need to use the facilities, you can go

17  outside and courthouse personnel can direct you to them.

18  Please come back promptly, do not wait around in the hall.

19  Certainly don't leave this floor of the courthouse.

20  Sometimes people stand outside the courtroom and start

21  talking among themselves.  That means that the Deputy Clerk

22  has to go and find you, and that takes time.  So please come

23  back into the courtroom promptly.

24         I ask you not to speculate about the case.  If you

25  have information that you're going to provide me, please do

 1    not discuss it with your fellow jurors so that you don't

 2    create a problem for them by telling them something that may

 3    require that I excuse you, and then may wind up requiring

 4    that I excuse them as well.

 5         You may not conduct any independent investigation

 6    of the law or facts in this case.  That means that you

 7    cannot conduct any kind of research about this case.  For

 8    example, researching any issue on the internet, using your

 9    phone or another device, asking any questions of anyone via

10    e-mail or text or otherwise communicating about or

11    investigating the facts or law connected to the case.  You

12    can talk amongst yourselves, there's no problem with that,

13    so long as you wear your masks and maintain social

14    distancing.  I'd just ask that you not discuss the case.  If

15    you do get up, please look at whomever is on either side of

16    you and where you are.  We put you in order according to a

17    list so we know who you are.  I'll ask that you go back to

18    the same seat when you return, that way we won't take you

19    out of order.

20         If you run into any anyone associated with this

21    case, please do not talk to them about anything.  If you're

22    seen talking to them, I'll need to add that to my list of

23    questions to make sure you weren't talking about the case.

24    You're not allowed to talk about the case.  And again, if

25    you're seen talking to counsel or others, even if you're not

1   talking about the case, I still need to make inquiry and

2   that takes a lot of extra time.  Finally, if you see any of

3   the attorneys or witnesses involved in the case and they

4   turn and walk away from you, they're not being rude, they're

5   merely following the same instruction that I gave you.

6          We want you to come here without getting

7   additional information from somebody else.  If you're chosen

8   as a juror, you'll be required to make your decision based

9   solely on the evidence that is going to be presented in the

10  courtroom.  We'll do this as quickly as we possibly can.

11  And I do appreciate all of your patience, so thank you.

12      (Off the record at 9:45 a.m.)

13      (Back on the record at 9:53 a.m.)

14      **MS. PETERSON:**  Your Honor, I just wanted to make

15  sure the Court knew we do have an objection to the

16  government's request to modify the preliminary instructions.

17  I didn't want the Court to be making those changes without

18  us being heard first.

19      **THE COURT:**  Okay, I appreciate that.  Let's bring

20  in the first juror.

21          So we have Juror 1323.  I have your card here, and

22  I don't think you had a yes answer to any question; is that

23  correct?

24      **PROSPECTIVE JUROR:**  That's correct.

25      **THE COURT:**  How long have you lived in D.C.?

1      **PROSPECTIVE JUROR:** Eighteen years.

2      **THE COURT:** What do you do for a living?

3      **PROSPECTIVE JUROR:** I'm a flight attendant.

4      **THE COURT:** And as I mentioned, we think the

5 presentation of the evidence in this case will be complete

6 by April 6th, and the jury will deliberate for however long

7 it has to deliberate. Is that something that's workable

8 with your schedule as a flight attendant?

9      **PROSPECTIVE JUROR:** Yes, it is.

10      **THE COURT:** Ms. Shields, do you have any follow up

11 questions you'd like to ask? I'm not sure who on your team

12 is doing this.

13      **MS. SHIELDS:** Apologies, Your Honor. Thank you,

14 Your Honor. Thank you, sir. No questions from the defense.

15      **THE COURT:** Thank you. Mr. Salgado?

16      **MR. SALGADO:** No questions from the government,

17 Your Honor.

18      **THE COURT:** Okay, thank you. You can go back to

19 the other room, just go through the door there with the red

20 sign on it. Thank you.

21      **MR. SALGADO:** Your Honor, just to confirm for time

22 relation purposes, how many peremptories do the parties get?

23      **THE COURT:** So the government gets six and the

24 defense gets 10, and then one each for the alternates.

25      **MR. SALGADO:** So we have to qualify 32?

**A0676**

```
1            THE COURT:  Yeah, and I might qualify 33 or 34
2    just to play it safe, depending on how we're going.
3            MR. SALGADO:  Thank you, Judge.
4            THE COURT:  So we have juror 1503.  Thank you for
5    being here.  I see you answered yes to three of my
6    questions, so I'd like to go through that with you.  You
7    answered yes to that question about whether you, a family
8    member or a close friend have ever worked for any of that
9    long list of organizations that I gave.
10           PROSPECTIVE JUROR:  Yes.
11           THE COURT:  What were you talking about there or
12   what do you have in mind?
13           PROSPECTIVE JUROR:  My ex-spouse worked for --
14           THE COURT:  I'm sorry, can you get a little closer
15   to the microphone?
16           PROSPECTIVE JUROR:  My ex worked for the
17   Metropolitan Police Department, and I have two grandsons on
18   Metropolitan Police.
19           THE COURT:  And would the fact that you have those
20   relationships with folks who have worked in law enforcement
21   affect in any way your ability to be a fair and impartial
22   juror?
23           PROSPECTIVE JUROR:  No.
24           THE COURT:  Then you answered yes to question 23
25   about whether you, a family member or a close friend have
```

20

1    ever been detained by the police, arrested or charged with a

2    crime or investigated.

3          **PROSPECTIVE JUROR:**  My son was charged with gun

4    trafficking.

5          **THE COURT:**  Was there a trial in that case?

6          **PROSPECTIVE JUROR:**  Yes.

7          **THE COURT:**  Did it result in a conviction, do you

8    know?

9          **PROSPECTIVE JUROR:**  Yes.

10         **THE COURT:**  And was there anything about your

11   experience with that case that left you with such strong

12   feelings about prosecutors, defense lawyers, judges, the

13   judicial process, anything that would interfere with your

14   ability to be a fair and impartial juror?

15         **PROSPECTIVE JUROR:**  No.

16         **THE COURT:**  Then you answered yes to the question

17   about whether you've been a juror before.

18         **PROSPECTIVE JUROR:**  Yes.

19         **THE COURT:**  Tell us about that.

20         **PROSPECTIVE JUROR:**  I've been a juror several

21   times.  It was in a civil case, it was against the police

22   department.  And I've also been in a criminal trial, and

23   that was drug related.

24         **THE COURT:**  Drug related?

25         **PROSPECTIVE JUROR:**  Right.

1　　　　　　　**THE COURT:** When was the last case you were a

2　juror in, how long ago?

3　　　　　　　**PROSPECTIVE JUROR:** Maybe five years.

4　　　　　　　**THE COURT:** Have you ever been a juror in this

5　courthouse before or was it always over at the superior

6　court?

7　　　　　　　**PROSPECTIVE JUROR:** It was always over in superior

8　court.

9　　　　　　　**THE COURT:** Anything about your experience as a

10　juror that would affect your ability to serve as a fair and

11　impartial juror here?

12　　　　　　　**PROSPECTIVE JUROR:** No.

13　　　　　　　**THE COURT:** Did you feel as though the process

14　worked well?

15　　　　　　　**PROSPECTIVE JUROR:** Yes.

16　　　　　　　**THE COURT:** Mr. Salgado, any follow up questions

17　you want to ask?

18　　　　　　　**MR. SALGADO:** Yes, Your Honor. Thank you. Good

19　morning, ma'am. On the criminal matter in which you served

20　as a juror, without telling us the result, did that matter

21　go to verdict?

22　　　　　　　**PROSPECTIVE JUROR:** Yes.

23　　　　　　　**MR. SALGADO:** Thank you, Judge.

24　　　　　　　**THE COURT:** Ms. Shields?

25　　　　　　　**MS. SHIELDS:** Good morning, ma'am. Are you

 1   retired now?

 2          **PROSPECTIVE JUROR:**  No, I work full-time.

 3          **MS. SHIELDS:**  I'm sorry, excuse me?

 4          **PROSPECTIVE JUROR:**  I work full-time.

 5          **MS. SHIELDS:**  And where is that, ma'am?

 6          **PROSPECTIVE JUROR:**  At Ace Check Cashing.

 7          **MS. SHIELDS:**  Thank you so much.

 8          **THE COURT:**  Well, thank you.

 9          We have Juror 162.  You answered yes to three of

10   my questions.  You answered yes to the question about

11   whether you, a family member or a close friend have worked

12   for a long list of the organizations I mentioned.

13          **PROSPECTIVE JUROR:**  Correct.

14          **THE COURT:**  Tell us which ones and what you have

15   in mind.

16          **PROSPECTIVE JUROR:**  I previously worked at the

17   U.S. Department of Justice in the antitrust division.

18          **THE COURT:**  And when was that until?

19          **PROSPECTIVE JUROR:**  2012 through 2014.  And

20   actually, also 2006 to 2007.

21          **THE COURT:**  And what did you do in the antitrust

22   division?

23          **PROSPECTIVE JUROR:**  I was a trial attorney in the

24   national criminal enforcement section where I investigated

25   and prosecuted criminal violations of the antitrust laws.

**1**             **THE COURT:**  And what do you do now?

**2**             **PROSPECTIVE JUROR:**  I'm a partner at the law firm

**3** Morrison & Foerster.

**4**             **THE COURT:**  Doing similar sort of work there?

**5**             **PROSPECTIVE JUROR:**  Competition and antitrust law.

**6**             **THE COURT:**  Are you doing any criminal related

**7** work there?

**8**             **PROSPECTIVE JUROR:**  Yes, I do represent companies

**9** and senior executives in criminal and civil conduct

**10** investigations by the DOJ and the FTC.

**11**             **THE COURT:**  And let me ask you, the fact that you

**12** have been a prosecutor in the Justice Department, would that

**13** in any way affect your view towards the prosecutors or the

**14** defense in this case in any way?

**15**             **PROSPECTIVE JUROR:**  No, it would not.

**16**             **THE COURT:**  Would it affect your ability in any

**17** way to be a fair and impartial juror?

**18**             **PROSPECTIVE JUROR:**  No.

**19**             **THE COURT:**  And you answered yes to question 22

**20** about whether you, a family member or a close friend have

**21** any legal training or worked in a law office.  Other than

**22** the fact that you're a lawyer, any other family members or

**23** close friends -- obviously, I guess you must have close

**24** friends who are lawyers?

**25**             **PROSPECTIVE JUROR:**  Yes, several close friends.

1  My father is a state court judge in Oregon.  My brother is a

2  partner at a law firm.

3          THE COURT:  And where is he?

4          PROSPECTIVE JUROR:  In San Francisco.

5          THE COURT:  What sort of practice does he have?

6          PROSPECTIVE JUROR:  Insurance recovery.  And my

7  sister-in-law is a law professor at UC Berkeley.

8          THE COURT:  Family of lawyers.  Do you have

9  friends who work in the Public Integrity Section at the

10  Justice Department?

11          PROSPECTIVE JUROR:  Not that I know of

12  specifically.

13          THE COURT:  And then you answered yes to question

14  six, which is whether you knew anyone else in the jury pool.

15          PROSPECTIVE JUROR:  I saw someone who looked

16  familiar.  I don't remember the person's name, but just

17  someone who I recognize from D.C.

18          THE COURT:  Any reason to think that if that

19  person ended up on the jury and you did, that you would be

20  more or less likely to give weight to that person's views?

21          PROSPECTIVE JUROR:  No.  As I mentioned, I don't

22  recall the person's name.

23          THE COURT:  Anything else you think we ought to

24  know about you as to whether you'd be a fair and impartial

25  juror in this case?

1    **PROSPECTIVE JUROR:**  No, I don't believe so.

2    **THE COURT:**  Okay.  Ms. Shields, follow up?

3    **MS. SHIELDS:**  Good morning, ma'am.  You said that

4    you recognized one of the jurors.  Is it an individual whose

5    name is Sharon Mann?  Do you recognize that name?

6    **PROSPECTIVE JUROR:**  I don't recognize the name.

7    It is a woman.  I can describe her if you'd like.

8    **MS. SHIELDS:**  Understood, no worries.  Thank you.

9    You also mentioned that you both served as a trial attorney

10    in the antitrust division as well as now, I assume, you're

11    on the defense side?

12    **PROSPECTIVE JUROR:**  That's correct.

13    **MS. SHIELDS:**  Is there anything about those

14    experiences that wouldn't allow you to follow the Judge's

15    instructions about the law?

16    **PROSPECTIVE JUROR:**  No.

17    **MS. SHIELDS:**  Thank you very much.

18    **THE COURT:**  Mr. Salgado?

19    **MR. SALGADO:**  Thank you, Your Honor.  Good

20    morning, ma'am, how are you?

21    **PROSPECTIVE JUROR:**  Good morning.

22    **MR. SALGADO:**  Just very quickly, have you yourself

23    tried cases, criminal matters?

24    **PROSPECTIVE JUROR:**  I've not led a trial.  I have

25    represented the government in court appearances when I was

1    at the DOJ.

2        **MR. SALGADO:**  Okay, thank you.

3        **THE COURT:**  Although you have experience in the

4    criminal law and training from law school, would you be able

5    to follow my instructions with respect to the law and not

6    any independent views you might have with respect to the

7    law?

8        **PROSPECTIVE JUROR:**  Yes, Your Honor.

9        **THE COURT:**  Thank you very much.

10        So we have Juror 864.  You wrote down the numbers,

11    I think up to 21, and wrote no for many of the answers, and

12    then wrote yes for questions 20 and 21.  Let me ask you,

13    were there any yes answers you would have had for the

14    questions after 21?

15        **PROSPECTIVE JUROR:**  No.

16        **THE COURT:**  So your only two yes answers are 20

17    and 21?

18        **PROSPECTIVE JUROR:**  Right.

19        **THE COURT:**  So 20 was whether you've ever been a

20    witness in a court case or a party.  Tell us about that.

21        **PROSPECTIVE JUROR:**  Oh, no, I was a juror.  I

22    misunderstood.

23        **THE COURT:**  Oh, you were a juror before?

24        **PROSPECTIVE JUROR:**  Yes.

25        **THE COURT:**  Tell us about that.  When were you a

1    juror and where?

2    **PROSPECTIVE JUROR:** It's been a while ago, at the

3    courthouse on Indiana Avenue.

4    **THE COURT:** What sort of case was it?

5    **PROSPECTIVE JUROR:** I think a young lady assaulted

6    a police officer or something, something in that order.

7    **THE COURT:** Do you remember if the jury reached a

8    verdict? You don't have to tell me what it was, but did you

9    reach a verdict?

10    **PROSPECTIVE JUROR:** Yeah.

11    **THE COURT:** Anything about that experience that

12    would affect your ability to be a fair and impartial juror?

13    **PROSPECTIVE JUROR:** It was a little surprising,

14    but, I mean, I set and did what I had to do as far as being

15    fair.

16    **THE COURT:** Do you feel as though you could be a

17    fair juror in this case?

18    **PROSPECTIVE JUROR:** I do believe so.

19    **THE COURT:** And then you answered yes to question

20    21 about whether you, a family member or a close friend have

21    been a victim of a crime.

22    **PROSPECTIVE JUROR:** Oh, a victim of a crime, I

23    missed --

24    **THE COURT:** If you had something else in mind,

25    tell us --

1    **PROSPECTIVE JUROR:**  I thought you had said if

2    anybody in the family ever had been arrested.

3    **THE COURT:**  I did ask you about that, it may just

4    be a different number.  So any friends or family members or

5    you ever been arrested?

6    **PROSPECTIVE JUROR:**  Yeah, once before -- this was

7    back before 2010.  Me and a friend mine just had a little

8    disagreement and the police were called.  They took me down,

9    and the next day they just let me go.

10    **THE COURT:**  I'm sorry, can you get a little closer

11    to the microphone?  It's a little hard for me to hear you.

12    **PROSPECTIVE JUROR:**  Me and a friend of mine had a

13    little misunderstanding.  The police were called.  They took

14    me down to -- over across the street over here.  And the

15    next day, they just let me go.  No papers were filed or

16    anything.

17    **THE COURT:**  So you were held overnight.  Was it on

18    an assault charge or something like that?

19    **PROSPECTIVE JUROR:**  I think that's what they was

20    calling it, if I can remember.

21    **THE COURT:**  Anything about how you were treated or

22    anything about your experience in that case that would

23    affect how you would approach being a juror here?

24    **PROSPECTIVE JUROR:**  No.

25    **THE COURT:**  Anything else you think we ought to

29

 1    know about you as to whether you can be a fair and impartial

 2    juror?

 3         **PROSPECTIVE JUROR:**  The only thing is, I don't

 4    know if it concerns this case or whatever, I'm a security

 5    officer.  I deal with a lot of police on a day-to-day basis.

 6    And we all -- if I can't handle the situation where I work,

 7    then we have to get the police involved.  I know a lot of

 8    the officers.  But I don't think that would --

 9         **THE COURT:**  I don't think it's likely that any

10    officer that you know would be a witness in this case.  But

11    I guess I do have a follow up question for you about that,

12    which is:  Given the fact that you know a lot of police

13    officers and that you work in security yourself, as a result

14    of that, would that experience affect in any way the weight

15    that you might give to the testimony of a law enforcement

16    officer in this case?

17         **PROSPECTIVE JUROR:**  No.

18         **THE COURT:**  Mr. Salgado, any follow up?

19         **MR. SALGADO:**  Thank you, Judge.  Good morning.

20         **PROSPECTIVE JUROR:**  Good morning.

21         **MR. SALGADO:**  So your current occupation is -- you

22    work as a security officer?

23         **PROSPECTIVE JUROR:**  Yes, I work for

24    Contemporaneous Services Corporation.  They mainly do crowd

25    management, but we are licensed security officers.

1          MR. SALGADO:  Got it.  And before that, what did

2     you do, what was your employment?

3          PROSPECTIVE JUROR:  Well, I've been doing this for

4     the last 16 years.

5          MR. SALGADO:  Sixteen years.  Thank you, sir.

6          THE COURT:  Ms. Shields?

7          MS. SHIELDS:  Good morning, sir.

8          PROSPECTIVE JUROR:  Good morning.

9          MS. SHIELDS:  Judge Moss asked you about if you --

10    the fact that you know and work with police officers, if

11    that would affect your ability to be fair and impartial

12    here.  The law enforcement -- the relevant law enforcement

13    entity is the Office of the Inspector General.  Does that in

14    any way -- would that affect your ability to be fair and

15    impartial as a juror?

16         PROSPECTIVE JUROR:  No, because I never worked

17    with an Inspector General or nothing like that.

18         MS. SHIELDS:  Understood, thank you.

19         THE COURT:  Well, thank you.

20         We have Juror 568.  You answered yes to question

21    31, which is the one about whether serving as a juror in

22    this case would pose an extreme hardship to you.

23         PROSPECTIVE JUROR:  Yes, I was supposed to start a

24    new job this morning.  My orientation was at 7:30, but I had

25    to report here instead.  I've been unemployed since early

 1  February, and I'm not on unemployment.

 2         THE COURT:  I see.  What's the job that you're

 3  starting?

 4         PROSPECTIVE JUROR:  Ice cream maker out in Laurel,

 5  Maryland with Nestle.

 6         THE COURT:  Any objection?

 7         MR. SALGADO:  No, Your Honor.

 8         MS. SHIELDS:  No.

 9         THE COURT:  Well, I don't want to interfere with

10  your employment, so I'm going to go ahead and dismiss you.

11  I want you to be able to go do your job.  Thank you for

12  coming today.  Thank your employer for letting you come in

13  today, and extend the Court's thanks.  You're welcome to

14  leave.  If you can go to work today, you're welcome to do

15  so.  Thank you for being here.

16         PROSPECTIVE JUROR:  Thank you so much.

17         THE COURT:  So next we have Juror 945.  I've got

18  your card here, and I think you wrote the numbers down on

19  the card here.  I want to make sure, you're not saying you

20  have a yes answer to every question, right?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Did you have a yes answer to any of my

23  questions?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  How long have you lived in D.C.?

1      PROSPECTIVE JUROR:  Since 2012.

2      THE COURT:  What do you do?

3      PROSPECTIVE JUROR:  I'm retired now, but I worked

4  as a bank examiner.

5      THE COURT:  I see.  And where did you work as a

6  bank examiner?

7      PROSPECTIVE JUROR:  When?

8      THE COURT:  Where?

9      PROSPECTIVE JUROR:  Both in New York and in D.C.

10      THE COURT:  As a bank examiner, were you involved

11  in any way in law enforcement?  Did you participate in law

12  enforcement in any way?

13      PROSPECTIVE JUROR:  No.

14      THE COURT:  Did you -- as a bank examiner, did you

15  work for the bank or did you work for the government?

16      PROSPECTIVE JUROR:  Worked for the government, the

17  state of New York and the city of D.C.

18      THE COURT:  I see.  And was it in a -- an

19  administrative-type capacity?  I take it it wasn't civil or

20  criminal enforcement actions?

21      PROSPECTIVE JUROR:  No, sort of accounting and

22  auditing.

23      THE COURT:  And did you work with software or IT

24  in doing that?

25      PROSPECTIVE JUROR:  A bit.  When I started out

1   many years ago, we didn't have any software.

2          **THE COURT:** Were you yourself involved in the IT

3   or did someone else do the IT?

4          **PROSPECTIVE JUROR:** There was a separate division

5   that was responsible for the IT work.

6          **THE COURT:** Anything else you think we ought to

7   know about you as to whether you could be a fair and

8   impartial juror in this case?

9          **PROSPECTIVE JUROR:** What would you like to know?

10          **THE COURT:** Well, if there's anything else that

11   comes to your mind that I may not have asked about?

12          **PROSPECTIVE JUROR:** Nothing special.

13          **THE COURT:** Ms. Shields, do you want to ask any

14   follow up questions?

15          **MS. SHIELDS:** Good morning, sir. You mentioned

16   that you were a bank examiner. Were you working with a team

17   or is that something where you were individually supervising

18   the banks?

19          **PROSPECTIVE JUROR:** Both. As time went on, I had

20   more people assigned to me. Initially I worked by myself.

21          **MS. SHIELDS:** So you said that you are retired

22   now. Does that mean that at various points you had direct

23   reports to you?

