ORAL ARGUMENT NOT YET SCHEDULED

No. 24-3021

# In the United States Court of Appeals for the District of Columbia Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*

v.

MURALI YAMAZULA VENKATA,
*Defendant-Appellant*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
D. CT. NO. 1:20-CR-00066-RDM-2 (MOSS, J.)

APPELLEE'S BRIEF FOR THE UNITED STATES

JEANINE F. PIRRO
United States Attorney

CHRISELLEN R. KOLB
Appellate Chief
District of Columbia

A. TYSEN DUVA
Assistant Attorney General

JOSH A. GOLDFOOT
Deputy Assistant Attorney General

CELIA CHOY
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 535-7384
Celia.Choy@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. R. 28(a)(1), the government certifies as follows:

### A. Parties and Amici

The parties who appeared in the district court and in this Court on appeal are the United States of America (Plaintiff-Appellee) and Murali Yamazula Venkata (Defendant-Appellant). There are no intervenors or amici.

### B. Rulings Under Review

Venkata appeals the judgment of conviction entered by the district court on February 9, 2024, in his criminal case, *United States v. Venkata*, No. 1:20-cr-66 (Moss, J.). App.455-62. He seeks review of the district court's memorandum opinion and order, entered January 3, 2024, (1) denying his motion for a new trial on the ground that the district court declined to give his requested theory-of-defense instruction, App.447-53; and (2) denying his motion for judgment of acquittal on the conspiracy to defraud the United States and wire fraud counts on the ground that the government introduced insufficient evidence of materiality, App.398-13. The district court's order is reported at 709 F. Supp. 3d 9. Venkata also

contends, for the first time on appeal, that the district court's instructions regarding aiding and abetting, App.2461-62, 2466, were erroneous and raises additional challenges to the sufficiency of the evidence that were neither raised nor ruled upon below.

### C. Related Cases

This case has not previously been before this Court. The government is not aware of any related cases.

s/ Celia Choy
CELIA CHOY
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES .......... i

TABLE OF CONTENTS .......... iii

TABLE OF AUTHORITIES .......... vi

GLOSSARY OF ABBREVIATIONS .......... xii

JURISDICTIONAL STATEMENT .......... 1

ISSUES PRESENTED .......... 1

STATEMENT OF STATUTES AND REGULATIONS .......... 1

STATEMENT OF THE CASE .......... 2

I. Procedural history .......... 2

II. Statement of facts .......... 4

A. The Offices of Inspector General and their case management systems .......... 4

B. Venkata, Edwards, and Patel scheme to develop a commercial case management system using stolen government software and sell that system back to the government .......... 8

C. Venkata lies to investigators and deletes relevant communications from his phone .......... 15

D. The Offices of Inspector General incur remediation costs and operational and reputational harm as a result of the scheme .......... 18

SUMMARY OF ARGUMENT .......... 19

ARGUMENT .......... 22

I. The district court did not err in declining to give Venkata's proposed theory-of-defense instruction .......... 22

A. Background ........................................................ 22

B. Standard of review ................................................ 28

C. No evidence supported Venkata's proposed "apparent authority" instruction ........................................ 28

D. The instructions as delivered adequately conveyed the substance of the requested instruction .................. 32

E. Any error was harmless in light of the overwhelming evidence that Venkata knew that his conduct was unauthorized .................................. 36

II. The district court correctly instructed the jury on aiding and abetting .................................................. 37

A. Background ........................................................ 38

B. Standard of review ................................................ 40

C. The district court's aiding-and-abetting instructions were not erroneous, much less plainly so .................................................................. 42

III. Ample evidence supported Venkata's fraud convictions ........................................................ 50

A. Background ........................................................ 50

B. Standard of review ................................................ 53

C. The government presented sufficient evidence that the interstate wire furthered the fraud scheme .......... 54

D. The government presented sufficient evidence that the conspirators committed fraud through misleading half-truths ............................................ 57

E. The government presented sufficient evidence that the misleading half-truths were material .................. 59

CONCLUSION ........................................................................................ 63

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Badders v. United States*,
20 U.S. 391 (1916) .......... 55

*Belton v. United States*,
382 F.2d 150 (D.C. Cir. 1967) .......... 28

*Borochov v. Islamic Republic of Iran*,
94 F.4th 1053 (D.C. Cir. 2024) .......... 43

*Byrd v. United States*,
342 F.2d 939 (D.C. Cir. 1965) .......... 48

*Dubin v. United States*,
599 U.S. 110 (2023) .......... 3

*Gray v. United States*,
260 F.2d 483 (D.C. Cir. 1958) .......... 43, 46

*Greer v. United States*,
593 U.S. 503 (2021) .......... 48

*Griffin v. United States*,
502 U.S. 46 (1991) .......... 62

*Kousisis v. United States*,
605 U.S. 114 (2025) .......... 51, 59, 60, 61

*Laughlin v. United States*,
385 F.2d 287 (D.C. Cir. 1967) .......... 35

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024) .......... 58

*Molina-Martinez v. United States*,
578 U.S. 189 (2016) .......... 42

*Murchison v. United States*,
486 A.2d 77 (D.C. 1984) .......... 46

*Neder v. United States*,
527 U.S. 1 (1999) .......... 48

*Rosales-Mireles v. United States*,
585 U.S. 129 (2018) .......... 42

*Schmuck v. United States*,
489 U.S. 705 (1989) .......... 55, 56

*Strickland v. United States*,
332 A.2d 746 (D.C. 1975) .......... 46

*United States v. Akhigbe*,
642 F.3d 1078 (D.C. Cir. 2011) .......... 28, 33, 34, 35

*United States v. Ali*,
718 F.3d 929 (D.C. Cir. 2013) .......... 43

*United States v. Autuori*,
212 F.3d 105 (2d Cir. 2000) .......... 58

*United States v. Barrow*,
109 F.4th 521 (D.C. Cir. 2024) .......... 53

*United States v. Baugham*,
449 F.3d 167 (D.C. Cir. 2006) .......... 36

*United States v. Breedlove*,
204 F.3d 267 (D.C. Cir. 2000) .......... 42

*United States v. Butler*,
822 F.2d 1191 (D.C. Cir. 1987) .......... 34

*United States v. Clark*,
156 F.4th 664 (D.C. Cir. 2025) .......... 41

*United States v. Cross*,
766 F.3d 1 (D.C. Cir. 2013) .......... 36

*United States v. Crowder*,
543 F.2d 312 (D.C. Cir. 1976) .......... 29, 32, 36

*United States v. Gambler*,
662 F.2d 834 (D.C. Cir. 1981) .......... 34

*United States v. Glover*,
153 F.3d 749 (D.C. Cir. 1998) .......... 28

*United States v. Gooding*,
No. 23-3177, 2024 WL 2132055 (D.C. Cir. May 9, 2024) .......... 47

*United States v. Han*,
962 F.3d 568 (D.C. Cir. 2020) .......... 33, 36, 37

*United States v. Hurt*,
527 F.3d 1347 (D.C. Cir. 2008) .......... 28, 32, 33, 35

*United States v. Jackson*,
824 F.2d 21 (D.C. Cir. 1987) .......... 53

*United States v. Jesenik*,
152 F.4th 924 (9th Cir. 2025) .......... 57

*United States v. Kepler*,
74 F.4th 1292 (10th Cir. 2023) .......... 47

*United States v. Lemire*,
720 F.2d 1327 (D.C. Cir. 1983) .......... 36

*United States v. Logan,*
998 F.2d 1025 (D.C. Cir. 1993) .......... 41

*United States v. Maxwell*,
920 F.2d 1028 (D.C. Cir. 1990) .......... 54

*United States v. McCall*,
460 F.2d 952 (D.C. Cir. 1972) ........................................................ 43

*United States v. Mellen*,
393 F.3d 175 (D.C. Cir. 2004) ........................................................ 62

*United States v. Olano*,
507 U.S. 725 (1993) ........................................................ 42

*United States v. Parker*,
133 F.3d 322 (5th Cir. 1998) ........................................................ 53

*United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) ........................................................ 57

*United States v. Raper*,
676 F.2d 841 (D.C. Cir. 1982) ........................................................ 43

*United States v. Reid*,
533 F.2d 1255 (D.C. Cir. 1976) ........................................................ 55

*United States v. Reynoso*,
38 F.4th 1083 (D.C. Cir. 2022) ........................................................ 54

*United States v. Spinner*,
152 F.3d 950 (D.C. Cir. 1998) ........................................ 53, 56, 59

*United States v. Spriggs*,
102 F.3d 1245 (D.C. Cir. 1996), *as amended* (Feb. 20, 1997) ............. 41

*United States v. Stoddard*,
892 F.3d 1203 (D.C. Cir. 2018) ........................................................ 54

*United States v. Sun-Diamond Growers of Cal.*,
138 F.3d 961 (D.C. Cir. 1998), *aff'd*, 526 U.S. 398 (1999) ............ 52, 61

*United States v. Taylor*,
997 F.2d 1551 (D.C. Cir. 1993) ........................................................ 32

*United States v. Wahl*,
290 F.3d 370 (D.C. Cir. 2002) ............ 54

*United States v. Washington*,
106 F.3d 983 (D.C. Cir. 1997) ............ 43

*United States v. Williams*,
463 F.2d 958 (D.C. Cir. 1972) ............ 48

*United States v. Wilson*,
605 F.3d 985 (D.C. Cir. 2010) ............ 43

*United States v. Winstead*,
74 F.3d 1313 (D.C. Cir. 1996) ............ 60

*Universal Health Servs., Inc. v. United States*,
579 U.S. 176 (2016) ............ 57, 59