24          **PROSPECTIVE JUROR:** I am retired, and I have no

25   more reporting responsibilities of course.

1          **MS. SHIELDS:**  No, I'm sorry, my apologies.  So by

2    the time you retired, at the time that you retired, you had

3    various direct reports, people reporting to you; is that

4    right?

5          **PROSPECTIVE JUROR:**  That's correct.

6          **MS. SHIELDS:**  About how many, sir?

7          **PROSPECTIVE JUROR:**  How many people did I report

8    to?

9          **MS. SHIELDS:**  Reported to you, sir.

10          **PROSPECTIVE JUROR:**  How many reported to me?  In

11    D.C., 10.

12          **MS. SHIELDS:**  Thank you so much.  And how many did

13    you report to?

14          **PROSPECTIVE JUROR:**  I reported to one individual

15    above me.

16          **MS. SHIELDS:**  Understood.  Thank you, sir.

17          **THE COURT:**  Mr. Salgado?

18          **MS. CHOY:**  Good morning, sir.

19          **PROSPECTIVE JUROR:**  Good morning.

20          **MS. CHOY:**  When you were working as a bank

21    examiner, did you personally conduct audits or oversight?

22          **PROSPECTIVE JUROR:**  Yes, that was the nature of

23    the position.

24          **MS. CHOY:**  And when you were doing that, if you

25    ever found any kind of irregularities, what would you then

1   do?

2       **PROSPECTIVE JUROR:**  Report it, just write it up in

3   the report.  Each report had two sections, one that was open

4   to the public and to the board of directors of the

5   institution, and one that was confidential, only shared

6   between government agencies.

7       **MS. CHOY:**  Thank you, sir.

8       **THE COURT:**  Well, thank you.

9       Next up we have Juror 137.  You indicated, in

10  answer to one of my questions, that you have some difficulty

11  understanding -- or reading or writing or understanding

12  English; is that right?

13      **PROSPECTIVE JUROR:**  Yes, I did say that.  I can

14  communicate, but I'm not good enough to participate in this

15  activity.  I can speak, but my language is not good enough

16  to serve on this case, I guess.

17      **THE COURT:**  So you would be concerned that you

18  might not be able to understand some of the evidence in the

19  case?

20      **PROSPECTIVE JUROR:**  Yes.

21      **THE COURT:**  Okay.  Any objection?

22      **MR. SALGADO:**  None, Your Honor.

23      **MS. SHIELDS:**  No.

24      **THE COURT:**  I appreciate your candor about that.

25  I'm going to go ahead and dismiss you in light of that.  I

1    do appreciate your letting us know that.  I appreciate your

2    being here.  You're welcome to leave.  Thank you for coming.

3             We have Juror 1244.  Let me start with question 15

4    where you indicated that you had some experience with an

5    Office of Inspector General for a federal agency?

6             PROSPECTIVE JUROR:  Sorry, I thought it was a

7    legal training one.

8             THE COURT:  Okay.  So tell me about legal

9    training.

10            PROSPECTIVE JUROR:  I went to law school, so

11   that's about the extent of it.

12            THE COURT:  What do you do now?

13            PROSPECTIVE JUROR:  I don't practice.  Currently I

14   run a company.  It's a national security company that sells

15   containers basically.

16            THE COURT:  When you were in law school, did you

17   do any clinical programs that had you working either with

18   defense lawyers or prosecutors in criminal cases?

19            PROSPECTIVE JUROR:  No, I did not.

20            THE COURT:  Did you take criminal law?

21            PROSPECTIVE JUROR:  I did.

22            THE COURT:  Would you, despite your legal

23   training, be able to follow my instructions of the law

24   rather than any views you might have of your own?

25            PROSPECTIVE JUROR:  Yes, Your Honor.

1    **THE COURT:**  And then you indicated as well that

2    you've been a witness in a case or been a party in a case

3    before.

4    **PROSPECTIVE JUROR:**  Yeah, just a couple vehicular

5    accidents I've either been a passenger in or had an

6    accident, nothing criminal, though.

7    **THE COURT:**  But those cases actually ended up in

8    court?

9    **PROSPECTIVE JUROR:**  Two were in court, one was

10   just a deposition.  The other actually I had to sit through

11   a proceeding.

12   **THE COURT:**  Anything about that experience that

13   would affect your ability to be a fair and impartial juror?

14   **PROSPECTIVE JUROR:**  No, Your Honor.

15   **THE COURT:**  And then you also said that you or

16   family member or a close friend have been a victim of a

17   crime.

18   **PROSPECTIVE JUROR:**  Yeah, just petty crimes,

19   nothing major.  My wife was mugged, a couple car thefts,

20   stuff like that.  Kind of typical city stuff.

21   **THE COURT:**  Anyone in your family or a close

22   friend a victim of any identity theft type crime?

23   **PROSPECTIVE JUROR:**  My wife had her credit cards

24   stolen once, one of those swipe things, but it was taken

25   care of pretty quickly.

1      **THE COURT:** Anything about that that would affect

2  your ability to be a fair and impartial juror in a case in

3  which one of the allegations is aggravated identity theft?

4      **PROSPECTIVE JUROR:** No, Your Honor.

5      **THE COURT:** And then you answered yes to whether

6  you -- I see, this is the legal -- number 22 is the legal

7  training. Do you remember, on 15, I'm kind of curious as to

8  what that might have been. That was the Inspector General

9  one. The question right before that one was whether you

10  have any strong opinions about the Department of Homeland

11  Security, the Department of Agriculture or the Postal

12  Service. The question after that was whether you have any

13  experience in software programming or developing or working

14  in information technology. No?

15      **PROSPECTIVE JUROR:** No, sorry, Your Honor.

16      **THE COURT:** I wanted to make sure I wasn't missing

17  something, that was all. Other than yourself, any of your

18  family members or close friends lawyers?

19      **PROSPECTIVE JUROR:** No, not really.

20      **THE COURT:** And then you indicated that you, a

21  family member or a close friend have been detained by the

22  police or charged with a crime or investigated.

23      **PROSPECTIVE JUROR:** Yes, Your Honor, that was me

24  in 2006. I had a DUI.

25      **THE COURT:** And how long ago was that?

1    **PROSPECTIVE JUROR:**  2006.

2    **THE COURT:**  Anything about your experience with

3    the prosecutors, defense lawyers, the courts that would

4    affect your ability to be a fair and impartial juror?

5    **PROSPECTIVE JUROR:**  No, Your Honor.

6    **THE COURT:**  Did that result in a trial?

7    **PROSPECTIVE JUROR:**  It was a traffic violation, so

8    I did have to go to court, I did get sentenced.  I did a

9    couple weekends in prison, and then had 240 hours of

10    community service.

11    **THE COURT:**  Anything about the fact that you spent

12    some time in prison that would affect your ability to be a

13    fair and impartial --

14    **PROSPECTIVE JUROR:**  Didn't like it, but no, it

15    wouldn't impact my ability.

16    **THE COURT:**  Anything else that we should know

17    about you?

18    **PROSPECTIVE JUROR:**  No, sir.

19    **THE COURT:**  Ms. Shields, any follow up?

20    **MS. SHIELDS:**  Good morning, sir.  You mentioned

21    that you are a defense contractor; is that right?

22    **PROSPECTIVE JUROR:**  Yes.

23    **MS. SHIELDS:**  And so you're dealing with which

24    federal agency?

25    **PROSPECTIVE JUROR:**  Primarily, Department of

1   Defense.

2          **MS. SHIELDS:**  And you mentioned that you're doing

3   container work.  Are you running that organization?

4          **PROSPECTIVE JUROR:**  So the president of the

5   company that basically takes -- think of like regular sea

6   containers, and we'll modify those either for transportation

7   purposes with shelving and doors or we'll install command

8   center type stuff.  I would say kind of low-grade IT, I

9   wouldn't put it in a high-grade class.

10          **MS. SHIELDS:**  Understood.  Thank you, sir.

11          **MS. CHOY:**  Good morning, sir.

12          **PROSPECTIVE JUROR:**  Good morning.

13          **MS. CHOY:**  Have you ever personally worked in

14   government?

15          **PROSPECTIVE JUROR:**  I have, yes.  I was a staff

16   member for a House member.  I was also in the Army, active

17   duty.

18          **MS. CHOY:**  When did you serve in the Army?

19          **PROSPECTIVE JUROR:**  I was in the Army, graduated

20   West Point in '98, served five years active.  I got out in

21   May of '03.

22          **MS. CHOY:**  Were you deployed?

23          **PROSPECTIVE JUROR:**  I was stationed in Korea for

24   one year.  I was stationed in Puerto Rico for about three

25   years.

1          **MS. CHOY:**  When you had that issue with the DUI a

2     few years back, did you feel you were treated fairly?

3          **PROSPECTIVE JUROR:**  I was.

4          **MS. CHOY:**  Thank you.

5          **THE COURT:**  Well, thank you.

6          We have Juror 550.  You answered yes to the

7     question about whether you have any experience with an

8     Office of an Inspector General.

9          **PROSPECTIVE JUROR:**  Oh, I interviewed there for a

10    job.  I thought that question was about being -- having

11    identity theft.

12         **THE COURT:**  Have you been the victim of identity

13    theft?

14         **PROSPECTIVE JUROR:**  I have.

15         **THE COURT:**  Tell us about that.

16         **PROSPECTIVE JUROR:**  So I lost my purse one day,

17    and of course I did a police report.  People had -- they had

18    wrote checks.  It took a while for me to actually get it

19    resolved.  It even came up when I purchased my home, so that

20    was an issue for me.

21         **THE COURT:**  I see.  Anything about the fact that

22    you were yourself a victim of identity theft that would make

23    it difficult for you to be a fair and impartial juror in a

24    case in which one of the allegations is aggravated identity

25    theft?

1          **PROSPECTIVE JUROR:** Possibly.

2          **THE COURT:** Explain a little bit more what you

3     mean by that.

4          **PROSPECTIVE JUROR:** Well, I think identity theft

5     is an egregious activity, so I could be partial to it.

6          **THE COURT:** Well, let me ask you this way: There

7     are lots of things that people are charged with that are

8     serious matters, that's the reason they're crimes. But

9     there's a different question about whether -- from the

10    question of whether you think the charge is a serious one

11    versus the question of deciding whether someone was guilty

12    or not of that charge.

13          So I guess the question for you -- and we only can

14    rely on your best personal judgment about this, but do you

15    think that your feelings about identity theft are so strong

16    that it would affect your ability to be fair and independent

17    about how you evaluate the evidence in the case?

18          **PROSPECTIVE JUROR:** No.

19          **THE COURT:** You answered yes, I think, as well

20    to -- I think it was question 19. I'm not quite sure how

21    they line up here, but that's about whether you've been a

22    juror before.

23          **PROSPECTIVE JUROR:** I have.

24          **THE COURT:** Tell us about that.

25          **PROSPECTIVE JUROR:** It's been some time, I can't

1    remember.  I think the -- it was a sexual assault case

2    probably.  I think the young man was found guilty, if I'm

3    not mistaken.  But again, it was some years ago.

4         **THE COURT:**  Was it over in the superior court?

5         **PROSPECTIVE JUROR:**  It was.

6         **THE COURT:**  Anything about your experience being a

7    juror that would affect your views towards defense lawyers,

8    the government lawyers, the Court, that might have any

9    bearing at all on your service as a juror in this case?

10        **PROSPECTIVE JUROR:**  No.

11        **THE COURT:**  And then you answered yes, I think, to

12   question 27.  I'm saying I think just because it's not lined

13   up straight across.  That was the question about whether you

14   or a family member or a close friend have worked for any of

15   that long list of organizations I gave you.

16        **PROSPECTIVE JUROR:**  Yes.  Was one of them the

17   Department of Justice, perhaps?

18        **THE COURT:**  Yes, it was.

19        **PROSPECTIVE JUROR:**  Okay, yeah, I worked for the

20   Department of Justice.

21        **THE COURT:**  You currently do or you did?

22        **PROSPECTIVE JUROR:**  Currently.

23        **THE COURT:**  Where do you work at Justice?

24        **PROSPECTIVE JUROR:**  U.S. Marshals.

25        **THE COURT:**  In the Marshals Service.  What do you

1    do for the Marshals Service?

2        **PROSPECTIVE JUROR:**  I am a personnel security

3    specialist.

4        **THE COURT:**  What does that mean?

5        **PROSPECTIVE JUROR:**  I determine whether or not a

6    person is suitable to work for the government, for the U.S.

7    Marshals Service.

8        **THE COURT:**  I see.  So you're screening people for

9    their jobs?

10        **PROSPECTIVE JUROR:**  Yes.

11        **THE COURT:**  How long have you done that?

12        **PROSPECTIVE JUROR:**  A year there, but before that

13    I was at Homeland Security and did the same thing.

14        **THE COURT:**  I see.  And when you were at Homeland

15    Security, did you have any interaction at all with the

16    Office of Inspector General?

17        **PROSPECTIVE JUROR:**  I did not.

18        **THE COURT:**  But it was the same job you were

19    performing there for -- I guess maybe I should ask, who were

20    you screening at the Department of Homeland Security?

21        **PROSPECTIVE JUROR:**  I worked for FEMA at that

22    time.

23        **THE COURT:**  So you were screening people for their

24    security backgrounds for working at FEMA?

25        **PROSPECTIVE JUROR:**  Yes.

1          **THE COURT:**  And would the fact that you currently

2     work for the Department of Justice and there are lawyers

3     from the Department of Justice who are going to be sitting

4     at the prosecutor's table there -- would you be in any way

5     affected in your views with respect to the arguments they

6     make or their presentation by the fact that you also work

7     for the Department of Justice, even though it's a different

8     portion?

9          **PROSPECTIVE JUROR:**  No.

10         **THE COURT:**  Are you confident that you could be

11    fair and impartial and not favor one side or the other here?

12         **PROSPECTIVE JUROR:**  I am.

13         **THE COURT:**  Mr. Salgado, any follow up -- or

14    Ms. Choy?

15         **MS. CHOY:**  Good morning, ma'am.

16         **PROSPECTIVE JUROR:**  Hello.

17         **MS. CHOY:**  I thought I heard you mention that you

18    had interviewed for a job at the Office of Inspector

19    General.  Did I hear that right?

20         **PROSPECTIVE JUROR:**  I believe so, many years ago

21    though, not recent, not within the past -- 16 years ago, it

22    probably was 16 or 20 years ago.

23         **MS. CHOY:**  What do you remember about that

24    experience, if anything?

25         **PROSPECTIVE JUROR:**  Nothing in particular that I

1    can -- that stands out.

2         **MS. CHOY:**  Thank you.

3         **THE COURT:**  Ms. Shields?

4         **MS. SHIELDS:**  Good morning, ma'am.

5         **PROSPECTIVE JUROR:**  Good morning.

6         **MS. SHIELDS:**  You mentioned that identity theft is

7    an egregious crime, and you didn't know if you'd be able to

8    follow the Judge's instructions.  In your view, was it the

9    fact of your own experience of identity theft, is that why

10   you view it as an egregious crime?

11        **PROSPECTIVE JUROR:**  Yes.

12        **MS. SHIELDS:**  You said it took you some time, it

13   affected your ability to get a house?

14        **PROSPECTIVE JUROR:**  It didn't necessarily affect

15   me getting a house, but it made it a little bit more

16   difficult, I guess, because I had to provide all the

17   documentation and stuff like that.

18        **MS. SHIELDS:**  Was it ultimately resolved?

19        **PROSPECTIVE JUROR:**  Absolutely.

20        **MS. SHIELDS:**  Thank you so much, ma'am.

21        **PROSPECTIVE JUROR:**  You're welcome.

22        **THE COURT:**  Well, thank you.

23        We have Juror 1447.  Let me ask you, you wrote a

24   10 under that -- is that part of your juror number, the 10,

25   or was that an answer?

1            **PROSPECTIVE JUROR:**  Ten was my juror number.

2            **THE COURT:**  And so I think the only question you

3       answered yes to was 22; is that right?

4            **PROSPECTIVE JUROR:**  That's right.  If I heard

5       correctly, that asked if a relative or close friend had ever

6       worked in a law office.

7            **THE COURT:**  That's correct.

8            **PROSPECTIVE JUROR:**  I don't think this is

9       relevant, but my late first wife was a paralegal in a New

10      York City law firm many years ago for a few years.

11           **THE COURT:**  Do you know what sort of firm it was?

12      Did they do criminal law at all?

13           **PROSPECTIVE JUROR:**  It's Sullivan & Cromwell.

14           **THE COURT:**  I've heard of it.

15           **PROSPECTIVE JUROR:**  Some of the cases are -- the

16      case -- the one case I remember that she had something to do

17      with was an antitrust case about copper producers or

18      something like that.

19           **THE COURT:**  How long ago was that?

20           **PROSPECTIVE JUROR:**  That was in the early 1970s,

21      so almost 50 years ago.

22           **THE COURT:**  Anything else you think we should know

23      about you and whether you can be a fair and impartial juror

24      in this case?

25           **PROSPECTIVE JUROR:**  I don't think so.

1          **THE COURT:**  Mr. Salgado, any follow up?

2          **MS. CHOY:**  Good morning, sir.

3          **PROSPECTIVE JUROR:**  Good morning.

4          **MS. CHOY:**  So you mentioned that your former wife

5     had worked at Sullivan & Cromwell?

6          **PROSPECTIVE JUROR:**  That's right.

7          **MS. CHOY:**  What kind of work was she doing there?

8          **PROSPECTIVE JUROR:**  She was a paralegal.  She was

9     not a lawyer.  She was involved in assembling evidence, as I

10    recall, for various cases.  The only specific thing I

11    remember was, again, this copper case where she and a

12    colleague were going through an absolutely enormous amount

13    of papers to try to find anything that related to copper.

14         **MS. CHOY:**  So she was working in litigation?  Was

15    she working in litigation?

16         **PROSPECTIVE JUROR:**  She was a litigation

17    assistant, that's right.

18         **MS. CHOY:**  And did you form any opinions about the

19    law firm of Sullivan & Cromwell while she was working there

20    or after?

21         **PROSPECTIVE JUROR:**  Other than that it's a fairly

22    fancy law firm, if that's the right word.

23         **MS. CHOY:**  Thank you, sir.

24         **THE COURT:**  Ms. Shields?

25         **MS. SHIELDS:**  Good morning, sir.

1              **PROSPECTIVE JUROR:**  Good morning.

2              **MS. SHIELDS:**  Are you retired, sir?

3              **PROSPECTIVE JUROR:**  Basically, yes.  I only have a

4     very tiny hat left on my head that is almost meaningless,

5     yes.

6              **MS. SHIELDS:**  What do you do, sir?

7              **PROSPECTIVE JUROR:**  My career was spent with an

8     international NGO for many years, and then I was a college

9     professor for several years.

10             **MS. SHIELDS:**  You said you were a college

11    professor.  In what area, sir?

12             **PROSPECTIVE JUROR:**  I directed a program called

13    Global Perspectives, and was a professor of history.

14             **MS. SHIELDS:**  Thank you so much.

15             **THE COURT:**  Well, thank you.

16             We have Juror 1367.  Let me start at the back.

17    You answered yes with a question mark to question 31, I

18    think, which is about the timing of the trial.

19             **PROSPECTIVE JUROR:**  That's right, I have a couple

20    of weddings coming up, and I wasn't sure --

21             **THE COURT:**  When are your flights?

22             **PROSPECTIVE JUROR:**  Pardon me?

23             **THE COURT:**  You said you had flights coming up?

24             **PROSPECTIVE JUROR:**  Weddings.

25             **THE COURT:**  Oh, weddings.  When are the weddings?

1          **PROSPECTIVE JUROR:**  Do you mind if I look at my --

2          **THE COURT:**  Sure, take your time.

3          **PROSPECTIVE JUROR:**  One is the weekend of

4    April 23rd and 24th, and the next is at the end of June,

5    beginning of July.

6          **THE COURT:**  Okay.  I don't think those will be

7    problems, but thank you for telling us about that.  And then

8    you answered yes to question 29 about whether you or anyone

9    you live with or who you have frequent contact with is at

10   risk of severe illness from COVID-19.

11         **PROSPECTIVE JUROR:**  Yeah, I have some congenital

12   heart issues, so that would be me.

13         **THE COURT:**  Let me ask you this:  As you can see,

14   we're taking health seriously here in the courthouse and

15   having people wear masks.  If you see where those dots are,

16   that's where the jurors are going to be sitting, not in this

17   courtroom but a similar courtroom.  People will be separated

18   like that during the process.

19         But the question is would you be comfortable

20   being -- if you were selected to be a juror in the case or

21   would your health concerns affect your ability?

22         **PROSPECTIVE JUROR:**  I would feel confident that it

23   was all right.

24         **THE COURT:**  And then on question number 22, you

25   said yes about whether you, a family member or a close

1    friend have legal training.

2         **PROSPECTIVE JUROR:**  Yeah, so my stepfather is an

3    attorney.

4         **THE COURT:**  What sort of law does he practice?

5         **PROSPECTIVE JUROR:**  Mostly transportation law.

6         **THE COURT:**  Where is he, what city?

7         **PROSPECTIVE JUROR:**  He's in Louisville, Kentucky

8    now.

9         **THE COURT:**  Anything about the fact that he's a

10   lawyer that would affect your views towards the case in any

11   way?

12        **PROSPECTIVE JUROR:**  I don't believe so, no.

13        **THE COURT:**  You answered yes to question 21 about

14   whether you, a family member or a close friend have been the

15   victim of a crime.

16        **PROSPECTIVE JUROR:**  That's right.

17        **THE COURT:**  Tell us about that.

18        **PROSPECTIVE JUROR:**  I've had my car stolen here in

19   D.C., and many people I know -- myself, my partners, have

20   had our cars vandalized before.  But I would say that's

21   about the extent of it.

22        **THE COURT:**  Did they catch anyone who stole your

23   car?

24        **PROSPECTIVE JUROR:**  No.

25        **THE COURT:**  Anything about that experience that

1  would affect your views as a juror?

2    **PROSPECTIVE JUROR:**  Not in particular I don't

3  think, no.

4    **THE COURT:**  And then you had a no with a question

5  mark about whether you've ever been the victim of identity

6  theft.

7    **PROSPECTIVE JUROR:**  I have had my bank information

8  stolen before.  I wasn't sure if that's the same thing as

9  identity theft.