**Statutes**

18 U.S.C. § 1028A ............ 2

18 U.S.C. § 134 ............ 55

18 U.S.C. § 1343 ............ 2, 55

18 U.S.C. § 1519 ............ 2

18 U.S.C. § 2 ............ 39

18 U.S.C. § 3231 ............ 1

18 U.S.C. § 371 ............ 2, 3

18 U.S.C. § 641 ............ 2, 3

28 U.S.C. § 1291 ............ 1

D.C. Cir. R. 28 ............ i

Fed. R. Crim. P. 30 ............ 40

Fed. R. Crim. P. 52 .......... 41

**Other Authorities**

Criminal Jury Instructions for the District of Columbia,
Instruction No. 3.200 .......... 38, 45, 46

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| App. | Appellant's Appendix |
| Br. | Appellant's Opening Brief |
| Supp.App. | Government's Supplemental Appendix |
| DHS-OIG | Department of Homeland Security – Office of Inspector General |
| Postal-OIG | United States Postal Service – Office of Inspector General |
| Agriculture-OIG | United States Department of Agriculture – Office of Inspector General |
| EDS | Enforcement Data System |
| PARIS/STARS | Postal-OIG's case management system (origins of acronym unknown) |

## JURISDICTIONAL STATEMENT

Defendant-Appellant Murali Yamazula Venkata appeals from a final judgment of conviction in this criminal case. The district court (Moss, J.) had jurisdiction under 18 U.S.C. § 3231. The judgment was entered on February 9, 2024, App.455-62, and Venkata filed a timely notice of appeal on February 12, 2024, App.37. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

I. Whether the district court correctly declined to give Venkata's requested jury instruction on "apparent authority."

II. Whether, on plain-error review, the district court correctly instructed the jury on aiding and abetting.

III. Whether sufficient evidence supported the jury's findings that (a) the charged wire communication furthered the fraudulent scheme; (b) the scheme involved actionable misrepresentations; and (c) those misrepresentations were material.

## STATEMENT OF STATUTES AND REGULATIONS

Pertinent statutes and regulations are produced in the addendum to Venkata's opening brief.

## STATEMENT OF THE CASE

This case is about a scheme to steal proprietary government software systems and sensitive law-enforcement databases and to exploit them for commercial gain. Defendant-Appellant Murali Venkata, a software developer then-employed by the Department of Homeland Security – Office of Inspector General ("DHS-OIG"), deployed his technical expertise to further that scheme. When questioned about his actions, he lied to investigators and deleted relevant communications from his cell phone. For this conduct, a jury convicted Venkata of conspiracy, theft of government property, wire fraud, and destruction of records. This Court should affirm his convictions.

### I. Procedural history

A grand jury returned an indictment charging Venkata with one count of conspiracy to commit theft of government property and to defraud the United States, in violation of 18 U.S.C. § 371; one count of theft of government property, in violation of 18 U.S.C. § 641; one count of wire fraud, in violation of 18 U.S.C. § 1343; four counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A; and one count of destruction of records, in violation of 18 U.S.C. § 1519. App.44-64. The

district court dismissed three of the four counts of aggravated identity theft as multiplicitous. App.34, 1981.

Co-defendant Charles Kumar Edwards pleaded guilty to one count of conspiracy to commit theft of government property and to defraud the United States, in violation of 18 U.S.C. § 371; and one count of theft of government property, in violation of 18 U.S.C. § 641. Supp.App.1-23. A second co-conspirator, Sonal Patel, pleaded guilty to one count of conspiring to commit theft of government property, in violation of 18 U.S.C. § 371. Dkt. Nos. 4, 5, *United States v. Patel*, No. 1:19-cr-81 (D.D.C.).

Venkata proceeded to trial. The jury found Venkata guilty on all counts. App.22, 455-56. After trial, the district court granted the government's motion to dismiss the remaining aggravated identity theft count based on the Supreme Court's intervening decision in *Dubin v. United States*, 599 U.S. 110 (2023). App.33. The district court sentenced Venkata to four months' imprisonment, to be followed by two years of supervised release, of which the first eight months were to be served on home confinement. App.455-62.

## II. Statement of facts

Taken in the light most favorable to the government, the evidence at trial demonstrated as follows.

### A. The Offices of Inspector General and their case management systems

DHS-OIG is an independent law-enforcement agency within the Department of Homeland Security charged with protecting the Department from waste, fraud, and abuse. App.942. DHS-OIG investigates alleged misconduct, primarily criminal in nature, affecting the Department's programs. App.941-43, 1097. Similarly, the United States Postal Service – Office of Inspector General ("Postal-OIG"), is an independent law-enforcement agency that investigates waste, fraud, and abuse relating to the United States Postal Service. App.947-48.

To manage investigative and other data, these two offices used proprietary software programs known as case management systems. App.943, 948-49, 1908. DHS-OIG's case management system was called the Enforcement Data System ("EDS"). App.943. EDS housed the case files for DHS-OIG investigations, including operational details of past and ongoing investigations as well as names of and other information about subjects, victims, witnesses, and whistleblowers involved in each

investigation. App.943, 971. EDS also stored human resources data relating to approximately 246,000 Department of Homeland Security employees, including their names, addresses, social security numbers, and performance evaluations. App.943-44, 996-97, 1896.

EDS had two components. App.945-46. The back-end database stored DHS-OIG's investigative and human resources data. App.944-46, 1535-37. The front-end user interface allowed investigators and other users to input information into, and retrieve information from, the database. App.943-46, 1012, 1333-34.

DHS-OIG procured the original EDS source code at a cost of $2.3 million. App.965. It also employed, on average, four full-time employees dedicated to the system's maintenance and development. App.965-66. All told, the government invested over $5 million in the acquisition and development of EDS. App.971.

Because of EDS's sensitive nature, DHS-OIG strictly controlled access to it. App.944. The physical server was housed in a secure facility with access restricted to a limited number of individuals. App.944-45. DHS-OIG's network was separated from the broader Department of Homeland Security network and could be accessed only by authorized

personnel using a chip card and PIN. App.945. EDS users, such as special agents, were granted access via the front-end interface based on the needs of their jobs. *Id.* Access to the back-end database was restricted to individuals with administrator rights, and only developers such as Venkata could access the source code. App.945-56. When working with the code, developers used a specialized software program that allowed individuals with the appropriate rights and privileges to check out a portion of code, modify it, and then check it back in. App.969. This system allowed DHS-OIG to preserve the source code's integrity and maintain the system's availability to users. *Id.*

All employees, including Venkata, had to sign a computer access agreement for access to DHS-OIG technology. App.952-53; Supp.App.164. The agreement provided, among other things, that users may not remove DHS-OIG computer systems or software from government workspaces without express written permission, and may not use personal equipment to access DHS-OIG systems or information. App.954-56; Supp.App.164.

A system-specific end user agreement was also displayed to EDS users on a regular basis. App.958-60; Supp.App.165. Developers such as

Venkata had to view the agreement and click "I agree" every time they changed the code and restarted the server or placed new code on the server. App.960; Supp.App.165. That agreement informed the user that: "This Information system is provided for U.S. government authorized use only" and "[u]nauthorized or improper use or access of this system may result in disciplinary action, as well as civil and criminal penalties." Supp.App.165.

Postal-OIG also had a case management system consisting of a front-end user interface linked to a back-end database. App.949, 1333-34, 1815-16. Postal-OIG's user interface was known as PARIS and its database was known as STARS.[1] App.949. Like EDS, STARS housed both sensitive law-enforcement data generated during Postal-OIG's investigations and personnel data relating to Postal-OIG employees. App.949.

---

1 The record does not reflect what those acronyms stood for.

### B. Venkata, Edwards, and Patel scheme to develop a commercial case management system using stolen government software and sell that system back to the government

1. At the time of the offense conduct, Venkata worked at DHS-OIG's information technology department as a lead EDS developer. App.946. Branch Chief Sonal Patel supervised him. App.2121, 2141.

Venkata, Patel, and co-defendant Charles Edwards had previously worked together at Postal-OIG, where they developed PARIS and STARS. App.1019, 1099-1100, 2127. Unbeknownst to Venkata, Patel and Edwards were having an extramarital affair. App.1014, 2129. Patel and Venkata eventually followed Edwards to DHS-OIG, where Edwards became the Acting Inspector General, the most senior position within that Office. App.1006, 1020, 2128-29. Ultimately, Edwards left DHS-OIG amidst allegations that he misappropriated government resources for personal use and failed to disclose a conflict of interest involving his wife's employment. App.1007.

After Edwards left the government, he started a company called Delta Business Solutions. App.1009. He planned to build a "next generation" case management system and market it to Inspector General

Offices across the government. App.1011. Edwards engaged software developers in India to build his system. App.1044-45.

Edwards wanted to model the new system on DHS-OIG's and Postal-OIG's existing case management systems. App.1045. To that end, he decided to set up working versions of those government systems on his personal laptop and home servers to show to the Indian developers. App.1057, 1062, 1072. But Edwards, having left the government, no longer had access to EDS or PARIS/STARS, nor did he have the technical expertise to set up and run the software on his personal devices. App.1012-13.

For that, Edwards turned to Venkata and Patel, who were still employed at DHS-OIG. App.1012-13. Patel agreed to steal copies of the proprietary government software and databases for Edwards, and Venkata agreed to provide the technical expertise necessary to run them on Edwards' personal devices. App.1034-45. Venkata and Patel understood that Edwards' requests were in service of his commercial venture. App.1034-35, 2187-88. In discussions about the plan, Venkata remarked that if Edwards developed a commercially viable case management system, Edwards would make "millions." App.1034-35.