10    **THE COURT:**  Tell us about that.  What happened?

11    **PROSPECTIVE JUROR:**  Someone got ahold of my credit

12  card information and tried to charge some things to it

13  online.  My bank caught it.

14    **THE COURT:**  Anything about that that would affect

15  your ability to be a fair and impartial juror in a case in

16  which one of the allegations is aggravated identity theft?

17    **PROSPECTIVE JUROR:**  I don't think in particular,

18  no.

19    **THE COURT:**  I can't remember whose turn it is, but

20  go ahead.

21    **MS. MACEY:**  Good morning, sir.

22    **PROSPECTIVE JUROR:**  Good morning.

23    **MS. MACEY:**  You mentioned that you yourself and

24  some other people you knew have had vehicles stolen here in

25  the District?

**A0710**

1    **PROSPECTIVE JUROR:** Stolen or just broken into.

2    **MS. MACEY:** Thank you for the correction. Were

3    you satisfied with the efforts of the police in terms of the

4    investigation?

5    **PROSPECTIVE JUROR:** Somewhat, somewhat not.

6    **MS. MACEY:** Can you explain what you mean?

7    **PROSPECTIVE JUROR:** Well, sure. When I initially

8    called the police, the person I spoke to seemed to sort of

9    doubt that I had actually had it stolen. He thought that

10   maybe my girlfriend had taken the keys or something. It

11   seemed he didn't believe me at first, and I had to really

12   convince him that was the case.

13   **MS. MACEY:** Would that experience affect your

14   ability to perceive law enforcement investigations at large

15   in this trial?

16   **PROSPECTIVE JUROR:** I don't think that one thing

17   clouds my judgment, no.

18   **MS. MACEY:** And may I ask what sort of work you

19   do?

20   **PROSPECTIVE JUROR:** Yes, I'm a tutor.

21   **MS. MACEY:** In a particular subject?

22   **PROSPECTIVE JUROR:** So I do a lot of SAT and ACT

23   tutoring, and I also do some academic tutoring in things

24   like algebra, geometry, things like that.

25   **MS. MACEY:** Thank you very much.

1              **THE COURT:**  Ms. Shields?

2              **MS. SHIELDS:**  Good morning, sir.

3              **PROSPECTIVE JUROR:**  Good morning.

4              **MS. SHIELDS:**  I want to follow up on the question

5     about the work that you do.  You said that you're a tutor?

6              **PROSPECTIVE JUROR:**  That's right.

7              **MS. SHIELDS:**  Are you doing that in the District

8     of Columbia?

9              **PROSPECTIVE JUROR:**  I do live and work here, and I

10    tutor mostly online these days, but yes.

11             **MS. SHIELDS:**  And how long have you been doing

12    that?

13             **PROSPECTIVE JUROR:**  About 10 years now.

14             **MS. SHIELDS:**  Thank you so much, sir.

15             **PROSPECTIVE JUROR:**  Thank you.

16             **THE COURT:**  Thank you.

17             **MR. SALGADO:**  Judge, just to resolve, I wanted to

18    let you know we're taking turns of five each.

19             **THE COURT:**  Five each, okay.

20             **MR. SALGADO:**  Apologies for the confusion.

21             **THE COURT:**  No worries.  Also, I want to make

22    sure, since you're all new to me, it's Mr. Salgado, Ms. Choy

23    and then Ms. Macey; is that right?

24             **MR. SALGADO:**  Yes.

25             **THE COURT:**  Okay.  We have Juror 430.  You

1    answered yes to one question, which is whether you are

2    familiar with any of the long list of names that you might

3    hear in the trial.

4            **PROSPECTIVE JUROR:**  Yes.  I think it said if you

5    know of.

6            **THE COURT:**  Yes, I did say that.

7            **PROSPECTIVE JUROR:**  So yes, I've heard of Senators

8    Johnson and McCaskill, obviously.

9            **THE COURT:**  I'm sorry, say again.

10           **PROSPECTIVE JUROR:**  I'm aware of Senators Johnson

11   and McCaskill.

12           **THE COURT:**  Do you know them in any way?

13           **PROSPECTIVE JUROR:**  No, no, just know of them.

14           **THE COURT:**  You mean just from the news?

15           **PROSPECTIVE JUROR:**  Exactly.

16           **THE COURT:**  How long have you lived in D.C.?

17           **PROSPECTIVE JUROR:**  About 15 years.

18           **THE COURT:**  What do you do?

19           **PROSPECTIVE JUROR:**  I work for a conservation

20   nonprofit, Rare.

21           **THE COURT:**  And what do you do there?

22           **PROSPECTIVE JUROR:**  I run the marketing

23   department.

24           **THE COURT:**  Do you work with IT in doing that?

25           **PROSPECTIVE JUROR:**  No.

1           THE COURT:  Ms. Shields?

2           MS. SHIELDS:  Good morning, sir.

3           PROSPECTIVE JUROR:  Good morning.

4           MS. SHIELDS:  You said you work for a conservation

5    nonprofit.  What is your role there?

6           PROSPECTIVE JUROR:  I run the marketing and

7    communications team.

8           MS. SHIELDS:  So do you have a number of people

9    that report to you?

10          PROSPECTIVE JUROR:  Yes.

11          MS. SHIELDS:  About how many people?

12          PROSPECTIVE JUROR:  Nine.

13          MS. SHIELDS:  And then are there people that you

14   report to as well?

15          PROSPECTIVE JUROR:  Yes.

16          MS. SHIELDS:  How many people approximately?

17          PROSPECTIVE JUROR:  I report to a chief who

18   reports to a CEO.

19          MS. SHIELDS:  Got it.  And finally you mentioned

20   you're aware of the names of Senators Johnson and McCaskill

21   through the news.  Would you consider yourself a pretty

22   regular news watcher?

23          PROSPECTIVE JUROR:  Yeah, I would say so.

24          MS. SHIELDS:  Thank you so much, sir.

25          THE COURT:  Ms. Macey?

1          **MS. MACEY:**  No questions, Your Honor.

2          **THE COURT:**  Thank you.

3          We have Juror 1546.  Let me start at the end,

4    because you indicated in response to question 31 that

5    serving as a juror in this case could be an extreme hardship

6    for you.

7          **PROSPECTIVE JUROR:**  Yeah, I'm a teacher, so it's

8    just hard to be out for an extended period.

9          **THE COURT:**  Where do you teach?

10          **PROSPECTIVE JUROR:**  At an elementary school on

11    Capitol Hill, DCPS.

12          **THE COURT:**  At which one?

13          **PROSPECTIVE JUROR:**  Maury Elementary.

14          **THE COURT:**  What do you teach?

15          **PROSPECTIVE JUROR:**  First grade.

16          **THE COURT:**  When you're out, what happens?  Is

17    there a substitute teacher who comes in?

18          **PROSPECTIVE JUROR:**  Yes.

19          **THE COURT:**  Is that something that could be done

20    here?  I realize it's always an inconvenience and difficult

21    to be a juror, but is that something that could be done?

22          **PROSPECTIVE JUROR:**  Sure, it could be.  I just

23    means that it's hard for things, obviously, to go on as

24    normal if I'm not there.  But obviously it's possible, yes.

25          **THE COURT:**  And would the fact that you'd like to

**A0715**

1    be with the kids affect your ability to pay attention and to

2    be a fair and attentive juror?

3            **PROSPECTIVE JUROR:**  No, it wouldn't preclude me

4    from that, no.

5            **THE COURT:**  And then you answered yes to question

6    27 about whether you, a family member or a close friend have

7    worked for that long list of organizations.  Tell us about

8    that.

9            **PROSPECTIVE JUROR:**  My father used to work for the

10   attorney general's office in New York state.

11           **THE COURT:**  The Attorney General of the State of

12   New York?

13           **PROSPECTIVE JUROR:**  Yes.

14           **THE COURT:**  And what did he do there?

15           **PROSPECTIVE JUROR:**  He worked in construction

16   contract law.

17           **THE COURT:**  So he's a lawyer?

18           **PROSPECTIVE JUROR:**  Yes.

19           **THE COURT:**  What does he do now?

20           **PROSPECTIVE JUROR:**  For the past 30 years or so

21   he's owned his own business.  He owns an assisted living

22   facility.

23           **THE COURT:**  So he's not practicing law now?

24           **PROSPECTIVE JUROR:**  No.

25           **THE COURT:**  You answered yes to question 22 about

1    whether -- this may be the same answer, but have you, a

2    family member or a close friend had any legal training or

3    worked in a law office?

4           **PROSPECTIVE JUROR:**  Yes.

5           **THE COURT:**  Anything beyond your father?

6           **PROSPECTIVE JUROR:**  I think in reference to the

7    other question with all those organizations, my boyfriend is

8    a contractor for the FDA.  So he's not employed by the FDA,

9    but he does IT work for the FDA.

10          **THE COURT:**  Oh, he does.  Tell us about what he

11   does there.

12          **PROSPECTIVE JUROR:**  Oh, I don't really know.  I

13   mean, he works on -- you know, if they have IT difficulties,

14   and there are many databases.  People submit tickets for

15   these IT problems, and he and his colleagues pick up the

16   tickets and work on the websites and whatever.

17          **THE COURT:**  Do you know if he actually writes any

18   code or does he just go in and tell you to reboot when your

19   system stops working?

20          **PROSPECTIVE JUROR:**  I mean, my understanding -- I

21   mean, he's not like a developer.  My understanding is that

22   he kind of fixes things when they go wrong.

23          **THE COURT:**  This case is one in which the jurors

24   may hear a fair amount about IT.  Is the fact that your

25   boyfriend works in the field, would that affect your ability

1    to be fair and impartial and decide the case only on the

2    evidence presented in the courtroom?

3           **PROSPECTIVE JUROR:** I don't think so.  As you can

4    tell, I don't have a firm understanding of the types of

5    things he has to do, so I don't think so.

6           **THE COURT:** Ms. Shields?

7           **MS. SHIELDS:** Good morning, ma'am.

8           **PROSPECTIVE JUROR:** Good morning.

9           **MS. SHIELDS:** Two questions.  You said that your

10    boyfriend works in IT.  How long has he done that, do you

11    know?

12           **PROSPECTIVE JUROR:** He's done this for about,

13    I think, 10 years, and then prior to that he was not in IT.

14           **MS. SHIELDS:** Do you know if he's a supervisor in

15    that job?

16           **PROSPECTIVE JUROR:** No, he's not.

17           **MS. SHIELDS:** And you mentioned that it would be

18    difficult because you are a first grade teacher and there

19    would be a substitute teacher.  Is there anything about the

20    fact that there would be a substitute teacher and you would

21    not be with your students, anything that would affect your

22    ability to pay attention to this case, any concerns there?

23           **PROSPECTIVE JUROR:** No, I don't think so.

24           **MS. SHIELDS:** Thank you so much.

25           **THE COURT:** Ms. Macey?

1          **MS. MACEY:**  Good morning, ma'am.

2          **PROSPECTIVE JUROR:**  Good morning.

3          **MS. MACEY:**  We've asked you a lot of questions

4    about your boyfriend, and I have one more question.  What's

5    his educational background?

6          **PROSPECTIVE JUROR:**  Well, he's -- his undergrad is

7    in geography and urban planning.  He worked for a bank in

8    Canada for a while, and then went to business school for

9    finance.

10          **MS. MACEY:**  And you mentioned that he works at the

11    FDA as a contractor.  Has his experience there given you an

12    impression, whether favorable or unfavorable, about the

13    agency?

14          **PROSPECTIVE JUROR:**  No.  I mean, no, we don't --

15    as I said, I don't have like a huge understanding of what he

16    does day-to-day, just that he kind of like fixes parts of

17    the websites that are broken and things like that.  But no,

18    nothing about the agency itself.

19          **MS. MACEY:**  And how long have you lived here in

20    the District?

21          **PROSPECTIVE JUROR:**  This will be nine years.

22    Almost nine years.

23          **MS. MACEY:**  Thank you very much.

24          **THE COURT:**  Thank you.

25          We have Juror 1205.  You indicated in response to

1    my questioning that you have difficulty reading, speaking or

2    understanding English.

3           **PROSPECTIVE JUROR:**  Yeah, sometimes I have some

4    hard time to understand.

5           **THE COURT:**  What's your principal language?

6           **PROSPECTIVE JUROR:**  Italian.

7           **THE COURT:**  How long have you lived here?

8           **PROSPECTIVE JUROR:**  About 10 years.

9           **THE COURT:**  Do you find at times that you have

10    difficulty reading -- is it reading or speaking or hearing

11    or understanding spoken language?

12           **PROSPECTIVE JUROR:**  Sometimes hearing.

13           **THE COURT:**  So do you think that that would affect

14    your ability to understand all the testimony in the case?

15    Sometimes some people speak more clearly, some people less

16    clearly, some people speak quickly, some people speak

17    slowly.  It's important that the jurors be able to hear and

18    understand the testimony.  Do you think your language issues

19    might affect your ability to hear and understand the

20    testimony?

21           **PROSPECTIVE JUROR:**  I think so.  I want -- I think

22    it's an important thing, and I want to make sure I

23    understand well.

24           **THE COURT:**  Absolutely.  Any objection?

25           **MR. SALGADO:**  No.

1          MS. SHIELDS:  No.

2          THE COURT:  Okay.  In light of that, I'm going to

3     go ahead and let you go.  You're welcome to leave.  Thank

4     you for being here, and thank you for your candor.

5          PROSPECTIVE JUROR:  Thank you so much.

6          THE COURT:  So next we have Juror 1572.  You

7     answered yes to my question about whether you, a family

8     member or a close friend have ever been detained by the

9     police, arrested or charged with a crime or investigated.

10          PROSPECTIVE JUROR:  Well, not really a crime, but

11     it was a DWI.

12          THE COURT:  Tell us about that.

13          PROSPECTIVE JUROR:  My partner got into an

14     accident, and he called me.  When I got there, he had been

15     drinking.  So he was held at the detention center until the

16     next day.

17          THE COURT:  Until the next day?

18          PROSPECTIVE JUROR:  No, actually until like 4:00

19     o'clock in the morning or something, and I went to pick him

20     up.

21          THE COURT:  Did you have to go pick him up or what

22     happened?

23          PROSPECTIVE JUROR:  By that time he was sober.

24          THE COURT:  And was he charged with a crime?

25          PROSPECTIVE JUROR:  No.

1          **THE COURT:**  Anything about your experience in that

2     case with the police or anything about that that would

3     affect your ability to be a fair and impartial juror?

4          **PROSPECTIVE JUROR:**  No.

5          **THE COURT:**  How long have you lived in D.C.?

6          **PROSPECTIVE JUROR:**  Almost 30 years.

7          **THE COURT:**  And what do you do?

8          **PROSPECTIVE JUROR:**  I work in civil rights,

9     Department of Housing and Community Development.

10          **THE COURT:**  Say that again.

11          **PROSPECTIVE JUROR:**  I do fair housing.

12          **THE COURT:**  Where do you do that?

13          **PROSPECTIVE JUROR:**  Department of Housing and

14     Community Development for D.C.

15          **THE COURT:**  So you work for the D.C. government?

16          **PROSPECTIVE JUROR:**  Yes.

17          **THE COURT:**  Tell us, what sort of work do you do

18     relating to fair housing?

19          **PROSPECTIVE JUROR:**  I instituted the fair housing

20     certification program for the agency, and I particularly

21     work now mostly in accessibility for the construction side,

22     make sure that the constructions are built in or rehabbed

23     according to the code and regulations.

24          **THE COURT:**  Do you review the plans or actually go

25     out to the sites and look at them?

1        **PROSPECTIVE JUROR:** I look at the sites and

2    sometimes review plans, but that requires more payment so I

3    don't do very many plan reviews.

4        **THE COURT:** I see, okay. Ms. Shields, any follow

5    up questions?

6        **MS. SHIELDS:** Good morning, ma'am.

7        **PROSPECTIVE JUROR:** Hello.

8        **MS. SHIELDS:** You mentioned that you're working

9    for the D.C. government in fair housing. Do you have people

10   who report to you?

11       **PROSPECTIVE JUROR:** No.

12       **MS. SHIELDS:** Do you report to others within the

13   organization?

14       **PROSPECTIVE JUROR:** Yes.

15       **MS. SHIELDS:** How many people do you report to?

16       **PROSPECTIVE JUROR:** One.

17       **MS. SHIELDS:** And how long have you worked there?

18       **PROSPECTIVE JUROR:** Twenty-one years.

19       **MS. SHIELDS:** Thank you so much, ma'am.

20       **THE COURT:** Ms. Macey?

21       **MS. MACEY:** Good morning, ma'am.

22       **PROSPECTIVE JUROR:** Good morning.

23       **MS. MACEY:** You explained to us your partner's

24   situation with the DWI.

25       **PROSPECTIVE JUROR:** What do you mean?

 1     **MS. MACEY:** With the -- being held until you had

 2 to --

 3     **PROSPECTIVE JUROR:** So he works in the restaurant

 4 business and decided to stay a little bit longer at work,

 5 and drove home when he shouldn't have driven home. And

 6 about two blocks away from the house, he got into an

 7 accident.

 8     **MS. MACEY:** Do you feel like the police treated

 9 him fairly in that situation?

10     **PROSPECTIVE JUROR:** Yes, yes.

11     **MS. MACEY:** Thank you.

12     **THE COURT:** Well, thank you.

13     We have Juror 803. You didn't have a yes answer

14 to any of my questions, right?

15     **PROSPECTIVE JUROR:** No, but I have one like small

16 comment.

17     **THE COURT:** Yes, please.

18     **PROSPECTIVE JUROR:** You mentioned the USDA. I

19 just wanted to add that I do, at work, work on contracts

20 with the Forest Service, which is part of USDA. I'm not

21 sure if that's material, but I just wanted to let you know.

22     **THE COURT:** More information is always better, so

23 thank you for sharing that. Tell us what you do.

24     **PROSPECTIVE JUROR:** I work in advertising.

25     **THE COURT:** In what way do you work with the

```
 1      Forest Service in advertising?
 2              PROSPECTIVE JUROR:  I work in public service
 3      communications, so campaigns like discovering nature,
 4      wildfire prevention.  The Forest Service serves as a funding
 5      and issue expert sponsor.
 6              THE COURT:  Okay, great.  How long have you lived
 7      in D.C.?
 8              PROSPECTIVE JUROR:  Five years.
 9              THE COURT:  Five years, okay.  Mr. Salgado, I
10      think it maybe is your turn.
11              MR. SALGADO:  No questions, Your Honor.
12              THE COURT:  Ms. Shields?
13              MS. SHIELDS:  Good morning.
14              PROSPECTIVE JUROR:  Good morning.
15              MS. SHIELDS:  You mentioned that you do public
16      service advertising; is that right?
17              PROSPECTIVE JUROR:  Yes.
18              MS. SHIELDS:  So you work with government agencies
19      in that capacity?
20              PROSPECTIVE JUROR:  At times, yeah.
21              MS. SHIELDS:  So are you communicating with folks
22      who -- in the government who need your advertising services?
23              PROSPECTIVE JUROR:  That's correct.
24              MS. SHIELDS:  And then do you have people that
25      report to you?
```

1    **PROSPECTIVE JUROR:**  Not from any government

2    organizations, more so we work for them as an agency

3    partner.

4    **MS. SHIELDS:**  I'm sorry, my question wasn't clear.

5    So in your job at your organization, do you have people that

6    report to you?

7    **PROSPECTIVE JUROR:**  Yes.

8    **MS. SHIELDS:**  And do you report to anyone?

9    **PROSPECTIVE JUROR:**  Yes.

10    **MS. SHIELDS:**  How many people report to you?

11    **PROSPECTIVE JUROR:**  Currently, three.

12    **MS. SHIELDS:**  And how many people do you report

13    to?

14    **PROSPECTIVE JUROR:**  Two.

15    **MS. SHIELDS:**  Thank you so much.

16    **THE COURT:**  I have one more follow up question.

17    In your work with the Forest Service or any other government

18    agencies, are you the contracting officer or do you do

19    contracts in any way?

20    **PROSPECTIVE JUROR:**  I'm not the contracting

21    officer, no.

22    **THE COURT:**  Not on implementing the contracts, but

23    actually negotiating the contracts?

24    **PROSPECTIVE JUROR:**  No, not negotiating them.  I

25    write proposals that are then submitted for consideration,

1    but not as the contracting officer.

2    **THE COURT:**  Thank you.

3    Okay, I think we'll do one more now and then take

4    a break.  So we have Juror 747.  You answered yes to just

5    one of my questions, which is whether you, a family member

6    or a close friend have worked for any of the long list of

7    organizations that I mentioned.

8    **PROSPECTIVE JUROR:**  Yes.

9    **THE COURT:**  Go ahead and tell us.

10   **PROSPECTIVE JUROR:**  My mom works for the NSA.

11   **THE COURT:**  The NSA, okay.  Any other family

12   member or friends work for the government or a government

13   agency?

14   **PROSPECTIVE JUROR:**  We grew up around Fort Meade,

15   so my dad and brother are contractors at the DoD, and my

16   aunt works for the NSA.

17   **THE COURT:**  When you say they're contractors, you

18   mean they work on a contract basis for government agencies?

19   **PROSPECTIVE JUROR:**  Yeah, they work for -- I guess

20   someone has a contract with the NSA, they're working on that

21   contract, yes.

22   **THE COURT:**  Do they do any of the contracting work

23   themselves or is their work pursuant to a contract?

24   **PROSPECTIVE JUROR:**  Pursuant to a contract.

25   **THE COURT:**  And anyone that you're friends with or

1    a family member do IT work?

2    **PROSPECTIVE JUROR:** My brother does. He's a

3    contractor and he does IT work. He sets up computers and

4    things.

5    **THE COURT:** How long has he done that?

6    **PROSPECTIVE JUROR:** A couple years, two or so

7    years.

8    **THE COURT:** Does he do that privately for people

9    or for companies or government agencies?

10    **PROSPECTIVE JUROR:** For the DoD.

11    **THE COURT:** So he goes in and sets up computers

12    and things like that?

13    **PROSPECTIVE JUROR:** Yes.

14    **THE COURT:** Does he do any computer coding or

15    developing any programs?