2. In fall 2015, Peter Paradis, the Deputy Assistant Inspector General for Investigations at the United States Department of Agriculture – Office of Inspector General ("Agriculture-OIG"), was tasked with acquiring a new case management system for his agency. App.1411, 1422-23. Having previously worked at DHS-OIG, Paradis was familiar with EDS and was acquainted with Edwards, Patel, and Venkata. App.1415-19, 1423. He reached out to Patel about acquiring that system, which he understood could be accomplished at no cost via an intra-governmental transfer. App.1423-25. Paradis was therefore taken aback when Patel suggested that Agriculture-OIG consider purchasing Edwards' competing case management system instead. App.1430-32. Paradis reported his concerns to his supervisor, then to DHS-OIG leadership. App.1433-35. DHS-OIG opened an investigation. App.1437.

At the direction of DHS-OIG investigators, Paradis arranged to meet Edwards and Patel to discuss Edwards' proposal. App.1448-49. Edwards and Patel had hoped to meet first with Venkata to get his input on the product, but Edwards had to cancel that meeting due to a family emergency. App.1030-31. On May 26, 2016, Edwards and Patel met with

Paradis for lunch in downtown Washington, DC. App.1448-49. At the investigators' direction, Paradis recorded that meeting. App.1449-54.

At the meeting, Edwards and Patel pitched Paradis on their "Next Gen" case management system. App.1449-52. They made numerous representations about its functions, development, and advantages over EDS. *See, e.g.*, App.477-78. They did not mention, however, that the new system would, in fact, be built using stolen copies of EDS and PARIS/STARS that Edwards planned to install on his personal computers. App.1463-64.

The day after the lunch meeting, Patel copied EDS in its entirety, including the databases and the source code, onto two compact discs and gave them to Edwards. App.1038-40. She also emailed instructions to Edwards on how to install EDS on a home server. App.1039.

The following Monday, which was Memorial Day, Edwards, Patel, and Venkata met at Patel's home. App.1042, 2185. They discussed the next steps for developing the new case management system and the latest market trends. App.1042-43, 2187. Patel and Venkata demonstrated some of EDS's latest features for Edwards. App.1042-43, 2186-87. For example, Paradis had expressed interest in eSubpoena, a

new module that generated administrative subpoenas based on user input. App.1042-43. Venkata, the lead developer on eSubpoena, showed Edwards how it functioned. *Id*. Venkata agreed to help Edwards set up the "mirror" version of EDS on Edwards' personal devices to show the developers in India. App.1045.

3. Later that summer, Edwards planned a trip to India to meet with the developers. App.1066. He wanted to install EDS on his laptop to bring on the trip, but his efforts failed because he was not familiar with the system's inner workings. App.1062, 1041. Edwards reached out to Patel, who enlisted Venkata's help to fix the problem. App.1059. Around July 12, 2016, Patel gave Edwards' laptop containing the stolen databases and source code to Venkata. App.1060.

Over the following days, Venkata configured Edwards' laptop to run the EDS system. App.1059-62. Subsequent forensic analysis showed that, while the laptop was in Venkata's possession, various portions of the EDS code and databases were installed, configured, and tested on the laptop. App.1538-51. On July 15, 2016, Venkata met Edwards at a jewelry store in Tysons Corner, Virginia, to hand over the laptop.

App.1058-60. When Edwards received the laptop back from Venkata, EDS was functional. App.1065.

The laptop proved to be too slow, however, so Edwards decided to set up EDS on his home server and grant the developers remote access to it. App.1071. Again, he needed Venkata's help. App.1070-73. On July 20, 2016, Edwards texted Venkata details for his home server so that Venkata could log in. App.1070-71; Supp.App.173. Over the next two weeks, Venkata configured EDS to run on Edwards' home server, working two weekends in a row so that the program would be functional before Edwards' trip to India. App.1075-88.

After Edwards returned from India, he continued to call and meet with Paradis. App.1500-01, 1506-07. In those discussions, Edwards updated Paradis on the progress of the new system and touted its advantages, but he never disclosed the theft underlying the entire enterprise. Supp.App.214-56.

4. In March 2017, Edwards again reached out to Venkata. App.1088. The first EDS server was running out of storage space, so Edwards asked Venkata to install EDS on a second server located in Edwards' home. App.1087-90; Supp.App.19 (admitted at trial as GX47).

Venkata instructed Edwards to copy the database from the first server to the second, then successfully configured the second server to run EDS. App.1090-91; Supp.App.178-80.

5. Later that month, Edwards messaged Venkata that he was trying to install Postal-OIG's PARIS system on a third server at his home so that he could show the PARIS audit module to the developers. App.1097-99; Supp.App.181. Edwards reported that he had imported all the data from STARS — Postal-OIG's database that housed its investigative and personnel data — but that the program was not working. App.1099-1100; Supp.App.181-82. Venkata made several attempts to fix the issue, but the server crashed. App.1100-05; Supp.App.182-86.

Edwards reached out to Patel and requested a new copy of PARIS/STARS that he had saved on DHS-OIG's server years earlier. App.1106, 1184-86. Patel copied this data onto two DVDs. *Id.* On the day Edwards wanted to pick up the DVDs, Patel planned to telework, so she left the DVDs inside a yellow envelope on Venkata's office chair for him to deliver to Edwards. App.2177-78.

On the morning of March 22, 2017, Edwards messaged Venkata that he would come to DHS-OIG's headquarters in Washington, DC, at 11:15am to pick up the DVDs. App.1105-07, 1834; Supp.App.184. Later, Edwards called Venkata to arrange the pickup. App.1138-39. When Edwards arrived at DHS-OIG's headquarters, Venkata came down to the curb and handed them over. App.1107, 1138. Edwards uploaded the data on the DVDs to his home server. App.1110.

Three days later, Edwards messaged Venkata that he had the PARIS server up and that everything worked except the investigations module. App.1110; Supp.App.184. Venkata initially had trouble logging in but eventually accessed the server. App.1111-16; Supp.App.185-91. The next day, Venkata messaged Edwards that he had fixed the issue with the investigations module. Supp.App.192. Venkata then helped Edwards access individual cases and timesheets stored within the STARS database via the PARIS system. Supp.App.192-93.

### C. Venkata lies to investigators and deletes relevant communications from his phone

On April 19, 2017, DHS-OIG investigators executed search warrants at Edwards' and Patel's homes. App.1833-34. Patel was placed

on leave. App.1719. Because Venkata was the next most senior developer, he was promoted to acting branch chief. App.1838-39.

The following day, the investigators conducted preliminary interviews of the information technology department's staff to determine whether anyone else was involved in the scheme. App.1833, 1838. At that time, they were unaware of Venkata's involvement. App.1838-39. The interviewing agent asked Venkata generally about his relationship with Edwards and his knowledge of Edwards' business. App.1723-24. Venkata denied having a close relationship with Edwards, claimed he had not heard of Edwards' business, and stated that he had never provided the EDS source code to anyone or been asked to do so. App.1724. He failed to disclose that he had helped Edwards configure EDS and PARIS/STARS on Edwards' personal laptop and home servers. App.1726-27.

On May 16, 2017, the investigators interviewed Venkata a second time. App.1834. By then, the investigators had a more detailed understanding of the scheme and had recovered communications implicating Venkata. App.1833, 1837. In the interview, Venkata claimed that he was not involved in developing a commercial platform with

Edwards and denied knowledge of EDS being removed from DHS-OIG servers. App.1837. He stated that it would be "unethical" to take government-owned information, and that he was not authorized to remove government development tools from DHS-OIG. App.1837-38.

In the same interview, Venkata admitted that Edwards had provided him with login credentials to access Edwards' PARIS server. App.1830. But he falsely claimed that he had never successfully logged in and that he did not know what it was for. App.1830, 1839. Venkata then provided a written, sworn statement admitting that Edwards had contacted him and that he had "[r]eceived login detail to login server" but falsely stated that he "did not try to login." App.1832; Supp.App.212.

During the interview, Venkata consented to the agent reviewing his cell phone. App.1843. The agent reviewed Venkata's text messages, email account, and call logs, but found no communications with Edwards or Patel. App.1845-49. Venkata acknowledged that he had deleted communications with Edwards after learning of the investigation in order to "distance himself" from Edwards and Patel. App.1845.

On May 31, 2017, investigators interviewed Venkata again. App.1851-52. Venkata then admitted that he had met with Edwards and

Patel outside DHS-OIG to discuss the development of a case management system. App.1851. He also admitted to sending Edwards a document related to EDS's eSubpoena module and to having Postal-OIG materials on his personal devices. App.1852. But he maintained that he was not involved in Edwards' and Patel's effort to develop a case management system. *Id.*

### D. The Offices of Inspector General incur remediation costs and operational and reputational harm as a result of the scheme

The scheme caused DHS-OIG and Postal-OIG significant financial, operational, and reputational harm. DHS-OIG was required by regulation to notify Congress, the public, and the individuals affected by the data breach. App.972. To mitigate the harm, DHS-OIG offered credit monitoring and protection services to the approximately 246,000 Department of Homeland Security employees whose personal information had been disclosed at a cost of over $400,000. App.975-79. DHS-OIG also hired an outside firm to perform a security assessment of EDS. App.1897-98.