16    **PROSPECTIVE JUROR:** No, it's just hardware based.

17    **THE COURT:** Ms. Shields, any follow up questions?

18    **MS. SHIELDS:** Good morning, sir.

19    **PROSPECTIVE JUROR:** Good morning.

20    **MS. SHIELDS:** You mentioned that your brother does

21    IT work for DoD; is that right?

22    **PROSPECTIVE JUROR:** Yes.

23    **MS. SHIELDS:** He's a contractor?

24    **PROSPECTIVE JUROR:** He's a contractor, yes.

25    **MS. SHIELDS:** How long has he been doing that?

1          **PROSPECTIVE JUROR:**  A few years, two or three

2     years I'd say.

3          **MS. SHIELDS:**  Have you formed any relation -- or

4     any views as to his experience or DoD or anything about

5     government agencies and their demands?

6          **PROSPECTIVE JUROR:**  No, he really doesn't talk

7     about his job too much.  He can't really say anything.

8          **MS. SHIELDS:**  Got it.  Does he have a clearance

9     then?

10          **PROSPECTIVE JUROR:**  Yes.

11          **MS. SHIELDS:**  Also, sir, what do you do?

12          **PROSPECTIVE JUROR:**  I'm an accountant.

13          **MS. SHIELDS:**  How long have you been doing that?

14          **PROSPECTIVE JUROR:**  Five years.

15          **MS. SHIELDS:**  Do you have anyone who directly

16     reports to you?

17          **PROSPECTIVE JUROR:**  Yes.

18          **MS. SHIELDS:**  How many people?

19          **PROSPECTIVE JUROR:**  Two.

20          **MS. SHIELDS:**  Thank you so much.

21          **THE COURT:**  Mr. Salgado?

22          **MR. SALGADO:**  Thank you, Your Honor.  Good

23     morning, sir.

24          **PROSPECTIVE JUROR:**  Good morning.

25          **MR. SALGADO:**  You work at KPMG?

1          **PROSPECTIVE JUROR:**  I do.

2          **MR. SALGADO:**  What type of work do you do for

3     them?

4          **PROSPECTIVE JUROR:**  I'm like a consultant, so I

5     work with government contractors giving advice on just

6     regulations and things.

7          **MR. SALGADO:**  So you don't do accounting work per

8     se?

9          **PROSPECTIVE JUROR:**  Not per se, no.

10         **MR. SALGADO:**  And what type of consulting work do

11    you do for government contractors?

12         **PROSPECTIVE JUROR:**  It varies.  So it can be

13    anything from -- it's mostly regulations like federal

14    regulations, cost accounting standards.  I'm not sure if

15    you're familiar with those things.

16         **MR. SALGADO:**  No, no, please go ahead.

17         **PROSPECTIVE JUROR:**  Incurred cost submissions, so

18    like indirect rates.  So proposals to the government, things

19    like that.

20         **MR. SALGADO:**  And are you -- as part of your job,

21    do you have to familiarize yourself with those regulations

22    so that you can consult properly?

23         **PROSPECTIVE JUROR:**  Yes.

24         **MR. SALGADO:**  And what is your educational

25    background?

1          **PROSPECTIVE JUROR:**  I have a Bachelors of Science

2     in accounting and finance from the University of Maryland.

3          **MR. SALGADO:**  In the course of your work, have you

4     encountered or had any experience with OIGs, Offices of

5     Inspectors General?

6          **PROSPECTIVE JUROR:**  No, I haven't worked with OIG.

7          **MR. SALGADO:**  Thank you, sir.

8          **THE COURT:**  Thank you.

9          By my count, we've qualified 14 jurors so far.

10    Anything you want to raise before the break?  Okay, why

11    don't we just come back then at 11:15.  Thank you.

12         (Recess taken at 11:03 a.m.)

13         (Proceedings resumed at 11:15 a.m.)

14         **THE COURT:**  Good morning.  We have Juror 643.  I

15    see you answered yes to the question about whether you, a

16    close friend or a family member has worked for that long

17    list of organizations I gave.

18         **PROSPECTIVE JUROR:**  Are you asking about federal

19    agencies?

20         **THE COURT:**  Yes.

21         **PROSPECTIVE JUROR:**  Yes.

22         **THE COURT:**  Tell me about that.

23         **PROSPECTIVE JUROR:**  I have a sister that works for

24    the State Department.  I have friends that work for HUD.

25         **THE COURT:**  What does your sister do for the State

1    Department.?

2              **PROSPECTIVE JUROR:**  She is a procurement

3    specialist.

4              **THE COURT:**  Do you know what types of things she

5    procures?

6              **PROSPECTIVE JUROR:**  Well, at one point she was

7    doing materials and things for passports, and now I'm not

8    sure what she procures.

9              **THE COURT:**  Were there friends or family who

10   worked for HUD as well?

11             **PROSPECTIVE JUROR:**  Yes.

12             **THE COURT:**  Tell me what they do at HUD.

13             **PROSPECTIVE JUROR:**  One is a grant specialist at

14   HUD, and one is a secretary.

15             **THE COURT:**  What does the grant specialist do?

16             **PROSPECTIVE JUROR:**  I guess she works on grants

17   that come through HUD from other agencies or to give to

18   agencies for HUD.

19             **THE COURT:**  Do you know if any -- including your

20   sister or the folks at HUD, do anything related to IT,

21   computers, that sort of thing?

22             **PROSPECTIVE JUROR:**  No.

23             **THE COURT:**  What do you do?

24             **PROSPECTIVE JUROR:**  Currently, I am a catering

25   coordinator at Chartwell's Catering at American University.

 1          **THE COURT:**  And then you answered yes as well to

 2     the question about whether you've been a juror before.

 3          **PROSPECTIVE JUROR:**  Whether I've been a juror?

 4          **THE COURT:**  A juror.

 5          **PROSPECTIVE JUROR:**  Yes.

 6          **THE COURT:**  Tell us about that.

 7          **PROSPECTIVE JUROR:**  Well, I've been a juror on a

 8     number of things.  I did some criminal cases over at the

 9     other court.  I was on a grand jury before.  I've done some

10     civil cases here.  It was a while ago.  One was an

11     automobile accident, and the rest I can't remember.

12          **THE COURT:**  Let me ask you about your service as a

13     grand juror.  Do you understand that when a grand jury

14     returns an indictment, that that isn't any indication as to

15     whether the person is guilty or not, it's just a charge

16     that's being brought?

17          **PROSPECTIVE JUROR:**  Yes.

18          **THE COURT:**  And with respect to the criminal cases

19     that -- where you served as a juror, anything about those

20     experiences that would affect your ability to be a fair and

21     impartial juror here?

22          **PROSPECTIVE JUROR:**  No.

23          **THE COURT:**  Do you recall -- and you've been a

24     juror many times.  But in all the cases you've been a juror,

25     has the jury reached a verdict in all those cases or were

1      there some cases where you never reached a verdict?

2                **PROSPECTIVE JUROR:**  The civil case involving the

3      auto accident, no verdict was reached.  It kind of settled

4      before we got to that point.

5                **THE COURT:**  And then you also indicated that

6      you've been a victim of identity theft.

7                **PROSPECTIVE JUROR:**  Yes.

8                **THE COURT:**  Tell me about that.

9                **PROSPECTIVE JUROR:**  Someone filed a tax return

10     under my Social Security number.  I was contacted by the

11     Internal Revenue, and they said there was a tax return.  I

12     guess it was kind of out of line with what I usually would

13     file.  They asked me had I filed a return, and I said no.

14     And from that date to this, I use a PIN number when I file

15     my return, that they send me.

16               **THE COURT:**  I see.  Anything about that experience

17     that would interfere with your ability to be a fair and

18     impartial juror in a case in which one of the allegations is

19     aggravated identity theft?

20               **PROSPECTIVE JUROR:**  No.  I mean, the issue was

21     resolved, and that was the only thing that they used my

22     Social Security number for.

23               **THE COURT:**  Ms. Shields, any follow up questions?

24               **MS. SHIELDS:**  Good morning, ma'am.

25               **PROSPECTIVE JUROR:**  Good morning.

1          **MS. SHIELDS:**  You said that you have been the

2     victim of identity theft in connection with a tax return.

3     Anything else that occurred, any sort of other issues with

4     your credit or anything else?

5          **PROSPECTIVE JUROR:**  No, it was just the tax

6     return.

7          **MS. SHIELDS:**  And were you ever contacted in

8     connection with an investigation into who had filed this

9     false tax return?

10         **PROSPECTIVE JUROR:**  No.

11         **MS. SHIELDS:**  And you said that you're a catering

12    coordinator, is that right, at American?

13         **PROSPECTIVE JUROR:**  Yes.

14         **MS. SHIELDS:**  So are you a supervisor?

15         **PROSPECTIVE JUROR:**  Uh, yes.

16         **MS. SHIELDS:**  How many people report to you

17    approximately?

18         **PROSPECTIVE JUROR:**  Seven.

19         **MS. SHIELDS:**  You paused a little bit.  You said

20    "Uh, yes."

21         **PROSPECTIVE JUROR:**  Yeah, it's kind of like I work

22    in conjunction with the catering director.  When they're

23    there, they're in charge.  When they're gone, I'm in charge.

24    It's kind of like the two of us kind of working together.

25         **MS. SHIELDS:**  Understood.  Thank you so much.

1          **THE COURT:**  Mr. Salgado?

2          **MR. SALGADO:**  Thank you, Your Honor.  Good

3     morning, ma'am.

4          **PROSPECTIVE JUROR:**  Good morning.

5          **MR. SALGADO:**  I'd like to talk to you about your

6     sister's work at the State Department for a moment.

7          **PROSPECTIVE JUROR:**  Okay.

8          **MR. SALGADO:**  How long has she been there?

9          **PROSPECTIVE JUROR:**  Probably about, I want to say,

10    maybe 30 years.

11         **MR. SALGADO:**  What does she do at the State

12    Department?

13         **PROSPECTIVE JUROR:**  She is a procurement

14    specialist.

15         **MR. SALGADO:**  Has she ever mentioned to you any

16    interaction that she's had with the Office of Inspector

17    General at the State Department?

18         **PROSPECTIVE JUROR:**  No.

19         **MR. SALGADO:**  How about your friends, have they

20    ever mentioned anything like that?

21         **PROSPECTIVE JUROR:**  No.

22         **MR. SALGADO:**  And have they ever mentioned to you

23    that they've been interviewed in the course of

24    investigations or reviews after jobs, by any chance?

25         **PROSPECTIVE JUROR:**  No.

 1              **MR. SALGADO:**  Thank you, ma'am.

 2              **THE COURT:**  Thank you.

 3         We have Juror 894.  You answered yes to the

 4    question about whether you, someone you live with, or who

 5    you need to be in close contact with, is at heightened risk

 6    for severe COVID.

 7              **PROSPECTIVE JUROR:**  Yes.

 8              **THE COURT:**  Tell me about that.

 9              **PROSPECTIVE JUROR:**  That's my father.  My father

10    lives with me.  He's 72.  He has a heart condition, open

11    heart surgery a few years back.

12              **THE COURT:**  How often do you see your father?

13              **PROSPECTIVE JUROR:**  We live together.

14              **THE COURT:**  As you can see, we're doing our best

15    to take health precautions here in the court.  People are

16    wearing masks.  You see where those red dots are, it's not

17    going to be this courtroom, but it's going to be a courtroom

18    like this one, and people will be sitting separate like

19    that.

20         Would you be comfortable being a juror in the case

21    even though you go home and see your father at the end of

22    the day?

23              **PROSPECTIVE JUROR:**  Yes.

24              **THE COURT:**  You answered yes to question 25 as

25    well, which is the question about whether you tend to

1    believe or disbelieve, or find more credible than other

2    witnesses, law enforcement testimony.

3              **PROSPECTIVE JUROR:** Yes.

4         **THE COURT:** Tell me about that.

5         **PROSPECTIVE JUROR:** It's just personal experience.

6    I mean, I was in Richmond, Virginia and a moving truck, he

7    swerved in my lane. I tried to avoid it, I hit the curb.

8    That police officer never talked to me, he just gave me a

9    reckless driving. He never spoke to me. He spoke to them,

10   he let them go. I went to court, but that case was

11   dismissed.

12        **THE COURT:** So this is not a case that's going to

13   involve testimony from police officers who work on the

14   street. But there will be testimony from law enforcement, I

15   believe, from inspectors from the Office of the Inspector

16   General. Would you be able to evaluate that testimony that

17   you hear in this courtroom based -- and decide whether you

18   think it's credible or not based just on what you hear in

19   the courtroom, and to treat their testimony no better or no

20   worse than anybody else's testimony?

21             **PROSPECTIVE JUROR:** I can.

22        **THE COURT:** And then you indicated that you, a

23   family member or a close friend has been arrested, charged

24   with a crime or investigated.

25             **PROSPECTIVE JUROR:** Yes.

1          **THE COURT:**  Tell me about that.

2          **PROSPECTIVE JUROR:**  My sister, she was arrested

3     for DUI.

4          **THE COURT:**  And what happened with that?

5          **PROSPECTIVE JUROR:**  Just her license got

6     suspended.

7          **THE COURT:**  Was there a trial in the case?

8          **PROSPECTIVE JUROR:**  I'm not sure.  I know she

9     spent a night in jail, but I never heard of no trial.

10         **THE COURT:**  Anything about her experience there

11    that would affect your ability to be a fair and impartial

12    juror in this case?

13         **PROSPECTIVE JUROR:**  No, I don't think so, no.

14         **THE COURT:**  You answered yes to question 21, which

15    is whether you, a family member or a close friend have ever

16    been a victim of a crime.

17         **PROSPECTIVE JUROR:**  Yes, that's me.

18         **THE COURT:**  Tell me what happened.

19         **PROSPECTIVE JUROR:**  I've just been robbed a couple

20    of times living in D.C., coming out of the Metro station --

21    and one a few years back.  Just robberies.

22         **THE COURT:**  Anything about that that would affect

23    your ability to be a fair and impartial juror?

24         **PROSPECTIVE JUROR:**  No.

25         **THE COURT:**  Mr. Salgado, any follow up?

1                       **MR. SALGADO:** No, Your Honor.

2                       **THE COURT:** Ms. Shields?

3                       **MS. SHIELDS:** Good morning, sir.

4                       **PROSPECTIVE JUROR:** Good morning.

5                       **MS. SHIELDS:** Are you employed, sir?

6                       **PROSPECTIVE JUROR:** Yes.

7                       **MS. SHIELDS:** Where are you employed?

8                       **PROSPECTIVE JUROR:** I drive a bus for the

9   Montgomery County government.

10                      **MS. SHIELDS:** And how long have you been doing

11  that, sir?

12                      **PROSPECTIVE JUROR:** Six years.

13                      **MS. SHIELDS:** Thanks very much, sir.

14                      **THE COURT:** Thank you.

15                      We have Juror 617. You answered yes to my

16  question about whether you, a family member or a close

17  friend has been arrested or charged with a crime or

18  investigated.

19                      **PROSPECTIVE JUROR:** Yes.

20                      **THE COURT:** Tell me about that.

21                      **PROSPECTIVE JUROR:** That would be my nephew, it

22  was a DWI. He hit a police car while driving drunk, so he

23  was arrested, charged and jailed.

24                      **THE COURT:** How long did he go to jail for?

25                      **PROSPECTIVE JUROR:** One day. Lucky him.

1              **THE COURT:**  Was there a trial in the case?

2              **PROSPECTIVE JUROR:**  He pleaded, so there was no

3      trial.

4              **THE COURT:**  Anything about your family's

5      experience dealing with that that would affect your ability

6      to be a fair and impartial juror?

7              **PROSPECTIVE JUROR:**  No experience -- I mean, no,

8      there's no feelings either way.

9              **THE COURT:**  You also indicated that you, a family

10     member or a close friend had been a victim of a crime.

11             **PROSPECTIVE JUROR:**  Well, yeah, our house was

12     broken into twice, so I consider that a crime.

13             **THE COURT:**  Absolutely.

14             **PROSPECTIVE JUROR:**  Since we're victims, so yes.

15             **THE COURT:**  Did they ever arrest anybody for that

16     break-in?

17             **PROSPECTIVE JUROR:**  No, they never found who it

18     was either time.

19             **THE COURT:**  Anything about that experience, your

20     interactions with law enforcement or anything that would

21     affect your ability to be a fair and impartial juror?

22             **PROSPECTIVE JUROR:**  No.

23             **THE COURT:**  And then you also answered yes to

24     whether you've been the -- a witness in the case or been a

25     party in a case.

1        **PROSPECTIVE JUROR:**  Yes, this was years ago.  I

2    was -- they called it assault.  I don't know, but that's

3    what it was, so I had to testify.  It was probably 40 years

4    ago.

5        **THE COURT:**  And you say they called it an assault?

6        **PROSPECTIVE JUROR:**  Yeah, it was two men.  They

7    were trying to put a bar of soap in my mouth, so one was

8    kind of holding me.

9        **THE COURT:**  There was a criminal trial?

10        **PROSPECTIVE JUROR:**  Yes.

11        **THE COURT:**  You were a witness in that trial?

12        **PROSPECTIVE JUROR:**  Yes.

13        **THE COURT:**  You said that was about 40 years ago?

14        **PROSPECTIVE JUROR:**  Yeah, at least.

15        **THE COURT:**  Anything about that that would affect

16    your ability to be a fair and impartial juror?

17        **PROSPECTIVE JUROR:**  No.

18        **THE COURT:**  And then you answered yes to whether

19    you've been a juror before.

20        **PROSPECTIVE JUROR:**  Yes.

21        **THE COURT:**  Tell us about that.

22        **PROSPECTIVE JUROR:**  Oh my God, a couple different

23    times.  One time it had something to do with a gentleman

24    possessing a gun in an SUV at the Howard homecoming.  I

25    really -- yeah, I can't remember what else was about that.

1    Another time it was a woman suing somebody for wrongful

2    termination.  I was also on a grand jury.

3         **THE COURT:**  With respect to the grand jury, from

4    your service on the grand jury, do you understand that when

5    a grand jury --

6         **PROSPECTIVE JUROR:**  Grand jury leads to here.

7         **THE COURT:**  I'm sorry?

8         **PROSPECTIVE JUROR:**  Grand jury kind of leads to

9    here.

10        **THE COURT:**  Leads to here, yeah, right.  But do

11   you understand, though, that the decision by a grand jury to

12   return an indictment is not evidence of guilt one way or the

13   other?

14        **PROSPECTIVE JUROR:**  Oh, absolutely.  It's just is

15   there enough evidence to proceed.

16        **THE COURT:**  They're just making a probable cause

17   determination.  Do you understand that?

18        **PROSPECTIVE JUROR:**  Right, I understand that.

19        **THE COURT:**  And do you understand, as a juror, you

20   can't draw any inference one way or the other as to

21   someone's guilt or innocence based merely on the fact

22   they've been indicted?

23        **PROSPECTIVE JUROR:**  Correct.

24        **THE COURT:**  You understand the indictment is not

25   evidence of guilt in any way?

1    **PROSPECTIVE JUROR:**  Yes, I understand that

2    completely.

3    **THE COURT:**  It's just initiating the proceeding,

4    right?

5    **PROSPECTIVE JUROR:**  Exactly.

6    **THE COURT:**  And with your service as a juror, a

7    trial juror, did you reach verdicts in all the cases where

8    you were a juror?

9    **PROSPECTIVE JUROR:**  On both juries, yes.

10    **THE COURT:**  And then I've got a question mark next

11    to seven, which was the list of people's names you might

12    hear in the case.

13    **PROSPECTIVE JUROR:**  Well, I've heard of the

14    senators before, so I don't know if that counts.

15    **THE COURT:**  I think you literally answered my

16    question correctly, because I think I asked whether you know

17    of these individuals.  So you listened carefully.

18    Do you know anything about them other than just

19    what you've seen in press reports?

20    **PROSPECTIVE JUROR:**  No, just what -- in the press,

21    yeah.

22    **THE COURT:**  What do you do for a living?

23    **PROSPECTIVE JUROR:**  I am -- it's a long job title,

24    Senior Executive Administrative Aide to the Director of

25    Recreation for Montgomery County Government.

1          **THE COURT:**  But you live in D.C.?

2          **PROSPECTIVE JUROR:**  But I live in D.C., yes.

3          **THE COURT:**  What do you do in that job?

4          **PROSPECTIVE JUROR:**  The big one is juggling her

5    day-to-day calendar, but I like to say it's making sure

6    everybody in the department has the tools they need to do

7    their job seamlessly.

8          **THE COURT:**  Thank you.  Ms. Shields, any follow

9    up?

10         **MS. SHIELDS:**  Good morning, ma'am.

11         **PROSPECTIVE JUROR:**  Good morning.

12         **MS. SHIELDS:**  So in connection with that job with

13   that very long job title, are people reporting to you?

14         **PROSPECTIVE JUROR:**  No, people come to me, but

15   nobody reports to me.

16         **MS. SHIELDS:**  And you were reporting to her,

17   though; is that right?

18         **PROSPECTIVE JUROR:**  Yes.

19         **MS. SHIELDS:**  How long ago were you a grand juror?

20         **PROSPECTIVE JUROR:**  Oh my goodness, it's -- oh my

21   goodness, I have to think about this.

22         **MS. SHIELDS:**  So it's been a long time?

23         **PROSPECTIVE JUROR:**  Yeah, it's been over 20 years,

24   I would say.

25         **MS. SHIELDS:**  Thank you so much, ma'am.

```
1              THE COURT:  Mr. Salgado?

2              MR. SALGADO:  Thank you, Your Honor.  Good

3    morning, ma'am.

4              PROSPECTIVE JUROR:  Good morning.

5              MR. SALGADO:  I want to talk a little bit more

6    about your job.  How long have you had that job?

7              PROSPECTIVE JUROR:  I was promoted January of

8    2020.

9              MR. SALGADO:  And before that, what title did you

10   have?

11             PROSPECTIVE JUROR:  I was an office manager, still

12   in the recreation department, but specifically for youth

13   development.

14             MR. SALGADO:  So in total, how long have you

15   worked for Montgomery County?

16             PROSPECTIVE JUROR:  So 1993 I was a temp, and then

17   started with HHS in '95, I think.  And then I was laid off

18   in the great layoff of 2009, and went to work for another

19   government agency, the City of Laurel, and came back to

20   Montgomery County in 2017.

21             MR. SALGADO:  I see.  When you say HHS, you

22   mean --

23             PROSPECTIVE JUROR:  Health and Human Services, I'm

24   sorry, yes.

25             MR. SALGADO:  At the federal level?
```

1            **PROSPECTIVE JUROR:**  No, all local, all Montgomery

2     County Government.

3            **MR. SALGADO:**  Now, does Montgomery County have an

4     Office of Inspector General?

5            **PROSPECTIVE JUROR:**  They sure do.