The scheme also undermined DHS-OIG's ability to pursue its law-enforcement mission. The release of the identities of whistleblowers and

confidential sources exposed those individuals to danger and undermined trust in DHS-OIG. App.973, 994. Law-enforcement partners hesitated to work with DHS-OIG following the breach. App.994. And the disclosure of law-enforcement activities endangered law-enforcement officers and jeopardized ongoing investigations. App.973-75.

## SUMMARY OF ARGUMENT

I. The district court correctly rejected Venkata's proposed jury instruction on "apparent authority." No evidence supported Venkata's theory that he believed that DHS-OIG, acting through Patel, duly authorized his conduct. Venkata's suggestion that the jury could have inferred such belief from the bare fact that Patel was his supervisor is pure speculation, and Venkata points to no other relevant evidence supporting his theory. In any event, any error was harmless because the district court's instructions adequately conveyed the substance of Venkata's requested instruction in less-confusing terms and the evidence that Venkata understood that his conduct was unauthorized was overwhelming.

II. The district court's instructions regarding aiding and abetting were not plainly erroneous. The pattern instruction delivered by the

court correctly explained to the jury that aiding and abetting is an alternative theory on which it could convict Venkata for the completed offenses of theft of government property and wire fraud. In doing so, the court repeatedly referred to "the commission" of the underlying offense or the offense "being committed," making clear that such offense must have been committed by someone other than Venkata. Indeed, with respect to theft of government property, the district court instructed the jury that it must "unanimously agree that the crime *was completed* on or after March 5, 2015." App.2462 (emphasis added). Regardless, any error did not affect Venkata's substantial rights because Edwards' and Patel's commission of the underlying offenses was not in dispute.

III. Ample evidence supported Venkata's fraud-related convictions. First, Venkata's contention, raised for the first time on appeal, that the government presented insufficient evidence that the charged wire communication furthered the fraudulent scheme lacks merit. Edwards called Venkata to arrange to pick up two DVDs containing stolen copies of PARIS/STARS, which Venkata then helped Edwards install on his home servers to show the software developers in India. That call satisfied the statute's jurisdictional requirement.

Second, Venkata's claim that the government offered no evidence that Edwards was under a duty to disclose the theft of EDS or PARIS/STARS to Agriculture-OIG, also raised for the first time on appeal, likewise fails. No such evidence was necessary because a reasonable jury could find that Edwards' and Patel's misleading half-truths about the features and development of Edwards' "new" case management system constituted actionable misrepresentations.

Finally, the government introduced ample evidence that those misleading half-truths were material. Paradis testified that, had he known that Edwards' system was being built using stolen government property, he would never have contemplated purchasing it for Agriculture-OIG because of the associated legal and ethical risks. A reasonable jury could also infer from Paradis's testimony that Edwards' deception affected the value of the system because a product tainted by illegality is worth less than an untainted one.[2]

---

[2] None of Venkata's arguments apply to his conviction for destruction of records. His conviction on that count should therefore be affirmed.

## ARGUMENT

### I. The district court did not err in declining to give Venkata's proposed theory-of-defense instruction

Venkata contends that the district court erred in declining to give his proposed "apparent authority" instruction. Br.37-46. Because no evidence supported that instruction, the district court properly declined to give it. In any event, a new trial is not warranted because the instructions as delivered conveyed the substance of the requested instruction in less-confusing terms and because the uncontroverted evidence demonstrated that Venkata knew that his conduct was not authorized.

#### A. Background

Before trial, Venkata filed a notice, pursuant to Federal Rule of Criminal Procedure 12.3, that he intended to assert an affirmative defense that he acted "with public authority" from DHS-OIG and Patel. App.65. The government moved to preclude, arguing that such a defense was not available because Patel lacked the claimed authority. App.70-77. The Court granted that motion. App.605-06. In doing so, the court noted that Venkata remained free to argue that he lacked *mens rea* because he believed Patel had authorized his conduct but cautioned that

it was "skeptical . . . of the notion that there's actually an affirmative defense that I should instruct the jury about, and that I should instruct the jury that if you find that there was reasonable reliance on apparent authority, that that's sufficient." App.604.

Venkata filed proposed jury instructions after trial had begun, three weeks after the deadline had passed. App.15, 19. His proposed instructions included a lengthy theory-of-defense instruction that recited his view of the evidence and asserted that the government had failed to prove each of the charges. App.144-45. At the charging conference, the district court explained that Venkata's proposal was not a "proper theory of the case instruction" but gave him "another shot" to submit a proper instruction. App.2209-11. The court remarked that Venkata's reasonable but erroneous belief in Patel's authority was "the sort of thing" that "is appropriate for a theory of the defense instruction," App.2266, but expressed doubt that there was "any evidence that would support that," App.2265.

During the lunch break, Venkata submitted a second proposed theory-of-defense instruction concerning "apparent authority":

> Mr. Venkata contends that he did not possess the requisite state of mind because he engaged in the charged conduct

> based on his reasonable belief that he was acting pursuant to the apparent authority of Sonal Patel, regardless of whether or not she had the actual authority to sanction that conduct.

App.183. The government objected on the ground that this language conflated the distinct *mens rea* requirements for the various charges against Venkata and improperly suggested that the "apparent authority" theory would also apply to the destruction-of-records charge. App.2282. The court indicated that it would resolve this issue after closing arguments. App.2282-83.

After the government's closing, the court returned to the defense's "desire to have some instruction with respect to reasonable belief," asking defense counsel to clarify that she intended to argue in closing that Venkata "didn't have the relevant *mens rea*," as opposed to asserting an affirmative defense. App.2334-36. Defense counsel stated that she intended to argue that Venkata "does not have the requisite *mens rea* because of the apparent authority." App.2336.

Defense counsel then delivered her closing argument. App.2336-64. She referenced Patel's "authority" only once, in passing. App.2340. Instead, the crux of her argument was that Venkata did not know about the scheme at all. *See, e.g.*, App.2337 ("He was asked to do some technical

support work, was told nothing about the larger purpose, and he had no idea what was going on."); App.2338 ("Mr. Venkata was not involved in the scheme at issue here."); App.2343 ("There's just simply no other evidence that Mr. Venkata had any knowledge of the scheme, and Mr. Edwards's testimony is not credible."); App.2351 ("But none of that happened because Mr. Venkata had no idea what was going on.").

After the jury was excused, the court returned to the theory-of-defense instruction, explaining that it shared the government's concern that Venkata's revised instruction "conflates a lot of the legal standards." App.2380. Nonetheless, the court gave the defense "yet another shot at it." App.2381.

That evening, Venkata filed a third proposed theory-of-defense instruction:

> Mr. Venkata also contends that he did not possess the requisite state of mind because he engaged in the conduct related to Counts One, Two, Eleven and Twelve based on his reasonable belief that he was acting pursuant to the apparent authority of Sonal Patel, regardless of whether or not she had the actual authority to sanction that conduct.

App.186-87. The government objected that this sentence was confusing and misleading because it did not require the jury to consider the evidence pertaining to *mens rea* separately as to each count. App.188-89.

It also objected that there was no evidence supporting the proposed instruction. App.189.

The following morning, the court inquired what evidence supported Venkata's claimed belief in Patel's authority. App.2394. Defense counsel argued that Venkata's belief could be inferred from the fact that Patel was his "sole supervisor" within the "hierarchical structure of DHS-OIG." App.2398.

The court expressed skepticism that "a theory of the defense instruction is necessary or appropriate in this case," App.2422-23, but invited the parties' comments on the following language, which reflected defense counsel's argument:

> [Mr. Venkata] also contends that you can infer from the fact that Ms. Patel was his sole supervisor, that he believed he had the authority to do what he did, and that he therefore lacked the state of mind required to steal or knowingly convert government property.

App.2424. After hearing additional arguments from counsel, the court decided not to include this language. App.2432.

The court explained that "a lot of concepts . . . are getting mushed together here," but ultimately the only question before the jury is "whether Mr. Venkata had the requisite state of mind, or the requisite

*mens rea*." App.2436-37. Regardless of the labels "actual or apparent authority," it observed, the "question is just whether Mr. Venkata believed that he could do what he did, and whether he knowingly converted property." App.2437. And that is not "a legal concept that requires a separate instruction on the law for the jury, it just goes to *mens rea*." App.2438. Thus, the court did not find it appropriate to "pull[] out one piece of evidence – or one argument with respect to the evidence that goes to *mens rea* where I think that my instructions adequately and completely explain to the jury what the relevant *mens rea* requirements are." *Id.* Consistent with that explanation, the court instructed the jury that Venkata contended that he did not commit the charged offenses and that "he did not have the required state of mind for counts one, two and 11." App.2469.

After the jury rendered its verdict, Venkata moved for a new trial on the ground that the court should have instructed the jury on "apparent authority." App.296-301. The court denied that motion. App.447-53. First, it observed that Venkata's proposed instruction risked confusing the jury by using the "legally inapt" term "apparent authority," when all that Venkata sought to argue was that he lacked the required state of

mind. App.448-49. Second, it found a new trial unwarranted because the court's instructions on *mens rea* covered the same ground as Venkata's proposal, albeit without the confusing reference to "apparent authority." App.449-50. Finally, the court found that no instruction was necessary because there was insufficient evidence in the record from which a reasonable jury could have found for Venkata on his theory. App.452.

### B. Standard of review

This Court reviews the district court's failure to provide a requested theory-of-defense instruction *de novo*. *See United States v. Hurt*, 527 F.3d 1347, 1351 (D.C. Cir. 2008).