6            **MR. SALGADO:**  What's your understanding of what

7     they do?

8            **PROSPECTIVE JUROR:**  Just recently they slapped our

9     hands for not having fleet management up to code, so to

10    speak.  We didn't have our records in order.  That's all I

11    know.

12           **MR. SALGADO:**  Understood.  And that was the

13    outcome of a review, of an investigation?

14           **PROSPECTIVE JUROR:**  Yeah, the inspector general

15    met with our director, did an audit of how we were keeping

16    fleet, you know, was it accurate and up to date.  And it

17    wasn't, so we have, I don't know, however many days, months

18    to get it together.

19           **MR. SALGADO:**  Were you personally involved in that

20    review?

21           **PROSPECTIVE JUROR:**  I am now.

22           **MR. SALGADO:**  How so?

23           **PROSPECTIVE JUROR:**  She handed -- my director

24    handed me that project, so I'm now in charge.

25           **MR. SALGADO:**  Were you interviewed as part of that

1    review by the Office of Inspector General?

2            **PROSPECTIVE JUROR:**  No.

3            **MR. SALGADO:**  Was your boss interviewed?

4            **PROSPECTIVE JUROR:**  Yes.  All I did was set up the

5    appointment for him to meet with her.  I didn't know what it

6    was about.

7            **MR. SALGADO:**  And did your boss comment to you

8    about the experience or share any insight into the

9    experience?

10           **PROSPECTIVE JUROR:**  I'm using her language when I

11   say:  "Our hands were slapped."  That was about all she

12   said, and that we need to bring our fleet management up

13   to -- make sure it's current.

14           **MR. SALGADO:**  Understood.  What about the

15   aftermath of that experience?  Did it leave you with any

16   impressions or biases towards the work that offices of

17   inspectors general do?

18           **PROSPECTIVE JUROR:**  Oh, no, but towards my

19   director, yes.  But not towards the office, no.

20           **MR. SALGADO:**  Feelings towards your director,

21   okay.  How about other experiences with the Montgomery

22   County OIG?

23           **PROSPECTIVE JUROR:**  Really, none.  I mean, we get

24   regular memos that tell us about ethics, you know, if you

25   have other jobs, if you -- you know, so you have to report

1  them, especially if they're in conflict with what you do,

2  making sure you don't wear political buttons supporting any

3  candidate while you're on the job.  Other than that, I mean,

4  it's follow the rules, and they're there to make sure we do.

5  That's how I understand it.

6       **MR. SALGADO:**  And do you have any feelings about

7  that set up, you know, that OIG is there to make sure you

8  follow the rules?

9       **PROSPECTIVE JUROR:**  I think it's a good thing.

10       **MR. SALGADO:**  Thank you, ma'am.

11       **THE COURT:**  Thank you.

12       We have Juror 84.  You answered yes to a couple of

13  my questions.  You answered yes to the question about

14  whether you, a family member or a close friend have worked

15  for one of the long list of organizations I gave you.

16       **PROSPECTIVE JUROR:**  Yes.

17       **THE COURT:**  Do you want to tell us about that.

18       **PROSPECTIVE JUROR:**  Yeah, my aunt is a retired

19  police officer.  My mother, she works for the SBA as a

20  lawyer.

21       **THE COURT:**  Where did your aunt work?

22       **PROSPECTIVE JUROR:**  In D.C.

23       **THE COURT:**  Metropolitan Police?

24       **PROSPECTIVE JUROR:**  The Metropolitan Police

25  Department.

 1          **THE COURT:**  Would the fact that your aunt worked

 2    in law enforcement affect your ability to fairly consider

 3    the testimony, one way or the other, of law enforcement

 4    officers in this case?

 5          **PROSPECTIVE JUROR:**  No.

 6          **THE COURT:**  And you said your mother's a lawyer?

 7          **PROSPECTIVE JUROR:**  Correct.

 8          **THE COURT:**  What sort of lawyer is -- what does

 9    she do?

10          **PROSPECTIVE JUROR:**  Real estate.

11          **THE COURT:**  She does real estate, I see.  Does she

12    do government contracting work, do you know?

13          **PROSPECTIVE JUROR:**  I believe so.  She reviews

14    applications for, I guess, like grants towards people with

15    housing issues.  She approves applications for grants for

16    people who have housing issues.

17          **THE COURT:**  Does she do anything at all involving

18    enforcement, to your knowledge?  By that I mean if she

19    thinks someone has done something wrong, contacting the

20    authorities, or is she really more just in a role of

21    assisting people who are filing grant applications?

22          **PROSPECTIVE JUROR:**  She's just assisting people

23    with grant applications.

24          **THE COURT:**  Anyone else that you're close to

25    that's worked for one of those agencies or organizations

1  I've mentioned?

2  **PROSPECTIVE JUROR:**  No, sir.

3  **THE COURT:**  And then you answered yes to question

4  22 about whether you, a family member or a close friend have

5  any legal training.  Anyone other than your mother?

6  **PROSPECTIVE JUROR:**  No, sir.

7  **THE COURT:**  And what do you do?

8  **PROSPECTIVE JUROR:**  I'm an occupational therapist.

9  **THE COURT:**  Occupational therapist, okay.  Where

10  do you work?

11  **PROSPECTIVE JUROR:**  I work for DCPS, so a

12  pediatric occupational therapist in a school.

13  **THE COURT:**  I see, okay.  Ms. Shields, any follow

14  up questions?

15  **MS. SHIELDS:**  Good morning, ma'am.

16  **PROSPECTIVE JUROR:**  Good morning.

17  **MS. SHIELDS:**  Briefly, you mentioned that you work

18  as an occupational therapist at DCPS, at a school.  What

19  level is it, elementary, middle?

20  **PROSPECTIVE JUROR:**  Elementary.

21  **MS. SHIELDS:**  And in which quadrant of the city?

22  **PROSPECTIVE JUROR:**  Technically that is Southeast,

23  but it's near the Marine Barracks off of Eighth Street.

24  **MS. SHIELDS:**  So Capitol Hill area?

25  **PROSPECTIVE JUROR:**  Correct.

 1                  MS. SHIELDS:  Thank you, no other questions.

 2                  THE COURT:  Mr. Salgado -- or it's Ms. Choy's

 3       turn.

 4                  MS. CHOY:  Good morning, ma'am.

 5                  PROSPECTIVE JUROR:  Good morning.

 6                  MS. CHOY:  Just to follow up on your work as an

 7       OT, are you in one particular school or do you float among

 8       many schools?

 9                  PROSPECTIVE JUROR:  I'm just in one school.

10                  MS. CHOY:  And which school is that?

11                  PROSPECTIVE JUROR:  Tyler Elementary.

12                  MS. CHOY:  Thank you.

13                  THE COURT:  Thank you.

14                  Next we have Juror 1528.  You answered yes to

15       three of my questions.  Let me start at the back.  You

16       indicated that you, a family member or a close friend have

17       worked for one of the long list of organizations that I

18       mentioned.

19                  PROSPECTIVE JUROR:  Yes, by day I work for the

20       United States Environmental Protection Agency.

21                  THE COURT:  You say worked, past tense.  Is he no

22       longer there?

23                  PROSPECTIVE JUROR:  No, I'm currently working

24       there now.

25                  THE COURT:  Oh, sorry, you are currently working

1    there?

2                    **PROSPECTIVE JUROR:**  Yes.

3                    **THE COURT:**  Oh, I see.

4                    **PROSPECTIVE JUROR:**  That's my day job.

5                    **THE COURT:**  And what do you do at EPA?

6                    **PROSPECTIVE JUROR:**  I work in human resources.

7                    **THE COURT:**  And tell us a little bit more in

8    detail what that means.

9                    **PROSPECTIVE JUROR:**  Well, specifically I work as a

10   training coordinator for an office of about 550 federal

11   employees.  So my focus is on the training and development

12   of federal employees' compliance with mandatory training

13   programs which we have to run, a various number of them, for

14   a bunch of employees every year.

15                   **THE COURT:**  I'm sorry, can I ask you to just slow

16   down a little bit, because the court reporter has to take

17   down what everyone's saying, and it's hard for him --

18                   **PROSPECTIVE JUROR:**  Oh, sure -- and maybe this

19   will help, too.  So I help run training development programs

20   for an office of about 550 federal employees.  I help with a

21   lot of tracking and compliance with regards to mandatory

22   trainings we have to implement for the workforce every year.

23   And I also do some contracting and procurement, as it

24   relates to buying or developing training and development

25   programs for the federal workforce of the EPA's Office of

1   Water.

2   **THE COURT:** I see, okay. And in the trainings

3   that you do, does any of the training have to do with

4   government property, government intellectual property,

5   anything like that?

6   **PROSPECTIVE JUROR:** Tangentially. It's not an

7   overt focus, but we do a lot of basic trainings on things

8   like FOIA and continuity of operations. So there's always

9   some governmental property nexus there or, you know,

10  preservation of governmental records. We do mandatory

11  records management training every year as well.

12  **THE COURT:** Okay. Other than the fact that you

13  work for the EPA, any close friends or family members work

14  for other government offices?

15  **PROSPECTIVE JUROR:** Yeah, so my parents were both

16  career federal civil servants with the United States Forest

17  Service, but they're both retired -- long since retired.

18  And I obviously have friends at the EPA where I work.

19  **THE COURT:** Anyone, either your parents or your

20  friends, work in IT in any way?

21  **PROSPECTIVE JUROR:** Yes, some of my friends do

22  work in IT. I'm not sure if their explicit job title is IT

23  project manager or program manager, but they do some

24  information technology.

25  **THE COURT:** Any of them involved in developing IT

1    for the government?

2          **PROSPECTIVE JUROR:**  I'm not entirely certain.  I'd

3    have to ask my friends more about what they do.

4          **THE COURT:**  And then you indicated that you, a

5    family member or a close friend have been detained by the

6    police, arrested or charged with a crime or investigated.

7          **PROSPECTIVE JUROR:**  Yes, that's correct.  I

8    believe -- it's been a while now.  So in 2010, I was

9    arrested, and I believe I pled guilty to a misdemeanor for a

10   minor in possession of alcohol in Washington State.  In

11   2009, I was not arrested, but cited, as a civil violation

12   for a minor in possession of alcohol in Salem, Oregon.

13   Those are the only two criminal infractions I have on my

14   record.

15         **THE COURT:**  How long ago was that?

16         **PROSPECTIVE JUROR:**  The earliest was over 12 years

17   ago now.

18         **THE COURT:**  And what about the second one?

19         **PROSPECTIVE JUROR:**  Thirteen years ago,

20   approximately.

21         **THE COURT:**  Did either of those cases result in a

22   trial of any kind?

23         **PROSPECTIVE JUROR:**  No, one of them was just a

24   civil infraction, like a ticket.  That was the misdemeanor

25   in Oregon State.  In Washington State, it was a bit more

1    serious.  It was a class B misdemeanor that I pled guilty

2    to, so there was no trial.  I was also charged with

3    furnishing alcohol to minors.  Of course, that was part of

4    the plea agreement.  That charge was dropped and I admitted

5    to the minor-in-possession charge.

6        THE COURT:  Anything about your experience in that

7    case that would affect your view towards the trial in this

8    case?

9        PROSPECTIVE JUROR:  No, I don't think it has much

10    of a nexus to identity theft.

11        THE COURT:  And then you also indicated you, a

12    family member or a close friend have legal training or have

13    worked in a law office.

14        PROSPECTIVE JUROR:  That's correct.  I hope you

15    all consider this legal training.  I'm currently a part-time

16    evening student at the American University's Washington

17    College of Law, in my third year out of a four-year program.

18        THE COURT:  So you're studying to be a lawyer?

19        PROSPECTIVE JUROR:  That's correct.

20        THE COURT:  Have you taken criminal law?

21        PROSPECTIVE JUROR:  Yes.

22        THE COURT:  Even though you've had some training

23    in criminal law, would you be able to follow my instructions

24    on the law and put aside anything else you may have heard in

25    class about the law -- or read?

1   **PROSPECTIVE JUROR:**  Yes, I believe I can do that.

2   **THE COURT:**  Ms. Choy, do you want to follow up

3   with any questions?

4   **MS. CHOY:**  Good morning, sir.

5   **PROSPECTIVE JUROR:**  Good morning.

6   **MS. CHOY:**  Are you aware of whether EPA has an

7   Office of Inspector General?

8   **PROSPECTIVE JUROR:**  Yes, I am.

9   **MS. CHOY:**  Do you have any experience with that

10   office in your job?

11   **PROSPECTIVE JUROR:**  Not really.  Yeah, so I --

12   sorry if I should have answered yes affirmatively to that

13   question as well.  I'm aware of the Office of Inspector

14   General of the EPA, but I don't really work closely with

15   them at all.  I think the most interaction I've had with

16   them is I've gone to a training they did once for a lot of

17   employees in our office.

18   **MS. CHOY:**  And has anyone that you worked with had

19   any interaction with them?

20   **PROSPECTIVE JUROR:**  Not that I know really in like

21   a professional sense.

22   **MS. CHOY:**  Have you come to form any impression of

23   the Office of Inspector General, whether positive or

24   negative?

25   **PROSPECTIVE JUROR:**  Not particularly.  I know

 1  their function.  They're there to audit our programs and

 2  oversee the programs that the Executive Branch executes at

 3  the behest of Congress.  But aside from that, I'm not

 4  terribly familiar.

 5      **MS. CHOY:**  And then just taking you back to the

 6  issue you had with the misdemeanor charge.  Did you feel you

 7  were treated fairly in either -- in both those cases?

 8      **PROSPECTIVE JUROR:**  The dynamics of the first --

 9  the one in 2010, the misdemeanor charge I pled guilty to, I

10  felt I was treated somewhat unfairly by the arresting

11  officer in that case, yes.

12      **MS. CHOY:**  Could you say more about that?

13      **PROSPECTIVE JUROR:**  Not a whole lot of detail, it

14  was a long time ago.  Just during the evening of the

15  interaction, and what was later stated in the police report,

16  it felt like the officer at that time was untruthful as to

17  the circumstances.  Later on -- this was years later, that

18  officer would later leave the force due to a separate

19  incident, which was caught on videotape, where he was

20  documented lying about an arrest he had made.  So that

21  officer had been the arresting officer in my case.

22      **MS. CHOY:**  Did that experience cause you to form

23  any opinions of police officers more broadly?

24      **PROSPECTIVE JUROR:**  When I was younger perhaps,

25  but I don't think I hold those views now.

 1          **MS. CHOY:**  And what about your experience with the

 2   court system in that case, did you feel that the court

 3   system treated you fairly?

 4          **PROSPECTIVE JUROR:**  Yeah, no, I think it did.  I

 5   think it's better to be standing where you're standing than

 6   perhaps where a defendant may be standing or sitting, but it

 7   didn't unfairly taint my impression of the judicial system I

 8   would say.

 9          **MS. CHOY:**  Thank you.

10          **THE COURT:**  Ms. Shields?

11          **MS. SHIELDS:**  Good morning, sir.

12          **PROSPECTIVE JUROR:**  Good morning.

13          **MS. SHIELDS:**  I wanted to follow up on your

14   response to Ms. Choy.  You said it's better to be standing

15   where, I guess, the prosecution is standing; is that what

16   you meant?

17          **PROSPECTIVE JUROR:**  Yeah, when I go to court, I

18   would prefer to be working in the courtroom as a lawyer and

19   not as a subject matter witness or a defendant.

20          **MS. SHIELDS:**  Is that based on your view that --

21   I'm trying to unpack that a little bit.  Are you basically

22   saying you don't want to be a defendant or is it that you

23   don't want to --

24          **PROSPECTIVE JUROR:**  I don't think anyone wants to

25   be a defendant in a federal criminal case.

1    **MS. SHIELDS:**  Okay.  Is that because of a power

2    dynamic?  I'm just trying to understand what you mean by

3    that when you say that.

4    **PROSPECTIVE JUROR:**  I think it feels a lot easier

5    to sit in a chair when you're going to court as a

6    professional who helps administer justice than being the

7    individual who's being investigated and tried.

8    **MS. SHIELDS:**  Understood.  You also mentioned that

9    you do compliance work -- you're doing training and

10   compliance work at I think it's EPA?

11   **PROSPECTIVE JUROR:**  That's correct.

12   **MS. SHIELDS:**  Are you supervising people in that

13   capacity?

14   **PROSPECTIVE JUROR:**  No, I'm not.  I'm just an

15   employee, not a supervisor.

16   **MS. SHIELDS:**  So is anybody reporting to you?

17   **PROSPECTIVE JUROR:**  No.

18   **MS. SHIELDS:**  Do you have direct reports?

19   **PROSPECTIVE JUROR:**  Yes -- no, I do not have

20   direct reports.  I report --

21   **MS. SHIELDS:**  You report -- I'm sorry, I actually

22   misspoke.  You report.  About how many people are you

23   reporting to?

24   **PROSPECTIVE JUROR:**  Well, I have one supervisor,

25   and then a manager who sits above him.

1              **MS. SHIELDS:**  Thank you so much.

2              **PROSPECTIVE JUROR:**  You're welcome.

3              **THE COURT:**  Thank you.

4         We have Juror 987.  So you answered yes to my

5    question about whether you, a family member or a close

6    friend have worked for one of the long list of organizations

7    I mentioned.

8              **PROSPECTIVE JUROR:**  Yeah, I thought I heard you

9    say government agency.

10             **THE COURT:**  I did.

11             **PROSPECTIVE JUROR:**  I work for a contractor that

12   has a project on -- at NASA right now.

13             **THE COURT:**  And who do you work for?

14             **PROSPECTIVE JUROR:**  Booz Allen.

15             **THE COURT:**  And what do you do there?

16             **PROSPECTIVE JUROR:**  Like a project manager.  Right

17   now my project is a hackathon.

18             **THE COURT:**  Is what?

19             **PROSPECTIVE JUROR:**  A hackathon.

20             **THE COURT:**  I see.  So you're working with NASA

21   now?

22             **PROSPECTIVE JUROR:**  Yes.

23             **THE COURT:**  Were you involved at all in the

24   contracting process or were you just involved in actually

25   executing or performing on the contract?

1    **PROSPECTIVE JUROR:**  Not involved in getting the

2    contract, but just executing the contract.

3    **THE COURT:**  Okay.  And does the contract involve

4    any IT technology?

5    **PROSPECTIVE JUROR:**  Not specifically, but the

6    hackathon is a science and technology hackathon.

7    **THE COURT:**  What does that mean?

8    **PROSPECTIVE JUROR:**  So we pose challenges to the

9    public, and the challenge statements are about various

10    research that different NASA scientists are working on.  And

11    this is a way to crowdsource ideas from the public to help

12    with the research.

13    **THE COURT:**  And ideas in what area here with this

14    particular project?

15    **PROSPECTIVE JUROR:**  Space and earth science

16    mostly.

17    **THE COURT:**  So you're, in general, just broadly

18    seeking ideas from the public about space and earth science?

19    **PROSPECTIVE JUROR:**  Yes.

20    **THE COURT:**  And any other experience working with

21    federal agencies or do you have any other friends who work

22    for federal agencies?

23    **PROSPECTIVE JUROR:**  No.  I used to work in the

24    Senate, but not an agency.

25    **THE COURT:**  Where did you work in the Senate?

 1              **PROSPECTIVE JUROR:**  Senator Shaheen's office from

 2      New Hampshire.

 3              **THE COURT:**  And what did you do there?

 4              **PROSPECTIVE JUROR:**  I was a legislative

 5      correspondent working on health care education.

 6              **THE COURT:**  Then you also indicated you've been

 7      the victim of identity theft.

 8              **PROSPECTIVE JUROR:**  Yes.

 9              **THE COURT:**  When was that?

10              **PROSPECTIVE JUROR:**  Last year I found out that

11      somebody stole my Social Security number to get unemployment

12      insurance.  I don't think they were successful, but I'm told

13      that the only way they would have gotten an application in

14      was to get my Social Security number.

15              **THE COURT:**  What came of all that?

16              **PROSPECTIVE JUROR:**  I don't think anything

17      happened.  I haven't noticed anything with my credit or any

18      new credit cards opened.  I got a letter in the mail one day

19      saying that my -- that I have a claim filed for unemployment

20      insurance, but it wasn't me.  So I just notified all the

21      agencies that I was told to notify, and then nothing

22      happened.

23              **THE COURT:**  Anything about that experience that

24      would make it difficult for you to be a fair and impartial

25      juror in a case that involves an allegation of aggravated

1  identity theft?

2    **PROSPECTIVE JUROR:**  I don't think so.  I just --

3  I'm being really protective now of my passwords and things

4  like that, but I believe I can be impartial.

5    **THE COURT:**  In the end, obviously, all we can do

6  is rely on your best judgment about that.  So the question

7  is whether you think that you could leave that experience

8  outside the courtroom and evaluate the evidence in this case

9  based on just what's presented in the courtroom?

10    **PROSPECTIVE JUROR:**  Right, yeah, I would say I

11  could.

12    **THE COURT:**  And then you also indicated, I

13  think -- you answered yes to my question about the charges

14  in this case, and about whether there's anything about them

15  that could make it difficult for you to render a fair and

16  impartial verdict.

17    **PROSPECTIVE JUROR:**  I'm sorry, what was the

18  question there?

19    **THE COURT:**  So the question -- I think question 13

20  was that Mr. Venkata is charged with conspiracy, theft of

21  government property, wire fraud, aggravated identity theft

22  and destruction of records.  Is there anything about the

23  nature of these charges that would make it difficult for you

24  to render a fair and impartial verdict if you are chosen as

25  a juror?

1          **PROSPECTIVE JUROR:**  I picked up on the identity

2     theft piece of that.