### C. No evidence supported Venkata's proposed "apparent authority" instruction

A defendant is entitled to a theory-of-defense instruction only "if the record contains 'sufficient evidence from which a reasonable jury could find' for the defendant on his theory." *United States v. Akhigbe*, 642 F.3d 1078, 1083 (D.C. Cir. 2011) (quoting *United States v. Glover*, 153 F.3d 749, 754 (D.C. Cir. 1998)). A court need not give an instruction that is "based on speculation without foundation in the evidence." *Belton v. United States*, 382 F.2d 150, 156 (D.C. Cir. 1967); *see also United States*

*v. Crowder*, 543 F.2d 312, 317-18 (D.C. Cir. 1976) (court need not give instruction supported only by "wisps of evidence" and "impermissible speculation").

Venkata's proposed "apparent authority" instruction was not warranted because the record contained no evidence that Venkata believed that Patel could or did duly authorize the scheme on behalf of DHS-OIG. The transfer of government-owned code and databases to a private party violated clear written rules that Venkata had expressly acknowledged. Supp.App.164-65. Patel had no ability to authorize a breach of those rules. App.2191. Nothing about her position as a middle manager in DHS-OIG's information technology department suggested such authority. App.1418, 2107. Nor was there any evidence that she held herself out as having such authority. App.2191-92.

To the contrary, three coworkers, including one called by the defense, testified that they well understood that supervisors could not authorize employees to take DHS-OIG-owned software for their own or another's use. App.1639-42, 1705-11, 2045-48. Venkata himself told a DHS-OIG investigator that "it would be unethical to take DHS information" and that "he was not allowed or authorized to take DHS

development tools from DHS-OIG." App.1837-38. And he obstructed DHS-OIG's investigation into his conduct, demonstrating his consciousness of guilt. App.1833-45.

Venkata argues, as he did below, that his belief in Patel's authority can be inferred from the fact that she was his sole supervisor. Br.39. But the fact that Patel gave Venkata his work assignments, validated his timecards, and completed his performance evaluations, App.2109-11, 2147-48, does not suggest that she was empowered to authorize transfer of a multi-million-dollar proprietary software system to a private party. Venkata's proposed inference is purely speculative.

Venkata's other arguments are either irrelevant or mischaracterize the record, or both. Venkata asserts that Patel's requests were "considered routine." Br.40. But the cited pages show only that another employee once sent Patel an EDS contingency planning document over DHS-OIG's email system. App.1699-1703; Supp.App.207-10. That employee considered that interaction "in the workplace" to be "normal." App.1703. But that says nothing about whether Venkata or anyone else believed it was "normal" to share government-owned source code and databases outside DHS-OIG.

Venkata further argues that Patel "ran a tight ship." Br.39-40. The cited pages contain a coworker's vague testimony that he was "afraid to say things at work" due to fear of "retaliation." App.2033-34. That testimony is not probative of whether Venkata believed Patel had duly authorized the offense conduct. And although Venkata highlights (Br.40) testimony that Patel sent him text messages largely between the hours of 8:00am and 5:30pm, App.1862, there was no evidence that Patel ever suggested to Venkata that his work for Edwards was part of his official duties, App.2189. Moreover, Venkata ignores other evidence that he met with Edwards and Patel on evenings and holidays off DHS-OIG's premises and worked on Edwards' project on weekends. App.1059, 1075-88, 2185.

Finally, Venkata cites Patel's testimony that she never had an "explicit" discussion with Venkata about the scheme's details. Br.40. This argument ignores extensive evidence that Venkata was well aware of the scheme, including his own text messages referencing the Indian programmers who were building Edwards' case management platform. App.1033-35, 1043-44, 2185-88; Supp.App.178, 189. In any event, if there were evidence that Venkata was not informed of the nature of the

scheme, that would tend to show that he lacked knowledge of the scheme, not that he thought Patel had authorized it. In sum, Venkata's proposed instruction asked the jury to infer his "apparent authority" theory "from various wisps of evidence." *Crowder*, 543 F.2d at 317. The court was not required to give it.

### D. The instructions as delivered adequately conveyed the substance of the requested instruction

Even if it was error to reject Venkata's "apparent authority" instruction, reversal is required only if the requested instruction "was not substantially covered in the charge actually delivered to the jury." *Hurt*, 527 F.3d at 1351 (quoting *United States v. Taylor*, 997 F.2d 1551, 1558 (D.C. Cir. 1993)). "Taking the instructions as a whole," the reviewing court "determine[s] whether the trial court adequately conveyed the substance of the requested instruction to the jury." *Id.*

The district court did so here. As to theft of government property, the court "stressed to the jury that theft of government property is a specific intent crime." *Hurt*, 527 F.3d at 1351. The court instructed the jury that, to be guilty of that offense, Venkata must have "stole[n] or knowingly converted property for his use or for the use of another," explaining that "[t]o steal means to take away from one in lawful

possession, *without right*, with the intention to keep *wrongfully*" and that "conversion requires the *unauthorized* exercise of control over property in such a manner that serious interference with ownership rights occurs." App.2459-60 (emphases added).

The court further instructed that Venkata must have "intended to deprive, *without right*, the owner of the use or benefit of the property." App.2460 (emphasis added). The court reiterated that "regardless of whether Mr. Venkata is an aider and abettor or a principal offender, the government must prove beyond a reasonable doubt that Mr. Venkata personally acted knowingly and *with the intent to deprive the owner of the use or benefit of the property*." App.2462 (emphasis added). These instructions "made abundantly clear that the jury must acquit" if it believed that Venkata thought his conduct was duly authorized. *Hurt*, 527 F.3d at 1352; *Akhigbe*, 642 F.3d at 1083-84; *United States v. Han*, 962 F.3d 568, 574 (D.C. Cir. 2020) (holding failure to give theory-of-defense instruction harmless where "there was no real risk of confusion about [the defendant's] theory of the case or its legal basis").

Similarly, the district court's wire fraud instructions explained that Venkata must have "acted with the specific intent to defraud," which it

defined as "a conscious knowing intent to deceive or cheat someone." App.2464. The court cautioned that regardless of whether Venkata acted as a principal or an aider and abettor, "the government must prove beyond a reasonable doubt that Mr. Venkata personally acted knowingly and with the intent to defraud." App.2466. And it defined "knowingly" to mean "that an act was done voluntarily and intentionally, and not because of ignorance, mistake or accident." App.2453. This Court has repeatedly held that, where the instructions required the jury to find specific intent to defraud, the failure to give a separate good-faith instruction is not reversible error. *See, e.g.*, *Akhigbe*, 642 F.3d at 1083-84; *United States v. Butler*, 822 F.2d 1191, 1197-98 (D.C. Cir. 1987); *United States v. Gambler*, 662 F.2d 834, 837 (D.C. Cir. 1981). The same reasoning applies here, where Venkata contends that his good-faith belief in Patel's authority negated his intent to defraud.

With respect to the conspiracy to commit theft of government property and to defraud the United States, the district court explained that Venkata must have "voluntarily and intentionally" joined the conspiracy "with the intent to advance or further the unlawful object of the conspiracy." App.2457. It cautioned that "unknowingly acting in a

way that helps the participants" would not suffice. *Id*. Thus, again, the court's instructions made clear that the jury could not convict if Venkata believed that Patel could and did authorize his conduct. *See Hurt*, 527 F.3d at 1352; *Akhigbe*, 642 F.3d at 1083-84.

Finally, the district court informed the jury that "Mr. Venkata contends that he did not have the required state of mind for counts one, two and 11." App.2469. And it explained how the jury was to evaluate that contention: "You should consider all the circumstances in evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt that the defendant acted with the necessary state of mind," which would include Patel's status as his supervisor. App.2454.

Having instructed the jury on the *mens rea* required for each charge, informed the jury that Venkata contended that he lacked that *mens rea*, and instructed the jury to evaluate that contention in light of all relevant evidence, the court was not required to "give special emphasis" to the sparse facts Venkata contended supported his "apparent authority" theory. *Laughlin v. United States*, 385 F.2d 287, 294 (D.C. Cir. 1967). That is particularly so because Venkata's proposed

instruction incorporated an undefined legal term, "apparent authority," that was likely to confuse the jury. *See Crowder*, 543 F.2d at 317 (district court properly rejected instruction that was "complicated and confusing on its face"). A new trial is not warranted.

### E. Any error was harmless in light of the overwhelming evidence that Venkata knew that his conduct was unauthorized

Finally, any error in declining to give Venkata's proposed "apparent authority" instruction was harmless. The failure to give a requested theory-of-defense instruction is reversible only if the defendant was prejudiced as a result. *See United States v. Cross*, 766 F.3d 1, 4 (D.C. Cir. 2013). An error is prejudicial if it "had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *United States v. Baugham*, 449 F.3d 167, 174 (D.C. Cir. 2006)) (internal quotation marks omitted). This determination is made "[i]n light of all the circumstances – the language of the instructions, the arguments of counsel, and the evidence itself." *Han*, 962 F.3d at 574 (quoting *United States v. Lemire*, 720 F.2d 1327, 1339 (D.C. Cir. 1983)). The "incredibility" of a defendant's theory "can provide a basis to find the failure to instruct harmless." *Id.* (internal quotation marks omitted).