3          **THE COURT:**  Anything other than that, just the

4     identity theft?

5          **PROSPECTIVE JUROR:**  No, that's it.

6          **THE COURT:**  As you sit here now, are you confident

7     you could be a fair and impartial juror despite the nature

8     of the charges?

9          **PROSPECTIVE JUROR:**  Yeah, I think I could.

10          **THE COURT:**  Ms. Choy?

11          **MS. CHOY:**  Good morning, ma'am.

12          **PROSPECTIVE JUROR:**  Hi.

13          **MS. CHOY:**  In your work, have you had occasion to

14     come across an inspector general's office at any federal

15     agency?

16          **PROSPECTIVE JUROR:**  No, I haven't.

17          **MS. CHOY:**  Are you aware of what that is?

18          **PROSPECTIVE JUROR:**  I think they are like

19     investigators for issues that come up internally, I believe.

20     I'm not quite sure.

21          **MS. CHOY:**  And do you have any impression of

22     inspector generals offices, whether positive or negative?

23          **PROSPECTIVE JUROR:**  I think probably positive.  I

24     think they try to investigate any wrongdoing that might be

25     occurring.

108

1    **MS. CHOY:**  Thank you very much.

2    **THE COURT:**  Ms. Shields?

3    **MS. SHIELDS:**  Good morning, ma'am.

4    **PROSPECTIVE JUROR:**  Hi.

5    **MS. SHIELDS:**  You mentioned, in response to

6    Ms. Choy's question, that you have a positive impression of

7    inspector generals offices.  Why is that, specifically?

8    **PROSPECTIVE JUROR:**  Probably because they're

9    trying to get to the bottom of something that happened,

10   usually something bad, I think.  I kind of -- I view them as

11   being impartial.  I don't have a lot of experience with

12   them.

13   **MS. SHIELDS:**  How have you come across them in the

14   first instance?

15   **PROSPECTIVE JUROR:**  I honestly don't even know.  I

16   might have heard the term or the title in the past and maybe

17   wondered what they did, and might have looked them up.  But

18   I didn't -- not anything in detail.

19   **MS. SHIELDS:**  Understood.  You mentioned that

20   you -- do you have any sort of a computer programming

21   background or anything like that?

22   **PROSPECTIVE JUROR:**  No, I'm not an IT person at

23   all.

24   **MS. SHIELDS:**  We're all intrigued by the

25   hackathon.

**A0766**

1    **PROSPECTIVE JUROR:**  Yeah, it's pretty fun.

2    **MS. SHIELDS:**  Finally, you said you were notified

3    of the fact that your information had been taken.  I guess

4    there was a letter or something like that.  Did anyone

5    follow up with you about that, aside from the letter?  Did

6    you receive any contact from the government, anything like

7    that?

8    **PROSPECTIVE JUROR:**  No, no.  I was surprised, this

9    is the first time I had been -- something had happened like

10   that.  I thought all these people were going to contact me

11   to let me know what to do, but it was actually I had to be

12   proactive and do a lot of searching and figuring out what to

13   do.  Nobody contacted me.

14   **MS. SHIELDS:**  Understood.  Thank you so much.

15   **PROSPECTIVE JUROR:**  Sure.

16   **THE COURT:**  Thank you.

17   Okay, we have Juror 271.  You only had a yes

18   answer to one of my questions, which was whether you, a

19   family member or a close friend have had legal training or

20   worked in a law office.

21   **PROSPECTIVE JUROR:**  That's correct.  My

22   father-in-law is a defense attorney and a former Assistant

23   U.S. Attorney.

24   **THE COURT:**  Where does he work?

25   **PROSPECTIVE JUROR:**  Middle District in Georgia.

 1     **THE COURT:**  In Georgia.  Do you know what types of

 2 cases he handles?

 3     **PROSPECTIVE JUROR:**  Criminal defense.

 4     **THE COURT:**  Do you know more specifically the

 5 particular types?

 6     **PROSPECTIVE JUROR:**  White-collar, I believe police

 7 cases and like public employees.

 8     **THE COURT:**  And he was previously a prosecutor

 9 before that?

10     **PROSPECTIVE JUROR:**  That's correct.

11     **THE COURT:**  What sort of cases did he prosecute?

12     **PROSPECTIVE JUROR:**  I don't know, that was before

13 I met him.

14     **THE COURT:**  Anything about the fact that your

15 father-in-law is a defense attorney now, and was previously

16 a prosecutor, that would affect your ability to be a fair

17 and impartial juror in this case?

18     **PROSPECTIVE JUROR:**  Not in my opinion.

19     **THE COURT:**  Would it have any affect in your views

20 towards either the defense counsel or the prosecutors in

21 this case?

22     **PROSPECTIVE JUROR:**  No.

23     **THE COURT:**  What do you do?

24     **PROSPECTIVE JUROR:**  I work for the Metro.  I work

25 in communications.

1          **THE COURT:**  What do you do in communications?

2          **PROSPECTIVE JUROR:**  Make videos, photography, all

3     sorts of visual content about construction work and all

4     sorts of Metro stuff.

5          **THE COURT:**  How long have you been in D.C?

6          **PROSPECTIVE JUROR:**  Nine years, 10 years.

7          **THE COURT:**  Ms. Shields, any follow up?

8          **MS. SHIELDS:**  Sir, you mentioned that you work for

9     Metro; is that right?

10          **PROSPECTIVE JUROR:**  That's correct.

11          **MS. SHIELDS:**  Have you ever made videos in

12     connection with any sort of criminal investigation?

13          **PROSPECTIVE JUROR:**  No.

14          **MS. SHIELDS:**  What are the purpose of the videos?

15          **PROSPECTIVE JUROR:**  They're to highlight capital

16     projects, so like investments and infrastructure, things

17     like that.

18          **MS. SHIELDS:**  Your father-in-law, who was a

19     criminal defense attorney -- who was a former AUSA, do you

20     have much contact with him?

21          **PROSPECTIVE JUROR:**  Yes.

22          **MS. SHIELDS:**  How often would you say you see him?

23          **PROSPECTIVE JUROR:**  In person, several times a

24     year, probably four or five.

25          **MS. SHIELDS:**  Do you have a good relationship with

1    him, generally?

2             **PROSPECTIVE JUROR:**  Yes.

3         **MS. SHIELDS:**  Thank you so much, sir.

4         **THE COURT:**  Ms. Choy?

5         **MS. CHOY:**  Hello, sir.

6             **PROSPECTIVE JUROR:**  Hi.

7         **MS. CHOY:**  You had mentioned that your

8    father-in-law has been an attorney both on the prosecution

9    side and the defense side.  Through that experience, have

10   you come to form any opinions, generally, about the

11   functioning of the criminal justice system?

12            **PROSPECTIVE JUROR:**  Not that I can think of.

13        **MS. CHOY:**  Has that led you to any conclusions

14   about whether the system is fair?

15            **PROSPECTIVE JUROR:**  Honestly, the only thing we've

16   ever really talked about, in terms of legal stuff, is how

17   someone can come to defend a client, like how you make that

18   decision, whether it's if you believe everyone deserves

19   representation or it's focused on a financial reason.

20        **MS. CHOY:**  Did any of those discussions lead you

21   to form opinions about either defense attorneys or

22   prosecutors?

23            **PROSPECTIVE JUROR:**  Not really, no.

24        **MS. CHOY:**  Thank you.

25        **THE COURT:**  Well, thank you.

 1                    We now have Juror 1019.  You answered yes to one

 2       of my questions, which was whether you or someone you are

 3       close to has ever worked for one of that long list of

 4       organizations I gave.  Tell us about that.

 5                    **PROSPECTIVE JUROR:**  Just living in D.C., I have a

 6       lot of friends who are lawyers in government.

 7                    **THE COURT:**  I take it you're not a lawyer; is that

 8       right?

 9                    **PROSPECTIVE JUROR:**  No.

10                    **THE COURT:**  But which of those organizations do

11       your friends work for as lawyers?

12                    **PROSPECTIVE JUROR:**  My boyfriend works -- oh, as

13       lawyers, just -- oh, they had to be a lawyer in --

14                    **THE COURT:**  No, no, I was just repeating it the

15       way you put it to me.  Let me strike that, start all over

16       again here.

17                    Of the folks you're close with, which agencies do

18       they work with?

19                    **PROSPECTIVE JUROR:**  My boyfriend works for DHS.

20                    **THE COURT:**  What does he do there?

21                    **PROSPECTIVE JUROR:**  He does like mapping

22       technology stuff.

23                    **THE COURT:**  Which agency at DHS does he work in?

24                    **PROSPECTIVE JUROR:**  Just like DHS in general.

25                    **THE COURT:**  Just DHS in general.  It could just be

1    DHS, that has a lot of other organizations.

2        **PROSPECTIVE JUROR:**  Yeah, he works for all of

3    them. He does like all different --

4        **THE COURT:**  And when you say he does mapping, what

5    does that mean?

6        **PROSPECTIVE JUROR:**  Like geospatial mapping.

7        **THE COURT:**  What's his background?

8        **PROSPECTIVE JUROR:**  In that, like in -- like he

9    worked for Esri, just doing like mapping technology and like

10   coding, that sort of thing.

11       **THE COURT:**  Does he write programs for DHS?

12       **PROSPECTIVE JUROR:**  Yeah, yeah.

13       **THE COURT:**  Write computer programs that relate to

14   mapping?

15       **PROSPECTIVE JUROR:**  Exactly, yes.

16       **THE COURT:**  Then they use those programs to map

17   portions of the country or the world?

18       **PROSPECTIVE JUROR:**  Yeah, exactly, whatever the

19   agency needs.

20       **THE COURT:**  Has he had anything to do, as far as

21   you know, with the Office of Inspector General at DHS?

22       **PROSPECTIVE JUROR:**  I don't think so.

23       **THE COURT:**  How long has he been at DHS?

24       **PROSPECTIVE JUROR:**  For like two years.

25       **THE COURT:**  Would the fact that this case -- there

 1  will be testimony about DHS witnesses who have or do work at

 2  DHS, would that affect your ability to be a fair and

 3  impartial juror in any way?

 4          **PROSPECTIVE JUROR:**  I don't think so.

 5          **THE COURT:**  Are there other friends or family

 6  members who have worked for one of the organizations that I

 7  mentioned?

 8          **PROSPECTIVE JUROR:**  What were the other

 9  organizations?

10          **THE COURT:**  Either government agencies or it could

11  also be defense -- law defense offices or --

12          **PROSPECTIVE JUROR:**  Yeah, I have friends who are

13  lawyers.

14          **THE COURT:**  And what do they do?

15          **PROSPECTIVE JUROR:**  I have a friend who works at

16  Jones Day, and another one at Kirkland Ellis.

17          **THE COURT:**  Do you know -- what does your friend

18  at Jones Day do, if you know?

19          **PROSPECTIVE JUROR:**  Does business regulation, I

20  think.

21          **THE COURT:**  What about your friend at Kirkland?

22          **PROSPECTIVE JUROR:**  Does like appellate work.

23          **THE COURT:**  And what do you do?

24          **PROSPECTIVE JUROR:**  I work for a marketing agency.

25          **THE COURT:**  What do you do there?

1          **PROSPECTIVE JUROR:** I do business development for

2     them.

3          **THE COURT:** How long have you been in D.C.?

4          **PROSPECTIVE JUROR:** I grew up here, and then I

5     moved back from New York at the start of the pandemic.

6          **THE COURT:** How long have you been back?

7          **PROSPECTIVE JUROR:** For like two years now.

8          **THE COURT:** Ms. Shields, any follow up questions?

9          **MS. SHIELDS:** Good morning.

10         **PROSPECTIVE JUROR:** Good morning.

11         **MS. SHIELDS:** You said that you grew up here; is

12    that right?

13         **PROSPECTIVE JUROR:** Yes.

14         **MS. SHIELDS:** Which quadrant of the city?

15         **PROSPECTIVE JUROR:** I grew up in Maryland and then

16    moved to Georgetown.

17         **MS. SHIELDS:** When you moved to Georgetown, all

18    the way until you went to college or --

19         **PROSPECTIVE JUROR:** Yeah, my parents now live

20    there still, and I went to college somewhere else.

21         **MS. SHIELDS:** And your friends that are at law

22    firms, presumably are they both associates?

23         **PROSPECTIVE JUROR:** Yes.

24         **MS. SHIELDS:** Have they ever talked to you about

25    their work?

1          **PROSPECTIVE JUROR:**  Just casually, you know.

2          **MS. SHIELDS:**  Is it interesting discussion?  Do

3     you follow up with them about it?

4          **PROSPECTIVE JUROR:**  Yeah, I like it.

5          **MS. SHIELDS:**  And based on that, and based on what

6     they tell you about their work, have you formed any

7     impressions for criminal law or the criminal justice system?

8          **PROSPECTIVE JUROR:**  I mean, just as much as anyone

9     else, I think.

10         **MS. SHIELDS:**  What does that mean?

11         **PROSPECTIVE JUROR:**  I mean, of course I have

12    opinions about things.  I don't know, it's hard not to, I

13    guess.

14         **MS. SHIELDS:**  That's right.  Let me clarify my

15    question a bit.  Do you feel like the criminal justice

16    system is fair?

17         **PROSPECTIVE JUROR:**  Generally, yeah.

18         **MS. SHIELDS:**  No further questions.  Thank you so

19    much.

20         **THE COURT:**  Ms. Choy?

21         **MS. CHOY:**  No questions.

22         **THE COURT:**  Thank you.

23         We have Juror 1254.  You answered yes to one of my

24    questions, which is whether you, a family member or a close

25    friend have been detained by the police, arrested, charged

1    with a crime or investigated.

2              **PROSPECTIVE JUROR:**  Yes.

3              **THE COURT:**  Tell us about that.

4              **PROSPECTIVE JUROR:**  I was detained for possession

5    of paraphernalia, maybe over a decade ago, in high school.

6              **THE COURT:**  Anything come of it?

7              **PROSPECTIVE JUROR:**  Charges dropped due to

8    pretrial diversion.

9              **THE COURT:**  I see.  So you were under some

10   conditions for some period of time, and they eventually

11   dropped the charges?

12             **PROSPECTIVE JUROR:**  Yes, I performed community

13   service.

14             **THE COURT:**  Anything about that experience that

15   left you with strong views about defense lawyers,

16   prosecutors, courts, anything that might affect your role as

17   a juror in this case?

18             **PROSPECTIVE JUROR:**  No.

19             **THE COURT:**  Do you think you were treated fairly

20   in that process?

21             **PROSPECTIVE JUROR:**  Fairly enough.

22             **THE COURT:**  How long have you lived in D.C.?

23             **PROSPECTIVE JUROR:**  Over five years.

24             **THE COURT:**  What do you do?

25             **PROSPECTIVE JUROR:**  I work for Politico in sales.

1          **THE COURT:**  Ms. Choy, any follow up questions?

2          **MS. CHOY:**  Actually, we're switching to Ms. Macey

3     now.

4          **THE COURT:**  Ms. Macey, any follow up?

5          **MS. MACEY:**  No questions.

6          **THE COURT:**  Ms. Shields, any follow up?

7          **MS. SHIELDS:**  Very briefly.  Good afternoon, sir.

8     You said you work in sales at Politico.  What does that

9     entail exactly?

10          **PROSPECTIVE JUROR:**  Selling a subscription service

11    for Politico-based news.

12          **MS. SHIELDS:**  Do you have any direct reports that

13    report to you?

14          **PROSPECTIVE JUROR:**  No.

15          **MS. SHIELDS:**  Do you have people you report up to?

16          **PROSPECTIVE JUROR:**  Yes, ma'am.

17          **MS. SHIELDS:**  About how many?

18          **PROSPECTIVE JUROR:**  Two people directly.

19          **MS. SHIELDS:**  Thank you so much, sir.

20          **THE COURT:**  Thank you.

21          Next is Juror 638.  You answered yes to two of my

22    questions.  You first answered yes to whether you've ever

23    been a witness in a court case or been a party to a case.

24          **PROSPECTIVE JUROR:**  Yes, I wasn't sure if a

25    divorce counted.

1          **THE COURT:**  Yeah, it does.

2          **PROSPECTIVE JUROR:**  Yeah, I was divorced five or

3     six years ago.

4          **THE COURT:**  Anything about the -- was there

5     actually a trial?

6          **PROSPECTIVE JUROR:**  There was a hearing for it,

7     and then they -- eventually the other party conceded.

8          **THE COURT:**  Anything about that experience that

9     could carry over in any way and affect your thinking in this

10    case?

11         **PROSPECTIVE JUROR:**  No.

12         **THE COURT:**  You answered yes to question 16 about

13    whether you have experience with software programming or

14    development or working in IT.

15         **PROSPECTIVE JUROR:**  Yes, I've been in software

16    development, IT work for the past 12 years.

17         **THE COURT:**  Tell us what you do.

18         **PROSPECTIVE JUROR:**  I'm a salesforce developer.

19    So I work at a consulting firm right now where I work with

20    different clients managing their client -- or upgrading and

21    doing development for their client management databases.

22         **THE COURT:**  You're writing the software for the

23    clients?

24         **PROSPECTIVE JUROR:**  Yes, just writing different

25    code for -- that they will either run or maintain

1    themselves, or just individual things to run off with it.

2        **THE COURT:**  And are you involved at all in the

3    contracting to do that work or are you just more on the

4    implementation side?

5        **PROSPECTIVE JUROR:**  I am somewhat involved in the

6    contracting.  Usually there's other people in the firm who

7    will kind of drum up the business.  And then once the

8    discussions get to a certain point with the potential

9    client, they'll bring in me or someone else to discuss how,

10    if we did get the contract, we would develop whatever

11    solution they need.

12        **THE COURT:**  Is there someone else who would come

13    in and actually then draft the paperwork for the contract?

14        **PROSPECTIVE JUROR:**  Usually someone else has done

15    at least the initial copy, and then I'll go in and edit it

16    or change things, you know, copy from other contracts we've

17    done if it's a similar project.

18        **THE COURT:**  Have any of the projects that you have

19    done or been involved in been for the federal government?

20        **PROSPECTIVE JUROR:**  No.

21        **THE COURT:**  Any for any other governmental entity?

22        **PROSPECTIVE JUROR:**  A handful for -- I currently

23    am working with the state of Connecticut on their Department

24    of Labor family medical leave complaints submissions, and

25    worked with the state of Illinois for their COVID contacts

1    tracing.

2              **THE COURT:**  Have you ever -- either you personally

3    or your firm in a way in which you've been involved or had

4    knowledge, been involved in conflicts with respect to the

5    ownership of any code that you or your firm has written?

6              **PROSPECTIVE JUROR:**  No, I have not.

7              **THE COURT:**  Ms. Shields, any follow up questions?

8              **MS. SHIELDS:**  Good morning, sir.  So you mentioned

9    that you are doing the -- I guess it's the coding for these

10   various clients.  You'll get in and determine whatever sort

11   of software needs they have; is that right?  Is that a fair

12   characterization?

13             **PROSPECTIVE JUROR:**  Yes.

14             **MS. SHIELDS:**  So are you basically then working

15   with the clients or are you working with your team members

16   to write this code?

17             **PROSPECTIVE JUROR:**  Depending on the project,

18   sometimes both.  There are some clients we have that they do

19   not have programmers on staff, so they just rely solely on

20   consultants to come and do what they need.  There are others

21   that they have people on staff who just might not have the

22   time to do it, so we will work kind of hand-in-hand with

23   them.  But even when it is something that we're doing

24   ourselves and they don't have developers, we'll still kind

25   of do an explanation for them and make sure that we leave

1    good documentation, work with them to make sure they can

2    manage it once we leave.  Because we don't do a lot of --

3    our consulting work is more of we go in and do the project,

4    and then we don't maintain and stay on for years and years.

5    So we make sure when we leave, the house is in order.

6          **MS. SHIELDS:**  Got it.  So the code that's written,

7    that code is owned by the client then; is that right?

8          **PROSPECTIVE JUROR:**  Yes.

9          **MS. SHIELDS:**  So it's their proprietary code, and

10   you're assisting them with whatever their needs are; is that

11   fair?

12         **PROSPECTIVE JUROR:**  Yes.  So there are some times

13   that they will need just basic things like, all right, how

14   do you determine how many business hours it has been since

15   something was created.  The client wouldn't have something

16   like that written, but that's something I've written up a

17   thousand times, so that's where I'll just copy/paste.  It's

18   not really things that aren't owned as much, it's just kind

19   of common -- it's just like out there on the internet that

20   you can just Google how do I get this code, and someone's

21   just written it out.

22         **MS. SHIELDS:**  Got it.  Relatedly, do you have

23   anyone who reports to you?

24         **PROSPECTIVE JUROR:**  Not currently, no.

25         **MS. SHIELDS:**  Do you report -- I'm phrasing this

1    incorrectly.  Are there people you report to?

2         **PROSPECTIVE JUROR:**  Yes.

3         **MS. SHIELDS:**  How many people?

4         **PROSPECTIVE JUROR:**  There's -- I have one direct

5    manager for the actual like development and projects that

6    I'm on, and then one people leader who is the more just how

7    I'm staffed on different projects and how I work within the

8    firm itself.

9         **MS. SHIELDS:**  How long have you been doing this?

10        **PROSPECTIVE JUROR:**  I've been with this firm for

11   about three years, three and a half.

12        **MS. SHIELDS:**  Were you doing something similar

13   prior to that?

14        **PROSPECTIVE JUROR:**  Before that I was working

15   doing the same, similar thing but just for actual companies,

16   mostly for start-ups.

17        **MS. SHIELDS:**  Okay, got it.  And sorry, one last

18   question.  You said you don't have anybody reporting to you

19   currently.  Is that within this organization?

20        **PROSPECTIVE JUROR:**  Yes.  I might have people in

21   the future, but not at the moment.

22        **MS. SHIELDS:**  Got it.

23        **THE COURT:**  Ms. Macey?

24        **MS. MACEY:**  Good afternoon, sir.  Can you explain

25   to us what your educational background is?

1     **PROSPECTIVE JUROR:** Yes, I -- high school, college

2     at BYU. I actually studied psychology and then switched to

3     doing IT work, because I did not want to continue doing

4     school.

5     **MS. MACEY:** So is it fair to say you learned your

6     IT skills on the job rather than formal education?

7     **PROSPECTIVE JUROR:** Yes.