Here, the government presented extensive and uncontroverted evidence that Venkata knew his conduct was unauthorized. That evidence included DHS-OIG's rules governing technology use, which Venkata signed or acknowledged, App.952-53, 960; Supp.App.164-65; the testimony of multiple DHS-OIG employees that is was widely understood that supervisors could not authorize the taking of DHS-OIG's property, App.1639-42, 1705-11, 2045-48; Venkata's own statements that that "it would be unethical to take DHS information" and that "he was not allowed or authorized to take DHS development tools from DHS-OIG," App.1837-38; and Venkata's false sworn statement that he never accessed Edwards' stolen copy of PARIS/STARS, App.1832; Supp.App.212. In light of this extensive evidence of Venkata's *mens rea* and the dearth of any contrary evidence, Venkata's "apparent authority" theory was "incredib[le]," *Han*, 962 F.3d at 574, and the court's failure to instruct on it did not prejudice Venkata.

## II. The district court correctly instructed the jury on aiding and abetting

Venkata contends, for the first time on appeal, that the district court's instructions on aiding and abetting theft of government property and wire fraud omitted an element of the offense, that the underlying

crime must have been committed by someone. Br.47-52. That claim, which is reviewable only for plain error, lacks merit.

### A. Background

The government requested that the court deliver Instruction No. 3.200 (Aiding and Abetting) from the Criminal Jury Instructions for the District of Columbia ("Redbook"). Supp.App.32. Venkata's proposed instruction, by contrast, initially listed the elements of the crime using Redbook Instruction No. 3.200:

> To find that a defendant aided and abetted in committing a crime, you must find beyond a reasonable doubt that:
>
> (1) Mr. Venkata knowingly associated himself with the commission of the crime;
>
> (2) Mr. Venkata participated in the crime as something he wished to bring about; and
>
> (3) Mr. Venkata intended by his actions to make it succeed.

App.135. Then, the proposed instruction listed the elements of the crime again, but in slightly different language taken from the Fifth Circuit's pattern jury instructions:

> (1) That the offense of theft of government property was committed by some person;
>
> (2) That the defendant associated with the criminal venture;
>
> (3) That the defendant purposefully participated in the

criminal venture; and

(4) That the defendant sought by action to make that venture successful.

App.136. The government objected that Venkata's proposed instruction was "confusing because it sets forth two different sets of elements that the jury must find in order to find defendant liable on an aiding and abetting theory" and reiterated its request that the court deliver the standard Redbook Instruction No. 3.200. App.153.

Venkata responded that he was "not opposed" to "deleting the elements of the offense set out in the standard Red Book Instruction 3.200, and proceeding using the elements set out in the Fifth Circuit's Pattern Instruction 2.04." App.165. He contended that the Fifth Circuit's reference to "'associat[ion] with the criminal venture'" was "more consistent with the evidence adduced at trial, as well as with the government's theory of Mr. Venkata's criminal liability." *Id.*

The district court's draft jury instructions included Redbook Instruction No. 3.200, as proposed by the government. Supp.App.79-80. At the charging conference, Venkata objected to this draft instruction only on the ground that the aiding and abetting statute, 18 U.S.C. § 2, was not specifically cited in the count of the indictment charging him

with wire fraud. App.2241-46.

After the charge conference, the court posted a revised set of draft jury instructions. Supp.App.101-60. The new draft retained Redbook Instruction No. 3.200 and added a special unanimity instruction requested by Venkata and a statute of limitations instruction requested by the government. Supp.App.139-40; App.2215, 2238. The following morning, the court asked if the parties had "any other comments or objections to anything that's in that version of the instructions." App.2392. Venkata did not object to the aiding and abetting instruction. App.2392-2440.

### B. Standard of review

Because Venkata raises his claim for the first time on appeal, it is reviewable only for plain error. Rule 30(b) provides that a party who objects to the jury instructions must inform the court of the "specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(b). Failure to do so "precludes appellate review, except as permitted under Rule 52(b)." *Id.* Rule 52(b), in turn, provides that "[a] plain error that affects substantial rights may be

considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b).

Thus, "[t]o preserve an objection to jury instructions, a defendant must raise the specific objection before the trial court." *United States v. Spriggs*, 102 F.3d 1245, 1259 (D.C. Cir. 1996) (per curiam), *as amended* (Feb. 20, 1997) (quoting *United States v. Logan,* 998 F.2d 1025, 1030 (D.C. Cir. 1993)). Where a defendant fails to object to the final instruction, the fact that he initially proposed a different instruction is not sufficient to preserve his objection for appellate review. *See United States v. Clark*, 156 F.4th 664, 675-76 (D.C. Cir. 2025).

Although Venkata initially proposed an aiding and abetting instruction that incorporated the Fifth Circuit's pattern instructions, he did not argue that Redbook Instruction No 3.200 fails to instruct the jury that the government must prove that the crime was committed by someone. Nor did he request that the district court include the supplemental bracketed language from Redbook Instruction No. 3.200 that he now contends (Br.49) is necessary to apprise the jury of that requirement. Venkata thus failed to "alert[] the trial court to the

substance of [his] point," *United States v. Breedlove*, 204 F.3d 267, 270 (D.C. Cir. 2000), and his claim is reviewable only for plain error.

To succeed under that standard, Venkata must show (1) "an error"; (2) that the error is "plain — that is to say, clear or obvious"; and (3) that the error "affected [his] substantial rights." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016). An error affects substantial rights if there is "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Rosales-Mireles v. United States*, 585 U.S. 129, 134-35 (2018) (internal quotation marks omitted). Even if those conditions are met, the Court should not exercise its discretion to correct the forfeited error unless the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993) (brackets and internal quotation marks omitted).

### C. The district court's aiding-and-abetting instructions were not erroneous, much less plainly so

Venkata cannot show that the district court's aiding-and-abetting instructions constituted plain error.

1. As Venkata observes (Br.47-48), for a defendant to be found guilty of aiding and abetting, the government must prove that someone

else committed the underlying offense. *See Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1063-64 (D.C. Cir. 2024); *United States v. Raper*, 676 F.2d 841, 849 (D.C. Cir. 1982). However, the principal need not be convicted for the aider and abettor to be held liable. *See United States v. McCall*, 460 F.2d 952, 955 n.13 (D.C. Cir. 1972); *Gray v. United States*, 260 F.2d 483, 484 (D.C. Cir. 1958) (per curiam). On appellate review, the question is whether, "taken as a whole," the district court's aiding-and-abetting instruction "accurately state[d] the governing law and provide[d] the jury with sufficient understanding of the issues and applicable standards." *United States v. Wilson*, 605 F.3d 985, 1018 (D.C. Cir. 2010) (per curiam) (quoting *United States v. Washington*, 106 F.3d 983, 1002 (D.C. Cir. 1997) (per curiam)).

The court's instructions did so here. After instructing the jury on the elements of theft of government property, the court explained that aiding and abetting is an alternative theory on which a defendant may be held liable for that offense. App.2461; *see also United States v. Ali*, 718 F.3d 929, 936 (D.C. Cir. 2013) ("Aiding and abetting is a theory of criminal liability, not a separate offense."). In the explanation that followed, the court incorporated its instructions on the elements of the

underlying offense by reference and repeatedly referred to "the commission" of that offense or the offense "being committed," making clear that the offense must have been completed. App.2461-62.

For example, the court explained that Venkata could be convicted of theft of government property regardless of whether he "was present while the crime *was being committed*," as anyone who "intentionally participates in *the commission* of a crime can be found guilty as an aider or abettor or as a principal offender." App.2461 (emphases added). It explained that Venkata must have "knowingly associated himself with *the commission* of the crime" and must have "participated in *the crime* [a]s something he wished to bring about." *Id.* (emphases added). It cautioned that Venkata's presence "at the place and time the crime *is committed*" is not by itself sufficient, but that the government need not prove that Venkata was "actually present while the crime *was committed*" or that "the crime *was committed* in the particular way planned or agreed upon." App.2462 (emphases added). The court instructed the jury to apply these same instructions to the wire fraud count. App.2466.

With respect to theft of government property, the court further instructed the jury that, to find Venkata guilty on an aiding and abetting theory, it "must unanimously agree on what property *was stolen or knowingly converted*" and "must also unanimously agree that the crime *was completed* on or after March 5, 2015," further confirming that the offense must actually have been committed. App.2462 (emphases added). In sum, the court's instructions made clear that aiding and abetting is an alternative theory on which the jury could convict Venkata of a crime that had been committed by someone else. It was not necessary for the court to list the commission of the underlying crime as a separate element of the offense.

Venkata nonetheless contends that the court should have further included the following bracketed supplemental language from Redbook Instruction No. 3.200:

> It is not necessary that all the people who committed the crime be caught or identified. It is sufficient if you find beyond a reasonable doubt that the crime was committed by someone and that the defendant knowingly and intentionally aided and abetted in committing the crime.

Br.49 (emphasis omitted). The Redbook comments explain that this bracketed instruction "should be given in cases in which the principal

offender is not on trial with the defendant." Redbook Instruction No. 3.200 comments. The comments cite *Murchison v. United States*, 486 A.2d 77, 81-82 (D.C. 1984), which in turn cites *Strickland v. United States*, 332 A.2d 746 (D.C. 1975), for the proposition that "there is no prerequisite that the principal perpetrator of the offense also be convicted." Redbook Instruction No. 3.200 comments.

Thus, the purpose of the bracketed instruction is to dispel any doubt that the aider and abettor may be convicted even if the principal is not. *See Gray*, 260 F.2d at 484. It does not add to the elements of the offense. To the contrary, the fact that this language appears as an optional supplement underscores that the basic instruction already requires the jury to "find beyond a reasonable doubt that the crime was committed by someone." Redbook Instruction No. 3.200.

The supplemental language was not necessary in this case because both principals, Edwards and Patel, pleaded guilty and testified at trial. There was therefore no danger that the jury would be confused as to whether it could convict Venkata as an aider and abettor even if the principals had not been "caught or identified." Redbook Instruction No.