8     **MS. MACEY:** Now, you explained through

9     Ms. Shields' questioning some of the background in terms of

10    the client being the entity that owns the software code.

11    Are you involved at all, or is your company involved at all,

12    in copyrighting any of that code or making any other sort of

13    proprietary --

14    **PROSPECTIVE JUROR:** I know that there is -- I

15    don't know about officially copyrighting it. I know that we

16    do have kind of a repository of certain code that if one

17    team in the D.C. office has worked on something and they

18    developed some code, that other offices can use that. I

19    believe that it's -- we're told that you can't go and like

20    sell this as like this is my code that I wrote, and go and

21    try to have your side hustle for it. But we're freely

22    allowed to use it on other projects.

23    So that's -- the ownership of it is a kind of -- I

24    guess it's kind of a gray area. I haven't had to really

25    look into it as much, because I've not tried to sell it or

1    start my own business with it.

2         **MS. MACEY:**  You referenced in your answer some

3    rules that govern what you can do with that sort of

4    software.  Are those enumerated rules that you have to abide

5    by as an employee?

6         **PROSPECTIVE JUROR:**  Yeah, I guess whenever there's

7    any questions with it, we'll ask -- we'll consult it like,

8    okay, are we allowed to do this.  And especially with the

9    firm -- or the clients themselves, asking like, all right,

10   are you -- if we put this code that does whatever, is that

11   okay.  Or if we're going to be reading -- like if this code

12   would need to look at Social Security numbers, we don't want

13   the code actually reading them.  So like how can you tell us

14   just if it's present or not, because we don't want to write

15   anything that's going to be looking at it, and we don't want

16   that liability, just as an example.

17        **MS. MACEY:**  Do you have any feelings about those

18   rules in terms of whether you think they're necessary or

19   unnecessary or anything like that?

20        **PROSPECTIVE JUROR:**  I very much believe they're

21   necessary.  There's a lot that can go wrong with coding that

22   you don't expect.  Lots of common things of just you write

23   your code, and then something breaks in a way you never

24   thought would happen.  So a lot of times having those rules

25   helps to prevent things like that from happening, or just

1    from people using some code or something else that someone

2    else wrote and putting it in yours if you implement it.  If

3    you didn't write it but you're still implementing it, you're

4    responsible for that.  So that's where kind of having

5    repositories or things that we know like this is safe code,

6    this is not going to break things, is a very good thing.

7         MS. MACEY:  You mentioned that sometimes your line

8    of work exposes you or the software can expose you to Social

9    Security numbers.  Have you worked with any other sort of

10   personally identifying information in your line of work?

11        PROSPECTIVE JUROR:  Yes, a lot with especially the

12   state of Illinois COVID contacts tracing.  It was the system

13   where the users would test positive for COVID, and then they

14   would need to say all of their information and all of the

15   information about anyone that they were in close contact

16   with.  So we had to develop ways of having that be an online

17   submission process without -- you know, with keeping the PII

18   safe.

19        MS. MACEY:  And I believe you answered that you do

20   not have anybody reporting to you; is that correct?

21        PROSPECTIVE JUROR:  Correct.

22        MS. MACEY:  Do you work independently or do you

23   work with a team of colleagues on your projects?

24        PROSPECTIVE JUROR:  Usually a team.  There's --

25   occasionally I will be the only developer, and there will

1    just be a project manager.  But usually there's at least two

2    or three other people.

3        **MS. MACEY:**  Thank you very much.

4        **THE COURT:**  I want to just ask you a couple follow

5    up questions.  As the Judge in the case, I don't actually

6    know what the evidence in the case is going to show because

7    I haven't heard the evidence yet.  But there may be a fair

8    amount of testimony and evidence in the case about computer

9    code, computer programming, areas in which you personally

10   have some personal experience.

11       Would you be able to decide this case purely based

12   on the evidence that's presented in the courtroom, and not

13   bring your own sort of personal experience or knowledge to

14   the courtroom; and not, for example, say to the other

15   jurors:  Wait a second, let me tell you how this really

16   works -- or even say that to yourself in some way.  But it's

17   essential that in a case -- that you decide the case based

18   on the evidence presented in the courtroom, and not based on

19   your own personal experiences or information that you bring

20   to the courthouse that is not presented in the courtroom.

21       Do you think you can do that and segregate those

22   two?

23       **PROSPECTIVE JUROR:**  Somewhat.  I think it would be

24   difficult, again, not knowing what the offense would be.

25   But if something came up of like, oh, somebody just copied

1   code from the internet and put it in and then it caused some

2   issue, it would be hard for me to not look at that and be

3   like that was a silly choice, you shouldn't have done that;

4   come on, you should know better.  That would be a very hard

5   thing for me to not look at that and be like come on, that's

6   basic.

7       **THE COURT:**  Let me try and put it a little bit

8   more precisely.  There's obviously not -- a criminal case

9   isn't about whether somebody did something silly or unwise,

10  it's about whether somebody violated the law or not.  I will

11  instruct the jury on what the law is, and you'll have to

12  take my instructions on the law and abide by them.  The

13  jury's then going to have to decide the facts.  They're

14  going to have to decide the facts based just on the

15  testimony that's presented in the courtroom, and not on

16  anything else.  I will tell everyone that you have to do --

17  you have to decide the case just based on the evidence

18  that's presented in the courtroom.  That goes to the

19  question about whether the alleged crimes occurred, and

20  whether the government has carried its burden beyond a

21  reasonable doubt or not.

22      The question is whether you feel as though you

23  know so much about the subject matter of IT and computer

24  programming that you would find it difficult to abide by my

25  instruction, that you have to decide the case based just on

1    the testimony and evidence presented in the courtroom?

2    **PROSPECTIVE JUROR:**  I think it might be difficult.

3    There are -- the field of IT is a very wide field, so

4    there's a chance that I would have no idea of what any of

5    the things that are said.  But if it was something that was

6    involving projects or things that I'd worked -- that I'm

7    familiar with, it might be hard to shut off that part of my

8    thinking and be like, nope, we're not -- just look at what

9    happened in the courtroom, don't look at what you know about

10   it.  So I would hope so, yes.

11   **THE COURT:**  I realize the question is abstract,

12   because I don't know what the evidence is and you don't know

13   what the evidence is, and I'm asking you about this.  But it

14   is essential that the case be decided not based on the

15   expertise of a particular juror, but based on the evidence

16   that's actually presented in the courtroom.

17   Maybe what I ought to do is just let counsel

18   follow up with some additional questions, if they want to,

19   because they have a better idea of what some of the evidence

20   may get into.

21   Ms. Shields, anything you want to follow up with?

22   **MS. SHIELDS:**  Thank you, sir.  Just to follow up,

23   you said that you wouldn't be able to shut off that part of

24   your brain if there's discussions around computer coding; is

25   that right?

1    **PROSPECTIVE JUROR:**  If it was parts -- it was

2    stuff about code that I was familiar with, you know, the

3    processes of doing it -- because different languages are

4    very different than each other, have very different kind of

5    standard operating procedures.  So if it was something that

6    I'm not familiar with, it would be very easy to not have any

7    preconceived notions because I'm not familiar.  But if it's

8    something I'm intimately familiar with, it would probably be

9    more difficult to not have any preconceived notions.

10            I don't believe that it would be an issue with --

11    the things that I work with, I'm not sure how they would

12    relate to some of the -- when they were initially read, the

13    charges, I was like, okay, these are not things that I

14    regularly work with.

15        **MS. SHIELDS:**  And I don't want to cut you off, but

16    you mentioned not just the specific code but the processes

17    by which you, I guess, maintain code, if that makes sense.

18    Is that also something that you feel like you understand,

19    generally, how you're supposed to maintain code?

20            **PROSPECTIVE JUROR:**  Yes.

21        **MS. SHIELDS:**  You're familiar with those

22    processes?

23        **PROSPECTIVE JUROR:**  Yeah, kind of code hygiene,

24    having other people check your code, doing the -- having

25    kind of a stated procedure of doing that to make sure you

 1    don't put out untested code.

 2              **MS. SHIELDS:**  Thank you so much, sir.

 3              **THE COURT:**  Ms. Macey, any follow up?

 4              **MS. MACEY:**  Yes, Your Honor.  Sir, do you have any

 5    familiarity with a database called EDS, Enforcement Data

 6    System?

 7              **PROSPECTIVE JUROR:**  I do not.

 8              **MS. MACEY:**  What about a database by the acronym

 9    of PARIS, P-A-R-I-S?

10              **PROSPECTIVE JUROR:**  No.

11              **MS. MACEY:**  Thank you.

12              **THE COURT:**  Can I ask counsel to pick up the

13    phones for a second.

14         (Brief interruption)

15         (Prospective Juror No. 638 not present)

16              **THE COURT:**  Since the phones aren't working, go

17    ahead, Ms. Shields.

18              **MS. SHIELDS:**  Your Honor, the defense would move

19    to strike for cause.  When questioned about the processes,

20    including code hygiene, the potential juror said that he is

21    familiar with those processes, that he wouldn't be able to

22    disregard that information in the jury box.  So we think he

23    would be a candidate to strike.

24              **THE COURT:**  Ms. Macey.

25              **MS. MACEY:**  Your Honor, we would oppose that

1   motion.  The potential -- prospective juror did state that

2   when he made the comment about his mind not turning off, it

3   was in the context of being exposed to code that he was

4   familiar with.  In follow up questions, he said he has no

5   familiarity with the systems that will be presented in this

6   trial.  Therefore, the evidence suggests he will be

7   objective and follow the Court's instructions.

8           **THE COURT:**  I'm going to strike him for cause.

9   Quite frankly, when you start asking questions of that

10  detail to witnesses, you get the answers of that sort of

11  detail from a witness.  You know, he's indicated to the

12  Court that he is -- I think there's a risk he's going to

13  tell the jurors how it all works, and I think that's

14  problematic here.  So let's bring the juror back in, I'm

15  going to strike him for cause.

16      (Prospective Juror No. 638 present)

17          **THE COURT:**  So I am going to go ahead and dismiss

18  you.  I appreciate your candor about all of this.  You could

19  make a great and interesting witness, but I think, at the

20  end of the day, it probably makes sense to strike you as a

21  juror in this case.  So you're welcome to leave.  And I do

22  appreciate your service, so thank you.

23              **PROSPECTIVE JUROR:**  Thank you.

24          **THE COURT:**  Next we have Juror 93.  How are you

25  today?

1    **PROSPECTIVE JUROR:** Fantastic. How about

2    yourself?

3    **THE COURT:** I'm doing okay, thanks. You answered

4    yes to, I guess, about six of my questions, so let's just

5    run through these. First of all, you indicated that you, a

6    family member or a close friend have been detained by the

7    police, arrested, charged with a crime or investigated.

8    **PROSPECTIVE JUROR:** No, I'm sorry, I screwed that

9    one up.

10    **THE COURT:** Do you want me to read that again or

11    not?

12    **PROSPECTIVE JUROR:** Yeah, if you would.

13    **THE COURT:** The question was: Have you, a family

14    member or a close friend ever been detained by the police,

15    arrested or charged with a crime? Have you, a family member

16    or a close friend ever been investigated by a federal, state

17    or local law enforcement agency?

18    **PROSPECTIVE JUROR:** Federal. I have a security

19    clearance, so I've had a background check. So that's

20    probably why I marked that one.

21    **THE COURT:** What do you do?

22    **PROSPECTIVE JUROR:** I'm a computer programmer. I

23    work for the Navy mostly. Civilian, but I work for the

24    Navy.

25    **THE COURT:** And then you answered yes to 21 about

1    whether you, a family member or a close friend had been a

2    victim of a crime.

3        **PROSPECTIVE JUROR:**  Victim of a crime, no --

4        **THE COURT:**  Have you, a family member or a close

5    friend been the victim of a crime?

6        **PROSPECTIVE JUROR:**  I incorrectly marked that one,

7    I apologize.

8        **THE COURT:**  No worries.  So the question right

9    after that one was:  Have you, a family member or a close

10   friend had any legal training or worked in a law office?

11       **PROSPECTIVE JUROR:**  That's the one I was probably

12   trying to mark.

13       **THE COURT:**  Okay.  Tell me about that.

14       **PROSPECTIVE JUROR:**  My -- I call him my

15   stepbrother, the family I live with, my brother -- and he

16   was also a roommate at the time, is a lawyer.

17       **THE COURT:**  What sort of law?

18       **PROSPECTIVE JUROR:**  Immigration.

19       **THE COURT:**  Anything about your knowledge of that

20   or conversations with him that would affect your role as a

21   juror in this case?

22       **PROSPECTIVE JUROR:**  No, not at all.

23       **THE COURT:**  And then you answered yes to whether

24   you've ever been a witness in a case or a party.

25       **PROSPECTIVE JUROR:**  I have had to -- when they

1  question you before a case.  Partners in a software company

2  I worked at --

3          **THE COURT:**  Oh, a deposition?

4          **PROSPECTIVE JUROR:**  A deposition, thank you.  I

5  apologize.  I didn't know if that qualified or not.

6          **THE COURT:**  Yeah, it does.  Tell me about that.

7  What was the case about?

8          **PROSPECTIVE JUROR:**  There were three primary

9  partners.  Two of them were basically firing one to kick him

10  off, kick him out of the company.

11          **THE COURT:**  Were you a partner in the firm?

12          **PROSPECTIVE JUROR:**  I was -- yeah, I was a class B

13  partner, if you will, or class B member.  So I was one of

14  the people that had testified -- or at least go to the

15  deposition.

16          **THE COURT:**  I see, okay.  And was there anything

17  about that experience that would affect your ability to be a

18  fair and impartial juror here?

19          **PROSPECTIVE JUROR:**  No.

20          **THE COURT:**  Did that case have anything to do with

21  the -- not the ownership of the firm itself, but the

22  ownership of particular IP?

23          **PROSPECTIVE JUROR:**  No, it was the firm itself.

24          **THE COURT:**  And you indicated that you've been a

25  victim of identity theft.

1    **PROSPECTIVE JUROR:**  My wife has, also my family

2    has.  I have not.

3    **THE COURT:**  What happened there?

4    **PROSPECTIVE JUROR:**  They filed for her tax returns

5    and as well, I think, for unemployment benefits.

6    **THE COURT:**  In this case, as you know, one of the

7    allegations in it is aggravated identity theft.  Would your

8    wife's experience have any impact on your role as a juror in

9    this case?

10    **PROSPECTIVE JUROR:**  I don't think so, no.

11    **THE COURT:**  Then I think you've already touched on

12    this a second ago, but do you have any experience with

13    software programming or development or with working in the

14    information -- with working in information technology more

15    generally?

16    **PROSPECTIVE JUROR:**  Yes, that's pretty much my

17    career.

18    **THE COURT:**  Tell me what you do.

19    **PROSPECTIVE JUROR:**  I design sonar systems for the

20    Navy mostly.

21    **THE COURT:**  Say again.

22    **PROSPECTIVE JUROR:**  Sonar systems for the Navy.

23    So I've done computer programming for 25 or 30 years.  I've

24    done IT support, been in small companies so I've been the IT

25    department.  That's pretty much what I do.

 1          **THE COURT:**  Okay.  You also answered yes to the

 2     question about whether you have experience with an Office of

 3     the Inspector General.

 4          **PROSPECTIVE JUROR:**  Not the inspector general, I

 5     thought it was a long --

 6          **THE COURT:**  Yeah, there was a long list.

 7          **PROSPECTIVE JUROR:**  About federal departments.  So

 8     I've worked with the Department of the Navy and a variety of

 9     federal groups like that.

10          **THE COURT:**  Where did you work before the Navy?

11          **PROSPECTIVE JUROR:**  I didn't, this is my first

12     grown-up job.

13          **THE COURT:**  I'm sorry?

14          **PROSPECTIVE JUROR:**  This is my first job.  My

15     whole career I've worked for the Navy as a contractor, but

16     I've worked for the Navy and with various groups that are

17     federal agencies.

18          **THE COURT:**  Are you involved in any way in the

19     contracting with the Navy for your services or is that

20     someone else who does the contracting?

21          **PROSPECTIVE JUROR:**  Someone else does all that.

22          **THE COURT:**  As I understand it, what you're doing

23     is writing software that is used for sonar systems?

24          **PROSPECTIVE JUROR:**  That's correct.

25          **THE COURT:**  Have you done any other type of

1    programming for the Navy?

2             PROSPECTIVE JUROR:  No, that's been pretty much

3    it.

4             THE COURT:  Ms. Shields, any follow up?

5             MS. SHIELDS:  Good afternoon, sir.

6             PROSPECTIVE JUROR:  Good afternoon.

7             MS. SHIELDS:  First you mentioned that -- I think

8    you said your brother-in-law or roommate?

9             PROSPECTIVE JUROR:  Yes, I lived with a different

10   family in high school, so I consider him a stepbrother.  He

11   was also my roommate in college and my roommate after

12   college when he was working on the Hill here.

13            MS. SHIELDS:  You said he's an immigration

14   attorney; is that right?

15            PROSPECTIVE JUROR:  He is.

16            MS. SHIELDS:  Okay.  Is he in defense or does he

17   work for DHS?

18            PROSPECTIVE JUROR:  No, he works for some big law

19   firm now.  But when he was here, he worked for some House

20   commission, committee.  I don't know which one.

21            MS. SHIELDS:  Turning to the work that you do for

22   the Navy.  You said you're a software programmer.  Are you

23   involved in writing the code then that is used for the sonar

24   tracking?

25            PROSPECTIVE JUROR:  Yes.

1      **MS. SHIELDS:**  And are you involved in -- in terms

2  of writing the code, are there certain guidelines or any

3  kind of rules and regulations around how to maintain that

4  code?

5      **PROSPECTIVE JUROR:**  Yes.

6      **MS. SHIELDS:**  What are some of those things?  It

7  sounds like there's a lot.

8      **PROSPECTIVE JUROR:**  Yeah, and it depends program

9  to program.  A lot of them are just removing dead code, if

10  you will, stuff that shouldn't be there anymore.  From a

11  security standpoint, we have a lot of rules about how we

12  handle the data and process it, what we can send to other

13  people and how we do it.  But there are a variety of things

14  like that.

15      **MS. SHIELDS:**  Have you ever -- you, or anyone else

16  you know, ever gotten into some issue with code hygiene,

17  essentially where it's transferred in a way it shouldn't be?

18      **PROSPECTIVE JUROR:**  Yes.

19      **MS. SHIELDS:**  Was that you or someone else?

20      **PROSPECTIVE JUROR:**  No, not me.  We'll call them a

21  data spill where somebody e-mails something that turns out

22  probably was classified, so we've got to take everyone's

23  laptop and things like that.

24      **MS. SHIELDS:**  Do you know the person that was

25  involved in that?

1        **PROSPECTIVE JUROR:**  It's happened dozens of times.

2   I've been doing this for 25, 30 years.

3        **MS. SHIELDS:**  Do you have any views about people

4   that sort of are involved in these data spills where

5   classified information is shared?

6        **PROSPECTIVE JUROR:**  Most of them are just

7   mistakes, it wasn't like an intent.  I don't have anything

8   bad to say about them or think about them.

9        **MS. SHIELDS:**  You said you've worked for the Navy

10  for your entire career; is that right?

11       **PROSPECTIVE JUROR:**  Uh-huh.

12       **MS. SHIELDS:**  Have you always been sort of in this

13  software IT space with the Navy?

14       **PROSPECTIVE JUROR:**  Yes.

15       **MS. SHIELDS:**  And how long has that been?

16       **PROSPECTIVE JUROR:**  '94, so 28 years if my math

17  works out.

18       **MS. SHIELDS:**  Have your roles and responsibilities

19  changed?

20       **PROSPECTIVE JUROR:**  Sure.  I've had a variety of

21  jobs from the entry level programmer to a manager to now I

22  do more system integration.

23       **MS. SHIELDS:**  Do you have people that are

24  reporting to you, then?

25       **PROSPECTIVE JUROR:**  Not anymore, I work for a

1    company of one, so just myself.  So I don't -- as a

2    technical lead, a lot of times I have people that report to

3    me, but not in a managerial way.

4              **MS. SHIELDS:**  Thank you so much.

5              **PROSPECTIVE JUROR:**  You're welcome.

6              **THE COURT:**  Ms. Macey?

7              **MS. MACEY:**  No questions.

8              **THE COURT:**  Thank you.

9              So we have Juror 978 who has an oral argument in

10   the U.S. District Court of Minnesota on April 6th on a

11   motion to dismiss; is that right?

12             **PROSPECTIVE JUROR:**  That is correct.

13             **THE COURT:**  Is that argument in-person or remote?

14             **PROSPECTIVE JUROR:**  It is actually in-person.  But

15   prior to coming in, I did ask my assistant to confirm that

16   it is still, in fact, scheduled and will be in-person.

17             **THE COURT:**  Did your assistant confirm that?

18             **PROSPECTIVE JUROR:**  She's looking into it now.

19             **THE COURT:**  Maybe the thing for us to do then is

20   to wait until you hear back from her about that, and then I

21   can bring you back in.  So if you can just maybe let the

22   clerk know when you hear back from your assistant about just

23   whether the argument is going forward or not, that would be

24   helpful.

25             **PROSPECTIVE JUROR:**  Okay.  Thank you.

1          **THE COURT:**  Okay, thanks.

2          I have Juror 1578, and you answered yes to three

3   of my questions.  You first -- or last indicated that you, a

4   family member or a close friend have worked for one of that

5   long list of agencies or organizations that I mentioned.  Do

6   you want to let us know what you had in mind?

7          **PROSPECTIVE JUROR:**  Yeah, I work for the Defense

8   Department.

9          **THE COURT:**  You work for DoD?

10         **PROSPECTIVE JUROR:**  Yes.

11         **THE COURT:**  What do you do there?

12         **PROSPECTIVE JUROR:**  I'm a mathematician.

13         **THE COURT:**  Do you do any coding for the

14  Department of Defense?

15         **PROSPECTIVE JUROR:**  Yes.  That's also why I

16  answered yes to your question 16, I believe it was.

17         **THE COURT:**  Tell us about what you do.

18         **PROSPECTIVE JUROR:**  I do various software

19  development.  I mostly implement algorithms to advance the

20  mission of the Defense Department.  So sort of analyzing

21  quantities of data to try to find intelligence and patterns.