3.200. The court did not err by failing to *sua sponte* deliver this supplemental instruction.

2. Even if the district court's instructions were erroneous, they were not clearly or obviously so for purposes of the second plain-error prong. The district court delivered the standard Redbook Instruction No. 3.200. Venkata fails to cite any case calling that pattern instruction's validity into question. *See United States v. Gooding*, No. 23-3177, 2024 WL 2132055, at *2 (D.C. Cir. May 9, 2024) (per curiam) (unpublished) (finding no plain error where court delivered pattern instruction that no court had found to be erroneous); *see also United States v. Kepler*, 74 F.4th 1292, 1313 (10th Cir. 2023) ("A court's use of language from our pattern jury instructions weighs against a finding of plain error."). Moreover, even if the instructions could have been clarified by listing the commission of the underlying crime as a separate element, that revision was not clearly or obviously necessary in light of the instruction's explanation that aiding and abetting is merely an alternative theory of liability for "the commission" of the underlying crime.

3. In any event, any error did not affect Venkata's substantial rights. Venkata suggests that failure to instruct on an element of the

offense automatically requires reversal. Br.50-51. That is incorrect. Venkata relies on two cases decided over 50 years ago holding that failure to instruct the jury on *any* of the elements of the crime is reversible error. *See United States v. Williams*, 463 F.2d 958, 962 (D.C. Cir. 1972); *Byrd v. United States*, 342 F.2d 939, 941 (D.C. Cir. 1965). But the Supreme Court has made clear that omission of a single element of the offense is not a structural error, and unpreserved errors of that nature are subject to ordinary plain-error review. *See Greer v. United States*, 593 U.S. 503, 513-14 (2021); *Neder v. United States*, 527 U.S. 1, 8-15 (1999).

Here, any error in failing to expressly delineate that element of aiding and abetting did not affect Venkata's substantial rights because Edwards' and Patel's commission of the underlying offenses was not seriously disputed at trial. In opening arguments, Venkata's counsel repeatedly asserted that Edwards and Patel were guilty. *See, e.g.*, App.929 ("[Edwards] decided to improve EDS by stealing it and then selling it back to the government."); App.936 ("[Venkata] didn't steal the data, Charles Edwards and Sonal Patel did."). Venkata's counsel repeated those assertions in closing. *See, e.g.*, App.2363 ("Mr. Edwards and Ms. Patel were the only ones who stole the [Postal]-OIG and DHS-

OIG case management systems and databases. . ."); App.2363-64 ("Mr. Edwards and Ms. Patel were, similarly, the only ones who tried to cheat Pete Paradis and the [Agriculture]-OIG into paying for their new system.").

The evidence confirmed those assertions. The jury heard that Edwards and Patel both pleaded guilty. App.1005, 2126-27. Edwards' Statement of Offense detailing his criminal conduct was admitted at trial. App.1303; Supp.App.14-23 (admitted at trial as GX47). Edwards also admitted on the stand to stealing DHS-OIG's and Postal-OIG's case management systems, App.1005; to using those systems to build a commercial case management system, App.1011-13; and to attempting to sell his new system to Agriculture-OIG without disclosing that he built it using stolen government software, App.1037. Edwards' admissions were corroborated by text messages, Supp.App.173-93; by covert recordings of his and Patel's interactions with Paradis, App.463-518; Supp.App.214-56; and by the forensic examinations of his personal laptop and home servers, App.1529-30, 1740-41. Likewise, Patel admitted her participation in the scheme, which was corroborated by documentary and forensic evidence. App.1530, 2167-68, 2172-75; Supp.App.194-207.

Thus, there is no reasonable probability that, had the court expressly instructed the jury that it must find that some principal committed the underlying crimes, the jury would have reached a different verdict on the theft of government property and wire fraud counts.

## III. Ample evidence supported Venkata's fraud convictions

Venkata challenges the sufficiency of the evidence supporting his convictions for conspiracy to defraud the United States and wire fraud on three grounds. Br.53-70. First, he contends that the evidence was insufficient to prove that the interstate wire furthered the fraud scheme. Second, he contends that the evidence was insufficient to prove the fraud schemes because Edwards had no duty to disclose his use of stolen government software to Agriculture-OIG. Third, he contends that the evidence was insufficient to prove that Edwards' misrepresentations or omissions were material to Agriculture-OIG. Those challenges should be rejected.

### A. Background

At the close of the government's case-in-chief, Venkata orally moved for a judgment of acquittal and the court reserved decision. App.1933-2000. After trial, Venkata renewed his motion in writing. App.254-90.

Venkata's oral and written motions made two arguments with respect to the fraud charges. First, Venkata argued that there was no evidence that the scheme contemplated economic harm to the intended victim, Agriculture-OIG. App.264-67, 1934-35. In passing, Venkata claimed that the government "failed to provide sufficient evidence that there was a material omission or misrepresentation with respect to the wire fraud." App.1934. Second, Venkata argued, with respect to wire fraud, that the evidence was insufficient to prove the interstate nature of the charged wire communication. App.267-68, 1933-34.

The district court denied Venkata's motion. The court noted that Venkata's argument that fraud requires an intent to cause economic harm to the victim "wades into a circuit split." App.399. It ruled that neither the plain language of the relevant statutes nor the applicable case law require that the scheme contemplated economic loss to the victim. App.401-02. The Supreme Court subsequently reached the same conclusion in *Kousisis v. United States*, 605 U.S. 114, 123 (2025) (rejecting an "economic-loss requirement" for wire fraud).

The court then reviewed the evidence and concluded that "the government presented sufficient evidence at trial to permit a reasonable

jury to find the requisite scheme to defraud." App.404. It noted that Paradis testified that Edwards' and Patel's misrepresentations and omissions "were not only material, but were of critical importance, to the proposed contract—both to the value of the proposed product and to whether [Agriculture]-OIG would have even contemplated entering into such a contract." App.405. A reasonable jury could have found, the court held, that had Edwards and Patel disclosed that the "new" system was being built using stolen copies of EDS and PARIS/STARS, "government procurement rules would have categorically barred the purchase and that, in any event, the tainted product would have been worth far less than a product developed without the benefit of stolen government property." App.409. The court further held that a reasonable jury could have found that concealing the theft from Agriculture-OIG "'expose[d] the [agency] to costly legal entanglements' apart from the value of the electronic management system itself." *Id.* (quoting *United States v. Sun-Diamond Growers of Cal.*, 138 F.3d 961, 972 (D.C. Cir. 1998), *aff'd*, 526 U.S. 398 (1999)).

As to the wire fraud statute's jurisdictional element, the court addressed only the issue raised by Venkata, the interstate nature of the

charged wire. It cited "ample direct and circumstantial evidence from which the jury could infer beyond a reasonable doubt that when the call occurred, Edwards was in Maryland and Venkata was not." App.417.

### B. Standard of review

Venkata raised specific objections to the sufficiency of the evidence in the district court, but failed to raise the first two claims he makes on appeal: (1) that the evidence was insufficient that the charged wire communication furthered the scheme to defraud, and (2) that Edwards was under no duty to disclose the theft of EDS and PARIS/STARS. Those claims are reviewable only for plain error. *See United States v. Barrow*, 109 F.4th 521, 526 (D.C. Cir. 2024).

"When reviewing a sufficiency-of-the-evidence challenge for plain error," this Court will "reverse only to prevent a 'manifest miscarriage of justice.'" *United States v. Spinner*, 152 F.3d 950, 956 (D.C. Cir. 1998) (quoting *United States v. Jackson*, 824 F.2d 21, 26 (D.C. Cir. 1987)). A miscarriage of justice "would exist 'only if the record is devoid of evidence pointing to guilt, or . . . because the evidence on a key element of the offense was so tenuous that a conviction would be shocking.'" *Id.* (quoting *United States v. Parker*, 133 F.3d 322, 328 (5th Cir. 1998)).

Venkata's third claim regarding materiality should be reviewed *de novo*. *See United States v. Stoddard*, 892 F.3d 1203, 1213 (D.C. Cir. 2018). Venkata passingly referenced materiality in his oral motion, App.1934-35, and the court reserved decision, App.2000. Although Venkata failed to renew that argument in his post-trial motion, App.264-67, the district court nonetheless addressed materiality in its opinion denying Venkata's motions. App.404-10. That issue was therefore preserved for this Court's review. *See United States v. Wahl*, 290 F.3d 370, 373-75 (D.C. Cir. 2002).

Even on *de novo* review, the Court's review is "highly deferential to the jury's decision." *United States v. Reynoso*, 38 F.4th 1083, 1089 (D.C. Cir. 2022). "A conviction should be reversed only where the evidence is such that, viewing it in the light most favorable to the government, a reasonable trier of fact could not have found guilt beyond a reasonable doubt." *United States v. Maxwell*, 920 F.2d 1028, 1035 (D.C. Cir. 1990).

### C. The government presented sufficient evidence that the interstate wire furthered the fraud scheme

Venkata first contends that the government presented insufficient evidence that the charged wire communication furthered the fraudulent

scheme. Br.54-59. Venkata cannot show any error, much less plain error.