22         **THE COURT:**  How long have you done that for?

23         **PROSPECTIVE JUROR:**  Well, I guess my current role

24  is just about a year, but I've worked for DoD for a total of

25  about 10 years now.

1          **THE COURT:**  Have you been doing computer coding

2    throughout that period of time?

3          **PROSPECTIVE JUROR:**  Yes.

4          **THE COURT:**  What other types of coding have you

5    done, other than what you've just described?

6          **PROSPECTIVE JUROR:**  I've also worked on

7    cryptography projects, so either implementing cryptographic

8    algorithms or studying weaknesses in those algorithms.

9          **THE COURT:**  What's your degree in?

10          **PROSPECTIVE JUROR:**  Mathematics.

11          **THE COURT:**  Is that an advanced degree?

12          **PROSPECTIVE JUROR:**  Yes, I have a PhD.  And then

13    I'll mention one other -- I don't know if it's relevant, but

14    one other job that I've had is, about seven years ago, I

15    worked for a company called Pindrop Security in Atlanta.

16    And at that company, I also did coding for them.  And that

17    company is involved in trying to identify instances of

18    financial fraud, and help financial institutions prevent

19    fraud.

20          **THE COURT:**  Have you ever worked with the DoD

21    Office of Inspector General in any way?

22          **PROSPECTIVE JUROR:**  No, I have not.

23          **THE COURT:**  Have you done any type of coding that

24    is more administrative in nature that relates to just how

25    the Department of Defense, or any agencies in the Department

1   of Defense, handle employment matters or things of that

2   nature?

3          **PROSPECTIVE JUROR:**  No, I have not.

4          **THE COURT:**  And then you answered yes to question

5   seven, I think, which was whether you were aware of any of

6   those individuals that I listed.

7          **PROSPECTIVE JUROR:**  Yes, and I just -- the

8   specific two that I was -- that I know of are Senator

9   Johnson and former Senator McCaskill that you mentioned,

10  both just general awareness.  I have friends and family who

11  are constituents or former constituents of those senators.

12  And I worked during 2020 -- I did a fellowship where I was a

13  staff member for the Senate, and so I became pretty aware

14  of, certainly, Senator Johnson during my time there.

15         **THE COURT:**  But I take it you didn't work

16  personally with either of them?

17         **PROSPECTIVE JUROR:**  No.

18         **THE COURT:**  Did you work with either of those

19  offices?

20         **PROSPECTIVE JUROR:**  No.  Oh, and I also did want

21  to mention -- because I forgot the question number by the

22  time it occurred to me, the question about do you have

23  family members who are attorneys.  My brother-in-law is an

24  attorney for the city of Allentown, Pennsylvania.

25         **THE COURT:**  What sort of work does he do there?

```
 1             PROSPECTIVE JUROR:  He represents the city in

 2    civil proceedings.  So if there's a civil action where the

 3    city is a party, he may do research and litigation on behalf

 4    of the city.

 5             THE COURT:  Anything about your relationship with

 6    him that could affect your role as a juror here?

 7             PROSPECTIVE JUROR:  I don't believe so, no.

 8             THE COURT:  In addition -- or beyond your service

 9    in the Department of Defense, any other close friends or

10    family members who work for government agencies?

11             PROSPECTIVE JUROR:  Well, I don't know, is the

12    D.C. District government included in your list?

13             THE COURT:  That was within my question, yeah.

14             PROSPECTIVE JUROR:  Okay.  My wife is an

15    elementary school teacher for the District of Columbia, and

16    my sister works in the Health Services Department of the

17    District government.

18             THE COURT:  What does your sister do?

19             PROSPECTIVE JUROR:  She's the long term care

20    director for D.C.

21             THE COURT:  Okay.  Ms. Macey, any follow up?

22             MS. MACEY:  Yes, Your Honor.  Good afternoon, sir.

23             PROSPECTIVE JUROR:  Hi.

24             MS. MACEY:  Would the software that you work on at

25    DoD, is that all proprietary to DoD?
```

1    **PROSPECTIVE JUROR:** It's a mix. So we do develop

2    some government off-the-shelf software, but we also work on

3    open source tools as well.

4    **MS. MACEY:** And for either sort of software, are

5    there rules and regulations that govern how you can handle

6    or transfer or use the software?

7    **PROSPECTIVE JUROR:** Oh yes, very much so. And in

8    fact, most of the software that we develop internally is not

9    just governed by those sorts of rules, but it may well be

10   classified, which further limits its possible distribution.

11   **MS. MACEY:** With your sort of work, do you work

12   individually on your projects or do you work with

13   colleagues?

14   **PROSPECTIVE JUROR:** Well, in my current team, I'm

15   mostly collaborating with colleagues. I'm in a technical

16   leadership position, so I'm sort of supervising a team of

17   developers that are doing most of the actual coding.

18   **MS. MACEY:** Okay. Thank you very much.

19   **THE COURT:** Ms. Shields?

20   **MS. SHIELDS:** Good afternoon, sir.

21   **PROSPECTIVE JUROR:** Hi.

22   **MS. SHIELDS:** We suspect that the evidence in this

23   case will relate to software and coding, and particularly

24   issues around code hygiene, whether or not code was

25   safeguarded in the way that it should have been. Do you

 1  || have some familiarity with those issues?

 2  ||          **PROSPECTIVE JUROR:**  Yes.

 3  ||          **MS. SHIELDS:**  Do you think that the fact that you

 4  || have some familiarity with those issues, that that would

 5  || somehow affect how you looked at the evidence?  Or when you

 6  || were listening to witnesses testify, would that -- would you

 7  || have views about their testimony?

 8  ||          **PROSPECTIVE JUROR:**  Well, I mean, I guess it

 9  || could.  I don't know if I would be instructed to sort of

10  || forget all of my own personal experience with code hygiene

11  || by the Court.

12  ||          **THE COURT:**  So you would be instructed to decide

13  || the case based only on the evidence presented in the

14  || courtroom.  I suppose the question for you is whether you

15  || feel as though that's something you could do?

16  ||          **PROSPECTIVE JUROR:**  I think I could follow that

17  || instruction.

18  ||          **MS. SHIELDS:**  You said you think you could follow

19  || the instruction to listen to the evidence that's presented

20  || to you?

21  ||          **PROSPECTIVE JUROR:**  To make a decision purely on

22  || the basis of what is presented in the court, and not based

23  || on any of my prior experience with code hygiene or the other

24  || issues you raised.

25  ||          **MS. SHIELDS:**  I'm going to rephrase that slightly.

1    If there are issues in the case that suggest that certain

2    individuals were not being as diligent as they needed to be,

3    or there is language around certain processes with which you

4    might have familiarity, do you feel like you would bring

5    that to bear in assessing evidence?

6        **PROSPECTIVE JUROR:**  I believe I can be unbiased in

7    evaluating the evidence that is presented.

8        **MS. SHIELDS:**  Is there a chance in which, because

9    you do know this, that that would be something -- if the

10    jurors had questions about certain things related to code

11    hygiene, would you feel like, oh, I can answer that

12    question?

13        **PROSPECTIVE JUROR:**  I feel like I could, but I

14    don't know if -- you know, I would seek guidance from the

15    Court about whether I would be permitted to.

16        **MS. SHIELDS:**  Understood, thank you so much.  I

17    just wanted to understand, I'm sorry, a bit more.  You, I

18    know, are working for DoD.  Is that contracting?

19        **PROSPECTIVE JUROR:**  No, I'm a civilian employee of

20    DoD.

21        **MS. SHIELDS:**  How long have you been there?

22        **PROSPECTIVE JUROR:**  About 10 years total, but with

23    a break in between, like I mentioned, to work for the

24    software company in Atlanta.

25        **MS. SHIELDS:**  Thank you so much, sir.

 1          **THE COURT:**  Thank you.

 2          Now we have Juror 118.  I just want to run through

 3   the answers that you gave to my questions.  Question 27 was

 4   the one where I rattled off that long list of organizations

 5   and asked if you or a close friend or relative worked for

 6   one of them.

 7          **PROSPECTIVE JUROR:**  I don't recall the

 8   organizations, I'm sorry.

 9          **THE COURT:**  So it was a federal agency -- any type

10   of federal, state or local law enforcement agency, a local,

11   state or federal prosecutor, a public defender, private

12   criminal defense firm or a penal institution.  Does that

13   ring bells now?

14          **PROSPECTIVE JUROR:**  Yes.

15          **THE COURT:**  So what did you have in mind on that?

16          **PROSPECTIVE JUROR:**  So I was an AUSA here in D.C.

17   from 2000 to 2009.

18          **THE COURT:**  I'm sorry, 2000 to 2009?

19          **PROSPECTIVE JUROR:**  Yes.

20          **THE COURT:**  What do you do now?

21          **PROSPECTIVE JUROR:**  I now work for a multinational

22   directing their investigations.

23          **THE COURT:**  I see.  Did you work in the criminal

24   section or the civil side?

25          **PROSPECTIVE JUROR:**  The criminal side.

1           **THE COURT:**  What sort of cases did work on?

2           **PROSPECTIVE JUROR:**  Sex offense and domestic

3     violence.

4           **THE COURT:**  Domestic violence, and what was the

5     first thing?

6           **PROSPECTIVE JUROR:**  Sex offense.

7           **THE COURT:**  Okay.

8           **PROSPECTIVE JUROR:**  Fraud and Public Corruption,

9     and general felonies for a brief period of time.

10          **THE COURT:**  Can you tell us what you did with

11    Fraud and Public Corruption?

12          **PROSPECTIVE JUROR:**  Sure.  I handled the standard

13    portfolio of a rotator in that organization, and handled

14    some mortgage fraud, some personal identity theft cases,

15    some wire fraud cases, things like that.

16          **THE COURT:**  And did you work with the Public

17    Integrity Section at the Main Justice?

18          **PROSPECTIVE JUROR:**  No.

19          **THE COURT:**  And given the fact that you were until

20    2009 a prosecutor, do you feel as though you could

21    nonetheless be a fair and impartial juror in a criminal

22    case?

23          **PROSPECTIVE JUROR:**  I do.  I did continue to work

24    for the Department of Justice afterwards, but in a different

25    role.

1          **THE COURT:**  Where did you go next?

2          **PROSPECTIVE JUROR:**  I went to the White House

3    briefly, and then to the Office of Legal Policy at DOJ.

4          **THE COURT:**  Were you doing criminal law policy at

5    OLP?

6          **PROSPECTIVE JUROR:**  Some.

7          **THE COURT:**  And given the fact that this table's

8    going to have lawyers from the Justice Department at it,

9    would you be able to treat them no better or no worse than

10   the folks who are sitting over at the defense table?

11         **PROSPECTIVE JUROR:**  I would be able to treat them

12   no better or no worse, yes.

13         **THE COURT:**  I'm sorry?

14         **PROSPECTIVE JUROR:**  Yes.

15         **THE COURT:**  And tell us a little bit more about

16   what you're doing now.

17         **PROSPECTIVE JUROR:**  I head the investigations team

18   for my company, which is a global company.  I manage a team

19   that investigates all employee misconduct and handles all

20   government inquiries.

21         **THE COURT:**  Government what?

22         **PROSPECTIVE JUROR:**  Inquiries.

23         **THE COURT:**  So are you doing foreign corrupt

24   practice type of stuff, that type of thing?

25         **PROSPECTIVE JUROR:**  Yes.

1       **THE COURT:** And beyond yourself, any close friends

2 or family members who work for the federal government?

3       **PROSPECTIVE JUROR:** My husband works for the

4 Department of Justice.

5       **THE COURT:** What does he do there?

6       **PROSPECTIVE JUROR:** He's in the environmental

7 division in their appellate section.

8       **THE COURT:** Does he do criminal cases?

9       **PROSPECTIVE JUROR:** Occasionally.

10       **THE COURT:** Anyone else?

11       **PROSPECTIVE JUROR:** No.

12       **THE COURT:** And then you answered yes to the

13 question of whether you have worked in a law firm or have

14 legal training. You've answered that somewhat with respect

15 to you and your husband. Anyone else?

16       **PROSPECTIVE JUROR:** I mean, yes, like other

17 members of my extended family are lawyers.

18       **THE COURT:** Anyone else that does criminal law?

19       **PROSPECTIVE JUROR:** No.

20       **THE COURT:** And despite the fact that you've

21 worked as an AUSA and have legal training, would you be able

22 to strictly follow the law as I instruct you on the law?

23       **PROSPECTIVE JUROR:** Yes.

24       **THE COURT:** And then you answered yes to the

25 question about whether you've been a witness in a case or a

1    party.

2              **PROSPECTIVE JUROR:**  A party.

3              **THE COURT:**  What happened?

4              **PROSPECTIVE JUROR:**  I am a party to a current case

5    trying -- involving a trust where the administrator of the

6    trust is not serving their purpose.  So it's a family

7    matter.

8              **THE COURT:**  Are you trying to just remove the

9    trustee, is that it?

10             **PROSPECTIVE JUROR:**  Correct.

11             **THE COURT:**  Anything about that that could have

12   any effect on your views of this case?

13             **PROSPECTIVE JUROR:**  No.

14             **THE COURT:**  You said yes to 17 about whether

15   you've been a victim of identity theft.  Tell us about that.

16             **PROSPECTIVE JUROR:**  Nothing more than being

17   notified that I have -- that my information has been taken,

18   and therefore requires --

19             **THE COURT:**  Anything about that that could affect

20   your views in this case, understanding that there's an

21   allegation of aggravated identity theft?

22             **PROSPECTIVE JUROR:**  No.

23             **THE COURT:**  And then you answered yes to whether

24   you have any experience with software programming or

25   development or working in the IT field.

1              **PROSPECTIVE JUROR:**  Just that my company is an IT

2    company, not particularly that I have technical knowledge.

3              **THE COURT:**  In your role working in the IT

4    company, have you been involved in any disputes with respect

5    to either ownership or theft of IP or IT?

6              **PROSPECTIVE JUROR:**  Only misuse of IT, not theft

7    of IT.

8              **THE COURT:**  Can you just give us an example of

9    what you mean by misuse?

10             **PROSPECTIVE JUROR:**  Use of computers to access

11   material that shouldn't be accessed, either because it is

12   not permitted by our company policies or not permitted by

13   law.

14             **THE COURT:**  And then you indicated you have

15   experience with an Office of Inspector General.

16             **PROSPECTIVE JUROR:**  No, only through being an

17   AUSA.  Otherwise, no.

18             **THE COURT:**  When you were an AUSA, did you have

19   any -- did you work on any cases with an OIG?

20             **PROSPECTIVE JUROR:**  Yes, I'm quite certain that I

21   did.

22             **THE COURT:**  Did you work on any cases with the

23   Office of Inspector General from the Department of Homeland

24   Security?

25             **PROSPECTIVE JUROR:**  No, I don't believe so.

1          **THE COURT:**  Finally, you answered yes to the

2     question about whether you know anyone on my staff.

3          **PROSPECTIVE JUROR:**  You know, I figured it was

4     better to disclose it in an abundance of caution.  I was

5     involved in your nomination and confirmation process in a

6     small way.

7          **THE COURT:**  That's fair enough.  So whose turn is

8     it now, Mr. Salgado?

9          **MR. SALGADO:**  Your Honor, no questions from the

10    government.

11         **THE COURT:**  Ms. Shields?

12         **MS. SHIELDS:**  Good afternoon.  You mentioned that

13    you were an AUSA from 2000 to 2009, is that correct, in the

14    Fraud and Public Corruption section?

15         **PROSPECTIVE JUROR:**  Not all of it was in the Fraud

16    and Public Corruption section, but some of it, yes.

17         **MS. SHIELDS:**  Do you maintain any relationships

18    with any supervisors that are currently in FPC?

19         **PROSPECTIVE JUROR:**  No.

20         **MS. SHIELDS:**  Do you maintain any relationships

21    with anybody else, friendly or not, who's currently at the

22    U.S. Attorney's Office?

23         **PROSPECTIVE JUROR:**  No.

24         **MS. SHIELDS:**  The Judge named a number of people

25    that were involved in this matter, including names from both

1  the prosecution and the defense.  Do you recall whether or

2  not you're familiar with any of those names?

3              **PROSPECTIVE JUROR:**  No.

4              **MS. SHIELDS:**  Thank you very much.

5              **THE COURT:**  Thank you.

6         So we're going to bring back that one juror who

7  had the oral argument in Minnesota, talk to her and then

8  we'll take our break.  I'll let you make a motion after we

9  do this, if you'd like to.

10     (Prospective Juror No. 978 present)

11             **THE COURT:**  So what did you find out?

12             **PROSPECTIVE JUROR:**  I confirmed that the hearing

13  is April the 6th at 8:30 in the District Court of Minnesota.

14             **THE COURT:**  Any objection?

15             **MR. SALGADO:**  No objection.

16             **MS. SHIELDS:**  No objection.

17             **THE COURT:**  I'm going to go ahead and dismiss you.

18  Good luck with your oral argument.  Thank you for being

19  here.  You're welcome to leave.

20             **PROSPECTIVE JUROR:**  Thank you.  I will need that

21  luck.

22     (Prospective Juror 978 not present)

23             **THE COURT:**  Ms. Shields.

24             **MS. SHIELDS:**  Thank you.  Your Honor, defense

25  would move to strike Juror 118 on the grounds that she

 1    previously worked as an AUSA in the Fraud and Public

 2    Corruption section at the U.S. Attorney's Office.  FPC is

 3    bringing this case.  Ms. Macey is a member of FPC.  And

 4    while she did state, Your Honor, that she could follow Your

 5    Honor's instructions, at this point, given the fact that she

 6    had significant time both at the U.S. Attorney's Office and

 7    at the Department of Justice, the defense would have

 8    concerns.

 9            I should also note, which is separate from the

10    strike, Juror 118 did hire one of the members of this team.

11    I don't think she recognized Ms. Ohrtman, but she did hire

12    Ms. Ohrtman.

13            **THE COURT:**  Hire her for what?

14            **MS. SHIELDS:**  For a position, when Ms. Ohrtman

15    worked at OLP.

16            **THE COURT:**  I see, okay.  Mr. Salgado.

17            **MR. SALGADO:**  Judge, the government will oppose

18    their motion.  The juror was very clear in that she can

19    follow instructions.  This employment with FPC was 13 years

20    ago.  She maintains no connections there.  She's still very

21    much an officer of the Court.  And obviously when she

22    answered that she can follow instructions and remain

23    impartial, that representation has value.  And she knows

24    that when she makes it, she means it.  So we would oppose

25    that motion, Your Honor.

1            **THE COURT:** I'm going to deny the motion to strike

2  this juror. It has been many, many years since she was

3  there. Quite frankly, I was impressed by her candor. And I

4  actually -- she did impress me, along the lines of what

5  Mr. Salgado said, as someone who takes her obligations

6  seriously. She told me she thought she can be fair and

7  impartial, and I think she can be. She has been working, in

8  some sense, as a defense attorney for many years now as

9  well. I don't have any reason to doubt that she can be a

10 fair and impartial juror, so I'm going to deny the motion.

11         Yes?

12         **MS. SHIELDS:** Your Honor, one additional request.

13 Would it be possible to recall the juror ending 93? The

14 defense did fail to ask a couple of follow up questions to

15 that juror. If Your Honor recalls, this is a juror that

16 worked in software engineering for the Department of Navy.

17 That was my error in not asking him some follow-up

18 questions.

19         **THE COURT:** What did you want to ask him?

20         **MS. SHIELDS:** I wanted to ask him the questions

21 along the lines of the questions that were asked to both the

22 prior juror and the juror ending 1578, with respect to the

23 fact he has personal knowledge around software coding. And

24 given the fact that the evidence will address software

25 coding, if he could follow Your Honor's instructions and not

1    let his own personal experience infect his view of the

2    evidence or in discussions with jurors.

3         **THE COURT:**  I thought he said that on his own.  I

4    mean, I thought he volunteered that and said that he thought

5    he could do that.

6         **MS. SHIELDS:**  I don't recall that, Your Honor.  I

7    don't recall him being -- explicitly saying:  You do have

8    this personal knowledge, will you have an impartial view of

9    the evidence.  I don't know if others recall that and I

10   missed that, but I do not.

11        **THE COURT:**  I thought he did, but I will during

12   the -- we'll take the lunch break now, and I can actually

13   look back at the transcript and confirm that.  But I think

14   he said that he felt that he could do that.

15        **MS. SHIELDS:**  Thank you, Your Honor.

16        **THE COURT:**  I also think, quite frankly, that

17   there's a difference between somebody who is working for the

18   military, where there are just very different rules that

19   apply with respect to protection of information, than there

20   are for people who are working for other agencies where the

21   rules are just very different.  So my take on someone who

22   works in the military -- and I think he talked about, for

23   example, classified information and protection of classified

24   information, which is a different thing.  But I'll look at

25   the transcript and confirm he did give the answer that I

1    think he did with respect to that.

2    And I have to say, I realize that people who have

3    coding experience, there's a need to ask somewhat deeper

4    questions.  I do worry a little bit not -- really from both

5    sides, that there was starting to be a windup of arguments

6    to the jury rather than actually asking questions to

7    determine whether people could be fair jurors:  If you knew

8    the evidence in this case showed such and such, what would

9    your impression be of that.  I think that's going -- I don't

10   mean to be targeting that at you, Ms. Shields, but that does

11   concern me when people start to ask questions like that.  So

12   I just think we need to be careful.  And I understand you

13   need to explore those points, but there's a fine line there

14   as well.

15         **MS. SHIELDS:**  Understood, Your Honor.

16         **THE COURT:**  Okay, thank you.  So let's go ahead

17   and take our lunch break now.  We'll come back at -- have we

18   sent the jurors to lunch yet, Kristin?

19         **DEPUTY CLERK:**  No.

20         **THE COURT:**  No, okay.  So let's come back at

21   2:15 then.  I want to build in a little extra time for the

22   jurors since the cafeteria will get crowded.  Okay, so I

23   will see you all then.

24         (Lunch recess taken at 1:05 p.m.)

25

1                    **C E R T I F I C A T E**

2

3                I, **Jeff M. Hook, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9        April 30, 2024

10            **DATE**                        **Jeff M. Hook**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A0820**