The wire fraud statute criminalizes use of interstate wires "for the purpose of executing" a scheme to defraud. 18 U.S.C. § 1343. The interstate wire "need not be an essential element of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710 (1989) (interpreting 18 U.S.C. § 1341). Rather, it need only be "incident to an essential part of the scheme" or "a step in the plot." *Id.* (quoting *Badders v. United States*, 20 U.S. 391, 394 (1916)) (brackets omitted). This Court has explained that, because this requirement "serves only a jurisdictional purpose," it should be construed in a "relatively loose manner," and that a "relatively tenuous relationship to a federal instrumentality . . . may be sufficient to establish federal jurisdiction over the offense." *United States v. Reid*, 533 F.2d 1255, 1260 n.19 (D.C. Cir. 1976).

The evidence at trial demonstrated that, in March 2017, Edwards worked to set up PARIS/STARS on his home server to show the audit module to the software developers in India. App.1097-99. Edwards enlisted Venkata to help him with a technical problem, but the system crashed. App.1100-04; Supp.App.182-85. Edwards therefore asked Patel

to make a new copy of PARIS/STARS from the version saved on DHS-OIG's servers. App.1106.

Patel copied the system onto two DVDs, which she left for Venkata to deliver to Edwards. App.1105-06. On the morning of March 22, 2017, three days after Edwards messaged Venkata that the version of PARIS/STARS installed on his home server had crashed, Edwards called Venkata to "arrang[e] pickup of the discs." App.1138-39; Supp.App.184. Venkata then delivered the DVDs to Edwards outside DHS-OIG's headquarters, and Edwards installed them on his home server. App.1100, 1107, 1138. Shortly thereafter, Venkata configured PARIS/STARS on Edwards' home server so that Edwards could make it available to the programmers. App.1110-20. From this sequence, the jury reasonably inferred that the telephone call was "a step in the plot" of the fraudulent scheme. *Schmuck*, 489 U.S. at 711 (brackets and internal quotation marks omitted). Certainly, a holding to the contrary would not constitute a "manifest miscarriage of justice," *Spinner*, 152 F.3d at 956 (internal quotation marks omitted), as required to warrant reversal on plain error review.

### D. The government presented sufficient evidence that the conspirators committed fraud through misleading half-truths

Venkata next contends that the government failed to prove actionable fraud because it presented no evidence that Edwards was under a duty to disclose that his "new" case management system was being built using stolen government software and databases. Br.59-62. But no such evidence was necessary because, even in the absence of a duty to disclose, "half-truths — representations that state the truth only so far as it goes, while omitting critical qualifying information — can be actionable misrepresentations." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 (2016).

This rule applies when the omissions "render the defendant's representations misleading with respect to the goods or services provided." *Universal Health Servs., Inc.*, 579 U.S. at 187. Thus, "even partially true statements can be actionable fraud if intentionally misleading as to facts." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1128 (D.C. Cir. 2009) (per curiam); *see also United States v. Jesenik*, 152 F.4th 924, 938 (9th Cir. 2025) (holding that a fiduciary relationship "is not required in fraud cases premised on misrepresentations, including

half-truths"); *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000) (holding that defendant's "upbeat statements were misleading by their incompleteness"). "[T]he difference between a pure omission and a half-truth is the difference between a child not telling his parents he ate a whole cake and telling them he had dessert." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024).

Here, the evidence showed that Edwards and Patel repeatedly compared their "new" system to EDS. For example, they told Paradis that their new system was "the same thing" as EDS but "more modularized," Supp.App.170; that it would have the same "functionality" as EDS but that "user management and maintenance is easier in the long term," *id.*; that it was "[s]imilar in concept" to EDS, App.477; that Edwards' code was "not like DHS because DHS code is so . . . cobbled together, you would get lots of issues," Supp.App.215; and that Edwards was "not wanting to rebuild EDS" because he had "seen the flaws," App.478. They also made misleadingly incomplete claims about their development process, claiming, for example that Edwards took "a long time because [he] completely re-wrote investigations, hotline, admin, and subpoena," Supp.App.222; and that Edwards and his team "went through

and broke it apart, and each template we built back the way it's supposed to load," Supp.App.242.

Edwards and Patel thus told the truth "only so far as it goes," *Universal Health Servs., Inc.*, 579 U.S. at 188, touting their "new" platform's functional similarities to EDS, while "omitting critical qualifying information," *id.* — that it was being built using stolen copies of EDS and PARIS/STARS. A rational jury could find that those omissions were "misleading in context," *id.* at 189, as to the true nature of Edwards' software product. A conviction based on such a finding would not constitute a "manifest miscarriage of justice," *Spinner*, 152 F.3d at 956 (internal quotation marks omitted), and thus is not reversible on plain error review.

### E. The government presented sufficient evidence that the misleading half-truths were material

Finally, Venkata contends that the evidence was insufficient to prove that the misleading half-truths were material to the contemplated transaction. Br.62-70. A misrepresentation is material "if a reasonable person would attach importance to it in deciding how to proceed, or if the defendant knew (or should have known) that the recipient would likely deem it important." *Kousisis*, 605 U.S. at 131; *see also United States v.*

*Winstead*, 74 F.3d 1313, 1320 (D.C. Cir. 1996).[3] The record contained ample evidence from which a jury could conclude that the conspirators' deception was material.

Paradis testified that it would have "mattered to [him]" to know that "the new system had been built using software copied from case management systems used at DHS-OIG and USPS-OIG." App.1464. And he explained why: "[i]t would have been illegal, and it would have resulted in multiple procurement acquisition violations, ethics violations, conflict of interest, et cetera." App.1464. Had he known of those facts, Paradis explained, he would have immediately reported them to his supervisor "in order to make him aware of that, of the seriousness of it," and, presumably, proceeded no further with the acquisition of Edwards' product. App.1464-65. Paradis further testified that it would have "mattered to [him]" if he "knew the new system had been built using

---

[3] In *Kousisis*, the government argued that the test is whether the misrepresentation went to the "very essence of the parties' bargain." 605 U.S. at 131 (internal quotation marks omitted). The Court declined to decide which formulation applied because materiality was not contested. *Id.* at 131-32. Venkata's claim fails under either standard.

source code transferred to another country along with U.S. Government employees' personal information" for "the same reasons." App.1465.

This Court has recognized that "deceitful assurances of legality" can be material because they "expose the [victim] to costly legal entanglements." *Sun-Diamond Growers of Cal.*, 138 F.3d at 972; *see also Kousisis*, 605 U.S. at 162 (Sotomayor, J., concurring) (noting that defendant's concealment of noncompliance with legal requirements was material because it "would have exposed [the victim] to risk of serious legal consequences"). Just so here. The jury could reasonably conclude from Paradis's testimony that Edwards' theft of government software and databases was material to Agriculture-OIG because it would expose the agency to serious legal, ethical, and reputational risks.

Ignoring this testimony, Venkata focuses only on the next question posed to Paradis, whether knowledge that Edwards' system was "developed using stolen government property" would have affected the price he was willing to pay. Br.68-70. Paradis responded that it would, explaining that in his experience, "you pay a much reduced price on the dollar" when "purchasing stolen goods." App.1465. Thus, he "would not definitely pay full price for something if [he] knew it was stolen." *Id.*

Venkata contends that Paradis's testimony should be disregarded because, in his interpretation, Edwards' case management system was not literally "stolen goods." But a reasonable jury could understand the self-evident point underlying Paradis's metaphor — a product tainted by illegality is worth less than one that is not. And it could reasonably conclude that Edwards' use of stolen government software in the development of his competing platform was material for that additional reason.

Under either route, the government presented ample evidence of materiality.[4]

---

[4] Although Venkata asks the Court to reverse both his wire fraud and his conspiracy convictions for insufficiency of the evidence (Br.53-70), he provides no basis to reverse his conspiracy conviction. His arguments regarding the interstate wire transmission are not relevant to his conviction for conspiracy to defraud the United States. *See United States v. Mellen*, 393 F.3d 175, 180-81 (D.C. Cir. 2004) (listing elements of conspiracy to defraud the United States). And he does not challenge the sufficiency of the evidence supporting the theft-of-government-property object of the conspiracy. The jury found by its special verdict that Venkata conspired to commit that offense. Supp.App.161; *cf. Griffin v. United States*, 502 U.S. 46, 59 (1991) (holding that reversal of multi-object conspiracy conviction, following general jury verdict, is not warranted where sufficient evidence supports at least one object). Venkata's conspiracy conviction should therefore be affirmed.

## CONCLUSION

For these reasons, the Court should affirm the judgment.

Respectfully submitted,

JEANINE F. PIRRO
United States Attorney

CHRISELLEN R. KOLB
Appellate Chief
District of Columbia

A. TYSEN DUVA
Assistant Attorney General

JOSH A. GOLDFOOT
Deputy Assistant Attorney General

CELIA CHOY
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 535-7384
Celia.Choy@usdoj.gov

April 2, 2026

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d), the undersigned counsel of record certifies that the foregoing Brief for the United States was this day served upon counsel for appellant, by notice of electronic filing with the District of Columbia Circuit CM/ECF system.

DATED: APRIL 2, 2026

s/ Celia Choy
CELIA CHOY
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 535-7384
Celia.Choy@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 11,842 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Century Schoolbook 14-point font in text and Century Schoolbook 14-point font in footnotes.

3. This brief complies with the privacy redaction requirement of Fed R. App. P. 25(a)(5) because it contains no personal data identifiers.

4. The digital version electronically filed with the Court on this day is an exact copy of the written document to be sent to the Clerk; and

5. This brief has been scanned for viruses with the most recent version of McAfee Endpoint Security, version 10.7, which is continuously updated, and according to that program is free of viruses.

DATED: APRIL 2, 2026

s/ Celia Choy
CELIA CHOY
U.S. Department of Justice
Criminal Division, Appellate Section